# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| COMMON CAUSE, et al.,<br><br>                Plaintiffs,<br><br>     v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, et al.,<br><br>                Defendants. | No. 1:16-CV-1026 |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al.,<br><br>                Plaintiffs,<br><br>     v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, et al.,<br><br>                Defendants. | No. 1:16-CV-1164 |

Before WYNN, Circuit Judge, and OSTEEN, Chief District Judge, and BRITT, Senior District Judge.

## MEMORANDUM OPINION

PER CURIAM:

In these consolidated cases, two groups of Plaintiffs[1] allege that North Carolina's 2016 Congressional Redistricting Plan (the "Plan") constitutes an unconstitutional partisan gerrymander in violation of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and, in the case of the Common Cause Plaintiffs, Article I, Sections 2 and 4 of the Constitution. In particular, Plaintiffs allege that in drawing district lines, the Republican-controlled North Carolina General Assembly violated the Constitution by improperly relying on "political data"—data "reflect[ing] whether the people . . . had voted in favor of Democratic or Republican candidates for certain state-wide elections"—to draw districts intended to maximize the number of Republican members of North Carolina's congressional delegation. First Am. Compl. Declaratory J. & Inj. Relief, Doc. 12, ¶ 18, *Common Cause v. Rucho*, No. 1:16-cv-1026, Sept. 7, 2016 ("Common Cause Am. Compl.").

---

[1] The plaintiffs in 1:16-CV-1026 are Common Cause; the North Carolina Democratic Party; Larry D. Hall; Douglas Berger; Cheryl Lee Taft; Richard Taft; Alice L. Bordsen; William H. Freeman; Melzer A. Morgan, Jr.; Cynthia S. Boylan; Coy E. Brewer, Jr.; John Morrison McNeill; Robert Warren Wolf; Jones P. Byrd; John W. Gresham; and Russell G. Walker, Jr. (collectively, the "Common Cause Plaintiffs"). The plaintiffs in 1:16-CV-1164 are League of Women Voters of North Carolina; Elliott Feldman; Carol Faulkner Fox; Annette Love; Maria Palmer; Gunther Peck; Ersla Phelps; John Quinn, III; Aaron Sarver; Janie Smith Sumpter; Elizabeth Torres Evans; and Willis Williams (collectively, the "League Plaintiffs," and with the Common Cause Plaintiffs, "Plaintiffs").

Before the court are Defendants'[2] motions to dismiss the two actions under Federal Rule of Civil Procedure 12(b)(6).  In support of their motions, Defendants principally assert that (1) *Pope v. Blue*, 809 F. Supp. 392 (W.D.N.C. 1992), which the Supreme Court summarily affirmed, requires dismissal of Plaintiffs' actions and (2) the Supreme Court's splintered opinions regarding the justiciability of—and, to the extent such claims are justiciable, the legal framework for—partisan gerrymandering claims foreclose Plaintiffs' claims.  Defs.' Mem. Supp. Mot. Dismiss, Doc. 31, *League of Women Voters of North Carolina v. Rucho*, No. 1:16-cv-1164, Nov. 28, 2016 ("Defs.' League Br."); Defs.' Mem. Supp. Mot. Dismiss, Doc. 29, *Common Cause v. Rucho*, No. 1:16-cv-1026, Oct. 31, 2016 ("Defs.' Common Cause Br.").  Mindful that "courts should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel," *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (internal quotation marks omitted), we conclude that neither of these arguments supports dismissal at this juncture.

I.

---

[2] The defendants in both actions are Robert A. Rucho, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting; David R. Lewis, in his official capacity as Chairman of the North Carolina House of Representatives Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting; Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives; Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate; A. Grant Whitney, Jr., in his official capacity as Chairman and acting on behalf of the North Carolina State Board of Elections; the North Carolina State Board of Elections; and the State of North Carolina (collectively, "Defendants").

A.

We take Plaintiffs' factual allegations in their respective complaints as true. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). On February 5, 2016, a panel of three federal judges held that two districts established by North Carolina's 2011 decennial congressional redistricting plan constituted racial gerrymanders in violation of the Equal Protection Clause. *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016). To remedy this constitutional violation, and in deference to the state's legislative responsibilities, the *Harris* Court ordered the drawing of new congressional districts to be used in future elections. *Id.* at 627.

In accordance with the court's instruction, the leadership of the North Carolina General Assembly appointed a Joint Select Committee on Redistricting (the "Committee"), comprised of 25 Republican and 12 Democratic legislators, to draw a new congressional district plan. Am. Compl., Doc. 41, ¶ 42, *League of Women Voters of North Carolina v. Rucho*, No. 1:16-cv-1164, Feb. 10, 2017 ("League Am. Compl."). On February 16, 2016, the Committee debated a set of criteria to govern the drawing of the new districts. *Id.* ¶ 43. The proposed criteria included "Partisan Advantage," pursuant to which the Committee would "make reasonable efforts to construct districts in the [2016 plan] to maintain the current partisan makeup of North Carolina's congressional delegation," which, under the map held unconstitutional in *Harris*, included 10 Republicans and 3 Democrats. *Id.*; *see also id.*, Ex. A (Contingent Congressional Plan Committee Adopted Criteria). To achieve this result—and forestall claims of improper racial gerrymandering—the proposed criteria also would require the mapmakers to rely only on (1) population data and (2) "political

4

data"—"election results in statewide contests since January 1, 2008, not including the last two presidential contests." *Id.* ¶ 44.

