| | |
|---|---|
| COMMON CAUSE, *et al.*,<br><br>PLAINTIFFS,<br><br>v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, *et al.*,<br><br>DEFENDANTS. | CIVIL ACTION<br>NO. 1:16-CV-1026-WO-JEP<br><br>THREE-JUDGE COURT |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, *et al.,*<br><br>PLAINTIFFS,<br><br>v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting, *et al.,*<br><br>DEFENDANTS. | CIVIL ACTION<br>NO. 1:16-CV-1164-WO-JEP<br><br>THREE JUDGE PANEL |

## LEAGUE OF WOMEN VOTERS PLAINTIFFS' TRIAL BRIEF

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................... 1

FACTS ........................................................................................................... 4

I. The 2016 Plan Was Enacted with Discriminatory Intent. ................................ 5

 A. The 2016 Plan's Predecessor Was Enacted with Discriminatory
  Intent. ................................................................................ 5

 B. The Architects of the 2016 Plan Openly Admitted Their Discriminatory
  Intent. ................................................................................ 6

II. The 2016 Plan Has Exhibited a Large and Durable Partisan Asymmetry............. 9

 A. The 2016 Plan Was the Single Most Asymmetric Map in the Country
  in the 2016 Election. ............................................................ 9

 B. The 2016 Plan's Asymmetry Is Nearly Certain to Endure for the Rest
  of the Decade. .................................................................... 12

III. The 2016 Plan's Large and Durable Partisan Asymmetry Cannot
 Be Justified. ........................................................................ 13

ARGUMENT ............................................................................ 15

I. The Test's Discriminatory Intent Prong Is Discernible, Manageable, and
 Satisfied Here. ...................................................................... 17

 A. The Prong Is Rooted in the Supreme Court's First and Fourteenth
  Amendment Precedents. ...................................................... 17

 B. Plaintiffs Do Not Need to Prove that Partisan Considerations
  Predominated. ................................................................... 19

II. The Test's Discriminatory Effect Prong Is Discernible, Manageable, and
 Satisfied Here...................................................................... 20

 A. The Prong Is Based on Partisan Asymmetry, the Concept Identified
  as Promising by the *LULAC* Court. ........................................ 20

 B. Plaintiffs Do Not Need to Prove Noncompliance with Traditional
  Redistricting Criteria Nor Is Their Test a Requirement of Proportional
  Representation. .................................................................. 23

III. The Test's Justification Prong Is Discernible, Manageable, and
 Satisfied Here...................................................................... 28

Case 1:16-cv-01026-WO-JEP Document 64 Filed 06/05/17 Page 2 of 43

A.    The Prong Is Drawn from the Supreme Court's Reapportionment
      Cases. ................................................................................................ 28

B.    Defendants' Potential Justifications for the 2016 Plan's Partisan
      Asymmetry Are Contradicted by the Evidence. ......................................... 29

CONCLUSION ................................................................................................ 34

Case 1:16-cv-01026-WO-JEP   Document 64   Filed 06/05/17   Page 3 of 43

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abrams v. Johnson*,
521 U.S. 74 (1997)............................................................................32

*Ariz. State Legis. v. Ariz. Indep. Redist. Comm'n*,
135 S. Ct. 2652 (2015) ........................................................................4

*Bethune-Hill v. Va. State Bd. of Elections*,
137 S. Ct. 788 (2017)........................................................................25

*Brown v. Thomson*,
462 U.S. 835, 843 (1983)................................................................3, 25

*City of Greensboro v. Guilford Cnty. Bd. of Elections*,
2017 U.S. Dist. LEXIS 50253 (M.D.N.C. Apr. 3, 2017) ...........................19

*Connor v. Finch*,
431 U.S. 407 (1977)..........................................................................22

*Cooper v. Harris*,
___ S. Ct. ___, 2017 WL 2216930 (May 22, 2017) ..........................5, 31, 32

*Cox v. Larios*,
542 U.S. 947 (2004)......................................................................19, 33

*Davis v. Bandemer*,
478 U.S. 109 (1986)....................................................................*passim*

*Gaffney v. Cummings*,
412 U.S. 735 (1973) .........................................................................24

*Growe v. Emison*,
 507 U.S. 25 (1993) ..........................................................................16

*Harris v. Indep. Redist. Comm'n*,
136 S. Ct. 1301 (2016) ......................................................................19

*Harris v. McCrory*,
159 F. Supp. 3d 600 (M.D.N.C. 2016) ...............................................5, 6, 31

iv

**Cases**                                                        **Page(s)**

*Larios v. Perdue*,
306 F. Supp. 2d 1190 (N.D. Ga. 2003) ........................................17

*LULAC v. Perry*,
548 U.S. at 399 (2006) ...............................................*passim*

*Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*,
827 F.3d 333 (4th Cir. 2016) ................................................ 19, 29

*Reynolds v. Sims*,
377 U.S. 533 (1964) ................................................. 4, 16

*United States v. Carolene Prods. Co.*,
304 U.S. 144 (1938) ........................................................17

*Vieth v. Jubelirer*,
541 U.S. 267 (2004) ...............................................*passim*

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v.*
*OpenBand at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013) ...........................................18

*Warth v. Seldin*,
422 U.S. 490 (1975) .......................................................17

*Washington v. Davis*,
426 U.S. 229 (1976).........................................................2

*Whitford v. Gill*,
218 F. Supp. 3d 837 (W.D. Wis. 2016); ........................... 10, 12, 17

*Whitford v. Nichol*,
151 F. Supp. 3d 918, 929 (W.D. Wis. 2015) ..............................25

**Other Authorities**                                            **Page(s)**

Jowei Chen & David Cottrell,
*Evaluating Partisan Gains from Congressional Gerrymandering: Using*
*Computer Simulations to Estimate the Effect of Gerrymandering in the U.S.*
*House*, 44 Electoral Stud. 329 (2016)...........................................15

Case 1:16-cv-01026-WO-JEP   Document 64   Filed 06/05/17   Page 5 of 43

## Other Authorities

Page(s)

Andrew Gelman & Gary King,
*Enhancing Democracy Through Legislative Redistricting*, 88 Am. Pol. Sci. Rev. 541 (1994) ...........................................................................................27

Bernard Grofman & Gary King,
*The Future of Partisan Symmetry as a Judicial Test for Partisan Gerrymandering After* LULAC v. Perry, 6 Election L.J. 2 (2007) .........................*passim*

Gary C. Jacobson, *It's Nothing Personal: The Decline of the Incumbency Advantage in U.S. House Elections*, 77 J. Pol. 861 (2015) .......................34

Michael D. McDonald & Robin E. Best,
*Unfair Partisan Gerrymanders in Politics and Law: A Diagnostic Applied to Six Cases*, 14 Election L.J. 312 (2015) ........................9, 11, 26

Richard G. Niemi & Simon Jackman,
*Bias and Responsiveness in State Legislative Districting*, 16 Legis. Stud. Q. 183 (1991).........................................................................27

Carlos A. Sanchez-Martinez & Kenneth W. Shotts,
*Assessing Robustness of Findings About Racial Redistricting's Effect on Southern House Delegations*, 6 Stat., Pol. & Pol'y 97 (2015) .......................32

Nicholas O. Stephanopoulos & Eric M. McGhee,
*Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015) .........................................................................9

Ebonya Washington,
*Do Majority-Black Districts Limit Blacks' Representation? The Case of the 1990 Redistricting*, 55 J.L. & Econ. 251 (2012) .................................32

# INTRODUCTION

Most gerrymanderers try to conceal their pursuit of partisan advantage. But not the architects of the North Carolina congressional plan adopted in February 2016 (the "2016 Plan"). Their official criteria baldly declared that "[t]he partisan makeup of the congressional delegation under the enacted plan [shall be] 10 Republicans and 3 Democrats." Proposed Finding of Fact ("PFOF") ¶37. One of the co-chairs of the 2016 Joint Select Committee on Congressional Redistricting (the "Joint Committee"), Representative David Lewis, added at a Joint Committee meeting, "I acknowledge freely that this would be a political gerrymander." PFOF ¶69.

