| | |
|---|---|
| COMMON CAUSE, et al.,<br><br>               Plaintiffs,<br>   v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, et al.,<br><br>               Defendants. | No. 1:16-CV-1026 |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al.,<br><br>               Plaintiffs,<br>   v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, et al.,<br><br>               Defendants. | No. 1:16-CV-1164 |

1

# MEMORANDUM OPINION

Wynn, Jr., Circuit Judge, wrote the opinion, in which Britt, Senior District Judge, joined:

In these consolidated cases, two groups of Plaintiffs[1] allege that North Carolina's 2016 Congressional Redistricting Plan (the "Plan") constitutes an unconstitutional partisan gerrymander in violation of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and, in the case of the Common Cause Plaintiffs, Article I, sections 2 and 4 of the Constitution. Before the Court is Legislative Defendants'[2] motion to stay Plaintiffs' action pending the Supreme Court of the United States' final decision in *Gill v. Whitford*, No. 16-1161 (calendared for oral argument on Oct. 3, 2017). The trial

---

[1] The plaintiffs in 1:16-CV-1026 are Common Cause; the North Carolina Democratic Party; Larry D. Hall; Douglas Berger; Cheryl Lee Taft; Richard Taft; Alice L. Bordsen; William H. Freeman; Melzer A. Morgan, Jr.; Cynthia S. Boylan; Coy E. Brewer, Jr.; John Morrison McNeill; Robert Warren Wolf; Jones P. Byrd; John W. Gresham; and Russell G. Walker, Jr. (collectively, the "Common Cause Plaintiffs"). The plaintiffs in 1:16-CV-1164 are League of Women Voters of North Carolina; Elliott Feldman; Carol Faulkner Fox; Annette Love; Maria Palmer; Gunther Peck; Ersla Phelps; John Quinn, III; Aaron Sarver; Janie Smith Sumpter; Elizabeth Torres Evans; and Willis Williams (collectively, the "League Plaintiffs," and, with the Common Cause Plaintiffs, "Plaintiffs").

[2] Legislative Defendants in both actions are Robert A. Rucho, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting; David R. Lewis, in his official capacity as Chairman of the North Carolina House of Representatives Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting; Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives; and Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate. Plaintiffs also name as defendants A. Grant Whitney, Jr., in his official capacity as Chairman and acting on behalf of the North Carolina State Board of Elections ("Whitney"); the North Carolina State Board of Elections (collectively, with Whitney, the "Board Defendants"); and the State of North Carolina (collectively, with the Legislative Defendants and the Board Defendants, "Defendants").

court in *Whitford* held that a Wisconsin state legislative redistricting plan was an unconstitutional partisan gerrymander in violation of the First Amendment and the Equal Protection Clause. *Whitford v. Gill*, 218 F. Supp. 3d 837, 884 (W.D. Wis. 2016).

After careful consideration of the parties' briefing and arguments, we conclude that Legislative Defendants have failed to put forward the "clear and convincing circumstances outweighing potential harm" to Plaintiffs necessary to justify staying these proceedings. *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983). Therefore, and as further explained below, we exercise our discretion to deny Legislative Defendants' motion to stay.

## I.

On February 5, 2016, a panel of three federal judges held that two districts established by North Carolina's 2011 decennial congressional redistricting plan constituted racial gerrymanders in violation of the Equal Protection Clause. *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017). To remedy this constitutional violation, the *Harris* Court established a two-week deadline for the North Carolina General Assembly to draw new congressional districts to be used in future elections. *Id.* at 627. Thereafter, the General Assembly adopted the Plan at issue in this case. According to Plaintiffs, the Plan relied on "political data"—data "reflect[ing] whether the people . . . had voted in favor of Democratic or Republican candidates for certain state-wide elections"—to draw districts intended to maximize the number of Republican members of North Carolina's congressional delegation. (Doc. 12, ¶ 18.)

