```
 1            IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF NORTH CAROLINA
 2
   COMMON CAUSE, et al.,          )  Greensboro, North Carolina
 3                                 )  October 16, 2017
        Plaintiffs,                )
 4    v.                           )     Case No. 1:16CV1026
                                   )
 5  ROBERT A. RUCHO, in his        )
    official capacity as Chairman  )
 6  of the North Carolina Senate   )
    Redistricting Committee for    )
 7  the 2016 Extra Session and     )
    Co-Chairman of the Joint Select)
 8  Committee on Congressional     )
    Redistricting, et al.,         )
 9                                 )
        Defendants.                )        Bench Trial
10                                 )
   LEAGUE OF WOMEN VOTERS OF       )        Volume I of IV
11 NORTH CAROLINA, WILLIAM         )
   COLLINS, ELLIOTT FELDMAN,       )
12 CAROL FAULKNER FOX,             )
   ANNETTE LOVE, MARIA PALMER,     )
13 GUNTHER PECK, ERSLA PHELPS,     )
   JOHN QUINN, III, AARON SARVER,  )
14 JANIE SMITH SUMPTER,            )
   ELIZABETH TORRES EVANS, and     )
15 WILLIS WILLIAMS,                )
                                   )
16      Plaintiffs,                )
                                   )
17    v.                           )     Case No. 1:16CV1164
                                   )
18 ROBERT A. RUCHO, in his         )
   official capacity as Chairman   )
19 of the North Carolina Senate    )
   Redistricting Committee for     )
20 the 2016 Extra Session and      )
   Co-Chairman of the 2016 Joint   )
21 Select Committee on             )
   Congressional Redistricting,    )
22                                 )
   DAVID R. LEWIS, in his          )
23 official capacity as Chairman   )
   of the North Carolina House of  )
24 Representatives Redistricting   )
   Committee for the 2016 Extra    )
25 Session and Co-Chairman of the  )
```

1  2016 Joint Select Committee on
   Congressional Redistricting,          )
2                                         )
   TIMOTHY K. MOORE, in his              )
3  official capacity as Speaker          )
   of the North Carolina House of        )
4  Representatives,                       )
                                          )
5  PHILIP E. BERGER, in his              )
   official capacity as President        )
6  Pro Tempore of the North              )
   Carolina Senate,                       )
7                                         )
   A. GRANT WHITNEY, JR., in his         )
8  official capacity as Chairman         )
   and Acting on Behalf of the           )
9  North Carolina State Board of         )
   Elections,                             )
10                                        )
   THE NORTH CAROLINA STATE BOARD        )
11 OF ELECTIONS, and                     )
   THE STATE OF NORTH CAROLINA,          )
12                                        )
        Defendants.                       )
13 _____)

14

                    PROCEEDINGS HELD BEFORE:

15
                   **WILLIAM L. OSTEEN, JR.,**
16    CHIEF U.S. DISTRICT JUDGE FOR THE MIDDLE DISTRICT OF N.C.

17                     **W. EARL BRITT**
     SENIOR U.S. DISTRICT JUDGE FOR THE EASTERN DISTRICT OF N.C.

18
                     **JAMES A. WYNN, JR.**
19  CIRCUIT JUDGE OF THE U.S. COURT OF APPEALS FOR THE 4TH CIRCUIT

20

   APPEARANCES:
21
   On Behalf of Common Cause, et al:
22
   EDWIN M. SPEAS, Jr.
23 STEVEN P. EPSTEIN
   CAROLINE P. MACKIE
24 Poyner Spruill, LLP
   301 Fayetteville Street, Suite 1900
25 Raleigh, North Carolina 27602

```
 1   EMMET J. BONDURANT
     BENJAMIN W. THORPE
 2   Bondurant Mixson & Elmore, LLP
     1201 W. Peachtree Street, N.W., Suite 3900
 3   Atlanta, Georgia 30309

 4   PETER A. NELSON
     Patterson Belknap Webb & Tyler
 5   1133 Ave. of the Americas
     New York, NY 10036-6710
 6
     On Behalf of League of Women Voters of North Carolina, et al:
 7
     ANITA S. EARLS
 8   ALLISON JEAN RIGGS
     Southern Coalition for Social Justice
 9   1415 W. Highway 54, Suite 101
     Durham, North Carolina 27707
10
     ANNABELLE E. HARLESS
11   RUTH M. GREENWOOD
     Campaign Legal Center
12   73 W. Monroe Street, Suite 322
     Chicago, Illinois 60603
13
     On Behalf of the Legislative Defendants:
14
     PHILLIP JOHN STRACH
15   MICHAEL DOUGLAS McKNIGHT
     Ogletree Deakins Nash Smoak & Stewart, P.C.
16   4208 Six Forks Road, Suite 1100
     Raleigh, North Carolina 27609
17
     On Behalf of the State and State Board of Elections:
18
     ALEXANDER M. PETERS
19   JAMES BERNIER, Jr.
     N.C. Department of Justice
20   P.O. Box 629
     Raleigh, North Carolina 27602
21


22
     Court Reporter:        Joseph B. Armstrong, FCRR
23                          324 W. Market, Room 101
                            Greensboro, NC  27401
24
               Proceedings reported by stenotype reporter.
25        Transcript produced by Computer-Aided Transcription.
```

1                          I N D E X

2
  WITNESSES FOR THE PLAINTIFF:                        PAGE
3
  JONATHAN CHRISTOPHER MATTINGLY
4     Direct Examination By Mr. Epstein                 20
      Cross-Examination By Mr. Strach                    93
5     Redirect Examination By Mr. Epstein              129
      Recross-Examination By Mr. Strach                141
6

7  JOWEI CHEN

8     Direct Examination By Mr. Thorpe                 153
      Cross-Examination By Mr. Strach                  216
9
  EXHIBITS:                                           RCVD
10
   PX-3040  Dr. Mattingly PowerPoint presentation       75
11            demonstrative
   PX-3041  Chen Illustrative Exhibit                   162
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              P R O C E E D I N G S

2          (At 9:05 a.m., proceedings commenced.)

3          JUDGE OSTEEN:  All right.  Good morning, everyone.

4  Apparently, Judge Wynn was sitting in my chair earlier this

5  morning and lowered it down on me.

6          Calling now for trial cases number -- Case Numbers

7  16CV1026 and 16CV1164.  1026 is Common Cause, et al., versus

8  Rucho, et al., and 1164 is League of Women Voters versus Rucho,

9  et al.

10          Let's see.  Why don't we start with the Common Cause

11  Plaintiffs.  Are you all ready to proceed?

12          MR. SPEAS:  We are, Your Honor.

13          JUDGE OSTEEN:  And if you'll just introduce Common

14  Cause attorneys you have seated at the table.

15          MR. SPEAS:  Seated to my right is Emmet Bondurant,

16  and to his right is Peter Nelson.  Mr. Bondurant is with

17  Bondurant Mixson in Atlanta, and Mr. Nelson is with Patterson

18  Belknap in New York.  Over here, I have my colleagues Steve

19  Epstein and Caroline Mackie and Ben Thorpe, who is

20  Mr. Bondurant's cocounsel.

21          JUDGE OSTEEN:  All right.  Thank you, sir.  And for

22  the League of Women Voters?

23          MS. EARLS:  Good morning, Your Honor, Anita Earls,

24  for the League of Women Voters.  With me is Allison Riggs of

25  the Southern Coalition for Social Justice, and then Annabelle
```

```
 1  Harless from the Campaign Legal Center.  Also with our team is
 2  Ruth Greenwood from the Campaign Legal Center and Nick
 3  Stephanopoulos.
 4          JUDGE OSTEEN:  All right.  Thank you.  And are the
 5  Defendants ready to proceed?
 6          MR. STRACH:  Yes, Your Honor, thank you, Phil Strach,
 7  Ogletree Deakins, here for the Legislative Defendants here with
 8  my colleagues Michael McKnight to my left and Brodie Erwin on
 9  the far end of the table.
10          THE COURT:  All right.  For the State?
11          MS. PETERS:  Good morning, Your Honor, Alec Peters of
12  the Attorney General's Office, along with James Bernier of our
13  office on behalf of the State and the State Board of Elections
14  Defendants.
15          JUDGE OSTEEN:  All right.  A couple of things I want
16  to talk about before we get started.  First of all, the parties
17  filed their opening statements.  I can't speak for all the
18  judges on the bench, but I thought it was very helpful to have
19  those written opening statements filed on Friday to give us a
20  chance to review and see where things were headed.  We have
21  also received your deposition designations and exhibit list.
22          A couple of housekeeping matters:  One, in terms of
23  the motion in limine to bifurcate the expert witnesses'
24  testimony with respect to the -- we'll call it the additional
25  theory presented by the League of Women Voters, with respect to
```

that expert testimony, that motion will be granted.  We do ask

that you deal with whatever -- address whatever you can during

the initial testimony and not be repetitive when you come back.

So you're reserving your right to recall the witness to explain

a theory based upon certain evidence that will be presented as

a foundation during the presentation of your case.  So that's

one housekeeping matter.

Number two, in reviewing the opening statements, the

deposition testimony, and various other evidentiary filings in

this case, it appears to me certainly, and to my colleagues as

well, that this case is really more about a legal issue than it

is a factual issue.  In other words, certain facts and evidence

will have to be presented in terms of expert testimony as well

as perhaps some nonexpert testimony to address the question of

whether or not political gerrymander -- well, let's say it this

way:  Whether or not a justiciable standard can be created to

determine whether or not there exists constitutional limits to

political and incumbent gerrymandering.

I have no doubt after reading the facts that the

Plaintiffs in this -- both of these cases, actually, claim to

be aggrieved by the fact generally, I'll summarize it, that

based on the percentage of registered Democratic voters and

based on the percentage of Republican representatives from the

13 congressional districts, that those voters contend that the

political gerrymandering that took place elevated -- unfairly

elevated control of the House races or the congressional races
to the Republicans. I'm not stating that as a fact. I'm
simply saying that is an issue in the case.

The Supreme Court has been wrestling and is currently
wrestling with the question of whether or not political --
whether or not a justiciable standard for political
gerrymandering can be established within the context of the
United States Constitution.

If, in fact, our analysis is correct, and, that is,
this is primarily a legal issue in terms of, A, whether or not
a standard can be established, and, B, what standard can be
proved by a preponderance of the evidence in this case, then it
seems to us that there ought to be some way to streamline this
testimony such that we spend more time in final arguments with
questions and answers from the Court than we do worrying
about -- and I don't mean to diminish this in any way. I'm
speaking solely for myself -- than we worry about voters,
registered Democrat or otherwise, who are -- contend to have
been injured by the election results, most recent on 10/3, if
that makes any sense to anyone.

So I'm hoping that perhaps by making these comments
here before we start, either the next few minutes this morning,
we can take a short break and may take a short break to let you
start talking about this, but perhaps we can find some way to
really get to the heart of the issues in this case, which

clearly are going to be the expert witness testimony, part one;
but, part two, with respect to the facts necessary to establish
a foundation for that testimony, it seems to me there's a way
that -- whether they're stipulated to or not, that that part
can be presented and then some of the -- what we anticipate
might be the testimony in the case can either be stipulated to
or presented by way of deposition.

Mr. Speas, any questions about those comments at this
point?

MR. SPEAS:  No, Your Honor, I just --

JUDGE WYNN:  Before you start, I want to be clear in
terms of where we're going with this.  This is primarily a
legal case.  The issues that are before this Court, rather, are
not as simply stated as what is here.  They are very difficult
legal issues.  There's a lot of dispute in terms of what the
law is.  There's not a lot of dispute in terms of some of the
facts in this case.  What we want you to do is to stipulate
either by stipulation or by deposition, or whatever is there,
as to that testimony that there's no dispute.  We don't want to
hear undisputed evidence because we can read, and so that's
basically where we're going, so if we can go there.

And then we want to give you ample time to present
the legal arguments to this Court, because that's really where
it is.  We don't want to hear the policy arguments and all the
other stuff that goes with it in terms of what might sound good

1  because this is a legal case, and we want to get to the law of

2  the case quicker.

3          MR. SPEAS:  We agree with you, Your Honors, that this

4  is a case in which there is not significant dispute as to the

5  facts.  We would like the opportunity to put on Senator Dan

6  Blue to give the Court an overview of what happened in the

7  legislature because we think that is important.  We also would

8  like to put on our two institutional Plaintiff representatives,

9  Bob Phillips from Common Cause and Wayne Goodwin from the

10  Department -- from the Democratic Party, but we have our two

11  experts here today.

12          My estimate is that we can present this evidence to

13  the Court within the day.  We would be happy to confer, of

14  course, with the other side about further stipulations, but we

15  have tried to tailor our case to just what you're saying.  This

16  is, in essence, a legal dispute about which the facts are not

17  much in dispute.  I suppose they have an expert who has one

18  view.  We certainly have experts who have a different view, but

19  with regard to what happened in the General Assembly, most of

20  it is transcribed and recorded and before the Court in

21  stipulated exhibits.

22          JUDGE WYNN:  Mr. Speas, we want you to present your

23  case.  What I'm saying to you is do not present that which we

24  are reading.  If we are reading it and we see it, I don't need

25  for a witness -- if it can be stipulated to, if the other side

agrees with you, this is what he's going to say, we don't have
any dispute with it, streamline it, and I understand you want
to get it out, but understand the Court already has read this,
and we're the Court.  This is not a public trial in the sense
that you're trying to appeal to a jury.  We have already read
this.  So streamline it.  I know you feel like you've got to
say it, but you don't have to keep repeating it to us if we
read it.  That's the only thing I'm saying, and I think you are
going to have to have time to confer with counsel.  If you
can't agree, present it.

JUDGE OSTEEN:  Let me get Ms. Earls -- if she has
anything, and then we'll come around to you.

MS. EARLS:  Yes, Your Honors, I appreciate and
understand the point you're making.  I would say this
immediately arises for us in the -- with the first witness
because there's an exhibit that hasn't been stipulated to, the
videotape of actual legislative proceedings.  So that
immediately comes to fore for us, but I would just add the
other point, that the question of standing has been contested
by the Defendants as well, and that's what some of our
individual Plaintiffs were intending to address, the facts that
we contend show they have standing.

So that's another issue that if there was a
stipulation, we wouldn't have to present testimony, but if it's
contested, then we have facts that relate to standing.

1          JUDGE WYNN:  Well, I think the facts, to the extent

2     that they are presented, if they're undisputed, we will make

3     the decision on standing on law, but we don't need to hear

4     facts that we already -- that you can stipulate to.

5          MS. EARLS:  Thank you, Your Honor.

6          MR. STRACH:  Your Honor, I agree with that.  Many of

7     the facts on standing, et cetera, are in the transcripts that

8     have already been filed, and we would certainly be happy -- if

9     the Court wanted to give the parties a brief recess, we -- from

10    the defense side, we certainly would be willing to have this

11    conversation right now before the Court got going, in light of

12    the comments we're hearing.

13         JUDGE OSTEEN:  All right.

14         MS. PETERS:  Nothing to add to that, Your Honor.

15         JUDGE OSTEEN:  All right.  Why don't we take a little

16    15-minute recess now and let you all talk a little bit.

17         I'm well aware of the fact -- or I'm assuming, I'm

18    not well aware of, that you may have been swapping witness

19    lists to prepare for each day ahead, and we'll make some

20    allowances if things change and we need some stuff; but we'll

21    give you 15 minutes now, and just do the best you can with it.

22    We'll come back, we'll start hearing the evidence, and then

23    once we've -- we'll get through to at least the lunch break,

24    and if at various points you think about stopping and

25    stipulating or doing whatever, we'll give you some time as we

go ahead.

I understand we're springing this on you a little
bit, but we got the opening statements on Friday.  We've had
the benefit of the proposed findings and conclusions of law.
So we have some idea of what the -- what the issues are in the
case, and I agree with Judge Wynn 100 percent in terms of
primary legal issues that are going to have to be resolved and
complicated legal issues.  I don't mean to diminish that in any
way, but you all know best what evidence is necessary to decide
those issues.

We'll stand in recess for 15 minutes.

(At 9:18 a.m., break taken.)

(At 9:42 a.m., break concluded.)

JUDGE OSTEEN:  Just so everybody knows, we'll do an
official opening and closing at the beginning of the day and at
the end of the day, and on recesses and lunches, we'll just
come back in and get started.  You'll hear a law clerk say
remain seated, come to order, the court is again in session.

Judge Britt, I think you wanted to admonish the
parties before we get started.

JUDGE BRITT:  Not exactly.  I just want to ask for
your cooperation.  When you get to my age, some artificial
equipment helps you considerably, and for me, it's my hearing
aids; and my hearing aids, fortunately, through Bluetooth
technology, are tied in with the sound system here.  We've just

been able to get it working right.  So if you will, please try

to talk into the microphone, although not too close to it; but,

most importantly, please try to avoid letting a sheath of

papers hit that microphone because it's painful.  Thank you

very much.

        JUDGE OSTEEN:  All right.  We've got the courtroom

set up a little differently from last time.  The witness box

obviously is turned, so we, as the finders of facts, can have a

better view of the witnesses.  We'll see how it goes.  I would

like you to conduct your examinations from the podium to the

extent possible because it allows the witness to look this way

instead of having to look away from us.

        We're ready to proceed.  The Plaintiffs may call

their first witness.

        MR. SPEAS:  Your Honor, I think that we have reached

an agreement.  I would like to outline that agreement and make

sure that I'm stating it correctly.

        The agreement is that all depositions and all

deposition exhibits come in the record.  All objections

previously made to any testimony or any exhibit is withdrawn.

The live testimony will be limited to the expert witnesses.

        Mr. Strach has agreed that I can take five minutes

and put the case in context, and he will tell the Court whether

I have misstated it or not and that Mr. Earls will take a short

time and do the same thing, and Mr. Strach will sign off or

1 not.

2         JUDGE OSTEEN:  All right.  So, basically, a mini

3 opening statement kind of thing, an outline of what's going on?

4         MR. SPEAS:  I wouldn't go so far as to describe it

5 that way, but, yes, just putting it briefly in context.

6         JUDGE OSTEEN:  All right.  Everybody good with that?

7         JUDGE BRITT:  Absolutely.

8         JUDGE OSTEEN:  All right.  You may proceed then.  I

9 don't want to get too far out of order, but we'll recognize the

10 stipulation, and all depositions and exhibits are admitted.

11         MR. SPEAS:  And if, at this point, I may make my very

12 brief remarks putting the case in context.

13         JUDGE OSTEEN:  You may.

14         MR. SPEAS:  On February 5, 2016, the federal court

15 declared the 2011 Congressional Redistricting Plan

16 unconstitutional because Districts 1 and 12 were racial

17 gerrymanders for which there was no compelling interest.  The

18 Court gave the legislature until February 19 to draw a new map.

19         On the 12th of February, a redistricting committee

20 was appointed by the speaker and the president of the Senate.

21 Senator Rucho and Representative Lewis were cochairs.

22 Thirty-six persons were appointed to the committee, 24

23 Republicans and 12 Democrats.

24         On Monday, February 15, the Joint Committee appointed

25 on Friday convened to hold a public hearing.  The transcript of

that public hearing is Exhibit 1004.  The next day, Tuesday,

February 16, the Joint Committee met to adopt the criteria to

be used to draw the new map.  One of those criterion was

partisan advantage, which reads:  "The political makeup of the

Congressional Delegation is ten Republicans and three

Democrats.  The Committee shall make reasonable efforts to

construct districts in the 2016 Plan to maintain the current

partisan makeup of the North Carolina Congressional

Delegation."

          Another criterion presented to the committee on that

date was -- well, let me back up just a second.  Representative

Lewis was asked to explain that criterion on the floor.  He

said, and I quote:  "The explanation of this is reasonably

simple, as we are allowed to use political data in the drawing

of maps.  I would propose that to the extent possible the map

drawers create a map which is likely to elect ten Republicans

and three Democrats.  I acknowledge freely that this would be a

political gerrymander, which is not against the law."

          In response to a question from Senator McKissick, at

that meeting, Representative Lewis said, and I quote:  "I

propose that we draw the maps to give a partisan advantage, ten

Republicans and three Democrats, because I do not believe it is

possible to draw a map with eleven Republicans and two

Democrats."

          The 2016 elections were held, and three -- ten

1    Republicans and three Democrats were elected.

2          With regard to the political data criterion,

3    Representative Lewis said on February 16 that "We want to make

4    clear that to the extent we are going to use political data in

5    drawing the map, it is to gain partisan advantage, advantage on

6    the map.  I want that criterion to be clearly stated and

7    understood."

8          MR. STRACH:  Your Honor, those are certainly facts in

9    the legislative record.  Just brief additional context is that

10   the two criteria that Mr. Speas has related to the Court were

11   among four or five or six other criteria, all of which, the

12   record will show, were followed and balanced and harmonized.

13   It was not simply -- partisan advantage was not the only

14   criterion that was followed.

15         And I will simply just note for the Court that the

16   statements by Representative Lewis that Mr. Speas has noted

17   have all been explained in his deposition.  They'll be coming

18   in.  The Court will be able to see that the explanation for

19   those is that Representative Lewis was making it clear that

20   since they were -- had been -- the districts had been ruled a

21   racial gerrymander, that the political data was in no way being

22   used to further any race goals, but that there's different

23   motives at play.

24         And so this is -- the Court will see when it reads

25   the record that this was a uniquely -- a unique case in that it

was coming back on a draw from racially gerrymandered

districts, and that largely explains the mistakes.

JUDGE OSTEEN:  All right.

MR. SPEAS:  Your Honor, just to be clear, we would

suggest that the deposition transcripts don't explain it.

JUDGE OSTEEN:  Understood.

MS. EARLS:  Your Honor, if I may be heard briefly, I

do not need to elaborate further on the factual context, but I

do want to be a little more precise on the League of Women

Voters' understanding of the agreement that we've reached so

far, that it would be fact witness depositions, not all

depositions, so not depositions of expert witnesses, and that

the -- that there will likely need to be additional fact

stipulations relating to standing that we have not fully ironed

out with the Defendants, but we're confident that with

additional time to discuss, we can likely resolve those.

But I just wanted to be clear it was only the fact

witness depositions, and there may be -- the League of Women

Voters reserve at this point the potential that there are some

exhibits to some depositions or some exhibits that we still

need to discuss with the Defendants in terms of whether we

would totally agree to their admission.

So the blanket "all depositions, all exhibits" was

not quite where we were with the League.

JUDGE OSTEEN:  All right.  Anything in terms of --

 1          MR. SPEAS:  I had understood that the expert

 2  depositions were -- the experts will testify, and to the extent

 3  their exhibits come in, they come in.

 4          JUDGE OSTEEN:  That's the way I understood it, too.

 5  Anything further in terms of the facts that you wanted to

 6  outline or just overview of the agreement?

 7          MS. EARLS:  I only wanted to address the agreements.

 8          JUDGE OSTEEN:  All right.  Mr. Strach?

 9          MR. STRACH:  Your Honor, I believe that's largely

10  right, although I think we and the Common Cause Plaintiffs were

11  probably more in agreement that everything will come in from

12  fact witnesses regardless.  I think we're prepared to waive all

13  objections.

14          The only logistical issue that I've already raised

15  with the Plaintiffs and I wanted to raise with the Court is we

16  were assuming our case was going to largely be Wednesday and

17  Thursday, and so we have -- one of our experts is currently

18  under subpoena in a case in Arizona, and he won't be able to be

19  here until Thursday.  We could have him right up Thursday

20  morning, but he will literally be flying during part of this

21  trial, and we have -- our other expert is -- will probably get

22  here late, late Tuesday night.  We could probably put him up

23  Wednesday, but it might be the afternoon.  So we may ask the

24  Courts' indulgence and the parties' indulgence, if this moves

25  along more quickly because of our agreements, to help us with

1  the logistics with some of our experts.

2          JUDGE OSTEEN:  I'll see what the other judges want to

3  do, but from my perspective, if we run into a problem where

4  evidence ends early and we have some gaps in getting witnesses

5  here, my preference would be not to piecemeal it, in other

6  words, not two hours on Wednesday and two hours on Thursday.  I

7  would like to try to keep it all in big blocks of time.  So if

8  we run out of evidence and we need to discuss it a little bit,

9  I'll just tell you now, I'll be looking to try to get everybody

10  lined up in one day.  So if your last witness is here Thursday,

11  get everybody on -- we'll see where we go.

12          MR. STRACH:  That's fine, Your Honor.

13          JUDGE OSTEEN:  That's from my perspective.  They're

14  the visitors, and I'll defer to them ultimately.

15          MR. STRACH:  Thank you, Your Honor.  That's all we

16  have.

17          JUDGE OSTEEN:  All right.  Then you may proceed.

18          MR. EPSTEIN:  Your Honors, at this time the Common

19  Cause Plaintiffs call Dr. Jonathan Mattingly.

20          (Witness sworn by the clerk.)

21              JONATHAN CHRISTOPHER MATTINGLY,

22          PLAINTIFFS' WITNESS, SWORN AT 9:54 a.m.

23                  DIRECT EXAMINATION

24  BY MR. EPSTEIN:

25  Q    Good morning.

1  A    Good morning.

2  Q    Go ahead and state your full name, please.

3  A    Jonathan Christopher Mattingly.

4  Q    Where did you grow up, Dr. Mattingly?

5  A    Charlotte, North Carolina.

6  Q    Tell us, if you would about your educational --

7           JUDGE OSTEEN:  Hold on just a second.

8           JUDGE BRITT:  Mr. Court Reporter, you're using the

9  wrong lawyer.  This is Mr. Epstein instead of Mr. Bondurant.

10           MR. EPSTEIN:  Thank you, Your Honor.

11  BY MR. EPSTEIN:

12  Q    You may proceed to tell us, if you would, about your

13  education from high school until you completed your education

14  and letting us know along the way what degrees you obtained.

15  A    I started high school in Charlotte, and then I moved to

16  the North Carolina School of Science and Math in Durham; after

17  which, I went to undergraduate at Yale, where I received a

18  degree in applied mathematics.  After that, I spent some time

19  in France studying at the Ecole Normale school of nonlinear

20  physics.  Then I returned to Princeton University, where I

21  completed my Ph.D in applied and computational mathematics.

22  Q    Now, if you would, take us through your career in teaching

23  from the time it commenced until today.

24  A    After Princeton, I spent four years as a Szego assistant

25  professor at Stanford University in the mathematics department.

1   Then I spent one year at the Institute for Advanced Study in

2   Princeton, a think tank there, doing research.

3   Q    Let me stop you quickly.  Can you name any famous people

4   who went to that think tank like you did?

5   A    Von Neumann and Einstein.

6   Q    Go ahead.

7   A    And then I started my tenure-track position at Duke

8   University, and I progressed there through different ranks, and

9   now I'm a full professor, and, currently, I'm chair of the

10  mathematics department, and I also have an appointment in the

11  statistical science department.

12  Q    What courses have you taught there recently?

13  A    Undergraduate probability, stochastic processes,

14  stochastic computation classes.

15  Q    How many publications have you authored in peer-reviewed

16  professional journals?

17  A    Over 50.

18  Q    Okay.

19       MR. EPSTEIN:  And, Your Honors, at this time I would

20  like to approach the witness, if I may, to hand him an exhibit

21  notebook.  I believe the exhibit notebook for him has been

22  placed on the bench for each of Your Honors.

23       JUDGE OSTEEN:  All right.  And I don't have any

24  objection to you not asking each time you want to go up.

25       MR. EPSTEIN:  Thank you, Your Honor.

1  BY MR. EPSTEIN:

2  Q    If you would please turn to the tab marked No. 1, and tell

3  us what we see there.

4  A    It's my CV.

5  Q    Okay.  And is your CV something that at the time your

6  expert report was submitted in March of 2017 -- is it accurate

7  as of that date?

8  A    Yes, it is.

9  Q    And does it accurately describe the progression of your

10  education and career and disclosed all of your published

11  writings as of that day?

12  A    Yes.

13  Q    All right.  Let's put that aside for a second, and let's

14  talk a little bit about some of these terms that you've used

15  that may be a little bit unfamiliar to us.

16          What is applied computational mathematics?

17  A    It's the study of mathematics to solve problems of

18  engineering and scientific and social relevance.

19  Q    And what would you consider your area of specialization to

20  be within the field of applied computational mathematics?

21  A    Stochastic processes.

22  Q    Spell that for the benefit of the court reporter.

23  A    Okay.  I'm borderline dyslexic, so you'll have to bear

24  with me if I switch letters, S-T-O-C-H-A-S-T-I-C.

25  Q    Okay.  Now, that was the hard part.  The easy part, what

1  does it mean?

2  A    It's the Greek word for random.  So it just means the

3  study of things that evolve in time or have random influences.

4  Q    Can you give us some examples of how you have used applied

5  computational mathematics to study various phenomenon?

6  A    So I've studied turbulent fluid flow like around a jet

7  wing or in water.  I've studied the computational methods that

8  are used to simulate protein folding in, for instance, drug or

9  molecular design.  I've also studied biochemical pathways in

10  cells and how they fluctuate, as well as doing some basic

11  understanding of computational methods used in statistics and

12  machine learning.

13           MR. EPSTEIN:  Your Honors, at this point the Common

14  Cause Plaintiffs tender Dr. Jonathan Mattingly as an expert

15  witness in the field of applied computational mathematics.

16           JUDGE OSTEEN:  Voir dire?

17           MR. STRACH:  No objection, Your Honor.

18           MS. PETERS:  No objection, Your Honor.

19           JUDGE OSTEEN:  Mr. Strach, you'll be speaking for all

20  the Defendants primarily?  I don't want to catch anybody off

21  guard.

22           MR. STRACH:  Primary, but we'll certainly let you

23  know, but primarily.

24           JUDGE OSTEEN:  Dr. Mattingly is accepted as an expert

25  in the field of applied computational mathematics -- what was

 1  it?

 2          MR. EPSTEIN:  That's it.  Thank you, Your Honor.

 3          JUDGE OSTEEN:  Okay.  He may offer his opinion.

 4  BY MR. EPSTEIN:

 5  Q    Dr. Mattingly, can you tell us -- we talked about

 6  schedules a second ago with witnesses from the Defendant.

 7          Can you tell us if there were any difficulties

 8  getting you scheduled to testify this week?

 9  A    Yes.

10  Q    What else do you have on your agenda this week?

11  A    Tomorrow, I'm talking to a meeting at the National Academy

12  of Science in Durham on redistricting, and then I'm flying to

13  Toronto for a Fields Medal Symposium in Toronto at the Fields

14  Institute.

15  Q    A Fields Medal Symposium.  What's the Fields Medal?

16  A    The Fields Medal is the closest thing to a Noble Prize in

17  mathematics, and a coauthor of mine received it, and I'm

18  talking in celebration and honor of his work.

19  Q    Now, in the 20 or so years that you have been teaching

20  applied mathematics, both at Stanford and at Duke, how many

21  times prior to 2016 have lawyers knocked on your door to ask

22  you to help them in a court case?

23  A    Never.

24  Q    This is the first such case?

25  A    Yes.

1  Q    You've never been an expert witness who testified under

2  oath before this case?

3  A    No, I haven't.

4  Q    How many political science degrees do you have?

5  A    None.

6  Q    Have you ever worked with or for a legislative body in the

7  redistricting process?

8  A    I have not.

9  Q    Describe how you went from being a Duke professor,

10 teaching applied computational mathematics, to sitting here

11 today telling us about redistricting as an expert witness in a

12 court case.

13 A    I had an undergraduate student who became interested in

14 modeling, random modeling of politics through the work of Nate

15 Silver that we all read about in *The New York Times*, and we

16 were reading about that; and then in the popular press, we read

17 about the 2012 election, where just over 50 percent of the

18 votes were cast for Democratic candidates, but, yet, the

19 majority of -- the vast majority elected to the US House of

20 Representatives from North Carolina were Republican, and we

21 started -- we just posed ourselves a question to try to

22 understand what was going on there.

23 Q    Okay.  And what was that question?

24 A    Well, some people in the press were arguing that just

25 because 50 percent of the votes had been cast for Democrats,

1  clearly 50 percent of the representatives should have been

2  Democratic, but, as was already said, I grew up in North

3  Carolina, so I have some idea of the political differences from

4  one corner of the state to the other corner of the state, from

5  different metropolitan areas to other metropolitan areas, and

6  it's quite reasonable that maybe the geopolitical structure of

7  North Carolina could account for some of that.

8  Q    All right.  Did you and Ms. Vaughn collaborate on a

9  project in 2013?

10  A    We did.

11  Q    Can you describe that project for the Court?

12  A    We created an ensemble of maps.  We generated with

13  computers some maps, and then we reran the elections using the

14  2012 votes, and we tried this -- we saw what the outcomes were,

15  and we used that to situate the outcomes that actually occurred

16  using the General Assembly's maps.

17  Q    Let's make this as clear as we can for the benefit of the

18  Court.

19         From the point of time that work began in 2013 until

20  today, has your work, or the work that you assisted students

21  with, ever focused on how a legislative body, be it the North

22  Carolina General Assembly or another, should draw a

23  redistricting map?

24  A    No, we always looked at maps after the fact and tried to

25  situate them and analyze them.

1  Q    And did the work that you and Ms. Vaughn did together

2  eventual lead to looking at congressional redistricting in

3  other states besides North Carolina, such as Maryland and Iowa?

4  A    Yes, there was a second group of people who Christy helped

5  mentor, and that group of undergraduates, again, looked at

6  redistricting in Maryland, in Iowa, in Texas, and a few other

7  states.

8  Q    And did that particulars project have a name?

9  A    Yes, that was called the Quantifying Gerrymandering

10 Project.

11 Q    Now, did there come a point in time when the Terry Sanford

12 School of Public Policy at Duke became interested in the work

13 that you and Ms. Vaughn and you and this other group of

14 students had been doing on redistricting?

15 A    Yes.  So Tom Ross was in residence as a visiting professor

16 at Duke University in the Terry Sanford School of Public

17 Policy, and he had approached Information Initiative, which is

18 a group that deals with large data, to maybe provide some

19 technical support and some analysis of his -- in his project.

20 Q    And is that the Tom Ross that was the president of the UNC

21 system before going to Duke as a visiting professor?

22 A    Yes, and Davidson.

23 Q    And when was that that he began talking to you about this

24 project?

25 A    That was spring of 2016.

1  Q    Okay.  What was the project that he envisioned at its

2  inception?

3  A    It was a simulation of a bipartisan redistricting

4  committee where it would be made up of retired judges, and they

5  would make up their own maps following -- House Bill 92 was

6  what he was setting out as his procedure.

7  Q    And we'll talk about that bill in a minute, but how was

8  that -- how were the judges divided?  Was there some kind of

9  partisan divide on that -- on that pretend or fictional

10 committee of a redistricting commission?

11 A    He called it a simulation of a redistricting committee,

12 and it was six Democrats and six Republicans.

13 Q    Okay.  And did that project have a name?

14 A    Yes, it was Beyond Gerrymandering.

15 Q    And did you and another group of students get involved in

16 the Beyond Gerrymandering Project?

17 A    Yes.

18 Q    In what time frame?

19 A    That was over the summer of 2016 and into the fall.

20 Q    And what role did you and your students play in the Beyond

21 Gerrymandering Project?

22 A    We observed mainly the judges' deliberations, and then

23 once they had produced their maps, they were given to us; and

24 we then tried to situate them, much as we had done before,

25 using an analysis of, you know, a group of other maps that we

1  generated, how typical and the characteristics of those maps,

2  and then we gave a report on it.

3  Q    All right.  And you said maps in plural.  I just want to

4  make sure we're clear.  Did the Beyond Gerrymandering Project

5  produce multiple maps for the congressional redistricting or

6  just one?

7  A    A single map.

8  Q    Okay.  And did all of that occur before you became

9  involved in this case?

10  A    Yes.

11  Q    All right.  Well, let's talk about your involvement in

12  this case.  When and how were you asked to become involved in

13  this case?

14  A    Based on some of the presentations we've given, Eddie

15  Speas approached me around Christmas of 2016.

16  Q    Okay.  And when he approached you, what did he ask you?

17  A    He asked if we would be -- if I would be willing to write

18  up a report which summarized the work we had done already.

19  Q    How far along was the work you were doing on the project

20  for Tom Ross, the Beyond Gerrymandering Project, at the time

21  that Mr. Speas approached you around Christmas of 2016?

22  A    The main conclusions we'd already presented in a

23  conference at the Sanford School, and we were in the process of

24  writing up a report.

25  Q    And having never been an expert witness in a case before,

1    did you run for the hills or did you sign on?

2    A    You should always try everything once, right?  So, yes, we

3    signed on.

4    Q    Okay.  And what specifically did Mr. Speas ask you to do?

5    A    He asked just to write out a report that summarized what

6    results we had presented in our talk and what we had found in

7    analyzing the judges maps and how that fit into the maps that

8    the legislature had drawn.

9    Q    Did he ask you to do that work for free?

10   A    No.

11   Q    Did he talk with you about compensation?

12   A    Yes.

13   Q    And what was discussed about compensation?

14   A    $12,500.

15   Q    $12,500 a week?  A month?  A year?

16   A    A flat fee.

17   Q    Dr. Mattingly, about how many hours have you put into your

18   efforts as an expert witness in this case?

19   A    Hundreds.

20   Q    Does that include preparation of your report, your

21   deposition -- which occurred over two days, is that right?

22   A    Yes.

23   Q    -- your preparation for trial and your time here at trial?

24   A    That is correct.

25   Q    And since you began your involvement in this case, have

1  you also provided assistance in other court cases involving

2  redistricting and alleged gerrymandering?

3  A    Yes, we did some more analysis, again as an academic

4  analysis.  We did analysis of the redistrictings in Wisconsin,

5  and then we were -- became involved with writing an amicus

6  brief to the Supreme Court based on that analysis, and then

7  right after the legislature released its new maps for the North

8  Carolina legislative maps, the Senate maps, we were involved in

9  making some preliminary analysis and filing a summary of that

10 report for Common Cause.

11 Q    Okay.  Did you get paid for either of those efforts?

12 A    The first one, no.  The amicus brief was just a summary of

13 a paper we had written, which is now publicly available, and

14 the second one, a member of my team was paid; I was not.

15 Q    All right.

16 A    Because he did the writing.

17 Q    Now, Dr. Mattingly, you've talked about Mr. Speas asking

18 you to write a report in this case, an expert report.  Did you,

19 in fact, eventually do that?

20 A    I did.

21 Q    All right.  If you would open your witness notebook, just

22 so it's clear to the Court, behind Tab No. 2, labeled

23 "Plaintiffs' Exhibit No. 3002," is that your report for this

24 Court in this case?

25 A    It is.

1  Q    Entitled "Report on Redistricting, Drawing the Line,"

2  Jonathan C. Mattingly?

3  A    Yes.

4  Q    And that was submitted back in March?

5  A    Yes.

6  Q    Was the content of that report something that you prepared

7  solely for the lawyers that are assembled here today?

8  A    No.  Since we already had a draft of our actual academic

9  paper in progress, I borrowed heavily from that.

10 Q    Okay.  Is there a more complete version of the information

11 contained in your expert report in this case?

12 A    Yes.

13 Q    And where can that more complete version be found?

14 A    On the same public ePrint server where Christy and I

15 published our initial work.

16 Q    What is an ePrint server?

17 A    It's run by the National Science Foundation and Cornell

18 University, and it's just a public repository where you place

19 something, and then it's visible for all-time.  It's what we do

20 -- it's the main way we publish things initially.

21 Q    And if you turn to Tab 4 in your notebook where we have

22 Plaintiffs' Exhibit 3004, is that, in fact, that full published

23 on ePrint paper that you were just discussing that you and your

24 coauthors submitted for ePrint?

25 A    Yes.

1  Q    And what is the date that that was last published on that

2  archive?

3  A    It's date stamped 8th of May 2017 on the left-hand side on

4  the margin.

5  Q    Is that article that we're looking at behind Tab No. 4

6  available for anyone in the world who has an internet

7  connection to see?

8  A    Yes, it's publicly available.

9  Q    Is it your intention to publish that article in a referee

10 professional journal?

11 A    Yes.

12 Q    All right.  My next questions are going to zoom in on some

13 of the big picture conclusions that you state in that article

14 behind Tab No. 4.

15        Before we get to the specific conclusions, I would

16 like you to very briefly describe how you and your students

17 went about evaluating the 2012 and 2016 Redistricting Plans

18 adopted by the General Assembly as well as the Judges Plan.

19 What was the means or mechanism to do that?

20 A    So we generated a large number, over 24,000 maps, that

21 adhered to the bipart -- the nonpartisan redistricting criteria

22 laid out in House Bill 92.  Then we took each of those maps,

23 and we took the actual vote count from the 2012 or the 2016

24 elections, and we saw what outcome that map would produce, and

25 then we tabulated all of those statistics, the outcomes of each

1    of those elections, as well as the partisan makeup of each of

2    the districts, and then we used that to provide a background

3    against which we could evaluate the Judges maps or the 2012

4    maps or the 2016 maps.

5    Q    Okay.  On page 3, in the second full paragraph of your

6    article, "Redistricting, Drawing the Line," you say that the

7    2012 and 2016 Redistricting Plans produced results that are,

8    quote, extremely atypical.  What did you mean by that?

9    A    What I meant was that over 99 percent of the maps we

10   looked at produced more Democratic seats than those maps did.

11   Q    In the next sentence, you say, quote, finer analysis

12   clearly shows that the Democratic voters are clearly packed

13   into a few districts, decreasing their power, while Republican

14   voters are spread more evenly, thus increasing their power,

15   unquote.  What did you mean by that?

16   A    So what I meant was that the maps we -- this ensemble of

17   maps you created gave us a baseline, and when you compared the

18   percentages in the most Democratic districts to those -- that

19   baseline, there were clearly many, many more Democrats packed

20   into those Democratic districts; and on the other hand, that

21   allowed there to be many more Republicans in the next group of

22   districts.

23   Q    On page 9 of your article, just before Figure 6, you state

24   that the 2012 and 2016 Redistricting Plans, quote, were

25   precisely engineered and tuned to achieve a partisan goal,

1  unquote, and that, quote, the components of those plans were

2  not randomly chosen, unquote.  What did you mean?

3  A    Well, we also did analysis where we moved slightly the

4  boundaries of each of the districts to see how the makeup would

5  change, how the partisan makeup would change, and we saw that

6  when we shifted just as little as 10 percent of the boundary,

7  the makeup of the districts changed dramatically.  So if you

8  were just to -- and I should say this is all nearby the actual

9  maps.  So if you were just to pick a map randomly nearby those

10 maps, you would find a map that was very, very different.

11 Q    And very different in what way?

12 A    Much, much less advantageous to the Republicans.

13 Q    By the time you concluded your work on this project,

14 Dr. Mattingly, how many simulated plans or maps did you and

15 your students come up with that would have satisfied what you

16 would consider to be traditional redistricting criteria?

17 A    Almost 120,000.

18 Q    And from that, you ultimately selected how many?  From

19 that, how many were talked about in your article primarily?

20 A    The main group -- because we started doing the analysis

21 before we had -- the runs had completely finished, we used just

22 over 24,000.

23 Q    And of the 24,000 and of the 120,000, based upon your

24 analysis, how many -- in how many of those plans, whether it

25 was the 24,000 or the 120,000, would Democrats have scored more

1  congressional seats -- would have won more congressional seats

2  than they did in the General Assembly's 2012 and 2016

3  Redistricting Plans?

4  A    99 percent -- over 99 percent.

5  Q    Based upon the work that you did with your students,

6  Dr. Mattingly, are you able to address the degree of partisan

7  gerrymandering represented by the General Assembly's 2012 and

8  2016 Congressional Redistricting Plans?

9  A    Yes.

10  Q    And based upon that same work, are you able to address

11  which of the districts in those plans are most affected by

12  partisan gerrymandering?

13  A    Yes, we can.

14  Q    Dr. Mattingly, have you assisted us in preparing a

15  PowerPoint presentation to help illustrate the work you and

16  your students undertook that led to both your report in this

17  case and to the article that we've been referencing?

18  A    Yes, I did.

19  Q    Is there anything in that PowerPoint that represents new

20  or additional work beyond the work covered in the article,

21  "Redistricting, Drawing the Line," that we were looking at,

22  Exhibit 3004?

23  A    There's not.

24  Q    And would using that PowerPoint today assist you in both

25  condensing and illustrating your testimony?

