```
 1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF NORTH CAROLINA
 2
    COMMON CAUSE, et al.,            )  Greensboro, North Carolina
 3                                   )  October 17, 2017
            Plaintiffs,              )
 4     v.                            )     Case No. 1:16CV1026
                                     )
 5  ROBERT A. RUCHO, in his          )
    official capacity as Chairman    )
 6  of the North Carolina Senate     )
    Redistricting Committee for      )
 7  the 2016 Extra Session and       )
    Co-Chairman of the Joint Select  )
 8  Committee on Congressional       )
    Redistricting, et al.,           )
 9                                   )
            Defendants.              )        Bench Trial
10                                   )
    LEAGUE OF WOMEN VOTERS OF        )       Volume II of IV
11  NORTH CAROLINA, WILLIAM          )
    COLLINS, ELLIOTT FELDMAN,        )
12  CAROL FAULKNER FOX,              )
    ANNETTE LOVE, MARIA PALMER,      )
13  GUNTHER PECK, ERSLA PHELPS,      )
    JOHN QUINN, III, AARON SARVER,   )
14  JANIE SMITH SUMPTER,             )
    ELIZABETH TORRES EVANS, and      )
15  WILLIS WILLIAMS,                 )
                                     )
16          Plaintiffs,              )
                                     )
17     v.                            )     Case No. 1:16CV1164
                                     )
18  ROBERT A. RUCHO, in his          )
    official capacity as Chairman    )
19  of the North Carolina Senate     )
    Redistricting Committee for      )
20  the 2016 Extra Session and       )
    Co-Chairman of the 2016 Joint    )
21  Select Committee on              )
    Congressional Redistricting,     )
22                                   )
    DAVID R. LEWIS, in his           )
23  official capacity as Chairman    )
    of the North Carolina House of   )
24  Representatives Redistricting    )
    Committee for the 2016 Extra     )
25  Session and Co-Chairman of the   )
```

```
 1  2016 Joint Select Committee on
    Congressional Redistricting,        )
 2                                       )
    TIMOTHY K. MOORE, in his             )
 3  official capacity as Speaker         )
    of the North Carolina House of       )
 4  Representatives,                     )
                                         )
 5  PHILIP E. BERGER, in his             )
    official capacity as President       )
 6  Pro Tempore of the North             )
    Carolina Senate,                     )
 7                                       )
    A. GRANT WHITNEY, JR., in his        )
 8  official capacity as Chairman        )
    and Acting on Behalf of the          )
 9  North Carolina State Board of        )
    Elections,                           )
10                                       )
    THE NORTH CAROLINA STATE BOARD       )
11  OF ELECTIONS, and                    )
    THE STATE OF NORTH CAROLINA,         )
12                                       )
         Defendants.                     )
13  _____ )
```

14

                    PROCEEDINGS HEARD BEFORE:
15
                    **WILLIAM L. OSTEEN, JR.,**
16     CHIEF U.S. DISTRICT JUDGE FOR THE MIDDLE DISTRICT OF N.C.

17                       **W. EARL BRITT**
      SENIOR U.S. DISTRICT JUDGE FOR THE EASTERN DISTRICT OF N.C.
18
                      **JAMES A. WYNN, JR.**
19  CIRCUIT JUDGE OF THE U.S. COURT OF APPEALS FOR THE 4TH CIRCUIT

20
    APPEARANCES:
21
    On Behalf of Common Cause, et al:
22
    EDWIN M. SPEAS, Jr.
23  STEVEN P. EPSTEIN
    CAROLINE P. MACKIE
24  Poyner Spruill, LLP
    301 Fayetteville Street, Suite 1900
25  Raleigh, North Carolina 27602

1   EMMET J. BONDURANT
    BENJAMIN W. THORPE
2   Bondurant Mixson & Elmore, LLP
    1201 W. Peachtree Street, N.W., Suite 3900
3   Atlanta, Georgia 30309

4   PETER A. NELSON
    Patterson Belknap Webb & Tyler
5   1133 Ave. of the Americas
    New York, NY 10036-6710

6
    On Behalf of League of Women Voters of North Carolina, et al:
7
    ANITA S. EARLS
8   ALLISON JEAN RIGGS
    Southern Coalition for Social Justice
9   1415 W. Highway 54, Suite 101
    Durham, North Carolina 27707
10
    ANNABELLE E. HARLESS
11  RUTH M. GREENWOOD
    Campaign Legal Center
12  73 W. Monroe Street, Suite 322
    Chicago, Illinois 60603
13
    On Behalf of the Legislative Defendants:
14
    PHILLIP JOHN STRACH
15  MICHAEL DOUGLAS McKNIGHT
    Ogletree Deakins Nash Smoak & Stewart, P.C.
16  4208 Six Forks Road, Suite 1100
    Raleigh, North Carolina 27609
17
    On Behalf of the State and State Board of Elections:
18
    ALEXANDER M. PETERS
19  JAMES BERNIER, Jr.
    N.C. Department of Justice
20  P.O. Box 629
    Raleigh, North Carolina 27602
21

22
    Court Reporter:        Joseph B. Armstrong, FCRR
23                         324 W. Market, Room 101
                           Greensboro, NC  27401
24
            Proceedings reported by stenotype reporter.
25      Transcript produced by Computer-Aided Transcription.

```
1                          I N D E X

2
    WITNESSES FOR THE PLAINTIFF:                    PAGE
3
    JOWEI CHEN
4      Cross-Examination, Continued By Mr. Strach      5
       Redirect Examination By Mr. Thorpe            14
5
    SIMON JACKMAN
6      Direct Examination By Ms. Earls               28
       Cross-Examination By Mr. Strach               83
7      Redirect Examination By Ms. Earls            132

8   JOWEI CHEN
       Direct Examination By Ms. Riggs             142
9      Cross-Examination By Mr. Strach             164

10  EXHIBITS:                                       RCVD

11   PX-2010 Chen Expert Report                     142
     PX-2011 Chen Figure A                          142
12   PX-2012 Chen CV                                142
     PX-3001 Mattingly CV                           174
13   PX-3002 Mattingly Report                       174
     PX-3004 Mattingly Vol. II Ex. 5 - Redistricting 174
14           Drawing the Line - Version 2
     PX-4002 Dr. Simon Jackman's amended expert      27
15           report
     PX-4003 Dr. Simon Jackman's rebuttal report     27
16   PX-4004 Dr. Simon Jackman's CV                  27
     PX-4022 Agreed to exhibit                      140
17   PX-4023 Agreed to exhibit                      140
     PX-4024 Agreed to exhibit                      140
18   PX-4078 Demonstrative of Dr. Jackman's district 83
             calculations
19   PX-4079 Demonstrative of Dr. Jackman's District 40
             1 calculations
20

21

22

23

24

25
```

| | |
|---|---|
| 1 | <u>P R O C E E D I N G S</u> |
| 2 | (At 9:07 a.m., proceedings commenced.) |
| 3 | JUDGE OSTEEN:  All right.  One small housekeeping |
| 4 | matter before we get started, and, that is, those of you who |
| 5 | have tried a case in my courtroom know that, generally |
| 6 | speaking, we do the "all rise" at the beginning of the day and |
| 7 | the end of the day, and then the rest of it's just remain |
| 8 | seated and come to order when the Court enters the courtroom; |
| 9 | but we had such a big crowd here yesterday, that it was a |
| 10 | little sluggish getting started, so we're going back to the |
| 11 | traditional "all rise" every time the judges enter the |
| 12 | courtroom to kind of get everybody's attention a little quicker |
| 13 | than we were able to do yesterday. |
| 14 | One word of caution:  I'm not going to call anyone |
| 15 | out, but do make sure your phones are turned off today.  If |
| 16 | anybody is smiling and feels guilty, then you all can conclude |
| 17 | what you want to from that. |
| 18 | All right.  Dr. Chen, you're still in the courtroom. |
| 19 | You are still under oath.  You can come forward, take the |
| 20 | witness stand, and, Mr. Strach, you can resume your |
| 21 | cross-examination. |
| 22 | CROSS-EXAMINATION, CONTINUED |
| 23 | BY MR. STRACH: |
| 24 | Q    Good morning, Dr. Chen. |
| 25 | A    Good morning, sir. |

1  Q    Dr. Chen, were you in the courtroom when Dr. Mattingly
2  gave his expert testimony?
3  A    I was in the room for part of it, sir.
4  Q    Have you read Dr. Mattingly's report?
5  A    I have not in any detail, sir.
6  Q    Do you recall that he did some computer-simulated
7  redistricting plans much like you did?
8  A    I wouldn't characterize it that way, sir.  I do recognize,
9  from having sat in here for part of his testimony yesterday,
10 that he conducted a version of computer-simulation algorithms.
11 Q    Can you tell me how his version differed from whatever you
12 did?
13 A    I can't speak for Dr. Mattingly's work, and you'll have to
14 ask him about that, but I can tell you and help you to recall
15 the details of my work, if you'd like.  So would you like me to
16 start there?
17 Q    I'm trying to just understand if there's a difference
18 between the way you ran your computer simulations to get your
19 redistricting plans versus the way he did, and it's okay if you
20 don't know, but I'm just trying to understand if you know if
21 there's any difference.
22 A    Yeah, I don't want to run the risk of mischaracterizing
23 Dr. Mattingly's work because there are several features of it
24 that I have not read in detail, his actual expert report, but I
25 would be happy to highlight some of the technical features of

1    my -- of my expert report that I think --

2              JUDGE OSTEEN:  Dr. Chen, the question simply is:  Can

3    you tell us what the difference is between what you did and

4    what Dr. Mattingly did?

5              THE WITNESS:  Okay.  Thank you, Your Honor.  I will

6    do that.

7              JUDGE OSTEEN:  Just answer that question yes or no.

8              THE WITNESS:  Okay.  I think the answer is that, no,

9    I really can't give you a particularly accurate recounting of

10   that.

11   BY MR. STRACH:

12   Q    All right.  Thank you.

13             Dr. Chen, when we broke yesterday -- well, and just

14   to set the stage with this, as you may recall from listening to

15   Dr. Mattingly, he had upwards of 24,000 simulated redistricting

16   plans in his report, and you had three sets of 1,000, is that

17   correct?

18   A    That's correct about my report, yes, sir.

19   Q    Does it make a difference in your mind if he had 24,000

20   and you had a total of only 3,000?

21   A    Does it make a difference in what terms, sir?

22   Q    Does it affect the statistical validity of either your

23   work or his work given the large difference in the number of

24   simulated plans?

25   A    It does not affect the statistical validity of my work,

1  and that's all I can speak to, and I think we had talked

2  briefly about that yesterday.

3  Q    All right.  And I think you had mentioned when we broke

4  that you had done some work in the past where you had as few as

5  25 simulated redistricting plans.  Do you recall that?

6  A    Yes, sir, I mentioned that yesterday.

7  Q    Can you describe what that work was?

8  A    That was a draft paper that I did quite a few years ago, I

9  believe as early as 2009 or 2010, and I was at that time just

10 studying redistricting plans and applying the

11 computer-simulation redistricting algorithm for the state of

12 Florida for various Florida congressional and legislative

13 districts; and I found back then having as few as 25 simulated

14 plans was enough to make characterizations about the

15 distribution of those plans and to draw conclusions about those

16 plans.  That's what I was referring to yesterday.

17 Q    All right.  Thank you.  Did you -- you said that was some

18 work in 2009.  Did that result in any -- did you make a report

19 using 25 plans to any court in Florida?

20 A    That -- I think you're referring to an expert report that

21 I later authored some years later in *Romo v. Detzner*, and I

22 did.  That was not the paper that I was just now talking about,

23 but later on, I did write a separate report in *Romo v. Detzner*.

24 Q    Did that report, the one you just referred to, include an

25 analysis limited to only 25 plans?

1  A    I can't remember exactly what I did in *Romo v. Detzner*.

2  Certainly there, I would have done something more like 1,000 or

3  so plans, something comparable to what I did in my expert -- a

4  number comparable to what I produced for my expert report here

5  today.

6  Q    Okay.  Have you ever submitted an analysis to a court that

7  used as few as 25 simulated districting plans?

8  A    For an expert report, I don't think so, no.  I was just

9  talking about a paper I wrote back in 2009 or 2010.

10 Q    Did you have that paper published?

11 A    A later version of that paper was eventually published

12 after lots of various revisions of different sorts, but a

13 couple years later or several years later, it was eventually

14 published, yes, sir.

15         MR. STRACH:  Let's put up Exhibit 5038.  Your Honor,

16 I assume your rule is still in effect?

17 BY MR. STRACH:

18 Q    Dr. Chen, this exhibit relates to something we talked

19 about yesterday.  I think we agreed yesterday that when you

20 added up all of the redistricting plans in your 3,000 -- your

21 set of 3,000, you had a 40 percent BVAP district or higher.  It

22 came to about 262 plans.  Do you recall that?

23 A    Yes, sir, that sounds right.

24 Q    Okay.  And this exhibit is simply a list of each one of

25 those districts and which district it was that had a 40 percent

 1  BVAP.  I know you didn't prepare this document.  Do you have

 2  any reason to dispute its accuracy?

 3  A    I'll accept your characterization of this document.

 4  Q    All right.  So 200 out of 3,000 -- let me ask you a

 5  question real quick about the 3,000.  The 3,000 plans that you

 6  have there are three sets of 1,000 plans, correct?

 7  A    Correct, sir.

 8  Q    Have you physically looked at each one of those 3,000

 9  plans?

10  A    I didn't actually print out a map of each one and look at

11  each one individually.  I have done my standard process of

12  analyzing them by computer.  So, certainly, I have inspected by

13  computer all 3,000 of them in my normal ways.

14  Q    All right.  So are you able to testify today that every

15  single one of those 3,000 plans is different from all the other

16  plans, that they are 3,000 unique plans?

17  A    Yes, that's certainly -- I mean, that's certainly

18  something that I would normally check when I analyze them by

19  computer.  Again, I didn't visually look at each one of those

20  3,000, but I analyzed them by computer along the things like

21  what you're describing.

22  Q    All right.  We're going to look at a document that's been

23  marked as Exhibit 5039.

24       JUDGE OSTEEN:  All right.  For purposes of the

25  record, let me get something straight here.  I don't know how

1  we're proceeding, but, obviously, the Defendants can't

2  introduce evidence during the Plaintiffs' case, but they can

3  mark exhibits and have them identified for purposes of the

4  record and then move introduction later.  So usually what I do

5  is if the Defendants' going to be presenting exhibits to a

6  witness, they get identified by number and by the witness; and

7  at that point, if there's going to be an objection, I would

8  expect something to be articulated stating that there is some

9  objection to that particular exhibit.

10         So this morning, as I see it, the first exhibit that

11  came in has got a number on my copy of Exhibit 5038, which has

12  been identified as -- by the witness as something that appears

13  to be a summary of various simulations as testified to

14  yesterday.

15         So backing up, is there any objection to this chart

16  at this point?

17         MR. THORPE:  Your Honor, we have no objection to

18  either of -- introducing either of those exhibits.

19         MS. RIGGS:  The League has no objection.

20         JUDGE OSTEEN:  Okay.  So we got Exhibit 5038.  It

21  hasn't been introduced, but it's identified as a summary.  So

22  when you're presenting an exhibit, if you'll give us a number

23  so the record remains clear as to what's being handed up, and

24  then just know that when an objection -- I mean, an exhibit is

25  identified, whether it's going to be introduced now or later,

1   that's when at least I anticipate any objection will be

2   forthcoming.  All right.

3           MR. STRACH:  Thank you, Your Honor.  And so for the

4   record, what I've just handed the witness has been marked for

5   identification purposes as Defendants' Exhibit 5039.

6   BY MR. STRACH:

7   Q    Dr. Chen, I'll represent to you that this is a chart

8   simply using your data demonstrating -- or listing all of the

9   plans in your three simulations that split a minimum of 11

10  counties with 100,000 population or greater.

11          As we talked about yesterday, do you have any reason

12  to dispute that these are, in fact, the 57 plans that split

13  11 -- at least 11 counties with 100,000 population or greater?

14  A    Okay.  So you're now talking about this exhibit labeled

15  "5039"?

16  Q    Yes, sir.

17  A    Okay.  Yeah, I believe I recall discussing that yesterday,

18  and, yesterday, I accepted your characterization of this

19  document that way.

20  Q    Right.  And to remind the Court, this is when we were

21  talking about splitting big counties versus smaller counties.

22  Do you recall that discussion from yesterday?

23  A    I recall that.  I recall that is what you told me about

24  how you produced this document.

25  Q    All right.  And would it be fair to characterize a county

1  with at least 100,000 people in it as a big county, a large

2  county?

3  A    I really -- I mean, I accept your characterization that

4  way.  It's not really anything I studied.

5  Q    All right.  Thank you.

6         MR. STRACH:  Your Honor, I'm going to hand the

7  witness what's been marked for identification purposes as

8  Defendants' Exhibit 5037.

9  BY MR. STRACH:

10 Q    Dr. Chen, this is a chart containing all of the plans in

11 your three simulation runs that both contain at least one

12 40 percent BVAP district and split a minimum of 11 counties --

13 11 big counties, as I've characterized it, and that came up

14 with six plans.

15        Do you have any reason to dispute the accuracy of

16 this based on your data?

17 A    I accept that that's how you produced this document.

18 Q    All right.  So would you ever conduct any statistical

19 analysis using simulated maps if it were limited to only six

20 simulated maps?

21 A    Well, I've never done so.  I'm not going to say that it is

22 impossible to do so, but it certainly wouldn't be my normal

23 research practice to do so, especially with the peculiar unique

24 combination of constraints that I think you were just listing

25 out here.

1  Q    Would it be fair to say that running the analysis that you
2  ran using only six simulated maps -- if you were limited to six
3  simulated maps, that that would call into doubt the statistical
4  significance of any results?
5  A    No.  Before you make any judgments about statistical
6  doubt, you've got to conduct statistical significance testing.
7  Again, as I said, I wouldn't normally do so, but I certainly
8  wouldn't have produced plans with the very specific unique
9  combination of features that I think you're listing out here.
10 Q    And you certainly wouldn't have limited yourself to six
11 simulated maps for purposes of your analysis, would you?
12 A    Well, as I said in my report I designed it to go to 1,000.
13 Q    Right.
14       MR. STRACH:  Thank you, Your Honor.  That's all I
15 have for now.  I understand the witness will be back later.
16       JUDGE OSTEEN:  All right.  Redirect?
17       MR. THORPE:  Thank you, Your Honor.
18                   REDIRECT EXAMINATION
19 BY MR. THORPE:
20 Q    Dr. Chen, good morning.
21 A    Good morning, sir.
22 Q    Do you recall yesterday an exhibit showing you Chen
23 Simulation Set One, Plan One?
24 A    Yes, sir.
25 Q    And you have that in front of you?

A     Yes, sir, I do.

Q     You did not create this document, correct?

A     No, sir, not at all.

Q     But your understanding is that this reflects the visual
display of the first set of simulations and the first plan
generated, is that correct?

A     That's how Mr. Strach represented it to me, and I think I
accepted that characterization.

Q     And what does this visual display tell us about the
frequency of any of the features appearing in this map,
appearing across the range of the thousand simulations that you
conducted in Set One?

A     Oh, virtually nothing at all.  This is one plan out of
1,000, 1,000 completely different independent districting maps.
So this really just tells us 1/1,000th of that total.  That's
it, no more, no less.

Q     Is there any way of determining from this single map the
frequency with which what were described yesterday as double
traversals occur?

A     No, sir, not at all.  It doesn't tell us anything at all
about the frequency.  It tells us about one map out of 1,000.

Q     Is there any way to determine from this map the frequency
with which a single district exists solely in Mecklenburg
County?

A     No, sir, not at all.  I mean, we can see that it occurs

1    in -- you know, it might occur in one plan, or it might not

2    occur in one plan, but this is just one plan out of 1,000

3    independent maps.

4    Q    And this map could be created by the Defendants based on

5    the data that was produced in combination with your expert

6    report, is that correct?

7    A    It could've been.  I turned over all of my data regarding

8    all 1,000 maps.  I really can't say exactly how they picked out

9    this particular map.

10   Q    You constructed your maps following what you described

11   yesterday as the nonpartisan portions of the Adopted Criteria,

12   is that correct?

13   A    Yes, sir.

14   Q    And so for that purpose, you used the text of the Adopted

15   Criteria as adopted by the legislature in 2016?

16   A    Yes, sir, exactly.

17   Q    So you did not look at other aspects of, for example,

18   legislative history to determine whether there may be criteria

19   that were not mentioned in the Adopted Criteria, is that

20   correct?

21   A    That is correct.  I just read the words on the text of the

22   Adopted Criteria.

23   Q    And so you did not evaluate whether amendments, for

24   example, to the Adopted Criteria that were rejected by the

25   Joint Committee had any effect on the partisanship or the

1  predominance of partisanship of any plan?

2  A     Absolutely not.  I didn't have access to those sorts of

3  amendments.

4  Q     And in determining the predominance of partisanship over

5  the plan, you did not evaluate statements of any members of the

6  legislature regarding whether it was possible to draw 11

7  Republican districts, did you?

8  A     No, sir, I didn't have access to any such statements.

9  Q     And you didn't evaluate any statements by members of the

10 legislature that this was to be a political gerrymander, did

11 you?

12 A     No, sir, I did not have access to any such statements.

13 Q     And so your conclusion that partisanship predominated over

14 the other criteria in the Adopted Criteria is independent of

15 any evaluation of such statements?

16 A     Yes, sir, absolutely.

17 Q     In constructing your maps, did you -- you instructed the

18 computer to create 1,000 simulations for each set of your

19 simulations, is that correct?

20 A     Yes, sir.

21 Q     And each one of those simulations imposed a slightly

22 different set of constraints on those maps?

23 A     Yes, sir.

24 Q     Did you at any point instruct the computer to generate a

25 thousand maps that had a black voting-age population by

1  district for at least one district of greater than 40 percent?

2  A    No, sir.  The Adopted Criteria told me to ignore race, and

3  so I ignored race at all times in writing my expert reports and

4  in constructing those simulations.

5  Q    Did you at any point instruct the computer to create a

6  thousand simulations that split a minimum of 11 counties of

7  100,000 population or greater?

8  A    No, sir.  The Adopted Criteria did not tell me to pay

9  attention to that.

10 Q    And so by reference to these various charts that show maps

11 with those features, that reflects within the population of

12 3,000 maps how many happen to contain those features, is that

13 correct?

14 A    That's correct.

15 Q    But, theoretically, and understanding that you've already

16 answered why you didn't do so, you could have created

17 additional sets of simulations that modeled the unique features

18 that are isolated here, is that correct?

19 A    Oh, yes, theoretically, very much I could have done so.

20 Q    And so it's difficult to determine in the absence of that

21 instruction the statistical significance of the numbers in the

22 exhibits that we've just reviewed?

23 A    That's correct, sir.

24          MR. THORPE:  Thank you.  That's all I have.

25          MR. STRACH:  Nothing further at this time, Your

1   Honor.

2           JUDGE OSTEEN:  I've got to ask one question.  I got

3   confused yesterday.  My apologies, maybe a couple questions.

4           Dr. Chen, on compactness, the instructions originally

5   said that "The Committee shall make reasonable efforts to

6   construct districts in the 2016 Contingent Plan that improved

7   the compactness of the current districts and keep more counties

8   and VTDs whole as compared to the current enacted plan."

9           As I understood your testimony yesterday, you never

10  looked at the 2011 Plan, is that correct?

11          THE WITNESS:  That is correct, sir.

12          JUDGE OSTEEN:  So in setting up your program to

13  program compactness, what exactly did you do?

14          THE WITNESS:  I tried to draw the districts to be as

15  geographically as compact as possible after, of course,

16  following the other nonpartisan constraints on the Adopted

17  Criteria.

18          JUDGE OSTEEN:  So there wasn't necessarily a

19  percentage on compactness; it's just you program it to say

20  maximize compactness within all five parameters?

21          THE WITNESS:  Yeah, after -- that's correct, Your

22  Honor, after satisfying the other criteria to make sure that

23  the districts were as compact as possible, and I certainly did

24  not explicitly analyze the previous plan in place -- in place

25  prior to 2016, but, certainly, it wasn't my -- it certainly was

1   not my understanding that it would be, say, acceptable just to

2   do better than the 12th District was in -- on a compactness

3   measure.  When I see that districts are supposed to be compact,

4   I interpret that to mean that we're trying to draw compact

5   districts across the entire plan, not just to say do better

6   than the 12th District was in the previous plan.

7          JUDGE OSTEEN:  So, ultimately, whatever plan you ran

8   was simply to maximize the compactness factor as opposed to

9   simply making it better than the 2011 Plan, is that a fair

10  conclusion?

11         THE WITNESS:  Your Honor, I just -- I just wouldn't

12  characterize it as maximizing compactness because there are so

13  many other constraints.

14         JUDGE OSTEEN:  This is where I got confused.  You

15  have several factors, and you're not putting -- you're not

16  making compactness predominant, is that correct?

17         THE WITNESS:  Yes, sir, Your Honor, that's absolutely

18  correct.

19         JUDGE OSTEEN:  And I'm not using maximize to mean

20  make compactness predominating over any other factor.  I'm

21  simply -- we've got an instruction here that says improve it

22  over the 2011 Plan, generally speaking, and so I'm trying to

23  figure out how your algorithm was programmed to accomplish that

24  result.  You don't know, as I understand it, what the

25  compactness was of the 2011 districts overall or individual,

 1  right?

 2          THE WITNESS:  Yes, Your Honor.

 3          JUDGE OSTEEN:  So somehow you programmed this

 4  computer to do something on compactness, but I'm not exactly --

 5  essentially it's to -- maybe we're using maximize the same way.

 6  It's to make them as compact as possible, correct?

 7          THE WITNESS:  That's correct, Your Honor, make it --

 8          JUDGE OSTEEN:  Is that in relation to the "one

 9  person, one vote," so I'm going to have all the districts be as

10  equal as possible on population, and once I've calculated that

11  number, then I'm going to make them all as compact as possible?

12          THE WITNESS:  That's basically right, Your Honor.  I

13  mean, except -- as I was just saying, obviously equal

14  population is inviable.  You cannot violate equal population

15  even if doing so would enhance compactness.  The county-splits

16  requirement is inviable.  You cannot split an additional county

17  even if doing so would make for a prettier, more compact

18  district.

19          So there are all these things that constrain what we

20  can do in terms of compactness; but after having satisfied the

21  other nonpartisan portions of the Adopted Criteria, then the

22  computer is, in fact, trying to draw really compact districts.

23  So it's constrained in many ways, but compactness is very

24  clearly a requirement of the Adopted Criteria.

25          JUDGE OSTEEN:  Okay.  Then in terms of just this

1  algorithm that you are running, the inviable factor is the

2  equal population?