In discussing the proposed redistricting criteria, the Republican legislators responsible for overseeing the drawing of the new plan openly acknowledged their partisan motivations. For instance, Defendant Lewis, one of the Committee's chairs, said he "propose[d] that [the Committee] draw the maps to give a partisan advantage to 10 Republicans and 3 Democrats because [he] d[id] not believe it[ would be] possible to draw a map with 11 Republicans and 2 Democrats." *Id.* ¶ 45 (quoting *id.*, Ex. B (Feb. 16, 2016 North Carolina General Assembly Joint Committee on Redistricting Transcript), at 50). And he further explained that "to the extent [we] are going to use political data in drawing this map, it is to gain partisan advantage." *Id.*, Ex. B, at 54. Defendant Lewis "acknowledge[d] freely that this would be a political gerrymander," which he maintained "is not against the law." *Id.*, Ex. B at 48.

That same day, the Committee adopted the proposed criteria by a party-line vote. *Id.* ¶ 47. The following day, February 17, 2016, Defendants Rucho and Lewis presented to the Committee the Plan, which had been drawn over the previous twenty-four hours to conform to the Committee's criteria. *Id.* ¶ 48. The Committee approved the Plan, again along party lines. *Id.* The North Carolina Senate and North Carolina House of Representatives approved the Plan on February 18 and February 19, respectively, in both cases by party-line votes. *Id.* ¶¶ 49–50.

The *Harris* plaintiffs filed objections to the Plan with the three-judge court. *Harris v. McCrory*, No. 1:13-cv-949, 2016 WL 3129213, at *1 (M.D.N.C. June 2, 2016). Among

5

those objections, the *Harris* plaintiffs asked the court to reject the Plan as an unconstitutional partisan gerrymander. *Id.* at \*2. Noting that the Supreme Court had not agreed to a framework for adjudicating partisan gerrymandering claims and that the "plaintiffs ha[d] not provided the Court with a 'suitable standard'" for evaluating such claims, the court rejected the partisan gerrymandering objection "as presented." *Id.* at \*3 (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015)). The court twice made clear, however, that its "denial of plaintiffs' objections *does not* constitute or imply an endorsement of, or foreclose any additional challenges to, the [Plan]." *Id.* at \*1, \*3 (emphasis added).

B.

The Common Cause Plaintiffs filed their complaint challenging the Plan on August 5, 2016. The individual plaintiffs in the Common Cause action reside in all thirteen of the congressional districts established by the Plan. Common Cause Am. Compl. ¶ 2. The League Plaintiffs, who reside in six of the thirteen congressional districts, filed their partisan gerrymandering action on September 22, 2016. League Am. Compl. ¶¶ 18–29. Collectively, the two groups of Plaintiffs allege that the Plan violates three constitutional provisions:

1. The Equal Protection Clause of the Fourteenth Amendment, by diluting the electoral strength of individuals who voted against Republican candidates, *id.* ¶¶ 69–80; Common Cause Am. Compl. ¶¶ 39–45;
2. The First Amendment, by burdening and retaliating against individuals who voted against Republican candidates on the basis of their political beliefs and association, League Am. Compl. ¶¶ 81–83; Common Cause Am. Compl. ¶¶ 25–38; and
3. Article I, Section 2, which provides that members of the House of Representatives will be chosen "by the People of the several States," by

6

usurping the right of the voters to select their preferred candidates for Congress, Common Cause Am. Compl. ¶¶ 46–49.

Regarding the Equal Protection claim, both groups of Plaintiffs allege that (1) the Plan was *intended* to favor Republican voters and discriminate against Democratic voters; (2) the Plan had the *effect* of making it more difficult for Democratic voters to elect the candidate of their choice, both within the ten districts drawn by the Committee to favor Republican candidates and statewide; and (3) Defendants cannot establish that the Plan's discriminatory effect is *justified* by any legitimate state interest, such as the State's underlying political geography. League Am. Compl. ¶¶ 72–80; Common Cause Am. Compl. ¶¶ 44–45.

To establish the intent prong, both complaints rely on the Republican control of the redistricting process, the Committee's redistricting criteria, and legislators' statements that they intended for the Plan to be a partisan gerrymander. League Am. Compl. ¶¶ 43–46; Common Cause Am. Compl. ¶¶ 12–18. Defendants do not dispute that, in adopting the Plan, the General Assembly intended to favor Republican voters and disadvantage voters who voted for non-Republican candidates.

The Common Cause Plaintiffs and League Plaintiffs make somewhat different allegations as to the second prong of their proposed test: discriminatory effects. The Common Cause Plaintiffs point to the alleged disparity between the percentage of registered voters for each major party and the number of seats the Plan's framers expected Republican candidates to win as evidence that the Plan is biased in favor of Republicans. Common Cause Am. Compl. ¶ 23. According to the Common Cause Plaintiffs, a

7

"statistical analysis of the 2016 Plan will confirm that the gerrymander . . . to perpetuate the 10-3 partisan advantage in favor of [Republicans] is intentional and is not the product of chance or the neutral application of legitimate redistricting principles." *Id.* ¶ 24.

The League Plaintiffs rely on a metric they term the "efficiency gap"—which they characterize as a measure of "partisan symmetry"—to argue that the Plan will have the effect of unduly discriminating against Democratic voters. League Am. Compl. ¶ 54. Partisan symmetry purports to "measure partisan bias by compar[ing] how both parties would fare hypothetically if they each (in turn) had received a given percentage of the vote." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 419 (2006) ("*LULAC*") (alteration in original) (internal quotation marks omitted).