Most congressional district maps are also reasonably symmetric in their treatment of the two major parties. PFOFs ¶¶152-53. But not the 2016 Plan. In the 2016 election, Republican candidates won ten out of thirteen seats even though the statewide vote was nearly tied. PFOF ¶189. As a result, the Plan exhibited the largest partisan asymmetry of any congressional map in the country examined by plaintiffs' expert. PFOF ¶185. Moreover, this extraordinary asymmetry is virtually certain to endure for the rest of the decade. Only if the statewide vote swings by at least nine points in a Democratic direction—producing the best Democratic showing in more than thirty years—will the Plan's pro-Republican bias dissipate. PFOFs ¶¶194-95.

In certain states too, district maps' large asymmetries can be justified by neutral factors such as political geography or compliance with traditional redistricting criteria. But not in North Carolina. When thousands of congressional plans are simulated, all

1

using exactly the same criteria as those adopted by the Joint Committee (with the exception of "Partisan Advantage"), not one of them is as asymmetric as the 2016 Plan. PFOFs ¶¶199-200. Indeed, the modal simulated plan slightly favors *Democrats*, indicating that, if anything, North Carolina's spatial patterns and redistricting principles would yield a pro-Democratic tilt if they were followed without a partisan motivation. PFOF ¶201.

The evidence that League of Women Voters plaintiffs[1] will present at trial will establish all of these points. The evidence will thus demonstrate that plaintiffs' proposed test for partisan gerrymandering is "judicially discernible and manageable," *Vieth v. Jubelirer*, 541 U.S. 267, 281 (2004) (plurality opinion), and satisfied by the 2016 Plan.

Plaintiffs' test has three prongs. The first is whether a district plan was enacted with *discriminatory intent*, that is, in order to engage in "intentional discrimination against an identifiable political group." *Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality opinion). This prong is discernible because it follows from the "basic equal protection principle that the invidious quality of a law . . . must ultimately be traced to a . . . discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 240 (1976). The prong is manageable because courts for decades have had little trouble distinguishing between maps with partisan motives (usually designed by a single party with unified control over redistricting) and maps without such aims (usually crafted by a court, a commission, or divided government). And there is no doubt that the prong is satisfied here; as this Court

---

[1] Throughout this memorandum, "plaintiffs" refers to the League of Women Voters of North Carolina and the individual plaintiffs in No. 16-cv-1164.

2

has noted, "Defendants do not dispute that, in adopting the Plan, the General Assembly intended to favor Republican voters and disadvantage voters who voted for non-Republican candidates." Mot. to Dismiss Op. ("MTD Op.") (Dkt. 50) at 7.

The second prong of plaintiffs' test is *discriminatory effect*, or whether a district map has exhibited a partisan asymmetry that is both large and durable. This prong is discernible because, as this Court has observed, "several Justices have stated that partisan symmetry has promise for measuring the discriminatory effects of a partisan gerrymander." *Id.* at 27; *see also, e.g.*, *LULAC v. Perry*, 548 U.S. at 399, 420 (2006) (opinion of Kennedy, J.) (not "discounting [symmetry's] utility in redistricting planning and litigation"). The prong is manageable because there exist reliable and widely accepted techniques for measuring both the asymmetry of a plan and how likely it is to persist for the remainder of a plan's lifetime. And the prong is plainly satisfied here, where the 2016 Plan was the single most asymmetric congressional map in America in the 2016 election, with a pro-Republican skew that even defendants' expert admits will endure under almost any electoral scenario. PFOFs ¶¶183, 194-95.

The third and final prong of plaintiffs' test is *justification*, or whether a district plan's large and durable asymmetry can be "justified by the State" based on its political geography or legitimate redistricting objectives. *Brown v. Thomson*, 462 U.S. 835, 843 (1983). This prong is discernible because it is drawn verbatim from the Supreme Court's reapportionment cases, where it balances population equality (rather than partisan symmetry) against both feasibility and other valid goals. The prong is manageable

3

because courts have used it for half a century to separate maps whose population deviations are justified by legitimate factors from maps whose malapportionment cannot be properly explained. And the prong is indisputably satisfied here, where the 2016 Plan's asymmetry is entirely outside the distribution of simulated maps created pursuant to North Carolina's own spatial patterns and (non-partisan) redistricting criteria.

After hearing the evidence and the submissions of counsel, the Court should therefore hold that the 2016 Plan is an unconstitutional partisan gerrymander that violates the First and Fourteenth Amendments. Judicial intervention is required here because the Plan is "'incompatible with democratic principles,'" *Ariz. State Legis. v. Ariz. Indep. Redist. Comm'n*, 135 S. Ct. 2652, 2658 (2015) (alteration omitted), and prevents North Carolina's congressional delegation from being "collectively responsive to the popular will," *Reynolds v. Sims*, 377 U.S. 533, 565 (1964). Democracy requires legislative representation that reflects the will of the electorate. Under the Plan, North Carolina's congressional delegation does not reflect, but rather flouts, voters' views. This is a grievous injustice that only the Court can remedy.

## FACTS

Under plaintiffs' proposed test, evidence on three issues is relevant to the constitutionality of the 2016 Plan: (1) whether the Plan was enacted with discriminatory intent; (2) whether the Plan has exhibited a large and durable partisan asymmetry; and (3) whether the Plan's large and durable asymmetry can be justified by any neutral factor. Plaintiffs summarize below the facts they will present at trial as to each of these issues.

4

Plaintiffs include additional factual information *infra* where they address defendants' likely counterarguments.

## I.    The 2016 Plan Was Enacted with Discriminatory Intent.

### A.    The 2016 Plan's Predecessor Was Enacted with Discriminatory Intent.

Beginning with discriminatory intent, it is necessary to discuss first the 2016 Plan's predecessor: the congressional plan adopted in July 2011 (the "2011 Plan"). The Supreme Court recently affirmed a trial court decision striking down two of the 2011 Plan's districts as unconstitutional *racial* gerrymanders. *See Cooper v. Harris*, ___ S. Ct. ___, 2017 WL 2216930 (May 22, 2017). Indeed, the Court held that "the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Id.* at *15 n.7. But defendants in the *Harris* litigation repeatedly stated—and plaintiffs here do not dispute—that the 2011 Plan as a whole was motivated by the pursuit of partisan advantage.