Common Cause Plaintiffs filed their complaint challenging the new districts as partisan gerrymanders on August 5, 2016, and League Plaintiffs filed their action on September 22, 2016. Collectively, Plaintiffs allege that the Plan violates four constitutional provisions:

1. The Equal Protection Clause of the Fourteenth Amendment, by diluting the electoral strength of individuals who voted against Republican candidates (Doc. 41, ¶¶ 69–80; Doc. 12, ¶¶ 39–45);

2. The First Amendment, by burdening and retaliating against individuals who voted against Republican candidates on the basis of their political beliefs and association (Doc. 41, ¶¶ 81–83; Doc. 12, ¶¶ 25–38);

3. Article I, section 2, which provides that members of the House of Representatives will be chosen "by the People of the several States," by usurping the right of the voters to select their preferred candidates for Congress (Doc. 12, ¶¶ 46–49); and

4. Article I, section 4, which provides that "the times, places and manner of holding elections of . . . Representatives, shall be prescribed in each State by the Legislature thereof" (Doc. 12, ¶¶ 50–54).

On February 21, 2017, Defendants moved to dismiss Plaintiffs' actions under Federal Rule of Civil Procedure 12(b)(6). (Doc. Nos. 45, 46.) In an order and accompanying memorandum opinion issued on March 3, 2017, this Court denied Defendants' motion to dismiss. *Common Cause v. Rucho*, -- F. Supp. 3d --, 2017 WL 876307, at *1 (M.D.N.C. Mar. 3, 2017).

This Court established an April 28, 2017, deadline for the parties to complete discovery and scheduled a bench trial for the week of June 26, 2017. (Doc. Nos. 47, 53.) Pursuant to that order, the parties engaged in extensive fact and expert discovery, which involved the production of documents, the propounding and answering of interrogatories,

4

the preparation and submission of a number of expert reports, and numerous depositions. On May 30, 2017, the parties filed their final pretrial disclosures. (Doc. Nos. 54–58.) One week later, the parties submitted their proposed findings of fact and conclusions of law and pretrial briefs. (Doc. Nos. 60–62, 64.) On June 19, 2017, League Plaintiffs moved *in limine* to exclude the testimony of one of Defendants' proffered expert witnesses and submitted substantial briefing and supporting materials in support of that motion. (Doc. Nos. 71, 72.) That same day, this Court held a pre-trial hearing. At the hearing, this Court, on its own motion, continued the trial indefinitely.

On June 26, 2017, Legislative Defendants filed the present motion to stay further proceedings pending the Supreme Court's final decision in *Gill*. (Docs. 74, 75.) Plaintiffs opposed Legislative Defendants' motion, and Board Defendants and Defendant State of North Carolina took no position. (Docs. 78, 79.) On August 29, 2017, having lifted the continuance, this Court received argument from the parties on Legislative Defendants' stay motion. That same day, this Court entered an order denying the stay motion and stating that this opinion would follow. (Doc. 85.)

II.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *see also Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 375 (4th Cir. 2013) (explaining that district courts have broad discretion "to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket"

5

(internal quotation marks omitted)). Factors courts consider in deciding whether to exercise their discretion to stay proceedings "include the interests of judicial economy, the hardship and inequity to the moving party in the absence of a stay, and the potential prejudice to the non-moving party in the event of a stay." *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 452 (M.D.N.C. 2015). "The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford*, 715 F.2d at 127.

A.

Legislative Defendants argue that "clear and convincing circumstances" outweigh the harm to Plaintiffs attributable to a stay because *Whitford* involves legal theories that are "essentially identical" to Plaintiffs' claims and "will ultimately resolve currently unanswered questions regarding the justiciability, legal standards, and appropriate remedy in political gerrymandering claims." (Doc. 75, at 2, 5.) Legislative Defendants maintain that if these proceedings move forward without the benefit of the Supreme Court's guidance, the parties will "unnecessarily expend significant time and resources at trial, only to have to re-try the case later or dismiss it." (Doc. 75, at 11–12.) Accordingly, we must consider whether the Supreme Court's decision in *Whitford* is likely to render any proceedings held in advance of that decision a sufficiently significant "waste of time and money" as to outweigh the harm to Plaintiffs caused by further delaying these proceedings. (Doc. 75, at 1.)