```
 1  A    It would greatly.
 2           MR. EPSTEIN:  Your Honors, at this point I would seek
 3  leave of the Court to ask Dr. Mattingly to step down to the
 4  monitor.  We have the ability to show the PowerPoint on the
 5  monitor.
 6           JUDGE OSTEEN:  You may.
 7           MR. EPSTEIN:  Thank you.  Okay.  Can everybody see
 8  it?  And if anybody needs to reposition -- I think they don't
 9  have it on their monitors.
10           JUDGE OSTEEN:  We have a monitor issue?
11           MR. EPSTEIN:  Let's proceed.
12  BY MR. EPSTEIN:
13  Q    Dr. Mattingly, we're at the title slide, and we're going
14  to move forward to the first full slide, and tell the Court --
15  you mentioned House Bill 92 before.  Why, first of all, did you
16  use the criteria from House Bill 92 for the work that you and
17  your students did?
18  A    We had already been considering many of these --
19           JUDGE BRITT:  Excuse me.  Can you use that
20  microphone?
21           THE WITNESS:  Would it be okay to move it this way?
22           JUDGE OSTEEN:  Yeah, don't turn your back on us.
23           (Off-the-record discussion.)
24  BY MR. EPSTEIN:
25  Q    Why don't you leave it there for a second.
```

```
 1  A     Just interrupt me at any moment if it's not audible.

 2               JUDGE BRITT:  Thank you very much.

 3               THE WITNESS:  So I was saying that we were already

 4  using most of these criteria already, but since we really

 5  wanted to interface with Tom Ross's project, we adopted

 6  precisely the criteria from House Bill 92.

 7  BY MR. EPSTEIN:

 8  Q     Was House Bill 92 something that was enacted into law?

 9  A     No, it wasn't.  It passed one of the chambers, but did not

10  pass the other.

11  Q     And was that in 2015?

12  A     I believe so, yes.

13  Q     Okay.  Name the criteria, if you would, from that House

14  bill?

15  A     Sure.  So continuity, so that means all the districts have

16  to be connected, so they have to be not separated by other

17  parts of the district.  They have to have equal population, so

18  "one person, one vote" as close as possible.  You want them to

19  be relatively compact.  You want them to minimize the number of

20  split counties, so a county which is in one congressional

21  district and another one simultaneously, and adhere so far as

22  possible to the Voting Rights Act.