3          THE WITNESS:  Yes, Your Honor.

4          JUDGE OSTEEN:  That's in all 3,000 maps?

5          THE WITNESS:  Absolutely, Your Honor.

6          JUDGE OSTEEN:  Contiguity, is that an inviable

7  principle?

8          THE WITNESS:  Yes, Your Honor.

9          JUDGE OSTEEN:  All right.  And what else shall we say

10  would be inviable besides those two?

11          THE WITNESS:  Your Honor, there are two others.  So

12  the Adopted Criteria tell us that except for equal population

13  considerations, you cannot be splitting VTDs except to achieve

14  equal population.  Same goes for counties.  The Adopted

15  Criteria tell us that counties can be split for reasons of

16  equal population and some political considerations, which I

17  ignored in Simulation Set No. 1, but those two are inviable,

18  subject, obviously, to the equal population constraints.

19          JUDGE OSTEEN:  So once those rules are more or less

20  set in the algorithm, those calculations are made by the

21  algorithm, and then, ultimately, we get to compactness.  So

22  within those rules, we want the districts as compact as

23  possible?

24          THE WITNESS:  Yes, Your Honor.  After having paid

25  attention to those other four factors first, then we can pay

 1  attention to compactness.

 2          JUDGE OSTEEN:  In terms of making compactness better

 3  or worse than the 2011 maps, you just -- you assumed, because

 4  your algorithm had made the districts as compact as possible,

 5  that that would then meet these factors?

 6          THE WITNESS:  That's -- I think that's an accurate

 7  characterization, Your Honor.  I mean, I would add that --

 8  obviously, as a political scientist, I'm aware of the general

 9  shape of the previous congressional maps and the controversy

10  that have arisen through those maps.  So I'm aware that there

11  were some rather noncompact districts in the previous plan;

12  but, again, as I said, I did not explicitly analyze to make

13  sure.  It was pretty clear just from visually looking at it

14  that the simulated maps that were being created were certainly

15  going to improve the compactness relative --

16          JUDGE OSTEEN:  Based on just a visual review?

17          THE WITNESS:  That was pretty clear.  Obviously, as I

18  said, I didn't do a computational calculation of the Reock

19  score of every district of the 2011 Plan, but, visually, I

20  could see what was going on.

21          JUDGE OSTEEN:  All right.  Anything in response to

22  that?

23          MR. THORPE:  No, Your Honor, thank you.

24          JUDGE OSTEEN:  Did you all have any questions?

25          JUDGE WYNN:  I just have a couple of technical

1  questions, Dr. Chen.  I'm over here.  We use a lot of terms,

2  and in 2017, they become commonplace, but I want to make sure

3  we are speaking about the same thing.  How do you define an

4  algorithm?

5          THE WITNESS:  How do I define an algorithm, Your

6  Honor?

7          JUDGE WYNN:  Yes.

8          THE WITNESS:  An algorithm, in the way that I use it

9  in my report, is a set of rules that I build into a computer

10  program.  It's literally a computer program.  So it's a set of

11  instructions.  I turned over all these instructions, all the

12  computer code.  The algorithm is a set of rules that I build

13  into those computer instructions that tell the computer when

14  you're building districts, here's what you pay attention to

15  first, here's what you pay attention to second, and so on.

16          JUDGE WYNN:  And where did you derive this set of

17  rules here?

18          THE WITNESS:  I derived the set of rules by reading

19  the Adopted Criteria.

20          JUDGE WYNN:  And that was the basis upon which this

21  algorithm was formed?

22          THE WITNESS:  Yes, Your Honor.  What I was trying to

23  do, in forming this algorithm, was to hold several

24  redistricting factors constant that I read from the Adopted

25  Criteria and to hold them constant by incorporating them into

1  that algorithm.

2          JUDGE WYNN:  Now, to understand how this type of

3  research is used, is it used in other areas other than in

4  redistricting for certain purposes?  And I know that's a

5  general question, but I'm trying to understand.  This is not

6  unique or is this unique, the method that you're using for

7  redistricting, from some other areas?

8          THE WITNESS:  You know, with the specificity that I,

9  for example, wrote this algorithm here designed to follow the

10  Adopted Criteria, obviously nobody else in the world outside

11  North Carolina does it in quite such specific detail, but it is

12  used in many commercial applications as well as in other

13  academic applications.

14          JUDGE WYNN:  Such as?

15          THE WITNESS:  Well, just to give a random example:

16  When FedEx wants to decide what kind of delivery zones that

17  they have, they have to set up zones to figure out which

18  drivers are going to go where, how to create maps that optimize

19  their driving time to make their deliveries faster, to minimize

20  the use of their driver resources, things like that.  You're

21  basically producing zone maps or delivery maps, and so you can

22  kind of see the parallels between that and the sort of thing

23  that we get into with redistricting.  So that's just a random

24  example.

25          JUDGE WYNN:  All right.  Thank you.

 1            JUDGE OSTEEN:  Anything in response to that?

 2            MR. THORPE:  Thank you, Your Honor, no.

 3            JUDGE OSTEEN:  Mr. Strach?

 4            MR. STRACH:  No, Your Honor.

 5            JUDGE OSTEEN:  All right.  You may step down,

 6  Dr. Chen.

 7            (At 9:39 a.m., witness excused.)

 8            JUDGE OSTEEN:  Mr. Speas, you disappeared a little

 9  bit, but not too far.  Does that complete the Common Cause

10  case, or what's going on?

11            MR. SPEAS:  That completes the expert testimony from

12  the Common Cause Plaintiffs.  Those are our two experts.

13            JUDGE OSTEEN:  Okay.  Do you anticipate any further

14  testimony -- I mean, presenting evidence in the case in chief

15  during the trial, or will the rest of it be --

16            MR. SPEAS:  I do not.

17            JUDGE OSTEEN:  Okay.  Thank you.  All right.

18  Mr. Earls, you may proceed.

19            MS. EARLS:  Thank you, Your Honors.  If I may, just a

20  word of context.  As you know from the opening statements, the

21  League of Women Voters' claim is very distinct from that of

22  Common Cause.  We intended to present first our evidence

23  relating to the intent prong of the standard we're proposing,

24  and with the next witness, we are moving to the discriminatory

25  effect prong of the standard that the League of Women Voters is

1  proposing.

2            JUDGE OSTEEN:  You may call your next witness.

3            MS. EARLS:  Thank you, Your Honor.  The League of

4  Women Voters call Dr. Simon Jackman.

5            Your Honors, at this time I would like to move to

6  admit Exhibits 4002, which is the amended report of Dr. Simon

7  Jackman, 4003, which is the rebuttal report of Dr. Simon

8  Jackman, and 4004, which is Dr. Jackman's CV.

9            JUDGE OSTEEN:  Any objection to those?

10           MR. STRACH:  No, Your Honor.

11           JUDGE OSTEEN:  Okay.

12           MS. EARLS:  And if I may, Your Honor, I have copies

13 to provide to the Court and a witness --

14           JUDGE OSTEEN:  I guess we should keep Dr. Chen's

15 report handy.  We'll be coming back to that a little later.

16           MS. EARLS:  The clerk had previously asked the

17 Plaintiffs to provide a notebook of expert reports, and so

18 that's what I'm handing up now, which includes the three

19 exhibits that have just been admitted.

20           JUDGE OSTEEN:  Okay.  But with respect to Dr. Chen,

21 at some point he'll be recalled, so we need to keep his report

22 handy also?

23           MS. EARLS:  Yes, but that will also be in the

24 notebook I'm about to hand to you.

25           JUDGE OSTEEN:  Oh, okay.

1                         SIMON JACKMAN,

2              PLAINTIFF'S WITNESS, SWORN AT 9:43 a.m.

3                        DIRECT EXAMINATION

4  BY MS. EARLS:

5  Q    Would you state your name for the record, please.

6  A    My name is Simon Jackman.

7  Q    And how are you employed?

8  A    I'm a professor of political science and the chief

9  executive officer of the United States Study Center at the

10 University of Sydney.

11 Q    And what is the United States Study Center?

12 A    The United States Study Center is a research institute, a

13 think tank, if you will, dedicated to the study of the United

14 States and to advancing Australian's understanding of the

15 United States.

16 Q    And what do you do in these roles?

17 A    It's a mix of things.  I research a lot of public outreach

18 and teaching.

19 Q    And how long have you had this position?

20 A    Eighteen months.

21 Q    Prior to that, for 19 years, you were a professor at

22 Stanford University?

23 A    That's correct.

24 Q    And in what departments?

25 A    In the departments of political science and statistics.

1  Q    And during that period, you also had visiting

2  professorships at the United States Study Center?

3  A    That's correct.

4  Q    And early on in your career, you were also a professor at

5  the University of Chicago?

6  A    That's correct.

7  Q    So you've essentially been in the United States for most

8  of your professional career?

9  A    Yes, all but the last 18 months, yeah.

10 Q    Now, what is your educational background?

11 A    I was an undergraduate back in Australia.  I came to the

12 United States.  My Ph.D, which I obtained from the University

13 of Rochester in Rochester, New York.  I spent three years

14 during that time at Princeton as I was completing my doctorate.

15 Q    And what are your areas of specialization?

16 A    American political institutions, elections and election

17 forecasting, and the application of statistical methods in

18 political science settings.

19 Q    What significant professional leadership roles have you

20 had?

21 A    I've been the director of the -- or the principal

22 investigator of the American National Election Studies, the

23 largest, most authoritative, longest-running, survey-based

24 study of the American electorate.  I've been the president of

25 the Society for Political Methodology.  That is the group of

1  political scientists with -- dedicated to the use of

2  statistical methods in political science.  Those are the two

3  that I would single out.

4  Q    If I could have Exhibit 4004 brought up, please, and it's

5  also in the notebook in front of you behind Tab 4.

6  A    Okay.

7  Q    Is this a copy of your CV that was current at the time you

8  provided it along with your expert report in this case?

9  A    That's correct.

10 Q    And on pages 2, 3, and 4 of your CV, do you summarize your

11 publications?

12 A    Yes.

13 Q    And you've written the authoritative textbook on *Bayesian*

14 *Analysis for the Social Sciences*?

15 A    I have.

16 Q    And how is that used?

17 A    It is used in master's and Ph.D-level courses around the

18 world in statistics and in social science settings as well.

19 Q    Your CV indicates, am I right, that you have approximately

20 30 articles published in refereed journals?

21 A    That's correct.

22 Q    Do any of those articles relate to the work that you did

23 in this case?

24 A    Yeah, they do.  Some of my very first publications,

25 designated "A1," "A2," "A3," "A5," deal directly actually with

1   many of the issues that arise in my report and in this matter.

2   Q    And did you calculate measures of partisan asymmetry as

3   part of your research for those or other articles?

4   A    Yes, absolutely I did, yes.

5   Q    And what about the most recent article listed here, "A30"?

6   A    Yeah, that is an article looking at a method called

7   "uniform swing" as a predicative tool in forecasting election

8   results in the United States.

9   Q    And then if we turn to page 6 of your CV, does that

10  summarize some of the significant awards you've received during

11  the course of your career?

12  A    Yes, it does.

13  Q    Now, have you testified as an expert witness in any other

14  case?

15  A    Yes, I have.

16  Q    Which case was that?

17  A    *Gill v. Whitford* in Wisconsin.

18  Q    And were you accepted by the Court as an expert and

19  testified in the trial of that case?

20  A    I was.

21  Q    And did you testify about some of the same subject matter

22  that you'll be testifying -- that's the subject of your report

23  in this case?

24  A    Yes, indeed.

25            MS. EARLS:  Your Honor, I tender Dr. Simon Jackman as

1  an expert in statistics, election forecasting, and American

2  political institutions.

3              JUDGE OSTEEN:  Any objection?

4              MR. STRACH:  No, Your Honor.

5              JUDGE OSTEEN:  All right.  He is -- the motion is

6  granted, and he will be allowed to render his opinion in the

7  areas of American political institutions, elections, and

8  election forecasting, and the application of statistical

9  methods in political science.

10             MS. EARLS:  Thank you, Your Honor.

11  BY MS. EARLS:

12  Q    Dr. Jackman, what were you asked to do in this case?

13  A    There were really five things I was asked to do.  First of

14  all, to assess the extent to which the districting plan in

15  place for North Carolina's 2016 congressional election

16  exhibited partisan asymmetry, number one; number two, to assess

17  and to compare the properties of different measures of partisan

18  asymmetry; number three, to assess the question of whether

19  there was a threshold value at which a measure of partisan

20  asymmetry might raise a concern or be -- or signal that a plan

21  ought to attract judicial scrutiny; number four, to assess how

22  durable partisan asymmetry is over the life of a districting

23  plan; and then, finally, having done all that, to put what we

24  see in 2016 from North Carolina in a broader setting, in a

25  broader comparative setting, to put it up alongside other

 1  elections in recent American political history to assess --

 2  and, therefore, to assess the level of partisan asymmetry we

 3  see in North Carolina 2016.

 4  Q    Now, before we go any further, I think it would be helpful

 5  if we define some of the terms that you've just used in

 6  describing your analysis in this case.  What is partisan

 7  asymmetry?

 8  A    Partisan asymmetry in this context refers to the property

 9  that -- the translation of votes into seats, right.  That's

10  what districting plans do.  They take votes on the ground, they

11  draw lines around voters, and we call those districts or seats.

12  It's that translation of votes into seats.  Is that translation

13  of votes into seats the same for both sides of politics?

14          So as Democrats increase their vote share, presumably

15  they will win more seats.  As Republicans increase their vote

16  share, presumably they will win more seats, but is the rate at

17  which increasing vote share is generating increased seat share,

18  is that mapping, if you will, the same for both sides of

19  politics?  Are those mappings symmetric with respect to the

20  Democrats and to the Republicans, or are they not?  And if they

21  are not, we say they are asymmetric.

22  Q    How long has this concept been discussed in political

23  science literature?

24  A    This goes way back actually.  You can find articles

25  beginning to grapple with this literally from the turn of the

1  20th century in the statistics literature.  The progression is

2  actually rather slow, but by the middle of the 20th century,

3  this is coming -- it's becoming less a statistics problem and

4  more a political science problem.  Through the '70s, 80s, and

5  90s, this property of partisan asymmetry in the political

6  science literature is called "partisan bias," is the operative

7  term for it, and I guess it's really in the last 20 years that

8  the term -- the more encompassing term "partisan symmetry" or

9  "partisan asymmetry" has become more widely used, and I think

10  that's, frankly, a better way to think about what this problem

11  is fundamentally all about.

12  Q    And what are some of the common ways it's measured today?

13  A    There are three widely used measures.  I just referred to

14  partisan bias.  That's been with us the longest, but the

15  literature has got some other proposals:  The mean-median

16  difference, which maybe we can define later on, and one that I

17  spent a lot of time analyzing in my report, the efficiency gap.

18  Q    And so what is the efficiency gap?

19  A    Sure.  So two words, efficiency gap.  Let's take the gap

20  piece first.  That refers to the partisan asymmetry I was

21  referring to.  Is there a gap between the parties with respect

22  to the way their votes are translated into seats?  And

23  efficiency gets at this idea of how are you using your votes?

24  How are your votes being grouped into districts such that

25  there's an efficient mapping from your support on the ground

1  into your seats in the legislature, and is that mapping less

2  efficient for one side of politics than the other?  That's what

3  the efficiency gap is fundamentally trying to measure.

4  Q    And in talking about the efficiency gap, is it common to

5  talk about wasted votes?

6  A    Yeah, at its core, the efficiency gap rests on this

7  concept of wasted votes.  And so what is a wasted vote?

8  Q    Yes, thank you.

9  A    A wasted vote in this context means a very specific thing.

10  If I lose a seat, none of the votes cast for me in that seat,

11  for my party in that seat, generated a seat in the legislature.

12  So from this very particular sense of the word "wasted," those

13  votes are wasted.  They did not generate a seat for me.  That's

14  for the loser in a given seat.

15        For the winner in a given seat, votes in excess of

16  what they needed to win the seat, right, too many votes are

17  there for them, those votes could be allocated somewhere else

18  in the pursuit of a seat.  So from that sense, winning by too

19  big a margin is also wastage in this very particular sense of

20  the way we're using the word "wasted" here.

21        So those are the senses in which we have wasted

22  votes.  So there are wasted votes for the winner in a seat.

23  There are wasted votes for the loser in a seat.

24  Q    So then can you tell us how the efficiency gap is

25  calculated in general terms?

1   A     Sure.  So what we do is in each district, we look at the

2   wasted votes for the winner, we look at the wasted votes for

3   the loser, and we would sum those over the districts in a

4   jurisdiction, and we would compare the wasted votes for the

5   Democratic candidates, we would look at the wasted votes for

6   the Republican candidates, we would sum those up and look at

7   the difference between the two, and that's the gap at that

8   point.  Are there more wasted votes for the Republican or for

9   the Democrat, or Democrats, plural?

10           MS. EARLS:  I would like to ask that we bring up

11  Plaintiffs' Exhibit 3023, and I believe this exhibit has

12  already been admitted by the Courts' order that all exhibits

13  not objected to are admitted.

14  BY MS. EARLS:

15  Q     And I would ask you to turn to page 2 of that exhibit, and

16  it's on the screen in front of you as well.  That shows the

17  Democratic and Republican votes in the 2016 congressional

18  elections, and my question for you is -- and I'm referring now

19  to the box on the right-hand side of page 2 of Exhibit 3023.

20           JUDGE OSTEEN:  All right.

21           MS. EARLS:  I'm sorry.

22           JUDGE OSTEEN:  I either need a copy or we're going to

23  have to move that easel because I can't -- my eyes aren't good

24  enough to see either one really, but I've got a better shot at

25  that one.

 1            JUDGE BRITT:  I was going to make the same

 2   observation, but I really can't see.  Oh, that helps.

 3            MS. EARLS:  Is it visible now?

 4            JUDGE OSTEEN:  I can see it now.

 5            MS. EARLS:  Thank you.

 6   BY MS. EARLS:

 7   Q    And my question for you is using those election results --

 8   statewide election results -- or I should say, by district the

 9   election results in the 2016 congressional elections, would you

10   be able to calculate the efficiency gap?

11   A    Oh, absolutely, yeah.  And, indeed, I did.

12            MS. EARLS:  Your Honors, at this point I would like

13   to ask permission for the witness to step down and use the

14   paper.

15            JUDGE OSTEEN:  Stay close to the microphone.

16            THE WITNESS:  Absolutely.

17            MS. EARLS:  So I'll let the record reflect, I've

18   asked Dr. Jackman -- I've handed him a marker.

19   BY MS. EARLS:

20   Q    And there's a calculator as well there for your use.

21   A    Okay.

22   Q    And so to calculate the efficiency gap for the 2016

23   congressional elections, can you just put that on the top of

24   the --

25   A    Sure.  So we're in District 1.  So I'll just write that at

 1  the very -- I'll just write that at the very top.

 2              JUDGE OSTEEN:  All right.  Let's -- you're going to

 3  be using numbers off what's on the screen?

 4              THE WITNESS:  Yes, indeed, I will in just a second.

 5              JUDGE OSTEEN:  They just tricked you and took them

 6  away.

 7              THE WITNESS:  I can still see them there.

 8              JUDGE OSTEEN:  I hate to block you out.  You can move

 9  if you need to, but I think it would be better if you move the

10  whiteboard over so that we can see both the screen and the

11  whiteboard.

12              THE WITNESS:  Yes, sir.

13              JUDGE BRITT:  There you go.  That's good.

14  BY MS. EARLS:

15  Q    So the column under -- for District 1 for Democratic votes

16  shows that the Democratic candidate in 2016 received 240,661

17  votes, and the Republican candidate in District 1 received

18  101,567 votes.  Using those numbers, what do you do next to

19  calculate the efficiency gap?

20  A    Right.  So remember the definition of wasted votes.  In

21  District 1, the Democrat has won, the Republican has lost, and

22  we will, for the purposes of this calculation, ignore the

23  relatively tiny number of votes for other here, and, indeed,

24  District 1 is the only district in which any votes for others

25  are recorded.  So we'll just put those to one side for the

1   purposes of focusing on the main game, if you will, the

2   Democrat v. Republican comparison here.

3           The Republicans lost.  So consistent with the

4   definition I gave before, from the Republican's perspective,

5   all of those votes are wasted, right.  101,567 votes were cast.

6   They yielded zero seats.  All right.  So votes cast that do not

7   generate a seat are considered wasted.  So the Republicans'

8   wasted votes here are all of the 101,567.

9           The next thing we need to do is to figure out how

10  many of the votes cast for the Democratic candidate are wasted

11  votes.  240,661 were cast, but the question we have to ask is

12  what did the Democrat actually need to win, and the answer is

13  to take the total votes, divide by two, plus one, right.  That

14  was the number of votes that the Democrat needed to win.

15          At this point, I'll resort to a hand calculator here,

16  and I'll note that we have 240,661 plus 101,567.  I take that

17  number, which is 342,228, divide by two and plus one, and I get

18  171,115.  So that's votes to win was 171,115.

19          And now the Democrats wasted votes are 240,661 in

20  excess of 171,115.  So simple subtraction, we're going to take

21  240,661 subtract 171,115, and I get 69,546 wasted votes for the

22  Republican [sic], 69,546.  And we're done for District 1.

23  Q    So you can return.

24          MS. EARLS:  And I'll just mark that as a

25  demonstrative exhibit for the purposes of the record.  I

1  believe that would be 4079.

2          JUDGE OSTEEN:  Any objection to that, Mr. Strach?

3          MR. STRACH:  No, Your Honor.

4          MS. EARLS:  Your Honor, if I may, at the break I can

5  add an exhibit sticker to that.

6          JUDGE OSTEEN:  Just take a pen and write the number.

7          MS. EARLS:  Okay, thank you, Your Honor.

8          JUDGE OSTEEN:  PX4079 is admitted for demonstrative

9  purposes.

10          MS. EARLS:  I would like to bring up Plaintiffs'

11  Exhibit 4078, which is also a demonstrative exhibit, and I have

12  copies to provide.

13  BY MS. EARLS:

14  Q    And, Dr. Jackman, this is in the notebook in front of you

15  as well behind Tab 78.

16  A    Sure.

17  Q    Did you -- did you do that exact same calculation that you

18  just showed us for District 1 for the remainder of North

19  Carolina's congressional districts using the election returns

20  from the 2016 congressional ?

21  A    Yes, I did.

22  Q    And are those the numbers that appear on the chart that is

23  Plaintiffs' Demonstrative Exhibit 4078?

24  A    Yes.

25  Q    So then can you describe for us, using this chart, how you

1  ultimately calculate the efficiency gap for that election?

2  A      Sure.  So I just stepped us through the calculations for

3  the first district, and you can see that in the first row we

4  have the results of my calculation, the wasted Democratic votes

5  that I computed manually, 69,546, and we also see in the top

6  right the wasted Republican votes in this instance, 101,567.

7          Now, we just repeat that logic, that very simple

8  calculation across the 13 districts, and then we sum, and we

9  have two sets of wasted votes now, two wasted vote totals.  The

10  Democratic wasted votes summed over the 13 districts, we get

11  1,592,124, the wasted Republican votes 702,859, and now we want

12  to compute the efficiency gap, right.  So now it's about the

13  difference between these wasted-vote totals for the two

14  parties.

15          So when we define the efficiency gap as Republican

16  wasted votes minus Democratic wasted votes -- and to convert

17  that to a percentage, we will then just divide by the total

18  number of votes cast for the two parties, and so that's the

19  calculation that you see in the very bottom row of this chart.

20  You'll see the 702,859 wasted Republican votes.  That's in red.

21  We will then subtract the 1,592,124 wasted votes for the

22  Democrats.  That's in blue.  All right.  So we have that

23  difference, and then we divide by the sum of the total votes,

24  which is just the 2.4-million-odd and the 2.1-million-odd for

25  Republican and Democratic candidates respectfully, and again

1  just nothing more than, you know, simple algebra, and we get

2  simple arithmetic, and we get negative 19.4 percent as the

3  calculated efficiency gap for North Carolina in 2016.

4  Q    And is that negative 19.4 percent an efficiency gap in

5  favor of which party?

6  A    Oh, right.  So the sign here, the fact that it's negative,

7  indicates that it is an efficiency gap indicating that

8  Republicans are wasting fewer votes than Democrats.  We define

9  this conventionally as wasted Republican votes minus wasted

10 Democratic votes.  That quantity, therefore, is negative.

11 That's indicative of Republicans wasting fewer votes or, if you

12 will, the districting plan exhibiting a tendency to favor

13 Republican candidates.

14        If, on the other hand, the efficiency gap is positive

15 in sign, it means that Democrats are wasting fewer votes than

16 Republicans, indicative of an electoral system or a districting

17 plan that manifests advantage for Democratic candidates, and

18 that is just merely conventionally.  Nothing turns on that.

19 It's left to right, Democrat to -- we could have easily done it

20 the other way.  It's just conventional to do it R minus D as

21 opposed to D minus R.

22 Q    And looking at this table, is there data here that allows

23 you to understand why the efficiency gap was negative

24 19.4 percent in that election?

25 A    Yeah, and so this is what I especially like about the

1  efficiency gap, by the way.  It is tied to the results

2  themselves on the ground.  We can literally eyeball -- the nice

3  thing about North Carolina is it's just 13 districts.  We can

4  literally see them all in a spreadsheet and just eyeball what's

5  going on here.

6          We can see in the districts that Democrats have won,

7  and there are three of them in North Carolina in 2016 -- we can

8  see that the Democrats win by relatively large margins.  For

9  instance, District 1, 240 -- 241,000-odd to 102,000-odd for

10 Republicans.  That produces the Republican's wasted votes,

11 right.  That's where their wasted-vote scores are getting

12 pretty high, but you see over the rest of -- so I'm going to

13 identify 1, there's 4, and then we can go down to 12, right,

14 where we see the Republican vote -- wasted-vote numbers in the

15 hundreds of thousands breaking 100,000, but look elsewhere,

16 look elsewhere.  Look over at the other ten districts, and you

17 will see Republican wasted-vote tailles that are quite small

18 relative to the Democrat wasted-vote numbers, which are

19 generally much larger.

20         And that gives us some insight as to what's going on

21 here, that the three districts that the Democrats won, that's

22 the place where Republican votes are wasted; but where

23 Republicans are winning, they're doing so quite literally very

24 efficiently with very few wasted votes, and that's the sense in

25 which this electoral system is giving, on its face at least,

 1  the ability for Republicans to translate their votes into seats
 2  much more efficiently than Democrats are translating their
 3  votes into seats.
 4          And so we get this -- the final number that pops out
 5  has this very tight connection to the actual facts on the
 6  ground or the actual election results.
 7  Q    Now, when was this concept of the efficiency gap first
 8  developed as a measure of partisan asymmetry?
 9  A    There are two articles in the literature where this really
10  comes together.  Political scientists have been talking about
11  wasted votes for a long time in the sense of efficiency.  These
12  ideas have been in the literature, but they really come
13  together in a piece by Eric McGhee in *Legislative Studies*
14  *Quarterly* in 2014 where he puts the two -- this idea that we're
15  going to compare wasted votes for Republicans and wasted votes
16  for Democrats.  That's the -- and build an index out of that.
17  That comes together in that piece, and then the word itself,
18  "efficiency gap," is due to an article by Stephanopoulos and
19  McGhee, which appeared in *The University of Chicago Law Review*,
20  and it circulated as a working paper for a little while before
21  it finally appeared in print.
22  Q    And in your opinion, is it a valid and reliable measure of
23  partisan asymmetry?
24  A    Yes.
25  Q    And why do you think it has value?