According to the League Plaintiffs, the efficiency gap measures partisan asymmetry by comparing the difference between the number of "wasted" votes cast by voters of each party in a given election. *Id.* ¶¶ 55–57. Partisan gerrymandering involves a combination of "cracking" (dividing a disfavored party's supporters among a number of districts, such that the party's supporters fall short of a majority in any individual district) and "packing" (consolidating a disfavored party's supporters into a single district such that the party enjoys an overwhelming majority in that district). *Id.* ¶ 55. Cracking "wastes" votes cast for the disfavored party because such votes "are cast for losing candidates." *Id.* ¶ 56. Packing "wastes" the disfavored party's votes "to the extent they exceed the 50 percent-plus-one threshold for victory (in a two-candidate race)." *Id.* The League Plaintiffs posit that an efficiency gap reflecting that one party has significantly more wasted votes than the

8

other provides evidence that the redistricting plan has the effect of discriminating against the party receiving more wasted votes. *Id.* ¶¶ 55–57, 79.

On February 10, 2017, the League Plaintiffs amended their complaint to add factual allegations regarding the effects of the Plan in North Carolina's 2016 congressional election, the first election to use the districts established by the Plan. *Id.* ¶¶ 60–66. As the Plan's framers anticipated, Republican candidates won 10 of the 13 congressional districts established by the Plan. *Id.* According to the League Amended Complaint, the Plan produced an efficiency gap of 19 percent in the 2016 election, which is "in approximately the worst *4 percent* of the historical distribution, and the single worst score of all relevant congressional plans in the country in 2016." *Id.* ¶¶ 61–62 (emphasis in original). Given these results and the structural advantages enjoyed by Republicans under the Plan, "the Plan is virtually certain to exhibit a very large pro-Republican average efficiency gap over the period it is in effect," the League Plaintiffs allege. *Id.* ¶¶ 65–66.

The League Plaintiffs point to "partisan bias"—"the divergence in the share of seats that each party would win given the same share (typically 50 percent) of the statewide vote"—as additional evidence of the Plan's discriminatory effect. *Id.* ¶¶ 53, 63. According to the League Plaintiffs, in 2016, the Plan "produced a pro-Republican partisan bias of *27 percent*[,] . . . by far the worst in North Carolina's modern history and at the far edge of the nationwide distribution." *Id.* ¶ 63 (emphasis in original).

The Common Cause Plaintiffs and the League Plaintiffs rely on essentially the same factual allegations to support the third prong of their Equal Protection framework: the lack of a legitimate justification supporting the partisan gerrymander. In particular, both

9

complaints allege that numerous other maps could be drawn that comply with federal and state districting requirements but do not exhibit the same pro-Republican bias as the Plan. *Id.* ¶ 80; Common Cause Am. Compl. ¶¶ 36, 38, 45.

In addition to their claims under the Equal Protection Clause, both groups of Plaintiffs allege that the Plan violates the First Amendment by "burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." League Am. Compl. ¶ 82 (internal quotations marks omitted) (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring)); Common Cause Am. Compl. ¶ 30. In particular, Plaintiffs allege that, by using the "political data" to draw district lines that favored Republican voters, the Plan (1) was intended to penalize voters who supported Democratic candidates for their previous political expression (*i.e.*, voting for and associating with Democratic candidates); (2) had the effect of penalizing such voters; and (3) does not survive strict scrutiny because Defendants cannot establish a compelling state interest justifying burdening such voters' First Amendment rights. League Am. Compl. ¶¶ 82–83; Common Cause Am. Compl. ¶¶ 25–38.

Both complaints seek relief from the alleged constitutional violations under 42 U.S.C. § 1983, requesting declaratory and injunctive relief barring the state from administering elections under the Plan and requiring the General Assembly to draw new districts that comply with the Constitution. The Common Cause Plaintiffs further ask the court to declare that, by enacting a political gerrymander, the General Assembly exceeded its authority under Article I, Section 4 of the Constitution, which empowers states to

10

determine the "Times, Places and Manner of holding Elections."  Common Cause Compl. ¶¶ 50–54.

## II.

Defendants moved to dismiss both actions under Federal Rule of Civil Procedure 12(b)(6).  To survive Defendants' motions, Plaintiffs' factual allegations, taken as true, must "state a claim to relief that is plausible on its face."  *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 288 (4th Cir. 2012) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Under this standard, a complaint must include sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Although "the complaint must contain sufficient facts to state a claim that is plausible on its face, it nevertheless need only give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Wright*, 787 F.3d at 263 (internal quotation marks omitted).  In assessing whether a complaint sets forth a plausible claim to relief, courts "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *Du Pont*, 637 F.3d at 440 (internal quotation marks omitted).

To the extent a complaint asserts claims that "do not fall within the four corners of our prior case law, this does not justify dismissal under Rule 12(b)(6)."  *Wright*, 787 F.3d at 263 (internal quotation marks omitted).  On the contrary, "courts should 'be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability' is 'novel' and thus should be 'explored.'"  *Id.* (quoting 5B Charles Alan Wright & Arthur R.

11

Miller et al., *Federal Practice & Procedure* § 1357 (3d ed. 2015)). Accordingly, when—as here—a claim for relief relies on a novel legal theory, "plaintiffs should be given 'an opportunity to develop evidence before the merits are resolved.'" *Id.* (quoting *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004)).

III.

To address the specific grounds for dismissal raised by Defendants, it is first useful to provide some background on the Supreme Court's partisan gerrymandering jurisprudence. The Supreme Court has recognized, in several opinions, that partisan gerrymanders have the potential to run afoul of the Equal Protection Clause by diluting the ability for voters supporting disfavored political parties to elect candidates of their choice. *See, e.g.*, *Gaffney v. Cummings*, 412 U.S. 735, 751 (1973) ("A districting plan may create multimember districts perfectly acceptable under equal population standards, but invidiously discriminatory because they are employed to minimize or cancel out the voting strength of racial *or political* elements of the voting population." (emphasis added) (internal quotation marks omitted)). The Supreme Court, however, never squarely addressed a claim asserting that a redistricting plan unconstitutionally favored the supporters of one political party at the expense of supporters of another until *Davis v. Bandemer*, 478 U.S. 109 (1986).