For example, the co-chairs of the 2011 Joint Committee, Lewis and Senator Bob Rucho, wrote in an official letter that "we have not been ignorant of the partisan impacts of the districts we have created." PFOF ¶29. More explicitly, Dr. Thomas Hofeller, the "'principal architect'" of the 2011 Plan, *Harris v. McCrory*, 159 F. Supp. 3d 600, 607 (M.D.N.C. 2016), declared in his expert report in *Harris* that "[p]olitics was the primary policy determinant in the drafting of the . . . Plan." PFOF ¶31. Hofeller added that "[t]he General Assembly's overarching goal in 2011 was to create as many safe [or] competitive districts for Republican incumbents or potential candidates as possible."

5

PFOF ¶32. He averred as well that "[t]he Republicans' primary goal was to create as many districts as possible in which GOP candidates would be able to successfully compete for office." PFOF ¶33.

In light of these comments (and many others like them), Judge Cogburn concurred with the trial court's racial gerrymandering ruling, but wrote separately "to express [his] concerns about how unfettered [partisan] gerrymandering is negatively impacting our republican form of government." *Harris*, 159 F. Supp. at 628 (Cogburn, J., concurring). "Elections should be decided through a contest of issues, not skillful mapmaking," he observed. *Id.* District maps like the 2011 Plan are thus "in disharmony with fundamental values upon which this country was founded," and an "affront to democracy." *Id.* at 629.

## B. The Architects of the 2016 Plan Openly Admitted Their Discriminatory Intent.

After the *Harris* court invalidated two of the 2011 Plan's districts, Lewis and Rucho could have taken Judge Cogburn's remarks to heart. Unfortunately, they did nothing of the kind. Instead, they presided over a redistricting process that was even more overtly infected with partisanship than its 2011 antecedent. During the first ten days after the court's decision on February 5, 2016—the bulk of the two-week period allotted by the court for the enactment of a new map—Lewis and Rucho met repeatedly with Hofeller in private. At these sessions, they orally provided Hofeller with a set of line-drawing instructions, thus leaving no paper trail of their interactions. PFOFs ¶¶49-55, 64, 96. They also watched attentively as Hofeller showed them draft plans with past election results prominently displayed. PFOFs ¶51-53.

6

On February 15, Lewis and Rucho convened a public hearing on redistricting. PFOF ¶59. Hofeller was not present at this hearing, nor did Lewis and Rucho convey to him any of the opinions that the attendees offered. PFOF ¶60. These opinions therefore had no impact on Hofeller's line-drawing choices.

On February 16, the Joint Committee met for the first time. PFOF ¶62. It was at this meeting that Lewis and Rucho introduced a series of criteria for the 2016 Plan. Two of these criteria were so brazenly partisan that they are worth quoting at length:

<u>Political data</u>

The only data other than population data to be used to construct congressional districts shall be election results . . . . Data identifying the race of individuals or voters shall not be used in the construction or consideration of districts in the 2016 Contingent Congressional Plan. . . .

<u>Partisan Advantage</u>

The partisan makeup of the congressional delegation under the enacted plan is 10 Republicans and 3 Democrats. The Committee shall make reasonable efforts to construct districts in the 2016 Contingent Congressional Plan to maintain the current partisan makeup of North Carolina's congressional delegation.

PFOFs ¶¶63, 66-67. Thus under the "Political data" criterion, not only would past election results be used to design the new congressional districts, but these results would be the *only* data employed other than population counts. Racial information would not be

considered at all. And under the "Partisan Advantage" criterion, not only would Republicans be given an edge, but they would be intended to win *ten* out of thirteen seats even though North Carolina's electorate is nearly evenly divided between the two parties.

It was also at the Joint Committee's first meeting that Lewis "acknowledge[d] freely" that a map crafted according to these criteria "would be a political gerrymander." PFOF ¶69. Lewis further "propose[d] that to the extent possible, the map drawers create a map which is perhaps likely to elect 10 Republicans and 3 Democrats." PFOF ¶70. He continued, "I propose that we draw the maps to give a partisan advantage to 10 Republicans and 3 Democrats because I do not believe it's possible to draw a map with 11 Republicans and 2 Democrats." PFOF ¶71. And he "ma[d]e clear that we to the extent are going to use political data in drawing this map, it is to gain partisan advantage." PFOF ¶73. More explicit statements of partisan intent are hard to imagine.

The "Political data" and "Partisan Advantage" criteria were endorsed by the Joint Committee on party-line votes. PFOF ¶68. The very next day, the Committee was reconvened to consider the 2016 Plan, which Hofeller had finished designing before the Committee had even met. PFOFs ¶57, 78, 82. At this meeting, Lewis reiterated that "this map will produce an opportunity to elect ten Republican members of Congress." PFOF ¶80. The Plan was adopted by the Committee on another party-line vote. PFOF ¶81. Votes by the full House and Senate followed on February 19, in which every Democrat opposed the Plan and every Republican (but one) supported it. PFOF ¶95.

## II. The 2016 Plan Has Exhibited a Large and Durable Partisan Asymmetry.

### A. The 2016 Plan Was the Single Most Asymmetric Map in the Country in the 2016 Election.

Turning to discriminatory effect, social scientists have developed several measures that quantify the partisan asymmetry of district plans.[2] One of these, the *efficiency gap*, is rooted in the insight that partisan gerrymandering is always carried out in one of two ways: the *cracking* of a party's supporters among many districts, in which their preferred candidates lose by relatively narrow margins; or the *packing* of a party's backers in a few districts, in which their preferred candidates win by overwhelming margins. *See Vieth*, 541 U.S. at 286 n.7 (plurality opinion). Both cracking and packing produce what are known as "wasted votes" because they do not contribute to a candidate's victory. In the case of cracking, all votes cast for the losing candidate are wasted; in the case of packing, all votes cast for the winning candidate, above the 50% (plus one) threshold needed for victory, are wasted. The efficiency gap is simply one party's total wasted votes in an election, minus the other party's total wasted votes, divided by the total number of votes cast. It captures in a single number the extent to which one party's voters are more

---

[2] All of these measures are valid in competitive jurisdictions like North Carolina. But only the efficiency gap should be used if one party enjoys a large statewide advantage. PFOF ¶155. The academic literature on these metrics is voluminous. *See, e.g.*, Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 U. Chi. L. Rev. 831 (2015); Bernard Grofman & Gary King, *The Future of Partisan Symmetry as a Judicial Test for Partisan Gerrymandering After LULAC v. Perry*, 6 Election L.J. 2 (2007); Michael D. McDonald & Robin E. Best, *Unfair Partisan Gerrymanders in Politics and Law: A Diagnostic Applied to Six Cases*, 14 Election L.J. 312 (2015).

Case 1:16-cv-01026-WO-JEP   Document 64   Filed 06/05/17   Page 15 of 43

cracked and packed than the other party's voters. PFOF ¶131-32; *Whitford v. Gill*, 218 F. Supp. 3d 837, 903-04 (W.D. Wis. 2016).

Another measure of partisan asymmetry, *partisan bias*, was discussed extensively by the Supreme Court in *LULAC. See* 548 U.S. at 420 (opinion of Kennedy, J.); *id.* at 466 (Stevens, J., concurring in part and dissenting in part). Partisan bias is the difference between the shares of *seats* that the major parties would win if they each received the same share (typically 50%) of the statewide *vote*. For example, if Democrats would win 55% of a plan's districts if they received 50% of the statewide vote (leaving 45% of the districts to be won by Republicans), then the plan has a pro-Democratic bias of 5%. PFOF ¶134.