In *Whitford*, Democratic voters challenged a decennial state assembly redistricting plan adopted by a Republican-controlled assembly and approved by the state's Republican

governor. *Whitford*, 218 F. Supp. 3d at 852. In creating the plan, the legislature considered several alternative districting plans and selected the plan that, according to the legislature's expert consultants, was likely to lead to the election of the most Republican candidates. *Id*. at 849–52. By the time of trial, Wisconsin had conducted two elections under the plan. In 2012, Wisconsin voters cast 48.6% of their votes for Republican candidates, yet Republican candidates won over 60% (60 of 99) of the seats in the state assembly. *Id*. at 853. In 2014, Republican candidates received 52% of the statewide votes, and won 63 of the 99 seats in the assembly. *Id*.

The *Whitford* plaintiffs alleged that the redistricting plans violated the Equal Protection Clause by "treat[ing] voters unequally, diluting their voting power based on their political beliefs," and the First Amendment by "unreasonably burden[ing] their First Amendment rights of association and free speech." *Id*. at 855. Although the plaintiffs asserted claims under both the First Amendment and Equal Protection Clause, the plaintiffs proposed a single, three-part framework for analyzing both claims and did not "identif[y] any analytical differences" between the two claims. *Whitford v. Nichol*, 180 F. Supp. 3d 583, 587 (W.D. Wis. 2016). Under the plaintiffs' proposed framework, which derived from the Supreme Court's decision in *Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality op.), plaintiffs first would have to demonstrate a legislative intent to discriminate against an identifiable political group and then have to establish a discriminatory effect, *Whitford*, 180 F. Supp. at 587. If plaintiffs satisfied their burden under the first two parts of their proposed framework, the burden would shift to the defendants to show that the discriminatory effects were justified by the state's political geography or other legitimate

7

redistricting considerations. *Id*. at 589–90. The "most significant innovation" of the plaintiffs' proposed test related to the discriminatory effects prong. *Id*. at 588. The *Whitford* plaintiffs proposed that the court assess the discriminatory effects of the challenged plan through a novel metric termed the "efficiency gap," which measures "partisan symmetry"—how each party "would fare hypothetically if they each (in turn) had received a given percentage of the vote," *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 419 (2006) ("*LULAC*") (alteration in original) (internal quotation marks omitted)—by comparing the number of "wasted" votes each political party has under a districting plan, *Whitford*, 180 F. Supp. 3d at 588–89.

A divided three-judge district court panel ruled that the legislative districting plan constituted an unconstitutional partisan gerrymander. *Whitford*, 218 F. Supp. 3d at 843. In reaching this conclusion, the *Whitford* majority applied a three-step framework similar to the frameworks used in *Bandemer* and suggested by the plaintiffs. *Id*. at 884. In particular, according to the majority, "the First Amendment and the Equal Protection Clause prohibit a redistricting scheme which (1) is intended to place a severe impediment on the effectiveness of the votes of individual citizens on the basis of their political affiliation, (2) has that effect, and (3) cannot be justified on other, legitimate legislative grounds." *Id*. Therefore, in line with the plaintiffs' suggestion, the *Whitford* majority treated the First Amendment and Equal Protection claims as analytically indistinguishable. *Id*.

The majority then found that plaintiffs' evidence satisfied the intent prong by demonstrating that, in drawing the districts, the legislature acted with "an intent to entrench

8

a political party in power." *Id.* at 887. In particular, plaintiffs' evidence showed that the legislature's line-drawing decisions focused on ensuring long-term Republican control of the assembly by selecting the district plan that was likely to ensure Republican control even if voters swung substantially in Democrats' favor in a particular election. *Id.* at 890–96. Regarding the discriminatory effect prong, the majority found that the results from the 2012 and 2014 elections demonstrated that the districts durably favored Republicans, consistent with the predictions the legislature made in drawing the map. *Id.* 898–901. The court did not embrace plaintiffs' "efficiency gap" measure as decisive evidence of discriminatory effect, but did state that the measure "bolstered" its conclusion. *Id.* at 903. In particular, the plaintiffs' evidence showed that, based on 2012 and 2014 election results, the efficiency gap favoring the Republican party exceeded the threshold at which, according to statistical analyses of hundreds of redistrictings in a number of states, a redistricting plan "will continue to favor that party for the life of the plan." *Id.* at 903–05. The majority further concluded that the defendants failed to demonstrate that the district lines were "justifiable, *i.e.*, . . . explained by the legitimate state prerogatives and neutral factors that are implicated in the districting process." *Id.* at 911.