23  Q     And you may have been in the courtroom earlier when

24  Mr. Speas described criteria that was adopted in February of

25  2016 after the original plan was held unconstitutional and had
```

1    to be redrawn.  Are those the same criteria that were adopted

2    by the legislature that we're looking at on the screen there?

3    A    Well, except if you remove the partisan ones, yes.  I

4    mean, this is -- we didn't want to do anything -- the whole

5    point was to do something nonpartisan.

6    Q    And when you began your work, was that before or after the

7    legislature adopted those criteria in February 2016?

8    A    Well, the earliest work we did the summer before using

9    almost the exact same criteria, that was before the

10   legislature, but then the work with Beyond Gerrymandering was

11   after that.

12   Q    Okay.  Let's go ahead to the next slide, and I'm going to

13   ask you to explain this slide to explain how the Court used --

14   I'm sorry -- how you used computers to create what you call an

15   ensemble, what I might call a collection of redistrictings to

16   use?

17   A    All right.  So first what we did was we took each map that

18   one might generate, and we assigned a score to it, and that

19   score determined how good or bad or well it adhered to the

20   criteria that had been laid out.  So a low number is a good

21   score, and that adheres better to the criteria than a high

22   number.  Then we used an algorithm.  Using this, we put a

23   distribution on all possible redistrictings, and then we used

24   an algorithm called Markov Chain Monte Carlo to draw new

25   districts.

Q     Let me stop you.  That algorithm that you just described,
Markov Chain Monte Carlo, is that used in anything else besides
redistricting?

A     It's a very standard algorithm used in modern statistics.
It has its origins going back to The Manhattan Project, and
it's used in drug development, it's used in weather
forecasting, it's used in machine loading, how SIRI works, et
cetera.

Q     Okay.  Go ahead.

A     And so then we tuned the score function just so that the
districts we were producing had basic criteria that looked
close to the districts that had been drawn before; and then, in
particular, to really -- we took these districts that we
generated using this.  We generated many, over 150,000, and
then we cut those down to some districts that had some bare
minimal reasonable criteria, and those were that they had at
most 1 percent population deviation.  They had a minimum
isoperimetric ratio of 6.  And what is isoperimetric ratio?
It's just a way of measuring compactness.  So it keeps it from
being a long hot dog.  It tends to want to make things look
more like a circle.

          We made sure there were no counties that were split
across three districts, and we made sure that at least one
district had at least 40 percent African-Americans and at least
one district had at least 33.5 percent African-Americans.

1 Q    Let me stop you there.  Why?

2 A    Well, you know, we were basing this largely on these

3 typical things by looking at what had -- the districts that had

4 been drawn by the State, by the legislature, and the

5 legislature had 44 percent in its 2016 map, had 44 percent

6 African-American in the most African-American district, and I

7 believe 36 percent, 36.2 percent, something around that,

8 African-American in its second highest.  So we tried to center

9 our distribution to be around that, be, you know, on either

10 side of that so we would be drawing ones that looked like what

11 had been used.

12 Q    And did that criterion also correspond with something that

13 was in House Bill 92?

14 A    Yes, House Bill 92 said quite explicitly that you had to

15 -- you were not to use race except to satisfy federal laws,

16 particularly the Voting Rights Act.

17 Q    Okay.  Go ahead, please.

18 A    So, I mean -- so maybe it's useful just to think about

19 this for a second.  So what we're really doing -- so this is

20 just an absolute minimum bar to get some set of reasonable

21 districts, but then within that group of redistrictings, some

22 redistrictings are more likely than others because they have a

23 better score function.  So we favored redistrictings that met

24 this criteria better than those that didn't meet the criteria

25 as well.

 1  Q    Were you able to take a large segment of redistricting

 2  maps and narrow it down in that way?

 3  A    So we had over 150,000 maps initially produced, and after

 4  this filtering procedure, this triage, we ended up with just

 5  over 24,000.

 6  Q    And if you were to use sort of a common everyday example

 7  of how you might think about this process as opposed to all of

 8  this fancy stuff, what would you say you did?

 9  A    So you have a bag, you're at a bingo parlor, and you want

10  to pull tiles out, and some tiles are more frequent.  The tiles

11  in there that are more frequent are the maps.  Each tile is a

12  map of North Carolina, redistricting in North Carolina, and the

13  tiles in there more frequently are tiles that satisfy well this

14  score function; that is to say, they satisfy the criteria on

15  the previous slide than the previous -- than the other tiles.

16  And so we drew a tile out.  That was the map of North Carolina.

17  We took that map, and then we evaluated the elections based on

18  the votes that were used in the 2012 and 2016 elections.

19  Q    Okay.  This next slide, it says:  "VTDs Used to Create 13

20  Districts for All 24,518 Simulated Maps."  Explain that.

21  A    So this is the map of North Carolina voting tabulation

22  districts, or essentially precincts in common parlance, and

23  there's over 2,800.

24  Q    And when it says it was used to create districts, 13

25  districts, what does that mean?

1  A     Well, what it means is basically what we did was we

2  assigned each of these voting-tabulation districts to a

3  particular one of the 13 congressional districts.  So every one

4  of these districts has a number, which it's in our fictional

5  District 1, our fictional District 2, our fictional District 3.

6  Q     And why are there some areas on this map of

7  voting-tabulation districts that are darker than others?

8  A     Those are the more populous areas where there are many,

9  many voting-tabulation districts packed in.

10 Q     Okay.  The next slide says on top "Actual Votes from

11 2012/2016 VTDs Applied to All 24,518 Simulated Maps."  Explain,

12 if you would.

13 A     So once we had this collection of 24,000 maps, we took

14 each map, which, of course, comes with it an assignment of

15 which VDTs are in which of the 13 congressional districts, and

16 then we took the actual map -- the actual votes, right.  We

17 have a record of what the votes are in each VTD from the Board

18 of Election.  We take that amount of votes, and we sum up all

19 the votes in the VTDs that are labeled "District 1", and that

20 gives us the votes in District 1.  We take all the VTDs that

21 are labeled 2, and we sum up their votes to get the votes in

22 District 2, both Republican and Democrat to get the partisan

23 makeup of those districts.  Then we do that for every single

24 one of those 24,000 maps, and that gives us, one, an

25 indication -- a collection of outcomes of the election, and it

1  also gives us some detailed information about what the

2  districts would look like.

3  Q    When you're talking about the votes, you mean how many

4  votes there were for Republican candidates and how many votes

5  there were for Democratic candidates?

6  A    Correct.

7  Q    And which election cycles would you use for that purpose?

8  A    The 2012 US House of Representatives elections and the

9  2016 House of Representatives elections.

10  Q    Wasn't there an election in 2014 as well?

11  A    There was.  The problem was is that that election had one

12  unopposed race.  So if there's an unopposed race, the people in

13  those precincts didn't have a chance to declare which way they

14  would have voted because they only had one candidate presented

15  to them.  We considered and we had in other work -- we

16  considered using a surrogate, using the Senate race, using the

17  governor's race, using something else, but we thought that it

18  was more powerful to just stick with clean results where we

19  just use exactly the votes that were given.

20  Q    And did your ensemble maps, the 24,000, have different

21  results using the 2012 votes versus using the 2016 votes?

22  A    Yes, I mean, the elections were very different, right.  In

23  2012, there were 50 statewide.  That doesn't say what happened

24  at a local level, but there were just over 50 percent

25  Democratic, and in the 2016, there was just over 46 percent

1  Democratic.

2  Q    And in parenthesis you have listed there "seats."  What is

3  that referring to?

4  A    So this is the actual outcome of the 2012 election.  So in

5  the 2012 election, using the legislature's 2012 map, four

6  Democrats were elected from 50 percent of the vote and nine

7  Republicans were elected from only 48.75 percent, and,

8  likewise, three and ten.  And part of the goal of this was to

9  understand whether -- to what extent this was determined by

10 geography of the state and the distribution of where people

11 live or whether this was something else going on.

12 Q    And did those distribution of seats wind up being

13 different from 2012 to 2016 in your 24,000 plans in a similar

14 fashion as we see there for the actual congressional actions?

15 A    Yes, very much.

16 Q    And is that because the vote was different in 2016?

17 A    Yes.

18 Q    All right.  This slide says:  "Planned, Analyzed Against

19 Simulated Maps Ensemble."  Can you explain it, please.

20 A    Yes.  So once we have this ensemble, which we've tabulated

21 all these elections, 24,000 elections, using actual votes each

22 time, that gives us a background signal, and then we go and

23 compare the results that one would have had using the Judges

24 map in 2012 and 2016 and the actual map used in 2012 and the

25 actual map used in 2016.  So this NC 2016, that's the actual

1  map from the legislature.  NC 2012 is the actual map --

2  Q    And why were you using these colors, green for judges, red

3  for NC 2012, and blue for NC 2016?

4  A    Because I needed three colors that had some contrast.

5  Q    And are those colors going to be consistent throughout

6  this PowerPoint?

7  A    Yes.

8  Q    All right.  Now, let's go to this next slide that says:

9  "Outcomes Among 24,518 Simulated Maps, Votes for the US House

10  2012."  Explain to the judges what we're looking at in this

11  slide, what the significant information is that you want them

12  to get.

13  A    So as I mentioned before, we took these 24,000 -- just

14  over 24,000 maps, and we took the actual votes from the 2012

15  election, and we tabulated the partisan makeup of the

16  delegation using that map; and when we did that, we kept track

17  of the number of Democrats who were elected each time, and this

18  histogram gives you the number of Democrats elected each time.

19  So out of the 24,000 maps, using the actual 2012 votes, just

20  38 percent had six Democrats.  So that's four -- 9,455, I won't

21  keep reading the numbers, and then seven were elected

22  39.52 percent of the time, and you see here just under

23  12 percent had five Democrats elected, just under -- just over

24  9 percent had eight Democrats elected.

25  Q    Would it be correct to say that in over 99.6 percent of

1  your simulated maps, five or more Democrats would have won

2  congressional seats in 2012 had the votes been cast the same as

3  they were in 2012?

4  A    Yes.  So that's summing up the total percentages in these

5  quads.  So this is -- five or greater would be this way.

6  Q    And would over 88 percent of your simulated maps have had

7  six or more Democrats elected?

8  A    Right.  So that's the same thing; you add up these numbers

9  here.  So that's all of the outcomes to this side.

10  Q    And the most likely outcomes in your simulated maps with

11  over 79 percent were what?

12  A    Six and seven, slightly more, but indistinguishably.

13  Q    And according to the data from all of those simulated

14  maps, was a map resulting in nine Democratic wins just about as

15  likely as a map resulting in four Democratic wins?

16  A    I mean, first of all, both of them were very unlikely, but

17  each -- they were about equally likely to get nine Democrats as

18  it was to get four Democrats.

19  Q    Okay.  Did you then use your ensemble, as you explained to

20  us earlier, to compare the three plans:  The Judges Plan, the

21  North Carolina 2012 Plan, and the North Carolina 2016 Plan?

22  A    I lost the question.  Could you --

23  Q    Did you then use this ensemble data to compare what the

24  Judges outcome was, what the North Carolina 2012 Plan, and 2016

25  Plan outcome was?

1   A     So we -- we calculated what -- how many -- there you go.

2   We calculated it using the Judges Plan.  So the Judges

3   redistricting map, there would've been nine -- I mean, six

4   Democrats elected, excuse me, six Democrats elected.

5   Q     Okay.  And what about the North Carolina 2012 Plan?

6   A     There would've been four Democrats elected.

7   Q     All right.  And what about the North Carolina 2016 Plan?

8   A     So, again, four Democrats.  It's important to remember

9   that we're still using the 2012 votes.  We're just using the

10  plan from 2016.  So if we used the 2012 votes in the 2016 plan,

11  we would have had four Democrats elected.

12  Q     Okay.  Let's go to this next slide, which I think is going

13  to require some more explanation; but before you do, I'm going

14  to read the title.  It says:  "Analysis of 13 Districts in

15  Simulated Maps, Votes for US House 2012."  Now, please take

16  some time and explain to the Court what we're looking at in

17  this slide.

18  A     So the broad picture is we're trying to understand what

19  that background signal was, what -- how -- the geopolitical

20  makeup of North Carolina, both the shape of the state and where

21  the people live, and the partisan makeup of where they live

22  would give us -- would tell us what we would typically see.

23  That's what we're trying to get at.

24        So to establish that, what we did was we took every

25  map that we generated, every map that we had, and we ran the

1  2012 elections.  So we have 13 congressional districts.

2  There's the most Republican, the second most Republican, the

3  third most Republican, the fourth most Republican, the most

4  Democrat, the second most Democrat.  So we ordered those

5  numbers, in other words, what's the percent -- the fraction of

6  Democratic vote -- the percent of Democratic vote, and we

7  ordered the districts from the most Republican to the most

8  Democrat.  So that's these 13 numbers.  These are not the

9  numbers associated with the districts as we see them when we

10 talk about District 12 or District 1.  These are just the most

11 Republican, the most Democrat.

12         So we take those 13 numbers for each of our maps, and

13 then we make this plot to summarize those statistics.  So what

14 this plot shows you is that if you took the most Democratic

15 map, most Democratic -- I misspoke -- the most Democratic

16 district in each of the 24,000 maps, so if you took the most

17 Democratic district in each of the 24,000 maps and you said

18 what was the fraction of Democrats in that map, the median

19 would be just around 67 percent, and how could that be helpful

20 to you?  You might -- somebody might come to you and say, you

21 know, isn't it weird that this district has 67 percent

22 Democrats in it?  That seems nefarious, but if, in fact, it was

23 the most Democratic district, that's what you would expect to

24 see.  Just typically when you draw maps of North Carolina,

25 that's what you end up with.

1            And then we did the same for the twelfth most

2    Democratic, the eleventh most, the tenth most, the first most

3    Republican, the second most Republican, the third most, the

4    fourth most Republican.

5            Now, just to unpack a little bit what this figure

6    shows you is the central line here is the median, which in

7    these cases is identical essentially to the mean.  So it's the

8    line that splits 50 percent above and 50 percent below.

9    Q    50 percent of the 24,000 --

10   A    Yes.

11   Q    Okay.

12   A    And then this box here, this is called a box plot, if you

13   want to look it up later.  So this box here holds 50 percent of

14   all the maps.  So all the maps had their most Democratic

15   district with a percentage that was in between these two --

16   these two upper levels of the box.

17   Q    You said "all."  Did you mean 50 percent?

18   A    I meant, yeah, 50 percent.  I misspoke.  Then there are

19   these whiskers, and these whiskers are supposed to demonstrate

20   what are outliers, what are exceptionally far from the mean,

21   and the reason these are chosen, these are 1.5 times this box

22   distance, and that's for the reason that if something was

23   Gaussian, if something was normally distributed, 98 percent --

24   over 98 percent would be outside of these whiskers.

25   Q    Okay.  Talk about the 50 percent line, that dark in the

 1  line.  What is that showing us with respect to each of these

 2  districts?

 3  A    Well, I mean, as we all know, whoever gets the most votes

 4  in a district, wins the seat.  So this line is the 50 percent

 5  line.  So if a map had -- each of these maps is a dot going up

 6  here, has -- the number of dots that are above this line is the

 7  number of seats the Democrats won, and the number of dots below

 8  this line is the number of seats the Republicans won.  So we

 9  saw in the previous plot it was between six and seven

10  typically, right.  And you notice that it's exactly the

11  seventh most Republican district that straddles the 50 percent

12  line.  So it's exactly typically split between 50 percent of

13  the time favoring the Republicans and 50 percent of the time

14  favoring the Democrats.

15  Q    And in your box plot, would that be the most competitive

16  district, the seventh most Republican district?

17  A    Yes, this would be the most.  I mean, it would be

18  essentially -- depending on the map, it would be 50/50 to be

19  more favoring the Democrats and more favoring the Republicans.

20  Q    Is that always going to be true, or it depends upon the

21  elections -- the votes that you're dropping in?

22  A    It depends upon the election.  So, typically, what we see

23  is if this general structure of the box plot looks the same,

24  but in the year when the populous vote is more Republican, then

25  necessarily the whole box plot shifts downward, thereby putting

1  more of the boxes below the 50 percent line, and in a year when

2  the populous vote is more Democratic, the box plot shifts

3  upward, thereby putting more of the boxes above the 50 percent

4  line.

5  Q    In other words, the line always stay -- the 50 percent

6  line always stays in the same place?

7  A    Right.

8  Q    And the box plot is up or down?

9  A    Right.

10  Q    Okay.  Which are the least competitive districts in this

11  box plot?

12  A    Clearly, the most Republican usually goes to the

13  Republican Party, and the most Democratic district tends to go

14  to the Democratic.  We're separated enough geographically that

15  we're not mixed in a blender.  It's spread evenly over the

16  state.

17  Q    Does this box plot also show you the variability of the

18  outcomes within individual districts?

19  A    Yes.  I mean, this says that over different maps, we

20  typically had a variation of this much in the percentage of

21  most Democratic, and, in particular, this one it shows that

22  about half the map favored the Democrats a little bit and about

23  half the map favored the Republicans.

24  Q    Which of these districts on this box plot shows to be the

25  most variable in your ensemble?

1  A    I mean, it's close, but I would say this one.  I mean, it

2  both has the biggest outliers and the biggest 50 percent box.

3  Q    And which would be the least variable?

4  A    This sixth most Republican district.  It has a very tight

5  50 percent box and a rather tight outlier box.

6  Q    And just to make sure we're clear on this, the numbers at

7  the bottom on the horizontal axle, the two, the four, the six,

8  the eight, the ten, the twelve, they represent what?

9  A    They do not represent the labeling that we used, the

10  twelve districts.  They represent how they order -- how the

11  lines order, whether they're the most Republican, the second

12  most Republican, the third most Republican, the most Democrat,

13  the second most Democrat, the third most Democrat.

14  Q    Okay.  Let's move forward now, and you've drawn on this

15  next one the exact same box plot with a yellow line.  Tell the

16  Court, if you would, what the yellow line is representing and

17  what you believe the significance of that yellow line is.

18  A    Well, the yellow line connects all the medians through the

19  center.  So this gives you some idea of typically what one

20  would expect to see, given the geography of North Carolina and

21  what -- the distribution of people in North Carolina.

22  Q    Okay.  And remind the Court what the inputs were that went

23  into getting a yellow line looks like that.

24  A    So we used the 24,000 maps to tabulate the actual votes

25  from the 2012 election and see how much they varied across

1  maps.

2  Q    And the 24,000 maps were created using what criteria?

3  A    They were created using the nonpartisan criteria laid out

4  in House Bill 92, just population deviation, compactness, not

5  splitting counties and satisfying the VRA, at least at the

6  level of the 2016 congressional maps.

7  Q    And in all of the work that you've done on gerrymandering

8  issues, in your opinion, is the shape of that yellow line

9  significant?

10 A    Yes, I mean, this -- when I started off talking, I said we

11 wanted to understand was the 2012 typical, you know, what would

12 one expect.  This gives a much finer detailed structure of what

13 one would typically see.  This is kind of the signal in the

14 election, as far as I'm concerned.

15 Q    Of how the voting in the individual districts compare to

16 one another?

17 A    Correct.

18 Q    All right.  What would you expect to see if the districts

19 had been gerrymandered to give one party an extreme partisan

20 advantage?

21 A    Well, let's say that they had been biased to the

22 Democrats.  You would expect to see a depression here where

23 many Republicans are impacted here, and then some districts

24 where they had been removed from, or, alternatively, if it had

25 done the other way, if it had been given the Republicans an

 1  advantage, you would have many more Democrats packed in the
 2  most Democratic districts, and then the Republican districts --
 3  the next set of districts would have many more Republicans
 4  because that would bring it down towards the 50 percent line.
 5  Q    And what would the line as a whole -- instead of that
 6  gradual sloping yellow line, what would that line look like?
 7  A    Well, I mean, it would be flatter here, and then it would
 8  jump up particularly to a flatness here, so it would have an
 9  S-shape there.
10  Q    All right.  Go ahead and tell the Court what you've done
11  on this next slide that adds more information.
12  A    So I've added the green dots.  Green is always the Beyond
13  Gerrymandering Project with Tom Ross.  So these are the
14  districts that the panel of six Republican and six Democrat
15  judges produced, and we see that they're pretty good,
16  especially right here in the middle part.  They fall at least
17  sometimes dead center, but usually typically pretty close to
18  the 50 percent box.  Definitely none of them are in the
19  outliers.
20  Q    And what criteria did the Beyond Gerrymandering Project
21  use to create their map?
22  A    They -- they just followed House Bill 92.
23  Q    With respect to this issue of gerrymandering, did the
24  green dots tell you anything as to the Judges Plan, what they
25  produced?

1  A    Well, I mean, it seems to be very typical.  It follows

2  very closely that yellow line we had before.

3  Q    Okay.  This is -- explain to the judge what we're looking

4  at in this next slide with the red dots.

5  A    So this is now the makeup of the districts for the 2012

6  Legislative Plan, and you see very much what I was talking

7  about before.  You see that these most three Democratic

8  districts have an anomalously large number of Democrats packed

9  into them, and these four or even five districts here have many

10 less Democrats than they would typically see.

11 Q    Okay.  And these were actual districts voting in the 2012

12 election?

13 A    Right.  These are -- where these are -- these box plots

14 are the signal -- from my ensemble of 24,000, these are the

15 actual makeups of the election results.

16 Q    And when we're looking at the previous slide, which I'll

17 go back to for a second, those weren't actual votes that

18 created those green dots.  What were they?

19 A    They were actual votes.

20 Q    I'm sorry.  They weren't actual votes in an election with

21 the judges map?

22 A    No, they were using the votes at the precinct level in the

23 2012 election, but then assigning them to districts according

24 to the judges maps.

25 Q    Okay.  As you did for your ensemble?

1  A     Correct.

2  Q     Okay.  Let's go ahead now.  What labeling have you added

3  to the horizontal axis on this slide?

4  A     So now we've actually replaced them with the numbers that

5  one usually thinks of Congressional District 1, Congressional

6  District 12, Congressional District 7, 4.  So you can see where

7  they fall in this ordering of districts, starting at the most

8  Republican and the most Democratic.

9  Q     The most Republican was?

10 A     The most Republican was District 3.

11 Q     And the most Democratic?

12 A     District 12.

13 Q     The box plot with the whiskers and the box in the middle,

14 are those specific to those districts you see on the horizontal

15 axis?

16 A     No, no, these have nothing to do with these numbers.

17 These are from our redistricting.  The number here just applies

18 to this number here, the actual outcome of the 2012 election.

19 So this is --

20 Q     I'm sorry.  Are you ready to go to that slide?

21 A     Yes.

22 Q     Okay.  All right.  So let's go to this next slide in which

23 you've added a whole bunch of additional labeling.  Take your

24 time and tell the Court what additional labeling you've added.

25 A     So just to help ground this and make sure that we all

1  understand what we're talking about, I've added the percentages

2  of -- the Democratic percentages in each of the districts.  So

3  in that election, the most Democratic, District 12, had

4  79 percent Democrats.  The next one had 76, District 1.  The

5  next one had 74, District 4.

6          And if you compare those to what we would expect from

7  our ensemble, the medians had a difference of plus 11 here,

8  plus 14 percent, plus 15 percent.  So there were many more

9  percentage Democrats in these districts than what we typically

10  see, and, conversely, in the next four, there were many less

11  Democrats.  In fact, this one had 50 percent Democrats when

12  normally one would expect to see 57 percent Democrats, the next

13  most Republican had 49 percent when one would typically see

14  55 percent, and then 46 percent when one would typically see

15  52 percent, and 44 percent when one would typically see

16  50 percent.

17  Q    Did you consider those differentials that you were just

18  looking at as between the median vote in your ensemble and the

19  actual vote in 2012 significant with respect to this issue of

20  partisan gerrymandering?

21  A    Yes, I mean, this shows that these districts have been

22  moved to become Republican, while these have been made even

23  safer Democratic.

24  Q    What's the relationship between safer Democratic seats and

25  districts that can become more Republican?

1   A    Well, you have to take the votes out of here and move them

2   here, and that's what this clearly shows.

3   Q    Okay.  This next slide has added a little bit of more

4   information.  Can you tell the Court what additional

5   information is on this slide?

6   A    Right.  So what you want to understand, though, is that a

7   typical result?  Are there some of our 24,000 elections in my

8   ensemble that have that structure?  And what this gives is this

9   tells you -- for instance, each of these numbers here gives the

10  percentage of the maps in the 24,000 ensemble, which had a

11  value above this whisker.  So 99.99 percent had values below

12  this whisker, and this is this map, the 2012 map.

13           None of the maps in my ensemble had values as high as

14  this whisker here, and this is the value for the 2012 map.

15  99.31 percent had a value below this whisker, and this is the

16  value for the 2012 map.  Conversely, you would want to know how

17  many are below this whisker or how many are above.  So only

18  1.5 percent, just over 1 percent, had a value below this

19  whisker, and this one is all the way down here.  Similarly, at

20  this whisker, only .43 percent had a value -- had a value or

21  percentage below this one, .04 percent had a value below this

22  whisker, and .07 below this.  We label these as "extreme

23  outliers" one by one.

24  Q    Does this slide, in your opinion, present any evidence

25  regarding partisan gerrymandering of individual districts?

1  A    Yes, I mean, since you can look at these districts, it

2  seems to say that this clump of districts -- for instance,

3  let's start here.  This clump of districts here, 4, 1, and 12,

4  actual Districts 4, 1, and 12, had significantly more Democrats

5  than one would typically see, even though they are the most

6  Democratic, and then the next four had many, many less

7  Democrats than what we would expect to see.

8  Q    Dr. Mattingly, did you actually add up how many Democratic

9  votes there were in the three most Democratic districts, 4, 1,

10 and 2, in that election?

11 A    I did.

12 Q    Do you have your cheat sheet telling you how many?

13 A    There were 765,000.

14 Q    Democratic votes?

15 A    Democratic votes in these three.

16 Q    And then for -- well, let me ask you:  In your ensemble of

17 maps, 24,000, how many had that many Democratic votes?

18 A    None.

19 Q    Okay.  For the next three districts, the ones that are --

20 on your map, they are District 7, District 9, and District 8.

21 Can you tell the Court how many Democratic votes were in those

22 three in the actual election?

23 A    So these had 665,000 --

24 Q    I'm sorry.  No --

25 A    765,000, and these three here had only 520,000.

1  Q    How many simulated maps in your 24,000 had that few

2  Democratic votes in those districts?

3  A    None did.

4  Q    And is that significant in your opinion?

5  A    Yes.  I mean, it shows that if one were to draw maps using

6  these criteria, it was extremely unlikely to ever end up with a

7  situation like this.  In fact, it was essentially -- it was

8  impossible.

9  Q    In your opinion, could the legislature have created a

10 redistricting plan that yielded those specific results

11 unintentionally?

12 A    No.

13 Q    Okay.  Let's go to the next slide.  Tell the Court what

14 we're looking at.  It says:  "Comparison of Results:  Ensemble,

15 Judges, NC 2012."  What are we looking at, and what do you find

16 significant?

17 A    Well, so, as I said, this yellow line that connected the

18 medians was my background signal.  It's what I would typically

19 expect to see, and you might ask, well, could a set of human

20 beings sit down and draw such a map.  Well, the judges did

21 without having access to this.  We did this after the fact.  So

22 the judges drew the maps that created this green line, which

23 very closely adheres to the yellow line.  On the other hand,

24 you see the legislature's maps are very flat here and then take

25 this huge jump and go up here.  So for me, when I see anything

1  like this, a plot like this, this kind of S-shape thing, you

2  know, this is what I mean by gerrymandering.  This is the

3  signature of gerrymandering.

4  Q    All right.  Now, we've just been through the 2012 Plan and

5  looked at the 2012 votes that actually occurred under the 2012

6  Plan.  Did you perform the same exercise for the 2016 Plan and

7  the 2016 votes?

8  A    Exactly the same exercise.

9  Q    All right.  Let's go through it, and let's start with what

10 you called the histogram, showing the outcomes in 2016 using

11 the 2016 Plan?

12 A    All right.  So, again, we typically had five Democrats

13 elected.  So this is a year when there was more -- the vote was

14 more Republican, so 53 percent Republican and 47 percent

15 Democrat.  So only five were elected, Democrats, and sometimes

16 four and sometimes six typically.

17 Q    Okay.  And what were the percentages of those three?

18 A    Just under 28 percent had four, just over 55 percent had

19 five Democrats elected, and just shy of 16 percent had six.

20 Q    So would it be correct to say that in over 99.3 percent of

21 your 24,000 simulated maps, four or more Democrats would have

22 won congressional races in 2016?

23 A    Yes, that's just adding up the percentages in these --

24 Q    And in over 71 percent of those simulated maps, five or

25 more Democrats would have won?

1    A    Yes, that's correct.  That's, again, just adding up these

2    last three.

3    Q    And was there one outcome that actually had the majority

4    in your 24,000 maps?

5    A    Five Democrats elected.

6    Q    Statistically speaking, was it just about as likely that

7    Democrats could have won seven seats had only mutual

8    redistricting criteria been used as it was for Democrats to win

9    only three?

10   A    Yes, they would have both been very unlikely, but they

11   would have been equally likely approximately.

12   Q    Okay.  And did you apply three plans, the Judges Plan, the

13   NC 2012, and NC 2016 to this histogram?

14   A    Yes, we did.

15   Q    And where do the Judges come out?

16   A    So the Judges had four Democrats.

17   Q    Assuming the 2016 votes were used?

18   A    Yes, take the full sentence.  So using 2016 votes, we had

19   four for the Judges.  When we looked at the NC 2012 Plan -- so,

20   again, just to be clear, we're using the plans, and we're using

21   the 2012 election, but we're using the votes from the 2016

22   election.  So they produced three this time.

23   Q    Okay.  And for the NC 2016 Plan?

24   A    So this is the actual plan that was used in this election,

25   and they produced three.

1    Q     Now, going ahead to your ensemble, what do you see here in

2    your ensemble with the yellow line?

3    A     So, basically, you see a box plot that looks very similar

4    to the previous one.  It has a nice gradual progression of the

5    median very much in the same way, but if you look a little

6    closer, you will notice that the whole box plot has shifted

7    downward, right.  It crosses the 50 percent line now just

8    between eight and nine, and that was because this was a more

9    Republican electorate.

10   Q     And does that show why five Democratic wins was the

11   majority outcome, looking at your box plot?

12   A     Right, yes, because typically one had eight here, and so

13   if eight is here, that leaves five.

14   Q     Five that were above the line?

15   A     Five above the line, one, two, three, four, five.

16   Q     Okay.  Is the type of line that we see, the yellow line

17   there, comparable, in your opinion, to the type of yellow line

18   that we saw in 2012 -- using the 2012 Plan and 2012 votes?

19   A     Right, it's a nice gradual line that doesn't have any

20   sharp kinks, and it just -- so as the vote moves up or down,

21   you gradually gain or loss a seat in a nice progressive way as

22   the percentage changes.

23   Q     Okay.  I want to move back to one thing that I neglected

24   to ask you.  Back here with the Judges Plan that came out with

25   four, four Democrats winning out of 13, can one say that, well,

1  that's pretty similar to the outcome of three that was actually

2  achieved under the 2016 Plan?

3  A    Well, I mean, the numbers are close, but this one is

4  42 percent more likely than this one.

5  Q    42 percent or 42 times?

6  A    I'm sorry.  I misspoke.  Thank you.  Forty-two times more

7  likely.  So if it's 42 times more likely to get four Democrats

8  than it was to get three Democrats in our ensemble.

9  Q    And did you actually, in your analysis and in your paper,

10  include a histogram showing whether the judges were close to

11  getting -- the Judges Plan was close to an outcome of five?

12  A    Yes, so, in fact, there's a more nuanced analysis.  I

13  think it's Figure 11.  Let me double-check.  While I'm getting

14  it, I'll talk.

15  Q    So in that --

16  A    Yeah, it's Figure 11.  It shows where -- how close they

17  were, in other words, how close one would expect them to flip,

18  and the Judges Plan was actually right over here.  So one would

19  expect that small changes in the distribution of votes would

20  actually move it to five.

21  Q    Okay.  Let's move forward to where we were with the yellow

22  line.  Which should have been -- according to your ensemble of

23  24,000 maps, using the 2016 votes, which should have been the

24  most competitive districts?

25  A    Well, it should have been typically the eighth most

1  Republican and the ninth most Republican.

2  Q     Okay.  And each of those --

3  A     But that's not District 8 and District 9.  That's if you

4  order them, it's the eighth most and the ninth most.

5  Q     And in each of those, would the winning share and the

6  median have been less than 55 percent?

7  A     Say that again.

8  Q     For the medians on those two, would the winning share of

9  vote, whether it was Democrat or Republican, have been less

10 than 55?

11 A     It would've been less than 55, yes, typically.  The box

12 plot here is where only 50 percent of the map is less than 55,

13 which is about here.

14 Q     Did you also plot the Judges and the 2016 results as

15 against your ensemble?

16 A     Yes, we did exactly the same analysis as before.  Here

17 they are.  So, again, they have a fairly gradual uptick.  This

18 one is a little bit outside the box, but still not in the

19 outlier band, and the rest of them are pretty where you'd.

20 Q     And what, in your opinion, does that say about partisan

21 gerrymandering of the Judges Plan?

22 A     It's not gerrymandering.

23 Q     Okay.  Let's go ahead to the 2016 Plan with the 2016

24 votes.

25 A     Well, we again see the same structure as before.  So the

1  last time we were looking at the 2012 map.  Now we're looking

2  at the 2016 map, and, again, we see this very flat region here

3  with many, many less Democrats in these three in particular and

4  many, many more Democrats in these three.

5  Q    Would you agree that the first seven districts are roughly

6  similar to what we saw in the Judges Plan in your ensemble?

7  A    Yes, in fact, even this one is lower.  So some of these

8  other ones have pulled up, but these basically look quite

9  similar to the rest.

10 Q    So which half of this slide is the one that is dissimilar

11 from the Judges and from your ensemble?

12 A    This one, this half, the half towards the Democratic

13 districts.

14 Q    Okay.  Let's go to the next slide.  What are we showing on

15 this slide?

16 A    We've actually labeled now -- this is -- now we've put the

17 actual districts -- the districts are on the map, the District

18 1 that we know, District 4, District 12, District 13, District

19 2, District 9, District 5.

20 Q    And let's go to the next slide.  Tell the Court what

21 additional data and information you've supplied on this slide.

22 A    So now we've actually labeled the partisan makeup.  So

23 first for the House -- for the 2016 map, the most Democrat had

24 70 percent, now the next most had 68, the next most had 67, but

25 that should be compared with 65, 62, and 57.  So it's plus 10

1  percent, plus 6 percent, plus 5 percent, and then these next

2  three districts had 44 compared to 54, so minus 10 less

3  Democrats; 51 to 43, minus 8; and 48 to 42, minus 6.

4  Q    Okay.  Does this -- let me back up.  Let's go to the next

5  slide -- well, let me -- sorry, I apologize.  Did you consider

6  those differentials at the bottom of the slide to be

7  significant on this issue of partisan gerrymandering?

8  A    Yes, I mean, this is, again, the structure which makes --

9  this kind of structure like this is the signature of something

10 being gerrymandered.

11 Q    With respect to the numbers at the bottom, the minus 10,

12 the minus 6, what is that telling us on this topic of partisan

13 gerrymandering?

14 A    That these districts had many, many more Democrats than

15 typically is found if one were to draw bipartisan maps.

16        JUDGE WYNN:  Counsel, I'm concerned of the record

17 that's being created here.  We don't have a visual of this, and

18 when you say these districts and don't specify where they are,

19 we are not going to have a clear picture of what you're talking

20 about upon review of this.  So if you would direct him to be

21 more specific so that we can have the record of this.

22        MR. EPSTEIN:  Thank you, Your Honor.

23 BY MR. EPSTEIN:

24 Q    Can you be more specific, when you're talking about these

25 districts, what you're referring to?

1  A    So the three most Democratic districts, the one farthest

2  to the right, have many more Democratic votes than one would

3  expect to see if one looked at the medians or the box plots for

4  those three districts that are the most Democratic, and then

5  when you compared the next three most Democratic, that is, the

6  next three after those first three, one sees that they have

7  many less Democratic votes than one would expect when one

8  compares to the medians, that is, the lines in the center of

9  the box plots.

10          JUDGE OSTEEN:  The actual district is down on the

11  bottom, right?

12          THE WITNESS:  Yeah, these are the actual numbers of

13  the districts, so it's the very bottom of the slide.

14          JUDGE OSTEEN:  So I think when you're talking about

15  the most Democratic district, if you'll identify that as CD1,

16  CD4, and CD12 in addition to what else you're going to say.

17          THE WITNESS:  CD?

18          JUDGE OSTEEN:  Or D.  You used D.

19          THE WITNESS:  D here is the actual district on the

20  map.  So that one just happens to be one.  This would be the

21  second most Democratic district, which is labeled District 4

22  traditionally, if you use the maps.  Now, that doesn't mean

23  that it exactly corresponds to the most Democratic district in

24  every one of the ensembles.  Where that is geographically can

25  move around, depending on the random map.

1  BY MR. EPSTEIN:

2  Q    Okay.  And I think this next question, Dr. Mattingly, will

3  help orient us to the most Democratic districts.  Did you add

4  up how many Democratic votes there were in the three most

5  Democratic districts in 2016, District 12, District 4, and

6  District 1?

7  A    So in the three most Democratic, three farthest to the

8  right, there were just around 750,000 Democratic votes.

9  Q    How many simulated maps in your 24,000 had that many

10 Democratic votes using the 2016 votes in their three most

11 Democratic districts?

12 A    None.

13 Q    Did you add up how many Democratic votes there were in the

14 next three most Democratic districts, which were District 13,

15 District 2, and District 9 in 2016?

16 A    Yes, just shy of 600,000.

17 Q    How many simulated maps in your 24,000 had that few

18 Democratic votes using the 2016 votes in the fourth, fifth, and

19 sixth most Democratic districts combined?

20 A    None of them did.

21 Q    Is that significant in your opinion?

22 A    Yes.

23 Q    Why?

24 A    It means that it's extremely unlikely that one would have

25 produced maps that had that level of packing here and that

1  level of depletion here unintentionally or using nonpartisan

2  criteria.

3  Q    All right.  Let's go ahead and look at the next slide.

4  We've added in the information about those whiskers, and be

5  specific, when you're talking about individual district and the

6  whisker, which district you're talking about.

7  A    Okay.  Again, now we're going through -- if we look at

8  each of these districts, how atypical was the value of

9  percentage in that district, as high or as low as it was.

10         So in the first most Democratic district, the one

11  farthest to the right, which had 70 percent Democrat and is

12  above this whisker here, that top whisker, only .61 percent of

13  the maps had a value above that whisker.  Similarly, for the

14  next one moving to the left, none of the maps had a value above

15  this whisker, while the maps from the legislature did.  Moving

16  to the third one in from the left, only .07 percent, or, in

17  other words, 99.93 percent, had a value below this whisker,

18  while the maps from the legislature had one just above it.

19         Then moving to the districts which seemed to have

20  less Democrats in them, the fourth most Democratic district,

21  moving from the left -- from the right, sorry, had -- below the

22  whisker only .19 percent, or 99.81 percent, had a value -- had

23  a value above this whisker.  So this was very atypical.  It was

24  very much an outlier, and the same thing as with the last two

25  with .53 percent being below this whisker and only .02 being

1   below this whisker.  Now, this one falls just above that, but

2   it's still well outside of this box.

3   Q    And what does the information that you've just been

4   through, the whiskers and where the plot points for the

5   Republican Plan comes -- what does that tell you about how

6   likely the result obtained would be if only neutral nonpartisan

7   redistricting criteria had been used?

8   A    Well, based on the ensemble that we generated, these would

9   be essentially impossible to generate randomly.  They would be

10  so highly atypical that one would not see it.

11  Q    And in your opinion, could the legislature have created a

12  redistricting plan that yielded the results we're looking at on

13  this slide unintentionally?

14  A    No.

15  Q    All right.  Go ahead and tell the Court what we're looking

16  at in this slide with reference to comparing results in the

17  2016 -- with the 2016 votes.

18        JUDGE BRITT:  Mr. Epstein, let me ask you another

19  question that follows what Judge Wynn said.  Do these slides

20  follow some of the drawings in the paper?

21        MR. EPSTEIN:  They do, Your Honor.  There's a little

22  bit more precision in them in terms of -- these lines are all

23  there.  They're just not -- the plot points aren't connected.

24  They are the same exact graphs and charts as are in the paper

25  with differences.  Here the lines are drawn in.

1          JUDGE BRITT:  Well, I was just wondering if it would

2    be helpful for the record, Judge Wynn, for this to be -- when

3    he's talking about a slide, to refer to a figure in his paper.

4          MR. EPSTEIN:  Your Honor, actually, it might be

5    easier.  We have -- I was going to ask at the end to introduce

6    this as an exhibit and have it admitted for illustrative

7    purposes.  We have them, and we can hand them to the Court

8    either now or at the end of his presentation, but we do have

9    them.

10          JUDGE BRITT:  At the end would be fine.

11          JUDGE WYNN:  Actually, I think it would be helpful to

12   hand them now, and then we can point to them.  Where we're

13   going with this is that when we review this and if you just say

14   "this" and "that," we're going to have some difficulty

15   ascertaining what you mean, and simply all you got to do is

16   point to the particular slide, indicate the figures that you

17   were talking about, and it's going to be pretty easy.  We're

18   smart, but we're not that smart, I don't think.

19          MR. EPSTEIN:  If Your Honor can give me a moment, I

20   can have our paralegal sort through them and hand them out

21   right now.

22          JUDGE OSTEEN:  Let's take about a 10-minute

23   mid-morning recess, and then we'll come back.

24          (At 11:05 a.m., break taken.)

25          (At 11:20 a.m., break concluded.)

1          JUDGE OSTEEN:  Before we resume testimony, in terms

2   of exhibits, my normal practice is the witness is handed an

3   exhibit.  It's -- the witness identifies the exhibit.  We take

4   a moment to see if there are any objections.  If not, move the

5   admission of the exhibit, and then we have it in front of us.

6          Even with the screens, especially with three judges

7   on the bench, it's difficult.  So going forward, to the extent

8   we have paper copies for the Court -- I know I asked for zip

9   drives, but if you don't have them for me, don't worry about

10  it; but if you have paper copies, go through that process so we

11  actually have our copy of the exhibit in front of us while you

12  go along.

13         MR. EPSTEIN:  Thank you, Your Honor.  At this point,

14  first of all, I would note that we do have zip drives for the

15  Court, law clerks, and everyone, which we'll be happy to

16  distribute at a break, but we would move the admission as an

17  illustrative exhibit Plaintiffs' Exhibit No. 3040.

18         JUDGE OSTEEN:  All right.  Any objection to that?

19         MR. STRACH:  No, Your Honor.

20         JUDGE OSTEEN:  Plaintiffs' Exhibit 3040 is admitted.

21         MR. EPSTEIN:  May I ask the witness to resume?

22         JUDGE OSTEEN:  You may.

23  BY MR. EPSTEIN:

24  Q    Okay.  Dr. Mattingly, before we took our break, we were

25  looking at this slide that says "Comparison of Results" and

1  it's Ensemble, Judges, NC 2016, and it's using the 2016 votes.

2  Using your pointer, please, can you walk you us through what

3  you find significant about this slide.

4  A    I think it's probably a good idea if I used the colors.

5  That way it will help everyone know what I'm talking about.

6         JUDGE BRITT:  I'm not getting any feedback from that

7  microphone right now.  Can anyone tell me why?

8         MR. EPSTEIN:  Please speak more loudly.

9         JUDGE BRITT:  It was probably my -- it's clear now.

10        THE WITNESS:  Is this too loud, or is this good?

11        JUDGE BRITT:  No, no, it was not your problem.  It

12  was right here.

13        THE WITNESS:  All right.  So the yellow line that

14  passes through the centers, that's through the median, and

15  that's what I would -- it's typically typical given what we see

16  in our ensemble, and then the green line, which passes very

17  close to the yellow line, is what the Judges map produced, and

18  this blue line deviates quite a bit.  This is the NC 2016 Plan.

19  And so, once again, we see the same kind of S-like structure

20  that we saw before.

21  BY MR. EPSTEIN:

22  Q    And what is significant about that S-like structure to

23  you?

24  A    Well, it is a signature of gerrymandering in the sense

25  that these have many, many more -- many, many more Democratic

1  votes, that is to say, the right most three, the three most

2  Democratic districts have many more Democratic votes than one

3  would typically see, and the next three have a very flat

4  structure with many less Democratic votes than one would

5  typically see.

6  Q    And for the record, just for the Court, I'll refer to this

7  as Slide 30.  I should have been doing that from the beginning,

8  and I apologize for not doing that so the record is little bit

9  clearer.

10         Dr. Mattingly, did you do any work to validate the

11  results of your work to make sure that they weren't overly

12  influenced by one factor or another?

13  A    We did.

14  Q    What did you do to validate your results, among other

15  things?

16  A    Well, one thing we did was -- you might ask was this

17  enough samples?  Did we sample this distribution on

18  redistrictings well enough?  Did we have enough maps?  So --

19  Q    Going to Slide 31, can you answer that question?

20  A    Yes.  So what I've been describing to you largely is the

21  result of using 24 -- just over 24,000 maps.  We also took a

22  longer run of just shy of 120,000 maps, and using those maps,

23  we produced the histograms, the two we've been talking about,

24  the histogram that shows the election results, and you see that

25  there's essentially no deviation.  The blue is the smaller

1    ensemble, and the yellow one is the much larger ensemble.  So

2    this says that the results have stabilized and adding more

3    ensemble -- adding more samples won't change anything.

4    Q    So what does that say about the size of 24,000 as your

5    original ensemble?

6    A    It was at least sufficient.  It doesn't mean that less

7    couldn't have been equally sufficient.

8    Q    And this was studying the 2012 votes with the larger

9    sample size?

10   A    Correct.

11   Q    Okay.  Let's go to what I'll call Slide No. 32, and this

12   is the box plot that corresponds with what we were just looking

13   at, the histogram.  I'm sorry.  I need to go -- there we go.

14   A    So this is the box plot again.  Again, the yellow box

15   plots are the larger sample, 120,000 or so, and the blue box

16   plots are the ones we've been talking about, and you see that

17   they have almost identical structure.  If you look at them next

18   to each other, they look essentially the same.  So that means

19   all the conclusions that we drew so far would be stable using

20   the larger ensemble.

21   Q    All right.  And did you do the same analysis using the

22   2016 votes?

23   A    Yes.

24   Q    Going to Slide No. 33, can you explain what we're looking

25   at there?

1  A    Again, exactly the same thing.  The blue is the smaller

2  ensemble we've been talking about up until now, and the yellow

3  is the larger, just shy of 120,000, and you see essentially

4  zero change between the two.

5  Q    And what does that tell you about whether using the 24,000

6  was enough to be looking at?

7  A    Again, it shows the results are stable.  24,000 was more

8  than enough to produce the good results.

9  Q    And when we go to Slide 34 and look at the box plot

10 structure for the 2016 votes, what does that tell you with

11 119,000 samples?

12 A    Again, the two sets of box plots line up essentially

13 identically.  The medians are in the same places, the

14 50 percent boxes are essentially lining up actually, and even

15 the outliers are coming in the same places.

16 Q    All right.  Dr. Mattingly, one of the things you talked

17 about when you were looking at House Bill 92 and those criteria

18 that were used, both by your students and you, on the one hand,

19 The Beyond Gerrymandering Project, on the other, was a

20 criterion that dealt with county splits, minimizing county

21 splits.

22        Did you take a look at your ensemble with reference

23 to the subject of county splits?

24 A    We did.

25 Q    Okay.  I'm going to go to Slide 35 and ask you to explain

1  to the Court what we're looking at in that histogram.

2  A      So we wanted to understand what the distribution of county

3  splits we had in our ensemble of 24,000 maps, and this light

4  blue histogram gives that collection.  So, typically, we saw

5  around -- the median is around 22, I would say, and it ranges

6  from somewhere around 17 to somewhere around 27, but we were

7  also interested -- you know, when we say a county split, that

8  means the tiniest bit that the legislative districts might leak

9  into a county, and we count that as a split.  Those kinds of

10  things could easily be fixed by hand, by moving a few districts

11  across the line.

12          What we wanted to see was how many significant splits

13  we had.  So we asked ourselves, well, a significant split is

14  where the smaller part is at least 10 percent of the county,

15  and when we did that, we got this darker blue.  So if we only

16  count significant splits, we're down to around 17, 18, 19

17  typically, and down as far as 13, 14.

18  Q      Do you know how many counties were split in the 2012

19  Redistricting Plan enacted by the legislature?

20  A      I believe it was 40.

21  Q      Were all 24,518 plans in your ensemble below that number?

22  A      Yes, we did a hard threshold to ensure that we never

23  considered a map in our 24,000 which had more than a 40-county

24  split.

25  Q      Okay.  Did you also do some validation work around this

1  subject of county splits to make sure that your ensemble was

2  fairly representative?

3  A    Right, so we were interested if decreasing the number of

4  county splits would have any qualitative effect on the results,

5  largely because the 2016 had 13.

6  Q    Let's go to Slide 36, and it says "Validating the Results:

7  The Effect of Doubling Weight Against County Splits."

8  A    So we created a brand-new ensemble.  So we generated a new

9  collection of maps where we -- in our score function, we

10 penalized districts -- redistrictings that had more county

11 splits.  We increased the penalty, so thereby decreasing the

12 chance of drawing a map that had a large number of county

13 splits.  This is that collection we produced, and this is the

14 number of county splits.  So now you see this one we haven't

15 even -- this is just any split.  We haven't even asked what's

16 the 10 percent, what's the significant county split, and it's

17 already down -- typically down 14, 16, 17, and going all the

18 way down to around 11.

19 Q    And did you then take this collection and look at the

20 results that you would have obtained using just this sample?

21 A    Right, so we wanted to compare the results we had before

22 and the results with this new ensemble which had -- which

23 concentrated on having less county splitting.

24 Q    Okay.  And let's go to Slide 37, and is that a --

25          JUDGE OSTEEN:  Hold on just a second.  Let me go back

1  to 35.  I'm not sure I understand the colors.  So the -- on the

2  left side of the graph, you have the darker blue.  That's the

3  splits greater than 10 percent?

4              THE WITNESS:  Yes, Your Honor.

5              JUDGE OSTEEN:  All right.  And then there's that

6  purply color in the middle.  What is that?

7              THE WITNESS:  That's just -- they're transparent.  So

8  where the two box plots -- where the two graphs go over each

9  other, that's so you can see the dark one in the background.

10 So this one coming down -- this is the significant splits and

11 then coming down, and then this one -- you can think of this

12 one being in front, the light blue.

13             JUDGE OSTEEN:  Hold on.  The light blue represents

14 all splits?

15             THE WITNESS:  Yes, Your Honor.

16             JUDGE OSTEEN:  Okay.  And then the lighter purple

17 color is where those two overlap?

18             THE WITNESS:  Correct.

19             JUDGE OSTEEN:  Okay.  Thank you.

20 BY MR. EPSTEIN:

21 Q    All right.  So we were just about to get to this histogram

22 on Slide 37 that now is analyzing the 2012 votes using your

23 different collection that only includes those doubly weighted

24 county -- against county splits plans.

25 A    So we've decreased the number of county splits a bit,

1  quite a bit actually, and we see that there's essentially no

2  change in the qualitative results.  The outcomes of the

3  elections are essentially the same.  The blue is what we had in

4  our original 24,000, and now orange on this plot is what we had

5  with our ensemble that had lower number -- a lower number of

6  county splits typically.