1  A    Well, number one, it's so simple.  You don't need a Ph.D

2  in statistics to compute this thing.  Literally with nothing

3  more than a hand calculator or an Excel spreadsheet, any one of

4  us, I think, could go off and produce that calculation.  There

5  is no algorithm.  There is no recourse to simulation.  There is

6  no modeling.  There is literally counting and adding and

7  subtraction and a little bit of division at the very end.

8  That's nice.  It's simple.

9          The other thing is, as I was just explaining, it

10 is -- and for that reason, it is closely connected to

11 real-world election results.  You're not imagining other

12 elections that might have happened but didn't.  You're not

13 asking yourself what if this district had been drawn that way

14 or this or that.  You are literally taking the facts of this

15 particular election, and any other election for that matter,

16 and counting up what happened.  You are not engaging in

17 speculation about hypothetical other elections or this or that.

18 You are computing it literally off official election returns.

19 Q    And does it operationalize what's wrong with partisan

20 asymmetry?

21 A    Yes, it does, right, again because of this deep connection

22 to wasted votes; and, indeed, as a measure of the extent to

23 which a plan is gerrymandered, I think it's got considerable

24 merit because of this idea of wasted votes is picking up

25 exactly the mechanisms of gerrymandering, as we refer to them

 1  euphemistically, "packing and cracking."

 2          If we could bring that table back up for a second,

 3  the packing that we, you know, typically associate with these

 4  lopsided Democratic wins is manifest in the large number of

 5  wasted Republican votes there, but there are only three such

 6  districts, and then the cracking is manifest in the very

 7  efficient way, the low numbers of wasted Republican votes in

 8  the remaining ten districts, but the relatively high numbers of

 9  wasted Democratic votes.  So packing and cracking is picked up

10  by this concept of wasted votes and summarized into an index in

11  a very nice tidy, simple-to-understand way.

12  Q    So let's turn to the other measures of partisan asymmetry

13  that you mentioned.  Can you define for us what partisan bias

14  is?

15  A    Sure.  So partisan bias asks us to contemplate an election

16  that is decided 50/50, right, where the statewide share of the

17  votes split perfectly evenly; and then if the election were

18  decided that way, if that's the way the election came out, it

19  asks then would the seats split 50/50, and --

20  Q    And --

21  A    Pardon me.

22  Q    I'm sorry.  Continue.

23  A    And if they did not, if it appears that a 50/50 split of

24  the vote would not yield a 50/50 split of the seats, we say the

25  districting plan is biased in favor of the party that would win

1   more than 50 percent of the seats, if it won 50 percent of the

2   vote and is biased against the other party that would win less

3   than 50 percent of the seats if it were able to win 50 percent

4   of the vote.

5   Q    And, just briefly, how is that calculated?  How is

6   partisan bias calculated?

7   A    So a simple method, and perhaps the most popular method,

8   the most widely used method, for computing partisan bias is to

9   take a set of real-world election results, like these ones, and

10  then shift the whole state back or up to or down to or up to

11  the 50/50 point, and then you literally look at -- some seats

12  may change hands under that scenario.  If I were to add a

13  little bit to the Democrats or subtract a little bit from the

14  Republicans, say, to get to 50/50, you may see under that

15  simulation exercise a seat change hands.  Then literally you

16  look at who wins each seat under this new world we've moved the

17  election results into.  You literally cannot prove who wins the

18  seats under that scenario, and you get the seat share out of

19  that, and is it 50/50.  And to the extent it's not, we've got a

20  measure -- you know, the difference from 50/50 is the measure

21  of bias in the system.

22  Q    And then what is the mean-median difference?

23  A    So the mean-median difference is, again, right, all of

24  these things are trying to pick up asymmetry, partisan

25  asymmetry, and so the mean-median difference says let's look at

1  the distribution of vote shares for say -- let's just, for the

2  sake of argument, take Democratic candidates across the state.

3  Let's look -- so in the case of North Carolina, that's 13

4  numbers.  So there are 13 numbers, and they have a mean, those

5  13 numbers have an average, and those 13 numbers have a median;

6  and if the distribution of Democratic vote shares is skewed,

7  that is to say, the distribution is asymmetric, the mean will

8  not coincide with the median.  That is in statistics a feature

9  of a skewed distribution, that the mean is pulled in the

10  direction of the skew, and a simple indication and, indeed, a

11  measure of skew is the extent to which the mean is different

12  from the median, and it's as simple as that.

13  Q    So how do you define proportional representation?

14  A    Proportional representation is the property in an

15  electoral system that you get as many seats in the

16  legislature -- you get -- the proportion of seats you get in

17  the legislature is equal to -- deterministically equal to the

18  proportion of votes you got in the election.

19  Q    So can you explain in basic terms how partisan asymmetry

20  is different from proportional representation?

21  A    Yeah, this is very important, I think, for everybody to

22  understand that there is nothing in an insistence on partisan

23  symmetry that ties you to proportional representation.  They

24  are quite distinct concepts.  Single-member district systems of

25  the sort we have in many, many places in the Democratic world,

but including North Carolina, typically do not generate

proportional representation.  It is not the case in a

single-member district system that either deterministically or

just empirically that a 1 percentage point increase in vote

yields a 1 percentage point increase in seats.  That's just not

what happens either by design or by accident.  It does not work

that way.

          Partisan symmetry is merely -- again, it's a weaker

property, if you will.  All it insists on is that the mapping

from votes into seats is the same for both sides of politics.

It does not say if I get 55 percent of the vote, I have to get

55 percent of the seats.  Empirically, over the long run in

American politics, in American congressional elections, if you

get 55 percent of the vote, you're probably going to do a

little better than 60 percent of the seats, right, maybe

65 percent of the seats.  You are not going to get 55 percent.

You're going to do better than that.

          Conversely, if you get 45 percent of the vote, you're

not going to get 45 percent of the seats, right.  You're going

to do worse than that, but partisan symmetry just insists that

whatever that mapping is -- and it typically is not

proportional.  In fact, it is not proportional.  I think we can

just assert that -- that it be the same for both sides of

politics.

          Now, at the 50/50-point, yeah, they coincide, right.

1  The one point, and there's only one point, where partisan

2  symmetry will line up with PR, and that's right at the 50/50

3  point, right.  If a system is symmetric, it will mean that if I

4  get 50 percent of the votes, I get 50 percent of the seats, and

5  so will you, by the way, but everywhere else, all it insists on

6  is if 45 yields 47, then that's true for you.  It's true for

7  me.  That's partisan symmetry.  It is not PR.

8  Q    Now, you stated that you were asked to look at the

9  durability of the efficiency gap and partisan asymmetry in the

10 North Carolina plans.  What do political scientists mean by

11 durability when used in connection with partisan asymmetry?

12 A    Sure.  That in the particular case of the United States,

13 districting plans -- other than courts intervening or whatnot,

14 districting plans are in place for a decade, and, that is, over

15 the life of a districting plan, are its properties with respect

16 to symmetry or asymmetry enduring, that is, such that if we see

17 a given level of asymmetry in the plan's design and in the

18 plan's first election, say, that that is something that we can

19 infer will be present over the subsequent elections of -- in --

20 of the -- over the plan's duration.

21 Q    Now, did you prepare a report on the work that you did in

22 connection with this case?

23 A    I did.

24 Q    If you would turn to Tab 1, Exhibit 4001 in the notebook.

25 A    I'm looking at it.

1    Q     Can you identify what that is?

2    A     That is a copy of the report I submitted in March of 2017.

3    Q     And if you would next turn to Exhibit 4002 behind the

4    second tab in the notebook, can you identify what that exhibit

5    is?

6    A     That is an update, an amendment to the report I submitted

7    in this case.  This one dates from April.

8    Q     And can you tell us, why did you amend your report in

9    April?

10   A     Yeah, after we submitted my report, it was -- experts from

11   the other side in this matter pointed out there were a couple

12   of niggling errors with respect to a tiny part of the analysis.

13   I looked at over 8,000 congressional elections at the district

14   level, and in 58 of them, I had some wrong numbers, which

15   Defendants' expert was gracious to point out to me, and we took

16   the opportunity to go back and correct those numbers; and,

17   moreover, there was some text accompanying one of the graphs

18   that was -- hadn't been updated from an earlier draft, and,

19   literally, the words on the page didn't match what was in one

20   of the graphs, and, again, it was Defendants' expert that

21   pointed that out, and, again, we took the opportunity for me to

22   go and amend that part of the report as well.

23            JUDGE OSTEEN:  All right.  Let me stop you there.

24   Speaking of graciously, we're going to take a mid-morning

25   recess.  We'll be in recess for 15 minutes.

 1              (At 10:24 a.m., break taken.)

 2              (At 10:45 a.m., break concluded.)

 3              JUDGE OSTEEN:  You may continue, Ms. Earls.

 4              MS. EARLS:  Thank you, Your Honor.

 5    BY MS. EARLS:

 6    Q    Before the break, we were looking at why you prepared an

 7    amended report, and you mentioned that out of the over 8,000

 8    separate district elections that you examined, there were 58 in

 9    which the data was not correct.  Did you discover why that

10    happened?

11    A    Yeah, in the course of my work, I inadvertently transposed

12    two columns in the data, and in a column where there was

13    supposed to be vote counts, the year of the election had been

14    put in there, which looked like a number, just a very low

15    number, and so that was picked up by -- and we fixed that.

16    Q    Right.  So once you made the correction, you reran your

17    numbers.  And did those errors impact your conclusions in any

18    way?

19    A    No, not at all, and the answer is because it's such a

20    small proportion of the overall data set.

21    Q    Now, let's look at the data that you did use in preparing

22    your report.  If I could have brought up on the screen

23    Exhibit 4002 at page 2 of that exhibit.

24    A    Yeah, so that's the part of the report where I detail the

25    data I used in the analysis.  The single largest collection of

 1  data is this data set on congressional election returns

 2  maintained by Harvard that is canonical inside political

 3  science.  That data collection runs up through '92, and '92 to

 4  the present.  Its *Congressional Quarterly* have a nice

 5  collection of congressional election returns; and then at

 6  various parts of the analysis, I relied on having presidential

 7  election results tabulated at the level of congressional

 8  districts.  And inside political science the go-to professor

 9  for that is Gary Jacobson, perhaps the most distinguished

10  scholar of Congressional elections in the country.  He is the

11  keeper of those data for political science.

12  Q    And then if you'll turn to page 67, at the end of this

13  expert report, there's a list of references.  Is that also

14  material that you relied on for your report?

15  A    Yes.

16  Q    Now, using this data, what analysis -- very broadly and

17  generally, what analysis did you perform?

18  A    I computed efficiency gap scores in -- which, remember, is

19  a state-level or jurisdiction-wide quantity.  So my analysis

20  yields an efficiency gap score in 512 elections conducted,

21  congressional elections at the state level, 1972 to 2016,

22  covering 25, 26 states, and those data also span 183 different

23  districting plans; and then that gave me, you know, frankly,

24  the most comprehensive database we have for examining these

25  partisan asymmetry measures, the efficiency gap in particular,

and, again, perhaps the most comprehensive set of data we have
for putting North Carolina 2016 in some context.

Q    And so does this analysis relate to the second prong of
the League Plaintiffs' proposed standard; namely, whether
there's a large and durable discriminatory effect from the
partisan --

A    Yes, indeed.  As I understand the totality of the
argument, my work speaks to the magnitude of the asymmetry, its
durability, the extent to which it is a property of a plan.  It
does not speak -- intent and whatnot were beyond the scope of
my report.

Q    And what overall conclusions did you draw from that
analysis about the North Carolina 2016 congressional districts?

A    So we had a chart up earlier that showed that efficiency
gap score that we compute for North Carolina in 2016 of
negative 19.4 percent.  In and of itself, that doesn't tell us
very much, but it's the comparative analysis I undertook
situating that number in the context of a large number of other
congressional elections that helps us understand it; and when
you do that, you discover a couple of things.  One is that is
an extremely large efficiency gap score.  In fact, it is the
largest efficiency gap score obtained in 2016 in my analysis.
It's the third largest in North Carolina's history, surpassed
only by those seen in 2012 and 2014.  It is durable.  It is so
large that for it to be sent back -- for this plan to start to

1  produce results consistent with a benign level of the

2  efficiency gap, we would be looking at Democrats picking up

3  about an 8 or 9 percent swing toward them, a swing that has

4  only been seen once in North Carolina's recent political

5  history.  In the Watergate election of 1974, there was a

6  massive swing towards Democrats.  It's a political upset of

7  that magnitude, of that historic magnitude, frankly, that would

8  take negative 19.4 and send it back somewhere in a benign

9  neighborhood of zero, and that sort of speaks -- and that's --

10 my analysis over time and over many states gives me the basis

11 for putting that negative 19.4 in some context.

12 Q    So I would like to start first with looking a little

13 closer at your analysis of the efficiency gap scores of all

14 congressional redistricting plans from 1972 to 2016, and you

15 mentioned that you looked at certain states.  If we could turn

16 -- have up on the screen and turn to page 19 of Exhibit 4002,

17 and does that list there the states that you looked at?

18 A    It lists -- the two bullet points there identify states

19 that are not in the analysis, and so there's -- because they

20 have six or fewer congressional districts, and Louisiana is

21 also out because of its -- because of its run-off system, and

22 then at various points, South Carolina, Kentucky, Colorado, and

23 Arizona are only in for part of the period '72 to '16 because

24 they're dropping below that seven-seat minimum.

25 Q    And why did you impose that seven-seat minimum?

1  A    Yeah, the efficiency gap, because of the way it's

2  computed, gets a little sensitive once you get down to

3  extremely small numbers of seats.

4  Q    And what do you mean by "sensitive"?

5  A    It means that a change in who wins the seat can produce a

6  big change in the efficiency gap; and when we're down to four

7  seats, say, one in four is not implausible at all, and that's

8  the circumstance in which, you know, you would want to do that

9  analysis almost -- take -- because it's so particular, you

10 would want to do apples to apples, and so you would want to

11 analyze all the four state -- four-seat states.  I would want

12 to analyze all the five-seat states.  I would want to analyze

13 all the six-seat states.  So I would want to do those in bins,

14 if you will, and straighter.  I'm much more comfortable putting

15 7 to 15 or 15 and above in their own buckets, but down -- well,

16 there's no redistricting to do in the at-large states.  States

17 with two congressional districts, redistricting isn't that

18 interesting.  Threes, fours, and fives and so on, I would want

19 to do the analysis in bins particularly there, and I didn't do

20 that in this case.  We've got an awful lot of data in the

21 seven-and-up category.  My calculations are that states with

22 seven CDs or more comprise -- currently comprise 82 percent of

23 the Congress.  So I was quite comfortable with that restriction

24 imposed on my analysis as to the data that entered my analysis.

25 Q    And if we could look at page 21 of Exhibit 4002, Figure 4,

1  what does that show?

2  A     That is a graphical summary of the data that are in, and

3  each orange square is a state year pair, and so you can see --

4  it just indicates where we've got data, and you can see South

5  Carolina coming in at the very end.  You can see Arizona coming

6  in in the 2000s.  You can see Kentucky dropping out after

7  the -- after the '80s, and then the horizontal lines group

8  states and years by the redistricting plan in place.  You see

9  the decade-type sequencing there in the sense that a

10 redistricting plan comes in on the two-year, and in some cases,

11 it's subject to court challenge or is amended, and there's a

12 few interruptions; but what you tend to see is this pattern of

13 five election sequences being held under the same plan,

14 modular, courts intervening or the legislature instituting a

15 new plan or things like that.

16 Q     So to be clear, with regard to Figure 4, you calculated

17 the efficiency gap, the partisan bias, and the mean-median

18 difference for all of the elections represented on this chart?

19 A     That's right.  So I've got 512 efficiency gap scores that

20 come from the state year elections as indicated in Figure 4.

21 Q     And in this analysis, what did you do when there were

22 uncontested elections?

23 A     Right.  So 14 percent of the roughly 8,000 district-level

24 data points do not have a D v. R, right, a Democrat running

25 against a Republican.  The typical thing is a Democratic or

 1  Republican incumbent being returned unopposed.  14 percent of

 2  the data are like that.

 3          You have a choice to make at that point.  Are you

 4  going to throw out the entire election, or are you going to

 5  keep it in?  Now, if you were to throw out the entire election,

 6  you would be throwing away an awful lot of those 512 elections.

 7  So the procedure that I adopt and others in the literature have

 8  adopted is to fit a model that makes it an imputation for what

 9  would have happened had there actually been a

10  Democrat-versus-Republican contest in that election.  To make

11  that imputation, I rely on the presidential vote that we

12  observed in that district, either just before or just after, in

13  some cases, or contemporaneously with the uncontested election,

14  and also to take into account the incumbency of the district,

15  that is, who was the fortunate incumbent -- the party of the

16  fortunate incumbent that did not face a challenge.  And any

17  imputation you would make has to satisfy the constraint that

18  that incumbent would win.  If you couldn't attract a

19  challenger, any sensible model should impute a vote total for

20  that candidate about 50 percent.

21          So I did that for the 14 percent of the roughly 8,000

22  cases where we don't observe a two-party contest.

23  Q    And is this imputation of data for uncontested elections

24  something that you have to frequently do in your analysis in

25  all sorts of contexts?

1   A    This idea of using presidential vote as an indicator of --

2   or looking at the relationship between congressional voting

3   outcomes and presidential voting in the district is quite

4   common in political science, but in this context, again, it was

5   only 14 percent of the data, and I think an important thing for

6   everybody to understand is that North Carolina 2016 did not

7   give us any uncontested districts, and so we're in the happy

8   position of not having to bother with that, at least for the

9   case of 2016 North Carolina.

10  Q    So, in other words, when you computed the efficiency gap

11  of the 2016 congressional districts in North Carolina, you

12  didn't have to do any imputations?

13  A    No, I did not, no.

14  Q    So let's turn to Figure 1 on page 2 of Exhibit 4002, and

15  can you tell us what that shows?

16  A    Yes, so I mentioned that my analysis was 8,000 districts,

17  512 elections, 136 plans.  Now we're at the level of 136 plans.

18  These are the 136 districting plans --

19           JUDGE OSTEEN:  Hold on a second.  Where are you?

20           MS. EARLS:  I'm sorry, Your Honor.  This is -- it's

21  probably easier to see it in a notebook, and this is page 10 of

22  Exhibit 4002.

23           JUDGE BRITT:  Well, it would be appreciated if you

24  would refer to it by the page number in the notebook.

25           MS. EARLS:  I will, Your Honor, thank you.

1          THE WITNESS:  So we're at Figure 1 on page 10, and

2   this has 136 dots, if you will, one dot for each districting

3   plan, and it's the average efficiency gap score that we observe

4   over the life of those 136 plans.  And I've arrayed the dots,

5   if you will, from top to bottom, top being the most

6   pro-Democratic efficiency gaps we see, to the bottom of the

7   graph on the left where we see negative efficiency gap scores

8   consistent with Republican advantage, and I've used a little

9   bit of color to distinguish the North Carolina plan that

10  governed the 2012 and 2014 congressional elections, which is

11  the lowest, the most pro-Republican redistricting plan observed

12  over 136 plans, 1972 to 2016, in my analysis.  And then the one

13  election that the current plan has generated -- we've seen

14  under the current plan, that is 2016, is one, two, three,

15  four -- it's the fourth most negative efficiency gap score, the

16  fourth most pro-Republican efficiency gap score observed over

17  the 136 plans that I examined.

18  BY MS. EARLS:

19  Q    Now, if we could turn to page 27 of Exhibit 4002, and if

20  you would look at Figure 6, does that also show in a different

21  way the results of your efficiency gap analysis?

22  A    Yeah, now, we're up at the level of the 512 elections in

23  my analysis, and this is a graphical device that we saw a lot

24  in court yesterday, a histogram, summarizing the distribution

25  of those 512 numbers, those 512 efficiency gap scores.  The

 1  height of the gray bars indicates that more data lies there
 2  than at other places where the bars might be lower.  So in this
 3  case, we see that there's this bug clump -- relatively big
 4  clump of data right around zero efficiency gap score --
 5  Q    I'm sorry.  When you say there's a big clump of data, what
 6  do you mean by that?
 7  A    I mean, in the preponderance of the data, the bars are
 8  higher in the middle of the graph close to an efficiency gap
 9  score of zero, meaning that over those 512 elections, on
10  average, we are much more likely to see an efficiency gap score
11  close to zero than we are likely to see an efficiency gap score
12  either taking on a large pro-Democratic positive magnitude or a
13  large pro-Republican negative magnitude.  Most of the data lie
14  in the middle.
15  Q    And then what is the red and blue lines on this?
16  A    Yeah.  So I've used, again, color to highlight where
17  recent North Carolina elections -- the efficiency gap scores
18  associated with those elections line up in the 512 elections
19  spanned by my analysis, and they lie far out in the left-hand
20  tail of this distribution.  You can see the blue line for 2016,
21  and you can see the red and almost superimposed line -- the
22  black line for 2014 and 2012 respectively, again some of the
23  more extreme efficiency gap scores I saw in my analysis
24  spanning 44 years and 512 elections.
25  Q    And what were you able to conclude as a result of this

1  analysis?

2  A     The unusual nature -- the unusually pro-Republican nature

3  of the efficiency gap scores and of the plans that created them

4  for North Carolina.  I concluded that, on average, efficiency

5  gap scores close to zero are not at all unusual over 44 years

6  of American political history.  What is unusual are efficiency

7  gaps -- and very unusual even are efficiency gap scores of the

8  magnitudes we've been observing in North Carolina in recent

9  elections; and over the body of the report, I then went on to

10  explore the durability of a score like the one we saw in 2016

11  relative to the patterns of durability we see with efficiency

12  gaps in the historical record.

13  Q     So I do want to talk more about your durability analysis,

14  but I want to ask, first, did you do any analysis of the

15  national data to determine the operative consequences of the

16  efficiency gap?

17  A     Sure.

18  Q     And what do you understand by "operative consequences"?

19  A     Yeah, okay, so what I wanted to do was to take these

20  numbers -- what is negative 19.4?  What is it positive 19.4 for

21  that matter?  What does that actually mean?  Like it's big, and

22  this histogram that we just looked at tells us it's big in a

23  relative historical sense, but I want to do more than that.  I

24  wanted to understand what does that mean in terms of actual

25  outcomes?

1         And so what I did was an analysis correlating

2   efficiency gap scores with the way that a particular

3   election -- the same election that generated a given efficiency

4   gap score, that same election generated a seat share that was

5   unusual relative to the vote share for a given party in that

6   election, and I did that calibration analysis, that

7   correlational analysis in states with small numbers of

8   congressional seats and slowly made them larger and larger and

9   larger, going up to the larger deligations like Texas and

10  California, to build, in my own mind, a sense of, you know, how

11  large is large for the efficiency gap.  At what point could we

12  look at an efficiency gap number and say, I believe that that

13  efficiency gap number is associated with a seat or it's more

14  likely that a seat is going to be one way or the other as a

15  consequence or at least in a way that's related to this

16  efficiency gap score, so this calibrating efficiency gap scores

17  back to outcomes in terms of seats or the likelihood that a

18  seat will flip.

19  Q    If you would turn with me to Exhibit 4002, page 37.

20  A    The same document, right?

21  Q    Yes.  And I just want to ask you:  Is that where you begin

22  your discussion of how large the efficiency gap must be to have

23  a politically meaningful outcome, such as a seat changing

24  hands?

25  A    Yeah, this is where that part of the analysis begins in my

1    report.

2    Q    And if you turn over then to page 41 of Exhibit 4002.

3    A    Yes.

4    Q    Does Table 2 report -- does that help you explain what

5    results you found?

6    A    Yeah.  So what I set about doing here, I present the

7    results in a table of this analysis I did to establish this

8    point at which the efficiency gap scores are more likely than

9    not to produce a measurable consequence like a seat changing

10   hands, and for small -- let's just take the column labeled

11   "Negative .05."  That's the cut point between zero and negative

12   one.  That's the point at which a one-seat deficit becomes more

13   likely than no change at all, and so I established that as a

14   threshold for my analysis, and in seven to eight seats, the

15   efficiency gap that's historically associated with that

16   half-seat point is negative .08.  In states with nine to ten,

17   it's negative .06.  In states with eleven to fifteen CDs, it's

18   negative .07.

19          And we can look at the column labeled "Positive .5,"

20   going the other way, and we see, you know, on the other side of

21   zero now a positive efficiency gap .07 for states with seven to

22   eight CDs; states with nine to ten CDs, we're talking .06; and

23   eleven to fifteen, we're down to .02, but you get a sense of

24   the analysis -- I'm coming up with a number -- an efficiency

25   gap number that puts us on the cusp of status quo versus we're

 1  getting an outcome in terms of seats that departs from

 2  historical norms.

 3  Q    So then for states with seven to fifteen congressional

 4  seats, what did you conclude about what the efficiency gap

 5  would be to mean that it's more likely than not that a seat

 6  would change hands?

 7  A    For sure.  So to summarize this, to make it easy to use,

 8  what I did is I just took -- I looked at the biggest number in

 9  the top half of those two columns we just went through, and

10  there's a negative .08, and I said let's take that as the

11  threshold, right.  I erred on the side of conservatism, if you

12  will, taking the largest number I saw in that group of six

13  numbers, the top three rows of the middle two columns there.  I

14  said let's take negative .08, and in states where the

15  congressional delegation is seven to fourteen seats, let's just

16  say that the threshold for an efficiency gap being so large

17  that it ought to cause us some concern that a seat -- we're

18  getting -- it's more likely that we're getting a seat deviation

19  than not.  Let's take that at plus or minus .08.

20          And then in the bottom half of the graph, again, to

21  simplify this information, I said in states with larger

22  congressional delegations, I looked -- and I saw the biggest

23  number is .05, and so let's take as the operative standard plus

24  or minus .05 at the point at which we think an efficiency gap

25  is telling us that the plan is more likely than not to produce

1   at least a one-seat deviation from historical norms given the

2   vote shares.

3   Q    So let's turn now to the analysis that you did to

4   determine whether it was possible to identify a threshold for

5   when a redistricting plan's efficiency gap might be durable?