In *Bandemer*, a group of Indiana Democrats sued Indiana state officials alleging that the State's decennial state legislative redistricting—which was enacted by a Republican-controlled legislature and approved by a Republican governor—violated the Equal Protection Clause by intentionally discriminating against Democrats, notwithstanding that

the plan satisfied the Equal Protection Clause's one-person, one-vote requirement. *Id.* at 113–15 (plurality opinion). In particular, the plaintiffs alleged that the legislature drew district lines that "packed" Democratic voters into certain districts and "cracked" Democratic voters in other districts in order to debase Democratic voting strength. *Id.* Beyond drawing favorable district lines, the legislature allegedly used multimember districts to further dilute the ability of Democratic voters to elect their preferred candidates. *Id.* at 114. In the 1982 election, the first election following the redistricting, Democratic candidates received 51.9 percent of the statewide vote but won only 43 of the 100 House seats. *Id.* at 115. In the Senate, Democratic candidates received 53.1 percent of the vote, and won 13 of the 25 seats up for election. *Id.*

A divided three-judge district court panel declared the apportionment plan unconstitutional, holding that the irregular shape of districts, the "peculiar" use of multimember districts, and the failure of district lines to adhere to political subdivisions and "communities of interest" evidenced an intent to favor Republican candidates. *Id.* at 116–17. The district court further held that the results of the 1982 election—the only election conducted under the challenged plan—demonstrated a discriminatory effect because the number of Democratic legislators did not reflect the proportion of votes Democratic candidates received. *Id.* at 117.

On direct appeal to the Supreme Court, defendants argued that Fourteenth Amendment partisan gerrymandering claims constitute nonjusticiable political questions under the test set forth in *Baker v. Carr*, 369 U.S. 186, 216 (1962). Six Justices held that partisan gerrymandering claims are not barred by the political question doctrine. *See*

13

*Bandemer* 478 U.S. at 123; *id.* at 165–66 (Powell, J., concurring). Writing for the Court, Justice White noted that the Court had previously concluded that "one person, one vote" and racial gerrymandering claims were justiciable, indicating that apportionment claims related to "issue[s] of fair representation" are justiciable. *Id.* at 123–25. The Supreme Court further stated that there was no reason to believe that the "standards . . . for adjudicating this political gerrymandering claim are less manageable than the standards that have been developed for racial gerrymandering claims." *Id.* at 125.

Although the *Bandemer* Court concluded that partisan gerrymandering claims are justiciable, the Court failed to agree on the proper test for adjudicating such claims under the Equal Protection Clause. Writing for a four-justice plurality, Justice White held that plaintiffs must prove "both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Id.* at 127 (plurality opinion). Regarding the effects element, the plurality stated that a plaintiff must prove that it "has been unconstitutionally denied its chance to effectively influence the political process" or that the "electoral system [has been] arranged in a manner that will consistently degrade a voter's or group of voters' influence on the political process as a whole." *Id.* at 132–33, 142–43. Because legislators are presumed to represent all of their constituents "even in a safe district where the losing group loses election after election . . . the mere lack of proportional representation will not be sufficient to prove unconstitutional discrimination." *Id.* at 132. Rather, a plaintiff must provide evidence "of continued frustration of the will to a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process." *Id.* at 133. Applying this test, the plurality concluded the

plaintiffs failed to meet their burden. *Id.* at 133–34. The plurality emphasized that, among other problems, the results of a single election were insufficient to demonstrate that Democrats would be relegated to minority status throughout the decade. *Id.*

In partial dissent, Justice Powell, joined by Justice Stevens, agreed that a prima facie claim of partisan gerrymandering requires proof of both discriminatory intent and discriminatory effects. *Id.* at 161 (Powell, J., dissenting). However, Justice Powell asserted that the plurality's effects test was overly burdensome. *Id.* In particular, Justice Powell posited that the plurality improperly required evidence from two elections; failed to consider factors such as the shapes of voting districts, adherence to political subdivisions, and the legislative process that led to adoption of the plan; and unreasonably required plaintiffs to show that their elected representatives were wholly unresponsive to their interests. *Id.* at 169–74. Considering the shapes of the enacted voting districts, adherence to political subdivisions, the legislative process, and the results of the first election conducted using the districts, Justice Powell concluded that the district court correctly held that plaintiffs satisfied their burden of demonstrating both that the challenged districting plan was adopted with discriminatory intent and that the districts had the effect of impermissibly diluting the electoral power of voters who preferred Democratic candidates. *Id.* at 175–84.

Although *Bandemer* recognized the justiciability of partisan gerrymandering claims, the plurality's test—which lower courts treated as controlling, *see, e.g.*, *Republican Party of N.C. v. Martin*, 980 F.2d 943, 955 n.22 (4th Cir. 1992)—proved virtually impossible for plaintiffs to satisfy, *Vieth*, 541 U.S. at 279–80 (plurality opinion) ("[I]n *all*

of the cases we are aware of involving that most common form of political gerrymandering[, the drawing of district lines], relief was denied."); Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, *The Law of Democracy* 783 (4th ed. 2012) ("*Bandemer* served almost exclusively as an invitation to litigation without much prospect of redress."); John Hart Ely, *Gerrymanders: The Good, the Bad, and the Ugly*, 50 Stan. L. Rev. 607, 621 (1998) ("[B]y its impossibly high proof requirements the Court in *Bandemer* essentially eliminated political gerrymandering as a meaningful cause of action, but only after it had essentially declared the practice unconstitutional."). Indeed, no court has held that a state or federal legislative redistricting plan constituted an unconstitutional partisan gerrymander under the *Bandemer* test.[3]