A final asymmetry metric is the *mean-median difference*, that is, the difference between a party's *mean* vote share and *median* vote share across all of the districts in a plan. When the mean and the median diverge significantly, the district distribution is skewed in favor of one party and against its opponent. For instance, if a plan's mean district has a Democratic vote share of 50%, and the plan's median district has a Democratic vote share of 45%, then the plan has a pro-Republican mean-median difference of 5%. PFOF ¶136.

All of these metrics tell the same story about the partisan asymmetry that North Carolina's congressional plans have exhibited over the last half-century. In the 1970s and 1980s, the maps substantially favored Democrats on average. PFOF ¶180. In the 1990s and 2000s, the maps were almost perfectly balanced on net. PFOF ¶181. And in the

10

current cycle, both the 2011 Plan and the 2016 Plan have massively advantaged Republicans. In the 2012 and 2014 elections, the 2011 Plan had an average efficiency gap of -21%, an average partisan bias of -27%, and an average mean-median difference of -7% (negative values being pro-Republican and positive values pro-Democratic). PFOF ¶182. Similarly, in the 2016 election, the 2016 Plan had an efficiency gap of -19%, a partisan bias of -27%, and a mean-median difference of -5%. PFOF ¶183.[3]

To put these scores in perspective, the 2011 Plan had the largest average efficiency gap of *any* of the 136 congressional plans in Professor Simon Jackman's database. PFOF ¶184. Likewise, the 2016 Plan had the largest efficiency gap in the 2016 election of any map in the country analyzed by Professor Jackman. PFOF ¶185. The 2011 Plan's and the 2016 Plan's partisan biases and median-median differences were also exceptionally severe. The partisan biases, in particular, were the *second-largest* on record. PFOF ¶186.

To achieve these nearly unprecedented partisan asymmetries, Hofeller assigned counties to congressional districts based on their performances in previous elections. PFOF ¶117. Hofeller therefore concentrated strong Democratic counties in just three districts (1, 4, and 12), while more evenly dispersing strong Republican counties across the map's remaining ten districts. PFOF ¶118. Where he split counties, Hofeller did so surgically for the sake of partisan advantage. PFOF ¶119. The staunchly Democratic city of Asheville, in Buncombe County, was thus cut in half between Districts 10 and 11.

---

[3] Mean-median differences are smaller than efficiency gaps and partisan biases because they are denominated in units of *vote share* rather than *seat share*. PFOF ¶137; McDonald & Best, *supra*, at 315.

11

PFOF ¶120. So was the Democratic stronghold of Greensboro, in Guilford County, between Districts 5 and 6. PFOF ¶121. Meanwhile, just about every Democratic precinct in Mecklenburg County was crammed into District 12, and almost every Democratic precinct in Wake County into District 4. PFOF ¶122. This was a virtuoso demonstration of the gerrymanderer's classic tools of cracking and packing.

### C. The 2016 Plan's Asymmetry Is Nearly Certain to Endure for the Rest of the Decade.

The partisan asymmetry of the 2016 Plan is not just exceptionally severe; it is also exceptionally durable. Professor Jackman established this property of the Plan through three separate analyses. *First*, he employed a technique known as *sensitivity testing*. Beginning with North Carolina's actual 2016 election results, that is, he swung the statewide vote by up to ten percentage points in each party's direction. Next, he determined what each party's performance would be in each district if it swung by the same margin as the statewide vote. Using these district-level estimates, he then calculated the efficiency gap corresponding to each shift. PFOF ¶190. Defendants' expert, Sean Trende, also relied on sensitivity testing, PFOF ¶191, and "[t]here [is] consensus" that sensitivity testing is "the accepted method of testing how a particular map would fare under different electoral conditions." *Whitford*, 218 F. Supp. 3d, at 899 n.255.

Professor Jackman's analysis revealed that the 2016 Plan's efficiency gap would become *even more* pro-Republican, peaking at more than -30%, for pro-Democratic shifts in the statewide vote of up to six percentage points. The Plan's efficiency gap would remain pro-Republican even for pro-Democratic shifts of up to *nine* percentage points (a

12

Democratic wave unseen in more than thirty years). The Plan's efficiency gap would also remain pro-Republican for pro-Republican shifts of up to ten percentage points. PFOFs ¶¶193-94. And these results are confirmed by defendants' expert, Trende, who made exactly the same findings. PFOF ¶195.

*Second*, using all congressional plans in his database in effect for at least three elections, Professor Jackman studied the relationship between plans' *initial* efficiency gaps and their *average* efficiency gaps over the remainder of their lifetimes. He found that this relationship is quite strong: a correlation of about 0.75 over the last two cycles. He also estimated based on the historical data that the 2016 Plan will have an average efficiency gap of roughly -12% if it is allowed to remain in place in future elections. PFOF ¶166, 196.

And *third*, Professor Jackman conducted an array of prognostic tests to ensure that a congressional plan's large initial efficiency gap is a reliable guide to the plan's future performance. For maps as skewed as the 2016 Plan, the "false positive rate" is close to 0%, meaning there is virtually no chance that such maps will have small average efficiency gaps over the rest of their lifetimes. Similarly, the "true negative rate" for such maps is nearly 100%, indicating that almost all plans with small rest-of-life average efficiency gaps are not so unbalanced in their first elections. PFOF ¶169.

## III. The 2016 Plan's Large and Durable Partisan Asymmetry Cannot be Justified.

The final factual issue under plaintiffs' proposed test is whether the 2016 Plan's large and durable partisan asymmetry can be justified by any neutral factor. Three distinct

sets of district maps show that the Plan's asymmetry cannot be justified. *First*, plaintiffs' expert, Professor Jowei Chen, used a simulation technique that the Fourth Circuit has previously relied upon, *see Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 344-45 (4th Cir. 2016), to produce three thousand different congressional plans for North Carolina. *All* of these maps matched or surpassed the 2016 Plan's performance in terms of district compactness, county splits, and VTD splits—the very criteria endorsed by the Joint Committee. Two thousand maps (Professor Chen's second and third simulation sets) also paired at least as few incumbents as the 2016 Plan, notwithstanding the concern that the Joint Committee used incumbency protection as a proxy for partisan advantage. PFOFs ¶¶198-99.

Yet despite performing as well as, or better than, the 2016 Plan on every non-partisan criterion, *not one* of the three thousand maps ever resulted in a ten-three Republican edge or an efficiency gap as large as the 2016 Plan's. No matter which criteria were employed, no matter which past elections were included, and no matter how incumbents were treated, every single simulated map was more symmetric than the 2016 Plan. Indeed, the modal simulated map using all twenty past elections available to Hofeller featured seven *Democratic* seats and an efficiency gap of almost exactly zero. PFOFs ¶¶200-201.[4]

---

[4] A recent article confirms that North Carolina's congressional plans this cycle have been far more biased than one would expect based on the state's political geography. *See* Jowei Chen & David Cottrell, *Evaluating Partisan Gains from Congressional Gerrymandering: Using Computer Simulations to Estimate the Effect of Gerrymandering in the U.S. House*, 44 Electoral Stud. 329, 337 (2016).

*Second*, over the course of designing the 2016 Plan, Hofeller himself created two draft maps (Congress ST-B and Congress 17A) that were much more symmetric than the 2016 Plan. Both of these maps included just seven Republican seats according to the twenty past elections available to Hofeller. Both of them were also more compact, on average, than the 2016 Plan, and split either somewhat fewer (10 versus 13) or slightly more (15 versus 13) counties. PFOFs ¶¶222, 226. Unsurprisingly, Hofeller quickly consigned these maps to the cutting room floor. Nevertheless, their existence is proof that the 2016 Plan's asymmetry cannot be neutrally justified.