To be sure, there are some similarities between *Whitford* and the present case. Both cases involve allegations of unconstitutional partisan gerrymandering. Likewise, both cases involve claims under the First Amendment and Equal Protection Clause. And like the plaintiffs in *Whitford*, League Plaintiffs, in particular, appeal to the "efficiency gap" as a metric demonstrating the discriminatory effects of the Plan. *Common Cause*, 2017 WL 876307, at *3-4.

But the cases also differ in a number of significant ways. To begin, the plaintiffs in *Whitford* lodged a statewide challenge to the legislative redistricting plans, notwithstanding that the plaintiffs did not reside in all of the challenged districts. *Whitford*, 218 F. Supp. 3d at 929. Before the Supreme Court, the *Whitford* defendants argue that individuals lack standing to bring a statewide partisan gerrymandering challenge, Br. for Appellants, *Gill v. Whitford*, No. 16-1611, at 26–34 (July 28, 2017), a question the Supreme Court has yet to resolve, *see Whitford*, 218 F. Supp. 3d at 929. Accordingly, the Supreme Court could dispose of *Whitford* on standing grounds without addressing the merits, thereby providing this Court with no additional guidance regarding the viability of and framework for evaluating partisan gerrymandering claims. By contrast, Plaintiffs in these matters reside in all thirteen North Carolina congressional districts and, therefore, have standing to assert their partisan gerrymandering claims regardless of whether the Supreme Court determines that such claims must proceed on a district-by-district basis, or, alternatively, may proceed on a statewide basis.

*Whitford* and the present cases materially differ as to the merits as well. First, whereas the *Whitford* plaintiffs proposed a single framework for evaluating partisan gerrymandering claims under the First Amendment and Equal Protection Clause, Common Cause Plaintiffs propose a distinct framework for assessing partisan gerrymandering claims under the First Amendment. This framework is derived from the Supreme Court's test for analyzing claims that a governmental defendant unconstitutionally burdened or penalized a plaintiff for exercising her First Amendments rights, including the right to engage in political expression and association. (Doc. 79, at 55–63 (citing *Reed v. Town of Gilbert*,

10

135 S. Ct. 2218 (2015); *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990); *Elrod v. Burns*, 427 U.S. 347 (1976))). The Supreme Court has held that the applicability of that framework to partisan gerrymandering claims—an approach first suggested by Justice Kennedy in his concurrence in *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring in the judgment)—is "uncontradicted by the majority in any of [the Court's] cases," *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015). There are potentially meaningful differences between the First Amendment framework advanced by Common Cause Plaintiffs and the framework applied by the *Gill* trial court, which treated the First Amendment claim as substantively indistinguishable from the Equal Protection claim. *See Benisek v. Lamone*, 2017 WL 3642928, at *27 (D. Md. Aug. 24, 2017) (Neimeyer, J., dissenting) (stating that if a legislature draws district lines to disfavor one party's voters, a plaintiff challenging the districting plan "need not show that the linedrawing altered the outcome of an election—though such a showing would certainly be relevant evidence of the extent of the injury"). Accordingly, *Whitford* likely will not address, much less resolve, the viability of Common Cause Plaintiffs' proposed First Amendment framework, much less whether Plaintiffs' evidence entitles them to relief under that framework.