7  Q    And going to Slide 38, was -- in this new collection, was

8  the box plot structure for the 13 districts similar or

9  different than for the original 24,000 ensemble?

10 A    It's very similar.  You see that the median, those lines

11 in the center of the box plots, largely line up very close, and

12 the sizes and positions of the 50 percent boxes are also in

13 agreement.

14 Q    So the last two slides that we looked at, what does that

15 tell you as the mathematical expert about this subject of

16 county splits and its impact upon the redistricting plans that

17 were in your original ensemble?

18 A    It doesn't make any real qualitative difference in the

19 conclusions we reached.

20 Q    Okay.  Now, it says -- I'm sorry.

21 A    Pushing the county splits down didn't change the

22 qualitative structure at all.

23 Q    And what does that say about the original results with the

24 higher number of county splits?

25 A    They seem -- they're valid.  They have the same

1  qualitative structure as the new ones.

2  Q    On the bottom right-hand corner of this and the previous

3  slide, it says "2012 votes."  Is that the votes that were

4  applied to do this validation work?

5  A    Right, since when we compared the two different box

6  plots -- when we did the comparison before with 2016 and 2012,

7  we didn't see anything different for these validations.  We

8  just used 2012 votes, and that was largely --

9  Q    Did you -- we're running out of your PowerPoint here, but

10 I'm going to ask you some questions about things that aren't in

11 the PowerPoint.

12          Did you do additional work to validate the results

13 that you've shared with the Court that aren't in your

14 PowerPoint but are in your paper?

15 A    Yes, we -- as I --

16 Q    I'm going to get to that.

17 A    The answer is yes.

18 Q    Is that the section of your paper entitled "Testing the

19 Sensitivity of Results," which is at pages 24 through 30 of the

20 paper, Exhibit 3004?

21          JUDGE OSTEEN:  Is that Tab 2 or Tab 4?

22          MR. EPSTEIN:  It's Tab 4.

23          JUDGE OSTEEN:  What pages again?

24          MR. EPSTEIN:  24 through 30, Your Honor.

25          THE WITNESS:  Yes.

1  BY MR. EPSTEIN:

2  Q    Okay.  And so I'm going to ask you some specific questions

3  about the testing of sensitivity of results you did that we

4  didn't show on the PowerPoint.

5            Did you test to make sure that reducing population

6  deviation down from 1 percent to the desired goal of 0 percent

7  would not qualitatively affect the outcome?

8  A    Yes, we -- initially, we thresholded at 1 percent.  So

9  this is Figure 12 in the paper on page 25.  We initially

10 thresholded at 1 percent, but we also then considered

11 thresholding at .75 percent and .5 percent, and you see that

12 decreasing it, there's no systematic effect, there's no change,

13 and if you compare the box plot to the picture to the right,

14 it's a little bit more -- it's a more informative version of

15 the box plot.  It actually shows the histogram, the PDF on each

16 of them, so it even gives more information, and, as you see,

17 the green and the blue in the figure on the right look almost

18 identical.  So it really shows that decreasing the populations,

19 the compliance with the population equal partition, didn't

20 change the results.

21 Q    Did you test to make sure that changing the compactness

22 threshold, that is how compact the individual districts had to

23 be to make it into your ensemble -- how that qualitatively

24 affected the outcome?

25 A    Yes, so if you turn to the next page, page 26 in Figure

1  13, we did the same exercise again.  We said let's -- so here

2  we're talking about the isoperimetric score, which is a smaller

3  score, which means it's more like a circle and less elongated

4  like a wiggly hot dog, and as it decreases from 80 to 60 to 54,

5  and even when we had absolutely no thresholding, the results

6  looked very similar, qualitatively the same.

7  Q    Did you test to make sure that changing the compactness

8  energy, as you call it, would not qualitatively affect the

9  outcome?

10 A    Yes.

11 Q    First of all, define what you mean by compactness energy?

12 A    So in our score function, there were different terms that

13 measured how well a particular district adhered to the design

14 that the nonpartisan design criteria laid out in House Bill 92.

15 One of those was the compactness; that is to say, how much it

16 looked like a circle.  Initially, we use the isoperimetric

17 constant, which is the ratio of the perimeter of the districts

18 squared over the area, but sometimes in the bill, they also

19 talk about other measures, and we considered a different

20 measure, which was looking at it in a box, a rectangle, which

21 included the district, and comparing the two areas.  So that's

22 a very different measure, but, in fact, it gave qualitatively

23 the same results.  So it was not sensitive to changing what our

24 definition of compactness was.

25 Q    Dr. Mattingly, when you began the Markov Chain Monte Carlo

1  algorithm to start producing Maps No. 1, 2, 3, and 4, in what

2  ultimately became over 24,000, was there some kind of

3  geographical starting point so the computer knew how to start

4  the process?

5  A    Yes.  The way the algorithm works is it starts with an

6  initial map, and then it manipulates and fidgets the boundary

7  in a way that preserves this measure.  So in the initial run of

8  24,000, we started from the Judges map.

9  Q    The Beyond Gerrymandering map?

10 A    The Beyond Gerrymandering map, but we also --

11 Q    Let me just ask you before you go there, how do you know

12 that that initial starting condition didn't skew the outcome in

13 favor of plans that looked like the Judges Plan and against

14 plans that looked more like the General Assembly's plans?

15 A    It's a legitimate question, and so we tested against that.

16 Q    Where at?

17 A    All right.  I am searching.

18 Q    Is that page 28?

19 A    You are correct.  It is page 28.  So if you look at

20 page 28, Figure 14, the top -- the top set of figures across

21 the top, we considered where we started from the Judges Plan,

22 where we started actually from the NC '12 map, and where we

23 started from the NC '16 map, and you see they look very, very

24 similar.  There is a small amount of fluctuation, but that's

25 attributed mainly to the fact that we used lower numbers.

1   Q    Okay.  And so if you had instead started with the 2012

2   Plan or the 2016 Plan, what is this chart in the upper

3   left-hand corner of page 28 telling us about what kind of

4   different results would have been obtained?

5   A    We would have obtained the same conclusions, especially

6   when you look at the box plot just to the right, and the same

7   thing, you see that they line up identically.  So all the

8   qualitative descriptions we've made about these S curves and

9   deviations impacting, they would have all -- the same

10  conclusions would have been made if we had started from the

11  legislative maps as the initial condition.

12  Q    Finally, did you do some validation work as it relates to

13  the topic of weighting of the criteria?

14  A    Yes, we did.

15  Q    Is that the chart -- Figure 16 at the top of page 30?

16  A    Thank you, yes.

17  Q    Okay.

18  A    So we made --

19  Q    Briefly describe what it is you were doing in this chart

20  and what you were validating.

21  A    So there was some choices.  We had to tune some parameters

22  to make the maps look basically like the maps we saw already

23  having been produced, the 2012, 2016.  We wanted them to have

24  reasonable numbers to county splits when compared with them,

25  reasonable compactness when compared with them, reasonable

 1  population deviations given what House Bill 92 said; but then

 2  we wanted to say, well, what if we had changed those

 3  weightings?  So we moved up and down around -- we moved up and

 4  down each of these weightings, and we chose different weights

 5  and sought to change the result.  If you look, we have this box

 6  plot.  This is Figure 16, and you'll see that, again, all of

 7  the boxes line up essentially in the same position.  There's

 8  some small fluctuations, but they're largely the same, the

 9  positions where they showed -- where they end up.

10  Q    And what does that tell you about the weighting that was

11  used in the actual ensemble, the 24,000?

12  A    That the conclusions we're drawing are not particularly

13  sensitive to the exact details of how we built this ensemble.

14  Q    Okay.  You used 2012 votes for the various validation work

15  that we just went through, is that correct?

16  A    That is correct.

17  Q    Why did you use 2012 votes for those?

18  A    Well, as I explained, we were doing this as part of this

19  Beyond Gerrymandering Project.  So we initially had a

20  presentation in early -- in November, and so the validation is

21  something we do very early on to make sure that you have things

22  going the way they should be going.  So at that time, we didn't

23  have 2016 votes yet.

24  Q    Okay.  And that's why you used that in your paper?

25  A    Correct.

1  Q    All right.  We're going to go forward to the last slide,

2  which is Slide No. 39 in your PowerPoint.  The first question I

3  want to ask you before -- are these -- have we seen these two

4  slides before?

5  A    We have.  These are just repeats.

6  Q    Are they now side by side the comparison of the 2012 Plan

7  to the ensemble of yours and to the Judges Plan and then the

8  comparison to 2016 Plan to your ensemble and to the Judges

9  Plan?

10 A    Yes.

11        JUDGE BRITT:  Does that appear in the chart -- in the

12 exhibit?

13        MR. EPSTEIN:  It appears, Your Honor, in the

14 PowerPoint that we gave you, which is Exhibit 3040.  It's the

15 last page.

16        JUDGE BRITT:  I got it.

17        MR. EPSTEIN:  Thank you.

18 BY MR. EPSTEIN:

19 Q    So the first question I want to ask you:  In looking at

20 this particular slide, is what it tells you about whether a

21 need to comply with the Voting Rights Act or to have two

22 districts that have high percentages of African-American

23 voting-age population requires the drawing of a -- of districts

24 in a way that provides a significant advantage to Republicans?

25 A    Well, our ensemble already had that as part of its

1   construction.  From all of our maps, we had these criteria so

2   they complied with the Voting Rights Act.  When you see that

3   typically we get this yellow line, and then the judges, when

4   they drew their maps, which also complied, produced the green

5   line, and so there's no -- there's no -- there's nothing in

6   that that necessitates a structure which would give this

7   S-shape and these packing here and these depletions here, and I

8   should be careful.  When I say "here," I mean in the first

9   three to the right on the left-hand panel and the first three

10  to the right on the right-hand side panel, and then the next

11  three in from those three on both panels being depleted, being

12  below the box plots.

13  Q    And let me ask that question in a slightly different way.

14       What does this slide tell you about whether the need

15  to comply with the Voting Rights Act or to draw two highly

16  populated African-American voting-age population districts

17  could explain the partisan distribution of congressional seats

18  resulting from the 2012 and 2016 Plans and elections?

19  A    It doesn't explain it.

20  Q    All right.  Now, Dr. Mattingly, you told us earlier when

21  we started that you began this project with Ms. Vaughn before

22  Mr. Speas ever knocked on your door, trying to figure out if

23  the political geography of North Carolina and the distribution

24  of where voters lived in North Carolina, whether they be

25  Democrat or Republican, could by itself explain the partisan

1   outcomes of our congressional elections during this decade.

2            Did you figure out the answer to that question in the

3   work that you've been describing to the Court today?

4   A    We did.

5   Q    And can you use those -- that slide and those graphs in

6   front of you to explain your answer to that question?

7   A    Yes.  So by using this ensemble of 24,000, we discovered

8   what the background structure in the geopolitical makeup of

9   North Carolina is, its geography, where its people live, where

10  its voters in each party are distributed, and where the

11  African-American population is, and what that necessitates

12  relative to the Voting Rights Act.  And what we see is -- this

13  yellow line and these set of boxes shows what we typically see

14  when we draw in a nonpartisan way, and as you can see, that's

15  very different than this type of packing, this packing here to

16  the most three right in each map, and then this depletion of

17  voters in the next three.  That's a very different structure

18  than what one would see just based on the geography and the

19  geopolitical distribution of people in North Carolina.

20  Q    And, Dr. Mattingly, if it's not the political geography of

21  North Carolina that explains the results of our congressional

22  elections over the past decade, what, in your opinion, does

23  explain those results?

24  A    Well, we did another analysis where we looked at the

25  boundaries of the maps, the boundaries of each of the

1   districts, and we moved the boundary around 10 percent, and we

2   saw that drastically changed the outcomes, the makeup of these

3   districts, and we found that it did for the 2016 and 2012 maps,

4   and it didn't for the Judges.  So that seems to say that it was

5   not just randomly chosen from a map that looked like that.  It

6   was very specifically tuned.

7   Q    And specifically tuned to do what?

8   A    To develop this type of partisan advantage.

9           MR. EPSTEIN:  Those are all of my questions, Your

10  Honors.

11          JUDGE OSTEEN:  Cross-examination?

12          MR. STRACH:  Yes, Your Honor, thank you.

13                          CROSS-EXAMINATION

14  BY MR. STRACH:

15  Q    It's still morning.  Good morning, Dr. Mattingly.

16  A    Good morning.

17  Q    I'm Phil Strach.  We met a couple of times at your

18  depositions.  This stuff is fairly complicated, so I'm going to

19  try to keep it as simple as I can keep it, but if I

20  oversimplify something, let me know, okay?

21  A    I will.

22  Q    You've already told the Court this is your first time

23  acting as an expert witness, is that right?

24  A    That is correct.

25  Q    And other than the redistrictings that are generated by

1  your computer, you've never sat down with redistricting

2  software and drawn an actual map, have you?

3  A    No, I haven't.

4  Q    And are you familiar with a redistricting software called

5  Maptitude?

6  A    I've never used it.  I've heard of it.

7  Q    Okay.  The article that you have published that you've

8  been talking about here today, has that article been

9  peer-reviewed?

10  A    It's not.  It's not yet been published.

11  Q    It's not been peer-reviewed or published?

12  A    It's -- no, it's not been -- well, it was under review,

13  but it's never been published, no.

14  Q    So it's never -- other than being on the internet with

15  that e-archive, I think is what you called it, it's never been

16  reviewed or published in any academic journal?

17  A    No.

18  Q    Let me just focus on one particular underlying assumption

19  that I want to make sure is clear about your work --

20           JUDGE OSTEEN:  Hold on, Mr. Strach.  I may have

21  messed up.  Is there any further direct examination?

22           MS. EARLS:  Thank you, Your Honor.  I would have

23  jumped up then.  Thank you.

24           JUDGE OSTEEN:  All right.  You may continue.  Sorry

25  about that.

1        MR. STRACH:  Thank you, Your Honor.

2  BY MR. STRACH:

3  Q    So let me focus in on something fairly basic, I think,

4  that I want to make sure is clear.  When you tell your computer

5  to generate these redistricting maps, you take votes from the

6  2012 and the 2016 elections, and then you change the districts

7  assuming that the votes would remain the same for the political

8  parties from those elections, correct?

9  A    Correct, we tabulate the votes in each district as they

10 were cast, Democrat or Republican.

11 Q    All right.  So the analysis that you've done just has a

12 baseline assumption that voters vote for the party and not for

13 the particular candidate, correct?

14 A    Yes, and we -- yes, we validated that.

15 Q    Right.  Well, but you agree -- you agree, though, that in

16 actual fact, voters don't always just vote for the party, they

17 also vote for the candidate?

18 A    Yes, they do, but we actually looked into whether that

19 held in these maps.

20 Q    And in the -- you agreed in one of your reports, though,

21 that assuming that voters vote only for the party and not the

22 candidate is not always a valued assumption, correct?

23 A    Right, but then we went on to validate that after that,

24 yes.

25 Q    So if you assume that voters vote only for the party when

1  they go in to vote, then your analysis does not take into

2  account the dynamics of each election, is that correct?

3  A     So we did actually address that.  So what we did was we

4  looked at -- we actually collected and used other elections.

5  So after we wrote this paper, we looked at -- because we were

6  curious about exactly this point, and we looked at a number of

7  different elections, including Senate races and presidential

8  races, and it may affect the qualitative -- it doesn't affect

9  to any extent the change in any of the results here.  The

10 qualitative structure of all the plots that I showed you stays

11 the same, and that, therefore -- thereby controls for whether

12 it was an incumbent or whether it wasn't an incumbent or

13 whether it was the personality of the candidate.

14 Q     All right.  So you didn't, though -- you were using

15 statewide voting data for your analysis, correct?

16 A     Which analysis?  The analysis here or the analysis I just

17 talked about?

18 Q     Both.

19 A     I was using sometimes statewide, but also different -- I

20 mean, we used legislature, we used President, we used Senate,

21 yes.

22 Q     You didn't do any study of, say, the dynamic of the 2016

23 race for the 10th Congressional District, including looking at

24 the candidates and fundraising, did you?

25 A     No, we did not.

1  Q    And, in fact, you didn't do any analysis like that for any
2  of the congressional districts individually, did you?
3  A    No.  Since our districts moved around, it really wouldn't
4  make sense to do that.
5  Q    Now, let me try to understand and make sure the Court
6  understands exactly how you selected and got down to the 24,000
7  redistrictings that formed the basis of your analysis.  And I
8  assume that your analysis is based on this 24,000-plus
9  redistrictings that you generated, correct?
10 A    Correct, and then validated against the 120,000.
11 Q    Right.  So is the first thing that you did was you asked
12 your computer to generate every possible redistricting --
13 congressional redistricting that could possibly be generated,
14 is that correct?
15 A    No.
16 Q    What did you do?
17 A    We first put a distribution on redistrictings that
18 weighted districts -- redistrictings according to how well they
19 satisfied the redistricting criteria, and then we sampled from
20 that distribution, drawing redistricts according to how well
21 they satisfied the redistricting criteria, and then after that,
22 we made a second thresholding just to remove any that were
23 large deviations away.
24 Q    Right, and I understand.  I'm going to actually get to
25 that part.  I'm starting even further from the beginning.

1  A    Right.

2  Q    Okay.  So I'm like in genesis.  You're like into the

3  Judges right at this point.  I'm going to start with genesis,

4  if that's all right?

5  A    That's fine.  So in terms of your analogy, in terms of

6  genesis, we didn't create all bacteria and all organisms.  We

7  started off with humans.  We first sampled from a certain

8  distribution.

9  Q    Right.  You told me in your deposition, right, that if you

10 tried to create -- if you told your computer to generate all

11 possible congressional redistrictings in North Carolina, that's

12 just some astronomical number?

13 A    Yes, that's correct.

14 Q    Right.  And you don't know that exact number, do you?

15 A    It depends.  You have to tell me what your assumptions

16 were.  If you wanted to make sure they were contiguous, if you

17 didn't --

18 Q    If they're not contiguous?

19 A    I think actually in the paper there was a number to that.

20 I don't have memorized it.  If you have it in front of you, I'm

21 happy to validate it.

22 Q    I just recall it was an extremely astronomical number,

23 correct?

24 A    Yes, but that would allow the 13th District to have

25 something, you know, out at the coast and something in the

1   mountains.

2   Q    That's right.  And that's why it's such a big number?

3   A    That's why it's such a big number.

4   Q    So from that, what you did is you asked the computer to at

5   least generate contiguous districts, is that correct?

6   A    Correct.  Correct.

7   Q    Okay.  And it's that set of districts that you called in

8   your paper the Set R, is that right?

9   A    Yes.

10  Q    Now, do you know of that Set R -- this is all of the

11  number of contiguous districts that your computer can draw for

12  North Carolina's 13 congressional districts.  Do you know how

13  many redistrictings were in that Set R?

14  A    It's hard to say exactly.  It's a difficult problem.

15  Q    Okay.  I mean, it could be a million?  It could be a

16  billion?  I mean, you just don't have any idea?

17  A    I would have to sit down and try to calculate, but I would

18  say -- I mean, it would be more than a million for sure.

19  Q    All right.  And I take it then, based on your testimony

20  today, you haven't sat down to try to calculate what that

21  number is?

22  A    No, we were interested in sampling from this distribution

23  of districts -- redistrictings that satisfied House Bill 92, so

24  that's what we were drawing from.

25  Q    Right.  And I just want to make sure because I think it's

1  important that we know what you started with to begin with, all

2  right?

3  A    Right.

4  Q    And so sitting here today, the set of redistrictings that

5  you used to created the 24,000 to sample from or whatever, you

6  don't know what that number is?

7  A    Well, that's not really the way to think about it, I

8  think, to phrase it right.  I think the way to think about it

9  is we first put a distribution on districtings that satisfied

10  House Bill 92, and then we sampled from that distribution on

11  redistrictings.  We didn't treat all districtings likely --

12  equally well because some redistrictings don't satisfy House

13  Bill 92 to the same extent or even at all.

14  Q    I understand that, and I'm going to get to that in just a

15  moment, I promise.

16         So what I'm focused on right now is the Set R, which

17  is the set of contiguous districts.  And you don't know that

18  number of redistrictings, correct?

19  A    Correct.

20  Q    Then from that Set R, is that the set from which you ran

21  the Monte Carlo sampling to get 150 redistricting plans?

22  A    150,000.

23  Q    I mean, 150,000?

24  A    Yes, we then sampled from that Set R based on the

25  distribution we had put on it.

1  Q    All right.  Now, so you got 150,000 redistricting plans

2  out of this unknown number of R -- Set R redistrictings.  So we

3  don't know what the percentage of the Set R that 150,000

4  equals, correct?

5  A    Correct, but we do know that we sampled the distribution

6  well and captured its characteristics.

7  Q    Okay.  So if you're imagining a continuum in your mind

8  that started off with all those unconnected redistrictings,

9  that astronomical number, and then continued down to the Set R

10 from that, which we don't quite know how many that is, and then

11 we carry on to the 150,000 that you got, we don't know where on

12 that continuum that Set R is, do we?

13 A    No, we don't.

14 Q    All right.  So then what you did is once you got --

15 A    I would say that what you said so far really isn't germane

16 to what we did, but I'm answering your questions.

17 Q    Thank you.  I appreciate that.

18       Once you got the 150,000, was it against the 150,000

19 plans that you then did I think what you've called your

20 thresholding?

21 A    That's correct.

22 Q    All right.  And is it fair to say that when you say

23 thresholding, what you mean is you're applying -- you're

24 telling the computer to now apply the criteria that you've

25 picked?

1  A    No, in drawing the 150,000, we already applied the

2  criteria.   Those were based on -- so the idea is that every

3  time we draw a redistricting, we're drawing it with more

4  likelihood.   We draw districts that satisfy -- the better a

5  district satisfies House Bill 92, the better it has low

6  compactness, the better it has low county splits, the better is

7  it splits the population equally, it's more likely to be drawn.

8  So we first drew 150,000 that was drawn from that distribution

9  and then -- just to make sure, but there are some that don't

10 satisfy it very well.   They were very unlikely, but when you

11 draw 150,000, you draw some unlikely things.

12            So then we removed by thresholding those ones that

13 were outside some minimal -- some absolute minimal standards

14 that we placed.

15 Q    Okay.   So your thresholding was a more specific way to

16 apply the criteria that you wanted to apply?

17 A    Well, within the ones we had drawn that were more likely

18 or less likely based on how well they satisfied the criteria,

19 it got rid of some that were absolutely not reasonable,

20 absolutely not likely complete, you know.

21 Q    All right.   And once you applied your thresholding

22 process, that's when you got down to your 24,000 redistrictings

23 from the 150,000, is that correct?

24 A    That's correct.

25 Q    All right.   Now, when you did this analysis, I believe it

1  was in 2016, the 2016 Congressional Plan had already been

2  enacted, is that correct?

3  A    I believe so, yes.

4  Q    I think you said you started this around May of 2016?

5  A    Yeah, that's correct.  Yes, you're right.

6  Q    Okay.  So if you wanted to apply thresholding using

7  criteria that could be observed in the 2016 congressional map,

8  you could have done that, correct?

9  A    Yes.

10  Q    You didn't do that, correct?

11  A    No, we largely used the 2012 as our thresholding because

12  we were just looking for an extreme upper bound.

13  Q    All right.  And you used the criteria as it was worded in

14  this House Bill 92, correct?

15  A    That's correct.

16  Q    Rather than using criteria that you could observe in the

17  2016 map, correct?

18  A    We did apply -- we did take some parts from the 2016 map.

19  We took the level of the VRA from the 2016 map.

20  Q    Okay.  All right.  We'll talk about that.  Now, you wanted

21  to use the House Bill 92 criteria because it was consistent

22  with that Beyond Gerrymandering Project that you were helping,

23  correct?

24  A    Right, that was the reason we did it.  We had used it --

25  some of those results -- we'd used them similarly the year

1  before, but we locked on to it that year because we wanted to

2  interface with the Beyond Gerrymandering Project.

3  Q    So it would've been possible for you -- for purposes of

4  this case, you could have ditched the House Bill 92 criteria

5  and you could have just said, hey, I'm just going to look only

6  at the criteria that were adopted and observed in the 2016

7  Plan, and you could have limited yourself to that criteria,

8  correct?

9  A    Well, we were interested in nonpartisan criteria.  So if

10 you remove the partisan criteria from that, you essentially

11 arrive at House Bill 92, I believe.

12 Q    All right.  We'll talk about that.

13           MR. STRACH:  If I may approach, Your Honor?

14           JUDGE OSTEEN:  No need to ask.

15 BY MR. STRACH:

16 Q    Dr. Mattingly, what I've handed you is a paper called

17 "Toward a Talismanic Redistricting Tool, a Computational Method

18 for Identifying Extreme Redistricting Plans."  Do you see that?

19 A    Yes.

20 Q    And the authors are Wendy K. Tam Cho and Yan Y. Liu.  Are

21 you familiar with either of those authors?

22 A    I've never met them.  I've seen their work.

23 Q    Do you understand that these two authors have published

24 numerous articles in this area of using computational methods

25 to identify gerrymandering?

1  A    I think they have similar numbers to us, yes, but if

2  they've published a few, yes, they have.

3  Q    All right.  And this appears to have been published in

4  2016.  Did you review this particular article when you were

5  preparing your report?

6  A    By "review," you mean did we look at it?

7  Q    Yes.

8  A    Yeah, we looked at it -- oh, when we prepare our report --

9  I mean, we looked at it along the way in preparing our paper,

10 yes.

11 Q    All right.  If you would turn to page --

12 A    I should be careful actually.  I'm not sure if we looked

13 at this exact one or one of her previous ones.  I know I've

14 looked at her work.

15 Q    Can you tell me if you've looked at this exact one prior

16 to finalizing your work in this case?

17 A    I can't be certain if it would be this exact one.  What

18 date was this published?

19 Q    It just says 2016.

20 A    She has another paper in machine learning or a genetic

21 learning algorithm paper journal which I looked at.  I don't

22 remember if I exactly looked at this one.

23 Q    Okay.  If you would turn to page 354, you'll see the

24 numbers at the top of the page.  Do you agree that these

25 authors study methods similar to what you've used in this case

1   in terms of using these simulated maps?

2   A    They used simulated maps.  The method for drawing them is

3   very different.

4   Q    Okay.  All right.  If you look on page 354 on the

5   right-hand side of the page, the first full paragraph starts

6   with "in addition to."  Do you see that?

7   A    Right-hand side, yes, "in addition."

8   Q    It says:  "In addition to creating a set of possible maps

9   where the underlying population is constant, the maps and the

10  baseline comparison set need to be a fully balanced comparison

11  set of plans, meaning that they balance and consider the full

12  set of relevant redistricting criteria."  Do you see that?

13  A    Yes.

14  Q    Dr. Mattingly, do you agree with that statement as applied

15  to this type of research?

16  A    It seems rather vague.  I don't quite know what it means.

17  Q    All right.  At the bottom of that paragraph, the authors

18  state that "On the other hand, when the full set of criteria

19  are not considered, the produced comparison set is

20  substantively less interesting and perhaps substantively

21  uninteresting."  Do you agree with that statement?

22  A    Perhaps.  Perhaps it might be.

23  Q    Dr. Mattingly, what I've handed you is an article

24  entitled, "Revealing Preferences Why Gerrymanders are Hard to

25  Prove and What to Do About It."  Do you see that?

A     Yes, I do.

Q     And it has as authors Micah Altman, Brian Amos, Michael P. McDonald, and Daniel A. Smith.  Are you familiar with any of those individuals?

A     I'm not.

Q     And so I take it you haven't read any of their work in this area?

A     I don't recall.  I may have.  I would have to look at the bibliography.

Q     All right.  Have you read this specific article at any point?

A     I don't recall it.

Q     Okay.  All right.  If you'll look at page 25, there's a section called "3.5, Method of Post-Hoc Comparison," and in the second paragraph of that section, they say that "Here, we assess the class of gerrymandering detection methods that compare an adopted plan to plans that are generated post-hoc to the redistricting process."

          Would you agree that the work you did is in this genre of research?

A     I haven't read the whole thing, so it's a little hard to know exactly what they mean, but we did it after the redistricting process, if that's what you mean, yes.

Q     All right.  And so if you look at the last sentence of this paragraph, it says:  "An important consideration is that

 1  to make proper inference of intent, a post-hoc plan must

 2  incorporate the relevant information that led to the agent

 3  state -- the redistricting data, the observable process, and

 4  public plans -- minus the illicit intent."

 5          Do you agree with that?

 6  A    No.

 7  Q    Why not?

 8  A    Because if I ask is it -- how likely is it for you to

 9  stumble upon a plan and without using intent, and I showed that

10  it's extremely unlikely for you to stumble upon it, without

11  having -- without actually looking for it, without actually

12  designing it, then it seems that I've shown that you must have

13  been driving there.

14  Q    All right.  Now, why don't you turn to page 28, and at the

15  top of that page, the authors state:  "Second, there may be a

16  good reason why an Authority did not explore fair options:

17  because they do not conform to all legally required criteria.

18  Some automated approaches attempt to draw only contiguous,

19  compact, and equal population districts," and do you see that

20  they cite your work there?

21  A    I do.  Let me just -- for benefit of the Court, let me

22  clarify that.  That's a very earlier work and not nearly as

23  nuanced as the one that came -- the two works -- the work that

24  came two generations later, but, yes, I agree with what you

25  said.

1  Q    All right.  This goes on to say that "One can only draw

2  inferences how an adopted plan deviates from plans drawn in

3  accordance to these criteria.  In survey research this issue is

4  described as an incongruence of the sample frame to the

5  population of interests, a situation that can produce biased

6  estimates."  Do you agree with their statement there?

7  A    Let me read it myself.

8          So what they say is that one can only draw inference

9  from plans that deviate with those plans drawn in accordance

10 with those criteria, which means that since we used the

11 criteria from House Bill 92, it's exactly what we've been

12 saying all along.  We're just deviating -- deciding whether

13 something would deviate from a plan that one would typically

14 see in House Bill 92.

15 Q    So you agree with the statement that I just read?

16 A    I agree with the statement that if -- you know, it's hard

17 to take a sentence out of context right in the middle of a

18 paper, but if this is saying that we just -- our plans were

19 asking if something would deviate from a plan that was drawn by

20 nonpartisan only using the criterion in House Bill 92, yes, I

21 agree.

22 Q    All right.  Well, let's look at the next sentence.  It

23 says:  "Automated algorithms that do not generate districts in

24 accordance with all legally required criteria present in the

25 observable process, minus the alleged illicit intent, pose the

 1  wrong counterfactual question and cannot be used to make

 2  inferences of intent."

 3          Would you agree with that based on the work that you

 4  did?

 5  A    No.  I think that you -- I think you would have to be more

 6  precise about which things you think are not -- which criteria

 7  we're not satisfying for me to actually answer that.  I think

 8  it would have to be a little more specific, your question.

 9  Q    Okay.  But you would agree that based on the scholarly

10  materials that we've been looking at, which criteria you end up

11  using to run through your algorithm are very important,

12  correct?

13  A    Of course.

14  Q    And those -- the criteria that you choose should try to be

15  as consistent as possible with the criteria that the

16  legislature actually used in the enacted map, is that correct?

17  A    I think we've been very explicit to say we used the

18  criteria in House Bill 92.

19  Q    All right.  And you've also agreed with me that by the

20  time you did your research, the 2016 Congressional Plan was

21  enacted and you could have looked at the criteria in the map

22  itself, correct?

23  A    In the map or in what the legislature said?  I don't know

24  what the criteria in the map means.  That's what's confusing to

25  me a little bit.

1  Q    Okay.  We'll talk a little bit more about that then.

2           Now, you mentioned earlier -- you understand that the

3  2016 Congressional Plan as enacted only split 13 counties, is

4  that correct?

5  A    Yes, I believe that was true and the Judges split 12 and

6  the 2012 split 40.

7  Q    All right.  Was there -- wasn't there an initial part of

8  your study that you did where in your 24,000 -- set of 24,000

9  redistrictings, none of your redistrictings split less than 14

10 counties?

11 A    Yes, in the initial one, but not in the second one.

12 Q    So your initial run produced no redistrictings that had

13 less than 14 split counties, is that correct?

14 A    Yes, we looked at the 2012, and we thought that was a

15 reasonable number in light of that.

16 Q    Right.  And then you tweaked your -- and then you tweaked

17 your study, and you were able to get some of the 24,000 that

18 did contain less than 14 splits, correct?

19 A    Not of the 24,000.  We created a new ensemble by changing

20 our distribution so that it was centered more on -- it cared

21 more about not splitting counties, and when we did that, we

22 produced I think it was around 15,000 or 14,000, which didn't

23 split as many counties, and the results didn't change.

24 Q    All right.  But suffice it to say, though, that in the

25 first set of 24,000 that you ran, you didn't have even one set

1  of redistrictings that split less than 14 counties, correct?

2  A    We didn't have very many.

3  Q    And isn't it fair to say that if you're trying to make an

4  apples-to-apples comparison here, you'd want redistrictings

5  that were generated by your computer that at least had the same

6  number of split counties as the enacted plan, correct?

7  A    I don't think that that's necessary.

8  Q    You don't think that that's necessary?

9  A    It doesn't have to have the exact same number.  We were

10  following the House bill, which said that one should try to

11  minimize that within some reasonable amount, and given what had

12  already been put forward by the legislature itself, it seemed

13  that since the previous plan had 40, this seemed something

14  around the high 20s, low 20s seemed quite reasonable, and then

15  we had a second set, which was much lower, which had a number

16  which were 13.

17  Q    Right.  So let me try to ask it this way then.  When you

18  did your -- when you were running your algorithms, you knew at

19  that time that the 2016 Plan split 13 counties, right?

20  A    That's correct.

21  Q    Okay.  So isn't it true that you could have told your

22  algorithm to limit itself to calling out redistricting plans

23  that only split 13 counties?

24  A    Yes, we could have.

25  Q    And did you do that?

1  A    No, we did not.

2  Q    So you have no idea how many simulated maps that would

3  have produced, do you?

4  A    I think it's not about the number.  It's about sampling

5  the distribution and whether the qualitative structure changes.

6  When we made a new distribution which significantly lowered the

7  number of county splits, we saw no qualitative change in the

8  results.  So it seems a bit of a red herring.  When we pushed

9  it to lower the county splits, it didn't change the qualitative

10 structure of our outcome at all.

11 Q    Okay.  But you never -- I mean, you could have -- you

12 could have at least tried out running an algorithm that just

13 pulled 13-county split plans, correct?

14 A    We could have.

15 Q    And you just didn't do that, correct?

16 A    No, we did not.

17 Q    So we have no idea what your conclusions would have been

18 had you done so, do we?

19 A    We have a pretty good idea.  We saw that when we reduced

20 the number of county splits down, it had no significant effect

21 on the results, and we had a number that were in that range,

22 and the judges produced one that had 12, and their results

23 lined up perfectly with our statistical ensemble.  So they had

24 12.  So I think we have a pretty good idea.

25 Q    All right.  But based on your assumption from an ensemble

1  plan that contained numerous split counties, not just 13,

2  correct?

3  A    Yes, some 14, 15, 16.

4  Q    Some in the 20s, some in the 30s, right?

5  A    Correct, in the first ensemble.  In the second ensemble, I

6  don't think we had anything as high as 30.  I would have to

7  check.  I can if you want.

8  Q    Did -- you understand, don't you, that the 2016

9  Congressional Plan contained no population deviation between

10  districts, correct?

11  A    Correct.

12  Q    And when I say "no," I mean zero, right?

13  A    Correct.

14  Q    And, nonetheless, however, in your set of 24,000

15  redistrictings, none of those redistrictings have a zero

16  population deviation, correct?

17  A    That's correct.

18  Q    Now, isn't it true that you could have told your algorithm

19  to limit itself to plans that contained zero population

20  deviation?

21  A    It's not really in the spirit of the type of algorithm,

22  but we saw from our experience in the Beyond Gerrymandering and

23  also looking at some of the numbers, once we got down to below

24  1 percent, and many of ours were much, much below 1 percent,

25  they were in the, I think, .25 percent deviation -- then once

1  you were at that level, it was just very simple to do a small

2  hand change to reduce it to zero repopulation, which is, in

3  fact, how the judges did it.  They got down to within 1 percent

4  and then afterwards, using a finer level structure, moved

5  boundaries around, and none of these made any of changes in the

6  qualitative structure of their maps.

7  Q    But you didn't run even one algorithm that told the

8  computer to generate only zero population plans, correct?

9  A    No, that's not true.  We did look and see if we were to

10 zero out exactly the Judges or exactly zero out the other maps,

11 because when you look at them only at the VTD level, they have

12 a small variation.  We looked and saw whether -- if you were to

13 zero them out in the worst-case analysis, whether it would

14 change any of the results, and it would not.  So it wouldn't

15 change qualitatively where they were.  So we didn't do that

16 with the 24,000, but you'd expect, since they fluctuate on

17 either side in an equal number, that the median effect would be

18 negligible and zero.

19 Q    Okay.  But that's part of what you recall in your

20 sensitivity analysis, correct?

21 A    Correct.

22 Q    That's not what I'm talking about.

23 A    Right.

24 Q    I'm talking about something different.

25 A    Okay.

1   Q    What I'm talking about is on the front end, isn't it true

2   that you could have told your algorithm to only choose

3   redistrictings that had zero population deviation?  Couldn't

4   you have done that?

5   A    No.

6   Q    You couldn't even have done that?

7   A    No, usually -- if you're doing it at the VTD level, you

8   first do it at the VTD level, and then you're going down to the

9   census block level to zero it out.

10  Q    But your algorithm couldn't have done that for you?

11  A    Not as it was used then.

12  Q    Okay.  So there was no way for to you run a comparison set

13  of redistrictings that had only zero population deviation on

14  the front end, not in your sensitivity analysis, but on the

15  front end?

16  A    No, but we could assess after the fact whether doing so,

17  zeroing them out, would have any effect, which is what we did.

18  Q    Now, by the time the 2016 Plan had been adopted, you were

19  aware, weren't you, that -- well, let me ask you this:  Were

20  you aware of the prior 12th Congressional District and it

21  looked kind of like a snake?  Are you aware of that?

22  A    Yes.

23  Q    Okay, good.  And so then once the plan was enacted, you

24  would have seen from a visual review of the plan that that

25  district was no longer like that, correct?

1   A     Correct.

2   Q     And that district was completely confined to Mecklenburg

3   County?  Did you -- were you aware of that?

4   A     Which, the new 12th?

5   Q     Yes.

6   A     Yes, I believe I was.

7   Q     All right.  And I believe it's true, isn't it, that you

8   could have told your algorithm to only -- to confine itself to

9   redistrictings which had the 12th District or at least one

10  district wholly confined to Mecklenburg, isn't that correct?

11  A     Yes, one could.

12  Q     And you did not do that, right?

13  A     No, we only followed the criteria in House Bill 92.

14  Q     Right.  That's right, but you did not follow a criteria

15  that said, hey, keep one of the districts in Mecklenburg?

16  A     That was not in House Bill 92, that's correct.

17  Q     Okay.  Then you were also aware, weren't you, that the

18  legislature adopted a criterion in the 2016 Congressional Plan

19  that made an attempt to not pair incumbents?  Were you aware of

20  that?

21  A     Yes, I believe so.

22  Q     And when I say "not pair incumbents," do you know what I

23  mean?

24  A     Yes, have them run head to head, if that's what you mean.

25  Q     That's right.  And you could have told your algorithm to

1  only pick redistrictings where each incumbent was in a separate
2  district, correct?
3  A    That's correct, we could.
4  Q    And you did not do that, did you?
5  A    Right, that was not in House Bill 92.
6  Q    Okay.  So we don't know what the results or what your
7  conclusions would have been had you done that, do we?
8  A    No, we were interested in seeing what the geopolitical
9  structure of North Carolina would give as a background, as a
10 default signal.  So we didn't want to do partisan things like
11 that.
12 Q    Do you recall at your deposition when we were talking
13 about a concept called a traversal?
14 A    Yes, you explained it to me.
15 Q    And a traversal is when a district comes into a county --
16 crosses a county line, correct?
17 A    That is correct.
18 Q    And we talked about the concept of a double traversal?
19 A    Correct.
20 Q    And the double traversal is when a district crosses into a
21 county twice at two different places?
22 A    That's correct.
23 Q    And you're aware, are you not, that the 2016 Congressional
24 Plan, as enacted, contains no double traversals?
25 A    You told me that at the deposition.

1  Q    And do you believe that to be true?

2  A    I took your word for it.

3  Q    And I believe that you could have instructed your

4  algorithm to ensure that there were no double traversals in the

5  maps that it generated, correct?

6  A    We could have added a square function that would have

7  penalized double traversals, yes.

8  Q    And you didn't do that, correct?

9  A    We did not.  It was not in House Bill 92.

10  Q    And then, as it turns out, there were -- your maps did

11  generate some double traversals, correct?

12  A    Yes.

13  Q    You talked about the Voting Rights Act, and I think you

14  agree that in the actual 2016 Plan, there's one district that

15  has a BVAP of 44.46 percent or some change, correct?

16  A    That's correct.

17  Q    And then there's a second district that has a BVAP around

18  36 percent?

19  A    36.2, I think, something like that.

20  Q    Now, this is an area where you did look at the 2016 Plan

21  and take some criteria from it, correct?

22  A    Yes.

23  Q    Okay.  But when you were setting your thresholds, you set

24  them at -- well, remind me, where did you set your thresholds?

25  A    I believe it was 44 and 33 1/2 for the first most

1  African-American and the second most African-American district.

2  May I remind you that those are just the thresholds where we

3  cut off.  We actually tuned the thing to be centered around the

4  same value as was in the 2016 Plan.

5  Q    Is there a reason why you didn't just go ahead and pick --

6  set your thresholds at 34 percent and 36 percent, why you chose

7  to go slightly lower?

8  A    It seemed reasonable to have some fluctuations around on

9  either side.  It was a choice.

10 Q    All right.  And I assume you never did the analysis using

11 36 and 44, did you?

12 A    What do you mean using 36 and 34?  You mean --

13 Q    You set your thresholds at 44 and 33, I think, is that

14 correct?

15 A    Say your numbers again.  We set the thresholds at 40 and

16 the lower threshold at 33 1/2, but we centered it around 44 and

17 change and whatever -- 36 and .2, whatever was in the 2016 map.

18 Q    Oh, I see.  So your one threshold was actually -- the

19 lower bound was 40 percent, correct?

20 A    Correct.

21 Q    And the high bound was --

22 A    It may have been 39.5.  I would have to double-check.

23 Q    So somewhere around 40 percent, correct?

24 A    Yes.

25 Q    And your high bound on that one was the 44 percent,

1  correct?

2  A    We didn't put a high bound.  There was no high bound.  We

3  just put a lower bound.  We put a lower bound on the most

4  African-American one -- so, first of all, we centered the

5  distribution so that the most -- if you look on Figure 9, it

6  actually shows you the distributions.  So we centered it so

7  that it would be centered around -- typically around the two

8  values in the 2016 Plan, but then we put a lower bound.  We

9  didn't accept anything that had less than 40 percent and

10  nothing less than 33 1/2, I believe.  It's written here, yes.

11  Q    Did you have a higher bound?

12  A    No, we had no higher bound.

13  Q    Now, if you had required your algorithm to pull only plans

14  with zero population deviation, isn't it true that -- well,

15  that would have reduced the number of redistricting simulations

16  that you could have generated?

17  A    I mean, we didn't design our algorithm to produce zero

18  percent population deviation.  We're talking about a different

19  algorithm.  So it's a little apples and oranges.  We could take

20  a given district and ask what -- taking it down to zero, what

21  change it would cause, but that's not the same as what you

22  asked.

23  Q    That's right.  If you had -- if you had told the algorithm

24  to just choose redistrictings with zero population deviation,

25  then that certainly would have increased the number of

1  redistrictings in your simulation set that split counties,

2  wouldn't it have?

3  A    As I said, it would not really be possible in the way we

4  designed the algorithm to go to zero in the algorithm.  That

5  would be a different algorithm.  We would have to do something

6  different.  So it's a little too hypothetical, your question.

7  Q    All right.  If you had told the algorithm to only choose

8  redistricting plans that had one district at 44 percent and one

9  district at 36 percent, then that would have reduced the number

10 of plans that your algorithm would have generated, correct?

11 A    Presumably.  If you tell me to select a subset of the set,

12 then I'm always going to have less numbers.

13 Q    Now, Dr. Mattingly, I want to talk about the -- what you

14 called the Judges map.  Under your analysis, as I recall from

15 your testimony, the map produced by the judges would elect nine

16 Republicans and four Democrats using the 2016 Data, correct?

17 A    I believe so, yes.  Let me double-check.  2016?  Yes.

18 Q    And so let's look at your Slide 20.  Do you have a little

19 set of slides up there?

20 A    I don't have.  Could I have a set of slides?

21          MR. STRACH:  Can someone hand Dr. Mattingly the --

22          JUDGE BRITT:  What page did you direct him to?

23          MR. STRACH:  Your Honor, I'm looking at page 20.

24          THE WITNESS:  Yes, I have them now.

25 BY MR. STRACH:

1  Q    All right.  So if you look at the -- I believe you said

2  that the 2016 Plan elected three Democrats.  So it would be on

3  the far left-hand side in that column with three, correct?

4  A    Yes.

5  Q    And the Judges would elect four, and that's right there

6  beside it, correct?

7  A    Correct.

8  Q    But the one that most often came up in your simulations

9  was actually five Democrats elected, correct?

10 A    That's correct.

11 Q    So if you look at the difference between where three

12 Democrats falls versus the Judges, I think that looks like a

13 difference of -- you know, it's hard to tell, but it's about

14 27 percent or so, is that fair?

15 A    Yes.

16 Q    Okay.  And then if you look at the difference between

17 where the Judges map fell versus where most of them fell, the

18 column of five goes up to about .55.  So you've got a

19 difference of about .55 and about 27 percent -- it, too, is

20 about a 27 percent difference, correct?

21 A    Correct.

22 Q    All right.

23 A    I don't understand the point.

24 Q    So the difference between the number of Democrats that the

25 2016 Plan produced versus the Judges is about the same

1  difference between what -- the percentage of what -- the

2  Democrats that were produced under the Judges versus your most

3  common result, correct?

4  A    And the effect of that is that it's twice as likely to get

5  five as it is to get four, but it's 42 times more likely to get

6  four than it is to get three.

7  Q    Right.  And so under your analysis, not even the Judges

8  map produced what you would contend to be the most reasonable

9  outcome, correct?

10  A    No, it's only twice as likely to get five as it is to get

11  four, but that's nothing to compare with three, which is 42

12  times less likely.  I mean, you can't compare two times and 42

13  times.

14  Q    And you said three times versus 42 times?

15  A    I think two times.  I mean, roughly speaking.  I'm looking

16  --

17  Q    Right.  That's what I'm interested in.  Between three

18  times and 42 times, in your mind, where does the plan go from

19  being reasonable to unreasonable?

20  A    I don't think I really want to say there's a line.  I just

21  want to say that clearly if something only happens in 99 -- in

22  1 percent of the times, it's an outlier.

23  Q    But if the Court has got to decide where that line should

24  be between three times and 42 times, you can't tell the Court

25  where that line ought to be?

1   A    I think I can tell the Court that this is an outlier, that

2   this is unreasonable.

3   Q    Okay.  Can you tell the Court where it becomes

4   unreasonable?  At what point on that line it becomes

5   unreasonable?

6   A    I mean, I think that's a question for the Courts.

7   Q    Okay.  Fair enough.

8        Dr. Mattingly, I believe you state in your report

9   that -- and you agree, don't you, that it is reasonable for

10  some amount of politics to be considered in redistricting?

11  A    Very much so.  That was the role of the Judges Plan in

12  this analysis.

13  Q    Okay.  In fact, isn't it your opinion that it would be

14  contrary to the idea of democracy not to allow some political

15  considerations to be used in redistricting?

16  A    Again, I think that's a question for the Court.

17  Q    All right.  And I believe in one of your reports, you

18  reviewed the efficiency gap test, is that correct?

19  A    People were very interested in it, so we, in passing, saw

20  what it did in our ensemble.

21  Q    And you did have a conclusion about the stability of the

22  efficiency gap test, didn't you?

23  A    Right.  I think you should clarify what we mean by

24  stability.

25  Q    Whatever you meant.

1  A    I can tell you what I meant, is that okay?

2  Q    Yes.

3  A    What we just meant was that we looked at the Judges Plan,

4  and we had some measures in there that were very stable.  They

5  didn't change from the 2012 to the 2016 elections.  The

6  efficiency gap changed a bit, but that was just an observation.

7  That's all.  It wasn't a condemnation of the efficiency gap on

8  that basis per se.

9  Q    So -- but you concluded, didn't you, that the results of

10 that test seemed to change when one changes the set of votes

11 used in the test?

12 A    For the Judges map, for our two votes.

13 Q    All right.

14 A    I don't really claim to be an expert on the efficiency

15 gap.

16 Q    I did want to follow up, Dr. Mattingly, on one thing, and

17 I believe this is at page 28 of your report.

18 A    Of the report or of the ePrint?

19 Q    Do you still have the report?

20 A    The original report?

21 Q    Yes.  Yes.  I think you have the one that's got your

22 handwriting all over it?

23 A    That's the ePrint.  At page 28, yes, I do have it.  It's

24 right here in front of me, please.

25 Q    So I'm looking at page 28 of the report and Figure 14,

1  which I believe you were testifying about just a little while

2  ago, is that correct?

3  A    That's correct.

4  Q    And I was looking at, I think, the -- you said that this

5  represented some -- I think what you called it was validation

6  work --

7  A    Correct.

8  Q    -- correct?  And you used only the 2012 votes only to do

9  the validation work, correct?

10 A    In this report, yes.  We later did it for 2016 also.

11 Q    But in this report, which is what we're looking at, you

12 only used 2012 votes, correct?

13 A    In this report, we hadn't done it yet for 2106, but we did

14 that later.

15 Q    In this report, you don't use the 2016 votes, do you?

16 A    No.

17 Q    And you agree with me, though, that the 2016 was a better

18 year for Republicans, correct?

19 A    Correct, but the validation still held.  Nothing changed

20 when we used 2016 votes.

21 Q    All right.  But that information is not in this report, is

22 it?

23 A    No, we hadn't done it yet.  We did that in preparation for

24 publishing the paper.

25            JUDGE OSTEEN:  Mr. Strach, how much longer on cross?

1          MR. STRACH:  Your Honor, maybe a minute or two.  I
2    just want to check some notes.
3          Your Honor, that's all I have.
4          JUDGE OSTEEN:  Redirect?
5          MR. EPSTEIN:  Your Honor, I have about -- I know
6    you're trying to assess the lunch hour.  I have about 15 to 20
7    minutes of redirect.  I don't know if you want me to proceed or
8    if you would rather take a lunch break.
9          JUDGE OSTEEN:  Let's take a lunch recess.  Do you all
10   want a little bit of time to talk about some more of the
11   witness stuff, or do you feel like we've got enough evidence
12   coming today that you can save that for the evening?
13         Ordinarily, I'd give you about an hour or a little
14   bit more for a lunch recess in this case, but if you want a few
15   extra minutes to talk, we can do that.
16         MR. SPEAS:  I think not, Your Honor, thank you.
17         JUDGE OSTEEN:  We'll just deal with that.  All right.
18   Let's take an hour lunch break and come back at 1:45.
19         (At 12:37 p.m., break taken.)
20         (At 1:47 p.m., break concluded.)
21         JUDGE OSTEEN:  All right.  Let me clarify a couple of
22   things before Dr. Mattingly returns to the stand.  In terms of
23   the deposition stipulations, as I understood it, I may be
24   wrong, we're not talking about filing complete depositions.
25   We're talking about what's been filed in terms of designations

1  and counterdesignations.  Or am I wrong about that at this

2  point?

3          MR. SPEAS:  I thought it was the whole deposition.

4          MR. STRACH:  Just to avoid the process of having to

5  go back and doing more counters and more designations, we

6  thought it would be easier to file the whole thing.

7          JUDGE OSTEEN:  When do you all anticipate the full

8  depositions will be delivered?

9          MR. STRACH:  We can file it whenever the Court would

10 like.

11         MR. SPEAS:  Next week.