6   A    Um-hum.

7   Q    And how did you assess that?

8   A    So -- okay, so this is the second piece of the analysis.

9   I identified, first of all, these thresholds for when it looks

10  like a seat -- it's more likely than not that we're going to

11  see a seat changing hands as a result of the efficiency gap,

12  but then I have to ask a second question:  Is that going to be

13  something we see over the life of the plan?  Is that just a

14  one-off, or how do I know I'm seeing something -- that that's

15  going to endure over the plan?

16           And so I took advantage of the fact that I've got 512

17  efficiency gap scores that group into 136 plans, and so I

18  looked at the relationship between the first efficiency gap you

19  see under a plan and the average -- the average efficiency gap

20  over the remainder of the plan, and that puts ourselves in the

21  position, not unlike the one we find ourselves here, where

22  we've got a plan, it's generated one election result, we have

23  one efficiency gap score under the current North Carolina plan,

24  and the question we're asking ourselves is is it likely to stay

25  large over the life of the plan if we were to do nothing?

1          And that's what I used regression analysis and

2    graphical inspection of the data to understand, not just is the

3    efficiency gap big, not only does it trip that threshold, but

4    how big must the first efficiency gap you see under a plan be

5    in order for the plan average to be above the thresholds we

6    were just talking about in the earlier table.

7    Q    So if we turn to page 54 of your report, Exhibit 4002,

8    does Table 3 at the top of page 54 -- does that summarize your

9    conclusions on this question?

10   A    Yeah, it does.  So what I've tried to do is to produce

11   this one table that summarizes a lot of the analysis that went

12   into my report.  So the top row of this table refers back to

13   the plus or minus .08 and the plus or minus .05 we were just

14   talking about.  The rest of the table identifies those -- now

15   it focused on the second question I was concerning myself with,

16   the relationship between the efficiency gap you see in the

17   first election and what you see over the remainder of the plan.

18   How large must that first election efficiency gap score be such

19   that you're comfortable, you're confident concluding that you

20   will see an average score greater than the threshold at the top

21   of the table?  And the answer is -- in states with a small

22   number of congressional districts, the answer is plus or minus

23   .12, and in congressional delegations -- states with

24   congressional delegations that are larger, it's plus or minus

25   .075.

1  Q      Now, did you also apply that durability analysis to North

2  Carolina's 2016 Congressional Plan?

3  A      Yes, I did.

4  Q      And so then if you would turn to me to page 52, this is in

5  Exhibit 4002, and look at Figure 19.

6  A      Right.

7  Q      Can you describe to us what Figure 19 shows?

8  A      Figure 19 shows, again, using this graphical device of a

9  histogram summarizing, if you will, our uncertainty.  We're

10 making a prediction.  It's not going to be deterministic,

11 right.  We're not going to determine this with absolute

12 certainty.  So there is some uncertainty associated with our

13 predictions for what will follow under this current North

14 Carolina plan, but given that its first efficiency gap score

15 was negative .19, the probability that it will produce

16 efficiency gap scores consistent with Republican advantage over

17 the life of the plan is 99 percent.  So based on the historical

18 relationship between the first efficiency gap score you see

19 under a plan and what happens afterwards, if I plug what we

20 currently got out of North Carolina in '16 into that analysis,

21 I can conclude that with 99 percent probability we're going to

22 get negative -- this plan will produce on average negative

23 efficiency gap scores, and, moreover, in excess of that actual

24 threshold, the probability of that is about 80 percent.

25 Q      Now, isn't it possible that other factors, such as a

1  political scandal, a celebrity candidate, a huge disparity in

2  campaign spending could alter that outcome?

3  A      That's correct.  That's absolutely correct.

4  Q      And how does your model take account those?

5  A      All of those factors appeared in those 512 elections I

6  looked at, 1972 to 2016.  The Watergate wave election is in

7  there.  The '94 wave is in there.  Obama is in there.  Trump is

8  in there.  All the things -- incumbents getting into trouble,

9  incumbents not getting into troubling, well-funded

10 challenges -- all the things that happened in the cut and

11 thrust of American politics that did happen in the cut and

12 thrust of American politics, I'm basing my analysis -- and my

13 conclusions and that uncertainty I just described to you comes

14 from the fact that the relationship between first election

15 efficiency gap score and planned average efficiency gap score

16 is not perfect, right, but, still, we're in a position in this

17 case where negative 19 is well in excess of those thresholds

18 that I identified.

19          And so notwithstanding all those other factors and

20 the way those other factors impinge and push election results

21 around, as reflected by the historical record, this negative 19

22 score, we are in a place where you can confidently conclude

23 those factors, notwithstanding that this plan will continue to

24 produce efficiency gap scores, wasting votes, if you will, that

25 favor Republicans over Democrats in a systematic and durable

1  way.

2  Q    Did you do any sensitivity analysis to determine if the

3  efficiency gap in the 2016 North Carolina elections at

4  19.4 percent was just a fluke or would continue through the

5  rest of the decade?

6  A    Well, in addition to the analysis I just described, I did

7  conduct some other analysis as well.

8  Q    Can you describe for us what you did?

9  A    Well, it is summarized in the report, but before we get

10  perhaps to the graph, I'll just describe it in words.

11        What we do is we take -- you heard me earlier

12  describing the uniform swing method.  What we do is we take the

13  2016 set of results for North Carolina, and we subject them to

14  a shift one way or the other, shifting the entire state in a

15  pro-Republican way or in a pro-Democratic way; and holding

16  everything else constant, the district lines stay the same, the

17  incumbents stay the same, everything stays the same, we're just

18  assimilating a big year for Republicans or a big year for

19  Democrats, and, indeed, not just big years, but monster years.

20  We go right out to nine-point swings either way and ask

21  ourselves how would the efficiency gap score change, everything

22  else being constant, but a big wave coming in on one side of

23  politics or the other.

24  Q    And is this swing analysis a type of analysis that is

25  commonly done in the field of political science?

1  A     Yes, it is.

2  Q     So let's turn then to page 58 of your report,

3  Exhibit 4002.

4  A     Yep.

5  Q     Looking there at Figure 21, does this show the results of

6  your swing analysis for the North Carolina 2016 Congressional

7  Plan?

8  A     Yes, it does.

9  Q     And can you tell us what this shows?

10  A     Yeah, so the red square in the middle is the 2016 result,

11  right.  So on the -- it is anchored at the zero point on the

12  horizontal axis.  On the horizontal axis, we've got those

13  levels of swing, or wave, if you like; and as we go to the

14  right, positive swing is swing in favor of the Democrats, and

15  going the other way is swing towards Republicans, and the thick

16  black line, the values of the efficiency gap that would result

17  if we subjected the state to the given level of swing indicated

18  on the horizontal axis, and so the red square is what we

19  actually got in 2016, and efficiency gap score, if you read

20  over to the vertical axis, you'll see that's at about negative

21  19 -- negative .194, just slightly above the negative .2 line

22  there.

23         But if you swing towards the Democrats, you'll see

24  that the efficiency gap score is getting bigger and bigger and

25  bigger, and, indeed, finally turns the corner once we get out

1   to a swing of about, what is that, about 6 percent, and it

2   turns that corner because with a 6 percent swing, the Democrats

3   would pick up a seat under the current boundaries.  We'd go

4   from 10-3 to 9-4, right.  And then the efficiency gap is

5   actually coming back as we keep swinging, and then there's

6   another kink, and that's the point at which Democrats with a

7   swing of around about seven points would pick up a second seat.

8   That's the point at which we end up with 8-5; and then if we

9   keep going, you'll see there's even another kink way out on the

10  right almost at nine points of swing, and that's where we get a

11  third seat, and we're at 7-6 at that point, and the efficiency

12  gap at that point is way up back in what I would call benign

13  territory at that point, all right.

14          The point here being, and this is what I think this

15  graph makes rather vividly, is that you've got to go out that

16  far.  You've got to go out to eight or better or even almost

17  nine points of swing to send this plan -- have it generate an

18  efficiency gap score that's back in benign territory, as

19  identified by my historical analysis and the thresholds we were

20  just talking about.

21  Q    And across the horizontal axis along the bottom of the

22  chart, what are those little hash marks?  What do they signify?

23  A    They're the actual swings that we've seen in North

24  Carolina's political history 1972 to 2016, and you'll see most

25  of them are rather small.  Most of those little tick marks on

1    the horizontal axis are reasonably close to zero.  There's a

2    few Republican swings out there, around about five points, but

3    the swing towards Democrats we're talking about or the swing

4    towards Republicans, by the way, that would rationalize this

5    plan send the efficiency gap score back into benign territory

6    close to the zero point.  We're talking a very, very large

7    swing, not just in absolute terms, but relative to the swings

8    we've seen in North Carolina's -- the last 44 years of

9    political history in North Carolina.

10   Q    So then what does this data allow you to conclude about

11   the durability of the efficiency gap in the 2016 --

12   A    For me, it's yet more evidence that speaks to the

13   magnitude of this efficiency gap and its durability in that we

14   are talking about a swing of historic proportions in order to

15   send that large efficiency gap back to a level under the

16   current lines, back to a level where we would say nothing to

17   see here.  History tells us, right, historical records says

18   historically record things are rare.  Therefore, it's quite

19   likely that this large efficiency gap will endure.  About the

20   only thing that could lead us to a different place would be a

21   swing on a par with the largest swings we've seen in the last

22   40, 50 years of political history in this state.

23   Q    Now, did you also do any analysis that allows to you draw

24   any conclusions about what caused the negative 19 percent

25   efficiency gap in North Carolina's 2016 plan?

 1   A    Yeah, again, so I've got 512 efficiency gap scores.  They

 2   span 44 years.  They span many states.  They span 136

 3   districting plans.  I'm able to ask the following question,

 4   and, that is, which side of politics controlled the districting

 5   plan -- or the districting process that generated each plan

 6   and, in turn, generated the efficiency gap scores under that

 7   plan, and is there any relationship between change in who

 8   controls the districting process in terms of partisanship of

 9   those people and the sorts of efficiency gap scores that

10   result, so, in essence, looking at the relationship between

11   partisan control of the districting process and the efficiency

12   gap scores that result.

13   Q    And what did you conclude from that analysis?

14   A    That in particular -- well, number one, no one has got

15   clean hands here.  I think it's important to concede that

16   point.  The historical record is quite clear on this, that

17   partisan gerrymandering by both sides of politics is real,

18   number one.

19        Number two, that in recent decades partisan control

20   of the redistricting process produces bigger efficiency gaps in

21   favor of the side of politics who has assumed control of the

22   districting process, and, no surprise, Democratic control of

23   the redistricting process tends to produce efficiency gap

24   scores consistent with Democratic advantage, that is, positive

25   efficiency gap scores.  Courts and independent commissions, you

1  tend to get in the middle, closer to zero, in the neutral

2  point.  Republican control of the districting process, you tend

3  to get negative scores.  That has really become much more

4  apparent in the zero zeros and in the current decade.

5          The change -- if you change, as North Carolina did,

6  from Democratic control to Republican control of your

7  redistricting process, that almost perfectly accounts for the

8  change in the efficiency gap score we see in North Carolina

9  under the previous decade to the '12, '14, '16 set of scores.

10  Q   And we'll look later at a chart that I think illustrates

11  that, but let me, before we get there, just ask you about the

12  prospective use of efficiency gap scores.  And there I want to

13  know is it possible to use the efficiency gap measures before

14  there's any election under the newly drawn redistricting plan

15  to assess its partisan symmetry or asymmetry?

16  A   Yes.  So in this matter, we find ourselves with one

17  election under the plan, but you asked me about the case where

18  there's zero.  That's interesting.  So what would we do in that

19  case?  Well, frankly, we would do what redistricters do and,

20  that is, as we heard in court yesterday, take previous election

21  results, many of them perhaps, tabulate efficiency gaps using

22  those election results but under the new proposed district

23  lines or the actual district lines, compute efficiency gap

24  scores that result from that either for Congress or with

25  perhaps even a model that used the other information, and we

1  heard yesterday about summary scores being computed out of up

2  to as many 20 statewide elections to help refine the estimates

3  of what's going on in a new district or new set of districts.

4  We could do that exercise.

5         And, further, to even make the results a little

6  robust, if you will, to any kind of reasonable assumption

7  about -- we don't know exactly what the next election -- it

8  could be a good election for Democrats because of national

9  forces.  It could be a bad election for Democrats because of

10 national forces.

11        I would also engage in some of that analysis I just

12 described where we subject any assumption about what's going to

13 happen district by district to a swing one way or the other,

14 you know, of a reasonable magnitude of the sort that's sort of

15 in line with what we've been seeing in recent history, and then

16 trace out a set of efficiency gap scores that result from that,

17 and are they large or are they small relative to the benchmarks

18 I've testified to about today.

19        MS. EARLS:  I'd ask that we bring up Exhibit 1017.

20 This is one of the joint joint exhibits that has already been

21 admitted.  All the parties have offered this exhibit.

22 BY MS. EARLS:

23 Q    And ask you, Dr. Jackman, this is data that was part of

24 the legislative record when this map was enacted.  Is this the

25 kind of data that the legislature would examine -- if the

1  Supreme Court were to adopt Plaintiffs' standard in the

2  *Whitford* case, when a legislature is drawing districts in 20 --

3  after the 2020 Census, is this the kind of data they can rely

4  on to do the calculations that you just described and ensure

5  that they have not allowed partisan considerations to go too

6  far?

7  A    Yeah, exactly.  I'm inferring that AG means Attorney

8  General and so on, but I don't know exactly what these columns

9  refer to, but, absolutely, I would be using data like this and

10 perhaps presidential vote as well.  There's many, many things

11 available to us to make inferences about the political behavior

12 of partisan composition of districts before we see them

13 actually produce -- they go out and vote in those new

14 districts, absolutely.

15 Q    And so to be clear, they would use those election returns

16 and calculate the efficiency gap the way you showed us earlier

17 using a calculator?

18 A    Sure, yeah, absolutely.

19 Q    Let's turn to some of the other measures of partisan

20 asymmetry.  Partisan bias, did you calculate the partisan bias

21 in North Carolina's 2016 Redistricting Plans?

22 A    Yes, I did.

23 Q    And what did you find?

24 A    I found an extremely large value of partisan bias for

25 North Carolina in 2016, but also in 2012 and 2014.

1  Q    So I would like to turn now to Exhibit 4003.  This is your

2  rebuttal report, and first just page -- one of this -- I'll let

3  you identify what it is.  Can you tell us what Plaintiffs'

4  Exhibit 4003 is?

5  A    This is my rebuttal report.

6  Q    Could you turn to page 4 of this exhibit?  And can you

7  tell us what Figure 1 demonstrates?

8  A    Yeah, Figure 1 shows the history of both efficiency gap

9  scores and partisan bias scores for North Carolina 1972 to

10 2016, and you will see that the partisan bias scores are in

11 blue and the efficiency gap scores are in red, and the question

12 you just asked me about the recent -- the most recent scores,

13 you'll see the extremely large value for partisan bias.  The

14 right most dots, if you will, in the graph are for 2016, and

15 you'll see that the partisan bias score is larger in magnitude

16 than negative .25.  We're down at negative .27 or so and the

17 larger set of partisan bias scores over -- in 44 years of North

18 Carolina history.

19 Q    And does this graph also tell you anything about the

20 stability of the efficiency gap measure in North Carolina?

21 A    Yeah, one of the things I'm struck by when I look at this

22 graph, we've got a rather impressive three election sequence

23 '12, '14, '16, at least with respect to partisan bias.  You've

24 got to go back to the '90s when essentially you've got a bias

25 of zero to find a nice type stable sequence like that or even

1  back to the '70s where it's a small Democratic advantage, but

2  not only have we got historically large values of the

3  efficiency gap and partisan bias for North Carolina in the last

4  three elections, but they're very stable, and those -- that's

5  not a coincidence.  Large and stable tend to go together with

6  these scores.

7  Q     Did you also look at how the partisan bias of North

8  Carolina's districts in 2012, 2014, and 2016 compared to other

9  congressional elections in the country?

10  A     Yes, I did.

11  Q     And if we could look at page 5 of Exhibit 4003, does

12  Figure 2 illustrate that?

13  A     Right, so here we focused on elections that have been

14  relatively close, decided by margins of 55 to 45, and now we're

15  down to 282 elections, and for each one of those 282 elections,

16  we get a partisan bias score; and, again, we're using this

17  graphical technique called a histogram to summarize

18  graphically, to let us see graphically the distribution of

19  those 282 numbers.

20  Q     And can you tell us why you only looked at the 45 percent

21  to 55 percent elections?

22  A     Yeah, and that's to do with the particular nature of

23  partisan bias.  Remember, when I defined partisan bias, it's

24  this -- it asks us to imagine a 50/50 election.  Well, that's a

25  stretch if the election was 60/40 or 65/35.  So before you even

1  do it, why not make the counterfactual that partisan bias asks

2  us to contemplate.  Let's put ourselves in a world where that's

3  not a huge stretch.  So the universe of cases here I define

4  down at 55/45.  So that's why our subset -- we've still got a

5  lot of data, 282 congressional elections decided by margins

6  like that.

7  Q    And so what does the data -- your analysis of the data as

8  reflected in Figure 2 tell you about North Carolina's partisan

9  bias measures?

10 A    Well, it's not a dissimilar conclusion to the histogram we

11 were looking at earlier of the efficiency gap scores.  We see,

12 again, most of the data are close to zero in the sense that

13 that's where the histogram bars are taller, indicating there's

14 more data around zero and that we've got to go way out into the

15 left-hand tail.  The unusual nature, if you will, the extreme

16 nature of the partisan bias estimates that we're getting out of

17 North Carolina '12, '14, '16, they're all the way over in the

18 very left-hand tail of the graph, and, indeed, they're that

19 last bar.  Those three scores are largely almost exclusively

20 what's giving us any data at all that far out.  It's what's

21 North Carolina has produced in the last three cycles.  It's

22 over 44 years, 282 elections.  North Carolina -- the last three

23 elections that North Carolina has produced are producing

24 partisan bias scores of quite literally historic magnitude, not

25 just relative to North Carolina's history, but in the United

1  States of America.

2  Q     Now, did you also look at the mean-median difference

3  metric for partisan asymmetry?

4  A     Yes, I did.

5  Q     And is this reported on page 8 of your rebuttal report,

6  Exhibit 4003?

7  A     Yes, that's the relevant part of the report.

8  Q     And what does that show?

9  A     That, too, shows that by this metric the North Carolina

10 plan is exhibiting quite unusual features, unusually large

11 pro-Republican advantage, as evidenced by this other measure.

12 The mean-median difference in 2016 is 5.1, and the way we

13 compute that is to note that across the 13 districts, average

14 Democratic vote share was 46.7, but the median was 41.6; and

15 the fact that the mean lies above the median indicates the skew

16 in the distribution, right, the -- for skewed distribution, the

17 mean will be pulled in the direction of the skew, and the skew

18 here arises from the fact that there are three districts where

19 Democratic vote share is in the 60s, and then there are ten

20 where it's below 50 percent, where the Democrat lost, and

21 that's what's giving us 5.1.  That is a large number relative,

22 not only to the country where that roughly has a mean of zero,

23 but also to North Carolina's history.  1972 to 2016, that

24 mean-median difference is one, one percentage point.  In 2016,

25 it was five times that.  It's 5.1.

1  Q    So we've looked at the efficiency gap metric, the partisan

2  bias metric, the mean-median difference.  Do all of those

3  measures of partisan asymmetry lead to the same conclusion

4  about North Carolina's 2016 congressional districts?

5  A    In my opinion, absolutely.

6  Q    So then based on the historical analysis you performed in

7  this case, what did you conclude about the partisan asymmetry

8  of the 2016 Congressional Redistricting Plan?

9  A    Well, to recapitulate, we have negative 19.4.  That is the

10 efficiency gap score for North Carolina in 2016.  That is

11 historically large.  It is the largest we observed in 2016.  It

12 is large relative to not just North Carolina's history, but the

13 history of efficiency gap scores 1972 to the present.  It is so

14 large that I assess it is generating tangible consequences in

15 terms of seats being won by one side of politics relative to

16 the other.  It is so large that it is in my view and based on

17 my analysis of efficiency gap scores and plans that it is not a

18 one-off.  Negative 19.4 is not the result of chance factors.

19 It is a symptom of a structural feature of the plan, much more

20 so than it is the result of something unusual in the air in

21 2016.  I'm quite convinced of that.

22          If left in place, the plan will continue to generate

23 efficiency gap scores comfortably above the threshold I

24 identified as where we would say it is more likely than not to

25 be associated with a seat going to one side of politics versus

1    the other.

2            MS. EARLS:  I have no further questions, Your Honor.

3    If I may, if I haven't before, I would like to move for the

4    admission of the Demonstrative Exhibits 4078 and 4079 we used.

5            JUDGE OSTEEN:  All right.  So admitted.

6    Cross-Examination?

7            MR. STRACH:  Yes, Your Honor.

8                        CROSS-EXAMINATION

9    BY MR. STRACH:

10   Q    Good morning, Dr. Jackman.

11   A    Good morning.

12   Q    Phil Strach.  We've not met.  My colleague took your

13   deposition, but I'll have a few questions for you this morning.

14          Dr. Jackman, I assume it's -- you've never actually

15   participated in politics in terms of running a campaign or

16   doing anything like that, is that correct?

17   A    Strictly speaking, no, no, no.

18   Q    When you say "strictly speaking," what --

19   A    I've done polling, not for candidates, but very, very up

20   close, shall we say.

21   Q    Have you ever -- have you done any -- other than what

22   you've done on the efficiency gap, have you done any research

23   on the impact of fundraising and availability of money to

24   candidates in Congressional elections?

25   A    No.

1  Q    Have you done any research on the impact of political ads

2  in congressional races?

3  A    No.

4  Q    How about "Get out the vote" operations?  Have you

5  researched how those operations affect the congressional

6  elections?

7  A    Not in my refereed publications, no.

8  Q    Have you ever studied the extent to which local issues, in

9  particular congressional districts, affect congressional

10 elections?

11 A    No.

12 Q    I assume you've never actually sat down and drawn, say, a

13 Congressional redistricting plan?

14 A    No.

15 Q    Have you done any of these simulations like we've seen

16 with some of the other experts?

17 A    Simulated maps?

18 Q    Yes.

19 A    No, no, I have not.

20 Q    You were mentioning -- and we'll talk a little bit about

21 this more.  You were mentioning using the efficiency gap

22 prospectively.  Have you actually ever done an efficiency gap

23 analysis on a plan before an election was held under it?

24 A    No, I have not.

25 Q    All of your research involves applying actual election

1  results to an actual plan generating the efficiency gap number,

2  correct?

3  A     Yeah, all of my analysis used actual results, yes.

4  Q     Are you aware whether any legislature anywhere in the

5  United States uses the efficiency gap currently to --

6  A     I have no knowledge of that.

7  Q     Do you happen to know whether any of the independent

8  commissions that exist for redistricting use efficiency gap?

9  A     I'm unaware.

10 Q     Other than what you've done in the efficiency gap arena or

11 what you've described broadly as partisan symmetry, what other

12 work have you done specifically in the redistricting context?

13 A     Well, we were referring to some of my earlier work where

14 I've engaged in some of the analysis we were describing towards

15 the end of my testimony where we relate measures of partisan

16 asymmetry, in that case partisan bias, to partisan control of

17 the redistricting process.

18 Q     Were those some of the articles that you wrote in the

19 '90s?

20 A     Yes.

21 Q     So between those articles and what you've done for this

22 case, have you done any research on redistricting in the

23 meantime?

24 A     Again, nothing that has appeared in a refereed journal.

25 Q     And that's about what, 20, 20-some years?

1  A      Roughly.

2  Q    All right.  So let me just kind of drill down a little bit

3  on some of the actual efficiency gap calculations.

4              You have focused primarily here on states with seven

5  to fourteen congressional districts, correct?

6  A    And but -- and above, but to make conclusions about North

7  Carolina, which has 13, yeah.

8  Q    You don't focus on states with six or less congressional

9  seats?

10  A    No, I do not.

11  Q    So just so I understand the concept of the wasted votes,

12  if the candidate loses under your model, that means every

13  single vote that that candidate got is, quote, wasted in your

14  analysis, is that correct?

15  A    Yeah, the definition of wasted votes asks -- is tied to

16  this idea that votes cast that do not yield seats in this very

17  narrow sense of that term are wasted.

18  Q    All right.  They're not actually wasted in fact, right?

19  The voters who cast those votes would probably not agree that

20  their vote was wasted in the normal sense of the term?

21  A    It's important to acknowledge we're using the word in a

22  very technical sense.

23  Q    And if the winning candidate in terms of their wasted

24  votes -- their wasted vote -- you've got -- if they get

25  50 percent plus one, the one vote is wasted on their side,

1  correct?

2  A    If all they wanted was 50 percent plus one, they haven't

3  wasted any votes.  They've done exactly what they needed to win

4  and nothing more.

5  Q    So in a -- if you were in a very competitive congressional

6  district, isn't it the case that because of the way the concept

7  of wasted votes work, the wasted votes could easily flip from

8  year to year, depending on the outcome of the competitive

9  election?

10  A    You want to walk me through an example?

11  Q    Is it possible -- let's say you have a district that is,

12  as you've said, you know, 50/50, that the Republican wins one

13  year, a Democrat wins the next year.  The number of wasted

14  votes for each is going to flip?

15  A    Well, let's take the winning case.  Suppose I win by one

16  vote, and next year two votes change hands or one vote changes

17  hands, and you win by one vote.  Now, how many votes -- that's

18  the case where I go from having wasted only one vote to having

19  wasted a lot of my votes.  So, sure.

20  Q    All right.  So the efficiency gap itself is based on a

21  statewide calculation of wasted votes versus seats won, isn't

22  that correct?

23  A    Versus?  I don't quite understand the last words in your

24  question.

25  Q    You're using a statewide calculation of wasted votes

1  versus seats actually won?

2  A     The efficiency gap is computed by doing those wasted-vote

3  calculations district by district and then summing over the

4  districts.

5  Q     Right.  And when you sum over the districts to get the

6  actual outcome, that's a statewide figure, correct?

7  A     That's correct.

8  Q     Have you done any calculations designed to determine

9  whether a particular district was intentionally gerrymandered

10 as relates to a prior particular district, or is this your

11 report relying on a statewide figure?

12 A     No, I haven't.  I've tended to focus on the fact that the

13 efficiency gap is, by design, a statewide, jurisdiction-wide

14 concept.  It is nonetheless in relatively small jurisdictions

15 where you can literally eyeball the data.  The packing and

16 cracking sometimes jumps off the page, as I tried to lead the

17 Court through this morning with that exhibit on the screen.  So

18 it's helpful in that respect, but it is at root designed to be

19 a jurisdiction-wide or, if you will, a statewide entity -- or

20 quantity.