In *Vieth v. Jubelirer*, 541 U.S. 267 (2004), the Supreme Court revisited partisan gerrymandering for the first time since *Bandemer*. *Vieth* involved a decennial congressional redistricting in Pennsylvania. *Id.* at 272–73. The plaintiffs alleged that the

---

[3] *Martin* is the only case in which a court found that a complaint included adequate factual allegations to support a partisan gerrymandering claim under the plurality's test in *Bandemer*. 980 F.2d at 957–58. There, the Fourth Circuit held that the plaintiff, the Republican Party of North Carolina, stated a claim premised on North Carolina's longstanding practice of electing superior court judges through statewide elections, notwithstanding that the judges would serve only in a single judicial district. *Id.* According to the complaint, the statewide election system systematically prevented Republican candidates from being elected to superior court judgeships, as evidenced by the fact that only one Republican had been elected as a superior court judge in nearly 100 years, notwithstanding that a majority of voters in numerous judicial districts had voted for a Republican candidate. *Id.* at 948–49. In refusing to dismiss the claim, the court said that "[t]he confluence of the alleged facts, including the unique claim of a near century-long dearth of political diversity among superior court judges in North Carolina, and the certainty of a similar future, compels our holding," illustrating the high bar set by *Bandemer*. *Id.* at 958.

redistricting plan—which was enacted by a Republican-controlled legislature and approved by a Republican governor—intentionally disadvantaged Democrats, as punishment for pro-Democratic redistricting plans adopted in other states. *Id.* To that end, in drawing the districts—which had contorted shapes and did not adhere to political subdivisions or communities of interest—the legislature allegedly sought "maximum partisan advantage . . . to the exclusion of all other criteria." *Id.* at 340 (Stevens, J., dissenting) (internal quotation marks omitted). The plaintiffs proposed that a partisan gerrymander exhibits discriminatory effects, as a matter of law, when it prevents a majority of voters from being able to elect a majority of a congressional delegation. *Id.* at 308 (Kennedy, J., concurring).

Five justices voted to dismiss the action. Conceding "the incompatibility of severe partisan gerrymanders with democratic principles," *id.* at 292 (plurality opinion), a four-justice plurality nonetheless asserted that no judicially manageable standards exist to adjudicate partisan gerrymandering claims and therefore voted to reverse *Bandemer*'s holding of justiciability, *id.* at 281.

Concurring in the judgment, Justice Kennedy agreed that the particular claims asserted by the *Vieth* plaintiffs failed to articulate a manageable standard for assessing their Equal Protection claims. *Id.* at 306 (Kennedy, J., concurring). Unlike the plurality, however, Justice Kennedy refused to rule that partisan gerrymandering claims are nonjusticiable *per se*. *Id.* In reaching this conclusion, Justice Kennedy stated gerrymanders that intentionally disfavor voters who support a particular party would, in certain instances, violate the Constitution. *Id.* at 311–12, 314–15. And Justice Kennedy

17

criticized legislators who enact the partisan gerrymanders as lacking "decorum and restraint" and effectively "declaring that, when it comes to apportionment, '"We are in the business of rigging elections."'  *Id.* at 316–17 (quoting statement by North Carolina legislator in Hoeffel, *Six Incumbents Are a Week Away from Easy Election*, Winston–Salem Journal, Jan. 27, 1998, p. B1).

Notwithstanding his recognition that gerrymandering that unduly disfavors a particular party violates the Constitution, Justice Kennedy identified two hurdles to recognizing a framework for evaluating partisan gerrymandering claims under the Fourteenth Amendment: (1) "the lack of comprehensive and neutral principles for drawing electoral boundaries" and (2) "the absence of rules to limit and confine judicial intervention" in partisan gerrymandering.  *Id.* at 306–07.  As Justice Kennedy explained, both of these complications arise from difficulties in identifying and assessing the discriminatory effects of an alleged gerrymander.  The first concern deals with the difficulty in identifying a "fair" districting plan to use as a baseline against which to assess the effects of a partisan gerrymander.  *Id.* at 307.  The second concern deals with the need to establish the degree of deviation from the "fair" districting plan that would render a partisan gerrymander unconstitutional.  *Id.* at 307–08.

Regarding the latter concern, Justice Kennedy specifically rejected the plaintiffs' contention that the Constitution entitles a majority of voters in a State to elect the majority of the State's congressional representatives.  *Id.* at 308.  Justice Kennedy further stated that the *Bandemer* test failed to address either of these concerns, but suggested that lower courts may be able to develop a workable framework if they are (1) allowed to consider

18

alternatives to the *Bandemer* plurality's test and (2) able to take advantage of new technology and methods of analysis:

> [D]uring these past 18 years the lower courts could do no more than follow *Davis v. Bandemer*, which formulated a single, apparently insuperable standard. . . . [T]he rapid evolution of technologies in the apportionment field suggests yet unexplored possibilities. Computer assisted districting has become so routine and sophisticated that legislatures, experts, and courts can use databases to map electoral districts in a matter of hours, not months. Technology is both a threat and a promise. On the one hand, if courts refuse to entertain any claims of partisan gerrymandering, the temptation to use partisan favoritism in districting in an unconstitutional manner will grow. On the other hand, these new technologies may produce new methods of analysis that make more evident the precise nature of the burdens gerrymanders impose on the representational rights of voters and parties. That would facilitate court efforts to identify and remedy the burdens, with judicial intervention limited by derived standards.

*Id.* at 312–13 (citations omitted).