And *third*, during the 2000s, North Carolina's congressional plan had an average efficiency gap of just 2%, or very close to perfect symmetry. PFOF ¶227. This plan was also so obviously compliant with federal and state law that it was not even challenged in court. While the state's population has grown and changed over the last decade, it is still probative that the map actually in effect in the most recent full cycle had exactly the same partisan symmetry characteristics as Professor Chen's simulations and Hofeller's drafts.

## ARGUMENT

In *Vieth,* five members of the Supreme Court "explicitly recognized that extreme partisan gerrymandering violates the Constitution." *LULAC*, 548 U.S. at 474 (Stevens, J., concurring in part and dissenting in part). "The other four Justices in *Vieth* stated that they did not disagree with that conclusion." *Id.* While the Constitution assigns to the states the responsibility for the reapportionment of congressional districts, *see* U.S. Const. art. I, § 4; *Growe v. Emison,* 507 U.S. 25, 34 (1993), "our precedents recognize an

important role for the courts when a districting plan violates the Constitution." *LULAC*, 548 U.S. at 415 (opinion of Kennedy, J.).

Decades ago, the Court acknowledged that the object of districting is to establish "fair and effective representation for all citizens." *Reynolds*, 377 U.S. at 565. The right to vote is fundamental, and "drawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-governance." *LULAC*, 548 U.S. at 416 (opinion of Kennedy, J.). As the evidence in this case will show, the 2016 Plan is precisely the kind of intentional, severe, durable, and unjustified partisan gerrymander that denies fair and effective representation to half of the state's voters. Under both a Fourteenth Amendment analysis that asks whether the intent and effect of burdening one class of voters are otherwise justified by a legitimate governmental purpose, and a First Amendment analysis that asks whether certain voters have been penalized because of their partisan affiliation without a compelling governmental interest, the standard plaintiffs advance in this case offers a judicially discernible and manageable way to determine the constitutionality of the Plan.

The problem of partisan gerrymandering, moreover, is one that the elected branches will almost never fix on their own. Intuitively, the officeholders who *benefit* from gerrymandering—who owe their positions and authority to it—are the *last* people who should be expected to limit the practice. And in fact, there is no sign that politicians who have engaged in gerrymandering intend to adopt independent redistricting commissions or stringent mapmaking criteria. To the contrary, where progress has been

16

made toward these reforms, it has occurred almost exclusively through the voter initiative (which is unavailable in North Carolina). Gerrymandering thus represents a paradigm case of incumbents warping the electoral process to keep themselves in power. There are few circumstances that call as urgently for judicial intervention. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

The individual plaintiffs have standing to bring this claim because they support Democratic candidates and policies and thus are harmed by a district plan that skews North Carolina's congressional delegation in a Republican direction. *See Whitford*, 218 F. Supp. 3d at 927-29. This is exactly the same logic that explains why any voter in any overpopulated district has standing to challenge a statewide plan on malapportionment grounds. *See, e.g.*, *Larios v. Perdue*, 306 F. Supp. 2d 1190, 1209 (N.D. Ga. 2003). Plaintiff League of Women Voters, a non-partisan organization, has organizational standing in its own right and as a representative of its members. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975); *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013).

## I. The Test's Discriminatory Intent Prong is Discernible, Manageable, and Satisfied Here.

### A. The Prong Is Rooted in the Supreme Court's First and Fourteenth Amendment Precedents.

The first prong of plaintiffs' proposed test is whether a district plan was enacted with discriminatory intent, that is, in order to engage in "intentional discrimination against an identifiable political group." *Bandemer*, 478 U.S. at 127 (plurality opinion).

17

Plaintiffs previously made the points that (1) both the First and the Fourteenth Amendments generally require discriminatory intent to be shown before liability can be assigned; (2) the Supreme Court has never rejected this intent formulation; and (3) courts have demonstrated the prong's manageability by consistently finding discriminatory intent when plans were designed by a single party with unified control over redistricting, and not finding such intent when plans were crafted by a court, a commission, or divided government. Pls.' Opp. to Defs.' Mot. to Dismiss ("MTD Opp.") (Dkt. 34) at 9-11. In denying defendants' motion to dismiss, this Court agreed that "in order to establish a partisan gerrymandering claim . . . a plaintiff must show . . . discriminatory intent." MTD Op. (Dkt. 50) at 21. The Court further observed that no argument to the contrary is tenable "given that a majority of the *Bandemer* Court embraced that general framework and *Vieth* did nothing to undermine it." *Id.* at 27.

To this discussion, plaintiffs further note that in a line of reapportionment cases postdating *Vieth*, the Supreme Court has made clear that the pursuit of partisan advantage is an improper motive that cannot justify even small population deviations. In *Cox v. Larios*, 542 U.S. 947 (2004), for instance, the Court summarily affirmed the invalidation of a Georgia plan whose districts' sub-10% population deviations were attributable to "'an intentional effort to allow incumbent Democrats to maintain or increase their delegation.'" *Id.* at 947 (Stevens, J., concurring). In *Harris v. Indep. Redist. Comm'n*, 136 S. Ct. 1301 (2016), likewise, the Court assumed that "partisanship is an illegitimate redistricting factor," and upheld the challenged map only because partisanship did *not*

18

"significantly explain[] deviations from numerical equality among districts." *Id.* at 1310. The Fourth Circuit has also held that the aim of ensuring one party's control over a legislative body is illegitimate and cannot justify deviations from the one-person, one-vote rule. *See Raleigh Wake Citizens Ass'n*, 827 F.3d at 346; *accord City of Greensboro v. Guilford Cnty. Bd. of Elections,* 2017 U.S. Dist. LEXIS 50253 (M.D.N.C. Apr. 3, 2017). These cases plainly support plaintiffs' articulation of their test's discriminatory intent prong.

### D. Plaintiffs Do Not Need to Prove that Partisan Considerations Predominated.

Plaintiffs do not expect defendants to argue at trial that the 2016 Plan was not motivated by partisan gain. Indeed, any such argument would be precluded by defendants' admission that they "intended to favor Republican voters and disadvantage voters who voted for non-Republican candidates." MTD Op. (Dkt. 50) at 7. However, defendants may contend that partisanship did not *predominate* over other considerations when the Plan was enacted because the "Partisan advantage" criterion was just one of several parameters endorsed by the Joint Committee.

This claim is legally and factually flawed. As a matter of law, five Justices in *Vieth* rejected the appellants' proposal that mapmakers be shown to have "'acted with a *predominant intent* to achieve partisan advantage.'" 541 U.S. at 284 (plurality opinion); *see also id.* at 308 (Kennedy, J., concurring in the judgment). In *LULAC*, similarly, Justice Kennedy rebuffed the appellants' suggestion that a plan be deemed invalid if it is "*solely* motivated by partisan objectives." 548 U.S. at 416 (opinion of Kennedy, J.)

(emphasis added). *Vieth* and *LULAC* thus render unavailable any intent formulation that requires partisanship to predominate over other redistricting goals or to be the only redistricting aim. It is enough for partisanship to be *a* motivation for a district plan—indeed, that is the only intent formulation that remains doctrinally acceptable.