A second substantive difference between these cases is that *Whitford* involves state legislative districts, whereas this case involves congressional districts. To that end, Common Cause Plaintiffs assert claims under Article I, section 2 of the Constitution, which provides that the "House of Representatives shall be composed of Members chosen . . . by the People," and Article I, section 4, which provides that "the Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the

11

Legislature thereof." The Supreme Court has relied on Article I, section 2 to invalidate congressional districting plans that violate the one person, one vote rule. *Wesberry v. Sanders*, 376 U.S. 1, 13–14 (1964) (explaining that malapportionment "defeat[s] the principle solemnly embodied in the Great Compromise" by making elected congressmen dependent on state legislatures, rather than the people, and by allowing "legislatures [to] draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others"). And the Court has held that Article I, section 4, commonly referred to as the "Elections Clause," does not endow state legislatures with the "power to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995); *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) ("The power to regulate the time, place, and manner of elections does not justify, without more, the abridgement of fundamental rights, such as the right to vote . . . or, as here, the freedom of political association."). Those two constitutional provisions apply to congressional districting plans, not state legislative districting plans. *See Reynolds v. Sims*, 377 U.S. 533, 560–61 (1964). Therefore, *Whitford* will not address, much less resolve, whether the Plan violates those provisions.

Third, there are a number of potentially meaningful factual differences between *Whitford* and the instant case. For example, the *Whitford* districting plan was enacted as part of a decennial redistricting, whereas the General Assembly drew the Plan to preserve the partisan make-up of the General Assembly after federal courts held that North Carolina's 2011 congressional districting plan constituted a racial gerrymander.

12

Additionally, Plaintiffs assert that statements made by the legislative leaders of the 2016 congressional redistricting effort will provide direct evidence that the General Assembly intended to draw the districts so as to maximize the number of Republican members of North Carolina's congressional delegation, and thereby maximally dilute the votes of citizens who previously opposed Republican candidate. By contrast, the *Whitford* court appears to have considered primarily circumstantial evidence of legislative intent. *Whitford*, 218 F. Supp. 3d at 890-96. Moreover, to demonstrate the discriminatory effects of the alleged partisan gerrymander at issue in the present case, Plaintiffs forecast that they will introduce a variety of statistical analyses in addition to the "efficiency gap" metric. Several of these analyses were never before the *Whitford* court. Finally, whereas, the *Whitford* plaintiffs presented statistical evidence from two elections conducted under the challenged districting plan, Plaintiffs intend to introduce statistical evidence from one election conducted under the Plan and two elections conducted under the unconstitutional 2011 congressional districting plan.

In light of the numerous legal and factual differences between *Whitford* and the instant case, staying these proceedings will, at most, minimally advance the interests of judicial economy and preventing hardship to Legislative Defendants. To begin, as a result of the untested approach to standing embraced by the district court in *Whitford*—an approach that Legislative Defendants have claimed conflicts with the Supreme Court's approach to standing in racial gerrymandering cases (Doc. 29, at 13)—there is a distinct possibility that the Supreme Court could resolve *Whitford* without reaching the merits, meaning that *Whitford* would provide this Court with no additional guidance as to how to

resolve Plaintiffs' claims. *See Ga. State Conf. of the NAACP v. Georgia*, -- F. Supp. 3d --, 2017 WL 3698494, at *11 (N.D. Ga. Aug. 25, 2017) (denying a request to stay a partisan gerrymandering claim pending the *Whitford* decision because "[t]he Supreme Court's jurisprudence on partisan gerrymandering teaches us that the Court could rule in a variety of ways on the issues before it in *Whitford*, including not ruling on them at all"). It makes little sense "to delay consideration of this case for possibly a year or more, waiting for a decision that may not ultimately affect it." *Id*.