12         JUDGE OSTEEN:  All right.  Dr. Mattingly is still in

13 the courtroom.  Come on back to the witness stand.  You're

14 still under oath.

15         JUDGE BRITT:  We only swear you but once.  That

16 satisfies.  You remain under oath.

17         You may proceed with redirect.

18                     REDIRECT EXAMINATION

19 BY MR. EPSTEIN:

20 Q    Okay.  Dr. Mattingly, during the cross-examination that

21 Mr. Strach went through with you, he asked you a number of

22 questions about the criteria that were actually adopted by the

23 General Assembly in February of 2016.  Do you recall numerous

24 questions of that sort?

25 A    I do.

1    MR. EPSTEIN:  Your Honors, if I may approach the

2  witness with this exhibit, which is Exhibit 1007.  I have

3  enough exhibits for counsel tables and for law clerks as well.

4  If I may pass those out?

5    JUDGE OSTEEN:  You may.

6    MR. EPSTEIN:  Thank you.

7  BY MR. EPSTEIN:

8  Q    Do you have Exhibit 1007 in front of you, Dr. Mattingly,

9  which says "2016 Contingent Congressional Plan Committee

10  Adopted Criteria"?

11  A    I do.

12  Q    Can you show us in those criteria Mr. Strach asked you

13  about where the General Assembly required the redistricting

14  plan to have only 13 county splits?

15  A    It does not.

16  Q    Okay.  Can you go to the section on compactness on the

17  second page?

18  A    Yes.

19  Q    And the first time the word "counties" appears I think is

20  on the fourth line.  It says :  "...of the current districts

21  and...."  Can you read what it says after the "and" in that

22  fourth line under "Compactness"?

23  A    "...and keep more counties and VTDs whole as compared to

24  the current...plan."

25  Q    How many counties were split in the current plan that was

1  referred to in the "Compactness" section of these criteria?

2  A    I believe it was 40.

3  Q    And if you would, go to your article, which is Tab 4 of

4  the notebook, the exhibit notebook, and on the top of page 22

5  is your Figure 9 that you were referring to earlier, which

6  actually contains two different graphs.  The histogram on the

7  right is the same as we looked at earlier in your PowerPoint,

8  correct?

9  A    That is correct.

10  Q    And is that -- the histogram showing in your ensemble of

11  24,000 the number of counties that were split?

12  A    Yes.

13  Q    Okay.  And I think you agreed with Mr. Strach that you had

14  some plans in your ensemble that split over 30 counties.  Can

15  you look at that histogram and confirm whether that's an

16  accurate statement?

17  A    If there's any over -- there's a tiny fraction that split

18  30 apparently, but less than -- definitely less than 1 percent.

19  Q    Okay.

20  A    Not over 30.

21  Q    I believe you agreed with Mr. Strach that there was no

22  plan within your 24,000 that split less than 14 counties.  Can

23  you look at that histogram and tell whether that was accurate?

24  A    It's not accurate.

25  Q    So you were mistaken when you said that?

1  A     Correct.

2  Q     Okay.  What is the accurate number of plans percentagewise

3  that split fewer than 14 counties?

4  A     It's hard to -- fewer than 14?

5  Q     Yes.

6  A     I mean, that split it all or significant splits?

7  Q     That split it all.

8  A     It's hard to read.  It's very small.

9  Q     Okay.

10 A     The light blue is the --

11 Q     And how many of the 24,000 plans complied with the

12 compactness criteria that you just read, keeping more counties

13 and VTDs whole, as compared to the current and active plan?

14 A     All of them.  We thresholded at 40.

15 Q     Mr. Strach also asked you about why you didn't tell the

16 computer when you were running your Markov Chain Monte Carlo

17 algorithm to only accept plans that had Mecklenburg County

18 confined to a single district.  Do you recall announcing that?

19 A     Yes.

20 Q     Going back to Exhibit 1007, the criteria that the

21 legislature adopted, look at the section on the 12th District

22 on the first page at the bottom.

23 A     Yes.

24 Q     Is there anything in that section about the 12th District

25 that required Mecklenburg County to be within a single district

1  in the enacted plan?

2  A    Give me a moment to read it.  No.

3  Q    Was your 12th District in all 24,000 plans different than

4  the 12th District in the enacted plan as it existed at the time

5  these criteria were adopted?

6  A    Yes, and it was more compact.

7  Q    I was going to say how do you know, without looking at all

8  24,000 plans, that none matched the existing 12th District?

9  A    Because the 12th District was very noncompact and we

10 thresholded the compactness level to make sure the 12th

11 District would never have passed that thresholding.

12 Q    Was there a single district in all 24,000 plans -- and if

13 you did the math 24,000 times 13, in all of those districts --

14 was there a single district in your entire ensemble of 24,518

15 that approximated what the 12th District looked like in the

16 enacted plan after the time this criteria were adopted?

17 A    No.

18 Q    Okay.  Double traversals.  As best you can, explain to the

19 Court what Mr. Strach was referring to when he was asking you

20 about double traversals in your simulated maps.

21 A    I'm going to use my hands, but I'll try to explain for the

22 record what my hands are doing.  If you have a district,

23 there's two places disjoint, that is to say not touching, where

24 a district pokes into a certain county.  So that's one

25 traversal, two traversals.

1  Q    And Mr. Strach asked you whether or not you told the Monte

2  Carlo algorithm to reject plans that contained these double

3  traversals and you said you did not.  Looking back at

4  Exhibit 1007, the Contingent Congressional Plan Committee

5  Adopted Criteria, which of those criteria indicated that double

6  traversals were unacceptable and could not be employed in a

7  plan adopted by the General Assembly?

8  A    I don't believe the double traversals are mentioned at all

9  in this document.

10 Q    Did the criteria adopted by the General Assembly even

11 require that there be two districts that had a high BVAP or

12 black voting-age population?  Did their criteria even include

13 that?

14 A    I believe that the Voting Rights Act wasn't mentioned in

15 here at all.

16 Q    And there were questions about your thresholding of those

17 two districts at 44 and 33 1/2 percent, and I believe your

18 testimony was you chose those numbers in order to center them

19 around a range, is that correct?

20 A    That is correct.

21 Q    Do you actually have a figure in your paper, Exhibit

22 3004, Tab 4 in your notebook, that shows exactly what the

23 different outcomes were for those percentages within your

24 24,000?

25 A    There is.

1    Q    Okay.  And if you look at page 22, it's actually right

2    next to the histogram we were looking at a moment ago.

3    A    Yes.

4    Q    On the left-hand side of page 22.

5    A    Yes.

6    Q    It says:  "Districts ordered by largest AA district."  Can

7    you tell the Court what we're looking at in that graph?

8    A    So the bottom axis is the district, so we see the axis

9    goes all the way up to 24,000.  So it's in Figure 9, the

10   leftmost panel.  And if you -- they were ordered -- all the

11   districts were ordered from highest -- so we looked at the most

12   African-American district, the highest percentage, and we order

13   it from highest to lowest and as you -- so that's the black

14   line at the very top of the plot.  Then you see it goes from

15   slightly above -- somewhere in the 36, 37, somewhere in there,

16   and then it drops down just -- I mean 46, 47.  Then it drops

17   down to below 45 for quite a while and then it slowly decreases

18   down to 40 percent.

19   Q    Where does 44 percent fall within that range?

20   A    Right in the middle.  And then for each of those values at

21   -- for each of the values of the most African-American

22   district, we then also plotted the range over which the second

23   most African-American district varied and we put one standard

24   deviation, so that captured a large chunk of them.  If you look

25   at the green, that's the second most African-American district

1 and it's centered somewhere around 36 percent.

2 Q    And was that essentially the number that you were shooting

3 for based upon what the 2016 General Assembly Enacted Plan

4 actually produced in terms of the second highest BVAP?

5 A    Yes, that was it.

6 Q    You were first asked -- I believe one of the first

7 questions you were asked by Mr. Strach was you made a baseline

8 assumption that voters vote for parties and not the candidate.

9 Do you recall being asked that?

10 A    I do.

11 Q    And do you recall telling him that, despite what you wrote

12 in your paper about that not necessarily being an accurate

13 assumption, you've done more work since then in order to

14 validate whether or not the candidate or incumbency makes a

15 difference to your ultimate results?

16 A    Yes.

17 Q    Tell the Court, if you would, what you did regarding that

18 subject.

19 A    We then looked at a number of different races.  We looked

20 at presidential in both years.  We looked at the Senate races.

21 We looked at a race from 2014.  We looked at different races,

22 and we compared the histograms we got and the box plots that

23 I've been showing you, and qualitatively they had the same

24 structure.  There was always a gradual line and then this

25 S-shaped jump.

1              The point of that -- the relevance to this question

2    is that the incumbency changed or, rather, the candidates

3    changed, many of the things we didn't control for changed, and

4    the result wasn't sensitive to it.  It never mattered.

5    Q    And that included the 2014 Senate election --

6    A    Yes.

7    Q    -- where different candidates then ran when the 2012 or

8    2016 congressional elections ran?

9    A    Yes.

10   Q    It included the 2016 presidential election?

11   A    Yes.

12   Q    We had presidential candidates as opposed to congressional

13   candidates?

14   A    Yes.

15   Q    And what other race or races?  A 2016 Senate race?

16   A    Yes.

17   Q    Any others?

18   A    There may have been the Secretary of State.

19   Q    Okay.  And regardless of which candidates were on the

20   ballot, when you dropped their votes for those statewide

21   elections into your 24,000 did the box plot structure change

22   appreciably?

23   A    There's also a governor race, at least one.  It did not

24   change.

25   Q    And did the S-shaped curve of what the General Assembly

1  did in 2016 in its enacted plan change?

2  A    No.

3  Q    You were asked about Figure 14 on page 28, which included

4  a number of validation charts, for lack of a better word.

5  A    Page -- which page?

6  Q    Page 28 of your paper.

7  A    Yes.

8  Q    And Mr. Strach asked you, you only did validation work

9  like that for the 2012 votes.  Do you recall him asking you

10  about that?

11  A    I do.

12  Q    Do you recall him saying that's not really fair because

13  2016 was a better Republican year?  Do you recall him saying

14  that?

15  A    Yes.

16  Q    And I think you responded that you now have done

17  validation work using the 2016 votes to ensure that the work

18  that you did was stable irrespective of whether you were using

19  the 2012 votes or the 2016 votes, is that true?

20  A    Yes.  We redid, for instance, this plot, the plot -- redid

21  a large number of these plots that we had done only with the

22  2012 votes.  We redid them with the 2016 votes and they were

23  again stable.

24  Q    Do you have those charts with us today?

25  A    I believe so.

1  Q    Okay.

2           MR. EPSTEIN:  And, Your Honor, with Your Honors'

3  permission, I have a couple of PowerPoint slides that I would

4  like to have Dr. Mattingly testify to.  I think he can do it

5  from the witness stand.

6           JUDGE OSTEEN:  Any objection?

7           MR. STRACH:  May I ask my colleague a question?  Your

8  Honor, I don't believe I've ever seen these before, so we're

9  going to object to the use of these at trial.

10          JUDGE OSTEEN:  Sustained if they haven't been turned

11 over.  Well, let me see what my --

12          (Discussion between the judges.)

13          JUDGE OSTEEN:  All right.  We'll let them in subject

14 to the objection.  We'll decide after we see the charts.

15          MR. EPSTEIN:  Thank you, Your Honor.

16          If you can get the PowerPoint cued up on the screens.

17 Thank you.  Okay.

18 BY MR. EPSTEIN:

19 Q    This first one, Dr. Mattingly, can you see it from where

20 you are?

21 A    I can.

22 Q    What 2016 -- what were you validating with 2016 votes in

23 this first slide?

24 A    So this is a repeat of what we did for 2012 with the exact

25 same colors, as you recall.  We were looking at the low county

1  splits where we had the second ensemble.  We concentrated
2  around much lower county splits, around 14 -- around 14 splits,
3  and that was in orange.  Here's the green -- blue again, which
4  is the ensemble with -- all evaluated with the 2012 vote, and
5  the structure is similar.  There's some small fluctuations.
6  There's not as many samples, but in particular number three --
7  the chance of having three is very small.  Then the box plots
8  look structurally the same, the same rise in the median.  It's
9  pretty much a straight line.
10 Q    The next slide, what were you validating with 2016 votes
11 in this second slide?
12 A    Again, we're now looking at starting from different
13 initial conditions.  We're saying we start our algorithm to
14 produce these ensembles.  We start from -- the original one was
15 the green one, which was starting from the judges, but then we
16 also started from the legislature's map from 2012 and the
17 legislature's map from 2016.  You see qualitatively the results
18 are pretty similar to the level that we're interested and the
19 box plots look the same.
20 Q    And finally, the last slide, what did you do with 2016
21 votes on this last slide?
22 A    In this last slide, we again did the validation of
23 changing the parameters in our score functions slightly, about
24 20 percent, around in that neighborhood, depending on the
25 parameter; and we saw that ended up changing qualitatively the

1   results that we got.  Again, since all the results follow from

2   the box plots, the box plots have pretty much the same

3   structure.

4   Q    Okay.  And those are the only three slides I have.

5   Dr. Mattingly, based upon that additional validation work you

6   did regarding 2016 votes, what is your testimony regarding the

7   reliability and stability of the 24,000 maps that you used in

8   your ensemble to base the work that you've testified about

9   today on?

10  A    I still state that they're just as valid.  They've been

11  validated.  They don't seem sensitive to any of these factors

12  from any of the results we've made.

13            MR. EPSTEIN:  No further questions.

14            JUDGE OSTEEN:  Recross?

15            MR. STRACH:  Recross, Your Honor, briefly.

16                      RECROSS-EXAMINATION

17  BY MR. STRACH:

18  Q    Dr. Mattingly, while we have this PowerPoint up here, when

19  did you do this extra validation work?

20  A    Sometime this fall -- summer and fall.  Some of them had

21  been done earlier.  Some of them maybe in the spring, some of

22  -- no, no.  In the summer and fall.

23  Q    I'm sorry.  Summer and fall of 2017?

24  A    Correct.

25  Q    Can you be more precise about when in the summer you did

1  it?

2  A     I mean, some of them are done at different points.  I

3  can't remember exactly when we were preparing the articles and

4  trying to produce more validations to make sure that we were

5  happy with them before we submitted them for publication.

6  Q     So this was work you were doing in connection with

7  preparing your articles for publication?

8  A     Correct.

9  Q     Was it -- would this work have been done after July of

10 this year?

11 A     I believe so.  Yeah.  Actually, I'm pretty certain.  Let

12 me say why I hesitated.  There's a lot of plots here and I

13 can't remember if they were all done at the same time.

14        MR. STRACH:  Your Honor, if I may just say for the

15 record, I believe the first trial in this matter was scheduled

16 in June, and this evidence would have never -- obviously

17 wouldn't have even been available at that time.  It's not been

18 produced since then.  I realize the Court is going to take it

19 under advisement.  I just wanted to note that for the record

20 given the testimony.

21        JUDGE OSTEEN:  And the Plaintiffs state succinctly

22 why you think it should be considered?

23        MR. EPSTEIN:  Yes, Your Honor.  During the

24 cross-examination, that was an attack on Dr. Mattingly's work,

25 which was:  You can't tell us anything about whether or not the

1   results would have held true for 2016 votes, can you?

2           And he responded:  Yes, I can.

3           The door was opened at that point.  We didn't know

4   Mr. Strach was going to ask him those questions and we had no

5   intention of using any of this information if Mr. Strach hadn't

6   asked those questions.

7           THE COURT:  Isn't that part of his expert work?

8           MR. EPSTEIN:  Well, his expert work will include --

9   it was, yes, Your Honor.  His expert work included validating

10  his results, which was an ongoing process.  At the time he

11  submitted his report, this hadn't been done yet, but his work

12  continued.  His work continued between the submission of his

13  report and his two depositions, and he handed Mr. Strach the

14  current work as of the second deposition, which was the article

15  that's before the Court today.  That was published on May 8,

16  2000 --

17          JUDGE OSTEEN:  I understand.  Do you agree or

18  disagree that Plaintiffs have a duty to supplement expert

19  reports when new information comes in?

20          MR. EPSTEIN:  As a general principle, yes, Your

21  Honor, I agree with that.  But we did not intend to use this at

22  all today unless the door was opened that attacked his

23  credibility for the fact he hadn't looked at this question,

24  which is what occurred.

25          JUDGE OSTEEN:  So you hold it back waiting to hear

 1  the cross-examination by the Defendants?

 2          MR. EPSTEIN:  Your Honor, unfortunately, we're

 3  dealing here with a witness who is preparing an academic work.

 4  So his work, as he just testified that he's been preparing, is

 5  for this article.  It wasn't done for us.  We didn't hold

 6  anything back.

 7          He's done a ton more work in other cases as well.  We

 8  haven't produced that because it wasn't work he did

 9  specifically as an expert witness in the case.  So there would

10  be all kinds of other things that he's done.

11          But because they attacked his credibility on that

12  specific issue, we believe it was only fair for him to be able

13  to say, well, that's not true, as he did, and then to be able

14  to show what he actually did.

15          THE COURT:  Let me ask something more specific.  The

16  last page of his article that's in the book at page 2 says:

17  "The most basic critique of this work is that we have assumed

18  that the candidate does not matter.  Furthermore, as districts

19  become more polarized and many election results become foregone

20  conclusion, voter turnout is likely suppressed.  While we could

21  try to correct for these effects, we find the simplicity and

22  power of using the actual votes very compelling."

23          That's a report that's been submitted to the Court.

24  As I understood the testimony, there's been additional work

25  done to test that factor of identity of candidate.  Did I

 1  understand that correctly?

 2          MR. EPSTEIN:  Yes, except this is not the expert

 3  report.  So there's a distinction between the expert report and

 4  the --

 5          JUDGE OSTEEN:  What do you consider the expert

 6  report?

 7          MR. EPSTEIN:  The expert report is behind Tab 2,

 8  which was the state of his work as of March of 2017.

 9          JUDGE OSTEEN:  I'm looking at page 23 of Tab 2.

10          MR. EPSTEIN:  Okay.  Bear with me, Your Honor.  Yes,

11  I see it, Your Honor.  It's in the book.  So that particular

12  discussion is in both his expert report and his article.

13  Unfortunately, the work that he's been doing, as he described,

14  is for this article.  He did not do any additional work for us

15  as an expert witness.  And I know that's confusing.  I

16  apologize if those lines are very blurry.

17          THE COURT:  If you submit an opinion from an expert

18  that says "we haven't tested this" and then you come to court

19  and you want to present evidence that it has been tested --

20  which is what happened here, right?

21          MR. EPSTEIN:  Your Honor, respectfully, I don't think

22  that's exactly what happened.

23          THE COURT:  How did you know to ask him the question?

24          MR. EPSTEIN:  In response to the cross-examination

25  question, yes, I know his work has continued because we've

 1  prepared for him to testify.

 2          JUDGE OSTEEN:  To ask him about the county maps.

 3  It's information he provided to counsel, wasn't it?

 4          MR. EPSTEIN:  Yes, to keep us aware of his ongoing

 5  academic work, Your Honor, yes.

 6          JUDGE OSTEEN:  All right.  Anything further?

 7          MR. EPSTEIN:  Nothing further, Your Honor.

 8          JUDGE OSTEEN:  Further examination?

 9          MR. STRACH:  Further cross, yes, Your Honor.

10  BY MR. STRACH:

11  Q    Dr. Mattingly, I want to turn back to, very quickly, I

12  think it's page 22, Figure 9, under Tab 4, and this is the

13  county split --

14  A    Yes.

15  Q    -- chart -- figure.  Your counsel asked you about the

16  number of county splits on the -- near 30, I think.  Does this

17  chart report how many county -- how many of your simulated sets

18  had contained 13 county splits?

19  A    It gives the percentage.

20  Q    The percentage.  Do you know about what the percentage is

21  based on looking at this chart?

22  A    So you don't mean -- you mean just any split at all, not

23  just a small -- not a sizeable split?

24  Q    Any split, yes.

25  A    Any split.  There's a tiny bump there, but not very much.

1  Q    So it would be fair to say that's a tiny fraction of your

2  overall ensemble?

3  A    In this ensemble, not the other ensemble, which is on the

4  next page or a few pages away.

5  Q    Right.  And that's one thing I wanted to just make sure is

6  clear.  I may not have done a good job with this earlier.  You

7  ran one set of redistrictings, an ensemble, in which zero of

8  those redistrictings had county splits less than 14, is that

9  correct?

10 A    A very small fraction at most, yes.

11 Q    Well, I mean, wasn't there some earlier work that we

12 looked at where you had additionally run a set of

13 redistrictings and you had no fewer than 14 county splits?

14 A    I believe so.  It's hard to read here.  I would say yes

15 essentially.

16 Q    And then you reran another set and that's when you got the

17 number that's reported in Figure 9, correct?

18 A    No.  This is the first set.  This plot here is the first

19 set to which you just spoke and then the one that we ran again

20 is in the validation section.  Bear with me for a second.  It

21 will take me a second to find it.  It's page 31, Figure 17.

22        And now in this second ensemble that we ran -- that's

23 the upper rightmost plot on Figure 17 -- you see that there's a

24 fair number that have 14; and when you use those to create the

25 same plots we've been using all along, they get the same

1  qualitative results.

2  Q    Right.  And based on this chart, it looks like the number

3  13 falls pretty far to the left of the chart.

4  A    I thought we were talking about 14.  14 or 13?

5  Q    Thirteen.

6  A    Thirteen now.  Yes, 13 falls to the left.

7  Q    Right.  And can you tell me about what percentage or

8  fraction 13 would be?

9  A    Thirteen would be about, I would say, 4 percent and there

10 were about 14,000 maps there.

11 Q    All right.  So look back at page 22 of this exhibit

12 because I want to make sure I understand something that you say

13 here.  Are you back on page 22?

14 A    Yes, I am.

15 Q    The very first sentence of this page says:  "Finally, we

16 display the histogram of the number of split counties over our

17 generated redistrictings.  We find a median of 21 split

18 counties with a mean of 21.6 and a range from 14 to 31."

19 A    Correct.

20 Q    The way I read that is a range means 14 was the fewest

21 number of county splits.  Am I reading that correctly?

22 A    I apologize.  Earlier you had said 14 and maybe you

23 misspoke or I misheard, so I thought you were talking about 14.

24 Q    So the fewest number of county splits in your generated

25 redistrictings were 14?

1  A    In this first set of generated redistrictings, not the

2  second set, which is on Figure 17.

3  Q    Okay.  All right.  But there was one set of generated

4  redistrictings that you did where the fewest number of county

5  splits was 14?

6  A    That's correct.

7  Q    And whether it's 14 or 13, you would agree with me that

8  the number of generated redistrictings with 13 or 14 split

9  counties is a tiny fraction of the overall number of generated

10 redistrictings, isn't it?

11 A    Well, if it was 4 percent, yeah, it's a small fraction,

12 but there are 14,000, almost 15,000 redistrictings.

13 Q    Now, in looking at the Adopted Criteria, Exhibit 1007, you

14 mentioned -- I think you were saying this in the context of

15 validation work that you did.  You looked at the candidacy

16 versus incumbency.  Could you explain that again, what you were

17 looking at?  You were using other election results to validate

18 some work?

19 A    Right.  So we also looked at a set of other elections and

20 reran the box plot to see what the general structure was, and

21 the point was that those didn't have the same incumbency or the

22 same candidacy structure as the 2016 or 2012 races.  So the

23 fact that in all cases we got qualitatively the same structure,

24 a general slope in the box plot and this S-shaped curve for the

25 two General Assembly Plans, thereby controls for that factor.

1  Q    Okay.  So you did look at incumbency to that extent, but

2  you chose not to look at an incumbency by creating a threshold

3  that would ensure no incumbents were paired?

4  A    It's a different criteria, but no, we didn't.

5  Q    And in terms of incumbency and trying to be consistent

6  with what the legislature did, did you build anything into your

7  algorithm that would evaluate how much of the core of each

8  district was retained from the old plan to the new plan?

9  A    No, we did not.  We preserved counties.

10 Q    Okay.  So to the extent that you looked at the retention

11 cores of districts, you were looking at counties but not the

12 core itself?

13 A    I'm not quite sure what you mean by "core," but no, we did

14 not do anything like that.

15            MR. STRACH:  That's all I have, Your Honor.

16            JUDGE OSTEEN:  Anything?

17            MR. EPSTEIN:  Nothing further, Your Honor.

18            JUDGE WYNN:  Let me just make it clear, Mr. Strach.

19 In regard to the advisability in terms of taking -- whether we

20 will consider these exhibits, we surely will consider them.  I

21 want to look at the record more carefully to determine, at

22 least in terms of expert disclosure, to the extent the door was

23 not opened by your questioning.

24            But as a matter of prudence, it would be prudent for

25 you to question him regarding those exhibits.  If you need to

1    have the opportunity to recall him later in this week upon your

2    further study of it, I, for one, would be in favor of it, and I

3    think my colleagues would be okay with that.

4            MR. STRACH:  Your Honor, I appreciate that.  I will

5    note that this question was asked at his deposition, so it's

6    not as if this was the first time this ever came up.

7            JUDGE OSTEEN:  Do you want to reserve the right to

8    recall him later?  I'm not saying you have to, but Judge Wynn

9    -- we want to make sure we get this right.

10           MR. STRACH:  I appreciate that.  I certainly won't

11   turn that down, but I would ask that if we decide not to recall

12   him that that not be held against us on our request for --

13           JUDGE WYNN:  Oh, no.  This is just to make sure that

14   you're afforded every opportunity to cross-examine on those

15   reports.  You -- by your questions, you had a report in front

16   of you in which the doctor based his conclusions about his own

17   study.  You then said, Wouldn't this be different essentially

18   if you had considered further studies?

19           He said, Yes, I've looked at others.  And we left it

20   there.

21           Then on redirect, he then comes up and says, Here,

22   yeah, I looked at it.  And then the exhibits come forth.

23           Typically an expert disclosure, you're correct, you

24   have to bring those forward; but in the manner it's being

25   presented here, there's a serious issue here as to whether we

 1  should not consider this out of fairness.  This is a bench

 2  trial, first of all, and I just want to be clear on that.  I

 3  don't want you to be blindsided if you -- if there's something

 4  there that you want to challenge, I want you to have every

 5  opportunity to challenge it.

 6          MR. STRACH:  And we certainly appreciate that.

 7  Normally, of course, we would have had a chance to test this

 8  through depositions, et cetera, but we'll certainly do the best

 9  we can.  We appreciate it.

10          JUDGE OSTEEN:  Now is the time to take a look at it.

11          You may step down.

12          MR. THORPE:  At this time, Your Honor, Plaintiffs

13  would call Jowei Chen.

14          JUDGE OSTEEN:  Just to help keep the record

15  straight -- I don't know who is going to be standing up to

16  conduct the examination, so when you stand to do an

17  examination, if you would state your name.

18          Mr. Strach, in fairness to the Plaintiffs, I'm making

19  them use the podium during their direct examination and so you

20  need to be on a level playing field, unless we change things.

21  So the cross-examination needs to be conducted from the podium,

22  too.

23          MR. STRACH:  Okay.  Thank you.

24          MR. THORPE:  Your Honor, Ben Thorpe from Bondurant

25  Mixson & Elmore on behalf of the Common Cause Plaintiffs.

1          JUDGE OSTEEN:  All right.

2          (Witness sworn by the clerk.)

3          MR. THORPE:  Your Honor, may I approach the witness

4   with the notebook as these are handed out?

5          JUDGE OSTEEN:  You may.

6                      JOWEI CHEN,

7         PLAINTIFFS' WITNESS, SWORN AT 2:22 p.m.

8                   DIRECT EXAMINATION

9   BY MR. THORPE:

10  Q    Would you state your name for the record, please?

11  A    Jowei Chen.

12  Q    And, Dr. Chen, what is your educational background?

13  A    I have a bachelor's degree in ethics, politics, and

14  economics from Yale University in 2004.  I have a master's in

15  science in statistics from Stanford University in 2007 and I

16  have a Ph.D. in political science, also from Stanford

17  University, in 2009.

18  Q    And how are you currently employed?

19  A    I am an associate professor at the University of Michigan

20  in Ann Arbor in the Department of Political Science.

21  Q    And have you been at Michigan throughout your academic

22  career?

23  A    Yes, sir, I have.

24  Q    And do you have any other academic positions or

25  appointments at this time?

1  A    Yes, sir, I do.  I am a research associate professor at
2  the Center for Political Studies at the University of Michigan.
3  I'm also a research associate at the Stanford Spacial
4  Laboratory at Stanford University, and I'm a research
5  associate, principal investigator at the Center for Governance
6  and Public Policy at Willamette University in Oregon.
7  Q    And in your academic work, what is your area of speciality
8  within the field of political science?
9  A    My areas of academic specialty are redistricting,
10  political geography, and congressional legislative elections.
11  Q    And how would you define political geography as you just
12  used it?
13  A    As I study it, political geography in my area of academic
14  specialty is the study of things such as voters -- the
15  political geography of voters, meaning where voters reside, and
16  what implications that voter geography has on issues such as
17  and relating to legislative districting.
18  Q    Dr. Chen, you have in the first tab of your binder Joint
19  Plaintiff's Exhibit 2012.  That should also appear on the
20  screen.
21        You have the exhibits we're going to reference in
22  front of you.  To make sure everyone is on the same page, they
23  will also display on the screens.
24        Can you identify this exhibit as a copy of your CV?
25  A    Yes, sir, it is.

1  Q    And does that CV accurately represent your academic

2  background and history and employment?

3  A    Yes, sir, it does.

4  Q    And does that CV list all publications that you have

5  authored in the last ten years?

6  A    Yes, sir, it does, except for the last few publications,

7  which on this particular CV were listed as forthcoming

8  articles.  They have since been officially published and are in

9  print.

10  Q    So that includes the two forthcoming articles listed on

11  the second page of your CV?

12  A    Yes, sir, that's correct.

13  Q    And the last of those articles is entitled "Analysis of

14  Computer-Simulated Districting Maps for the Wisconsin State

15  Assembly."  That article has since been published?

16  A    Yes, sir, it has.

17  Q    And it's published in a peer-review journal?

18  A    Yes, sir, in *Election Law Journal.*

19  Q    You have previously presented expert reports in other

20  litigation, is that correct?

21  A    Yes, sir, I have.

22  Q    And you have previously testified at trial?

23  A    Yes, sir, I have.

24  Q    As an expert witness?

25  A    Yes, sir.

1  Q    At what trials have you testified?

2  A    Well, I have a full list of other cases in which I have

3  done work on the first page of my expert report in this case,

4  but the specific cases in which I've testified at trial are the

5  2015 Raleigh Wake Citizens Association versus Wake County Board

6  of Elections and then in 2017 City of Greensboro versus

7  Guilford County Board of Elections, sir.

8  Q    And just for the record, the first page of your expert

9  report is the first page of Joint Plaintiffs' Exhibit 2010, is

10 that correct?

11 A    Yes, sir, that's correct.

12 Q    You have also submitted expert reports in additional

13 cases?

14 A    Yes, sir, I have and I've listed those on the first page

15 of my report in that second paragraph.

16 Q    And in each of these cases where you were asked to testify

17 at trial, were you admitted as an expert?

18 A    Yes, sir, I was.

19        MR. THORPE:  At this time the Common Cause Plaintiffs

20 tender Dr. Chen as an expert in political geography and

21 redistricting.

22        JUDGE OSTEEN:  And redistricting, is that what you

23 said?

24        MR. THORPE:  Yes, Your Honor.

25        JUDGE OSTEEN:  Any voir dire or any objections?

1          MR. STRACH:  Not on that, Your Honor.

2          JUDGE OSTEEN:  All right.  Dr. Chen is accepted as an

3    expert witness in political geography and redistricting and may

4    offer his opinion as to those matters.

5          MR. THORPE:  Thank you, Your Honor.

6    BY MR. THORPE:

7    Q    Now, Dr. Chen, just to be very clear about what your task

8    was in the expert testimony that you're going to give here,

9    what have the Common Cause Plaintiffs asked you to evaluate in

10   this case?

11   A    The Common Cause Plaintiffs asked me to evaluate two

12   questions.  First, I was asked to evaluate whether partisan

13   considerations were the predominant factor in the drawing of

14   the Enacted 2016 SB2 Plan; and second, the Common Cause

15   Plaintiffs asked me to evaluate the extent to which that SB2

16   Plan, the 2016 Plan, complied with the nonpartisan portions of

17   the Adopted Criteria as outlined by the Joint Select Committee.

18   Q    And the research question isolated in this report is

19   described at the bottom of page 1 and the top of page 2 of your

20   report, is that correct?

21   A    That's correct, sir.

22   Q    As an overview -- and, of course, we're going to dive into

23   greater detail on this -- how did you go about answering these

24   two questions that you were asked?

25   A    I went about answering these two questions by developing

 1  and analyzing a computer-simulation algorithm which I've

 2  developed in my own academic research -- my published academic

 3  research that produces a large number of districting plans --

 4  alternative districting plans produced by computer algorithm

 5  and this algorithm follows specific nonpartisan criteria that I

 6  programmed into the algorithm.

 7          So I conduct a large number of simulations of

 8  simulated plans, independent simulations; and I analyze these

 9  simulated plans; and I compare them to the Enacted SB2 Plan

10  along a number of measures, including, of course, the

11  nonpartisan portions of the Adopted Criteria, as well as

12  partisan measures.

13  Q    And broadly -- again, we will deal with this in more

14  detail -- what did you find as a result of conducting these

15  simulations and evaluating them as against the enacted plan?

16  A     Broadly what I found was that the partisan goal laid out

17  in the Adopted Criteria, specifically the goal of creating a

18  districting map with ten Republican seats, I found that that

19  partisan goal predominated in the drawing of the SB2 Plan; and

20  I found that the pursuit of that partisan goal, that partisan

21  goal of creating a ten Republican map, not only predominated

22  the drawing of the map, but it subordinated the nonpartisan

23  portions of the Adopted Criteria.  Specifically, I found that

24  it subordinated the portions of the Adopted Criteria relating

25  to avoiding the splitting of the counties, keeping counties

1  whole when possible, as well as the geographic compactness of

2  districts.

3  Q    And for your conclusion that partisanship predominated in

4  the drawing of those districts, what is the basis of that

5  conclusion as a mathematical matter?

6  A    Sure.  The basis for that conclusion, as I started

7  explaining earlier, was I analyzed a large number of

8  districting maps.  So what I found was the SB2 Plan, the

9  Enacted 2016 Congressional Plan, created a partisan outcome,

10  created a partisan distribution of seats that is an extreme

11  statistical outlier in terms of its partisanship, in terms of

12  its creation of ten Republican seats; and that the SB2 Plan in

13  creating this extreme 10-3 Republican outcome was creating an

14  outcome that was entirely outside of the range of the sorts of

15  plans that would have emerged under a districting process that

16  adheres strictly to the nonpartisan portions of the Adopted

17  Criteria.

18  Q    To understand how you reached that conclusion, I want to

19  take a step back.  When you refer to computer-simulation

20  techniques or to data algorithms, specifically what is it that

21  you are describing?

22  A    I'm describing computer-simulation algorithms that I have

23  developed in my own academic research in which I am able to

24  program a districting process designed to follow certain

25  criteria that I program and ignore criteria that I want the

1  program -- the computer to ignore.

2          So in this particular case, I programmed in or I had

3  the computer strictly follow the nonpartisan portions of the

4  Adopted Criteria.  In following the Adopted Criteria, I had the

5  simulation process or the districting process ignore, for

6  example, race altogether.  I also instructed the computer to

7  ignore partisan considerations altogether.

8  Q    And we'll talk about the criteria that go into those maps,

9  but does the algorithm also generate all the data necessary to

10 visually display an actual map created by that process?

11 A    Yes, sir, it does.  It creates actual maps, ones that you

12 can compare to a map, an image, of the SB2 Enacted Plan or any

13 other Congressional Plan that one might want to consider.  So

14 it creates actual districting maps for North Carolina, dividing

15 North Carolina into 13 congressional districts.

16 Q    And is Figure 1 in your report, which appears on page 8 of

17 your report, an example of such a map?

18 A    Yes, sir, it is.  It is an example of a simulated map.

19         MR. THORPE:  Okay.  For the Court's benefit, we would

20 like to introduce as an illustrative exhibit Plaintiffs'

21 Exhibit 3041, which will allow Dr. Chen to explain how the

22 simulation process actually yields something like Figure 1.  We

23 would move for admission of that exhibit.

24         JUDGE OSTEEN:  Okay.  So the PowerPoint is exhibit

25 what?

1              MR. THORPE:  3041.

2              JUDGE OSTEEN:  3041.

3              MR. THORPE:  I'm sorry.

4              PARALEGAL IN GALLERY:  The PowerPoint from

5    Dr. Mattingly was 3040.  This is 3041.

6              THE COURT:  So we've got the exhibit in the book at

7    page 8 that we're looking at now.  Then there's a PowerPoint

8    exhibit that is -- what's 3040?

9              PARALEGAL IN GALLERY:  That's the PowerPoint.  That's

10   the actual one that was used with Dr. Mattingly.

11             JUDGE OSTEEN:  Okay.  3041?

12             MR. THORPE:  I said this is 3041.

13             JUDGE OSTEEN:  Any objection to that?

14             MR. STRACH:  I haven't seen it yet.  Let me take a

15   look at it.

16             (Pause in the proceedings.)

17             MR. STRACH:  No objection.

18             JUDGE OSTEEN:  All right.  Then I guess it's

19   Exhibits 3040 and 3041 are admitted.

20             MR. THORPE:  My understanding, Your Honor, is that

21   Exhibit 3040 was the PowerPoint for Dr. Mattingly.

22             JUDGE OSTEEN:  Oh, the earlier PowerPoint.

23             MR. THORPE:  Yes, sir.

24             JUDGE OSTEEN:  So this is 3041.

25             MR. THORPE:  Yes.  And what's on the paper here will

1  also be displayed.

2          JUDGE OSTEEN:  Multiple pages?

3          MR. THORPE:  Yes.

4          JUDGE OSTEEN:  Exhibit 3041 is admitted.

5  BY MR. THORPE:

6  Q    So, Dr. Chen, explain what we're looking at on the first

7  page of Exhibit 3041.

8  A    This is just a map of North Carolina's VTDs, voting

9  tabulation districts, as well as county boundaries.  So I'll

10 just call them VTDs or they're sometimes called precincts.

11 This is all the VTDs in North Carolina.

12          The simulation algorithm starts with VTDs because

13 this is the basis for districting as laid out by the Adopted

14 Criteria.  The Adopted Criteria tell us that VTDs in general

15 cannot be split unless you actually need to do so for reasons

16 of equal population, but in general, you have to start with

17 VTDs, and so that's why I began with North Carolina's VTD

18 boundaries in starting the drawing of any districting map by my

19 computer.

20          JUDGE WYNN:  Counsel, is that what this is supposed

21 to be showing?  This looks like a county map to me.

22          MR. THORPE:  Yes, Your Honor, it is a county map

23 which contains lighter shaded VTD breaks in between.

24          JUDGE WYNN:  We have very old eyes here and I think

25 to be able to see those districts you have really got to pierce

1   through this.

2           MR. THORPE:  Hopefully, it will be more visible on

3   the screen when it begins to be colored in.

4           JUDGE WYNN:  This is worthless.  This is nothing but

5   a county map here from what I'm looking at here.  I mean, if

6   you're going to do these things, you ought to be careful and at

7   least make sure that it represents what it is.  There was one

8   previously up that actually had it in there, had all of them,

9   looked much like it, but this -- I'll accept that's what it's

10  supposed to show, but I'm just telling you that's not what this

11  is.

12          MR. THORPE:  Yes, Your Honor.  And I apologize for

13  any lack of clarity on that.  Hopefully, as we discuss any

14  county line splits within this, the VTDs boundaries will become

15  clear.  But I apologize.

16  BY MR. THORPE:

17  Q    How do your maps start being created based on the

18  instructions you give the computer?

19  A    The computer starts just by picking a random point on the

20  map, somewhere in North Carolina, and that is how the

21  construction of the first district in this plan begins.  So it

22  picks a random point and it begins building outward and, as I

23  said, it uses VTDs as the basis for building these districts.

24  So it constructs the first district by adding together adjacent

25  VTDs until you construct an entire first district.

1          Now, when you do so, there are, of course, other

2  portions of the Adopted Criteria that are followed here.  Most

3  importantly, splitting of counties is to be minimized.

4  Counties are to be kept whole as much as possible.  So that

5  means that when the computer adds an adjacent VTD, it tries to

6  pick a VTD from within a county it has already intruded into

7  before moving into new counties.  That is how any districting

8  process is going to minimize the splitting of counties or

9  trying to keep counties whole as much as possible.

10 Q    But at some point, in order to complete the district, some

11 county split is created, is that correct?

12 A    That is correct.  The Adopted Criteria tell us that

13 districts have to be perfectly equally populated, which for

14 North Carolina means 733,498 or 99 in population for every

15 district, and it has to be exactly that number.  So this means

16 that when you get to the very end of completing one district

17 you are inevitably going to end up in the middle of a county

18 without necessarily filling out that entire county.  That's how

19 county splits are created.  The Adopted Criteria tells us that

20 counties can be split in order to equalize population.

21         So inevitably, at the end of the first district,

22 you're going to have to split one county, but you don't have to

23 split any more than that.  You also need to split one VTD in

24 order to get precisely to that number 733,498, but you don't

25 want to split any more VTDs than that just to create equal

1  population.  That's how the first district is created.

2  Q    After that first district is created, how does the second

3  district get created?

4  A    The second district gets created by starting right where

5  the first district left off.  So it begins by picking up that

6  county that was left unfinished by that first district, fills

7  that one out, and again proceeds exactly like the first

8  district does.  It keeps on adding adjacent VTDs following

9  those same rules before.  You add VTDs that are within counties

10 you've already entered into and don't move into a new county

11 until you've completely filled out that first county.  So it

12 keeps on doing that until, once again, you get to exactly

13 733,498.

14         And, of course, at the end of that second district

15 you're going to need, inevitably, to split apart one more

16 county and exactly one more VTD, but you don't split those

17 apart for any reason other than the Adopted Criteria lays out

18 splitting up the VTD simply for the reason of population

19 equality.  So that second district is created much the same way

20 and the same goes for all subsequent 13 districts.

21 Q    And we can advance to -- so that shows an example which

22 appears in Figure 1 of your report of one of the simulations

23 that you generated for the purposes of this report, is that

24 correct?

25 A    Yes, sir.

1  Q    And, again, we'll talk about this in more detail, but how

2  many total simulations did you create?

3  A    Well, I created a total of 3,000.  I did three sets of

4  simulations using slightly different algorithms, slightly

5  different rules; but for each set of simulations, I conducted

6  1,000 simulations, so 1,000 separate maps.  And this is just

7  one example among those 1,000 or among those 3,000 total maps,

8  but every map is completely different.  It starts in a

9  different way, but it follows that same basic algorithm that I

10 just outlined.

11 Q    And so particular geographic features of this map may not

12 be matched in any other map or in some uncertain number of

13 other maps, is that correct?

14 A    That's correct, sir.  All the maps are different.

15 Q    Including which counties are split as a result of the

16 random starting point of the map?

17 A    That's correct, sir.  The different maps split different

18 counties, different combinations of counties.

19 Q    So this varies slightly from Figure 1 in that Figure 1

20 also displays a variety of information about the resulting

21 districts, is that correct?

22 A    That's correct, sir.  So once I complete or once the

23 computer has completed the construction of the entire

24 13-district map, my computer then goes back and calculates

25 various statistics relating to the Adopted Criteria describing

1    the districts on the map.

2           So, for example, obviously I've calculated the

3    population here in the left column, the population of all the

4    13 districts; and it just shows that these districts are, in

5    fact, equally populated, that everybody has 733,498 or 99 in

6    population.  So you can calculate certainly the population, but

7    I also calculate measures relating to geographic compactness.

8    I also calculate measures relating to how many counties were

9    split and how many VTDs were split.

10          So in this map, we see that I have displayed the

11   various geographic compactness measures along the measures of

12   Reock and Popper-Polsby, and these are just very commonly used

13   measures of geographic compactness where higher scores denote

14   greater geographic compactness.  So I've calculated the

15   compactness scores of all the districts here; and, of course,

16   you can calculate the average score, the average Reock and the

17   average Popper-Polsby, among all 13 districts.

18          Then I've also calculated which counties were split

19   and which VTDs were split, and we can see here in this map

20   there were exactly 12 counties split and exactly 12 VTDs split,

21   which is a result of the districting algorithm minimizing or

22   avoiding when possible the splitting of VTDs and counties,

23   except to equalize population.

24   Q    And your simulation approach and the data that you have

25   produced in connection with it reveals all of this data about

1   any one of your 3,000 simulated maps, is that correct?

2   A    That is correct, sir.  I turned over electronic maps of

3   all 3,000 of the simulated maps, so 3,000 completely different

4   districting maps.

5   Q    And just to be clear, when you say turned over those maps

6   it creates actually a shapefile of the map, as opposed to

7   something identical to Figure 1, is that correct?

8   A    Exactly, sir.  A shapefile is how we store maps

9   electronically on computers.

10  Q    But this data is available as a result of the various

11  folders that capture all of the simulations that you did?

12  A    That's exactly right, sir.  So in addition to those

13  shapefiles, I also turned over data files listing out these

14  various characteristics, as we see here, of every single one of

15  those 3,000 maps.

16  Q    Just to be clear, because the numbers don't necessarily

17  conform to what we've come to expect of actual North Carolina

18  districts, do the numbers that you assign to given districts

19  mean anything in correspondence to our current District 1 or

20  District 13?

21  A    No.  I made no attempt to assign any sort of meaning to

22  which district gets numbered as number one.  I found that to be

23  not really part of my task because the Adopted Criteria don't

24  tell us anything about the numbering system that is to be used.

25  I number them simply for the sake of organizing the files, but

1  the numbers mean absolutely nothing substantively.

2  Q    And also just for clarity, Figure 1 represents a single

3  simulation from your third set of simulations that we will

4  discuss, is that correct?

5  A    It represents an example from the second set of

6  simulations --

7  Q    Oh.

8  A    -- that I produced.

9  Q    And so the additional information that we know about this

10 map appearing in Figure 1 is that all of the 13 incumbents will

11 be placed in separate districts, is that correct?

12 A    Yes, that is one thing I found about this map.  I would

13 just add that among those files that I turned over were files

14 that identified which incumbents were in which district in

15 every one of those 3,000 maps.  So the files that I turned over

16 did, in fact, identify the incumbency information listed here

17 in this map.

18 Q    Understood.  I want to move to discussing the various

19 criteria that you used to create this map.

20        MR. THORPE:  And, Stacy, I think we're done with that

21 simulation or demonstration.

22 BY MR. THORPE:

23 Q    You stated that you created 3,000 maps?

24 A    Yes, sir.

25 Q    And the first set of maps that you created, you created

1  1,000 maps, is that correct?

2  A    Yes, sir, that's correct.

3  Q    What criteria did you use to conduct that initial set of

4  simulations?

5  A    So I'll explain the criteria and, broadly, these are

6  criteria taken from the nonpartisan portions of the Adopted

7  Criteria.  What I broadly wanted to do was to hold several

8  redistricting factors constant so that I could evaluate whether

9  or not the as-enacted SB2 map conformed to these or could be

10 explained simply in terms of it being a partisan-motivated map.

11 So the specific criteria that I followed here in Simulation Set

12 No. 1 were taken directly from the Adopted Criteria.

13 Q    And when you say "the Adopted Criteria," Dr. Chen, you are

14 referring to Exhibit 1007, which should appear at the third tab

15 of your binder?

16 A    Yes, sir, that's correct, the 2016 Joint Select Committee

17 Adopted Criteria.

18 Q    And you have referred to these earlier today as the

19 nonpartisan criteria from the Adopted Criteria.  What do you

20 mean by that?

21 A    What I mean by that, sir, is that this Joint Select

22 Committee Adopted Criteria document contains both partisan, as

23 well as nonpartisan, factors.

24        Now, I explained my goal in this expert report; and

25 it was to -- in part, to evaluate the extent to which the

1  Enacted SB2 Plan conforms, adheres to the nonpartisan portion

2  of the Adopted Criteria.  So in evaluating that, I, of course,

3  had to ignore the partisan mandates of the Adopted Criteria

4  specifically relating to its mandate of the creation of a ten

5  Republican, three Democrat congressional map.  So I certainly

6  ignored that portion.

7           As well in Simulation Set No. 1, I ignored the

8  Adopted Criteria's mandate of protecting incumbents; and the

9  reason I ignored that part is that even though it's not an

10 explicitly partisan criteria, given that the 13 incumbents as

11 of November 2016 are coming from an existing -- the previous

12 congressional map, there's certainly the possibility that there

13 is some indirect partisan effect if we were to draw districts

14 explicitly to protect those existing incumbents as of November

15 2016 given that they arose from the plan drawn for the 2012 and

16 2014 congressional elections.

17          So those were the portions of the Adopted Criteria I

18 ignored in Simulation Set No. 1.

19 Q    Dr. Chen, I'll direct you to page 6 and the top of page 7

20 of your report where you list criteria that the computer

21 algorithm followed.  Are these the criteria that you're

22 referring to when you say the nonpartisan portion of the

23 Adopted Criteria that you used to simulate Set One?

24 A    Yes, sir.  So I've listed out here on page 6 the five

25 nonpartisan criteria that I factored, that I built into

1  Simulation Set No. 1.  Specifically, the Adopted Criteria tell
2  us, obviously, that districts have to be perfectly equally
3  populated; second, that obviously districts have to be
4  geographically contiguous.  Those are fairly standard and not
5  very different than for, say, other states, but the Adopted
6  Criteria also give us very specific nonpartisan instructions
7  with respect to No. 3, avoiding county splits.

8         And so the Adopted Criteria specifically tell us
9  that, number one, if you do split a county, you cannot split it
10  into more than two districts.  You cannot split, say,
11  Mecklenburg County or any other county into three districts or
12  four districts.  You can only split it, at most, into two
13  districts.  More importantly, the Adopted Criteria also tell us
14  that you should avoid splitting counties when possible, that
15  they are to be minimized, and that you can split counties when
16  you need to do so to create equally populated districts.  So
17  that's a third criterion.

18  Q    And where does that criterion appear within the Adopted
19  Criteria because you just outlined several things?  I want to
20  be able to point where in the Adopted Criteria that shows up.
21  A    Yes, sir, in the Adopted Criteria, it's the paragraph
22  that's labeled "Compactness."
23  Q    Understood.  In addition, your simulation algorithm
24  introduces or, rather, measures compactness by other measures
25  that you previously referenced with Figure 1, correct?

1    A    Yes, sir, that's correct.

2    Q    And what are those measures?

3    A    Sure.  I just wanted to mention before I got to

4    compactness, though, that the fourth criterion is minimizing

5    VTD splits and the Adopted Criteria there tells us that you can

6    only split VTDs when necessary to create equal populations, as

7    I mentioned earlier in describing my algorithm.

8              And then the final one, in response to your question,

9    sir, is about geographic compactness.  So the algorithm

10   prioritizes the drawing of geographically compact districts,

11   and I measure that and operationalize that using two standard

12   measures of geographic compactness that scholars of

13   redistricting -- of legislative redistricting use very commonly

14   in the scholarly literature, as well as in court case work.

15   Those two measures are Reock and Popper-Polsby.

16   Q    And those measures are described on pages 6 and 7 of your

17   report, is that correct?

18   A    Yes, sir, that's correct.

19   Q    Returning to the first criterion that you referenced, I

20   just want to be very clear about the instruction that you gave

21   the computer in creating these simulated maps.  Did you

22   instruct the computer to conduct simulations that created

23   districts with zero population deviation?

24   A    That is correct, sir, I did and I found that that was very

25   straightforward to do and so all of the districts in all of the

1  3,000 maps that I produced for this report all have a

2  population deviation of -- sorry -- a population in the

3  district of either 733,498 or 99.

4         I mean, specifically the way that North Carolina's

5  statewide population breaks down if you divide it across 13

6  districts is you need exactly four districts with 498 and then

7  the remaining nine districts that have 499.  So you're going to

8  have four districts with 733,498 and the remaining are going to

9  be 99.  That's just how North Carolina's population breaks down

10 and that is strictly adhered to in every one of my simulated --

11 3,000 simulated plans.

12 Q    And so as a result of how you designed that algorithm, it