21 Q     Right.  Now, I think you mentioned that Professor McGhee

22 was the first person to discuss the notion of wasted votes in

23 this context.

24 A     I would say that he was the first person to sort of build

25 the index that is today known as the efficiency gap.  Wasted

1  votes, per se, had been talked about in this strictly kind of
2  technical sense in which we're using the word "wasted" and has
3  been around in the political science literature for some time.
4  Q    All right.  And then I think you said that the term was
5  actually coined in the article from McGhee and Professor
6  Stephanopoulos?
7  A    The efficiency gap comes into the literature through that
8  article.
9  Q    That particular nomenclature, efficiency gap, correct?
10 A    That's correct.
11 Q    And you're familiar with that particular article?
12 A    I am.
13 Q    If you could turn in the notebook that we have there for
14 you.  Put up -- we are going to put up Exhibit 5064.  It's
15 Defense Exhibit 5064 for identification purposes.  It's behind
16 the first tab, Dr. Jackman.  Do you see it?
17 A    I've got it in front of me.
18 Q    Do you recall this being a chart of efficiency gap scores
19 calculated by Professor Stephanopoulos in the article we were
20 just referencing?
21 A    I will accept the representation that these are the
22 efficiency gap scores that went into the article.
23 Q    All right.  And the scores that you calculated are very
24 similar to Professor Stephanopoulos's scores for 2012, aren't
25 they?

1  A    I believe so, yes.

2  Q    Okay.  Didn't you -- in terms of your numbers, your

3  efficiency gap numbers, and McGhee and Stephanopoulos, didn't

4  you both have a higher efficiency gap score for the 2011 North

5  Carolina Plan than the 2016 Plan?

6  A    I can speak with authority to my estimates, and that is

7  the case.  The difference I would, though, point out is

8  extremely small relative to the variation in efficiency gap

9  scores over the full 512 elections I looked at.  We're talking

10 about .01, .02 at most.

11 Q    All right.  But your efficiency gap score for the 2011 map

12 was higher than the 2016 score, correct?

13 A    The 2012 and 2014 under the 2011 Plan, that's correct,

14 but, again, I would point out that the differences we're

15 talking about are extremely small.

16 Q    So given that, that means there would have been more

17 proportionately wasted Democratic votes under the 2011 Plan

18 than the 2016 Plan, correct?

19 A    I believe so.  That must be -- in proportional terms, yes.

20 Q    Right.  But in your -- the analysis that you conducted,

21 you didn't try to identify the residences of ticket-splitting

22 voters who might vote for candidates of either party, did you?

23 A    Could you repeat the question?  I didn't identify the --

24 Q    The residences -- you didn't try to identify the potential

25 ticket-splitting voters who might vote for candidates of either

1  party?

2  A    There's nothing in the computation of the efficiency gap

3  that requires I know anybody's address.

4  Q    But you didn't try to identify in particular districts

5  groups of voters who might be ticket-splitters?

6  A    No.

7  Q    Now, is it true that in the Stephanopoulos and McGhee

8  article, that they concluded that the 2011 North Carolina Plan

9  would not be subject to review because of the efficiency gap

10  score?

11  A    That's my recollection of that case.  My recollection is

12  that they were using a different threshold to the one I

13  derived.

14  Q    And isn't it also true, though, that part of the reason

15  why it was not actionable, so to speak, under the efficiency

16  gap in their article was because of plausible shifts in voting

17  behavior by ticket-splitting voters?

18  A    I don't know why they -- I don't know why this fell below

19  their threshold.

20  Q    All right.

21  A    Or the -- you know, I don't.  It was their analysis.

22  Q    Do you agree that Stephanopoulos and McGhee in their

23  article agree that the Supreme Court has stated that some

24  partisan consideration in redistricting is lawful?

25  A    You're asking me to opine over their opinion as to the

1  Supreme Court opinion.  I just don't know.

2  Q    I'm just asking you if you remember that's what they said

3  in their article?

4  A    So could you repeat it?

5  Q    Did Stephanopoulos and McGhee say in their article that

6  the Supreme Court has said that some partisan consideration in

7  redistricting is lawful?

8  A    I don't recall that part of their article.

9  Q    All right.  Let me get to one of the differences between

10  your analysis and their analysis.  Did McGhee and

11  Stephanopoulos in their efficiency gap work adopt a criteria

12  that the scrutiny would apply only if a party won two or more

13  seats than what would be predicted by the efficiency gap?

14  A    That's my recollection of the threshold that they set in

15  their piece.

16  Q    All right.  And what's the threshold that you set?

17  A    I looked for a threshold, with respect to the efficiency

18  gap, where historical record suggests that it is more likely

19  than not that one seat would -- we would have a one-seat

20  difference from a status quo.

21  Q    Right.  So in operation, didn't that require you looking

22  at, I think, .5 or .6?

23  A    Of what?

24  Q    Well, of a seat?

25  A    Yes.  That's the point at which it becomes more likely

 1  that -- at .5, because it's halfway between zero and one,

 2  that's the point at which it's more likely that a seat flips

 3  than it doesn't.

 4  Q    Right.  So under the Stephanopoulos and McGhee version,

 5  instead of .6, it would take two seats -- the possibility of

 6  two seats switching, correct?

 7  A    I'm confused by your reference to .6.

 8  Q    Well, .5.  Theirs was 2; yours was .5, is that correct?

 9  A    Yes.

10  Q    Why is yours so much lower than theirs?

11  A    Because, again, as I just said, that is the point where on

12  a preponderance of the evidence, it's more likely, right, that

13  we're seeing a seat departure than no change at all.

14  Q    Why do you think yours is more strict than the threshold

15  that they adopted in their article?

16  A    I don't know.  We arrived at our judgments independently.

17  If a plan -- when is a plan exhibiting manifest differently --

18  manifestly different consequences to the status quo or when is

19  it more likely than not that it is, that's the question I

20  thought was the appropriate one to ask, and that's the one I

21  set out to answer.

22  Q    All right.  So it's a judgment call on the part of the

23  researcher, such as yourself?

24  A    We're at a stage where we are trying to set thresholds.

25  The very fact we are here and, indeed, the statement by Your

1  Honor at the very start of this matter yesterday morning

2  indicated that that is a live question, not just for the

3  research community, but for the bench, for the courts as well.

4         My analysis -- I tried to put myself thinking down

5  the road to today where we are asking ourselves at what point

6  can we use this metric to assess whether a plan should attract

7  judicial scrutiny.  So I asked the question:  When on the

8  preponderance of the evidence is it more likely than not that

9  this plan is generating manifest differences from the status

10 quo?  I thought that was an entirely reasonable question to ask

11 and one I set out answering in the analysis provided in this

12 report and that I testified to earlier today.

13 Q    All right.  So the Court has two choices then, correct?

14 They've got the two -- the two seats swing from Stephanopoulos

15 and McGhee.  They've got your .5 swing.  What is the Court to

16 do -- how are they to choose between one or the other?

17 A    With respect, that's for the Court.  I've provided as best

18 an analysis of I can -- that I can of the -- given that

19 definition of what I thought where a plan might reasonably

20 attract judicial scrutiny.  Courts could do nothing, too, by

21 the way; in which case, they've got a very easy decision, but

22 my job is to be helpful to the Court in making those

23 determinations.

24 Q    All right.  So let me make sure I understand another -- a

25 different -- another threshold -- another layer of this

1   threshold, and please correct me if I have stated this

2   incorrectly.

3           For plans with seven to fourteen seats, your analysis

4   requires an efficiency gap score of .08, and if it scores a

5   .08, that means the party in question is likely to elect at

6   least one more seat than expected?

7   A    If you don't mind, I'll just turn to the relevant table in

8   my report, if that's okay, so I can make sure we're literally

9   on the same page here.

10  Q    Please do it, and when you get there, would you tell us

11  which page.

12  A    Yeah, I'm just taking myself back to -- in -- I'm now

13  doing this with respect to my notebook, not yours, but it's the

14  amended report, and so I believe we've tagged that 4002,

15  page 54, Table 3.

16          JUDGE BRITT:  Page 54?

17          THE WITNESS:  Yeah, page 54, sir, Table 3.

18  BY MR. STRACH:

19  Q    Are you ready?

20  A    Yeah.  Could I get some water?

21  Q    So for -- so for plans with seven to fourteen seats, your

22  analysis says that an efficiency gap score of at least .08

23  means that the party in question is likely to elect at least

24  one more seat than expected?

25  A    It's more likely than not, that's right.

1  Q    Okay.  And you believe that congressional plans should be

2  subject to scrutiny in the first election under a new plan when

3  it's likely that one party will win at least one more seat than

4  expected over the life of the plan?

5  A    That's what I anchored my analysis to, that presumption,

6  yes.

7  Q    And let me introduce another number here to make sure I

8  understand how this fits in.  You have said that an efficiency

9  gap of plus or minus .12 -- in the first election, you've set

10 that as a threshold to predict a congressional plan will likely

11 elect at least one more seat than expected over the life of the

12 plan?

13 A    That's right.

14 Q    All right.  So to be actionable or subject to scrutiny by

15 the Court, after the first election, it needs a .12, is that

16 correct?

17 A    In the case of seven to fourteen CD states, yeah.

18 Q    Right.  And then over the life of the plan, after -- if it

19 showed a .12 in the first election, that -- your prediction

20 then is it's going to then exhibit at least a .8 for the rest

21 of the plan, correct?

22 A    The average EG over the life of the plan will be at least

23 a .08 magnitude.

24 Q    Okay.  All right.  And so what do you do in the second

25 election?  So if it's .12 in the first election, which triggers

1 some sort of scrutiny, but then it ends up being .04 in the
2 next election, what do you have to do?  Do you have to wait for
3 the remaining elections before you know whether it should have
4 stayed actionable or not?
5 A    Well, you identify exactly the dilemma I think everybody
6 finds themself in.  If we were to wait for the whole decade to
7 run out before we assess the plan, then, you know, it makes
8 what we're doing here kind of moot.
9         JUDGE OSTEEN:  Is there an answer to his question,
10 though?
11         THE WITNESS:  Sorry.  How about he restates the
12 question so I can answer it.
13 BY MR. STRACH:
14 Q    So what are you to do?  If there's a .12 in the first
15 election and there's a .04 in the next election, in order to
16 understand whether your -- the plan is subject to scrutiny
17 under your analysis, do you have to wait for one more election?
18 Two more elections?  How many more elections?
19 A    No, if you find yourself in this position that we're in
20 after two elections, then you could do a different -- you know,
21 I probably would have done a different sort of analysis.  Given
22 what you see in the first two elections, what does that tell
23 you about the remainder of the plan?  We could have done that
24 but didn't because that's not the case we find ourselves in
25 here.

1  Q    All right.  So your analysis is -- addresses the one

2  election under the 2016 Plan, but you've not provided the Court

3  what the answer will be if all of a sudden the efficiency gaps

4  drop in future elections.  They would have to come up with

5  their own rule on that?

6  A    I would be happy to come back and help you out in that

7  event.

8  Q    I'm sure you would.

9  A    I would say, though, that that would be surprising given

10  the historical record.  A negative .194 of the sort we've got

11  now, the historical record suggests that for that to revert

12  back to something like a benign number below the .08 threshold

13  is extremely unlikely.  I think it's important to stress that.

14  Q    Well, life is full of surprises, isn't it?

15  A    Yeah, and, indeed, American political history is full of

16  surprises, 1972 to 2016, and my analysis looked at all of them,

17  and the conclusion I just told you about.  The unlikelihood of

18  a small efficiency gap score followed by the larger one we saw

19  here is informed by my analysis of not just this election or

20  the one before it, but of 512 of them and 136 plans, and that's

21  why I sit here and tell you I think that's very unlikely to

22  happen.

23  Q    Right, but if it did happen, your analysis hasn't thought

24  through what a Court would have to do with that in that event,

25  has it?

1  A    If we were back here after two elections under the plan, I

2  would be presenting evidence -- analysis of two versus the

3  remaining three.

4  Q    So if that were to happen, you know, potentially, we could

5  have a court case every two years over a congressional plan,

6  couldn't we?

7  A    I don't think there's much to stop people suing over plans

8  at any point of the cycle.

9  Q    Well, we may have agreed on that.  It may be one of the

10 few things we agree on.

11          Let me focus you on -- and this is something that you

12 talked about in your deposition, and if we need to pull your

13 deposition out, we'll look at it, but as I understand it, you

14 looked at -- some of the data you looked at was the elections

15 from -- or plans from 2000 to 2014 --

16 A    Yeah.

17 Q    -- that had a .12 in the first election, right?  Is that

18 correct?

19 A    Yep.

20 Q    And you found that nine plans in that time period had a

21 .12 in the first election, correct?

22 A    That's right.

23 Q    And isn't it true that in three of those plans, the

24 efficiency gap average did not remain .08 for the remainder of

25 the decade, correct?

A    That's correct.

Q    And you referred to that, and that is what you would call a, quote, false discovery, is that right?

A    That's right.

Q    And, in fact, you referred to it as an error rate, isn't that right?

A    We could call it that as well.

Q    All right.  So the standard that you've proposed, at least in this instance, had an error rate of 33 percent, correct?

A    On one side, right.  It's making many other errors, by the way, where it's not throwing a flag at a plan that it probably should, right, where the errors here that this threshold that I've proposed makes err on the side of keeping plans out of court, and when it does throw a flag, it threw -- you know, 30 plans, it threw nine flags, three of those in retrospect shouldn't have been thrown might be the way to help people understand that; but there were many others where it should have thrown a flag but didn't because we're erring on the side of conservatism.

          So if you want to talk about error rate here, that's fine, but I think it's important for everybody to understand it's errors with respect to where we threw a flag in the first place, not errors where, for the sake of being conservative, we didn't throw a flag.

Q    So it's errors both ways?

1  A    There are errors both ways; but, as I said, we're being

2  very careful to keep plans out of court unless we're extremely

3  confident that they're going to stay above that threshold.

4            It's also important to understand that in the case of

5  states with 15 or more CDs, we don't make any errors.  There

6  were 14 plans like that since 2000.  We throw eight flags, and

7  we go -- we go eight for eight where that was the right call to

8  make with respect to each of those eight plans that were

9  singled out for safer scrutiny.

10 Q    Now, you've testified as well, I think as you mentioned,

11 in the case in Wisconsin, the *Whitford* case?

12 A    I did.

13 Q    Is it true that in the *Whitford* case your threshold for

14 the number of congressional districts there was eight to

15 fourteen, not seven to fourteen?

16 A    That's my recollection, yes.

17 Q    All right.  And, yet, for purposes of this case here in

18 North Carolina, you've reduced your threshold where you believe

19 the efficiency gap can be calculated to seven seats, is that

20 correct?

21 A    Yes.

22 Q    By reducing the threshold to seven seats, does that sweep

23 in any state's plans to be actionable under your analysis?

24 A    Oh, that's a good question.  I know obviously we get more

25 states in the analysis that way.  Whether -- I don't know the

 1  answer to that question specifically, sir, I don't.

 2  Q    Yeah, and that's a good point, but it does subject

 3  numerous other states to the analysis by reducing it from eight

 4  to seven, correct?

 5  A    Not many.  Just preparing for testimony, I went back -- in

 6  anticipation of exactly this question, I went back and looked

 7  at how many seven CD states we have.  Alabama is such a state,

 8  Arizona again sneaks in, but it doesn't make a particularly big

 9  difference to the analysis or the conclusions.

10  Q    It also sweeps in South Carolina?

11  A    Yes, it does.

12  Q    All right.  Is it true -- back on the Wisconsin case,

13  *Whitford*.  Is it true that you gave a report in that case

14  criticizing a report authored by Dr. Chen, who has testified in

15  this case?

16  A    There may have been some language in there where I

17  addressed work by Dr. Chen.

18  Q    And was the gist of your criticism of Dr. Chen that his

19  simulated maps, under some prior research he had conducted,

20  didn't account for the Voting Rights Act?

21  A    I haven't read that for a while.  If you are able to

22  direct me to that, I could verify that.

23  Q    Look at the Tab 5056, and if you'll put up Defendants'

24  Exhibit 5066.  It's marked Defendants' Exhibit 5056 for

25  identification purposes.

1  A     5056.

2  Q     And we're going to go to page 21 -- page 20.  And,

3  Dr. Jackman, if you'll look at the bottom of page 20, the word

4  "first," and if we can blow that up a little bit, if possible.

5  At the bottom of page 20 and carrying on to page 21, if you

6  could just read that -- the paragraph that starts "first,"

7  comma, if you could just read that paragraph to the Court.

8  A     Sure.  "First, Chen and Rodden do not even attempt to

9  simulate lawful plans.  Rather, they simulate plans 'using only

10 traditional districting criteria of equal apportionment and

11 geographic contiguity and compactness.'  They do not take into

12 account Section 2 of the Voting Rights Act, which often

13 requires majority-minority districts to be constructed.  They

14 also do not take into account Section 5 of the VRA, which until

15 2013 meant that existing majority-minority districts could not

16 be eliminated in certain states, and they do not take into

17 account state-level criteria such as respect for political

18 subdivisions and respect for communities of interest, which

19 are, in effect, in a majority of states."

20 Q     All right.  So you did criticize Dr. Chen for some of his

21 research that didn't take into account the Voting Rights Act,

22 correct?

23 A     Yes.

24 Q     Now, in your own analysis for this case, did you do any --

25 did you compare plans before or after 1992 to determine the

1  number of African-Americans elected between 1970 and 1990

2  versus those elected in 1992 through 2014?

3  A    I think I did that specifically.  I did look at the

4  relationship between the efficiency gap and the proportion of

5  minority legislators in a given state's congressional

6  delegation.

7  Q    Could you point out to me -- could you look at your report

8  and tell me --

9  A    My report?  Yep.  Is my rebuttal report in your tabs?

10  Q    Why don't you use the other binder.  It's probably easier

11  that way.  So you're looking at your rebuttal report?

12  A    Yes, I am, sir.  I'm looking at --

13  Q    Could you tell us what number is on the front.

14  A    Yeah, I'm sorry.  So that's 4003, page 11.

15  Q    All right.  You did this in your rebuttal report, not in

16  your initial report?

17  A    That's correct.

18  Q    And did you do a comparison of efficiency gap scores from

19  1970 to 1990 to see if they differed in any material way from

20  the scores for 1992 through 2014?

21  A    No, I did not.  Oh, in aggregate or with respect to this

22  question?

23  Q    Either.

24  A    In aggregate, I did, yes.

25  Q    And did you do that with respect to this question of the

1 Voting Rights Act or --

2 A    No, and what I did not do is specifically relate any such

3 difference to VRA-type matters, no.

4 Q    All right.  And you did not identify or otherwise focus on

5 states that were formerly -- or that were covered by Section 5

6 of the Voting Rights Act, did you?

7 A    Only in the indirect sense perhaps, as reflected in the

8 analysis in my rebuttal report.

9 Q    All right.  And did you do any comparison of the

10 efficiency gap scores for states covered by Section 5 versus

11 those not covered by Section 5?

12 A    I have not broken the data along those lines specifically,

13 only in the indirect sense in which I pick up on that via the

14 analysis in the rebuttal report.

15 Q    All right.  So you don't know what effect Section 5

16 coverage may have had on efficiency gap scores over time, do

17 you?

18 A    Strictly speaking, no.

19 Q    All right.  Now, in your analysis, your overall analysis,

20 you did not examine the quality of the incumbent in the

21 district or the challengers, did you?

22 A    Not directly, other than to again come back to the point

23 that all that natural variation in the incumbency challenge

24 equality is, if you will, baked into the pie.  The rich

25 tapestry of American politics 1972 to 2016 is in the analysis

1  and in the conclusions I draw from that analysis.

2  Q    All right.  But you didn't separately analyze incumbents

3  or challengers as part of your analysis?

4  A    No, I didn't and didn't have to.

5  Q    And you -- you've done other research or have read other

6  research.  I believe you stated that you believe incumbency

7  worked at least three percentage points in an election?

8  A    I think it's varied over the years.

9  Q    It's very what?

10  A    I think it's varied over the years.

11  Q    All right.  Have you read literature that led you to

12  believe that 3 percent was a fair percent to put on that?

13  A    In recent years, that's getting around -- that's -- put it

14  this way.  That would be close to the scholarly consensus for

15  recent decades.  It's come down a lot from where it used to be.

16  So 3 percent would be not -- not an unreasonable judgment.

17  Q    All right.  And you didn't separately consider how

18  fundraising or the amount of money raised by candidates

19  affected the efficiency gap separately?

20  A    I did not isolate the independent effects of that other

21  than to say it's baked in that pie I was referring to earlier.

22  Q    Right.  Okay.  And where there were uncontested elections,

23  you had to develop an imputation method to deal with that,

24  correct?

25  A    Yes, I did.

1  Q    And your efficiency gap analysis does not account for

2  turnout and how that might vary between elections in

3  congressional districts, does it?

4  A    Could you say a little more what you're referring to

5  there?

6  Q    Well, you count up the votes that were actually tallied,

7  correct, as part of your analysis, and then you apply your

8  formula to the --

9  A    We are not talking about the imputation method now.  We're

10 -- okay --

11 Q    Yeah, sorry, we're talking about the efficiency gap

12 itself.

13 A    Okay.

14 Q    You tally up the votes, and you apply your formula to

15 them, correct?

16 A    Yes.

17 Q    All right.  But you don't step back and analyze why the

18 turnout was what it was to produce those numbers, do you?

19 A    No.

20 Q    You just take the numbers as they are?

21 A    I do.

22 Q    Having looked at a lot of congressional elections and a

23 lot of redistricting maps -- I'll tell you what.  Let's just

24 put it on the screen.  I'm just going to ask for exhibit --

25 Defense Exhibit 5012.  It's going to go up on the screen.  This

 1  is the 1992 Congressional Plan.

 2  A    Okay.

 3  Q    I think most folks in here will be familiar, but I want --

 4          JUDGE OSTEEN:  I'll tell you what.  Before you do

 5  that, let's take a lunch recess until 1:45.

 6          (At 12:25 p.m., break taken.)

 7          (At 1:46 p.m., break concluded.)

 8          JUDGE OSTEEN:  You may continue, Mr. Strach.

 9          MR. STRACH:  Thank you, Your Honor.

10  BY MR. STRACH:

11  Q    All right.  Dr. Jackman, before we broke, I think we were

12  going to take a look at exhibit -- what's been marked for

13  identification purposes Defendants' Exhibit 5012 and this is

14  the 1992 North Carolina Congressional Plan.  Dr. Jackman, have

15  you ever seen that plan before in your study of these

16  congressional elections, et cetera?

17  A    It's one of the plans -- the plan that was in place '92

18  onwards was -- does appear in my analysis.

19  Q    Right.  And as we mentioned before -- and you'll recall

20  this is the plan -- the Congressional Plan that's somewhat

21  infamous for the 12th Congressional District.  Do you agree

22  with me about that, the snakelike district?

23  A    Okay.

24  Q    Do you see that?

25  A    I do see the --

1   Q     It looks a lot like a snake, right?

2   A     Okay.

3   Q     So it comes down in Gaston County and kind of snakes its

4 way all the up through Durham County.  Do you see that

5 district?

6   A     Yes.

7   Q     Would you consider that to be a gerrymandered district?

8   A     I don't have a view on whether a district is

9 gerrymandered.

10   Q     Okay.  All right.  Even just kind of looking at it, you're

11 not willing to say that's a gerrymandered district?

12   A     I've done analysis of entire plans using measures of

13 asymmetry that are properties of the plans -- the plans.  My

14 approach is based on that rather than eyeballing maps.

15   Q     Okay.  So under this 1992 Plan under -- the way you

16 analyze efficiency gap, scrutiny would not be required if the

17 first election under this plan was under .12, correct?

18   A     That's correct.

19   Q     And isn't it true that in your calculations this

20 particular plan scored below .12 in the first election after it

21 was drawn?

22   A     Our estimate -- yes is the answer to your question.

23   Q     You do recall that, correct?

24   A     Yes.

25   Q     This plan -- this 1992 Congressional Plan with that 12th

1  District, that first district, would not have warranted

2  constitutional scrutiny under your calculation of the

3  efficiency gap, is that correct?

4  A    That's correct.

5  Q    Now, when you are determining whether a plan should be

6  subjected to scrutiny, you do not particularly look at how many

7  counties are divided in any given map, do you?

8  A    No, I do not.

9  Q    And so you would have -- unless you counted them up, you

10 have no idea how many counties were divided in this 1992 Plan?

11 A    I couldn't tell you, no.

12 Q    All right.  And when you are assessing whether a plan

13 should be subject to scrutiny, you don't look at whether

14 precincts or voting-tabulation districts are divided, do you?

15 A    No, I do not.

16 Q    So you wouldn't know, unless you counted them up sitting

17 here today, how many divided precincts were in the '92 Plan, do

18 you?

19 A    I couldn't tell you that, no.

20 Q    Did you ever by chance read the legal cases --

21 A    No, I did not.

22 Q    -- that the 12th District spawned?  No.  Okay.  Does a

23 case called *Shaw v. Hunt* ring a bell to you?

24 A    No, it does not.

25 Q    And so we've talked about county splits and VTD splits.

1  Isn't it true in general in your analysis you don't evaluate

2  how well a plan complies or doesn't comply with traditional

3  redistricting principles, do you?

4  A    No.  You saw, for instance, the calculation we performed

5  for North Carolina '16.  To the extent -- 2016.  To the extent

6  a plan may not comply with conventional redistricting criteria,

7  that may and probably will give rise to large values of wasted

8  votes, but directly no.

9  Q    And would you -- when I say -- when I use the term

10 "traditional redistricting principles," do you understand that

11 to mean things like splitting counties, precincts, et cetera?

12 A    Well, equal population, contiguity, compactness,

13 minimizing splits, preserving communities of interest.

14 Q    Right.  And I mean would you agree with me that just

15 visually looking at the 1992 Plan that that plan does not do a

16 very good job of complying with traditional redistricting

17 principles?

18 A    It's the first time I've seen it all.  I don't have an

19 opinion on that.

20 Q    Okay.  Now, you don't -- in your analysis, you don't

21 attempt to isolate the effect of county splits on the

22 efficiency gap calculations, do you?

23 A    Not on a plan-by-plan basis, no.

24 Q    And you don't attempt to isolate the effect of precinct

25 splits on your EG calculations, do you?

1  A     No, I do not.

2  Q     And your analysis does not attempt to isolate the

3  residential concentrations of Republican or Democratic voters

4  around the state, does it?

5  A     No.

6  Q     And you don't attempt to analyze how residential patterns

7  or residential locations of Republican or Democratic voters

8  would impact the efficiency gap scores for a particular plan,

9  do you?

10  A     Again, not in a direct way, but only to again assert that

11  fluctuations in residence patterns, political geography over

12  time and over the American states are reflected in the

13  historical analysis and the conclusions I draw from historical

14  analysis.