Justice Kennedy further suggested that the First Amendment, as opposed to the Fourteenth Amendment, may be the best vehicle for addressing the constitutionality of partisan gerrymanders because "these allegations involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." *Id.* at 314. "Under general First Amendment principles those burdens in other contexts are unconstitutional absent a compelling government interest," he said. *Id.* (citing *Elrod v. Burns*, 427 U.S. 347, 362 (1976) (plurality opinion)).

The four dissenting justices—whose views were set forth across three separate opinions—agreed with the plurality and Justice Kennedy that gerrymanders designed to disfavor a particular political party are antidemocratic and potentially violate the

Constitution. *See id.* at 325–26 (Stevens, J., dissenting) ("[P]olitical affiliation is not an appropriate standard for excluding voters from a congressional district."); *id.* at 343–44 (Souter, J., dissenting); *id.* at 361 (Breyer, J., dissenting) ("[P]olitical gerrymandering that so entrenches a minority party in power violates basic democratic norms and lacks countervailing justification."). Likewise, the four dissenting justices agreed with Justice Kennedy that partisan gerrymandering claims are not *per se* nonjusticiable. *Id.* at 317 (Stevens, J., dissenting) ("[F]ive Members of the Court . . . share the view that, even if these appellants are not entitled to prevail, it would be contrary to precedent and profoundly unwise to foreclose all judicial review of similar claims that might be advanced in the future.").

The dissenting justices, however, disagreed as to the proper test for evaluating partisan gerrymandering claims under the Fourteenth Amendment. Justice Stevens said such claims should proceed only on a district-by-district, as opposed to statewide, basis, and should be evaluated under the framework used for racial gerrymandering claims. *Id.* at 335–36 (Stevens, J., dissenting). Under this framework, a redistricting plan would violate the Equal Protection Clause if the consideration that "predominated" was partisanship and the legislature failed to identify any rational, nonpartisan basis justifying the district lines drawn. *Id.* at 338–39. Justice Souter, joined by Justice Ginsburg, likewise proposed that partisan gerrymandering claims should, at least initially, proceed on a district-by-district, as opposed to statewide, basis. *Id.* at 345–50 (Souter, J., dissenting). Contrary to the standard proposed by Justice Stevens, Justice Souter suggested that such claims proceed under the burden-shifting framework used for evaluating Title VII

discrimination claims.  *Id.*  Finally, Justice Breyer suggested that partisan gerrymandering amounts to a structural problem, and therefore that such claims should be evaluated on a statewide basis.  *Id.* at 362 (Breyer, J., dissenting).  According to Justice Breyer, a partisan gerrymander would violate the Fourteenth Amendment when it leads to "unjustified entrenchment"—"a situation in which a party that enjoys only minority support among the populace has nonetheless contrived to take, and hold, legislative power" and that that "hold on power is purely the result of partisan manipulation and not other factors."  *Id.* at 360.

Taken together, then, the splintered opinions in *Bandemer* and *Vieth* stand for, at a minimum, the following: (1) Fourteenth Amendment partisan gerrymandering claims are justiciable; (2) in order to establish a partisan gerrymandering claim under the Equal Protection Clause, a plaintiff must show both (a) discriminatory intent and (b) discriminatory effects; and (3) the effects test proposed by the *Bandemer* plurality is unworkable, and, therefore, no longer controlling.  *Accord Whitford v. Gill*, -- F. Supp. 3d --, No. 15–cv–421–bbc, 2016 WL 6837229, at *30 (W.D. Wis. Nov. 21, 2016). Furthermore, given *Vieth*'s abrogation of *Bandemer*'s discriminatory effects test, the Supreme Court has failed to provide lower courts with guidance as to the proper standard for assessing whether an alleged partisan gerrymander produces discriminatory effects. With this background in mind, we now turn to the specific arguments raised in Defendants' motions to dismiss.

## IV.

Although Plaintiffs' complaints rely on somewhat different legal theories, Defendants make the same two principal arguments in support of each of their motions to

21

dismiss.  First, Defendants argue that *Pope v. Blue*, 809 F. Supp. 392 (W.D.N.C. 1992), which the Supreme Court summarily affirmed, rejected factually indistinguishable First and Fourteenth Amendment partisan gerrymandering claims and, therefore, requires dismissal of Plaintiffs' actions.  Second, Defendants maintain that Plaintiffs' claims are foreclosed by the Supreme Court's fractured opinions in *Vieth*.  For the reasons stated below, and mindful of the greater latitude we must afford at the pleading stage to parties, like Plaintiffs, who assert novel theories of liability, we conclude that neither of these arguments supports dismissal of Plaintiffs' claims at this early stage.

## A.

In *Pope*, several dozen North Carolina voters, most of whom were Republican, challenged the state's 1991 congressional redistricting plan as an unconstitutional partisan gerrymander, in violation of the Equal Protection Clause, the First Amendment, and Article I, Section 2 of the Constitution.  809 F. Supp. at 394–95, 397–98.  The plaintiffs alleged that Democratic majorities in the state legislature "prevented Republicans from having any influence in the redistricting process" and that the Plan included "contorted" and "serpentine" districts that did not reflect political subdivisions.  *Id.* at 394–96.

Applying the test set forth by the plurality in *Bandemer*, a divided three-judge panel held that the plaintiffs failed to state a claim.  *Id.* at 396.  In particular, the majority held that the plaintiffs failed to satisfy the discriminatory effects prong of the test because the plaintiffs did not allege Republicans had been "shut out of the political process;" that "Republicans in the Democratic majority districts [were] precluded from influencing the actions of their Congressmen;" or that "anyone ha[d] ever interfered with Republican

22

registration, organizing, voting, fund-raising, or campaigning." *Id.* at 397 (internal quotation marks omitted). The majority also emphasized that the *Bandemer* plurality "held that the results of a single election were insufficient to establish a discriminatory effect," but that the plaintiffs could not put forward results of "even . . . a single election to corroborate [their] allegations of disproportionate representation." *Id.* at 396–97. Likewise, the majority held that the plaintiffs' First Amendment freedom of association claim was "coextensive" with the Equal Protection claim, and therefore failed for the same reasons. *Id.* at 398.