And as a matter of fact, it is evident that partisan advantage took precedence over the rest of the Joint Committee's criteria. Numerical targets were used for partisan advantage—the creation of ten Republican and three Democratic districts—but not for any other requirement. Hofeller incorporated partisan data into a complex formula, but made no analogous efforts with respect to any other parameter. And Lewis declared proudly that the 2016 Plan would be a "political gerrymander," but made no such boasts about compactness, municipality splits, or anything else. PFOF ¶69.

## II. The Test's Discriminatory Effect Prong is Discernible, Manageable, and Satisfied Here.

### A. The Prong Is Based on Partisan Asymmetry, the Concept Identified as Promising by the *LULAC* Court.

The second prong of plaintiffs' proposed test is discriminatory effect, or whether a district plan has exhibited a partisan asymmetry that is both large and durable. Plaintiffs previously showed that (1) five Justices contemplated a discriminatory effect prong of this sort in *LULAC*; (2) in all of its partisan gerrymandering cases, the Supreme Court has sought to limit judicial intervention to persistently (rather than fleetingly) asymmetric maps; and (3) there exist reliable and well-accepted techniques for measuring both a plan's asymmetry and how likely it is to endure. MTD Opp. (Dkt. 34) at 11-13. Echoing

these points, this Court noted that "several Justices have stated that partisan symmetry has promise for measuring the discriminatory effects of a partisan gerrymander and structuring a remedy." MTD Op. (Dkt. 50) at 27. The Court also pointed out that by abandoning the *Bandemer* plurality's unworkable discriminatory effect prong, *Vieth* "opened the door" to "the standards and statistical methods proposed by Plaintiffs." *Id.* at 26.

The Court further flagged two concerns that Justice Kennedy expressed in his concurrence in *Vieth*. "The first concern deals with the difficulty in identifying a 'fair' districting plan to use as a baseline against which to assess the effects of a partisan gerrymander." *Id.* at 18. Plaintiffs' test addresses this concern through both its discriminatory effect prong and its justification prong. At the discriminatory effect stage, the baseline against which a plan's partisan asymmetry is measured is, simply, perfect symmetry. In the analogous reapportionment context, this is exactly how courts quantify population deviation—relative to a benchmark of perfect population equality. This approach is also supported by the empirical fact that, over the last half-century, congressional plans have had an average efficiency gap, partisan bias, and mean-median difference of nearly zero. PFOF ¶153. Measuring asymmetry vis-à-vis perfect symmetry is thus consistent with modern American electoral history.

At the justification stage, plaintiffs' test accounts for the possibility that a plan's asymmetry may be attributable to a state's political geography or efforts to comply with traditional redistricting criteria. Here the baseline for comparison is the distribution of

21

maps—created via computer algorithms or other techniques—that satisfy the state's own non-partisan requirements. If the enacted plan is comfortably within this distribution, then its asymmetry may be justified. But if the enacted plan is entirely outside the distribution, then there is likely no legitimate explanation for its asymmetry.

Justice Kennedy's "second concern deals with the need to establish the degree of deviation from the 'fair' districting plan that would render a partisan gerrymander unconstitutional." MTD Op. (Dkt. 50) at 18. In its reapportionment cases, the Supreme Court took more than a decade to arrive at its 10% population deviation threshold. *See Connor v. Finch*, 431 U.S. 407, 418 (1977). The same doctrinal path is possible here, with courts waiting to set an asymmetry threshold until they have accrued more experience with partisan gerrymandering cases. If and when courts *do* set an asymmetry threshold, though, the metrics and data presented by plaintiffs should be very helpful. An intuitive way to specify a cutoff is with quantitative measures whose values are known for many cases over many years. This is exactly what plaintiffs' evidence makes possible. It is also clear that wherever courts eventually draw the line, the 2016 Plan falls on the wrong side of it. Again, the Plan was the most asymmetric in America in the 2016 election, and its 2011 predecessor was the most asymmetric in Professor Jackman's entire database. There is no plausible threshold that the Plan does not exceed.

Beyond the concerns noted by this Court, plaintiffs' test responds to several other comments in Justice Kennedy's concurrence in *Vieth*. For example, he emphasized the need for "a workable standard for measuring a gerrymander's burden on representational

22

rights." 541 U.S. at 311 (Kennedy, J., concurring in the judgment). Metrics of partisan asymmetry like the efficiency gap, partisan bias, and the mean-median difference do precisely that: capture the burden imposed by district plans on legislative representation. Justice Kennedy also hoped that "new technologies may produce new methods of analysis that make more evident the precise nature of the burdens gerrymanders impose." *Id.* at 312-13. Here plaintiffs rely on cutting-edge techniques like sensitivity testing (to assess gerrymanders' durability) and district map simulations (to ascertain the impact of political geography). Justice Kennedy was interested as well in a "substantive definition of fairness in districting" that "command[s] general assent." *Id.* at 307. In the academic community, "[s]ocial scientists have long recognized partisan symmetry as the appropriate way to define partisan fairness . . . and for many years such a view has been virtually a consensus position." Grofman & King, *supra*, at 6.

## B. Plaintiffs Do Not Need to Prove Noncompliance with Traditional Redistricting Criteria Nor Is Their Test a Requirement of Proportional Representation.

Defendants will likely argue that in addition to (or instead of) partisan asymmetry, noncompliance with traditional redistricting criteria must be shown before a district plan can be struck down. But this claim was explicitly rejected by five Justices in *Vieth*. The plurality stressed the unmanageability of determining noncompliance with traditional criteria, asking "*How much* disregard of traditional districting principles?" and "What is a lower court to do when . . . the district adheres to some traditional criteria but not others?" 541 U.S. at 296 (plurality opinion). The plurality also observed that aesthetically

23

pleasing districts nevertheless can be grossly gerrymandered. "[I]t certainly cannot be that adherence to traditional districting factors negates any possibility of intentional vote dilution." *Id.* at 298; *see also id.* at 308 (Kennedy, J., concurring in the judgment); *Bandemer*, 478 U.S. at 140 (plurality opinion) (noting that disregard for traditional criteria "do[es] not show any actual disadvantage beyond that shown by the election results"); *Gaffney v. Cummings*, 412 U.S. 735, 752 n.18 (1973) ("[C]ompactness or attractiveness has never been held to constitute an independent federal constitutional requirement . . . .").

Of course, that noncompliance with traditional criteria cannot be an *element* of the cause of action does not mean it is *irrelevant*. As in the racial gerrymandering context, a failure to abide by traditional principles may be probative evidence of discriminatory intent. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) ("[A] conflict or inconsistency" between districts and traditional criteria "may be persuasive circumstantial evidence tending to show racial predomination."). And as in the one person, one vote context, respect for traditional criteria may provide a legitimate justification for a plan's discriminatory effect. *See, e.g.*, *Brown*, 462 U.S. at 844 (permitting a large population deviation that was "entirely the result of the consistent . . . application of a legitimate state policy").

Defendants will also probably assert that asymmetry metrics like the efficiency gap, partisan bias, and the mean-median difference are tantamount to requirements of proportional representation. They are not; indeed these metrics were created in the first

24

place to quantify partisan unfairness in single-member-district electoral systems that do *not* typically produce "equal representation in government [for] equivalently sized groups." *Vieth*, 541 U.S. at 288 (plurality opinion). The efficiency gap, for instance, "is about comparing the wasted votes of each party, not determining whether the party's percentage of the statewide vote share is reflected in the number of representatives that party elects." *Whitford v. Nichol*, 151 F. Supp. 3d 918, 929 (W.D. Wis. 2015). Thus "an election's results may have a small efficiency gap without being proportional or they may be proportional and still have a large efficiency gap." *Id.* at 929-30.