Even if the Supreme Court reaches the merits of the trial court's decision in *Whitford*, its decision is unlikely to address, much less resolve, many of the issues in this case because, as explained above, several of the legal theories advanced by Plaintiffs differ materially from those at issue in *Whitford*. To resolve Plaintiffs' claims under the First Amendment and Article I of the Constitution, in particular, this Court will, at some point, have to hold a trial and receive argument from the parties on those claims. Conducting further proceedings at this juncture is unlikely, therefore, to amount to an "unnecessar[y]" expense of time and resources, as the evidence and arguments presented by the parties will be necessary to resolve this case, regardless of the disposition of *Whitford*. (Doc. 75, at 11–12.) Indeed, even with regard to Plaintiffs' Equal Protection Clause claims—the claims most likely to be impacted by a decision in *Whitford*—the evidence the parties intend to introduce at trial—which speaks to Legislative Defendants' alleged discriminatory intent and the alleged discriminatory effects of the Plan—is likely to remain relevant to resolving those claims, regardless of any further guidance the Supreme Court provides regarding the framework for evaluating partisan gerrymandering claims under the Equal Protection

Clause. And to the extent the Supreme Court's decision in *Whitford* impacts this Court's legal analysis of the facts relevant to Plaintiffs' Equal Protection claims,—or any other claims, for that matter—"that ruling can be adjusted accordingly." *Ga. State Conf.*, 2017 WL 3698494, at *11.

From our perspective, the only way that *Whitford* would render ongoing proceedings in this case a "waste of time and resources" is if, as Legislative Defendants suggest, the Supreme Court holds that partisan gerrymandering claims are nonjusticiable under *any* legal theory, not just the Equal Protection framework advanced by the *Whitford* plaintiffs and adopted by the *Whitford* majority. But the Supreme Court recently stated that "[p]artisan gerrymanders . . . are incompatible with democratic principles." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015) (alteration in original) (internal quotation marks omitted). And the Court's last three decisions addressing partisan gerrymandering claims under the Equal Protection Clause have held that such claims are justiciable. *See LULAC*, 548 U.S. at 413–14 (declining to revisit *Bandemer*'s holding, affirmed in *Vieth*, "that an equal protection challenge to a political gerrymander presents a justiciable case or controversy"); *see also Ga. State Conf.*, 2017 WL 3698494, at *10 (holding, based on *LULAC*, *Vieth*, and *Bandemer*, that "[t]he justiciability of partisan gerrymandering claims is . . . certain under current caselaw"). It is axiomatic that "if a precedent of [the Supreme] Court has direct application in a case . . . [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (internal quotation marks omitted). Accordingly, in ruling on Legislative

15

Defendants' stay motion, we must follow the Supreme Court's holdings in *LULAC*, *Vieth*, and *Bandemer* that partisan gerrymandering claims are justiciable and, therefore, refrain from exercising our discretion to stay these proceedings on the bare possibility that the Supreme Court may reverse its precedent and flatly bar claims challenging a practice the Court has characterized as "incompatible with democratic principles." *Ariz. State Legislature*, 135 S. Ct. at 2658.

Not only is *Whitford* unlikely to render ongoing proceedings before this Court a waste of time and resources, Legislative Defendants will be minimally harmed by having to prepare for and participate in a trial. The parties completed discovery, submitted motions *in limine*, and prepared for trial *before* Legislative Defendants moved to stay these proceedings. Likewise, this Court already has had the opportunity to review the parties' proposed findings of fact and conclusions of law. Accordingly, staying the proceedings at this juncture will, at most, provide minimal savings to the parties and the Court in terms of time and resources.

B.

Although granting a stay would, at most, minimally advance the interests of judicial economy and preventing hardship to Legislative Defendants, such a stay would expose Plaintiffs to substantial prejudice. To begin, we note that Legislative Defendants waited until the eve of trial to file their motion to stay, notwithstanding that the *Whitford* court issued its opinion in November 2016 and the *Whitford* defendants noticed their appeal as of right to the Supreme Court by filing their jurisdictional statement in March 2017. When Legislative Defendants filed their stay motion, Plaintiffs already had devoted significant

16

time and resources to briefing and arguing Legislative Defendants' motions to dismiss, engaging in discovery, and preparing their cases for trial.