13 was not necessary on the back end of the simulations to zero

14 out the population to meet this criteria?

15 A    No, sir, I did not go through by hand and do any manual

16 fidgeting with the district boundaries or the assignment of

17 census blocks or anything like that.  It was entirely automated

18 by the computer districting process.

19 Q    You have previously conducted other simulations of

20 congressional and legislative redistricting, correct?

21 A    Yes, sir, that's correct.

22 Q    And in those previous either expert engagements or in your

23 academic work, have you always been given a written set of

24 criteria to follow?

25 A    No, sir.  This is quite rare.

1  Q    And what does that affect about your approach to the task

2  in this case?

3  A    Well, it meant my task in this particular case was

4  unusually narrow and very mechanical, meaning the following:

5  The Adopted Criteria here in this case give me a very specific

6  set of criteria and my task was to not deviate from the

7  nonpartisan portions of that Adopted Criteria.  They were

8  obviously very specific with respect to things like population

9  equality and contiguity, but also county splits, which was

10 quite unusual.

11          Usually my task in -- either as an expert witness or

12 in my academic research is to make subjective judgments or use

13 my expert as a redistricting expert and make determinations

14 about how traditional districting criteria should apply in this

15 state or that state or this jurisdiction and then try and

16 figure out how to apply them -- how to apply traditional

17 districting criteria given the various quirks of a particular

18 state.

19          In North Carolina, in this particular case, with the

20 Adopted Criteria as specifically as it is written, I had no

21 subjective judgments like that to make here.  My task here was

22 very mechanical, to very strictly follow the words that I saw

23 on the paper of the Adopted Criteria and to follow those rules

24 by programming them into the computer algorithm.  They were

25 even very specific with respect to the hierarchy of these

1  various criteria.

2          So that's what made this case so unusual in terms of

3  my own normal academic work and expert witness work using

4  redistricting simulations.  Here I had no -- very little

5  judgment call in deciding what districting criteria should be

6  in or which ones should apply here.  It was all very clearly

7  laid out for me in the Adopted Criteria.

8  Q    Do the adopt criteria also specify which election and/or

9  demographic data is to be used in the construction of these

10 maps or these districts?

11 A    Yes, sir, it does.

12 Q    And where is that specified?

13 A    Well, the Adopted Criteria tells us which elections are to

14 be used.  I believe it's the section called "Political Data."

15 But the Adopted Criteria tells us which elections to use in the

16 consideration of the partisanship of the districts in achieving

17 the stated political impact or partisan goal of the Adopted

18 Criteria.

19          So specifically that "Political Data" paragraph in

20 the 2016 Adopted Criteria tell us that the data we are to use

21 are the following:  All the statewide elections from 2000 --

22 from 2008 to 2014, but not including the presidential contests.

23 So that is a very specific list of exactly 20 statewide

24 elections.

25 Q    And what you just said you have read from the first

1  sentence under "Political Data" on page 1 of the Adopted

2  Criteria itself?

3  A    That is correct, page 1, the section called "Political

4  Data," and it tells us which elections to use.

5  Q    And does that section also describe any demographic data

6  that may be used in the construction of districts?

7  A    It tells us to avoid using certain demographic data.  It

8  tells us to avoid using the racial composition of any of the

9  census geographies or of any data about North Carolina.  So

10 that's pretty easy to follow.  I just ignore racial data

11 because the Adopted Criteria tell me to ignore racial data.

12 Q    And so specifically it reads:  "Data identifying the race

13 of individuals of voters shall not be used in the construction

14 or consideration of districts in the 2016 contingent

15 congressional plan."

16         Did you follow that in your construction and

17 consideration of the simulated districts in order to follow the

18 nonpolitical portions of the Adopted Criteria?

19 A    Yes, sir.  I considered that to be one of the various

20 nonpartisan portions of the Adopted Criteria.  So that sentence

21 tells me that racial data, data identifying the race of voters,

22 is not to be used; and so I followed that by completely

23 ignoring all racial data in constructing my computer's

24 districting simulation algorithm.

25 Q    And when I speak of whether you constructed districts

1  based on that result or considered that information, I am

2  referring to the information contained in your expert report

3  disclosed on March the 1st of 2017?

4  A    Yes, sir, that's correct.

5  Q    So the political data bullet point that you just

6  referenced includes 20 elections.  Was that the only election

7  formula that you considered for the purposes of this task?

8  A    It was one of two different formulas that I used.  There

9  was a second one as well.

10 Q    What is the other formula?  And I will direct your

11 attention to the next tab, which is Joint Plaintiffs'

12 Exhibit 2002.

13 A    This document is a document that Plaintiffs' counsel gave

14 to me and represented to me that it was the formula produced by

15 Dr. Tom Hofeller used for evaluating partisanship of North

16 Carolina congressional districts while he was producing the

17 2016 Plan.  Plaintiffs' counsel gave me this document, told me

18 it was produced by Dr. Hofeller in evaluating the partisanship

19 of North Carolina's congressional districts.

20          I looked at this formula and I found seven elections

21 and I found it was a very straightforward formula to apply.  I

22 saw seven elections and they're really just a subset of those

23 20 statewide elections I mentioned just a second ago that were

24 mentioned in the Adopted Criteria.

25          So Dr. Hofeller's formula lists for me seven

1  elections and it creates a very specific formula used to

2  evaluate the partisanship of districts.  I looked at it and I

3  saw that I had access to all of this data, all seven of these

4  elections, and I found it to be pretty reasonable and

5  straightforward to apply, and so I applied it as well.

6  Q    And you've mentioned applying this formula at the district

7  level.  Is it your understanding that this formula could only

8  work at the district level?

9  A    No.  I understand it to be a formula that was constructed

10 by Dr. Hofeller for the consideration, for the evaluation of

11 the partisanship of any geography.  It could be the

12 partisanship of a county or the entire state of North Carolina,

13 of a region in North Carolina.  It's just a formula that takes

14 a couple of different elections, puts them together, aggregates

15 the results; and all it simply does is it counts up were there

16 more Republican votes or Democratic votes in this particular

17 district across the seven elections.  So it's a very

18 straightforward formula that can be applied to any sort of

19 geography within North Carolina obviously.

20 Q    And this formula could easily be applied at the VTD level

21 as well?

22 A    Yes, sir.  I mean, it's all data that's available at the

23 VTD level and it's pretty clear what Dr. Hofeller was creating

24 here.

25 Q    Understanding that these elections were provided to you as

1  you've just testified, do you have an opinion about the

2  reasonability of using either the 20 elections or

3  Dr. Hofeller's formula to assess the underlying partisanship of

4  an individual geographic unit in North Carolina?

5  A    I do.  In general, I just accepted that this was

6  Dr. Hofeller's understanding of the partisanship or at least

7  Dr. Hofeller's conception of the partisanship of North

8  Carolina's congressional districts.  But obviously, I'm a

9  political scientist who studies election results and so I

10 looked at this formula and I looked at the various elections

11 used in this formula and it strikes me as a reasonable formula.

12 It may not be a perfect formula, but it strikes me as a fairly

13 reasonable way to measure across several election cycles and

14 across several different races the general partisanship of

15 North Carolina voters in any given district.

16 Q    And principally you accepted that either the 20 elections

17 or the 7 elections referenced in the document we were just

18 discussing were, in fact, used for that purpose in the creation

19 of the 2016 Plan?

20 A    Yes, sir, I accepted Plaintiffs' counsel's representation

21 of that fact, that these were the formulas that represented how

22 Dr. Hofeller measured or understood or perceived the

23 partisanship of North Carolina congressional districts, and I

24 accepted that Plaintiffs' counsel told me that the Adopted

25 Criteria was an accurate representation of the legislature's

1   instructions or intent in drawing the map.

2   Q    And then used those instructions that you understood to be

3   explicit to create your own set of simulations?

4   A    Well, yeah, that's correct.  So I created my own

5   simulations, as I said, in the past using the nonpartisan

6   portions of the Adopted Criteria, but then I went back and

7   evaluated the partisanship of every one of those districts in

8   every one of those 3,000 maps using both Dr. Hofeller's formula

9   and then later on using the 20-election formula as laid out in

10  the Adopted Criteria.

11  Q    Before we dive in more specifically to the results for

12  Simulation Set One, it also appears that you conducted two

13  additional sets of simulations after the first run of a

14  thousand.  Why did you do that?

15  A    I conducted the two additional set of simulations in order

16  to assess the plausibility of alternative explanations for why

17  the legislature might have drawn or needed to draw the SB2 Plan

18  with ten Republican seats.

19          So specifically, I conducted the second set of

20  simulations to evaluate the possibility that the legislature's

21  stated desire in the Adopted Criteria to protect incumbents

22  each in his or her own district might somehow account, explain

23  or necessitate the creation of a 10-3 Republican map.

24          And then I created a third set of simulations,

25  Simulation Set No. 3, to consider the altogether different

1  possibility that perhaps there were something specific, perhaps

2  something specific in the unique combination of features of the

3  Enacted SB2 Plan in terms of its unique combination of the 13

4  county split and exactly 11 protected incumbents that might

5  somehow explain its creation of an extreme 10-3 Republican map.

6          So I did these additional sets of simulations as

7  robustness checks to evaluate those possible alternative

8  explanations for why the enacted plan, the SB2 Plan, was such

9  an extreme partisan outlier.

10 Q    And so with respect to Simulation Set One, you tested the

11 criteria in -- the Adopted Criteria that you determined for

12 that set you would consider nonpartisan criteria, is that

13 correct?

14 A    Yes, sir, I considered just the nonpartisan portions of

15 the Adopted Criteria in Set One.

16 Q    So you did not consider partisan advantage?

17 A    That is correct.  In Simulation Set No. 1, I solely stuck

18 to nonpartisan criteria, did not consider political incumbency,

19 and did not consider partisan advantage in the construction of

20 these simulated plans.

21 Q    Including in determining whether and when to split

22 counties?

23 A    That's correct, sir.  Those were all applied in

24 nonpartisan fashions.

25 Q    I'm going to direct your attention to page 13 of your

1  report, which is Figure 2.  What does Figure 2 show, Dr. Chen?

2  A    Figure 2 describes the partisan results, the results in

3  terms of partisanship of this first set of simulations that I

4  just finished describing.  So once again, this is the set of

5  simulations in which the computer is strictly following the

6  nonpartisan portions of the Adopted Criteria.  It is paying no

7  attention to any sort of political data, as well as anything

8  about any incumbents; and that's before, of course, it's

9  completely ignoring racial data.

10         So this figure on the left of Figure 2, this

11  histogram, this is a diagram that tells us about the number of

12  Republican districts in all of these 1,000 simulated plans in

13  Simulation Set No. 1.  It's also telling us about the

14  partisanship, the number of Republican districts, of the

15  Enacted SB2 Plan.

16  Q    So explain what you mean by the two descriptions on the X

17  and Y axis of this histogram.

18  A    What I'm plotting here on the horizontal axis along the

19  bottom of this figure is the number of districts that have over

20  Republican -- 50 percent Republican vote share.  In other

21  words, how many Republican districts were there as measured

22  using Dr. Hofeller's formula, that formula that we just looked

23  at a few minutes back.

24         So I applied Dr. Hofeller's formula to every one of

25  the 13 districts in every one of these 1,000 simulated plans.

1   For each one of these computer-simulated plans, I simply

2   counted up how many -- out of 13 districts how many of those 13

3   districts are Republican rather than Democrat in terms of using

4   and applying Dr. Hofeller's formula.  Dr. Hofeller's formula

5   was a very straightforward way using those seven elections to

6   tell us whether a district was Republican or Democrat; and so I

7   used that, applied that across the 13 districts, and counted up

8   how many of those 13 districts are Republican districts rather

9   than Democrat districts.

10  Q    And the frequency with which your simulations generated a

11  particular number of districts with more Republican votes based

12  on that formula is captured by the vertical axis?

13  A    Correct, is captured vertically.  So this is a chart

14  that's just telling us how many of those 1,000 simulated plans

15  -- and remember that these are 1,000 completely independent,

16  completely different districting plans for North Carolina's

17  congressional districts.  So there are 1,000 different plans

18  here; and I'm counting up how many created exactly five

19  Republican seats, how many created exactly six Republican

20  seats, how many created exactly seven Republican seats, and so

21  on.

22  Q    And among the range of possible outcomes you observed in

23  this analysis, what was the most frequent result?

24  A    The most frequent outcome was plans that created exactly

25  seven Republican seats.  In other words, seven Republican and

1  six Democratic seats, that was an outcome that occurred a

2  little bit over 45 percent of the time.  So almost half the

3  time it was exactly 7 out of 13 Republican seats.

4  Q    And what was the second most likely outcome?

5  A    Second most likely outcome is six Republican seats.  So we

6  see that's happening 32 percent of the time, so approximately

7  320 out of those 1,000 simulated plans.  Put together --

8  another way of seeing that is to say that the vast majority of

9  these plans are either six or seven Republican seats, meaning

10 that they have six Republican and seven Democratic seats or

11 seven Republican and six Democratic seats.  That's what's

12 happening in these simulated plans most of the time, the vast

13 majority of the time here.

14 Q    And how frequently did this set of 1,000 simulations yield

15 ten Republican and three Democratic seats?

16 A    It never did so.  Zero out of 1,000 times.  It never

17 created ten Republican and three Democratic seats.

18 Q    And is that captured in the red text showing where the SB2

19 Enacted Plan winds up on this chart?

20 A    Yes, sir, that's right.  So you see a red bar there -- a

21 red dotted line and I've plotted out there SB2 Enacted Plan.

22 That represents the SB2 Enacted Plan's creation -- using

23 Dr. Hofeller's formula, the creation of ten Republican seats as

24 measured using Dr. Hofeller's formula.  So that red line is

25 telling us that the SB2 Enacted Plan created ten Republican

1   seats.  And once again, we can look at the entire distribution

2   of those 1,000 computer-simulated plans.  We can see that that

3   range is between five to nine and most of the time, as we just

4   mentioned earlier, it is usually six or seven.

5           So what that tells us is that the SB2 Enacted Plan's

6   creation of ten Republican seats is an extreme statistical

7   outlier.  It's creating ten Republican seats and that is an

8   outcome that is entirely outside of the range of plans created

9   under Simulation Set No. 1 following the nonpartisan portions

10  of the Adopted Criteria.  So it's entirely outside of this

11  range of simulated plans.

12  Q    And you performed the same analysis using the 20 elections

13  specified in the Adopted Criteria as well, correct?

14  A    Yes, sir, a completely separate formula that we just

15  described -- that I just went over a while ago of taking those

16  20 elections that were mentioned in the "Political Data"

17  portion of the Adopted Criteria, and I applied that formula

18  with those 20 elections.  Those election results were all

19  available to me and so I evaluated the same 1,000 plans a

20  second time, except this time, instead of using Dr. Hofeller's

21  formula, I used the Adopted Criteria formula.

22          And again, just to remind -- to go over what that

23  was, the Adopted Criteria gave us 20 elections, and I simply

24  counted up how many Republican votes and how many Democratic

25  votes across those 20 elections there are in each district, and

1  that allows us to determine whether each district is a

2  Republican or a Democratic district.

3         So once again, on the figure on the right I'm

4  plotting out or I'm displaying the number of Republican seats

5  in each of these 1,000 plans.

6  Q    And just briefly, what do you find is the most likely

7  result applying the Adopted Criteria elections to this

8  simulation set?

9  A    So right now we're looking at the figure on the right side

10 here, Figure 2.  That figure on the right side tells us that

11 the most likely outcome -- and this is an outcome that occurs

12 over half of the time again in these 1,000 simulated plans.

13 That most likely outcome is six Republican seats.  In other

14 words, six Republican and seven Democratic seats.

15        So what this is telling us is that when you follow a

16 simulation process that is strictly adhering to the nonpartisan

17 portions of the Adopted Criteria over half the time you would

18 create a plan that has exactly six Republican and seven

19 Democratic seats using the Adopted Criteria elections, the

20 formula laid out in the Adopted Criteria, for evaluating the

21 political impact of North Carolina congressional districts.

22 Q    Understood.  And, again, just briefly, how likely is it

23 that this simulation set using these elections would yield a

24 ten Republican, three Democratic plan?

25 A    Again, zero out of 1,000 times.  Never.

1  Q    How many times does it occur for nine Republican districts

2  and four Democratic districts?

3  A    Zero out of 1,000 times.  It never occurs.

4  Q    And how often does it occur in eight Republican districts

5  and six Democratic districts?

6  A    Less than 1 percent of the time.  0.5 percent of the time.

7  So it very rarely occurs, 5 out of 1,000 times.  For creating

8  seven Republican districts, then it occurs a sizeable number of

9  times, a small minority, at 13 percent.

10 Q    And so based on this data that's before us in Figure 2,

11 what can you conclude about the partisan distribution of seats

12 in the SB2 Enacted Plan relative to the partisan distribution

13 of seats among your simulated plans in Simulation Set One?

14 A    Using either one of these partisan formulas, these

15 partisan measures that I've just gone over, Dr. Hofeller's

16 formula as well as the Adopted Criteria formula, using either

17 one of those alone, I'm able to conclude with extremely high

18 statistical certainty that the SB2 Enacted Plan's creation of

19 ten Republican seats is an extreme outlier and it is entirely

20 outside of the range of the sorts of plans that would emerge

21 under my simulation process, under a districting process that

22 strictly follows the nonpartisan portions of the Adopted

23 Criteria.

24 Q    You separately -- did you separately evaluate whether the

25 plans in Simulation Set One tell us anything about the enacted

1  plan's compliance with other portions of the Adopted Criteria?

2  A    Yes, sir, I did.  I evaluated the geographic compactness,

3  as well as the number of county splits, of the Enacted SB2 Plan

4  as compared to all of the simulated plans.

5  Q    And what did you find with respect to the compactness of

6  those districts?

7  A    Well, the compactness calculations, the compactness

8  comparisons are shown on Figure 3.

9  Q    And Figure 3 appears on page 14 of your report.  I believe

10  you are referring specifically to the left side of that page.

11  A    Yes, sir, I'm referring just to the left side of this

12  figure.  This figure here on the left is a comparison of those

13  1,000 simulated plans that we've been talking about compared

14  against the Enacted SB2 Plan along geographic compactness; and

15  as I mentioned sometime ago, we're using two different measures

16  of geographic compactness here, the Reock score, as well as the

17  Popper-Polsby score.  These are scores that generally tell you

18  higher numbers mean greater geographic compactness.

19         So what this figure tells us is the geographic

20  compactness along these two, Reock and Popper-Polsby, measures

21  of every one of the 1,000 plans, as well as the Enacted SB2

22  Plan.  It tells us that in the SB2 Plan we have, say, a Reock

23  score of a little bit under .34.  Now, that by itself doesn't

24  mean anything without comparison to other plans.  So that's

25  what we have the simulated plans for.  We're able to see what

1   is a reasonable geographic compactness score, what is a

2   reasonable Reock score produced by a districting process that

3   more strictly adheres to or tries to draw compact districts;

4   and the answer is what we see in this figure here.

5              When you try and draw compact districts when you try

6   and adhere to the Adopted Criteria's nonpartisan portions, you

7   end up with plans that range in Reock from .38 -- from a little

8   bit under .38 all the way up to about .48.  That's the entire

9   range.  Now, where is the Enacted SB2 Plan?  It's at .34.  It's

10  entirely outside of that range and very significantly far below

11  that range, and what that tells me -- combined with the same

12  thing when we look at the Popper-Polsby measure along the

13  vertical axis, what that allows me to conclude is that the

14  Enacted SB2 Plan was not the product of a reasonable effort to

15  draw geographically compact districts because it was very

16  straightforward, very easy, 1,000 out of 1,000 times, to draw a

17  much more compact districting plan while otherwise maximizing

18  adherence to the nonpartisan portions of the Adopted Criteria.

19  Q    You just testified that the Reock score specifically of

20  the enacted plan wouldn't necessarily be reasonable.  Do you

21  mean reasonable with respect to this entire population of

22  simulations or reasonable as some absolute metric?

23  A    I don't really read much into it as an absolute metric.

24  For example, if you were to ask what is a reasonable Reock

25  score if you were drawing congressional districts or state

1  legislative districts for the islands in the state of Hawaii,

2  you would, of course, end up with much more geographically

3  noncompact districts than if you were drawing a districting

4  plan for the state of Wyoming, which it's much easier in the

5  second example to be drawing compact districts.  That's why I

6  say that you have to put Reock scores in a context by comparing

7  them to what could have been reasonably done.  That's what the

8  simulations -- the simulated plans allow us to do.

9  Q    And so the data in Figure 3 provides that context via the

10 simulations that you conducted?

11 A    Yes, sir.  It's telling us what sort of geographic

12 compactness scores, what sort of Reock scores would emerge.

13 Specifically in North Carolina and specifically trying to draw

14 congressional districts specifically using 2010 census data,

15 what sort of Reock scores would have emerged if you had tried

16 to draw reasonable compact districts.

17 Q    You said that you also evaluated county splits.

18 A    Yes, sir, I did.

19 Q    What did you find with respect to Simulation Set One

20 relevant to the enacted plan?

21 A    What I found is that in the first set of simulations --

22 and, again, this is the set of simulations that tries to

23 maximize adherence to the nonpartisan portions of the Adopted

24 Criteria, including the county split mandate, the mandate that

25 you avoid splitting counties when feasible.

1          What I found is that it is very straightforward,

2     again, 1,000 out of 1,000 times, to produce a congressional

3     districting plan that splits only exactly 12 counties.  You

4     don't need to split any more than 12 counties.  Counties are

5     split when you need to equalize the population of districts in

6     Simulation Set No. 1 and so it's very straightforward to create

7     only 12 counties that are split into two districts.

8          Now, I also evaluated -- I also evaluated the Enacted

9     SB2 Plan and I found that there were 13 county splits, so that

10    allowed me to conclude that the SB2 Plan was not the product of

11    a districting effort to minimize the number of county splits to

12    only split counties only when necessary to equalize district

13    populations.

14    Q    I want to direct your attention back to the Adopted

15    Criteria and specifically the compactness criterion that you

16    earlier referenced.  What is it in this compactness criterion

17    that caused you to minimize the number of county splits in the

18    creation of these districts?

19    A    Right.  Well, as we were discussing the simulation

20    algorithm quite some time ago, the simulation algorithm pays

21    great importance to the Adopted Criteria's mandate about

22    keeping counties whole when possible.

23         And so the way it works is what the algorithm does is

24    it doesn't go into a new county when building a district.  It

25    does not go into a new county until old counties, existing

 1  counties inside of that district, have already been filled up
 2  by that district.  So you don't intrude into a new county until
 3  you actually need to.  That's how any districting process would
 4  minimize county splits.  It builds those districts one by one
 5  and you don't go into new counties until you have to.
 6  Q    So there is a sentence in this criteria that reads:
 7  "Division of counties shall only be made for reasons of
 8  equalizing population, consideration of incumbency, and
 9  political impact."  Is that correct?
10  A    Yes, sir.
11  Q    Would I be correct in describing Simulation Set One as
12  following the rule that division of counties shall only be made
13  for reasons of equalizing population?
14  A    That's exactly what I did.  I read that sentence and it
15  lays out three reasons why one can divide counties:  Equalizing
16  population, but also to protect incumbents and political
17  impact, which I read the Adopted Criteria to mean trying to
18  create a ten Republican map or its political goal of creating a
19  ten Republican map.
20          And as I said, in Simulation Set No. 1, I solely
21  focused on the nonpartisan portions of the Adopted Criteria, so
22  that -- when I read the sentence, that meant that division of
23  counties can only be made in order to equalize the population
24  of districts, not to create a 10-3 map or to protect incumbents
25  here in Simulation Set No. 1.  That's why I followed that rule

1   in Set No. 1, allowing counties to be split only when necessary

2   to create perfectly equalized districts.

3   Q    Understood.  In Simulation Set No. 2, how did you vary

4   that design?

5   A    So in Simulation Set No. 2, I mostly followed the same

6   algorithm, but I wanted to ask a slightly different question.

7   I wanted to specifically ask whether or not the Adopted

8   Criteria's mandate of protecting political incumbents -- of

9   protecting the congressional incumbents might somehow explain

10  or justify or somehow necessitate the creation of a map with as

11  extreme of a partisan impact as the SB2 map.

12  Q    So what did you do to test that proposition?

13  A    What I did was I created a different algorithm, but it was

14  exactly the same as the first algorithm in so far as it

15  followed all of the nonpartisan portions of the Adopted

16  Criteria and maximized compliance with the nonpartisan Adopted

17  Criteria, but added one more feature.  It explicitly intended

18  to create districts that made sure that the entire districting

19  plan as a whole protects all 13 incumbents specifically by

20  avoiding the pairing of any incumbents.  So it avoids putting

21  two or more incumbents into the same district.

22          In other words, this is an algorithm that was exactly

23  like Set No. 1, which we've been talking about up until now,

24  except that it is mandating, it is requiring that every one of

25  the 13 incumbents in North Carolina as of the November 2016

 1  election is placed into his or her own district with no pairing
 2  or no double-bunking of incumbents.
 3  Q     Have you heard -- so you just referenced the
 4  double-bunking of incumbents.  Do you understand that to mean
 5  placing more than one incumbent in a given district?
 6  A     Yes, sir, that's what I understand by that term.
 7  Q     And so is it correct that in Simulation Set Two all of
 8  your simulations obey the rule that no incumbents are
 9  doubled-bunked?
10  A     Yes, sir, that's exactly how I designed Simulation Set No.
11  2.  I mandated that all 13 districts had to contain one and
12  only one of the 13 incumbents each, and I found that was very
13  straightforward to do.  It was very easy for the computer 1,000
14  out of 1,000 times to protect all 13 of the November 2016
15  incumbents in each -- in each of their own respective
16  districts, meaning that none were double-bunked or none were
17  paired.
18  Q     And were you able to determine whether this additional
19  constraint imposed on your simulations significantly altered
20  the partisan distribution of seats you would expect under those
21  simulations?
22  A     I was able to make that determination.  I found that it
23  had no impact at all.
24  Q     And I would ask you to look at Figure 4, which appears on
25  page 16 of your report.

1  A    Yes, sir.

2  Q    And again you were presenting results based on the

3  Hofeller formula and the 20 elections specified in the Adopted

4  Criteria, is that correct?

5  A    Yes, sir.  Just like the last figure, the left side has

6  results using the Dr. Hofeller formula.  The right side has

7  results using the 20-elections formula laid out in the Adopted

8  Criteria.

9  Q    And because the Court is familiar with this format from

10 the earlier figure, I just quickly want to review the results

11 from these simulated plans.  Applying the Hofeller formula,

12 what do you find is the most likely partisan distribution of

13 seats for Simulation Set Two?

14 A    Over 50 percent of the time the Simulation Set No. 2

15 creates seven Republican districts -- seven Republicans and six

16 Democratics among the 13 districts.  So seven Republicans is

17 the most likely outcome.

18 Q    And the SB2 Enacted Plan creates how many Republican

19 districts using that definition?

20 A    Using the Dr. Hofeller formula, the SB2 Plan creates ten

21 Republican districts, and this is an outcome that is never seen

22 in any of the 1,000 simulated plans here in Set No. 2.

23 Q    And how likely is a nine Republican, four Democrat

24 outcome?

25 A    A nine Republican plan occurs only 1 percent of the time,

1  so it is still an extremely unlikely outcome.  It occurs a very

2  small percentage of the time.

3  Q    And using the Adopted Criteria elections, what do you find

4  is the most likely outcome in terms of partisan distribution of

5  seats?

6  A    The most likely outcome here, again, using the Adopted

7  Criteria formula is six Republicans seats, six Republicans and

8  seven Democrats among the 13 districts.

9  Q    And how likely is it to yield ten Republican and three

10  Democratic seats?

11  A    It never yields ten Republicans.  Zero out of 1,000 times.

12  Q    Did it ever yield nine Republicans?

13  A    It never does.  Zero out of 1,000 times.

14  Q    And how frequently does it yield eight Republican seats?

15  A    Only a very small percentage of the time, 2.7 percent.  In

16  other words, 27 out of 1,000 times.

17  Q    So from these results, were you able to determine whether

18  the protection of all 13 House incumbents made the creation of

19  a 10-3 Republican advantage in the SB2 Enacted Plan a plausible

20  outcome?

21  A    I was able to make that determination.  I was able to

22  conclude with very strong statistical certainty that even if

23  the map drawer had been motivated by the concern of or by the

24  factor of trying to protect all 13 incumbents as mandated by

25  the Adopted Criteria, even such an extreme effort would not

1  have justified or explained or necessitated the creation of an

2  enacted districting plan with as extreme of a partisan outlier

3  as what we see in the SB2 Plan.

4  Q    And directing your attention to Figure 5 on the next page,

5  were you also able to determine whether this additional

6  constraint affected performance as to other features of the

7  Adopted Criteria, such as compactness?

8  A    Yes.  As before, I evaluated these 1,000 simulated plans

9  along the measures of geographic compactness, as well as the

10  number of county splits.  So here in Figure 5 on the left side,

11  this figure is just like the one we saw a couple of minutes

12  ago, except now for Simulation Set No. 2 I displayed here the

13  Reock score and the Popper-Polsby geographic compactness score

14  of all 1,000 of the simulations, and I've compared that again

15  with the compactness scores of the SB2 plan.  And once again

16  what we're seeing here is that the SB2 plan is creating a

17  geographic compactness score that is completely outside of and

18  significantly far below all 1,000 of the simulated plans.

19  Q    So from that are you able to determine whether the

20  protection of all 13 House incumbents required subordinating

21  any of the other nonpartisan portions of the Adopted Criteria,

22  such as compactness?

23  A    What I'm seeing here in Figure 5 is that the geographic

24  compactness of these 1,000 simulations in Set Two is largely

25  the same, substantially the same as what we saw in set one.

1              What that allows me to conclude is that it's very

2    clear that even heeding the Adopted Criteria's mandate of

3    protecting all 13 incumbents would not justify or explain or

4    necessitate subordinating geographic compactness to the extent

5    that the SB2 Plan does.  In other words, the protection -- the

6    possible desire to protect incumbents does not explain the SB2

7    Plan's drawing of noncompact districts.

8    Q    And is that conclusion summarized at the bottom of page 18

9    of your report?

10   A    Yes, sir, it is.

11   Q    Simulation Set Three, what was the purpose of the third

12   set of a thousand simulations?

13             JUDGE OSTEEN:  I'll tell you what.  Hold on just a

14   second.

15             MR. THORPE:  Absolutely.

16             JUDGE OSTEEN:  How much longer do you think you've

17   got?  Fifteen?

18             MR. THORPE:  Ten to 15 minutes.

19             JUDGE OSTEEN:  All right.  Let's take about a

20   15-minute recess.

21             (At 3:30 p.m., break taken.)

22             (At 3:52 p.m., break concluded.)

23             JUDGE OSTEEN:  Before you resume examination, let me

24   tell everyone that when we get to the end of today's

25   proceedings, I know we're -- adjusted on the fly in terms of

 1 the presentation of evidence, and some witnesses -- there may

 2 be some difficulties getting here.

 3         Right now, it's kind of -- having heard the first two

 4 expert witnesses, it's a little bit difficult to forecast how

 5 long an expert witness may be testifying.  And so contrary to

 6 what I said earlier today, I think we better take the witnesses

 7 when they come in instead of stacking up for several on

 8 Thursday; and if, as we anticipate, we should be able to get

 9 all the evidence in Wednesday or Thursday if we need to wait on

10 the expert from Arizona, then I would hope that Thursday

11 afternoon, at the latest two, we could at least get started

12 with a couple of hours of closing arguments.  Two hours in

13 total is what we're kind of thinking about right now.

14         You don't need to say anything just yet or agree to

15 it, but I want you to think about what we're thinking about in

16 terms of scheduling, and then we'll talk about it a little more

17 at the end of -- at the close of business today, and we'll

18 finalize it in the morning maybe or something like that. All

19 right.

20         JUDGE BRITT:  When you're thinking about your final

21 arguments, you might also keep in mind that we're going to want

22 you to file posttrial briefs.

23         JUDGE OSTEEN:  All right.

24 BY MR. THORPE:

25 Q    Dr. Chen, before our break, we were just about to discuss

 1  Simulation Set Three.  How does the third set of a thousand

 2  simulations that you created differ from the first and second

 3  set?

 4  A    This third set of simulations I wanted to ask a completely

 5  different -- a very different sort of question.  What I wanted

 6  to ask here is the following.  We've discussed today some of

 7  the aspects of the SB2 Enacted Plan, specifically, that it

 8  split 13 counties rather than the 12 that I found was very

 9  reasonable, and I also found that it protected only 11

10  incumbents rather than all 13.  So what I wanted to ask here in

11  Simulation Set No. 3 was whether the General Assembly's choice

12  to draw a less than optimal plan with respect to 13 county

13  splits rather than 12 and to only protect 11 incumbents might

14  somehow explain the extreme partisan advantage, the 10-3

15  partisanship, of the SB2 Enacted Plan.

16  Q    Would it be correct to say that for both Simulation Set

17  One and Simulation Set Two, understanding that there's a

18  difference with how you treat incumbency, that you were trying

19  to maximize adherence to the nonpartisan criteria within the

20  Adopted Criteria?

21  A    Yes, sir, that's correct.  In Set One and Two, I was

22  trying to maximize adherence to the nonpartisan portions of the

23  Adopted Criteria that we talked at length about today.

24  Q    Does Set Three attempt to maximize adherence to the

25  Adopted Criteria?

1  A    Not with respect to county splits and not with respect to

2  incumbents.  So what Set Three does instead is it intentionally

3  splits apart 13 rather than trying to minimize the number of

4  counties split.  It intentionally splits 13 counties rather

5  than 12, and it intentionally protects only 11 incumbents, no

6  more and no less.  So exactly the same number of incumbents as

7  protected in the Enacted SB2 Plan.

8          But on all other nonpartisan portions of the Adopted

9  Criteria, meaning VTD splits, geographic compactness, equal

10 population, et cetera, I am in Simulation Set Three otherwise,

11 aside from counting splits and incumbency protection, simply --

12 as before, I'm otherwise trying to maximize adherence or

13 strictly adhere to the nonpartisan portions of the Adopted

14 Criteria.

15 Q    And just to be clear, you instructed the computer to

16 create simulated districting plans that would yield 13 county

17 splits and 11 protected incumbents?

18 A    Yes, sir, exactly, even though that is less than optimal.

19 Even though 13 county splits is not optimal, I intentionally

20 did that; and, again, I intentionally did that to ask this very

21 specific hypothetical question:  Could the General Assembly's

22 choice to split 13 counties and protect only 11 incumbents --

23 somehow could that unique combination of features justify or

24 explain the enacted plan's creation of an extreme 10-3

25 Republican advantage.

1   Q    And if I could have you turn to page 21 of your report,

2   which is Figure 6, what did -- what does Figure 6 show with

3   respect to the partisan distribution of seats under the third

4   set of simulations?

5   A    Figure 6 is exactly laid out just like the other two

6   diagrams -- similar diagrams we saw just before the break,

7   except here I'm describing Simulation Set Three.  And this,

8   again, tells us, among those 1,000 simulations, in Set No. 3

9   this time, how many created six Republican seats, how many

10  created -- how many plans created seven Republican seats, how

11  many plans created eight Republican seats.  What it shows us is

12  that the most likely outcome under this third algorithm is the

13  creation of seven Republican seats -- seven Republican and six

14  Democratic seats.

15  Q    And you are referring here I believe to the chart on the

16  left side which uses the Hofeller formula for those elections?

17  A    Yes, sir.  I was just talking about the left figure here

18  referring to the results calculated using Dr. Hofeller's

19  formula.  I haven't gotten to the right side yet.

20  Q    And using Dr. Hofeller's formula, the likeliest outcome

21  was the election of seven Republicans based on vote share as

22  you've been calculating it throughout your report?

23  A    Yes, sir.  Using Dr. Hofeller's formula for again

24  measuring the partisanship of districts, most of the time, over

25  50 percent of the time -- so 53 percent of the time this third

1   set of simulations creates exactly seven Republican and six

2   Democratic districts, and we see that in the vast majority --

3   virtually all of the simulations create either five, six, seven

4   or eight Republican seats.

5   Q    And in this set of a thousand simulations, all of which

6   have 13 county splits and protect 11 incumbents, how frequently

7   does a 10-3 split in favor of Republican vote share occur?

8   A    Never.  In zero out of 1,000 times.  Never do we actually

9   have a ten Republican map.

10  Q    And, again, using the Hofeller formula, how frequently

11  does a nine Republican seat advantage occur?

12  A    Results are very similar to what we see in the previous

13  simulation sets.  It never occurs.  We don't ever have a plan

14  with nine Republican seats using the Adopted Criteria formula

15  for measuring partisanship.  That's what we see on the right

16  figure.

17  Q    On the right figure, you are referring to the use of the

18  20 elections?

19  A    Yes, sir.

20  Q    Okay.  And in those 20 elections, you're testifying that

21  you never see nine and you never see ten districts with a --

22  with more Republican than Democratic votes using those

23  elections?

24  A    Yes, sir.  So let me just go back and answer a little bit

25  more precisely.  When we use -- on the right side when we use

1  the 20 Adopted Criteria elections, we see that never does a

2  simulated plan create nine or ten Republican seats.  Now, on

3  the left figure, the one using the Dr. Hofeller formula, nine

4  out of thirteen Republican districts is an outcome that occurs

5  a little bit under 1 percent of the time.  So less than 10 out

6  of 1,000 times do we ever see a nine Republican seat plan using

7  the Dr. Hofeller formula.  But to go back to the right figure,

8  using the Adopted Criteria formula, we never see even a nine,

9  much less a ten, Republican seat plan.

10 Q    Understood.  Throughout these histograms, you have

11 displayed where the SB2 Enacted Plan falls along the likely

12 number of seats, is that correct?

13 A    Yes, sir.

14 Q    And I just want to be clear about what you're using to

15 yield that result.  We know now in retrospect that there are

16 ten Republicans that have been elected to the House of

17 Representatives, correct?

18 A    That's correct.  But just to answer the question, when I

19 wrote that red line out there, that red dashed line that says

20 "SB2 Enacted Plan," that is not based on, say, the number of

21 Republicans that were elected to North Carolina's congressional

22 delegation in 2016 or in any other year.  That is --

23 Q    So just to be clear, it is not based on your evaluation of

24 how many elections were actually won.  It was based on the

25 application of the same data, whether the Hofeller formula or

1  the Adopted Criteria elections to the same set of data?

2  A    Exactly correct, sir.  What I wanted to do in these

3  figures -- in all of these figures, like the one we see here,

4  is an apples-to-apples comparison on the left using

5  Dr. Hofeller's formula in evaluating all of my simulated plans,

6  and then use Dr. Hofeller's formula in evaluating the SB2 Plan.

7  So that's what makes it an apples-to-apples comparison here,

8  using the same partisan metric that Dr. Hofeller gave to me.

9  Q    Is there any circumstance in which Dr. Hofeller's formula

10 yielded a Republican -- a number of districts other than ten

11 where Republican votes exceeded Democratic votes?

12 A    You're asking about the SB2 Plan?

13 Q    Um-hum.

14 A    No, it calculated ten Republican districts under the

15 Dr. Hofeller formula.

16 Q    And using the Adopted Criteria elections, is there any

17 circumstance in which the elections specified by the Adopted

18 Criteria yield anything other than ten seats in which the

19 Republican vote share exceeds the Democratic vote share?

20 A    No, sir.  I had all the elections -- for the 20 elections

21 mentioned in the Adopted Criteria, it's very straightforward to

22 apply those and evaluate the SB2 Plan, and it was very clear

23 that using the Adopted Criteria formula the SB2 Plan has ten

24 Republican seats and three Democratic seats.

25            JUDGE OSTEEN:  Let me make sure I understand this.

1  So the red line on the right side of each of the charts is not

2  the actual SB2 result.

3          THE WITNESS:  Your Honor, it represents the number of

4  districts that using Dr. Hofeller's formula or the Adopted

5  Criteria formula are Republicans.  So it does not actually

6  reflect the actual congressional delegation elected in 2016 or

7  in any other year.  So it is not reflecting actual

8  congressional election results.  It is reflecting

9  Dr. Hofeller's formula.

10         MR. THORPE:  Would I be correct -- and, hopefully,

11 Your Honor, this --

12         JUDGE OSTEEN:  Let me think about this just a second

13 before we -- so are you saying it's taking Dr. Hofeller's

14 formula and putting it in one of your plans?

15         THE WITNESS:  No, Your Honor.  What I did is I just

16 evaluated the 13 districts in the Enacted SB2 Plan, the 2016

17 SB2 Plan, and I looked at that districting plan and its 13

18 districts, and I calculated for every one of the 13 districts

19 how did Dr. Hofeller's formula evaluate the partisanship of

20 that enacted SB2 district.  I did that for all 13 districts,

21 and I counted that Dr. Hofeller's formula would have classified

22 10 of those 13 districts as being Republican districts.  They

23 are, incidentally, the same 10 districts that elected

24 Republican candidates in 2016, but that was just my application

25 of Dr. Hofeller's formula.

1  BY MR. THORPE:

2  Q    And I'll ask sort of a different version of the question

3  and hope to make that a little bit more clear.  The SB2 Enacted

4  Plan that is reflected on all of these charts is not something

5  that, in hindsight, you said, well, the Republicans won ten

6  seats, so I'm going to put them all at ten; is that correct?

7  A    That's correct, sir.  I didn't just put ten there simply

8  because we know that there are ten Republicans elected.  That

9  was -- that was not what I did here.

10  Q    Instead, you used the actual districts as constructed

11  under the 2016 Plan and applied the same data that you used to

12  evaluate your simulated districts to determine the Republican

13  vote share for both the simulated districts and the enacted

14  plan?

15  A    Correct, sir.  That's what we need for an apples-to-apples

16  comparison here.  So, again, I just took the enacted plan, the

17  actual districts of that enacted plan, and I overlaid --

18  because this was easily publicly available data.  I overlaid

19  the results from all of those 20 Adopted Criteria elections

20  that we discussed some time ago.  I overlaid them and

21  calculated how did the Adopted Criteria political data evaluate

22  the partisanship of the districts of the enacted plan, those

23  actual 13 districts of the enacted plan.  And I went through

24  those 13 actual districts of the Enacted SB2 Plan one by one

25  and said how does the Adopted Criteria evaluate the

1  partisanship of this district given that the Adopted Criteria

2  already gives us a very specific set of elections to be used in

3  evaluating the partisanship of the districts.

4  Q    And it was your testimony a few moments ago that the

5  districts in which you found Republican vote share exceeded

6  Democratic vote share were, in fact, the same districts in

7  which Republican candidates prevailed in 2016?

8  A    Yes, sir, that's correct.

9  Q    I want to turn your attention to Table 1, which appears on

10  page 12 of your report.  And we don't need to go through this

11  in detail because we've largely discussed the information

12  included in it, but is it accurate to say that Table 1

13  summarizes the simulation set approaches that we have discussed

14  and the results that you -- these simulations yielded?

15  A    Yes, sir.  So it's, again, a comparison of Simulation Sets

16  One, Two, and Three, which we've now discussed, and a

17  comparison of those three simulation sets to the Enacted SB2

18  Plan, and I'm comparing all of these simulations to the Enacted

19  SB2 Plan on a number of nonpartisan criteria listed in the

20  Adopted Criteria.

21  Q    And how does Table 1 display the partisan distribution of

22  seats under both the enacted plan and the various simulation

23  sets?

24  A    So let's go to the very bottom of Table 1, that bottom

25  row, that bottom row there where I've labeled it "number of

 1   Republican districts under the Hofeller formula."  And just to

 2   go back again to what we were talking about a minute ago, I, of

 3   course, calculated the SB2 Plan using Dr. Hofeller's formula;

 4   and I found that in the SB2 Plan there are ten districts out of

 5   13 that Dr. Hofeller's formula counts as Republican districts.

 6   And I did the same formula -- applied that same formula to all

 7   three sets of simulations, to all 1,000 plans, maps, in these

 8   three sets of simulations, and I counted up in, say, Simulation

 9   Set No. 1, how many plans have exactly five Republican

10   districts, how many plans have exactly six Republican

11   districts.

12          This is all information that we already reviewed

13   earlier in those histograms and those figures we went through a

14   while ago, but it's laid out here in numerical form again here

15   in this bottom row.  So it's telling us that for Simulation Set

16   No. 1 the range of Republican districts calculated using the

17   Hofeller formula is always between 5 out of 13 up to 9 out of

18   13 Republican districts using the Dr. Hofeller formula; and, of

19   course, that is compared to the ten Republican districts using

20   Dr. Hofeller's formula as calculated in the SB2 plan.

21          Simulation Set Two, that next column over, is another

22   comparison.  It tells us that all of those simulated plans in

23   Simulation Set No. 2 are creating between nine to five -- or

24   five to nine Republican districts; and as we said earlier, most

25   of them are about seven Republican districts.  So over half of

1    them are creating exactly seven Republican districts under the

2    Dr. Hofeller formula.

3              Go to the next column, Simulation Set No. 3.  It

4    tells us another distribution like that.  Here we see that in

5    this bottom row in the very right column of this Table 1 --

6    what this Table 1 tells us there is that in Simulation Set

7    No. 3 the entire range of the partisan seats in these 1,000

8    simulated plans, these 1,000 districting plans in Simulation

9    Set Three, ranged from four to nine Republican seats; and,

10   again, most plans had six or seven Republican seats, but the

11   entire range went out as low as four and as high as nine, never

12   to ten.

13   Q    What then does Table 1 tell us or summarize about whether,

14   in your 3,000 simulations, there will be conditions that could

15   emerge that would explain a 10-3 Republican plan?

16   A    Well, we evaluated -- or I evaluated a number of different

17   possible explanations or possible alternative explanations for

18   what might possibly justify; and as I said before, in

19   Simulation Set No. 3 I was asking, well, is it possible that

20   the General Assembly's choice to create exactly 13 county

21   splits rather than minimize that number and the General

22   Assembly's choice to protect exactly 11 incumbents, if that

23   unique combination of features could somehow justify or explain

24   or necessitate the creation of a 10-3 Republican map.  What

25   these simulation results, as described here in this table,

1  allow us to see pretty clearly is that such unique combinations

2  of features of the Enacted SB2 Plan do not somehow necessitate

3  or justify or explain why it was necessary to create an Enacted

4  SB2 Plan with a 10-3 Republican advantage.

5           In other words, what it's showing here is that even

6  if you had wanted -- for whatever reason, even if you had

7  really wanted to create a plan with 13 county splits and just

8  protect 11 incumbents but otherwise follow strictly the

9  nonpartisan portions of the Adopted Criteria, even then with

10 that unique combination you still would have ended up with a

11 plan that generally creates six or seven Republican districts

12 under Dr. Hofeller's formula, occasionally five and

13 occasionally up to eight, but certainly never ten.

14 Q    And so I want to be very clear about what this explains.

15 You've referred to certain unique features of the Adopted

16 Criteria and of the enacted plan.  To be clear, does your

17 approach account for the political geography of North Carolina

18 voters and where they reside?

19 A    Accounting for political geography of North Carolina

20 voters was very much at the heart of the motivations for

21 conducting all these sets of simulations.  The whole point here

22 is that what the computer is doing is it is taking North

23 Carolina's voter geography, as laid out across all of North

24 Carolina's counties and VTDs and census blocks, and starting

25 with those census geographies, given their unique distribution

1  of partisan voters, their unique distribution of Democrat and

2  Republican voters, and saying given those sets of geographies

3  with that particular unique geography of North Carolina, what

4  happens when we build districting plans in North Carolina that

5  strictly comply with the nonpartisan portions of the Adopted

6  Criteria.  And so accounting for North Carolina's voter

7  geography is at the very heart of what this analysis is doing.

8  Q    And so are you able to conclude from this analysis that

9  the Enacted SB2 Plan creates a partisan distribution of seats

10 that falls entirely outside the range of outcomes possible in

11 the absence of the partisan criteria in the Adopted Criteria?

12 A    Yes, sir, that's exactly right.  What I'm finding here is

13 that regardless of which of these two measures of partisanship

14 that one uses, whether we use Dr. Hofeller's way of measuring

15 the partisanship of districts or the Adopted Criteria of

16 elections for measuring the partisan distribution of seats,

17 one, we see that the SB2 Plan has created ten Republican

18 districts using either one of these measures.

19        Second, we see that the SB2 Plan's creation of ten

20 Republican seats is an extreme statistical outlier in terms of

21 its partisanship, whether measured by Dr. Hofeller's formula or

22 by the Adopted Criteria of elections.  It's creating an extreme

23 statistical outlier in terms of its partisanship, and that

24 statistical outlier is entirely outside of the entire range of

25 the sorts of plans that would have emerged under a districting

1  process that strictly adhered to the nonpartisan portions of

2  the Adopted Criteria.

3  Q    I will be mindful of the Court's decision to grant the

4  motion in limine and respect that aspects of what I'm about to

5  discuss are principally going to be introduced by the League of

6  Women Voters Plaintiffs, but on page 23 you begin a section

7  that leads to the end of your report that is entitled

8  "Robustness Checks Using Alternative Measures of Partisanship."

9  Is that correct?

10  A    Yes, sir, that's correct.

11  Q    And speaking generally, what was the purpose of this

12  section of the report?

13  A    Generally, I wanted to conduct some robustness checks that

14  would test and confirm the results in the main part of my

15  report, which is everything that we've discussed up until now,

16  the first main part of my report.

17        So this second section, this latter section of my

18  report, presents a number of robustness checks that use

19  alternative measures of partisanship of districts, meaning

20  alternative measures in addition to and separate from,

21  completely different from, the measures that we've been talking

22  about with Dr. Hofeller's formula and the Adopted Criteria

23  formula.

24        The reason I wanted to present these alternative

25  robustness check measures of partisanship is that these are

1  measures that are commonly used by scholars of redistricting,

2  scholars who study -- study legislative districting and

3  congressional district elections, and so I wanted to make my

4  findings accessible and relatable to scholars that use some of

5  these various methods that come up in the scholarly literature.

6  So that's why I presented the robustness checks.

7            But they're not -- they're not robustness checks that

8  are meant to serve as the foundation of what I do in the main

9  part of the report.  They're just there to make the findings

10 more accessible and relatable to scholars that use these

11 alternative robustness checks in the literature.

12 Q   And that's really the question I want to ask.  Is there

13 anything in the section that begins on page 23 that is

14 necessary to explain the findings that are included in the

15 earlier sections of the report?

16 A   No, sir.  The earlier findings in the earlier section that

17 we've discussed up until now, that earlier section speaks for

18 itself.  What I'm doing here is making those findings more

19 relatable and to relate them to scholars that have used

20 alternative measures of partisanship using these various

21 robustness checks.

22            MR. THORPE:  With the understanding that that will be

23 a portion of direct testimony from the League of Women Voters

24 Plaintiffs tomorrow, those are all the questions I have.  Thank

25 you, Doctor.

 1              THE WITNESS:  Thank you, sir.

 2              THE COURT:  Any cross at this time?

 3              MS. RIGGS:  Good afternoon, Your Honors.  I just want