15  Q     All right.  And is it also the case that because this 1992

16  Plan under your analysis would not have triggered

17  constitutional scrutiny that under the analysis you're

18  proposing none of those districts -- individual districts would

19  be subject to scrutiny either?  Is that correct?

20  A     I'm not qualified to answer that question.  Whether there

21  may be legal grounds for challenging a particular district

22  is -- I'm not qualified to offer an opinion on that.

23  Q     Okay.  Well, let me ask it to you this way.  Let's assume

24  that the initial election under a plan draws an efficiency gap

25  of less than .2 under a given plan.

1  A     Less than .2?

2  Q     .12.  Excuse me.

3  A     .12.

4  Q     Are you offering the Court any analysis or test of how it

5  could nonetheless identify individual district gerrymanders

6  even where the overall plan doesn't trigger scrutiny?

7  A     That was not what I was asked to -- that analysis was not

8  what I was asked to provide in this matter.

9  Q     All right.  I'm going to ask you to take a look on the

10  screen at what's been marked Defendants' Exhibit 5061 and this

11  is -- I'm sorry.  Exhibit -- what's been marked as Defendants'

12  Exhibit 5044.  And, Dr. Jackman, I hope that it appears better

13  on the screen to you and maybe if you look at the screen on

14  your witness stand.  Are you familiar with the revised version

15  of the North Carolina Congressional Plan in the '90s after the

16  '92 Plan was struck down?

17  A     No.

18  Q     You understand, though, that the Congressional Plan in the

19  '90s in North Carolina did change, correct?

20  A     I believe I picked that up in --

21  Q     It had the orange dots on it.

22  A     Yes.

23  Q     Page 21 of your amended report.

24  A     Yep.  Here we go, yep.

25  Q     All right.  And are you able on your screen to see the

1  12th District?

2  A    Yes.

3  Q    And is it fair to say that it's not quite as snakelike,

4  but it's still a snakelike district?

5  A    To be honest, I can see it much more clearly on this map

6  than I could on the previous one and what I believe to be 12 on

7  this map is not snakelike.

8  Q    Okay.  Now, this particular plan under your calculations

9  would also not be subject to scrutiny, is that correct?

10  A    I would have to just find the relevant part of my report

11  where I have those --

12  Q    All right.  Let's look in your amended report at page 63.

13  I think that's the relevant figure.

14  A    Yes.  Correct, yep.

15  Q    So this particular plan would also have not been subjected

16  to scrutiny, is that correct?

17  A    Yeah, the first election -- this is in place as far as

18  1998, so no.

19  Q    You said you hadn't read the *Shaw v. Hunt* case.  Are you

20  familiar at all with a case called *Cromartie versus Hunt* from

21  North Carolina?

22  A    Nope.

23  Q    Were you aware that at some point the State of North

24  Carolina defended the 12th District in this map as a political

25  gerrymander?  Are you just generally aware of that?

1   A     I was not aware of that.

2   Q     Were you ever aware of a decision by the General Assembly

3   in the '90s to draw a congressional redistricting plan that had

4   six Republicans and six Democrats?

5   A     No, I was not.

6   Q     Is it -- would one way to avoid an efficiency gap issue

7   under your analysis be, if you had 12 congressional districts,

8   to draw six uncompetitive districts for Republicans and six

9   uncompetitive districts for Democrats?

10  A     Not necessarily, no.

11  Q     You don't agree with that?

12  A     No.  It would depend on -- if we were in a state that was

13  80/20, a 6-6 split of the seats would -- wouldn't seem

14  reasonable.

15       MR. STRACH:  Your Honor, I'm going to hand up the

16  deposition transcript and use that at this time.

17       JUDGE OSTEEN:  All right.

18       JUDGE BRITT:  What page have you directed us to?

19       MR. STRACH:  I haven't yet, Your Honor.

20  BY MR. STRACH:

21  Q     Dr. Jackman, if you could direct yourself to page 129.

22  A     Yes.

23  Q     And if you'll look beginning at line 5 -- if you'll read

24  to yourself lines 5 through 19 and let me know when you're

25  ready.

1  A    "Question:  Okay.  All right.  And then" --

2          JUDGE OSTEEN:  Read it out loud?

3  BY MR. STRACH:

4  Q    Just you read to yourself --

5  A    Oh, pardon me.

6  Q    -- and then I'll ask questions.

7  A    Okay.  Five through 19?

8  Q    Yes, sir.

9  A    Yeah.

10         (Pause in the proceedings.)

11         JUDGE OSTEEN:  I think he's finished.

12 BY MR. STRACH:

13 Q    So, Dr. Jackman, could you draw a plan that complied with

14 the efficiency gap by drawing six very safe Republican

15 districts and six very safe Democratic districts?

16 A    Well, in the specific context of a state that was close to

17 being 50/50, yes, that would produce close to a zero efficiency

18 gap, but that's not what I heard you ask me before.

19 Q    All right.  So tell me specifically when I asked this

20 question that I'm asking you now, not --

21 A    Okay.  I'll listen very carefully.

22 Q    Could you draw a plan that complied with the efficiency

23 gap by drawing six very safe Republican districts and six very

24 safe Democratic districts?

25 A    The answer is it depends on the statewide balance of

1  Democrats and Republicans.

2  Q    All right.  So there are circumstances where that could be

3  true, correct?

4  A    There do exist circumstances where, yes, 6-6 even on a

5  comparative could be -- could generate a small efficiency gap.

6  Q    And if the State chose to comply with the efficiency gap

7  under the circumstances that would allow them to do it because

8  of the nature of how the math would work out, the State could

9  thereby entrench six Republicans and entrench six Democrats

10 into its congressional delegation, couldn't it?

11 A    I suppose so, yeah.

12 Q    All right.  If you'll turn your attention to the screen,

13 we're going to put up what's been marked as Defendants'

14 Exhibit 5046.  I will represent to you, Dr. Jackman, that this

15 is North Carolina's 2001 -- it was passed in 2001 --

16 redistricting plan for Congress.  Have you ever looked at or

17 seen this particular plan?

18 A    If I have, it hasn't been for a while.

19 Q    Okay.  Do you -- can you see on your screen where the 12th

20 congressional District is on the map?

21 A    Yes.  Yes.  This is rather famous.

22 Q    Right.  This district has been famous for a long time,

23 hasn't it?

24 A    Yes.

25 Q    And it remained famous after this drawing of it, is that

1  correct?

2  A     That's my recollection.

3  Q     Okay.  And you also see on this particular map District 13

4  in the northern part of the state?

5  A     Yes, I do.

6  Q     You see how it stretches from Wake County all the way over

7  to I think it's Guilford County?

8  A     Thirteen up at the top?

9  Q     Right.

10  A     I think the leftmost county there is Rockingham, but yes.

11  Q     Do you know anything about -- in 2002, after this map went

12  and had its first election, do you know who any of the

13  incumbents were in any of these districts?

14  A     No.

15  Q     All right.  Isn't it true that this particular map would

16  not have been subjected to review under your analysis?

17  A     That's correct.

18  Q     However, is it not also true that by 2010 this particular

19  map scored above a .12?

20  A     Yeah.  In the very last election held under that map in

21  2010, there's a large value -- relatively large value of the

22  efficiency gap in a pro-Democratic direction of .13 or 4 or so,

23  yeah.

24  Q     Would you agree with me that 2010 was generally what you

25  might consider a wave Republican year?

1  A    That's my recollection.

2  Q    And is that likely the explanation for why the efficiency

3  gap changed so much in 2010?

4  A    Could be, but I'm not going to offer an opinion on that.

5  Q    Okay.  But if that wave election had occurred earlier in

6  the decade, it would have triggered scrutiny under your

7  analysis, correct?

8  A    Accepting your premise about the connection between a wave

9  election and the big efficiency gap number, which -- okay.

10  Let's just do that, but I -- perhaps.

11  Q    So this is an example where it wasn't known that this was

12  a potential gerrymander until the very last election of the

13  decade?

14  A    I haven't done this with respect to exactly this plan, but

15  I wonder if some of the analysis of the sort I've been

16  recommending and demonstrated with respect to the North

17  Carolina -- the current North Carolina plan might have revealed

18  that had a large wave election come along that this plan would

19  be revealed to be an incumbent protection plan, so racking up a

20  big efficiency gap for Democrats, say.  That is to say, the

21  reasoned analysis we might have done earlier that might have

22  forecast that this might be a property of the plan even though

23  it's only the trigger for scrutiny.

24  Q    What analysis are you speaking about?

25  A    The uniform swing analysis.  There exists a set of

1  circumstances such that this plan might trigger a large

2  efficiency gap even though it isn't doing so now.

3  Q    But you're saying you would have to do some uniform swing

4  analysis to figure that out?

5  A    Well, yeah, yeah.  You might -- it's a difficult problem

6  how might one reasonably anticipate something that no one saw

7  coming in, you know, five -- but there are tools available that

8  would at least put some weight on that possibility.

9  Q    So the simple mathematical calculation of the efficiency

10 gap by itself won't do that, though, correct?

11 A    No, no.

12 Q    Now, speaking of uniform swing, that was a concept that

13 you talked about earlier.  Is it fair to say, though, that this

14 concept of uniform swing has been criticized by other political

15 scientists?

16 A    Yeah.

17 Q    All right.  So is it fair to say there's not a consensus

18 on the appropriate use of uniform swing in this context?

19 A    I think that debate inside political science, one I've

20 contributed to over my career, has actually settled down

21 somewhat in recent decades precisely because it's a better

22 approximation to American political reality today than it may

23 have been earlier.

24          As electoral politics has become (a) more

25 nationalized and (b) more partisan, uniform swing -- and,

1  indeed, that's the point of my most recent publication "A30" on

2  my vitae, is to point to the sort of renewed validity of

3  uniform swing as a forecasting tool in recent American

4  elections, say if we were to go back to the '60s, '70s or even

5  the '80s; but I think in the '00s and forward political science

6  is discovering that uniform swing is not as bad as we might

7  have thought it was in those earlier decades.

8  Q   But it's fair to say, right, the debate is not over?

9  A   It's certainly calmed down an awful lot from where it was

10 in the '80s and the '90s.

11 Q   All right.  But there is a debate that's still going on

12 over uniform --

13 A   Frankly, I would not characterize it as an active debate,

14 but a debate that people remember when they do their work and

15 keep in the back of their minds.

16 Q   It's fair to say there is not a consensus?

17 A   I think operationally there is, that most people doing

18 this sort of work see very little utility from assuming

19 anything other than uniform swing because it has become a very

20 good approximation over recent decades.

21 Q   So are you --

22 A   For instance, the last time I can recall a serious

23 critique of uniform swing in the literature that speaks to this

24 sort of work would be the wave of work around Gelman and King

25 in the '90s into the '00s that provided a lot of the work that

1  went up in the LULAC matter and I think two things happened.

2  One, LULAC didn't prevail; and, two, I think the world has

3  changed a little bit since then as well.  And political

4  scientists know it's not 100 percent right, but it's a very

5  good approximation to contemporary patterns of change in

6  American politics and that is no longer an active debate is how

7  I would characterize the state of the field at the moment.

8  Q    So let me just ask you again to make sure I get an answer

9  to the question.  Are you willing to say that there is a

10 consensus?

11 A    I would characterize the consensus as follows:  In

12 American political science at the moment, most political

13 scientists are of the view that uniform swing is a very good

14 approximation to how election results change year to year,

15 cycle to cycle.

16 Q    And the consensus is that it is just an approximation,

17 correct?

18 A    A very good approximation.

19 Q    And isn't it true, just as a matter of fact, that the

20 swing among districts is not uniform, in fact, 100 percent of

21 the time?

22 A    No, but it's a very good approximation.

23        MR. STRACH:  If you'll just indulge me, Your Honor,

24 as I look back through some notes.

25        (Pause in the proceedings.)

BY MR. STRACH:

Q    Dr. Jackman, just to make sure this is clear, your analysis is not designed to apply to states with six or fewer congressional districts, correct?

A    That's correct.

Q    So the analysis that you're presenting to this Court could not be used nationwide?

A    It applies to 82 percent of the Congress.

Q    Right.  But not 100 percent?

A    Not 100 percent.

Q    So there would be some states -- there would be some people living in some states who would not be subjected to this political gerrymandering test under your analysis, correct?

A    That's correct.

Q    Now, you've described today -- and, again, make sure you correct me if I'm wrong -- several measures of what I think you would call globally partisan symmetry, right?

A    Yes.

Q    And you've got partisan bias.  I think you've had the mean-median difference and the efficiency gap, is that correct?

A    That is correct.

Q    And have you given any opinion in this case regarding how -- is the Court supposed to apply all three of them at the same time?  Is the Court supposed to average them up?  Is there some priority?  I don't want to know what the answer is.  First I

 1  want to know have you answered that in your report?

 2  A    My view is that the -- and, you know, I did not offer --

 3  my report, for instance, I think is quite clear on this in the

 4  sense that it's with respect to the efficiency gap that I did

 5  the deep dive in trying to do the thresholds and the

 6  durability.  I look on these other measures of partisan

 7  asymmetry, if you will, as strengthening the argument.  In the

 8  literature, other scholars rely on them.  They give essentially

 9  the same message as the efficiency gap, which is reassuring,

10  and that's particularly the case when our attention shifts to

11  North Carolina.  But in terms of putting forward something for

12  future scholars and courts to hang their hat on, it's the

13  efficiency gap is where I've landed.

14  Q    All right.  And so far as your report is concerned and

15  your testimony to the Court, as you put it, the efficiency gap

16  is, quote, where you landed, correct?

17  A    Correct.

18  Q    Just a few questions about a concept that you raised of --

19  you did some imputation to account for uncontested elections,

20  is that correct?

21  A    Correct.

22  Q    And I think you said that of the -- in your data, I think

23  you said 518 out of 8,000 elections were uncontested, is that

24  right?

25  A    14 percent, yeah.

1  Q    And what would you do -- how would you deal with the
2  efficiency gap analysis if in, let's say -- let's say the
3  legislature passes a plan in 2021 that's used in 2022; and of
4  the 13 districts that are up, three of them are uncontested.
5  How would your efficiency gap deal with that?
6  A    So -- right.  We're in 2021.  Let's see.  We're going to
7  have a presidential election in 2020.  Is this -- we're doing
8  this analysis after that first election?
9  Q    Yes.
10 A    After the 20 --
11 Q    2022.
12 A    2022.  All right.  So we've seen the first election under
13 a new plan.  We've got the 2020 election in our pocket -- the
14 presidential election in our pocket.  One thing -- you know,
15 literally this is what I did in my report is look at the
16 relationship -- in the ten districts where we do have both 2020
17 presidential by district and a congressional result, plus
18 incumbency, we know what the relationship looks like between
19 presidential vote in the district and congressional vote in the
20 district, and we know we've got a rough handle from North
21 Carolina and from other districts around the country what the
22 incumbency advantage is.
23       That gives us then a basis since we've got 2020
24 presidential in the districts where we did not -- in the three
25 districts where we did not see a congressional contest, we've

1 got a basis there to -- you know, something to plug into our

2 model that's going to give us a predicted congressional vote

3 for the three ones where we haven't got it.

4 Q    So you would be making an inference about what the vote

5 would have been had there been a contested election?

6 A    Yeah.  The last thing I would say about that is the way I

7 did the imputations is to also insist that whatever you predict

8 for the congressional vote in that district where the

9 congressperson did not have a challenger -- your inference is

10 that had that congressperson faced a challenge they would have

11 nonetheless won, so any imputation you make has to be above

12 50 percent of the two-party vote for the incumbent who did not

13 face a challenge, yeah.

14 Q    All right.  Would it cause any statistical validity issues

15 for you if 3 out of the 13 districts, though, were uncontested

16 and you had to make this inference about who would have won?

17 A    It is not a validity issue.  The issue that -- it does

18 raise an issue, but validity is not the issue.

19 Q    What issue does it raise?

20 A    Reliability.  And now the honest thing to do and the thing

21 I did throughout the report -- anytime I'm in that situation,

22 we have to confront the fact that we have imputed data and we

23 don't impute exactly.  We shouldn't pretend to know what would

24 have happened in that district with absolute certainty.

25          I employ methods to make sure that if I'm in a -- "3

1 out of 13 are imputed" situation, the efficiency gap I compute

2 in that election is going to be accompanied with some

3 uncertainty; and one of the things I was very careful to do is

4 to make sure that in the 512 elections -- if any of those

5 elections had some imputed data in it, then any inference I

6 make, say, about the relationship between the first election's

7 efficiency gap and the lifetime average efficiency gap has

8 folded in the fact that we don't know for sure what the

9 efficiency gap was because there was some uncontested data,

10 uncontested elections in there where we imputed and we never --

11 in statistics, we don't impute exactly.  We impute off a model.

12 Models aren't perfect, but that's okay as long as everything we

13 conclude from that point forward carries that uncertainty

14 forward.

15         And you can make a statement about probabilities now,

16 hence that 99 percent probability number I reported earlier at

17 various points in my report and in my testimony.  Every time

18 I'm doing that it's taking into account the fact that

19 14 percent of the data -- we had to fit a model to put a number

20 in there for a given congressional election where it was

21 uncontested.

22 Q    Thank you.  I appreciate that.  Let me think about it this

23 way.  Your overall efficiency gap analysis deals with the fact

24 that there's 518 out of 8,000 uncontested elections in your

25 data set, correct?

1  A    Correct.

2  Q    All right.  So you've presumably dealt with that in some

3  way.  What I'm trying to get at more is what if you have -- in

4  a congressional plan that has, say, 13 districts and you're

5  doing an efficiency gap analysis of that and you've got --

6  let's just say four out of the 13, a third of the districts,

7  had uncontested elections, does that present a reliability

8  issue for you?

9  A    Oh, I get your question now.  You would -- your estimate

10 of the efficiency gap would come out equipped with a 95 percent

11 confidence bound so --

12 Q    If there were four out of 13?

13 A    If there were one out of 13, right, because you've imputed

14 one.  Only 13 out of 13 we know exactly what it is.  It's just

15 a straight-shot calculation in North Carolina 2016, right?

16 Suppose even one, right?  At that point we're imputing and one

17 of -- now, that wouldn't matter too much, right?  If it was

18 only one district, the overall statewide quantity, the

19 efficiency gap won't be too troubled, but it will have a little

20 bit of uncertainty associated with it reflecting the fact that

21 one out of the 13 data points going into it was imputed.  Now

22 you're asking me to think about two, now three, now four, and I

23 get it.

24        The point is, yes, your conclusion about the value of

25 the efficiency gap is starting to become a little more

1 uncertain, and I think it is an empirical question.  It would

2 be a case-by-case determination.  If you're at a point where,

3 you know -- let's make up a number -- 10 out of 13 are imputed,

4 I think that you would be in a world where it would be very

5 hard to say much about using this analysis, about the

6 efficiency that would be starting to come out.

7           And I would have to see for myself, but the

8 confidence bound on it would start to become large and

9 probably -- it might be a case where your point estimate lies

10 above the threshold, but the confidence bound that it's

11 equipped with, because you've imputed so much of the data,

12 pushes you back below the threshold.  And then I think we've

13 got a real question, have we crossed the threshold or not; and

14 the answer is probably maybe not enough to trigger scrutiny

15 would be I think a perfectly reasonable response to analysis

16 under those circumstances.

17 Q    I take it, though, this is not something you thought about

18 before today?

19 A    No, I have because, as I just said, all through the report

20 there are examples where -- in coming up with the thresholds

21 themselves, I had to deal with that and so I'm very alert to

22 that.

23           The only thing I guess I would say is that it would

24 be -- you do get these cases here and there in the data where

25 you get a very large estimate of the efficiency gap.  You go,

1  wow, that's a big number, but it's also got a big confidence

2  interval.  That's reasonably rare and, indeed, more typical --

3  a few things to say:  Uncontestedness is still around in

4  American politics at the national level, in Congress to be

5  sure.  It has not going away.  Massachusetts still racks up

6  considerably high levels of uncontestedness in its

7  congressional elections, for instance.  But it's not as

8  prevalent as it used to be, number one.

9          And number two, when we tend to get a very large --

10  in the more recent decades, very large values of the efficiency

11  gap that are sailing above these thresholds that I've talked

12  about today, even in the presence of uncontestedness we're not

13  being troubled by especially wide confidence intervals that are

14  we really above the threshold or not.  That's seldom, as a

15  practical matter, something I've seen in the recent data, but

16  it's a live question to be sure.

17  Q    So, for instance, going back to the -- what we talked

18  about earlier, if the legislature had 12 congressional

19  districts and said, "All right.  The heck with this.  We're

20  going to draw six solid Republican districts, six solid

21  Democratic districts.  We're just going to deal with the

22  efficiency gap that way," and let's say the math works out that

23  they -- that they pass with flying colors, isn't it likely that

24  in such a map you're likely to have a lot of uncontested

25  elections?

1  A    Yes, I could easily imagine -- that's a -- well, I don't

2  know, but I see where you're going with the scenario.

3  Q    And if that were the case and you had 10 out of 12

4  uncontested elections, wouldn't you have some serious

5  reliability issues to contend with going forward?

6  A    It would be -- we're in a position in that case where,

7  since the election is not producing a lot of data, we would be

8  looking I think at this exercise of computing -- you know,

9  finding other ways to characterize the plan.

10 Q    So in that situation, your efficiency gap would have

11 essentially killed itself off?

12 A    Well, it's a rather speculative hypothetical chain that

13 you've put before me.  Map drawers, in anticipation of scrutiny

14 from the efficiency gap, engage in this plan to get around it

15 and I wonder about the set of partisan redistricting -- you

16 know, what set of redistricters conspire to go 6-6 each way.

17 Q    And just to be clear, you were talking about the

18 prospective use of the efficiency gap.  I think I've asked

19 this, but just for the record, you've not actually done a

20 prospective use of the efficiency gap in this report in this

21 case, correct?

22 A    No, I have not.

23          MR. STRACH:  Your Honor, that's all I have at this

24 time.

25          JUDGE OSTEEN:  Redirect?

 1              MS. EARLS:  Thank you, Your Honor.

 2                      REDIRECT EXAMINATION

 3  BY MS. EARLS:

 4  Q    I want to start with this 6-6 plan concept and -- first,

 5  to be clear, as you explained the concept of the efficiency gap

 6  based on wasted votes, this is not a measure that is intended

 7  to lead towards -- necessarily lead towards competitive

 8  districts, is that right?

 9  A    No.  We're measuring symmetry and we can be symmetric in

10  many different ways.

11  Q    So is it true in a 6-6 plan with a low efficiency gap that

12  means that we're treating the parties the same because it's a

13  low efficiency gap?

14  A    That's the concept of symmetry, yes.

15  Q    And would this kind of plan necessarily maintain a low

16  efficiency gap if the statewide vote shifted one way or the

17  other over the course of a decade?

18  A    Well, if they're all uncompetitive districts, yes, right?

19  Those incumbents are quite immune from changes in the national

20  tide, if you will.

21  Q    Now, my next -- I want to turn to the questions that you

22  were asked -- first let's -- clarify for us.  We've used this

23  word "threshold" a lot.  What figure or what threshold are you

24  recommending for flagging a redistricting plan as requiring

25  further attention?

1  A      In states with relatively small congressional delegation,

2  7 to 14 seats, plus or minus .12; in states with larger

3  congressional delegations, plus or minus .075.

4  Q     And then just because a plan is flagged, what's the next

5  step that needs to happen to determine whether it's ultimately

6  unfair?

7  A      You've got to subject the plan to some of that uniform

8  swing analysis that I showed earlier to reassure yourself that

9  before you take the plan into court that under some modest

10  assumptions about the swings that are likely to come down the

11  pipeline through national tides that a small pertubation, say

12  something as little as 1, 2, 3 or even 4 percent, isn't going

13  to produce an efficiency gap that would knock us below the

14  threshold I just described.

15  Q     So in other words, crossing the threshold isn't enough.

16  You then have to do the sensitivity analysis to determine

17  whether swings in the vote would keep you above the threshold.

18  A      I think that's an especially wise thing to do given -- as

19  I was saying earlier, I did it in my report, but (b) uniform

20  swing is a pretty good approximation to what happens in

21  American elections.

22  Q     Now, you were asked about an article by Stephanopoulos and

23  McGhee which used a different threshold.  My question for you

24  is:  Is there a principled reason to choose one threshold over

25  the other?

1  A    Yes, yes.  I believe that the Stephanopoulos and McGhee

2  threshold did not -- was not derived during the careful

3  examination of durability of efficiency gaps that I did, for

4  one thing; and that's, I think, you know, my reason for

5  preferring the way I've gone about this analysis, deliberately

6  trying to put myself in the shoes of a body trying to determine

7  the constitutionality or taking steps towards deciding the

8  constitutionality of a plan early in its life.

9  Q    Now, you were also asked about a hypothetical situation

10 where in the first election after a new plan is implemented the

11 efficiency gap is .12, but then it becomes .04 in the next

12 election.  How would a sensitivity analysis after that first

13 .12 election operate in these circumstances?

14 A    Yes.  So that sequence would be -- the plausibility of

15 that sequence would be revealed through the sensitivity

16 analysis of the first election's results.  It would make clear

17 that the .12 might not be as robust as it may appear on its

18 face and that would be a very easy thing to determine, that

19 this is a .12 that is perhaps more fragile than it appears.

20 Q    Now, you were also asked about your testimony in the

21 *Whitford* case or report, and initially you looked at eight and

22 above, and here you've gone to seven and above.  Why did you

23 make that change?

24 A    After I looked at the data very carefully -- and this is

25 my -- when I wrote that with respect -- in the *Whitford* matter,

1   I was looking at the fact that that was the state of the

2   literature.  When I turned to it myself, I was of the view that

3   there were some states that ought to come into the analysis

4   with seven CDs that, frankly, we want to have in the analysis.

5   The more you can put in, frankly, the better.  It makes the

6   case -- the analysis more compelling and more robust, and it

7   allowed us to put into the analysis -- you know, there's states

8   like Alabama and South Carolina and Arizona coming for part of

9   the period and, frankly, that's helpful.

10          I think we want to, where possible, subject what we

11  think we're learning to a more -- to a bigger pool, have more

12  data in the pool; and going from eight to seven struck me as a

13  step we could take.  I don't think I would want to go any

14  further than that, and I didn't in this case in terms of

15  putting smaller and smaller congressional delegations into the

16  analysis.

17          I didn't find it particularly material in the end

18  and -- so no negative consequences from doing it and positive

19  consequences from expanding the pool of cases available for

20  analysis and ultimately, I think, strengthening the conclusions

21  I draw about (a) the efficiency gap in general, but the

22  efficiency gap in North Carolina in particular.

23  Q    Also, in connection with your work in the Wisconsin case,

24  you were asked about your rebuttal report and I want to ask you

25  what were you explaining to the Court in the Wisconsin case

 1 with respect to Jowei Chen's 2013 academic article?