Defendants assert that "all of the allegations made by [P]laintiffs in this case track the allegations by the *Pope* plaintiffs, except that, unlike the *Pope* plaintiffs, [Plaintiffs] do not allege that the [Plan] fails to follow traditional redistricting principles," and therefore that *Pope* "is binding authority on this Court because it was summarily affirmed by the Supreme Court." Defs.' League Mem. Supp. Mot. Dismiss at 7; *see also* Defs.' Common Cause Mem. Supp. Mot. Dismiss at 7. We disagree.

The allegations in the present case do not "track" those in *Pope* because unlike *Pope*—in which the plaintiffs did *not* put forward *any* election results to support their claims—Plaintiffs allege that the results of the 2016 elections (1) reveal that the Plan already has had discriminatory effects and (2) indicate that those effects will persist. League Am. Compl. ¶¶ 60–66. More significantly, the *Pope* majority dismissed the action because it concluded that the plaintiffs had not satisfied their heavy burden under the test for discriminatory effects set forth by the *Bandemer* plurality. 809 F. Supp. at 397. As explained above, however, the Supreme Court unanimously abandoned the *Bandemer* test

23

in *Vieth*. *See supra* Part III; *Whitford*, 2016 WL 6837229, at \*30 ("In *Vieth*, however, the members of the Court were unanimous only in their willingness to jettison the test set forth in *Bandemer*. We conclude, therefore, that the *specific test* for political gerrymandering set forth in *Bandemer* no longer is good law."). Because *Pope* relied on the *Bandemer* plurality's now-abrogated effects test, *Pope* does not bind this Court and, therefore, does not serve as a basis for dismissing Plaintiffs' actions. *Cf. Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011) (holding that a panel decision is not binding on later panels if "a subsequent Supreme Court decision specifically rejected the reasoning on which [the prior decision] was based" (alteration in original) (internal quotation marks omitted)).

## B.

### 1.

Regarding *Vieth*, Defendants first argue that Plaintiffs' claims are not "justiciable because they are based upon the same allegations made by the *Vieth* plaintiffs, *i.e.*, that the [Plan] would result in the election of Republican candidates at a level that is disproportionate with the number of Republican voters," and five Justices found that such allegations did not state a justiciable claim. Defs.' League Mem. Supp. Mot. Dismiss at 12; Defs.' Common Cause Mem. Supp. Mot. Dismiss at 11. Defendants are again mistaken.

First, regarding Plaintiffs' First Amendment claims, Justice Kennedy, who provided the decisive fifth vote in favor of dismissing *Vieth*, expressly suggested that the well-established structure for analyzing claims that a governmental defendant unconstitutionally burdened or penalized a plaintiff for exercising her First Amendment rights could offer a

24

viable framework for adjudicating partisan gerrymandering claims. *Vieth*, 541 U.S. at 315 (Kennedy, J., concurring). And the Supreme Court recently held that Justice Kennedy's proposed First Amendment framework, which Plaintiffs adopt in their respective complaints, was "uncontradicted by the majority in any of [the Court's] cases," including *Vieth*. *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015). Accordingly, nothing in the Court's splintered opinions in *Vieth* rendered nonjusticiable Plaintiffs' First Amendment claims. *Accord Shapiro v. McManus*, -- F. Supp. 3d --, No. 1:13-cv-03233, 2016 WL 4445320, at \*10–11 (D. Md. Aug. 24, 2016) (concluding that partisan gerrymandering claims are justiciable under the First Amendment "[b]ecause there is no redistricting exception to th[e] well-established First Amendment . . . principle that the government may not penalize citizens because of how they have exercised their First Amendment rights").

Second, *Vieth* does not render nonjusticiable Plaintiffs' Equal Protection claims. *See LULAC*, 548 U.S. at 414 (stating that, in *Vieth*, a majority of Justices declined to reverse *Bandemer*'s holding that partisan gerrymandering claims are justiciable). On the contrary, Justice Kennedy voted to dismiss *Vieth* because the plaintiffs' proposed standard for establishing whether a gerrymander had a discriminatory effect—"that a majority of voters in the [state] should be able to elect a majority of the [state's] congressional delegation"— lacked a constitutional basis, not because partisan gerrymandering claims are nonjusticiable *in all instances*. *Vieth*, 541 U.S. at 308 (Kennedy, J., concurring). Plaintiffs do not rely on the discriminatory effects standard rejected in *Vieth*, and, therefore, *Vieth* does not render the present actions nonjusticiable.

25

Additionally, in rejecting the *Vieth* plaintiffs' discriminatory effects standard, Justice Kennedy expressed hope that the advent of new technology would bring forward judicially discernible and manageable standards for adjudicating partisan gerrymandering claims under the Equal Protection Clause or First Amendment. *Id.* at 312–13. By relieving lower courts of the obligation to apply the *Bandemer* plurality's discriminatory effects test, *Vieth* thus opened the door for lower courts to "search for a judicially manageable standard" for evaluating such claims, such as the standards and statistical methods proposed by Plaintiffs. *See Whitford v. Nichol*, 151 F. Supp. 3d 918, 924, 927 (W.D. Wis. 2015) ("Thus far, the Supreme Court has not identified a standard for reviewing a partisan gerrymandering claim, but it has left open the possibility that an appropriate standard may be found."); *see also Shapiro*, 2016 WL 4445320, at *8 ("Taken together, the combined effect of *Bandemer*, *Vieth*, and *LULAC* is that, while political gerrymandering claims premised on the *Equal Protection Clause* remain justiciable in theory, it is presently unclear whether an adequate standard to assess such claims will emerge.").