Likewise, a low partisan bias score is achieved when both parties would win about the same share of seats if they each received the same fraction of the statewide vote. A party's seats can therefore be highly disproportionate to its votes—as long as the *other* party's seats would be as disproportionate to *its* votes if the parties' performances flipped. *See* Grofman & King, *supra*, at 8 ("[P]artisan bias does *not* require proportional representation . . . ."). And the mean-median difference is simply a measure of the skew of the district vote share distribution. The metric does not even consider seats won or lost, meaning it cannot compel, or even encourage, proportional representation. *See* McDonald & Best, *supra*, at 313-16.

Defendants may further argue that plans intended to benefit a party sometimes exhibit small efficiency gaps and plans enacted without partisan intent sometimes exhibit large ones. This claim completely ignores the other prongs of plaintiffs' test. Under the test, there (correctly) is no liability when a party tries, but fails, to award itself a partisan

25

advantage. Nor (again correctly) is there liability when a partisan advantage arises unintentionally. This is because the test recognizes that discriminatory intent and discriminatory effect are distinct inquiries that should not be conflated. *See Bandemer*, 478 U.S. at 142 (plurality opinion) (explaining that it is "inappropriate . . . to view these separate components . . . as 'factors' to be considered together without regard for their separate functions or meaning").

Another problem with this argument is that it applies not only to the efficiency gap but also to *any* measure of gerrymandering that takes into account parties' seats or votes. An intentionally discriminatory plan can exhibit a small partisan bias or mean-median difference. A large partisan bias or mean-median difference can also occur in the absence of discriminatory intent. But in that case, defendants are objecting to the consideration of election results themselves, on the ground that they do not always reflect mapmakers' aims. This is a radical and untenable position since, as this Court has held, "to state a partisan gerrymandering claim . . . a plaintiff must allege discriminatory intent *and* discriminatory effects." MTD Op. (Dkt. 50) at 27 (emphasis added).

Still another flaw with the argument is that it is only supported factually by a number of unrepresentative anecdotes compiled by Trende. Trende never attempted a *statistical* analysis of how party control of the redistricting process is related to the efficiency gap—even though defendants' other expert, Professor James Gimpel, testified that this would be the proper approach to the issue. PFOFs ¶¶162-63. Professor Jackman, however, did undertake such a statistical analysis. And what he found exposes the

26

vacuousness of Trende's anecdotes. When *all* cases are considered (rather than a cherry-picked few), partisan control is indeed a powerful driver of the efficiency gap, especially in more recent cycles. PFOFs ¶¶159-60.[5]

Lastly, defendants may contend that the efficiency gap varies from election to election and so is not a stable metric. This claim has the same defects as the last one. First, it overlooks the fact that under plaintiffs' test, there is only liability if a plan exhibits a partisan asymmetry that is both large *and durable*. If sensitivity testing shows that a plan's large asymmetry would evaporate under different electoral conditions, then the plan would be upheld. Second, this volatility argument is not limited to the efficiency gap, but rather extends to all asymmetry metrics. Because they too are based on election results, partisan bias and the mean-median difference also change from year to year as parties' seats and votes shift.

And third, the only evidentiary support for the argument comes from another set of examples culled by Trende. Again, Trende did not carry out any statistical analysis of the efficiency gap's variation from election to election. And again, Professor Jackman did conduct such an analysis. As discussed above, he found that the 2016 Plan's pro-Republican skew would persist under any electoral environment other than the biggest Democratic wave in more than thirty years.

---

[5] Professor Jackman's finding is amply confirmed by the academic literature. *See, e.g.*, Andrew Gelman & Gary King, *Enhancing Democracy Through Legislative Redistricting*, 88 Am. Pol. Sci. Rev. 541, 550 (1994); Richard G. Niemi & Simon Jackman, *Bias and Responsiveness in State Legislative Districting*, 16 Legis. Stud. Q. 183, 195 (1991).

## III. The Test's Justification Prong is Discernible, Manageable, and Satisfied Here.

### A. The Prong Is Drawn from the Supreme Court's Reapportionment Cases.

The third prong of plaintiffs' proposed test is justification, or whether a state can account for a district plan's large and durable asymmetry based on the state's political geography or legitimate redistricting objectives. Plaintiffs previously pointed out that (1) this prong is borrowed verbatim from the Supreme Court's reapportionment cases; (2) according to these cases, the burden of justification is on the state, and applies to the plan's asymmetry (not its general contours); (3) the prong properly balances symmetry against other valid redistricting goals; and (4) the prong must be manageable since courts have used it effectively for half a century. MTD Opp. (Dkt. 34) at 13-15.

It is also important to stress the technological progress that has made it possible in recent years to determine whether a plan's asymmetry is, in fact, justified. At the time of *Vieth* and *LULAC*, this question was unanswerable because litigants had no way of finding out what asymmetries would result if districts were drawn without any consideration of partisanship. Over the last decade, though, Professor Chen and other scholars have developed simulation techniques that allow thousands of maps to be randomly created using whatever parameters the scholars specify. These techniques permit partisanship—and only partisanship—to be removed from the redistricting calculus, thus revealing what would happen in its absence. *See Raleigh Wake Citizens Ass'n*, 827 F.3d at 344 (observing that "Dr. Chen's simulations . . . hold several legitimate apportionment considerations constant so that Dr. Chen could assess whether

the population deviations in the challenged plans could have been the product of something other than partisan bias").

### B. Defendants' Potential Justifications for the 2016 Plan's Partisan Asymmetry Are Contradicted by the Evidence.

Defendants' experts have not identified any flaws in any of the three sets of district plans that show that the 2016 Plan's partisan asymmetry is unjustifiable: not Professor Chen's simulated maps, nor Hofeller's drafts or the plan actually in effect in the 2000 cycle. Instead of attacking these maps, defendants seem likely to argue that four factors, either individually or in tandem, explain the 2016 Plan's asymmetry: North Carolina's political geography, compliance with the Voting Rights Act, incumbent protection, and variation in candidate quality. None of these arguments has merit.

Starting with political geography, defendants' expert, Professor M.V. Hood III, determined that both Democratic and Republican voters are spatially clustered in North Carolina and that population density is positively correlated with the Democratic share of the vote at the VTD level. These findings are entirely unsurprising, and would likely hold for any American state in recent years. The findings also do not even begin to establish that North Carolina's political geography inherently favors Republicans when congressional district lines are drawn. As Hood himself admitted, his analysis "doesn't ultimately tell you anything about what is possible in terms of districting plans and the ultimate composition of the districts in those plans." PFOF ¶228.

To find out "what is possible in terms of districting plans," it is necessary to *design* plans. Only a reasonable volume of maps can indicate whether a state's unique

arrangement of partisan clusters does or does not translate into a reliable advantage for a particular party at a particular electoral level. Hood drew no maps and so could not address the effect that North Carolina's political geography might have on the skew of its congressional delegation. Professor Chen, Hofeller, and North Carolina's elected branches in the 2000 cycle *did* craft plans, however. And all of their plans lead to the same conclusion: that North Carolina's political geography poses no obstacle to the creation of congressional plans that comply with all non-partisan criteria and that also treat the major parties symmetrically. Indeed, Professor Chen's simulated maps hint that it is *Democrats* who enjoy a small natural advantage in North Carolina, thanks to the presence of several medium-sized cities that each could anchor congressional districts. PFOF ¶201.