Of greater practical significance, granting Legislative Defendants' motion would mean that this Court could neither schedule nor hold a trial until after the Supreme Court issues its decision in *Whitford*. The Supreme Court could issue that decision at any time after hearing oral argument on October 3, 2017—up to and including the end of the Court's term in June 2018. Depending on when the *Whitford* opinion is published, a trial in this case might not occur until the spring or late summer of 2018, with a written opinion issued following the conclusion of that trial. Plaintiffs reasonably seek relief from the allegedly unconstitutional Plan prior to the 2018 election cycle, which begins in early 2018. Delaying our consideration of this case until after *Whitford* creates a substantial risk that, in the event Plaintiffs prevail, this Court will not have adequate time to afford Plaintiffs the relief they seek—constitutionally compliant districting maps for use in the 2018 election. Given the Court's "responsibility to ensure that future elections will not be conducted under unconstitutional plans," *Larios v. Cox*, 305 F. Supp. 2d 1335, 1344 (N.D. Ga. 2004), this substantial risk weighs strongly against granting the requested stay, *see Johnson v. Mortham*, 915 F. Supp. 1529, 1549–50 (N.D. Fla. 1995) (denying a motion to stay a redistricting case pending a Supreme Court decision in a case involving a similar legal theory on grounds that "the public welfare will be better promoted by the immediate consideration of this cause, since any forthcoming Supreme Court decisions will be too untimely to effectively give this court an opportunity to adjudicate the case at bar without potentially disrupting the [next scheduled] elections").

17

That Plaintiffs and other North Carolina voters cast their ballots under an unconstitutional redistricting plan in 2012 and 2014 only enhances the potential prejudice to Plaintiffs associated with staying these proceedings. If Plaintiffs prevail in this case, but the Court nonetheless lacks sufficient time to afford relief before the 2018 election, Legislative Defendants would reap "the fruits of victory for another election cycle." *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 560 (E.D. Va. 2016). As a result, North Carolinians would cast votes in congressional elections conducted under unconstitutional maps in 2012, 2014, 2016, *and* 2018. That a stay could leave North Carolinians represented by a congressional delegation elected under unconstitutional districting plans for nearly a decade would send a troubling message to state legislatures that there is little downside to engaging in unlawful districting practices because "the federal courts are powerless to effectively redress [voters'] grievances." *Coal. for Educ. in Dist. One v. Bd. of Elections*, 370 F. Supp. 42, 58 (S.D.N.Y. 1974). Denying Legislative Defendants' stay motion ensures that this Court can definitively resolve the constitutionality of the Plan in adequate time to provide Plaintiffs meaningful relief, should this Court find that the Plan violates the Constitution.

III.

In sum, due to the material legal and factual differences between Plaintiffs' claims and *Whitford*, as well as the substantial time and effort the parties already have devoted to preparing these cases for trial, staying these proceedings would, at most, minimally advance the interests of judicial economy and preventing hardship to Legislative Defendants. These minimal benefits are significantly outweighed by the substantial

18

prejudice to Plaintiffs that would result from a stay. Because Legislative Defendants failed to demonstrate "clear and convincing circumstances outweighing" the significant harm to Plaintiffs, and North Carolina voters in general, *Williford*, 715 F.2d at 127, we exercise our discretion to deny Legislative Defendants' motion to stay.

DENIED

Osteen, Jr., District Judge, concurring:

I concur in the decision to deny the motion to stay. The point is well made in the majority opinion that the Supreme Court may resolve *Gill v. Whitford*, No. 16-1161, in a manner, such as on standing grounds, that does not resolve or provide guidance in this pending case.

Although the opinion of the majority here is narrowly drafted and well reasoned, I choose to concur only because I would exercise our discretion to deny the motion to stay solely on the narrow grounds described above. While *Whitford* may not resolve the issues in this case, it is at least arguable that the justiciability of either Equal Protection or First Amendment claims in this context may remain open to some debate. As the majority in *Benisek v. Lamone* recognized with respect to justiciability in granting a motion to stay, "the Supreme Court's decision to hold over the jurisdictional question for argument is a strong signal that the question remains unsettled in the minds of the Justices." *Benisek v. Lamone*, No. CV JKB-13-3233, 2017 WL 3642928, at *5 (D. Md. Aug. 24, 2017), *petition for cert. docketed*, No. 17-333 (U.S. Sept. 1, 2017).

I concur in the order denying the motion to stay this case.