 4   to confirm that, following the granting of the motion to

 5   bifurcate, we'll be reserving our questions for Dr. Chen for

 6   tomorrow and we'll go into details --

 7              JUDGE OSTEEN:  In terms of the other --

 8              MS. RIGGS:  The rest of the material in his expert

 9   analysis will be, I think, more -- will be better presented to

10   the Court after Dr. Jackman --

11              JUDGE OSTEEN:  Let me phrase it this way.  Have you

12   got any questions about anything he's testified to so far?

13              MS. RIGGS:  Not specifically.  I think that it will

14   be better framed in the context of the way I've -- the rest of

15   the report.  So the rest of the report uses the same

16   simulations that he used before.  So it will come up again a

17   little bit, but I anticipate our -- when we recall him, it will

18   be much more brief.

19              JUDGE OSTEEN:  All right.  A lot more brief, very

20   narrow.

21              Cross-examination?

22              MR. STRACH:  Yes, Your Honor.

23                              CROSS-EXAMINATION

24   BY MR. STRACH:

25   Q    Good afternoon, Dr. Chen.

1  A    Good afternoon, sir.

2  Q    You and I have never met.  I'm Phil Strach.  You had a

3  deposition taken with a colleague of mine, so it's good to

4  finally meet you.

5        I just want to ask a general question before I get

6  into too many detailed questions.  My understanding is with

7  regard to these simulation sets that you ran that you did so --

8  your purpose of doing that was trying to assess the

9  redistricting plans strictly on the basis of nonpartisan

10  criteria, is that correct?

11  A    Well, in Set No. 1, that was the case.  As I had discussed

12  some time ago, Set No. 2 and 3 were a little bit different and

13  did bring in some various partisan-related considerations.  But

14  you're right in describing Set No. 1 that way, sir.

15  Q    All right.  And then even in the other two sets, the only

16  partisan considerations you brought to bear were nonpairing of

17  incumbents, correct?

18  A    Specifically, the number of incumbents that were placed

19  into districts of their own, but I think you're getting at the

20  right idea there.

21  Q    Right.  And even with respect to incumbents, you did not

22  consider whether the incumbent could win their district, just

23  whether they had a separate district to run in, correct?

24  A    I strictly followed the Adopted Criteria when it told me

25  that incumbents are to be avoided -- are to be not

1   double-bunked, are not to be paired.  So that's how I

2   interpreted -- or that's how I read that portion of the Adopted

3   Criteria.

4   Q    Right.

5   A    You're asking if I considered, say, the partisan makeup of

6   the resulting districts, and the answer is no.  I followed the

7   Adopted Criteria and what it told me about the protection of

8   incumbents.

9   Q    Right.  And so other than the pairing of the incumbents --

10  the only point I'm trying to make is other than the actual

11  pairing of incumbents, you were assessing or trying to assess

12  these districts on the basis of nonpartisan criteria, correct?

13  A    That's correct, sir.  Aside from the incumbent issue that

14  we were just talking about, I otherwise was just following the

15  nonpartisan portions.

16  Q    All right.  So your analysis assumes that there would be a

17  rule in place that politics could not be considered in the

18  construction of districts.  That's what your analysis helps the

19  Court to look at, correct?

20  A    Well, I don't know if I make that assumption.  What I do

21  is I ignore the partisan portions of the Adopted Criteria when

22  the Adopted Criteria tell us you have to create ten Republican

23  districts.

24  Q    All right.

25  A    So I'm dropping that part.

1    Q    Okay.  And so to the extent that the consideration of

2    politics is an appropriate consideration in redistricting, your

3    report does not assess or try to study how much politics would

4    be too much?

5    A    Sure, I don't -- I mean, I think -- I don't take any

6    position on the extent to which politics is or is not an

7    appropriate consideration.  What I'm conducting is an empirical

8    study here, and it's just limited to answering what are the

9    sorts of plans that would have emerged if you had solely

10   followed the nonpartisan portions of the Adopted Criteria or if

11   you had followed the nonpartisan portions, plus the incumbency

12   portion, the incumbency criteria.

13   Q    Okay.  And then looking back briefly at your Table 1,

14   which is page 12 of your report?

15   A    Yes, sir.

16   Q    When you're looking at the bottom row, which is the number

17   of Republican districts under the Hofeller formula?

18   A    Yes, sir.

19   Q    And it's -- I think you've testified and I think it's fair

20   to say that generally the outcome that pops up the most in

21   these is Republicans electing six or seven members out of 13,

22   correct?

23   A    Yeah, that's correct.  Mostly six and seven and sometimes

24   eight.  Those are certainly the most common outcomes that we

25   see here in the bottom row of Table 1.

1  Q    And is it true that Republicans electing six or seven

2  would be closer to their share of the number of members if we

3  were electing members of Congress based on proportional

4  representation?

5  A    I don't know that I've ever done that calculation, so I

6  can't give you the precise number or whether or not your math

7  is accurate on that.

8  Q    If the Republican share of the vote for Congress in 2016

9  was about 53 percent, out of 13 districts wouldn't it stand to

10  reason that they would elect at least seven if you were going

11  on proportional representation?

12  A    Well, see, sir, your question there represents an

13  apples-to-oranges comparison because what I just presented here

14  in the bottom row of Table 1 is a calculation using

15  Dr. Hofeller's formula.  So you just -- I think you just used

16  actual congressional election results in giving me a basis for

17  forming a proportional question.  So I'm not sure that that's a

18  valid way of evaluating a proportional representation

19  calculation.

20  Q    Okay.  But when you study the use of -- when you study the

21  outcomes based on the so-called nonpartisan criteria, you just

22  happen to typically end up with an analysis that would result

23  in numbers that are close to six or seven Republicans?

24  A    That's correct, sir.  I mean, I certainly don't pay any

25  attention before that final calculation of the partisan results

 1  to what sort of representation this would mean for the

 2  Republicans or the Democrats, and I certainly am not designing

 3  the algorithm to be at all interested in whether or not

 4  representation is proportional.  That would be completely

 5  outside of what I set out to do here.

 6  Q    All right.  And just in general, Dr. Chen, have you

 7  ever -- we asked Dr. Mattingly about this.  Have you ever used

 8  Maptitude redistricting software?

 9  A    I've briefly used it.  It's not part of my normal research

10  practice or my normal research process.  But, obviously, I'm --

11  you know, as anybody who works in redistricting, I'm, of

12  course, familiar with it and have used it just briefly, but

13  it's not what I primarily use.

14  Q    All right.  And you've never -- you've never been engaged

15  to draw an actual redistricting plan in real life, correct, in

16  terms of for a legislature or for a client?

17  A    Well, I would -- I think -- I mean, I just want to answer

18  your question as accurately as I can here.  I have in this

19  expert report produced lots of districting plans, so certainly

20  I've produced plans.

21  Q    You've never been engaged to draw a plan that would

22  actually have to win enough votes to pass an elected body, have

23  you?

24  A    No, I don't think so, no.  No.  I mean, I think what

25  you're asking is if I've ever drawn one for a legislative body,

 1  right?  And the answer is no.

 2  Q    Okay.  And, in fact, your analysis really doesn't consider

 3  at all whether any of the maps that your computer draws could

 4  actually ever be adopted by a political body, does it?

 5  A    My expertise doesn't extend to evaluate that.  My

 6  expertise here is in simply taking the Adopted Criteria and

 7  saying here are plans that strictly comply with the nonpartisan

 8  portions of the Adopted Criteria.  Whether or not the North

 9  Carolina State Legislature would ever willingly adopt any one

10  of those plans that comply with the nonpartisan portions of the

11  Adopted Criteria, that's totally beyond me.

12  Q    All right.  Let me take a look at -- may it please the

13  Court?

14           JUDGE OSTEEN:  Are these all the same?

15           MR. STRACH:  Yeah, they should be.

16           JUDGE OSTEEN:  Just one copy of Chen Simulation Set

17  One Plan One?  That's what we're looking at?

18           MR. STRACH:  Yes, Your Honor.

19           JUDGE OSTEEN:  Okay.

20  BY MR. STRACH:

21  Q    Dr. Chen, I will represent to you that using your data

22  we've generated Plan One out of your Simulation Set One.  This

23  is -- we picked this one just because it was the first one in

24  the first set, and this is the map that was generated, much

25  like the map that you've generated that you talked about

1  earlier.  Do you have any reason to doubt whether or not this

2  is an accurate representation of the very first plan that your

3  set developed?

4  A    No.  I accept that, sir.

5  Q    All right.  For instance, just talking about real-world

6  consequences of a map like this, do you see where District 9 is

7  on this map?

8  A    Yes, sir.

9  Q    And do you see who the incumbent is in District 9?

10 A    It appears to be Butterfield, sir.

11 Q    All right.  Do you know Congressman Butterfield?  Do you

12 know of him?

13 A    No, sir, I don't.

14 Q    Do you have any idea whether Congressman Butterfield would

15 be able to win the district that is drawn for him, District 9,

16 in this map?

17 A    I definitely would not have analyzed that question because

18 the Adopted Criteria did not instruct me to analyze that

19 question, sir.

20 Q    All right.  If you look up at District 10, do you see

21 District 10?

22 A    Yes, sir, I do.

23 Q    And it appears to me that district stretches from Ashe

24 County in the west all the way over to Hertford in the east.

25 Does that look accurate to you?

1  A    Yes, sir, that sounds right.

2  Q    Do you have any idea whether any legislature, Democratic

3  or Republican, would ever pass a map that had that district?

4  A    I'm sorry.  If I could ask you to repeat.

5  Q    Well, let me ask it to you this way.  Do you have any

6  knowledge of North Carolina communities of interest in Ashe

7  County versus North Carolina communities of interest in

8  Hertford County?

9  A    Well, sir, my only understanding of communities of

10 interest is the way that the Adopted Criteria defines them, and

11 it defines them in terms of VTDs and counties, and so that's my

12 only understanding of communities of interest in North

13 Carolina.

14 Q    All right.  And you have no idea whether any legislature

15 in North Carolina would ever actually adopt a map containing a

16 district that went from Ashe County to Hertford County, do you?

17 A    That's definitely not something I would have analyzed

18 because the Adopted Criteria didn't tell me to analyze that

19 question.

20 Q    All right.  And why don't we have this map -- this is

21 something we'll talk a little bit more about later while we're

22 looking at this map.  Do you see Onslow County on this

23 particular map?

24 A    If you could orient me and maybe point me to it.

25 Q    Onslow County, if you look at southeastern North Carolina,

 1  borders the ocean.

 2  A    Okay.  I got you.  I see it there.

 3  Q    Okay.  And if you will note that District 11 juts into

 4  Onslow County two different times, is that correct?

 5  A    I can see that, yes, sir.

 6  Q    Do you have any understanding in North Carolina

 7  redistricting of what is called a "traversal"?

 8  A    Are you referring to "double traversal," I think, sir?

 9  Q    This is a double traversal, isn't it?

10  A    Yes, sir.  I understand what you mean by that term.

11  Q    Okay.  All right.  We'll talk about that a little bit

12  later.  Now, also let me just make sure I understand.  You

13  studied the 2016 Congressional Plan.  You did not study whether

14  the 2011 Congressional Plan was politically gerrymandered or

15  otherwise, did you?

16  A    I did not study the 2011 Plan for this expert report, no,

17  sir.

18  Q    All right.  And did you conduct the analysis in this

19  report after the 2016 Plan had been passed?

20  A    Yes, sir.  I think it was entirely after it had already

21  passed.

22  Q    All right.  Did you sit in on any of the legislative

23  proceedings that caused the enactment of that map?

24  A    No, sir, I didn't.

25  Q    And afterwards -- well, did you look at the 2016 enacted

1  map?

2  A    Oh, sure.  I looked at it in my analysis.

3  Q    All right.  And did you actually take a physical copy out

4  and look at the way the districts were shaped and what they

5  looked like on a physical map?

6  A    Well, I certainly looked at it on the computer screen.  I

7  think -- we don't real commonly print out everything that we --

8  or even many of the maps we look at now, but I certainly looked

9  at it in a hard copy form on my computer screen.

10 Q    All right.  Did you obtain a copy of the transcripts of

11 the legislative proceedings that produced the 2016 map?

12 A    No, I didn't.

13 Q    So I take it you didn't study or otherwise review the

14 legislative debates that produced that map?

15 A    No.  Doing so definitely would not have been part of what

16 I needed to accomplish for my research process here.

17 Q    All right.  In looking at the 2016 map itself, did you try

18 to identify which counties the General Assembly chose to

19 split -- as opposed to the fact that they split 13, did you try

20 and identify which ones were split?

21 A    Well, the Adopted Criteria don't tell me to favor or

22 disfavor any individual particular counties in deciding which

23 ones to split.  It only tells me to minimize, to not split them

24 unless necessary.  So I definitely would not have paid

25 attention to whether we were favoring this or that county when

splitting up counties.

Q    Did you happen to recognize whether all the -- whether most or all the split counties in the 2016 map were actually large counties that were split?

A    I followed the Adopted Criteria strictly, which means that I simply counted the number of counties that were split. That's all the Adopted Criteria told me to pay attention to.

Q    All right.  And you don't know if in the legislative history on this there's any indication that the legislature wanted to split larger counties as opposed to smaller counties?

A    That definitely would not have been relevant to my task in this report, so I did not do so.

Q    And if a legislature decided to split big counties rather than small counties, would you agree with me that would be a political consideration they would be making?

A    If the legislature had put in a criterion favoring the splitting of big counties rather than small counties, would that have been a political consideration?  I just want to make sure I understand the question.

Q    Would a decision, any decision, to split big counties rather than small counties be a political consideration in your estimation?

A    It's not quite the same thing as saying create ten Republican districts.  However, that is the sort of favoring or decision that may very well have some important political

1    impacts on maps that emerge, but when -- I emphasize it's not a

2    question I specifically studied because the Adopted Criteria

3    did not tell me to pay any attention to the population of the

4    counties that were split.

5    Q    The Adopted Criteria did say, though, that political

6    considerations would be taken into account in splitting

7    counties, correct?

8    A    Well, just to be clear, what I did in my report was to

9    ignore the partisanship criteria.  Now, the partisanship

10   criterion, as laid out very clearly in the Adopted Criteria, is

11   create ten Republican districts.

12            So I think what you're referring to is the paragraph

13   on compactness that talks specifically about the reasons that

14   counties may be split up.  And so I interpret that sentence to

15   mean that gives three reasons why counties may be split up

16   because it's telling us that counties may be split up to

17   equalize population, obviously, and protect incumbents; but the

18   third one means that if you are trying to achieve a 10-3

19   Republican advantage, then you can split up counties.  That's

20   how I read that sentence, which is what I think you're

21   referring to.

22   Q    And the actual words are:  Division of counties to be made

23   for reasons of equalizing population, consideration of

24   incumbency, and, quote, political impact, correct?

25   A    Yes, sir.  That's exactly what I was referring to and what

1  I was just trying to explain a minute ago was that my

2  understanding of what the Adopted Criteria means by "political

3  impact" is its explicit pursuit of a ten Republican map.

4  Q    That's your assumption of what those two words mean,

5  correct?

6  A    No, I just read the words on the Adopted Criteria.  The

7  Adopted Criteria are telling us build a ten Republican map, and

8  that is what clearly is meant by political impact.

9  Q    All right.  And so if legislators decided that they wanted

10 to make a political decision to split big counties and not

11 little counties, you're telling me the words "political impact"

12 could not include that concept?

13 A    No, I understand what that sentence to mean is that that

14 is a clause that allows the legislature, if it's strictly

15 following the partisan portions of the Adopted Criteria, to

16 split counties in order to create a 10-3 Republican map.  Doing

17 so might possibly be consistent with the kind of attention paid

18 to large counties versus small counties that you just alluded

19 to, but that's not something that I would have analyzed for my

20 report because because that was irrelevant for my task in my

21 report.

22 Q    Would there be any -- would there be anything wrong, in

23 your estimation, if a legislature did decide to split only

24 bigger counties rather than smaller counties to ensure the

25 smaller counties' representation wasn't adversely impacted?

1  A    By "wrong," you mean that I personally wouldn't have liked

2  it?

3  Q    Right.

4  A    I don't take a view on that.  My role in here was purely

5  to conduct empirical analysis and I take no position on what

6  the North Carolina legislature should or should not do.

7  Q    All right.  Now, remind if I get any of this wrong.  In at

8  least one of your simulations, you attempted to generate plans

9  that minimized the number of counties split, is that right?

10  A    That is correct.  In Simulation Set No. 1, I was

11  attempting to keep counties whole when possible; and also in

12  Simulation Set No. 2, I was doing so again in the same way.

13  Q    All right.  So in two of your simulation sets, is it fair

14  to say you were trying to maximize the number of whole

15  counties?

16  A    I was trying to keep counties whole and only split them

17  when necessary to achieve population equality, which is, again,

18  taken straight from that sentence that you and I were just

19  talking about about two minutes ago.

20  Q    All right.  But you would agree with me that the actual

21  Adopted Criteria nowhere says that the legislature would try to

22  maximize the number of whole counties?

23  A    Oh, I think it's very clear from the sentence that you and

24  I were just talking about a minute ago that if you read that

25  sentence of when counties can be split the Senate lays out

1    three reasons.

2           In the first simulation set, I ignored the political

3    reasons.  Now, if you take out the political reasons, what's

4    left in that sentence, it says that counties can only be split

5    to equalize population.  Now, applying that to Simulation Set

6    No. 1 or 2, in general the only times that you need to split a

7    county in order to achieve equal population are as we

8    illustrated or as I illustrated quite some time ago with

9    Mr. Thorpe, at the beginning and the end of the building of any

10   district.  Every additional district that you add you just need

11   to split one additional county in order to achieve equal

12   population.

13          So that was a pretty clear part of the Adopted

14   Criteria for me.   I only split counties when necessary to

15   achieve equal population.  It's a pretty straightforward

16   redistricting matter that if you have a certain number of

17   districts, say 13 districts, you only need, at most, to split

18   12 counties if your goal is to only split counties when

19   necessary for equal population.  So 13 counties means 12 split

20   counties -- 13 districts, sorry, means 12 split counties are

21   needed to achieve equal population, and so that's what I did in

22   Simulation Sets One and Two.

23   Q    All right.  So you ran your simulations based on your

24   reading of this criteria which lopped off the last two phrases

25   of the sentence, correct?  You took out the part about

1  incumbency and political impact, and you read it to say we can

2  only split a county to equalize population.

3  A     Absolutely.  In Simulation Set No. 1, again, as I

4  described earlier, I was trying to only pay attention to the

5  nonpartisan portions of the Adopted Criteria.  The last half of

6  that sentence is an explicitly partisan portion of the Adopted

7  Criteria, so I ignored that.  I ignored the partisan mandates

8  of the Adopted Criteria and just said, Let's try to comply as

9  much as possible with the nonpartisan portions of the Adopted

10 Criteria.  That's what the simulations do.

11 Q     Let me ask you this because there's another part of this

12 criteria on compactness that I don't think we've talked much

13 about.  The first sentence says:  "...the committee will make

14 reasonable efforts to construct districts in the 2016

15 Contingent Congressional Plan to improve the compactness of the

16 current districts and keep more counties and VTDs whole as

17 compared to the current enacted plan."

18         Do you recall that part of the criteria?

19 A     Yes, sir.

20 Q     And did the 2016 Plan in fact split fewer counties than

21 the 2011 Congressional Plan?

22 A     It's not something that I personally analyzed because it

23 wasn't necessary for the production of my report, but I

24 certainly accept your presentation on that one.

25 Q     So you didn't analyze that part of this criteria and how

1  it might affect your analysis?

2  A    No.  I mean, analyzing the 2011 Plan was not part of my

3  research task here.

4  Q    Even though -- even though the criterion said that what

5  we're going to aim to do is split less counties than what we

6  did in 2011?

7  A    Yeah.  Doing so was not part of my research process

8  because the Adopted Criteria are pretty clear on what I'm

9  supposed to do about county splits.  You only split counties

10 when necessary to achieve equal population.  It's pretty clear.

11 Q    So if the 2016 Plan in fact reduced the number of split

12 counties compared to 2011, that would comply with this

13 criterion even if it didn't minimize the number of split

14 counties, isn't that right?

15 A    That's possible, but it just wasn't relevant for me

16 because, once again, what I paid attention to was the portion

17 that told us when counties can be split.  Again, I followed

18 that and said counties can only be split to equalize

19 population.

20 Q    All right.  And so I take it as a given then that you did

21 not study or look at the number of county splits in

22 congressional plans prior to 2011, like 1998, 2001, et cetera?

23 You didn't look at any of those, did you?

24 A    That's correct, sir.  That would have been not relevant to

25 my study.

1  Q     So as you've noted, the enacted plan splits 13 counties,

2  correct?

3  A     Yes, sir.

4  Q     Did you study or analyze whether the General Assembly

5  could have created more Republican-leaning districts if it had

6  split, say, 30 counties instead of just 13?

7  A     Oh, I definitely didn't study that because it was not my

8  task in evaluating the enacted plan's compliance with the

9  Adopted Criteria.  It obviously was not part of my task to go

10 out and set out and try and draw extreme Republican

11 gerrymanders like what you're -- I think what you're alluding

12 to.  So definitely not.

13 Q     So I take it, too, when you were looking at the partisan

14 makeup of the districts that resulted using either the Hofeller

15 formula or the other formula, you didn't make any assessment of

16 how strong a Republican or Democratic district that particular

17 district was, did you?

18 A     No.  My task was very narrow here.  What I did was I took

19 Dr. Hofeller's formula at face value and, of course, I took the

20 Adopted Criteria elections formula at face value because I

21 wanted in part to measure how partisanship was understood by

22 the map drawer, by Dr. Hofeller and by the Joint Select

23 Committee.  So that's why I followed their formula in assessing

24 partisanship.

25 Q     So you agree with me, don't you, just as a general

1   redistricting matter, that you can have either ten really weak

2   Republican districts even though they lean Republican or you

3   can have ten very strong Republican districts, correct?

4   A    I mean, you're describing different plans.  For one plan

5   you're saying ten weak Republican districts and another plan

6   ten strong Republican districts.  I mean, I guess I accept that

7   that's abstractly possible.  I'm not answering with respect to

8   whether that's possible in North Carolina specifically or

9   steering to that in '16 -- with the 2016 Plan because I

10  definitely would not have assessed that kind of judgment

11  because that was definitely not part of my research task here.

12  Q    All right.  So you didn't -- you made no assessment of the

13  strength of any one of those ten, quote, unquote, Republican

14  districts?

15  A    Again, the Adopted Criteria did not tell me to do so, so I

16  did not do so.

17  Q    Okay.  And, in fact, you've not done any study of any

18  individual district and whether, given the current incumbent in

19  that district, that incumbent would win or loss the next

20  election.  You've made no attempt to do anything like that,

21  correct?

22  A    With the incumbents, the Adopted Criteria only told me to

23  analyze whether or not they are paired, whether or not they are

24  double-bunked, so that's all I did with incumbents.  I did not

25  do that because the Adopted Criteria don't tell me to do that.

1  Q    All right.  So you've done no individualized

2  district-by-district assessment with the likelihood that

3  Republicans going forward can hold any of those districts?

4  A    Again, no, because that Adopted Criteria definitely did

5  not tell me to consider that.

6  Q    And you certainly didn't look at the political dynamics in

7  those districts as to how much money was spent, strength of

8  incumbents to make any assessment of the likelihood of these

9  districts remaining Republican.  You didn't do any of that,

10 correct?

11 A    Correct.  Once again, the Adopted Criteria did not tell me

12 to factor things like campaign financing dynamics.

13 Q    Do you know if the 2016 Enacted Plan divided fewer

14 precincts or VTDs than the 2011 Plan?

15 A    I didn't evaluate the 2011 Plan along that dimension, so I

16 can't tell you for sure.

17 Q    All right.  And even though in the compactness criterion

18 it states that one of the goals was to keep more VTDs whole as

19 compared to the current plan?

20 A    I can see that portion that I think you're quoting from

21 under the compactness paragraph, sir, yes, sir.

22 Q    You didn't include that part in your study?

23 A    Oh, I absolutely did.  What I did was that I split VTDs

24 only when necessary to achieve equal population and that is --

25 you know, that's something that comes up even more

1  fundamentally earlier on in the Adopted Criteria.  The Adopted

2  Criteria were very clear, told me VTDs can only be split --

3  quote, should be split only when necessary to comply with the

4  zero deviation population requirement set forth above.  So

5  that's what I followed.

6            In doing so, obviously you're going to -- you're

7  going to split fewer VTDs than the previous plan, or I'm

8  assuming so, even though, as I said, I definitely didn't

9  evaluate the VTD splits in the previous plan because the

10 Adopted Criteria are so clear about when you are actually

11 allowed to split VTDs.

12 Q    Okay.  Am I correct in saying that your study uses

13 mathematical compactness tests to score the districts on a

14 compactness basis?

15 A    Yes, sir.  Specifically, Reock and Popper-Polsby I think

16 is what you're referring to.

17 Q    All right.  Do you know if those measures were used by the

18 General Assembly in actual enacting the plan?

19 A    I asked Plaintiffs' counsel about that, and Plaintiffs'

20 counsel represented to me that Popper-Polsby and Reock were

21 used by the map drawer.

22 Q    You know that based on the representation of counsel?

23 A    Plaintiffs' counsel represented that information to me,

24 yes, sir.

25 Q    You don't have any other independent basis for believing

1  that?

2  A     No.  I asked Plaintiffs' counsel.

3  Q     All right.  Did you take any look at whether or not the

4  General Assembly, if they had looked at mathematical

5  compactness, whether they could have drawn more Republican

6  districts that were less compact?  Did you attempt to analyze

7  that at all?

8  A     I just want to ask you to repeat or clarify the question.

9  I think I heard two different things going on.

10 Q     All right.  If the General Assembly had used mathematical

11 compactness scores, the same ones that you've described --

12 A     Okay.

13 Q     -- did you do any study to see whether or not if the

14 General Assembly had drawn -- intentionally drawn less compact

15 districts that they could have drawn more Republican districts?

16 Did you see whether that was possible?

17 A     You're saying more than ten?

18 Q     Yes.

19 A     I didn't set out in my simulation analysis to

20 intentionally try and draw an even more extreme Republican

21 gerrymander.  So in that sense, no, I did not directly analyze

22 that question.

23 Q     You don't know whether ten Republicans and three Democrats

24 is -- you don't know if that's the maximum Republican map that

25 could be drawn?

1  A    So I guess you're asking me whether or not if you drew

2  really, really serpentine-shaped districts whether it might be

3  possible to create an 11-2 plan and I acknowledge that's

4  hypothetically possible.  It was definitely not even something

5  that was relevant to my study.  I guess I acknowledge it's

6  hypothetically possible, but I really couldn't tell you for

7  sure one way or the other because I definitely was not trying

8  to draw such extreme Republican gerrymanders.

9  Q    And apparently the legislature wasn't either, right,

10 because to do that they would have had to have ignored a lot of

11 the traditional redistricting principles, wouldn't they have?

12 A    I really couldn't tell you one way or another.  I suppose

13 it's hypothetically possible.

14 Q    Could you describe for the Court what the -- what you call

15 the Popper-Polsby compactness test is and what it does?

16 A    Sure.  So it's a very standard measure used by scholars of

17 districting in measuring compactness, and it's just one of

18 these couple of very commonly-used and very widely-used

19 measures of compactness.

20         So the basic idea of Popper-Polsby is you're looking

21 at this perimeter of a district -- of any one of the 13

22 districts in the North Carolina congressional map or any of my

23 simulated maps and you look at that perimeter and you measure

24 its length.  You then ask the following kind of hypothetical

25 geometric question:  If you took that same perimeter -- and

1   let's just say -- hypothetically say that perimeter is 20.  Now

2   draw a circle that has a circumference of 20.  What's the area

3   of that circle?

4           Now, the reason I ask you that hypothetical geometric

5   question is the Popper-Polsby measure is simply a ratio.  It is

6   a ratio of the area of the actual district that we started

7   with -- the area of that district to the area of that circle,

8   okay.  So that comparison is a ratio that we use in

9   constructing a Popper-Polsby measure.

10          Now, let me just explain kind of intuitively what

11  that means because I'm not sure the geometric math side is

12  really that important here.  It's just a measure of

13  compactness.  It's just measuring how efficiently did the

14  boundaries of this district enclose the area of this district.

15  So if you have a district that looks more like a circle or even

16  like a square, then you're going to have a much better, a

17  higher Popper-Polsby score, meaning that you have a more

18  compact district.  If you have a district that you say is a

19  really long, thin serpentine-shaped district, then that's

20  really long, thin, narrow.  Then you're going to have a worse

21  Popper-Polsby score.  So that's the basic idea.

22  Q    All right.  There's another compactness test called Reock,

23  is that correct?

24  A    Yes, sir.

25  Q    Does it measure something different than Popper-Polsby?

1   A    Yes, sir.  It's a little bit different in how you

2   calculate it geometrically and I would be happy to give you the

3   same explanation for that, if you'd like.

4   Q    Sure.  But do they measure compactness in different ways?

5   A    They're slightly different in how they measure

6   compactness.  Yes, sir, they are.

7   Q    Is it true that sometimes these compactness tests conflict

8   with each other?

9   A    I think what you mean is that they're going to be slightly

10  different numerically.  I wouldn't say they conflict, and

11  there's a good illustration of that all up and down my report.

12  Every time -- if you remember from earlier today when we looked

13  at a comparison of the SB2 Plan to 1,000 simulations in terms

14  of compactness scores, both Reock and Popper-Polsby, we saw the

15  following theme:  The SB2 Plan is worse on Reock compactness

16  than all 1,000 simulations and the SB2 Plan is worse on

17  Popper-Polsby in all 1,000 simulations.

18          Why?  Because they're very correlated.  They're

19  essentially telling us different aspects of compactness.  But

20  districts that -- when you look at them visually, you can tell

21  that they're visually compact.  Those kinds of districts tend

22  to score very high on both Popper-Polsby and Reock.  That's why

23  we saw both of those measures telling us the same thing about

24  the noncompactness of the SB2 Plan.

25  Q    Is it true your algorithm used Popper-Polsby as a way of

1  drawing your simulated districts?

2  A    Essentially, yes.  I mean, I would be happy to clarify

3  that in some technical detail if you'd like, but that's -- it

4  gets at the right idea even though that's not literally what I

5  did.

6  Q    All right.  Is it true that a district that is longer and

7  more rectangular is going to score lower on the Popper-Polsby

8  than other compactness tests?

9  A    Yeah.  Like I just said a minute ago, if you have a very

10  long serpentine-shaped district you're going to have a pretty

11  bad Popper-Polsby score in general.

12  Q    All right.  So if the 2016 Enacted Plan, even though it

13  contained all whole counties, had a couple districts that were

14  long because it included, you know, four or five counties in a

15  row, that would score lower on Popper-Polsby because it's not

16  more square-like, is that correct?

17  A    It would score not optimally on Popper-Polsby, but let's

18  just be clear here.  It also wouldn't score that great on Reock

19  either.

20  Q    But you used Popper-Polsby or some variant of it in your

21  algorithm, correct?

22  A    Yeah, I mean -- and, again, like I said, I would be happy

23  to explain that in some more technical detail because it's not

24  literally what I do, but you're getting at the right idea when

25  you say that.  I think you're -- I think that's basically the

1    right idea.

2    Q    Did you tell your algorithm to prioritize compactness

3    through the Popper-Polsby measure?  Is that -- were you telling

4    it to prioritize that as the compactness measure?

5    A    You're talking about -- you're asking whether I

6    prioritized compactness over other Adopted Criteria, is that

7    right?

8    Q    Did you do that?

9    A    Okay.  So, yeah, let me explain.  The answer is no.  And

10   the hierarchy of Adopted Criteria or of nonpartisan criteria in

11   the districting criteria of the districting process is laid out

12   in my reports, and I'm happy to explain that in a little bit of

13   detail here, but you're welcome to stop me if this isn't the

14   sort of answer you're trying to ask for.

15          So what's really clear in the Adopted Criteria is

16   there are certain viable principles.  Obviously, equal

17   population, contiguity, those are the obvious ones, but it's

18   also very specific about county splits and VTD splits.  You can

19   only split VTDs to create population equality and in the

20   nonpartisan portion of the Adopted Criteria, you can only split

21   counties to also create equal populations.  So that tells me

22   that those two principles are inviable, except to create equal

23   populations.  That means, of course, that geographic

24   compactness falls below those two criteria.

25          So what the algorithm prioritizes is keeping counties

1  whole and keeping VTDs whole, and only after that do we pay

2  attention to geographic compactness.  So I just wanted to

3  answer your question as accurately as I could there by

4  explaining that level of priority.

5  Q    Okay.  And the actual criterion itself says that "the

6  Committee shall make reasonable efforts to construct

7  districts...that improve the compactness of the current

8  districts and keep more counties and VTDs whole...."

9         So are you saying you interpreted that to mean that

10 counties got priority and then compactness after that?

11 A    Well, the reasons that I interpreted that way had to do

12 with, like I said before, what the Adopted Criteria tell us

13 about the reasons acceptable for splitting counties and

14 splitting VTDs.  But I think more to your question about

15 compactness, the districts are meant to be compact or the

16 Adopted Criteria tell us to draw compact districts and so

17 that's what I followed in designing my algorithm.

18 Q    All right.  Did you pick a Popper-Polsby score that a

19 district had to settle on before it could go into a simulated

20 redistricting plan?

21 A    No, sir.  I was agnostic about that issue.  I sought to

22 find out what are the sorts of reasonable Popper-Polsby scores

23 that would emerge under a districting plan under a districting

24 process that is making efforts to draw geographically compact

25 districts.

1          As I said earlier, there are several figures

2   throughout my report that give a clear answer to that.  There's

3   a range of compactness scores, both in terms of Reock and

4   Popper-Polsby, that are the product of a reasonable effort to

5   draw geographically compact districts.  As I said earlier, the

6   SB2 Plan is completely below, entirely outside of that entire

7   range of all 3,000 simulations.

8   Q    Did you review any literature in your field to determine

9   what others had said a reasonable Popper-Polsby or Reock score

10  would be?

11  A    Yeah, sure.  I mean, I'm very familiar with that

12  literature working in the field of redistricting and drawing

13  legislative districts and analysis of districting plans.

14  Q    And so --

15  A    I was just going to give you a more complete answer, but

16  I'm happy to let you cut me off if you'd like.

17  Q    Sure.  So you're familiar then with an article written by

18  two gentlemen named Pildes and Niemi about compactness?

19  A    I've seen that article before.

20  Q    Do you recall about that article that they say a low

21  perimeter score or -- would be .05?  Do you recall that?

22  A    I couldn't really cite for you that specific -- you know,

23  that specific citation and so -- I mean, if you want to show

24  that to me, I would be happy to kind of affirm for you what

25  they're doing and help you understand what that article is

1  saying and, more importantly, help you understand what

2  jurisdiction or what districting plan they're analyzing because

3  that's a really important consideration.  We want to know if

4  their article with that specific number is actually talking

5  about North Carolina congressional districts, North Carolina

6  legislative districts or, say, Hawaii congressional districts.

7  We need that information to put that in context here.

8  Q    Let me just establish a couple of things.  Isn't it true

9  that a perimeter -- a measure of perimeter as a measure of

10 compactness is similar to Popper-Polsby?

11 A    I would try and explain it to you in a slightly different

12 way.  If you're comparing two different North Carolina

13 congressional districting plans, here's what you know about

14 those plans:  The total area of all 13 districts is going to be

15 the same in both plans because they're going to cover all of

16 North Carolina.

17          So go back to that Popper-Polsby measure I mentioned

18 and explained in some detail about 10 minutes ago.  Now, what

19 does that mean for that formula, for that ratio?  It means that

20 the only thing that's going to vary from one districting plan

21 in North Carolina to another North Carolina districting plan is

22 the perimeter of the districts.  So that's why if you're

23 comparing two North Carolina congressional districts

24 essentially you are comparing the perimeters.

25          Of course, you're comparing the perimeters in the

1  context of that ratio formula that I told you about a while

2  back, but the most important distinction between those plans

3  has to do with the differences in their perimeter because,

4  again, the areas of only North Carolina congressional

5  districting plan, areas across all 13 districts, is going to

6  have the same total area.  It's going to be all of North

7  Carolina.

8          So that's why I think the kind of question you're

9  trying to get at -- you're getting at the right idea, which is

10 that perimeter is what varies from one plan to another.

11 Q    Sure.  But all I'm asking is isn't another name for -- the

12 Popper-Polsby test, isn't it a perimeter score for compactness?

13 A    I mean, I haven't heard that kind of shorthand or, you

14 know, nickname for it, but I get what you're getting at even

15 though that's not really what we call it in the scholarly

16 literature.

17 Q    All right.  And do you -- are you aware of the Reock

18 measure being called a dispersion compactness score?

19 A    I'm not sure that I've heard that commonly used.  I think

20 I know what you're trying to get at, but I'm not sure that's

21 commonly used in the field.

22 Q    All right.  Is this Pildes and Niemi article that I've

23 referenced -- let me just make sure I establish you did read

24 that article, correct?  You have read that article?

25 A    I've heard of that article before.  I mean, I would just

 1  point out to you it was published a long time ago and there's

 2  much more current literature talking about district compactness

 3  and some of the issues that come up when you're comparing

 4  compactness scores from one state to another, one jurisdiction

 5  to another.  I'm aware that was a paper from, I don't know,

 6  about 20, 25, maybe 30 years ago.  I just can't remember.  So

 7  it certainly is one that I have heard of.  I couldn't -- I

 8  couldn't tell you a whole lot about it off the top of my head,

 9  though.

10  Q    All right.  Well, let's pull up Exhibit 5041.  We'll just

11  take a look at this table in this article and see if this

12  doesn't help you with this.

13             MR. STRACH:  And turn to page 34, Table 3.

14  BY MR. STRACH:

15  A    Sir, do I get a copy of this article?

16  Q    You'll see it right there on your screen.

17  A    Okay.

18  Q    Do you see on the screen Table 3?

19  A    Yes, sir, I see the top portion of that table.

20  Q    All right.  And can you see what the -- tell the Court

21  what the name of that table is.

22  A    It looks like the authors have called this table "1990s

23  Congressional Districts With Low Dispersion Or Perimeter

24  Compactness Scores" and there's a footnote.

25  Q    All right.  So they use -- in that table, they use the

1   dispersion and perimeter nomenclature.  Are you saying you're

2   not familiar with that nomenclature?

3   A     I don't hear it very commonly.  Again, I would point out

4   for you this is a 1993 article.  The field of studying

5   geographic compactness in districts has changed quite a bit

6   since then.  We've updated our measures and our understanding

7   of how these various measures work when you're trying to

8   compare districts across very different states.  Scholars have

9   pointed out lots of caveats when you're comparing scores across

10  different states.  I just want to help you understand it in

11  that context, that this is a very old article.

12  Q     All right.  So I take it you didn't use the information in

13  this article in generating your compactness measures that you

14  would use for your simulated sets?

15  A     I didn't go back and specifically look for this article in

16  the production of my report, no, sir.

17  Q     All right.  Did you rely on any of the literature on

18  compactness, even that which is more recent, in determining

19  where to set your Popper-Polsby settings?

20  A     I don't know that it was necessary for me to go and

21  specifically find any particular article.  Generally I keep up

22  with the field in legislative districting or in redistricting

23  as it's practiced in political science, so certainly these are

24  things that we talk about very frequently with other scholars

25  at conferences, at seminars.  So that's how I keep up with the

1  field and understand what other people are doing.

2           But I didn't go back and need to consult any

3  particular article simply because the calculation of a Reock

4  score and the calculation of a Popper-Polsby score are such

5  standard measures -- we do them all the time -- that it wasn't

6  something that I needed to go back and refresh my memory about

7  or to find out how to go about calculating these things.

8  They're very commonly done.

9  Q    All right.  Well, is it fair to say, as relates to the

10 Popper-Polsby aspect of your analysis, that you were trying to

11 have your algorithm draw districts that would maximize those

12 scores?

13 A    I would say that the algorithm was trying to make

14 reasonable attempts to draw geographic compactness but within

15 some very important constraints, as I've laid out.

16          So just to be clear and because I think this is what

17 you're asking me to literally tell you with your question, we

18 are not maximizing in this algorithm geographic compactness

19 above other considerations.  The Adopted Criteria are very

20 clear about this.  There are other considerations in

21 districting that are more important than that and so I just

22 wanted to, at the risk of repetition, make sure you really

23 understand that point because it's so important.

24 Q    Okay.  When you did the compactness analysis with the

25 Popper-Polsby, you did that based on a statewide average,

1  didn't you?

2  A    I calculate the Reock or the Popper-Polsby measure across

3  all 13 districts and then I average them.  That's just the

4  standard way of describing the compactness of an entire

5  districting plan with 13 districts.

6  Q    All right.  But did you compare any of the specific

7  districts in any of your simulation plans against any of the

8  specific districts in the 2016 Plan as it related to

9  compactness scores?

10 A    The Adopted Criteria didn't tell me to do that and so I

11 definitely would not have done so.  And what I mean by that

12 answer is that the Adopted Criteria do not say a sort of

13 compact district is acceptable in western North Carolina, but

14 you want a really compact district in eastern North Carolina.

15 There are no regional decisions like that, so I definitely

16 would not have done such an analysis.

17 Q    So you can't identify any specific district in the 2016

18 Plan that has a lower Popper-Polsby or Reock score than any

19 comparable district in your simulation plans?

20 A    Again, we're not doing a comparable district analysis

21 because that is not what's laid out in the Adopted Criteria.

22 The Adopted Criteria is not telling us that one threshold for

23 compactness is okay here and it's okay to not draw very compact

24 districts in the northeastern portion of North Carolina or

25 anything like that.  There are no regional distinctions when it

1   comes to compactness.  You're supposed to make districts
2   geographically compact.
3   Q   Isn't it possible, though, that there are districts in the
4   2016 Plan that have higher Popper-Polsby and Reock scores than
5   individual districts in your simulated plans?
6   A   Oh, that's very possible and that's not really relevant to
7   the main issue here, which is that when we analyze districting
8   plans we look at the plan as a whole and we look at the
9   compactness of all the districts together.  We don't just say
10  was there one good compact district here and that somehow
11  outweighs a noncompact district in another portion of the
12  state.  That's why what we do is we look at the compactness of
13  all 13 districts and take the average, and we compare those
14  averages across plans.
15  Q   All right.  Let me move to a different topic here.  Do you
16  know how many of the incumbents from 2014 in the North Carolina
17  congressional delegation were reelected in 2016?
18  A   I did not analyze that question, sir.
19  Q   All right.  Did you know that the only one not reelected
20  was Congresswoman Renee Ellmers, who lost in a primary to
21  George Holding?  Were you aware of that?
22  A   Again, that would not have been relevant to what I saw in
23  the Adopted Criteria, so I definitely did not analyze that
24  factor, that question -- or that issue.
25  Q   All right.  Were you aware of the -- for the 2016 Plan,

1  were you aware of the -- aware the residence of Congressman

2  George Holding was placed in the 2016 Plan?

3  A    You're asking me which district of the enacted plan --

4  Q    Right.

5  A    -- he was placed in?

6  Q    Right.

7  A    I can't tell you off the top of my head.  I'm sure, as you

8  know by now, I did, obviously, you know, have locations of the

9  incumbents.  So I clearly calculated something relating to that

10 fact at some point.  I really couldn't tell you off the top of

11 my head.

12 Q    All right.  Does it -- do you have any reason to think

13 that he wasn't placed in the 4th Congressional District?

14 A    No, I accept that.

15 Q    Now, when you did your -- two of your simulation sets, you

16 interpreted the incumbency protection simply to be that each --

17 there would be no pairing of incumbents, is that right?

18 A    That is what I read from the Adopted Criteria, yes, sir,

19 that to avoid the double-bunking or pairing of incumbents, two

20 in one district or three in one district.

21 Q    And then in a different simulation set you tried to

22 account for the fact that there were only 11 nonpaired

23 incumbents, correct, in the actual plan?

24 A    In Simulation Set Three, which I think is what you're

25 alluding to, sir, yes, sir.  So what I did specifically was to

1  require the simulation algorithm to match precisely the Enacted

2  SB2 Plan in terms of its 11 protected incumbents and 13 county

3  splits.

4  Q    All right.  In looking at Simulation Set Three, did you do

5  any analysis of the population from the 2014 district for each

6  incumbent that was retained in the 2016 district?

7  A    The Adopted Criteria did not instruct the map drawer to

8  account for that sort of analysis and therefore I did not do

9  so.

10 Q    Okay.  And, of course, you did no analysis of whether any

11 of those incumbents could actually win a district that they

12 were placed in in your simulated sets, correct?

13 A    The Adopted Criteria, again, did not ask the map drawer to

14 account for that factor and therefore I did not do so.

15 Q    The criteria actually did do that, correct, because they

16 said under "Partisan Advantage"  the Committee would make

17 reasonable efforts to construct districts to maintain the

18 current partisan makeup of North Carolina's congressional

19 delegation.  The criteria say, but you just didn't take that

20 into account because it was a partisan criteria, is that

21 correct?

22 A    I guess I thought your previous question was asking

23 whether a specific incumbent would be re-elected.  I read the

24 Adopted Criteria as just saying just create ten Republican

25 districts, so that's why I answered your previous question the

1  way that I did.  I see what you're getting at and I acknowledge

2  to you that I, in fact, ignored the political impact part of

3  the Adopted Criteria as it relates to creating intentionally a

4  ten Republican map.

5  Q    All right.  So in your study, you read the incumbent

6  protection criteria separately from the partisan advantage

7  criteria?

8  A    If I could just ask you to repeat.

9  Q    In making your analysis, you read the incumbency

10 protection criteria of these criteria separately from the

11 partisan advantage criteria?

12 A    I accounted for them in two different ways.  I ignored the

13 partisan requirement of creating a ten Republican map, but the

14 incumbency portion I certainly read as a different sentence and

15 I interpreted it as meaning that efforts should be made to

16 maximize a number of incumbents that are kept in their own

17 respective districts.  So I did read them separately and I

18 treated them as such.

19 Q    All right.  And when you ran your third simulation set

20 accounting for nonpairing of 11 incumbents, did you rerun a

21 simulation set all over again or did you apply the 11

22 incumbency criteria to an existing simulation set?

23 A    The former, sir.  This was a completely new, independent

24 set of simulations that had no relation to Simulation Sets One

25 and Two, except in so far as beyond intentionally keeping 11

 1  counties split -- sorry -- 13 counties split and 11 incumbents

 2  protected.  On top of that, I did prioritize the protection of

 3  the nonpartisan portions or maximize adherence to the

 4  nonpartisan portions of the Adopted Criteria.  But to answer

 5  your question, it was a completely different set of

 6  simulations, so I started the process anew.

 7  Q    All right.  And I think you mentioned earlier you didn't

 8  try to assess the actual political strength of each district

 9  when you were measuring the partisan impact of it, correct?

10  A    The Adopted Criteria did not tell the map drawer to assess

11  the political strength and so therefore I did not do so.

12  Q    All right.  So you do not know that if a strong Democratic

13  candidate who was well-funded in any of these ten alleged

14  Republican districts were to run, you've not studied whether

15  such a candidate could beat a Republican in one of these

16  districts?

17  A    Again, sir, the Adopted Criteria did not tell me to take

18  into account campaign finance dynamics.  Therefore, I did not

19  do so.

20          MR. STRACH:  Could we pull up Exhibit 5043?

21          JUDGE OSTEEN:  How much longer do you anticipate,

22  Mr. Strach?

23          MR. STRACH:  It could be a bit.  I think it will be

24  more than 10 minutes.

25          JUDGE OSTEEN:  All right.  All right.  We'll go

1  roughly ten more minutes, and then we'll take off, unless you

2  all want to be heard on that.  I think that I said court would

3  go until 5:30, but I can't remember.

4          MR. SPEAS:  You did.

5          JUDGE OSTEEN:  Okay.  Is that good, ten more minutes?

6          MR. STRACH:  Thank you, Your Honor.

7  BY MR. STRACH:

8  Q    Dr. Chen, I've got Exhibit 5043, which I believe is just

9  simply a table out of your report.  Does that look familiar?

10 A    Yes, sir.

11 Q    All right.  And in this exhibit or in this --

12 A    I'm sorry.  If I could go back and clarify, sir.

13 Q    Yes.

14 A    You asked me if it came from my report, is that right?

15 Q    Maybe -- is this something you created after your report

16 was submitted?

17 A    That's correct, sir, April 24th.

18 Q    That's right.  Okay.  And this was discussed with you at

19 your deposition, correct?

20 A    I believe Mr. Farr asked me a bit about this, yes, sir.

21 Q    In this exhibit, you identified the number of your

22 simulated plans that have one district with at least 40 percent

23 BVAP, is that correct?

24 A    Yes, sir, black voting-age population.

25 Q    Okay.  So for your Simulated Set No. 1, you had 85 of the

1  1,000 plans had such a district, is that correct?

2  A    Yes, sir.

3  Q    And in Simulation Set No. 2, you had 119 out of a thousand

4  plans had such a district, correct?

5  A    Yes, sir.

6  Q    And in Simulation Set No. 3, only 58 plans had such a

7  district, is that correct?

8  A    Yes, sir.

9  Q    All right.  So out of 3,000 simulated plans, you had a

10 total of 262 that had at least one district with a BVAP of over

11 40 percent, is that correct?

12 A    That sounds about right, sir, if your math is correct.

13 Q    All right.  And that's less than 10 percent, correct?

14 A    That is correct, sir.

15 Q    Now, the 2016 -- are you familiar with the BVAP of the

16 enacted -- any of the enacted districts?

17 A    Of the Enacted 2016 Plan?

18 Q    Yes, sir.

19 A    My answer is that the Adopted Criteria told me to ignore

20 any racial data about districts or about voters in North

21 Carolina, and so I definitely would not have analyzed that

22 number.

23 Q    All right.  But nonetheless, even though the criteria

24 didn't address it, you did nonetheless do an analysis of it,

25 correct?

1  A    I was just clarifying that the Adopted Criteria instructed

2  me to ignore it, so the Adopted Criteria did tell me very

3  specifically.

4  Q    Not to use race?

5  A    Correct.

6  Q    But notwithstanding that criteria, you, in fact, did

7  analyze race and you looked at the 40 percent BVAP districts,

8  correct?

9  A    Correct.  I did so well after the writing and the

10  production of my expert reports.

11  Q    Right.  But you're aware that one of the congressional

12  districts in the 2016 map has a BVAP of over 44 percent.  Does

13  that sound correct to you?

14  A    Again, I accept that you've represented that to me, but as

15  I said earlier, I definitely would not have analyzed that

16  myself.

17  Q    And you used in your -- in the exhibit that we're looking

18  at, you used, it looks like, 40 percent as your threshold or

19  your cutoff, is that correct?

20  A    That's correct, sir.  I went through all 1,000

21  simulations -- simulated maps and I identified which ones

22  contained at least one district with a 40 percent black

23  voting-age population.

24  Q    Why did you pick 40 percent rather than, say, 44 percent

25  to reflect the actual plan?