 2 A    Okay.  So I was making a point there that the Chen and

 3 Rodden algorithm was drawing plans consistent with a fairly

 4 minimal set of redistricting criteria, but without regard to

 5 particular state-by-state requirements about redistricting.  So

 6 I was trying to distinguish it from the arguments we were

 7 putting forward with respect to Wisconsin.

 8 Q    Is that criticism applicable to his work in this case?

 9 A    Oh.  So I've been reflecting on that since the question

10 was put to me and I think the way I would characterize it is I

11 was in court all day yesterday.  I heard Jowei Chen's

12 testimony.  As I understood it, and it was made clear time and

13 time again, his project was to draw maps out of his computer

14 algorithm that satisfied a particular set of criteria that were

15 fit for purposes that were adhering as closely as possible to

16 the words we heard over and over as the stated criteria.

17          Having -- it seems to me he was working on a

18 different problem in his work for this case than how

19 relevant -- what he was doing in the 2013 article with respect

20 to Wisconsin.  It seems to me what I heard yesterday sounded

21 extremely tailored to the particular circumstances before him

22 and before us in this matter versus what we were doing in

23 Wisconsin.

24 Q    And finally, I think you were asked twice whether you had

25 prospectively done an efficiency gap calculation for a

1  redistricting plan before there had been any election under

2  that plan, but what you weren't asked and what I want to ask

3  you is:  Are you aware of whether anyone else has done that?

4  A    I'm aware of an instance where here in North Carolina with

5  respect to the Assembly Plan, I believe it's even a member of

6  the state legislature himself precisely, perhaps because it is

7  reasonably simple --

8           MR. STRACH:  Your Honor.

9           THE COURT:  Hold on just a second.  Yes, sir.

10           MR. STRACH:  Your Honor, may I be heard on an

11  objection to the testimony?  It sounds like this is based on

12  hearsay, information that the witness does not have personal

13  knowledge of.  We would object to it on that basis.

14           MS. EARLS:  Well, I'm just asking if he's aware of it

15  as in throughout the work that he's done in this area.

16           JUDGE OSTEEN:  How is he aware of it?  Through what

17  somebody else told him?

18  BY MS. EARLS:

19  Q    Well, have you seen a report that was produced showing the

20  efficiency gap for the North Carolina legislative districts?

21           MR. STRACH:  I would renew my objection.

22           JUDGE OSTEEN:  Hold on.  Your objection stands.

23  Let's hear this answer.

24           Where did you get this information from?

25           THE WITNESS:  It was shown to me -- it's on a website

1 where one of the submissions, I believe -- it's a website

2 collating submissions and one of the submissions has a set of

3 Excel spreadsheets that -- some of them include calculations of

4 properties of a proposed plan denominated -- you know, done

5 with respect to the efficiency gap.

6        JUDGE OSTEEN:  Were you asked to do anything with

7 that or you just saw it on the website?

8        THE WITNESS:  No, it was -- it was brought to my

9 attention.

10        (Discussion between the judges.)

11        JUDGE OSTEEN:  All right.  I will let you testify to

12 it and we'll take it under advisement.  We'll decide the

13 objection.  The objection is noted.

14        MS. EARLS:  Thank you, Your Honor.  I have no further

15 questions.

16        JUDGE OSTEEN:  Redirect?

17        MR. STRACH:  Nothing further, Your Honor.

18        MS. EARLS:  Your Honor, may I just be clear?  We

19 would like to reserve the right to call Dr. Jackman on

20 rebuttal.

21        JUDGE OSTEEN:  On rebuttal.

22        MS. EARLS:  Yes.

23        JUDGE OSTEEN:  Oh, during the rebuttal case?

24        MS. EARLS:  That's correct.

25        JUDGE OSTEEN:  Understood.

1          MS. EARLS:  Thank you, Your Honor.

2          JUDGE OSTEEN:  You may step down.

3          THE WITNESS:  Thank you.

4          (At 2:39 p.m., witness excused.)

5          MS. EARLS:  Your Honor, at this point the next

6    witness that the Plaintiffs would call -- I believe we've been

7    able to resolve that in agreements with counsel and that there

8    are -- but I want to put those agreements on the record so that

9    we don't have to call -- so that we are not required to call

10   those witnesses.  If I may do that at this time?

11         JUDGE OSTEEN:  Okay.  So you've got some agreements

12   as to some foundation or something?

13         MS. EARLS:  Correct.

14         JUDGE OSTEEN:  All right.

15         MS. EARLS:  So the Plaintiffs were intending to call

16   Tim Stallman to lay a foundation for Plaintiffs' Exhibits 4023

17   and 4024, and I believe that in return for those -- the

18   objections to those exhibits being withdrawn, the Plaintiffs

19   have agreed that the Defendants' witness Dr. Hofeller will

20   submit a short declaration relating only to those two exhibits

21   to give his rebuttal to what they show.

22         JUDGE OSTEEN:  So you all -- is that part of the

23   deposition testimony that will be submitted?

24         MS. EARLS:  No.  This would be an additional new

25   declaration by Dr. Hofeller relating only to these two

1  exhibits.

2          JUDGE OSTEEN:  Okay.  So the two exhibits are going

3  to be -- we're just talking about the exhibits now?

4          MS. EARLS:  Correct.  If we don't have this

5  agreement, we would need to call Mr. Stallman to explain.

6          JUDGE OSTEEN:  Okay.  So, Mr. Strach, as I understand

7  it, you all have withdrawn your objection to these exhibits on

8  the condition that you be allowed to submit an affidavit from

9  Hofeller.

10         MR. STRACH:  I thought it included 4022 also.

11         MS. EARLS:  Yes.

12         JUDGE OSTEEN:  So it's 4022 and 4023?

13         MR. STRACH:  And 4024.

14         JUDGE OSTEEN:  And 4024.

15         MR. STRACH:  Right.

16         JUDGE OSTEEN:  So those three exhibits no objection

17  on the condition that Hofeller can submit an affidavit.

18         MR. STRACH:  That's right.

19         MS. EARLS:  So I believe I would like to move their

20  admission at this time.

21         JUDGE OSTEEN:  4022, 4023, and 4024 are admitted.

22         MS. EARLS:  Thank you, Your Honor.  Similarly, the

23  Plaintiffs were intending to call the past president of the

24  League of --

25         JUDGE OSTEEN:  Okay.  Without regard to what you

1  intended to do, what's the agreement?

2      MS. EARLS:  So the agreement is we have reached a

3  stipulation in writing, which we will file with the Court at

4  the end of the day today, regarding members in the League of

5  Women Voters, where they live and other identifiers.

6      MR. STRACH:  It's a standing thing and we've agreed

7  to a short stipulation that will obviate the need for her to

8  testify.

9      JUDGE OSTEEN:  Name, address kind of stuff?

10     MR. STRACH:  Sort of, kind of.

11     JUDGE OSTEEN:  All right.

12     MS. EARLS:  In that case, I think we're prepared to

13  recall Dr. Chen.

14     JUDGE OSTEEN:  All right.

15     MS. RIGGS:  Good afternoon, Your Honors.  Allison

16  Riggs on behalf of the League of Women Voters.  The League of

17  Women Voters recalls Dr. Jowei Chen.

18     JUDGE OSTEEN:  Dr. Chen, as I'm sure you recall

19  yesterday, as Judge Britt said, we only swear you once.  You're

20  still under oath in this case.

21     MS. RIGGS:  Your Honors, may I approach and give

22  Dr. Chen his notebook back?

23     JUDGE OSTEEN:  Is this expert report in here from

24  Dr. Chen the same one that was introduced yesterday?

25     MS. RIGGS:  Absolutely, Your Honors.  We're going to

1  be using that same smaller notebook and actually, as a matter

2  of housekeeping at this time, I would like to move the

3  admission of Joint Plaintiffs' Exhibit 2010, which is the Chen

4  report; 2011 which is Figure A -- it's under a separate tab --

5  and Joint Plaintiffs' Exhibit 2012, Dr. Chen's CV.

6            JUDGE OSTEEN:  Wait a minute.  I've forgotten our

7  numbers from yesterday.  Any objection to these exhibits?

8            MR. STRACH:  No, Your Honor.

9            JUDGE OSTEEN:  Were those the same numbers from

10 yesterday?

11        MS. RIGGS:  Yes, they're joint plaintiff

12 exhibit numbers.

13            JUDGE OSTEEN:  They're admitted.

14            MS. RIGGS:  Thank you, Your Honors.

15                      JOWEI CHEN,

16          PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

17                   DIRECT EXAMINATION

18 BY MS. RIGGS:

19 Q    Thank you for returning to the stand, Dr. Chen.  I would

20 like to talk with you about the three simulation sets that you

21 explained on the stand yesterday, but go into the analyses that

22 you didn't talk about with Mr. Thorpe in much detail.

23        To refresh our memory, though, very quickly, what

24 were the criteria you used for the first simulation set?

25 A    Simulation Set One I had the computer draw 1,000

1  districting plans that strictly followed, complied with the
2  nonpartisan portions of the Adopted Criteria.  We talked about
3  those at great length yesterday.
4  Q    You previously showed the Court your results for this
5  simulation set looking at the seat distributions using both
6  Hofeller's 7-election set and the General Assembly's
7  20-election set.  Did you also use those elections to calculate
8  the efficiency gap score of each of your simulated plans in the
9  first simulation set?
10 A    Yes, I did in the report.
11 Q    Okay.  Can you explain how you calculated the efficiency
12 gap score for each of your simulated plans?
13 A    I calculated it exactly the same way as what Dr. Jackman
14 had just explained earlier today.  So I looked at the total
15 number of wasted votes for each of the two parties.  You go
16 through district by district, just as Dr. Jackman laid out in
17 detail.  Go through district by district, count up the number
18 of total wasted votes for Democrats, total wasted votes for
19 Republicans.
20        Just to repeat what he said, you look at the number
21 of votes that each party has in a district that the party loses
22 and all of those votes are wasted.  In districts that a party
23 wins, you only look at the votes in excess of the 50 percent
24 plus one threshold needed for victory.
25        Anyways, you calculate the total number of wasted

1   votes for each party across all districts; and then you

2   aggregate them all together across the 13 districts and ask

3   what was the total number of wasted Republican votes, what was

4   the total number of wasted Democratic votes; and the difference

5   of that divided by the total number of statewide votes for

6   North Carolina, that gives us the efficiency gap.

7   Q    Did you create a set of charts that show the results of

8   your efficiency gap calculations for your first simulation set?

9   A    Yes, I did in the report.

10        MS. RIGGS:  Can we publish Figure 9 of Exhibit 2010?

11  It's on page 32 of the Chen report.

12  Q    Dr. Chen, can you explain what we're seeing in these two

13  charts that comprise Figure 9?

14  A    These two charts here are just characterizing the 1,000

15  simulations that we discussed at length yesterday in Simulation

16  Set No. 1, except this time on the horizontal axis on both of

17  these figures I'm reporting the efficiency gap, and I'm

18  reporting the efficiency gap in two different ways.

19        On the left, I've calculated the efficiency gap using

20  Dr. Hofeller's formula; and on the right, I've calculated the

21  efficiency gap using the 20-election Adopted Criteria formula

22  that I described yesterday.  Again, this is using the 20

23  elections that were specified by the Adopted Criteria to be

24  used in assessing the partisanship of North Carolina

25  congressional districts, those 20 elections from 2008 to 2014.

1    So I've calculated the efficiency gap along the horizontal axis

2    in two different ways in these two figures.  Along the vertical

3    axis I've reported the Reock compactness score of all these

4    plans.

5              So just like all those figures that we looked at

6    yesterday, what's going on in both of these figures is I'm

7    comparing the Enacted SB2 Plan against the 1,000 simulated maps

8    that I produced in Simulation Set No. 1.  And as I just said,

9    we're comparing them along the horizontal axis in terms of

10   their efficiency gap and along the vertical axis in terms of

11   their mean compactness score as measured by the Reock measure.

12   Q    And just to clarify on these two charts, how is the

13   efficiency gap score for the SB2 Plan denoted on the chart?

14   A    The Enacted SB2 Plan has an efficiency score that is

15   denoted by that red star that you see and it appears in the

16   lower left corner of each of these two figures.

17             So you can see on the left that the SB2 Plan, the

18   2006 Congressional Plan, the enacted plan has an efficiency gap

19   score of approximately negative 24 percent.  On the right

20   figure, we see that using the 20 elections -- so the left

21   figure, again, was using Dr. Hofeller's formula to calculate

22   the efficiency gap.

23             Now, on the right figure when we calculate the

24   efficiency gap using the 20 elections from the Adopted Criteria

25   formula, we get an efficiency gap of approximately negative

1  30 percent.

2        All of these -- both of these just indicate to us

3  that there are far more wasted Democratic votes than Republican

4  votes regardless of which measure, which election formula we

5  use, whether Dr. Hofeller's measure or the Adopted Criteria

6  formula.

7  Q    Now, Dr. Chen, how would you describe the distribution of

8  efficiency gap scores that you see for your first set of 1,000

9  simulated plans?

10 A    Well, to answer that, let's take a look at the

11 distribution of those black circles that we see on -- let's

12 just look at the figure on the left.

13       So there are 1,000 black circles here, and they

14 represent the efficiency gap scores, as well as the Reock

15 scores; but along the horizontal axis you see the efficiency

16 gap of those 1,000 plans.  And what we can see in the figure on

17 the left is that the most likely outcome, the row that you see

18 in the middle -- the column that you see in the middle there,

19 the most likely outcome among these 1,000 simulated plans is an

20 efficiency gap that is very close to 0 percent, ranging from

21 about roughly about negative 2 percent to about positive

22 1 percent.  In other words, all very close to 0 percent.  So

23 that's a very, very -- that's the most common outcome.

24       Of course, there's an entire range, and you see

25 efficiency gaps along these 1,000 simulated plans with as low

1  as negative 16 percent or so and as high as about positive

2  15 percent, but that's the entire range.  And, again, the most

3  common outcome is very close to 0 percent in efficiency gap.

4  Q    So how does the efficiency gap score for SB2 compare to

5  the efficiency gap scores you see in your simulated plans?

6  A    Again, just sticking to that figure on the left, the SB2

7  Plan's efficiency gap is shown to us by that red star that you

8  see on the lower left of that figure on the left.  The SB2 Plan

9  has got an efficiency gap score of negative 24 percent.  That

10 is an extreme partisan outlier and it is entirely outside the

11 entire range of the efficiency gaps of all 1,000 of the

12 simulated maps in Set No. 1.

13 Q    Do the efficiency gap scores for your first set of

14 simulated plans tell you anything about North Carolina's

15 political geography?

16 A    Yes.  It tells us pretty clearly that North Carolina's

17 political geography makes pretty reasonable a plan with an

18 efficiency gap score of right around 0 percent.  In other

19 words, it tells us that North Carolina's political geography is

20 not very strongly or inherently very strongly biased against or

21 for one party or the other.

22 Q    Is the enacted plan, so SB2 -- the SB2 Plan's efficiency

23 gap score, in any way caused or explained by the state's

24 political geography?

25 A    No.  The results that we see here both in the figure on

1  the left and the right are showing us pretty clearly that the

2  enacted plan -- the SB2 Plan's efficiency gap -- its extreme

3  efficiency gap is not explained by North Carolina's voter

4  geography.  It's not the natural product of taking North

5  Carolina's voter geography -- its VTDs, its counties, its

6  census, geography, and its voters -- and imposing a districting

7  process adhering to the nonpartisan portions of the Adopted

8  Criteria.  Clearly, the SB2 Plan's efficiency gap, its extreme

9  efficiency gap, is a product of something that is deviated far

10 from such a process.

11 Q    Okay.  And then do the efficiency gap scores you see for

12 the simulated plans also tell you anything about whether

13 compliance with traditional redistricting criteria in North

14 Carolina favors one political party or another?

15 A    It tells us that if you follow a traditional -- if you

16 follow a districting process that adheres to just the

17 traditional districting criteria listed in the Adopted

18 Criteria -- and those are the only districting criteria I'm

19 talking about here, the nonpartisan portions of the Adopted

20 Criteria -- you follow such a process, you end up with plans

21 that don't systematically favor one party or another in terms

22 of the efficiency gap.  In other words, you look at this

23 distribution, as well as the most common outcomes here in terms

24 of the efficiency gaps of these 1,000 simulated maps; and

25 they're not maps that systematically favor the Democrats or the

1  Republicans in one way or another.  There's no substantial bias

2  here in the distribution of efficiency gaps we see on this

3  figure.

4  Q    So then to take that another way, is the enacted plan's

5  efficiency gap score caused or explained by compliance with

6  traditional redistricting criteria?

7  A    Definitely not.  What we're seeing here is that the

8  enacted plan -- the Enacted SB2 Plan's efficiency gap is an

9  extreme partisan outlier and it is entirely outside of the

10 range of plans that would have emerged had they followed -- had

11 the districting process followed the nonpartisan portions of

12 the Adopted Criteria.

13 Q    Now, let's turn to your second simulation set, the second

14 1,000 simulations you ran.  Again, very briefly, can you remind

15 us what criteria you used for the second simulation set?

16 A    The second simulation set was exactly like the first one,

17 following the nonpartisan portions of the Adopted Criteria,

18 with one addition.  I instructed the computer in the second set

19 to explicitly protect all 13 incumbents, that is, to make sure

20 that each of the 13 incumbents reside within his or her own

21 district with no pairing of incumbents.  That's the only

22 difference from Simulation Set No. 1.

23 Q    And did you create charts like the ones we just went over

24 that show the results of your efficiency gap analysis for the

25 second simulation set?

1  A    I did in Figure 10.

2             MS. RIGGS:  Okay.  So can we publish Figure 10, which

3  is on page 33 of Exhibit 2010, the Chen report?

4  BY MS. RIGGS:

5  Q    Dr. Chen, do we -- do we read this chart the same way we

6  read the last one we discussed?

7  A    It is laid out in exactly the same way.  Efficiency gap is

8  on the horizontal axis.  The Reock compactness score is on the

9  vertical axis in both figures.  Again I'm showing

10 Dr. Hofeller's formula on the left and the 20 Adopted Criteria

11 elections formula on the right.

12 Q    So in this second set of simulation sets -- simulation

13 set, how would you describe the distribution of efficiency gap

14 scores for the second set?

15 A    It's largely the same as we just saw a minute ago in Set

16 No. 1.  The most likely outcome is a plan with an efficiency

17 gap score of very close to 0 percent, around about negative

18 2 percent to approximately positive 1 percent.  The general

19 range of distribution is nearly identical to what we just saw

20 with Simulation Set No. 1 as well, so the results are largely

21 the same.

22 Q    And in Simulation Set Two, how does the enacted plan's

23 efficiency gap score compare to the simulation set efficiency

24 gap scores?

25 A    Once again we see that the Enacted SB2 Plan's efficiency

1  gap on the left figure using Dr. Hofeller's formula, the SB2

2  Plan has an efficiency gap of negative 24 percent, same as in

3  the previous figure.  That is an extreme partisan outlier and

4  it is an outcome entirely outside of the entire range of the

5  1,000 simulated plans in Set No. 2.

6  Q    So then based on this analysis, what is your opinion about

7  whether the efficiency gap score of the North Carolina Enacted

8  Plan is caused or explained by not pairing incumbents?

9  A    It tells us that even if you shift to a districting

10  process that explicitly tries to -- tries to protect incumbents

11  by not pairing them, even that districting criterion does not

12  explain the extreme efficiency gap of the Enacted SB2 Plan.

13  Q    Turning then to your third set of simulations, as a quick

14  reminder, what were the criteria you used for the last set of

15  1,000 simulations?

16  A    In Simulation Set No. 3, I instructed the computer to

17  simply match, not exceed but to simply match, the enacted

18  plan's specific features of having exactly 13 split counties

19  and 11 protected incumbents and to do no better and no worse.

20           MS. RIGGS:  And now can we publish Figure 11 of

21  Exhibit 2010, the Chen report, which is on page 34?

22  BY MS. RIGGS:

23  Q    Dr. Chen, what does Figure 11 depict?

24  A    Figure 11 is exactly the same in layout as the two

25  previous figures we've just been looking at.  So once again it

1  describes Simulation Set No. 3 and its 1,000 simulated plans

2  with the efficiency gaps of those simulated plans, as well as

3  the enacted plan, depicted along the horizontal axis; and the

4  vertical axis in these two figures tells you the mean Reock

5  compactness score of all of these plans.  So once again we're

6  comparing the Enacted SB2 Plan against 1,000 simulated plans.

7  Q    And then in this last set, can you describe the

8  relationship between the distribution of efficiency gap scores

9  we see for your last set of 1,000 simulations as compared to

10 the efficiency gap score for the enacted plan?

11 A    The distribution of efficiency gaps for these 1,000

12 simulated plans we're seeing here in Figure 11 is virtually

13 identical to what we've been seeing in the previous two

14 figures.  We're seeing here that the most common outcome with

15 Simulation Set No. 3 with either of these two measures of

16 partisanship, whether we use the Dr. Hofeller formula or the

17 Adopted Criteria 20-elections formula, the most common outcome

18 is a simulated plan -- among the simulations, the most common

19 outcome is a simulated plan with very close to 0 percent

20 efficiency gap.  The distribution is virtually identical to

21 what we had just seen with Simulation Sets One and Two.

22 Q    So based on this analysis, what is your opinion about

23 whether the efficiency gap of North Carolina's enacted

24 congressional plan is explained or caused by the fact that the

25 plan splits exactly 13 counties and protects only 11

1  incumbents?

2  A     It's pretty clear from these results -- compared against

3  the previous two simulation sets, it's really clear from

4  Simulation Set Three, these results here, that even if the

5  General Assembly had specifically set out to follow a

6  districting process that specifically wanted to split exactly

7  13 counties and to protect exactly 11 incumbents, no more and

8  no less, that even that unique combination of features would

9  not explain or necessitate or justify creating a plan with as

10  extreme of an efficiency gap as what we see in the SB2 Enacted

11  Plan, and that is a very strong statistical conclusion we can

12  draw from these figures regardless of whether we use

13  Dr. Hofeller's formula or the Adopted Criteria formula for

14  measuring the partisanship of districts.

15  Q     So to wrap up our discussion of your efficiency gap

16  analysis on the three sets of 1,000 simulations you ran, I just

17  want to ask a couple of questions about the simulations.  Is

18  the point of running these simulations to produce better maps

19  that the legislature could have enacted?

20  A     No.  The point is not to produce better maps or the best

21  maps one could possibly imagine using whatever criteria one can

22  think of.  That's not the point.  The point isn't to produce

23  better maps.  The point here is to hold several redistricting

24  factors constant, specifically, as I've been describing, the

25  nonpartisan criteria, the nonpartisan redistricting factor set

 1  forth in the Adopted Criteria.

 2          So the point is to hold several redistricting factors

 3  constant so that -- and to produce a large number of plans

 4  under such a process holding these redistricting factors

 5  constant so that I can go and analyze these plans and determine

 6  whether or not the Enacted SB2 Plan could have possibly or even

 7  plausibly been the result of an attempt to actually comply with

 8  those nonpartisan factors or whether the SB2 Plan can only be

 9  explained as an attempt to solely pursue, predominantly pursue

10  the partisan criterion laid forth in the Adopted Criteria.

11  That is the partisan goal of creating a ten Republican map.  So

12  that's the point of creating these simulated maps, not

13  necessarily to produce the best maps or better maps.

14  Q    Dr. Chen, in your academic work using these simulations,

15  do you ever see enacted plans that fall within the range of

16  characteristics you observe in simulated plans?

17  A    Oh, you're just asking about my normal academic published

18  work.

19  Q    Yes.

20  A    Well, sure.  I mean, I study districting plans across all

21  sorts of states and jurisdictions, congressional and state

22  legislative plans; and I compare them very frequently to

23  computer-simulated plans following various combinations of

24  traditional districting criteria; and in those states, that's

25  usually what happens.  You usually see congressional or state

1  legislative plans that fall entirely within the range of plans

2  that are produced by a computer that just followed traditional

3  districting criteria.  That's kind of the point of traditional

4  redistricting criteria, that they are commonly used districting

5  criteria.

6  Q    Now I would like to pivot to the next inquiry you

7  performed for the League of Women Voters Plaintiffs.  In all of

8  the analyses we've discussed so far, what type of elections did

9  you use to calculate the efficiency gap?

10 A    In everything that we have discussed thus far today, I

11 have exclusively been using statewide elections, specifically

12 the 20 statewide elections, excluding presidential elections,

13 mentioned by the Adopted Criteria, as well as the seven

14 elections named in Dr. Hofeller's formula.  So those are

15 statewide elections, things like the gubinatorial, Attorney

16 General, et cetera.

17 Q    And to be clear, were any of those congressional

18 elections?

19 A    Well, they were not because congressional elections were

20 not listed in Dr. Hofeller's formula, nor were congressional

21 elections included in the 20 elections listed in the Adopted

22 Criteria.  So, no, no congressional elections.

23 Q    Did you also carry out a version of your analysis using

24 congressional election results?

25 A    I did in the latter half of my reports.

1  Q    Why?

2  A    I wanted to incorporate congressional elections because I

3  wanted to be able to measure and to incorporate the various

4  features that affect -- the various features and factors that

5  affect congressional elections that don't come up in statewide

6  election races.

7         So when we think about the statewide races that we've

8  been talking about thus far, things like gubinatorial races,

9  the US Senate races, these are races that are uniform across

10 all of North Carolina.  You have the same ballot in every

11 single county in North Carolina for these races.  That means

12 whatever incumbency advantage, whatever candidate quality

13 factors come up, they are the same for all counties and the

14 same for, obviously, all congressional districts.

15         Now, congressional elections are a little bit

16 different.  Congressional elections are different for every

17 district.  In every district you have a different combination

18 of candidates and thus a different combination of candidate

19 qualities.  You have, for example, differing issues of

20 incumbency in these different races.  I wanted to be able to

21 account for those various features, so that's why I

22 incorporated congressional election results into my report, as

23 solely a robustness check in order to account for these various

24 factors.

25 Q    So then how did you use congressional election results to

1  do the next part of your analysis?

2  A    Well, I conducted a regression predictive model -- a

3  predictive regression model.  So it's a regression model that

4  incorporates congressional elections in the following way:  I

5  used in this regression model presidential results from 2012 in

6  order to predict congressional election results in 2012 while

7  simultaneously accounting for and measuring factors such as

8  incumbency, whether or not each congressional race had a

9  Democratic or Republican incumbent.  So I conducted this

10  analysis, this regression model, in order to be able to account

11  for the various factors that affect congressional races,

12  including incumbency advantage.

13  Q    And are the details of how you developed that predictive

14  regression model on pages 26 to 28 of your report and Figure 12

15  on page 35 of your report?