### 2.

Defendants next argue that even if *Vieth* did not render Plaintiffs' Equal Protection claims nonjusticiable, Plaintiffs' allegations fail to state a claim under the Equal Protection Clause[4] when measured against the various standards for evaluating the discriminatory

---

[4] Defendants do not argue that, to the extent partisan gerrymandering claims are justiciable under the First Amendment, Plaintiffs fail to adequately allege such a claim. Accordingly, our discussion of the sufficiency of Plaintiffs' pleadings is limited to their Equal Protection claim.

26

effects of an alleged partisan gerrymander proposed and rejected by the splintered *Vieth* opinions. Again, we disagree.

To begin, Defendants do not dispute that, to state a partisan gerrymandering claim under the Equal Protection Clause, a plaintiff must allege discriminatory intent and discriminatory effects—nor could they, given that a majority of the *Bandemer* Court embraced that general framework and *Vieth* did nothing to undermine it. *Bandemer*, 478 U.S. at 127 (plurality opinion); *id.* at 161 (Powell, J., dissenting in part). And Defendants do not dispute that Plaintiffs adequately allege that, in enacting the Plan, the General Assembly intended to discriminate against voters who supported Democratic candidates. Accordingly, Defendants challenge the sufficiency of Plaintiffs' allegations only regarding the discriminatory effects of the Plan.

As to those alleged effects, we note that "the plaintiffs in *Bandemer*, *Vieth* and *LULAC* did not rely on partisan symmetry"—the discriminatory effects test proposed by the League Plaintiffs—"in their arguments before the Court and the Court did not reject partisan symmetry as a tool in determining whether partisan gerrymandering is unconstitutional." *Whitford*, 151 F. Supp. 3d at 930. To the contrary, several Justices have stated that partisan symmetry has promise for measuring the discriminatory effects of a partisan gerrymander and structuring a remedy. *See, e.g.*, *LULAC*, 548 U.S. at 465–66 (Stevens, J. dissenting in part) ("[T]he symmetry standard, a measure social scientists use to assess partisan bias . . . is undoubtedly a reliable standard for measuring a burden . . . on the complainants' representative rights." (internal quotation marks omitted)). Because (1) the Supreme Court's abrogation of *Bandemer*'s discriminatory effects test obliges lower

27

courts to "search for" new judicially discernible and manageable tests for evaluating political gerrymandering claims, *Whitford*, 151 F. Supp. 3d at 924, 927, and (2) the use of measures of partisan symmetry to assess discriminatory effects is "uncontradicted by the majority in any of [the Supreme Court's partisan gerrymandering] cases," *Shapiro*, 136 S. Ct. at 456, Plaintiffs have satisfied their pleading-stage burden to allege that the Plan had the effect of discriminating against disfavored voters.

Defendants nonetheless argue that Plaintiffs fail to state a claim under the partisan gerrymandering frameworks proposed by Justice Stevens, Justice Souter, and Justice Breyer in their dissents in *Vieth*.  But, in *Vieth*, a majority of the Court *rejected those tests*.  *See Vieth*, 541 U.S. at 292–301 (plurality opinion); *id.* at 308 (Kennedy, J., concurring).  Accordingly, Plaintiffs cannot be faulted for failing to satisfy them.[5]

IV.

In rejecting Defendants' arguments, we do not minimize the obstacles Plaintiffs must overcome to prevail—challenges evident in the Supreme Court's inability to agree, to date, on a framework for demonstrating the discriminatory effects of a purported partisan

---

[5] Defendants state, in a single sentence, that the League Plaintiffs lack standing to challenge all 13 congressional districts created by the Plan on grounds that none of the League Plaintiffs reside in 7 of those 13 districts.  Defs.' Mem. Supp. Mot. Dismiss at 13.  Defendants fail to cite any decision holding that a plaintiff has standing to challenge as an unconstitutional partisan gerrymander *only* that electoral district in which he resides, nor have we found any such decision.  On the contrary, the only court that appears to have squarely addressed standing in partisan gerrymandering cases held that partisan gerrymandering claims are analogous to "one person, one vote" claims and, therefore, that an individual plaintiff has standing to challenge a statewide districting map as a partisan gerrymander.  *Whitford*, 2016 WL 6837229, at *67–70 (citing *Baker*, 369 U.S. at 207–08).  Given that Defendants did not fully develop the standing argument in their brief, we decline to address it at this juncture.

gerrymander.  But the Supreme Court's declaration that "[p]artisan gerrymanders . . . are incompatible with democratic principles," *Ariz. State Legislature*, 135 S. Ct. at 2658 (alteration in original) (internal quotation marks omitted), and the need for courts to "err on the side of caution" in adjudicating claims "[w]here important rights are involved," such as "[a]llegations of unconstitutional bias in apportionment," *Vieth*, 541 U.S. at 311 (Kennedy, J., concurring), require that we afford Plaintiffs an opportunity to develop evidence establishing the viability of their proposed—and "uncontradicted"— discriminatory effects test.  Accordingly, Defendants' motions to dismiss is denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 3, 2017

/s/ James A. Wynn, Jr.
Hon. James A. Wynn, Jr.
United States Circuit Judge


/s/ William L. Osteen, Jr.
Hon. William L. Osteen, Jr.
Chief United States District Judge


/s/ W. Earl Britt
Hon. W. Earl Britt
Senior United States District Judge