Next, it is quite a startling assertion that the 2016 Plan's partisan asymmetry is attributable to the state's efforts to comply with the Voting Rights Act. The criteria adopted by the Joint Committee stated explicitly that "[d]ata identifying the race of individuals or voters *shall not be used* in the construction or consideration of districts in the 2016 Contingent Congressional Plan." PFOFs ¶¶66, 99 (emphasis added). Hofeller, Lewis, and Rucho also could not have been clearer that, in their view, the trial court in *Harris* had held that there was insufficient racial polarization in voting in North Carolina, meaning that the Act did not require the creation of any minority opportunity districts. PFOF ¶102. As Lewis stated to the Joint Committee, "the *Harris* opinion found that there

30

was not racially polarized voting in the state, and therefore, the race of the voters should not be considered." PFOF ¶103.

Hofeller stated in conclusory fashion that he considered the Voting Rights Act when he designed the 2016 Plan. But the Supreme Court held in *Cooper* that the mere *invocation* of the Act is never enough to justify the race-based design of districts. Rather, "[t]o have a strong basis in evidence that § 2 demands . . . race-based steps, the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions." 2017 WL 2216930, at *13. There was "nothing in the legislative record that fits that description" in *Cooper*, *id.*, and nothing has been added to the record since then.

Nevertheless, in an abundance of caution, Professor Chen and Professor Jackman analyzed whether an effort to respect concentrations of African-American voters in North Carolina could explain the 2016 Plan's partisan asymmetry. For each of his three simulation sets, Professor Chen identified all maps containing one district with a black voting-age population of at least 40%. These 262 maps were indistinguishable from the full array of 3000 in their electoral consequences. Again, not a single one had ten Republican seats, and again, the modal map using all twenty past elections available to Hofeller had seven *Democratic* seats. PFOF ¶229.

Professor Jackman examined how the efficiency gap is related to the proportion of House members in a congressional delegation who are black or Latino. He found that there is essentially no relationship, for black or for Latino representation. This means that there is nothing atypical about Professor Chen's conclusion for North Carolina.

31

Nationally too—across many states over many years—district plans' partisan fairness is simply unconnected to how well or poorly minority voters are represented. PFOF ¶164.[6]

Turning to incumbent protection, it does not carry the same weight as other traditional criteria because it is "'inherently more political,'" *Abrams v. Johnson*, 521 U.S. 74, 84 (1997), and can easily become "selective" rather than evenhanded, *Larios*, 542 U.S. at 949 (Stevens, J., concurring). It is also far from clear that incumbent protection is a traditional criterion in North Carolina. It is not mentioned by the state constitution or any state statute. It was flouted by the 2011 Plan, which paired four incumbents (all Democrats). PFOF ¶206. And notwithstanding the Joint Committee's criteria, it was violated by the 2016 Plan too, which unnecessarily paired two incumbents. PFOF ¶207. Furthermore, incumbent protection is *especially* problematic where (as here) the previous map was itself a partisan gerrymander. In that case, the criterion is synonymous with freezing in place the previous map's partisan skew.

In any event, Professor Chen's third simulation set matched the 2016 Plan in terms of pairing incumbents, and his second simulation set *improved* on it by not pairing *any* incumbents. Yet none of these maps had ten Republican seats, and most of them had only six or seven Republican seats. PFOFs ¶¶209-11. Thus even if incumbent protection is a

---

[6] The academic literature confirms this lack of a connection. *See, e.g.*, Carlos A. Sanchez-Martinez & Kenneth W. Shotts, *Assessing Robustness of Findings About Racial Redistricting's Effect on Southern House Delegations*, 6 Stat., Pol. & Pol'y 97, 107 (2015); Ebonya Washington, *Do Majority-Black Districts Limit Blacks' Representation? The Case of the 1990 Redistricting*, 55 J.L. & Econ. 251, 267 (2012).

32

legitimate criterion—and even if it is an *actual* criterion in North Carolina—it cannot justify the 2016 Plan's partisan asymmetry.

Finally, Hood argues that better candidates, not carefully crafted district lines, explain the Plan's pro-Republican tilt. But according to a model constructed by Professor Chen, the most reliable sign of candidate quality, incumbency itself, provided a boost of only about three percentage points to congressional candidates in recent North Carolina elections. PFOF ¶214.[7] Since every Republican incumbent received at least 56% of the vote in 2016, Republican candidates would still have won ten districts even if they had all been challengers rather than sitting members of Congress. PFOF ¶215.

Gimpel and Hood confirmed the lesser importance of candidate quality by analyzing the 2016 Plan using a range of *non-congressional* races (auditor, governor, president, and so on). "Because these races are statewide, not district-specific, they are entirely unaffected by district-level variations" in incumbency, fundraising ability, charisma, and other House member attributes. PFOF ¶230. Yet these races tell exactly the same story as the congressional election results: namely, that Republican candidates are favored in ten out of thirteen districts even when the statewide vote is nearly split. PFOF ¶231.

---

[7] Nationally too, the incumbency advantage is currently about three percentage points. *See* Gary C. Jacobson, *It's Nothing Personal: The Decline of the Incumbency Advantage in U.S. House Elections*, 77 J. Pol. 861, 863 (2015).

**CONCLUSION**

The 2016 Plan represents the continuation of one of the worst partisan gerrymanders in modern American history, severely disadvantaging Democratic voters and burdening their right to fair and effective representation in Congress. Plaintiffs have advanced a three-part test for partisan gerrymandering, all of whose prongs are judicially discernible and manageable and satisfied by the Plan. This Court should therefore hold that the Plan is an unconstitutional partisan gerrymander that violates the First and Fourteenth Amendments.

Respectfully submitted this 5th day of June, 2017.

/s/ Anita S. Earls
Anita S. Earls (State Bar # 15597)
Allison J. Riggs (State Bar # 40028)
Emily Seawell (State Bar # 50207)
Southern Coalition for Social Justice
anitaearls@southerncoalition.org
allisonriggs@southerncoalition.org
emilyseawell@southerncoalition.org
1415 Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380 ext. 115
Facsimile: 919-323-3942
Counsel for All Plaintiffs

/s/ Ruth M. Greenwood
Paul M. Smith
Ruth Greenwood
Annabelle Harless
Campaign Legal Center
1411 K Street NW, Suite 1400
Washington, DC 20005
(202) 736-2200
psmith@campaignlegalcenter.org
ghebert@campaignlegalcenter.org
rgreenwood@campaignlegalcenter.org
aharless@campaignlegalcenter.org

/s/ Nicholas O. Stephanopoulos
Nicholas O. Stephanopoulos
University of Chicago Law School
1111 E 60th St.
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing via electronic mail, addressed to counsel for all parties in this consolidated action.

This the 5th day of June, 2017.

/s/ Ruth M. Greenwood
Ruth M. Greenwood

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I hereby certify that this brief complies with L.R. 7.3(d) because the total word count for the body of the brief including headings and footnotes is 8,933.

This the 5th day of June, 2017.

/s/ Ruth M. Greenwood
Ruth M. Greenwood