```
 1  A    Plaintiffs' counsel asked me for that calculation, sir.
 2  Q    Okay.  So this was something -- this was a number that you
 3  picked for your analysis based on what a lawyer asked you to
 4  do?
 5  A    I didn't pick the number.  Plaintiffs' counsel asked me
 6  for the number of districts or simulated plans containing a
 7  district with over 40 percent black voting-age population and I
 8  answered that question for Plaintiffs' counsel.
 9  Q    Did you ever do an analysis of -- based on searching for
10  districts that had over 44 percent BVAP?
11  A    You're asking me if I analyzed my simulated plans with
12  respect to that number?
13  Q    Yes, sir.
14  A    And the answer is Plaintiffs' counsel did not ask me to do
15  so.
16  Q    Okay.  You are aware that the 2016 Enacted Plan has moved
17  the 12th Congressional District to wholly within Mecklenburg
18  County.  Are you familiar with that?
19  A    I didn't study the previous plan, but I accept your
20  representation about that fact.
21  Q    And you did not ask your algorithm to require at least one
22  congressional district to be wholly located within Mecklenburg
23  County, did you?
24  A    The Adopted Criteria definitely did not instruct the map
25  drawer to do so.  Therefore, I did not do so.
```

1  Q    You understand that the 2016 Enacted Plan has a second

2  district -- that has one district with 44 percent of BVAP and

3  it has a second district with at least 35 percent BVAP.  Were

4  you aware of that?

5  A    I accept your representation of that, but again, I

6  definitely did not analyze that in my report.

7  Q    So did your counsel ask you to search for simulated plans

8  that had both one district of at least 40 percent BVAP and at

9  least one district of 35 percent BVAP?

10 A    Plaintiffs' counsel did not ask me for that number, sir.

11 Q    Do you know whether any of your simulated plans have a

12 district of at least 44 percent BVAP?

13 A    Plaintiffs' counsel did not ask me to do that calculation.

14 I didn't do so, sir.

15 Q    So the answer is you don't know?

16 A    Correct, sir.  I don't know because I was -- I definitely

17 would have in my report ignored race.

18 Q    What was the significance of you picking or having a

19 thousand simulated maps in each set?  What was the significance

20 of a thousand or was there any significance?

21 A    The significance is that it is a number of simulated plans

22 that allows us to be able to draw strong statistical

23 conclusions from the body of simulations of simulated maps as

24 compared to an enacted map.  So it is a number that goes far

25 beyond what we actually need in order to draw conclusions about

 1  the extent to which, for example, the Enacted SB2 Plan is an

 2  extreme partisan outlier compared to the simulated maps or the

 3  extent to which the SB2 Plan does as well as it reasonably

 4  could have in complying with the nonpartisan portions of the

 5  Adopted Criteria.  So it is a large enough number that we are

 6  well beyond what is necessary to have strong, statistically

 7  significant conclusions regarding these questions.

 8  Q     And how low can you go before you lack the strong

 9  statistical significance in the results?

10  A     What do you mean how low you can go, sir?  You're asking

11  how many simulated plans?

12  Q     Yeah, below a thousand.

13  A     Oh, how many below 1,000.  Well, I certainly conducted my

14  academic research analysis of districting plans in different

15  states based upon as few as 25 simulated plans in my past

16  academic research, but what we do here, especially when I

17  produce an expert report, is I want to be extraordinarily

18  conservative in reaching any conclusions.  I'm reaching

19  conclusions and so what I do is essentially overkill.  I draw

20  an extremely large number of plans in order to make sure that I

21  am showing extraordinary deference to, say, an enacted plan

22  that I'm analyzing.  I want to make sure if I'm drawing any

23  conclusions at all that I'm extremely statistically certain

24  about them.  That's why I don't stop at, say, 25, even though

25  I've done so in my past academic research.

1           JUDGE OSTEEN:  Are you ready?

2           MR. STRACH:  I've got more, but, yeah, I'll stop

3   whenever you're ready.

4           JUDGE OSTEEN:  All right.  We'll stand in recess

5   until tomorrow morning at 9:00.

6           (At 5:27 p.m., proceedings adjourned.)

7                        *  *  *  *  *

8                  C E R T I F I C A T E

9       I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.
10

11                              _Joseph B. Armstrong_
                               _____
12   Date: 10/23/2017          Joseph B. Armstrong, RMR, FCRR
                               United States Court Reporter
13                             324 W. Market Street
                               Greensboro, NC  27401
14

15

16

17

18

19

20

21

22

23

24

25