16  A    Yes.  In addition, there's Table 2 which lays out the

17  details of the results of that regression model that I just

18  described.

19  Q    Is developing predictive regression models like you've

20  just described a common practice in the political science

21  field?

22  A    It's a very standard practice.  We use it in order to

23  incorporate the various features and factors that affect

24  congressional races and to estimate some of those factors,

25  things like incumbency advantage.

1  Q    So speaking of that, using the regression models that you

2  developed to predict congressional votes in the simulated

3  districts, what did you find with respect to the effect of

4  having a Democratic or a Republican incumbent in the simulated

5  districts?

6  A    The effect of having an incumbent in the districts is the

7  following:  I found in this regression model that I just

8  described that having an incumbent of your own party boosts

9  your party's vote share in the congressional election by

10 approximately 3 percent.  And that goes for both parties.

11           So, in other words, if you have a Republican

12 incumbent in a particular district, then typically the

13 Republican candidate's vote share, all else being equal, will

14 be about three percentage points higher as a result of having

15 that candidate be a Republican incumbent.  Same for the

16 Democrats.  If you've got a district with a Democratic

17 incumbent, Democratic candidate's vote share will, all else

18 being equal, be about three percentage points higher.  So the

19 incumbency effect is approximately 3 percent and it's roughly

20 equal, I find in my regression results, for both parties.

21 Q    So once you developed these predictive regression models

22 and the predicted congressional vote is established, what did

23 you do next as part of your analysis?

24 A    I then took the results of that regression model -- of

25 that regression analysis and then I applied that model as an

1   alternative way to measure the partisanship of North Carolina

2   congressional districting plans, both of the SB2 Enacted Plan,

3   as well as a thousand simulated plans.

4   Q    Using then those predicative models, how did you account

5   fully for the incumbency effect?

6   A    I accounted for the incumbency effect -- applying that

7   regression model, I accounted for an incumbency effect in two

8   different ways, two completely separate, independent analyses.

9         One analysis was assuming that all districts are

10  going to have exactly the incumbents that they had as of

11  November 2016, all 13 incumbents in place in their respective

12  districts as of 2013 -- sorry -- as of November 2016.  So that

13  first analysis assumes that incumbents are all there.

14        And then I did a second analysis in which I made the

15  opposite assumption.  I assumed -- very hypothetically, of

16  course, I assumed that there were no incumbents at all and that

17  all 13 races would be open seats.

18        So, again, I did two separate analyses and I did that

19  in order to make sure that I had -- I was able to account for

20  and determine whether incumbency could explain the extreme

21  partisan results we've been seeing in the SB2 Plan thus far.

22  Q    So using the models in those two different approaches,

23  what did you find with respect to whether incumbency -- the

24  incumbency effect explained the outlier nature of SB2?

25  A    I found that even accounting for incumbency advantages,

 1  all of the incumbents and all of the advantages that they enjoy
 2  as a result of being incumbents as of November 2016, even after
 3  fully accounting for that incumbency advantage, did not change
 4  my results at all.  It allowed me to conclude that even
 5  incumbency could not explain -- the incumbency advantage could
 6  not explain the extreme statistically outlying nature, the
 7  partisan nature of the Enacted SB2 Plan.
 8  Q    And how did your analysis using congressional results like
 9  we just discussed affect your conclusions you reached earlier
10  using noncongressional elections?
11  A    It was just a robustness check and that robustness check
12  strengthened my conclusions even further.  It strengthened my
13  conclusions or it confirmed my conclusions even further that
14  the enacted plan's creation of a 10 Republican map -- of a 10-3
15  map was an extreme statistical outlier and it could not be
16  explained, certainly not by compliance with the nonpartisan
17  portions of the Adopted Criteria, but also could not be
18  accounted for or explained for reasons of incumbency advantage.
19  Basically, that was all a robustness check designed to make
20  sure that we weren't missing anything by not considering
21  incumbency advantage.  So that's why I did all of that.
22  Q    All right.  Dr. Chen, now I want to discuss the last piece
23  of your analysis in this case.  To go back and remind the
24  Court, did you take into account racial considerations in
25  developing your algorithm you used for the simulations?

1    A    I did not.  The Adopted Criteria told the map drawer to

2    completely ignore the race of voters, the race of census

3    geographies, so I completely ignored race in the construction

4    of my computer simulations.

5    Q    So given that fact, though, if you wanted to determine

6    whether the presence of a 40 percent black voting-age

7    population district could cause the partisan asymmetry that

8    you've described in your previous testimony, could you do that

9    with the simulations you already ran?

10   A    Maybe.  It depends.  I mean, I would look at the

11   simulations I've already ran, but there's an important question

12   to ask, whether or not any of those simulated plans actually

13   contained a district with such a characteristic, a district

14   with a 40 percent black voting-age population.

15        Now, if I went back and analyzed all of those

16   simulations and I found that none of them contained such a

17   district, then we would be out of luck.  I wouldn't be able to

18   conduct such an analysis.  But if I went back and I found that

19   some number of them actually did, then we could analyze those,

20   and then I would be able to answer that question.

21   Q    And did some of the 3,000 simulated plans have such a

22   district with at least 40 percent black voting-age population?

23   A    Well, I went back and calculated, and I found that a

24   sizeable number in each set of simulations -- each of the three

25   sets of simulations, I found that a sizeable number actually

1  did satisfy that feature, actually had a district with at least

2  40 percent black voting-age population.

3  Q    So after you identified the districts that did have one --

4  the plans -- the simulated plans that did have one district

5  with 40 percent black voting-age population, what did you do?

6  A    Well, I isolated them.  I just counted them up.  I picked

7  them out.  It turned out to be 262 total plans across the three

8  sets of simulations.  And I reanalyzed them.  After isolating

9  them, I reanalyzed them in terms of the same partisan measures

10  that I had been describing yesterday, looking at their

11  partisanship in terms of the number of Republican districts as

12  measured both by Dr. Hofeller's formula, as well as by the

13  Adopted Criteria formula of using 20 --

14        MR. STRACH:  Your Honor, objection.  I feel like this

15  is material that we covered in Dr. Chen's first round of

16  testimony and I'm -- we certainly asked him about the 262 plans

17  that have 40 percent BVAP districts, and I thought this was

18  material that was already covered.  So I thought this was

19  supposed to be on material that we had not already covered.

20        MS. RIGGS:  Mr. Thorpe didn't bring this up in his

21  direct examination and we tried to indicate to the Court that

22  anything left in the report is what I was covering today.  It's

23  a brief module.  We're almost done.

24        JUDGE OSTEEN:  Let's keep it brief.  I understood

25  that we were -- today we were coming back for what had to have

1  a foundation laid by another witness, Dr. Jackman, so let's

2  move on through this.  I'll overrule and let you get into it,

3  but make it quick.

4  BY MS. RIGGS:

5  Q    Let's -- if you could turn with me to Tab 2011, which is

6  Figure A of your report.

7  A    Yes.

8  Q    Very briefly, Dr. Chen, what do these charts show?

9  A    The two charts in Simulation Set No. 1 here on this first

10 page show us that the distribution of these simulations, these

11 85 plans that contain one district with over 40 percent black

12 voting-age population, it's a distribution that is virtually

13 identical to the distribution that we saw yesterday where I

14 described all 1,000 of those plans.

15        The most common outcome is creation of a seven

16 Republican district under the Dr. Hofeller formula; and under

17 the 20 Adopted Criteria elections formula, the most common

18 outcome is six Republican districts.  So what we're seeing here

19 is the distribution is virtually identical to what we had seen

20 yesterday when we looked at all 1,000 of the simulations.

21 Q    So then, Dr. Chen, based on this analysis, does having a

22 district with 40 percent black voting-age population explain

23 having a plan with ten Republican and three Democratic

24 districts?

25 A    Clearly not, because even when we isolate plans that

 1  contain one black -- one 40 percent black voting-age population

 2  district, even then it's pretty clear that the Enacted SB2 Plan

 3  is an extreme statistical outlier in partisanship.

 4           MS. RIGGS:  No further questions.

 5           JUDGE OSTEEN:  Cross-examination?

 6           MR. STRACH:  Thank you, Your Honor.

 7                       CROSS-EXAMINATION

 8  BY MR. STRACH:

 9  Q    Dr. Chen, I think I heard you say that there is no

10  difference between the way that you and Dr. Jackman calculate

11  your efficiency gap.  Was that correct?

12  A    Yeah, I listened to Dr. Jackman describe how he calculates

13  it and that was consistent with my understanding of the

14  efficiency gap.

15  Q    Is it your understanding that Dr. Jackman uses actual

16  election results to make the calculation?

17  A    I understand that he uses congressional -- actual

18  congressional election results when they're available, yes,

19  sir.

20  Q    All right.  And you did something a little bit different,

21  isn't that correct, in terms of the data that you used?

22  A    Yes, sir.  As I explained just a few minutes ago, I used

23  the actual election results, but the election results using,

24  number one, Dr. Hofeller's formula, so those are seven

25  statewide elections; number two, the Adopted Criteria

 1  elections, 20 statewide elections; and then my predictive

 2  model.  But, yes, it's a little bit different in that respect.

 3  Q    So you used different election data than Dr. Jackman did

 4  to compute the efficiency gap values?

 5  A    Yes, sir, you're correct about that distinction, different

 6  sets of elections.

 7  Q    Isn't it true that when you used the election data that

 8  you used to compute the efficiency gap the efficiency gap was

 9  higher than Dr. Jackman's value?

10  A    I recall him reporting a 19.4 percent and definitely my

11  calculations, using a different set of elections, it turned out

12  to be greater in magnitude.  I think what -- I would

13  characterize it as more negative, but I get what you're saying.

14  Q    Okay.  I want to understand the -- in the robustness check

15  section of your report, as I see it, I believe on page 24, it

16  looked to me like you used the Reock compactness test in this

17  section, is that correct?

18  A    Yes, sir.  You're talking, though -- you're asking which

19  figures I show that Reock compactness calculation in?

20  Q    Well, I just asked you:  You used the Reock compactness in

21  this section, correct?

22  A    Yes, sir, that is correct.

23  Q    Now, in the -- I thought in your prior analysis with your

24  simulation sets you used the Polsby-Popper.

25  A    I used both.  Earlier I had shown -- you and I discussed

 1  yesterday how I measured it using both Reock and Popper-Polsby,

 2  and here in these figures I only showed the Reock, and that was

 3  just for brevity.  I really only had space in a two-dimensional

 4  figure to show one measure of compactness, so I chose the

 5  Reock.  I could have just as easily shown the Popper-Polsby

 6  with very little difference in results.

 7  Q    Do you report the Popper-Polsby anywhere in this section

 8  of the report?

 9  A    Oh, let me just clarify because I actually do.

10  Q    Okay.

11  A    It's the same set of simulations as what you and I had

12  discussed yesterday.  So I did report the Popper-Polsby scores

13  for all of these simulated plans in the earlier figures in the

14  report.  These I'm just reanalyzing the same set of 3,000

15  simulated plans.  So you've already got the Popper-Polsby

16  scores that you and I discussed yesterday.

17  Q    All right.  And when you calculate the efficiency gap

18  values using the data that you used, you're comparing the

19  values from the 2016 Plan to your simulation sets, correct?

20  A    You're asking if I use 2016 elections?

21  Q    You're comparing the efficiency gap value of the 2016 Plan

22  against the values that are derived from your simulation sets,

23  correct?

24  A    Okay.  I got you.  Yeah, that is correct.  So I'm

25  calculating the efficiency gap of the Enacted SB2 Plan enacted

 1  -- the 2016 Plan and I'm comparing that against all of my

 2  various simulated plans.

 3  Q    And your simulated plans were constructed with some effort

 4  to not use any criteria that you deemed partisan, correct?

 5  A    In Simulation Set One, that was true.  As we described at

 6  length yesterday, Set No. 2 does account for incumbency and so

 7  does Set No. 3.

 8  Q    All right.  But none of the sets account for incumbency by

 9  trying to determine who could win a district, correct?  It just

10  does nonpairing?

11  A    That's correct.  I was always in the simulated plans

12  ignoring the Adopted Criteria's mandate to create a ten

13  Republican map.

14  Q    Right.  And so you were scrupulously limiting your

15  simulation sets criteria to nonpartisan criteria, correct?

16  A    I just didn't want to characterize it as nonpartisan, but

17  I think we're in agreement about what you're talking about.

18  Q    All right.  So is it surprising -- would it really be

19  surprising to you that the efficiency gap measure of a plan

20  drawn by a legislature would exhibit more partisanship than

21  your simulation sets that were purposefully drawn with no

22  partisan criteria?

23  A    Does it surprise me that a partisan gerrymandered plan

24  would exhibit a more significant efficiency gap score than my

25  nonpartisan simulation process?

1  Q    No.  Does it surprise you that a plan drawn by a

2  legislature would exhibit a higher efficiency gap value than

3  your simulation plans which you scrupulously avoided

4  considering any politics in?

5  A    I guess you're asking about a hypothetical legislature and

6  I don't have an opinion or a prediction about that matter.  I

7  really don't try and predict what a legislature is or is not

8  going to do.  I simply -- the only thing I'm good for is

9  evaluating plans that have already been drawn.

10 Q    All right.  And you're evaluating them, in terms of your

11 efficiency gap analysis, assuming that nonpartisan factors were

12 taken into account.  That's what you're evaluating the

13 Legislature's Plan against, correct?

14 A    I am not assuming anything about what the North Carolina

15 General Assembly did or did not do.  I am simply building into

16 my computer algorithm what the General Assembly said it was

17 instructing the map drawer to do through the Adopted Criteria,

18 at least the nonpartisan portions of it.  So I made no such

19 assumptions about what the legislature actually did.

20 Q    So if the -- if the United States Supreme Court were to

21 say that a legislature is entitled to consider some amount of

22 politics in a plan, but not too much, and your simulation sets

23 don't consider politics at all, your analysis would not help

24 the Court decide whether or not a legislature's plan had gone

25 too far, isn't that correct?

1  A    I really don't have an opinion because I think that

2  requires a legal judgment.  So I don't have an opinion on

3  whether the Court is going to find my analysis useful or not.

4  I just try to report exactly what I find empirically and that's

5  all I can do.

6  Q    You mentioned -- if you'll turn to page 26 of your report

7  where you talk about the regression modeling.  You note in the

8  first paragraph -- and I'll start reading from about halfway

9  down the first paragraph.  "The results from any given

10 legislative election may deviate from the long-term partisan

11 voting trends of the district's voters" --

12 A    If I could just ask you to orient me where you're reading

13 from.

14 Q    Oh, sorry.  Page 26 and the first paragraph.

15 A    Okay.  Thank you.

16 Q    And about middle of the way down.  "The results from any

17 given legislative election may deviate from the long-term

18 partisan voting trends of the district's voters due to such

19 factors as incumbency advantage, the presence or absence of a

20 quality challenger, anomalous difference between the candidates

21 in campaign efforts or campaign finances, candidate scandals,

22 and coattail effects."  You go on to say:  "These factors can

23 even differ across different districts within the state of

24 North Carolina, thus making it statistically unreliable to

25 combine and directly compare election results from different

 1  congressional districts when evaluating a new districting

 2  plan."  Do you see that?

 3  A    Yes, sir.

 4  Q    So when you -- tell me exactly how you accounted for in

 5  your modeling the difference between candidates and campaign

 6  efforts or finances, candidate scandals, and coattail effects.

 7  A    Yeah, I was giving a list of all these different myriad of

 8  factors that make a difference in various congressional

 9  elections that vary in various congressional elections across

10  any state, and the point was to point out a lot of these

11  factors and to say, Here is why I am using congressional

12  elections in this predicative model in the way that I'm doing

13  in this section here.

14          So the reason I'm bringing in congressional elections

15  and using this regression modeling is to be able to draw upon

16  results that have resulted from, that have come from a bunch of

17  different district elections across the entire state of North

18  Carolina and to make sure that my results are robust even after

19  we incorporate such election results.

20  Q    So you don't isolate or control for in your analysis

21  specifically the campaign finances of candidates in any

22  specific districts, do you?

23  A    Oh, no, no.  That's not the point here at all.  The point

24  is to point out that here is why we are interested in looking

25  at congressional election results and here is how I do it, by

1  drawing upon congressional election results that have come from

2  very different congressional districts all across North

3  Carolina.

4  Q    All right.  So you've attempted to account for these

5  things like campaign fiances, candidate scandals, and coattail

6  effects simply by using the congressional election results?

7  A    Yeah.  I mean, the point is that there are a bunch of

8  different factors.  I'm not saying that, you know, any of these

9  particular factors were especially or were not especially

10 important in North Carolina congressional elections in any

11 given year.  They're just examples to help illustrate to you

12 the source of a myriad of factors that come up in election

13 races.  That's it.  Nothing more, nothing less.

14 Q    Okay.  So if you look with me on page 30 of your report at

15 the very top of the page, first paragraph, in the second

16 sentence, it says:  "Instead, the enacted plan could have been

17 created only through a process in which the explicit pursuit of

18 partisan advantage was the predominant factor, thus

19 subordinating the traditional districting criteria from the

20 Adopted Criteria."  Do you see that?

21 A    Yes, sir.

22 Q    But this analysis doesn't actually answer the question of

23 whether politics was the predominant factor because your

24 analysis didn't take politics into account at all, correct?

25 A    No, that's not the way to interpret what I'm doing here at

1  all.  The point -- as I've said earlier today, the point of the

2  analysis that I did was to hold several redistricting factors

3  constant, the nonpartisan portions of the Adopted Criteria, in

4  order to determine whether or not the enacted plan could have

5  possibly been the result of adhering to those nonpartisan

6  criteria or whether they were simply the result of the explicit

7  partisan goal set forth in the Adopted Criteria, the partisan

8  goal of creating a 10-3 map.  So I was trying to determine

9  which was the correct answer.

10  Q    All right.  So what you didn't -- what you weren't trying

11  to answer or what you didn't try to answer is to determine,

12  whether if some amount of partisanship was used or was

13  appropriate to be used, whether the 2016 map would still be an

14  outlier in light of its use of politics?

15  A    I want to try to answer your question.  I think the answer

16  to your question is I definitely did not attempt to determine

17  whether or how much it was appropriate to use politics in the

18  districting process.

19  Q    Okay.  Thank you.

20  A    And that's obviously because I have no legal expertise on

21  the matter.

22         MR. STRACH:  Thank you.  Your Honor, that's all I

23  have.

24         JUDGE OSTEEN:  Redirect?

25         MS. RIGGS:  None, Your Honor.

1          JUDGE OSTEEN:  All right.  You may step down.

2          We'll take our afternoon recess.  We'll be in recess

3 for 15 minutes.

4          (At 3:28 p.m., break taken.)

5          (At 3:46 p.m., break concluded.)

6          THE COURT:  All right.  Mr. Earls, are you ready to

7 call your next witness or where do we stand?

8          MS. EARLS:  If I may advise the Court on where I

9 believe we are.  There's an additional agreement that was

10 reached with the Defendants that we want to inform the Court

11 about regarding Dr. Hofeller's potential testimony and there's

12 an affidavit or a declaration, rather, that was submitted

13 subsequent to his deposition in this case; and with the certain

14 paragraphs, I don't know, deleted from that affidavit, there's

15 an agreement that that be admitted instead of calling

16 Dr. Hofeller to testify.

17          Am I representing that correctly?

18          MR. STRACH:  That's correct.

19          JUDGE OSTEEN:  You all haven't had a chance to redact

20 it and give final approval yet?

21          MR. STRACH:  We've marked the paragraphs, but we

22 haven't actually redacted it yet.

23          MS. EARLS:  So I assume we'll -- that is an exhibit

24 on the exhibit list.

25          MR. STRACH:  Right.

1          JUDGE OSTEEN:  And it's coming in in your case or

2    their case?

3          MS. EARLS:  Their case.

4          JUDGE OSTEEN:  Okay.

5          MS. EARLS:  But it is part of the agreements that

6    we've made.

7          JUDGE OSTEEN:  All right.

8          MS. EARLS:  And then Mr. Speas has some exhibits that

9    he wants to move admission of.

10          MR. SPEAS:  Your Honor, I think these are in, but in

11    case they are not, Mattingly Exhibits 3001, 3002, and 3004, I

12    would move their introduction, as well as Chen Exhibits 2010,

13    2011, 2012, I believe.

14          JUDGE OSTEEN:  All right.  If they haven't been, they

15    are admitted.

16          MS. EARLS:  So we are now at the point where the

17    Plaintiffs do not have any further witnesses to call, but there

18    are a few additional objections to work out with regard to

19    exhibits between -- amongst the parties so that we can then

20    provide to the Court an exhibit list that resolves -- either

21    maintains or abandons the final objections that have not

22    already been resolved.

23          It's my understanding that the Defendants' next

24    witness can't be available until tomorrow morning, so what we

25    would request is that the Court allow the parties the rest of

1 today to resolve these remaining issues with regard to

2 Plaintiffs' exhibits.

3       MR. STRACH:  And we would respectfully request, Your

4 Honor, given when the witness is going to be able to get in, if

5 we could -- we request that we start at 10 a.m. tomorrow, if

6 that's okay.

7       JUDGE OSTEEN:  Judge Britt's the time manager.

8       JUDGE BRITT:  Well, it depends on how many witnesses

9 you've got.

10       MR. STRACH:  We're only going to have one witness

11 tomorrow and then, as I mentioned earlier in the week, we've

12 got -- our next witness can't be here until Thursday morning,

13 so it will be just one witness.

14       JUDGE OSTEEN:  So the possibility of some rebuttal

15 evidence?

16       MS. EARLS:  That's correct, Your Honor, not

17 extensive, but we may depending on how the other testimony

18 comes in.  We may want a limited opportunity to call one

19 rebuttal witness.

20       JUDGE OSTEEN:  All right.  So it seems like I heard a

21 comment during the examination today about something wasn't

22 reviewed yesterday in great detail and I might take issue with

23 that statement.  We've heard a lot of evidence.  So be aware of

24 the fact we have been listening, we have been paying attention.

25 We don't need to repeat what's already been presented to some

degree.  Now, you get some latitude to kind of reestablish the
connection between what was presented and what is going to be
presented.

          So at this point you anticipate one witness tomorrow,
start at 10:00.  Probably a two- or three-hour witness you
think, expert?

          MR. STRACH:  On my side, two hours at the most I
would think.

          JUDGE OSTEEN:  And same for cross?

          MS. EARLS:  Probably not quite that much.

          JUDGE OSTEEN:  Okay.  So about four hours of
testimony tomorrow 10:00 -- starting at 10:00 and then -- is
tomorrow starting at 10:00?

          MR. STRACH:  Tomorrow, Wednesday, starting at 10:00,
yes.

          JUDGE OSTEEN:  And then Thursday morning we'll have
one more witness, in the two-hour range, you think?

          MR. STRACH:  Yeah, 2, 2 1/2 max.

          JUDGE OSTEEN:  We'll start --

          MR. STRACH:  9:00 would be fine with us on Thursday,
Your Honor.

          JUDGE OSTEEN:  I was just debating 8:30.  Assuming,
as best you can, or guessing that you have to recall a
rebuttal witness -- I think it was Dr. Jackman you reserved the
right --

1        MS. EARLS:  That's correct, Your Honor.

2        JUDGE OSTEEN:  Assuming you recall Dr. Jackman, what

3  are you talking about timewise?

4        MS. EARLS:  Again, I'm saying a limited opportunity,

5  20 or 30 minutes.

6        JUDGE OSTEEN:  So 2 1/2 hours on Thursday morning, a

7  couple hours of cross-examination Thursday morning, and then

8  maybe an hour of Dr. Jackman possibly as rebuttal.  So that

9  gives us four hours tomorrow starting at 10:00.

10        I've been kind of assuming that hopefully all the

11 dominoes would fall in place in terms of the stipulations, but

12 I think if you run into an issue and you feel like you're going

13 to have to put a witness on because the stipulation doesn't

14 work out -- Judge Britt may be getting ready to tell me no -- I

15 think tomorrow after this -- after you call your witness, if

16 that happens, then whoever needs to put evidence in needs to be

17 ready to go at that particular point and we can leave that time

18 for any cleanup.  Hopefully it won't be necessary, but if it

19 is -- then Thursday morning we'll start at 9:00.

20        Is 8:30 a possibility with you guys?

21        JUDGE BRITT:  Oh, yes.

22        JUDGE OSTEEN:  Be prepared.  We may bring you in at

23 8:30 if you can get your witness in.  We'll get started then so

24 we can try to clean up all the evidence.

25        Let me see what Judge Britt is talking to me about.

1          (Discussion between judges.)

2          JUDGE OSTEEN:  Okay.  So one thing to think about.

3  This is -- don't do this.  There are good reasons for it and

4  against it, so please -- I'm going to leave this entirely with

5  the Plaintiff.

6          But if Jackman's rebuttal testimony is going to

7  relate to what this witness says tomorrow and/or the Thursday

8  witness, if we have some time tomorrow, then you can consider,

9  if you want to, calling Jackman and dealing with whatever

10 rebuttal would come in response to tomorrow's expert.  Then we

11 maybe save some time on Thursday.  But if Jackman is better --

12 I'm leaving it entirely up to you.  If Jackman is going to be

13 relatively short and a little bit of rebuttal to both experts,

14 then call him Thursday like you plan.

15         Everybody just keep in mind that the longer we're

16 taking evidence on Thursday, the clock will be ticking on what

17 time you can spend in terms of final arguments.

18         So it's a possibility -- first of all, tomorrow we'll

19 hear your testimony with whatever time's left.  If there are

20 any witnesses and there are difficulties on stipulating and you

21 want to stick in some testimony very quickly, you can do that.

22 Then if you want to, entirely up to you, you can do a little

23 bit with Jackman tomorrow if that's the rebuttal testimony, but

24 you can hold Jackman to Thursday.  I understand.  Rebuttal

25 usually comes in at the very end of the case, so we understand

1  that.

2          Any questions about what I've outlined?

3          MR. STRACH:  Not here, Your Honor.

4          MS. EARLS:  No.  Thank you, Your Honor.

5          JUDGE OSTEEN:  All right.  Thank you all.

6          Anything else from you?

7          JUDGE BRITT:  Sayonara.

8          JUDGE OSTEEN:  I didn't know what he was going to say

9  to me.

10          All right.  We'll stand in recess until tomorrow

11  morning at 8:30.  Hold on just a second.  Excuse me.  10 a.m.

12  tomorrow morning.

13          (At 3:56 p.m., proceedings adjourned.)

14                    *  *  *  *  *

15                 C E R T I F I C A T E

16      I certify that the foregoing is a correct transcript
        from the proceedings in the above-entitled matter.

17

18                    _____

19  Date: 10/23/2017    Joseph B. Armstrong, RMR, FCRR
                        United States Court Reporter
20                      324 W. Market Street
                        Greensboro, NC  27401
21

22

23

24

25