```
 1              IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF NORTH CAROLINA
 2
   COMMON CAUSE, et al.,            )  Greensboro, North Carolina
 3                                  )  October 18, 2017
        Plaintiffs,                 )
 4    v.                            )      Case No. 1:16CV1026
                                    )
 5  ROBERT A. RUCHO, in his         )
    official capacity as Chairman   )
 6  of the North Carolina Senate    )
    Redistricting Committee for     )
 7  the 2016 Extra Session and      )
    Co-Chairman of the Joint Select )
 8  Committee on Congressional      )
    Redistricting, et al.,          )
 9                                  )
        Defendants.                 )         Bench Trial
10                                  )
   LEAGUE OF WOMEN VOTERS OF        )      Volume III of IV
11 NORTH CAROLINA, WILLIAM          )
   COLLINS, ELLIOTT FELDMAN,        )
12 CAROL FAULKNER FOX,              )
   ANNETTE LOVE, MARIA PALMER,      )
13 GUNTHER PECK, ERSLA PHELPS,      )
   JOHN QUINN, III, AARON SARVER,   )
14 JANIE SMITH SUMPTER,             )
   ELIZABETH TORRES EVANS, and      )
15 WILLIS WILLIAMS,                 )
                                    )
16      Plaintiffs,                 )
                                    )
17    v.                            )      Case No. 1:16CV1164
                                    )
18 ROBERT A. RUCHO, in his          )
   official capacity as Chairman    )
19 of the North Carolina Senate     )
   Redistricting Committee for      )
20 the 2016 Extra Session and       )
   Co-Chairman of the 2016 Joint    )
21 Select Committee on              )
   Congressional Redistricting,     )
22                                  )
   DAVID R. LEWIS, in his           )
23 official capacity as Chairman    )
   of the North Carolina House of   )
24 Representatives Redistricting    )
   Committee for the 2016 Extra     )
25 Session and Co-Chairman of the   )
```

```
 1  2016 Joint Select Committee on
    Congressional Redistricting,       )
 2                                      )
    TIMOTHY K. MOORE, in his            )
 3  official capacity as Speaker        )
    of the North Carolina House of      )
 4  Representatives,                    )
                                        )
 5  PHILIP E. BERGER, in his            )
    official capacity as President      )
 6  Pro Tempore of the North            )
    Carolina Senate,                    )
 7                                      )
    A. GRANT WHITNEY, JR., in his       )
 8  official capacity as Chairman       )
    and Acting on Behalf of the         )
 9  North Carolina State Board of       )
    Elections,                          )
10                                      )
    THE NORTH CAROLINA STATE BOARD      )
11  OF ELECTIONS, and                   )
    THE STATE OF NORTH CAROLINA,        )
12                                      )
        Defendants.                     )
13  _____)

14

15                PROCEEDINGS HEARD BEFORE:

16             WILLIAM L. OSTEEN, JR.,
       CHIEF U.S. DISTRICT JUDGE FOR THE MIDDLE DISTRICT OF N.C.

17                W. EARL BRITT
       SENIOR U.S. DISTRICT JUDGE FOR THE EASTERN DISTRICT OF N.C.

18
                  JAMES A. WYNN, JR.
19  CIRCUIT JUDGE OF THE U.S. COURT OF APPEALS FOR THE 4TH CIRCUIT

20
    APPEARANCES:
21
    On Behalf of Common Cause, et al:
22
    EDWIN M. SPEAS, Jr.
23  STEVEN P. EPSTEIN
    CAROLINE P. MACKIE
24  Poyner Spruill, LLP
    301 Fayetteville Street, Suite 1900
25  Raleigh, North Carolina 27602
```

1  EMMET J. BONDURANT
   BENJAMIN W. THORPE
2  Bondurant Mixson & Elmore, LLP
   1201 W. Peachtree Street, N.W., Suite 3900
3  Atlanta, Georgia 30309

4  PETER A. NELSON
   Patterson Belknap Webb & Tyler
5  1133 Ave. of the Americas
   New York, NY 10036-6710

6
   On Behalf of League of Women Voters of North Carolina, et al:
7
   ANITA S. EARLS
8  ALLISON JEAN RIGGS
   Southern Coalition for Social Justice
9  1415 W. Highway 54, Suite 101
   Durham, North Carolina 27707

10
   ANNABELLE E. HARLESS
11 RUTH M. GREENWOOD
   Campaign Legal Center
12 73 W. Monroe Street, Suite 322
   Chicago, Illinois 60603

13
   On Behalf of the Legislative Defendants:
14
   PHILLIP JOHN STRACH
15 MICHAEL DOUGLAS McKNIGHT
   Ogletree Deakins Nash Smoak & Stewart, P.C.
16 4208 Six Forks Road, Suite 1100
   Raleigh, North Carolina 27609

17
   On Behalf of the State and State Board of Elections:
18
   ALEXANDER M. PETERS
19 JAMES BERNIER, Jr.
   N.C. Department of Justice
20 P.O. Box 629
   Raleigh, North Carolina 27602

21

22 Court Reporter:        Joseph B. Armstrong, FCRR
23                        324 W. Market, Room 101
                          Greensboro, NC  27401
24
             Proceedings reported by stenotype reporter.
25        Transcript produced by Computer-Aided Transcription.

```
1                      I N D E X

2

  WITNESSES FOR THE DEFENDANT:
3                                                    PAGE

  SEAN TRENDE
4     Direct Examination By Mr. Strach              12
      Voir Dire Examination By Ms. Greenwood        21
5     Cross-Examination By Ms. Greenwood            44
      Redirect Examination By Mr. Strach            62
6     Recross-Examination By Ms. Greenwood          67

7  EXHIBITS:                                         RCVD

8   PX-4080  Stipulation                            8
    PX-4081  Timothy Stallman declaration           8
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2          (At 10:07 a.m., proceedings commenced.)

 3          THE COURT:  All right.  We're back again ready to go.

 4  Let me ask the parties, in terms of testimony and evidence

 5  today, what do you anticipate?  One expert witness or will

 6  there be anything else?

 7          And before you answer, I'll give you a little hint.

 8  The reason I'm asking is if it's one expert, then we may take a

 9  break after a couple of hours for a few minutes and just keep

10  on going until we get it done and finish, but tell me what you

11  anticipate today.

12          MR. STRACH:  We'll have one expert today, Your Honor.

13  I think the direct will go probably no more than two hours.

14          JUDGE OSTEEN:  Did you all make any plans or need to

15  call anybody today, or we just have the one expert witness

16  today?

17          MS. EARLS:  Well, Your Honor, I think we were

18  inclined to take advantage of the suggestion you made, and if

19  we do have rebuttal for this -- to this expert testimony, we

20  would try to put it on today.

21          JUDGE OSTEEN:  You still anticipate that it would be

22  relatively short?  I think you said 20 to 30 minutes.

23          MS. EARLS:  I do anticipate it would be short, and I

24  just want to be clear.  Our understanding would be then, if

25  Professor Jackman also had rebuttal testimony to the expert
```

1  being presented tomorrow, that there would be a brief

2  opportunity following that.

3          JUDGE OSTEEN:  That's what I outlined for you

4  yesterday.  So we're looking at probably four hours total

5  direct and cross of an expert, and then maybe 20 to 30 minutes

6  of rebuttal?

7          MS. EARLS:  I think that's correct, Your Honor.

8          JUDGE OSTEEN:  Does that seem right to you?

9          MR. STRACH:  Yes.  If it's 30 minutes of direct, I

10 can't imagine the cross would be more than 10, 15.

11          JUDGE OSTEEN:  All right.  Let me consult with my --

12          (Off-the-record discussion.)

13          JUDGE OSTEEN:  Judge Britt wants to go straight

14 through with no break, but I'm not man enough.  All right.

15 We're going to just plow ahead.  We're probably take maybe a

16 20-minute break, a little longer break than usual, after a

17 couple hours, maybe when direct stops or somewhere in that

18 range, and we'll go ahead until we finish and then eat a late

19 lunch.  I hope everybody got something to eat before they came.

20          Mr. Strach, you can call your first witness.

21          MS. EARLS:  Your Honor, actually, excuse me, my

22 apologies, but we need to admit a few more exhibits to then

23 close the Plaintiffs' case.

24          JUDGE OSTEEN:  Okay.

25          MS. EARLS:  And in addition to exhibits, there are

1  two matters that I need the Courts' guidance on.  We have a
2  stipulation as to the League of Women Voters of North Carolina
3  Plaintiffs.  It's in written form that the parties have agreed
4  to.  I can either -- I'm just not clear whether --
5           JUDGE OSTEEN:  My preference is to mark it as an
6  exhibit and just hand it up.  If it was a jury trial, I would
7  let you read it, but a bench trial, just mark it and hand it
8  up.
9           No objection to the affidavit?
10          MR. STRACH:  The affidavit or the stipulation?
11          MS. EARLS:  First, I'm talking about the stipulation.
12          JUDGE OSTEEN:  Sorry, stipulation.
13          MR. STRACH:  No objection to the stipulation.
14          MS. EARLS:  And then the second matter that we have
15  is a declaration of Timothy Stallman, and this is in relation
16  to the agreement I mentioned yesterday where, in lieu of him
17  coming to testify, the Plaintiffs would be allowed to submit
18  his declaration without objection, and the Defendants would be
19  filing a response by Dr. Hofeller.
20          THE COURT:  Okay.  So there's an affidavit and a
21  counteraffidavit?
22          MR. STRACH:  That's right, although just to be clear,
23  we might not be able to get that filed until later in the week
24  or early next week, but that is the plan.
25          JUDGE OSTEEN:  Yeah, that's fine.  You don't

1  anticipate any issues in terms of the content of the affidavit;

2  it's just going to take a little bit of time to get it filed?

3          MR. STRACH: I think that's right. I think it's

4  going to be pretty long.

5          JUDGE OSTEEN: Yeah, if it takes -- we've got

6  depositions coming in next week already anyway, so that's fine.

7  So we'll take -- Plaintiffs' Exhibit 4080 is the stipulation.

8  No objection. That document is admitted.

9          And with respect to the affidavit, what number do you

10  want to put on that?

11          MS. EARLS: This will be 4081, Your Honor.

12          JUDGE OSTEEN: Okay. Let me back up. The

13  stipulation is going to be 4080?

14          MS. EARLS: That's correct, Your Honor. And if I may

15  hand that up now?

16          JUDGE OSTEEN: Plaintiffs' Exhibit 4080 is a

17  stipulation. That's admitted. Plaintiffs' Exhibit 4081 is

18  admitted subject to the condition that the Defendants will be

19  permitted to introduce a counteraffidavit from Dr. Hofeller.

20          MS. EARLS: Now, with regard to the depositions and

21  deposition exhibits, I need to clarify now. As a result of a

22  global agreement that the parties have reached with regard to

23  the exhibits on the exhibit list in this case, the accurate

24  statement of what our agreement is -- and I just want to be

25  clear because I think in the minute entry and at the beginning

```
 1  of the trial there was some -- a little bit of confusion about
 2  that, but the correct agreement is that all depositions of fact
 3  witnesses are admitted, and the parties agree that if we're
 4  willing to rely on the designations and not require the full
 5  deposition to be submitted to the Court, we're trying to reduce
 6  the amount of paper that you have to wade through, that
 7  certainly the League of Women Voters Plaintiffs are content to
 8  rely on our deposition designations, but all -- any objections
 9  that appeared to those are now waived because the global
10  agreement is that any deposition testimony of fact witnesses is
11  admitted.
12          JUDGE OSTEEN:  That's -- the global agreement is
13  where I understood we'd left it last time we talked, that all
14  the depositions would be admitted and any objections were
15  withdrawn, and to the extent, during your closing arguments,
16  you want to make -- clarify that we're satisfied to rely on our
17  designations, or whatever you want to say to clean that up, I'm
18  fine with that, but at this point, all the depositions are
19  coming in.
20          MS. EARLS:  And then the second important point is --
21          JUDGE OSTEEN:  Of fact witnesses, excuse me.
22          MS. EARLS:  The deposition exhibits, however, are
23  dealt with on the exhibit list.  So it is not true that we're
24  globally agreeing that all deposition exhibits would be
25  admitted.
```

1          JUDGE OSTEEN:  Okay.  And the objection is listed

2    on -- is on the list now, if there is one?

3          MS. EARLS:  Well, and that's what we are now prepared

4    to go through.  We can identify which Plaintiffs' exhibits we

5    now can move for admission and then the Defendants -- this is

6    also -- we have agreement with regard to our objections to

7    their exhibits.  So when we come to that stage in their case,

8    they will be able to move admission of exhibits.

9          JUDGE OSTEEN:  If this is a bad idea, let me know

10   candidly, but my initial reaction to that is if there's going

11   to be some process where Plaintiffs and Defendants are going to

12   stand up and say we move this and there's no objection and we

13   move Y and there is an objection and then the objection is

14   going to be stated, I frankly think that might be a little

15   easier to do all at one time maybe with the help of a written

16   checklist as we go through.

17         MS. EARLS:  Well, what I can represent to you is that

18   we have resolved all the objections.

19         JUDGE OSTEEN:  So there are no objections?

20         MS. EARLS:  There are no objections that need to be

21   heard?

22         JUDGE OSTEEN:  Okay.

23         MS. EARLS:  But we do need to clarify which exhibits

24   -- some exhibits have been withdrawn.  Some objections have

25   been withdrawn.  So that's what we need to clarify.

1          JUDGE OSTEEN:  Is it possible to do that with a

2    written list?

3          MS. EARLS:  I believe so.

4          MR. STRACH:  Yeah, we could just file an updated list

5    that contains all the exhibits that are now not objected to.

6          JUDGE OSTEEN:  I'm willing to sit here and find now

7    that all exhibits not objected to are admitted, and they will

8    be -- that will be formalized in the form of a written list

9    submitted by the parties.

10         Do you all have any problem with that?

11         JUDGE WYNN:  Sounds good.

12         JUDGE BRITT:  Fine with me.

13         MS. EARLS:  Thank you, Your Honor.  If I may hand up

14   the Plaintiffs' exhibits.  I believe that then allows the

15   Plaintiffs -- both the Plaintiffs in these consolidated cases

16   to rest their cases in chief.

17         JUDGE OSTEEN:  All right.  Mr. Strach, you may call

18   your next witness.

19         MR. STRACH:  Thank you, Your Honor.  Your Honor, we

20   call Sean Trende.

21         (Witness sworn by the clerk.)

22         MR. STRACH:  And, Your Honor, I've got our expert

23   reports like the Plaintiffs did and some notebooks for you to

24   follow.  I'll hand those to you all.

25

 1              MR. STRACH:  May it please the Court?

 2              JUDGE OSTEEN:  You may proceed.

 3              MR. STRACH:  Thank you, Your Honor.

 4                          SEAN TRENDE,

 5              DEFENDANT'S WITNESS, SWORN  AT 10:17 a.m.

 6                      DIRECT EXAMINATION

 7    BY MR. STRACH:

 8    Q    Good morning, Mr. Trende.  Could you state your name for

 9    the record, please.

10    A    Yeah, it's Sean, S-E-A-N, Trende, T-R-E-N-D-E.

11    Q    And, Mr. Trende, what is your occupation?

12    A    I'm the senior elections analyst at RealClearPolitics.

13    Q    All right.  And what's your educational background

14    briefly?

15    A    I got -- I received a bachelor's degree from Yale with a

16    double major in history and political science.  I received a

17    master's degree from Duke in political science and a J.D. from

18    Duke as well.

19    Q    And are you working presently on any additional education?

20    A    Yes, I'm enrolled in a Ph.D program at Ohio State

21    University.

22    Q    All right.  And what's your concentration in the Ph.D

23    program?

24    A    It's a double concentration in methods in American

25    politics.

1  Q    All right.  And what do you mean by "methods"?

2  A    Methods is basically statistics and design for political

3  science.

4  Q    All right.  And how far along are you?  How many hours

5  have you had?

6  A    I'm in my second year.  I've had about 30 credit hour --

7  or 25 credit hours of statistics and, not counting my master's,

8  another 12 of political science.

9  Q    All right.  And what kind of courses are involved in what

10 you've done so far?

11 A    So for the statistics course work, it's been work in

12 probability theory, applied regression analysis, design of

13 experiments, nonperimetric statistics.  In the political

14 science side, I've done work on GIS systems, an independent

15 study on redistricting, public opinion, and so forth.

16 Q    All right.  Now, what did you do -- you said you got a law

17 degree from Duke, correct?

18 A    Yes.

19 Q    What did you do after law school?

20 A    So I clerked on the Tenth Circuit for a year.  Then I

21 worked at Kirkland & Ellis in Washington, DC., I worked at

22 Hunton & Williams in Richmond, and then for a small firm in

23 Newport News before going to RealClearPolitics.

24 Q    And when did you start with RealClearPolitics?

25 A    I started with them on a freelance basis in 2009 and then

1  full-time in March of 2010.

2  Q    All right.  And what is RealClearPolitics?

3  A    So RealClearPolitics, it has a physical office, but it's

4  an online site that's designed to be a one-stop shop for

5  politics.  It covers polls, it aggregates polls, and it also

6  produces original content.

7  Q    All right.  And what's your title there?

8  A    It's senior elections analyst.

9  Q    And what do you do as a senior elections analyst?

10 A    So I'm in charge of rating House -- the competitiveness of

11 House races.  I assist with the assignment of ratings to

12 governor and Senate races, although those tend to be

13 deterministic based on our poll averages, and I also, like I

14 said, do -- produce original written content analyzing

15 elections.

16 Q    All right.  And in connection with the analysis you do as

17 a senior elections analyst, what kind of data are you working

18 with?

19 A    It's all sorts of data from the Current Population Survey

20 to the exit polls, the CCES, a wide variety of data sources.

21 Q    All right.  And do you cover redistricting in your work?

22 A    I did, especially in the 2010 cycle.

23 Q    And tell us a little bit about what you did.

24 A    So it was my job to follow how these redistricting plans

25 were shaking out because, for one thing, you couldn't rate the

1  races for 2012 without knowing what the new districts were.

2  Secondly, that was crucial to my work with the *Almanac of*

3  *American Politics*, which we'll get to, I guess.

4  Q    Tell me about the almanac.  What is that?

5  A    So the *Almanac of American Politics* is a series dating

6  back to 1971 that covers -- it was actually originally

7  conceived over the anti -- a guide for antiwar efforts to

8  target members of Congress; but for every congressional

9  district in the country, it gives a summary of what the

10 district's history is, what the major occupations and

11 industries are in the district, and then it gives a summary of

12 the member of Congress that's representing that district, what

13 his or her voting history is and so forth.

14 Q    What's been your contribution to it?

15 A    I coauthored the 2014 edition, which covered the 2012

16 elections.  I was in charge of doing district write-ups for

17 about half the states, and so that involved, you know, looking

18 at how the district lines had changed, rewriting a large

19 portion of them because they were new districts.

20 Q    All right.  And have you covered redistricting in any

21 other ways outside of the almanac or what you do for

22 RealClearPolitics?

23 A    Well, redistricting was crucial to my book, *The Lost*

24 *Majority*, which covered the -- basically, it's an explanation

25 of what happened in the 2010 elections, and so it's a take

1    on -- there was a lot -- there were a lot of people after the

2    2008 elections that had signed on to what's called "The

3    Emerging Democratic Majority Theory," that because of

4    demographic changes, Republicans were being locked out of

5    politics and that the 2008 elections were the summary of that.

6    It's based on a 2002 book called *The Emerging Democratic*

7    *Majority*.

8            So looking back over elections, I said this just

9    doesn't happen.  Elections swing back and forth, and what we

10   saw was more random fluctuation due to the economy and so

11   forth.  This realignment theory that the book is based on --

12   the old book is based on doesn't really hold water, and also it

13   identified that, you know, one of the problems that the

14   Democrats had going forward was the clustering of their votes

15   and that this would impact their ability to redistrict lines in

16   their favor.

17   Q    All right.  And then in the almanac, going back to that

18   very briefly, does any part of the almanac cover North

19   Carolina?

20   A    Yeah -- yes, the 13 districts are all laid out, and I was

21   in charge of writing the districts for North Carolina.

22   Q    So it was essentially a historical look at the districts

23   in North Carolina?

24   A    It was a historical look at the districts, and then also

25   what the new districts were -- what the new districts looked

1  like, what their history was.  Some of them just had to be

2  completely rewritten, and some of them deserved to be

3  rewritten.  Like the history of Wilmington that didn't discuss

4  the Wilmington race riots, that needed to be included.

5  Q    Have you authored any other books or chapters in books?

6  A    Yes, I've written -- I've contributed the last -- every

7  year after the election, Dr. Larry Sabato at the University of

8  Virginia produces a compilation discussing the previous

9  elections, and I've written -- contributed chapters to the last

10  three editions.  I also have a chapter that's forthcoming on a

11  book with Rafael Jacob of Temple University covering swing

12  states, and I wrote the Ohio chapter for that.

13  Q    Have you ever written in any peer-reviewed literature?

14  A    I haven't.

15  Q    Any reason why?

16  A    It's not really relevant to what I do.

17  Q    Has your work ever been cited in peer-reviewed literature?

18  A    It has.  For one example, George Hawley's recent book on

19  white voters in the 21st century has a chapter dedicated to one

20  of my economic analyses.

21  Q    Have you -- you're familiar with the various political

22  science journals that are out there?

23  A    Yes.

24  Q    Have you ever been asked to be a peer reviewer for any of

25  those?

1  A    I have, twice.

2  Q    Which ones?

3  A    One of them is -- I believe it's *Political Parties*, and I

4  can't remember what the second one was.  I believe it was *PS*.

5  Q    Okay.  Now, I believe -- was there at any point in time

6  when you were asked to advise governments overseas in any

7  election-related way?

8  A    Yes.  So in 2012, I was flown out by the EU to discuss the

9  upcoming 2012 elections before the EEAS, which is the

10  diplomatic core for their state department, and then in 2016, I

11  was flown out to Sweden to discuss the implications -- I guess

12  2017, earlier this year, to discuss the implications of the

13  Trump presidency with some government officials there and then

14  to do presentations to think tanks and universities around

15  Stockholm about 2016 and what it meant.

16  Q    Do you sit on any commissions that are relevant to your

17  work?

18  A    So I sit on the States of Change Commission, which is a

19  joint enterprise of three think tanks to discuss demographic

20  change in the country.

21  Q    Okay.

22  A    And I was asked to coauthor the 2018 primary report.

23  Q    Have you testified in redistricting cases before?

24  A    Yes, I have.

25  Q    Do you recall which ones?

1  A     So *Whitford v. Nickel* or *Gill*, it's changed, which was the

2  Wisconsin efficiency gap state legislature piece, and then I

3  had my report submitted in *Dickson v. Rucho* and then *Covington*,

4  but I didn't testify live.

5  Q    All right.  And have you ever had an opinion of yours that

6  was not accepted by a court?

7  A     Yes, so in the *Husted* case, which is an early voting case

8  in Ohio, I had drawn some maps using the -- it's a terrible

9  name for a website, but it really is a good app, Dave's

10 Redistricting App, which allows you to create political maps

11 and demographic maps, and the Court felt that I should have

12 done additional checking of the underlying data to make sure

13 that it was accurate, and so those maps were not included,

14 although the underlying opinion in my testimony was accepted.

15 Q    Okay.

16         MR. STRACH:  Your Honor, at this time we would like

17 to offer Mr. Trende as an expert in US elections, including

18 congressional elections, analysis of electoral history, and

19 redistricting.

20         MS. GREENWOOD:  I would like to renew my objection.

21 I would like to object to that and renew my motion in limine to

22 exclude --

23         JUDGE OSTEEN:  Hang on just a second.  I'll take your

24 objection fully.  You can have a seat for just a second.  An

25 expert -- give me the field again.

1          MR. STRACH:  Yes, Your Honor.  US elections,

2    including congressional elections, analysis of electoral

3    history, and redistricting.

4          THE COURT:  Including congressional elections and

5    analysis of?

6          MR. STRACH:  Electoral history and redistricting.

7          JUDGE OSTEEN:  And one question in terms of US

8    elections is pretty broad.  I thought I understood that most of

9    his work had been directed toward House races and some in terms

10   of presidential and otherwise.  Just very briefly, tell me how

11   we get such a broad topic.  Maybe I misunderstood the

12   testimony.

13         Let me explain it this way.  US elections is very

14   broad and would include a lot more than just the House

15   elections, and I wasn't sure, in terms of the testimony I just

16   heard, that he was primarily directed toward House elections

17   and almost secondarily, maybe the way I understood it, toward

18   presidential and other elections, but with some experience in

19   that field.

20         MR. STRACH:  Right.  You know, I think it is probably

21   primarily congressional elections, but he's got substantial

22   amount of experience in legislative elections and presidential

23   elections.  So that's why we said US elections.

24         JUDGE OSTEEN:  Okay.  Now, any voir dire of the

25   witness?

1          MS. GREENWOOD:  Yes, please.  May I conduct a voir

2   dire?

3          THE COURT:  You may.

4          MS. GREENWOOD:  Thank you.

5                    VOIR DIRE EXAMINATION

6   BY MS. GREENWOOD:

7   Q    Good morning, Mr. Trende.

8   A    Good morning.

9   Q    Mr. Trende, are you a professor?

10  A    No.

11  Q    And you would not call yourself a political scientist,

12  would you?

13  A    No.

14  Q    And you testified that you haven't written any articles in

15  any peer-reviewed journals, is that right?

16  A    That's correct.

17  Q    Do you have a Ph.D?

18  A    I don't.

19  Q    And you said that you've completed one year of your Ph.D

20  program at the Ohio State University, is that right?

21  A    Yeah, I'm in my second year.

22  Q    Now, Professor Jackman coded all of his data work in a

23  program called R.  It's the letter, R.  Have you taken any

24  classes in R coding?

25  A    I'm taking one.

1  Q    Right.  So you haven't actually completed any classes in R

2  coding?

3  A    Right, I'm taking one.

4  Q    Right.  Professor Chen coded all his work in a program

5  called JAVA.  Have you taken any classes in JAVA coding?

6  A    No.

7  Q    And do you have experience writing code in any other

8  language?

9  A    Well, now, yes.  As of my deposition, no.

10 Q    Right.  What do you have experience in now?

11 A    Now I've done a lot of work in Stata.

12 Q    Right.  So at the time you submitted your expert report,

13 though, you hadn't had any coding in any language?

14 A    That's correct.

15 Q    Dr. Jackman uses Bayesian inference in his analysis.  Have

16 you taken a class on Bayesian inference?

17 A    No.

18 Q    I understand that when you're not studying, you're still

19 working at RealClearPolitics, and that one part of your job is

20 to rate the competitiveness of congressional elections, is that

21 right?

22 A    Correct.

23 Q    I also understand that an aspect of those ratings is to

24 rely on poll averages?

25 A    For Senate and governor races and somewhat for House

1  races.  It's just that the polling for House races is a lot

2  sparser.

3  Q    Right.  Do you generate any of the poll averages?

4  A    No.

5  Q    And you don't use any regression models in your ratings,

6  do you?

7  A    No.

8  Q    You said that you analyzed redistricting after 2010 for

9  RealClearPolitics, but you have no work experience analyzing

10  the redistricting plans in prior decades, do you?

11  A    Well, so one of the things that I did was Kenneth Martis

12  has a book of congressional districts going back to 1789 that,

13  unfortunately, doesn't give county lines or cities or how the

14  elections turned out.  So I actually digitized the book and

15  hand drew, using Adobe Illustrator, all the districts over

16  county lines and then coded them according to electoral

17  outcome, again going back to 1789, for my work to learn how

18  redistricting actually works.  So you can see, like, why did

19  William McKinley lose in 1890.  Oh, it's because the Democrats

20  drew his district out of Appalachia and into Holmes County,

21  which was then the most Republican -- or Democratic portion of

22  Ohio.  That's what happened.

23        So, yes, that's a lot of redistricting work for my

24  current work.

25  Q    Right.  You did a lot of those illustrations to try to

1  learn more about redistricting, but you weren't offering
2  analysis of those plans for your work, were you?
3  A    I have included those.  That's in my forthcoming book --
4  or my forthcoming chapter on Ohio.
5  Q    So you may in the future be able to say you've done work
6  that's been published on that, is that right?
7  A    I have included those maps in work for RealClearPolitics,
8  too.  There was a piece I did on Alabama's -- when Parker
9  Griffith switched parties in 2010, talking about the history of
10 the 5th District and how it had been drawn over time, and that
11 included those maps that I drew.  So that was back in 2009 --
12 or '10.
13 Q    Have you ever drawn a redistricting plan for a legislature
14 or another body like a commission that's required to draw plans
15 that will comply with applicable laws?
16 A    No, I've never drawn a map for a legislature.
17 Q    And you mentioned -- sorry.  Have you ever drawn a
18 redistricting plan in GIS software like Maptitude?
19 A    No.
20 Q    Have you ever successfully simulated district plans using
21 an approach of that like of Professor Chen?
22 A    No, that's part of why I stayed away from Dr. Chen's
23 report.
24 Q    Good idea.  Professor Jackman testified that in political
25 science literature a common measure of partisan asymmetry is

1  what is called "partisan bias."  As the term is used by

2  political scientists, how would you define partisan bias?

3  A    So the partisan bias of a plan is the difference -- it's

4  for an asymmetry measure.  It's the difference between -- once

5  you move the plan back to a position of parity, the difference

6  between where the votes-to-seats curve is in a neutral map,

7  which is -- usually, we think it passes through the origin

8  versus where that particular plan ends up.

9  Q    Right.  Now, that's not what you said at your deposition,

10 is it?

11 A    I don't remember.  I used the term -- in my report, I

12 distinguished between partisan bias and bias, which is what I

13 label "The Pure Proportional Representation Discrepancy," and I

14 thought the first question you asked was about the bias, not

15 the partisan bias, but I could be wrong.

16 Q    Right.  Well, would it help your recollection if you

17 reviewed your deposition?

18 A    I imagine.

19 Q    Okay.

20       MS. GREENWOOD:  May I approach and hand up the

21 deposition?

22       JUDGE OSTEEN:  Well, let's continue along with

23 qualifications first.

24       MS. GREENWOOD:  Okay.  I believe that his ability to

25 understand key concepts in this case is relevant to his

1  qualifications, but I'll move on to another.  I just have one

2  more question about that.

3             JUDGE OSTEEN:  All right.

4  BY MS. GREENWOOD:

5  Q    Another important concept in this case is the efficiency

6  gap.  And in your report, you say that one way to calculate the

7  efficiency gap is the so-called "simplified method."

8  A    Yes.

9  Q    If we use that simplified method for calculating the

10 efficiency gap, is it possible to read the efficiency gap off a

11 seats-votes curve?

12 A    Can you repeat that?

13 Q    Sure.  If we use the simplified method for calculating the

14 efficiency gap, is it possible to read the efficiency gap off a

15 seats-votes curve?

16 A    The simplified method is a line not a curve, so --

17 Q    Right.  Is it possible to -- can you read the efficiency

18 gap off a seats-votes curve?

19 A    Certainly not at large -- large values because they

20 diverge at large values.  At smaller values, they're very

21 similar.

22 Q    Right.  So your answer is that it's not possible to do

23 that?

24            JUDGE OSTEEN:  Let me explain one thing, as I

25 understand it.  He's been tendered as an expert in a slightly

1  different field from what I understood Drs. Chen and Jackman

2  were tendered for.  So I'm not sure that comparing his

3  knowledge to -- knowledge base to what Dr. Chen and Dr. Jackman

4  may have in terms of their experience is necessarily helpful in

5  deciding whether or not the witness is qualified to testify as

6  an expert.

7          MS. GREENWOOD:  Right.  I guess Mr. Trende is trying

8  to say that he's able to offer criticisms of Professor

9  Jackman's and Professor Chen's work, or mostly Professor

10 Jackman's, and I'm trying to establish that he would need to

11 understand that work.

12         JUDGE OSTEEN:  Let me explain.  He's being tendered

13 now to testify as an expert in a specific field.  Whether or

14 not that testimony will later extend to criticisms of Drs. Chen

15 and Jackman, we'll see, but the question is is he qualified to

16 testify as an expert in his field at this point.

17         MS. GREENWOOD:  Right, and I guess I would say that

18 the efficiency gap and partisan bias are key metrics in

19 redistricting, and if he's going to be --

20         JUDGE OSTEEN:  According to your theory, right?

21         MS. GREENWOOD:  Well, I think according to political

22 science.

23         JUDGE OSTEEN:  Has he been qualified to testify as an

24 expert in those two fields?

25         MS. GREENWOOD:  In redistricting, I believe it's a

 1 component for being -- if you're an expert in redistricting,

 2 you should be able to discuss partisan bias and the efficiency

 3 gap.

 4          JUDGE OSTEEN:  All right.  So then ask him that

 5 question.  If you want to get to these specifics, let's deal

 6 with that during the substantive testimony, if we get there.

 7 Do you understand?

 8          MS. GREENWOOD:  Sure.

 9 BY MS. GREENWOOD:

10 Q    So given that you're a little unclear on the definitions

11 of partisan bias and the efficiency gap, is it your intent to

12 offer expertise on redistricting but not on the efficiency gap

13 and partisan bias?

14          JUDGE OSTEEN:  Well, whatever -- is it in his report?

15          MS. GREENWOOD:  Yes.

16          JUDGE OSTEEN:  Okay.  Then ask him about whether or

17 not he opined on that in his report, not what -- his intent

18 will be controlled by what the lawyer asks him.  Does that make

19 sense?

20          MS. GREENWOOD:  Thank you, Your Honor, yes.

21          JUDGE WYNN:  Let me clarify, at least in terms where

22 I think -- and I agree with Judge Osteen on this point.  Where

23 you are now and the fact that he will be qualified as an expert

24 does not mean that every single thing within that particular

25 field he can render an opinion on.  There would be matters that

1    may be beyond the scope of his expert.  Even though we qualify

2    him in redistricting, that in and of itself really needs an

3    underlying level of qualification to specific things there.  We

4    can't possibly go through those.

5           So in redistrict -- on cross-examination, that's

6    where you would bring that out, and that is to indicate if he

7    does not possess that level of expertise within the

8    redistricting field, and if there are others there, it will

9    become apparent then; but at this point in time, if he

10   qualifies as an expert, then that's a general expert in his

11   field.  So qualifying a medical doctor as a doctor doesn't mean

12   he can get up and give an opinion on brain surgery and

13   everything else within the field, but he can be a general

14   expert within that field; but it is cross-examination where you

15   will bring that out.  What you're doing now is sort of a form

16   of cross-examination before the direct examination's been

17   offered on him.

18          MS. GREENWOOD:  Okay.  I apologize, Your Honors.  I

19   think that they are all my questions on qualifications, and so

20   I would just renew my submission that I think that Mr. Trende

21   does not meet the requirements of an expert.  He doesn't have

22   sufficient education, he doesn't have sufficient experience,

23   and he doesn't have sufficient skills to be an expert that will

24   offer reliable testimony to this Court.

25          JUDGE OSTEEN:  All right.  Thank you.

 1              (Off-the-record Discussion.)

 2              JUDGE OSTEEN:  In terms of this -- we'll take the

 3    ultimate question under advisement, but we're going to allow

 4    him to proceed to testify as an expert in this case.

 5              What does that mean?  We're going to take the

 6    testimony, and then if we change our mind later, we change our

 7    mind; but right now, we're going to take the testimony, and we

 8    are not -- in terms of US elections, I think that's too broad

 9    based on the experience and qualifications that I heard

10    Mr. Trende describe.  So unless there's another way to do it,

11    I'm going to limit it to congressional elections.  I understand

12    he's got experience looking at US elections, but unless there's

13    a reason I should reconsider that, at this point it will be

14    limited to congressional elections and analysis of electoral

15    history and redistricting.

16              JUDGE WYNN:  I just wanted to add to that that the

17    level of expertise is considered to be a general expert within

18    that field.  If there is specific expertise that he possesses

19    in the process of your examination that comes about or some

20    lack thereof, it would become -- it's the sort of thing we can

21    bring out in the testimony.

22              MR. STRACH:  All right.  Thank you, Your Honor.

23    BY MR. STRACH:

24    Q    So, Mr. Trende --

25              MR. STRACH:  And just for the Courts' information,

1  Mr. Trende's report is marked, it's in your notebook, as

2  Defendants' Exhibit 5101.  I think it might be the last tab in

3  the notebook that you have before you.

4        JUDGE BRITT:  5101?

5        MR. STRACH:  Yes, Your Honor, 5101.

6        JUDGE BRITT:  Got it.

7  BY MR. STRACH:

8  Q    Mr. Trende, just as a global matter and to put your

9  testimony in context of Dr. Jackman's testimony, could you tell

10 the Court what is the difference between what you're trying to

11 do in your report versus what Dr. Jackman is doing in his

12 report?

13 A    So kind of apropos the colloquy, Dr. Jackman is interested

14 in the statistical properties of the efficiency gap, the

15 theoretical properties of the efficiency gap, whether it

16 ties -- how it ties in to partisan asymmetry measures and so

17 forth.  That's really not what my report is about.  My report

18 is more practical.  Okay, we have this efficiency gap, and it's

19 been tied to asymmetry metrics.  We've done sensitivity tests

20 of it over time and regression analyses.  What happens when we

21 actually try to put the efficiency gap into practice?  Does it

22 work?  Does it produce sensible results?  Is it actually easy

23 to calculate?  Those are the type of questions that I've --

24 I've tried to explore, things that are more in line with my

25 practical experience.

1   Q    All right.  Why don't you turn to page 7 of your report

2   where you begin to discuss this issue.  And if we could put up

3   5101, we'll start with page 7.

4            Mr. Trende, here in your report you say that "there's

5   no single efficiency gap, making it difficult to choose a

6   standard."  What do you mean by that?

7   A    So if you look at the various articles and then testimony

8   that have been offered over time, you see different versions of

9   the efficiency gap and different cutoffs that have been

10  suggested for the efficiency gap.  So this just identifies some

11  different ways in which the efficiency gap has been presented.

12           One thing that has changed over time is when

13  Dr. McGhee and Mr. Stephanopoulos published their law review

14  article, the suggested cutoff is eight seats.  In other words,

15  states with fewer than eight congressional districts would not

16  be subjected to efficiency gap analysis.  My understanding --

17  and that was certainly the cutoff in Wisconsin where I was

18  cross-examined for analyzing states with seven seats, Alabama

19  and Colorado in particular.

20           Now, it's my understanding that the cutoff is seven

21  seats, and Alabama and Colorado are actually included in the

22  analysis.

23  Q    So as a practical matter, if the cutoff for this is

24  reduced from eight congressional seats to seven congressional

25  seats, what's the practical impact of that?

1  A    So three additional states are brought into consideration.

2  There's three states that have seven congressional districts:

3  South Carolina, Alabama, and Colorado.

4  Q    All right.

5  A    And the upshot of that is that the Alabama and South

6  Carolina maps were drawn by Republicans.  The Colorado map was

7  adopted by a court.  So you subject two additional

8  Republican-drawn maps to scrutiny.

9           JUDGE WYNN:  Counsel, I just want to make sure I

10  understand what his testimony is and what his level of

11  expertise is, and I'm just puzzled and I just want to -- if you

12  wouldn't mind, lay a little more foundation in terms of his

13  expertise on this, because we did hear he didn't know about

14  Jackman's work.  He's not done that level of study, and it

15  would be helpful, at least to me, to lay a little bit more in

16  terms of what his expertise is in this area, particularly with

17  efficiency gap and the manner in which it's being used.

18           MR. STRACH:  Well, Your Honor, I think what he said

19  and what the testimony is is he's not opining on the

20  theoretical theory, political science theory, what have you,

21  about the efficiency gap.  He's simply accepting the numbers

22  for what they are, and then telling the Court what the

23  practical impact of that is if a Court or anybody else was

24  having to actually apply it.

25           So based on his unique history of congressional

 1  elections and electoral history and analysis, he's able to show

 2  how these numbers operate in the real world.

 3           JUDGE OSTEEN:  And I agree with Judge Wynn.  It's one

 4  thing to say after this -- when this evidence was presented, I

 5  learned of the efficiency gap.  It was based on seven or more

 6  districts, so I went out and looked at elections in that

 7  category, and then I heard eight, and I went out and looked at

 8  elections in that category; and then moving on to what effect

 9  the difference may have had in terms of what analysis he did is

10  one thing.

11           The testimony sounded a little to me like a criticism

12  of the efficiency gap because here it was seven and now -- or

13  here it was eight and now it's seven, and the target is

14  changing, but whether that's a good thing or bad thing within

15  efficiency gap analysis is not something I understood him to be

16  qualified to opine on, if that makes any sense.

17           JUDGE WYNN:  I mean, it gets to the point of being

18  maybe it's just lay testimony.  What he's saying is probably

19  anybody could say, but he doesn't have the expertise to

20  criticize an expert report for which he does not have the

21  expertise in.  Or does he?  I'm trying to understand that, but

22  I think you need to lay at least some basis of how he has that

23  level of expertise to get an opinion.

24           MR. STRACH:  I'm not -- I'm having -- so he's trying

25  to give -- the standard at one time was eight seats.  It's now

 1  down to seven seats; and as a result, that sweeps in additional

 2  states.  That's the practical impact, and --

 3          THE COURT:  So what?

 4          MR. STRACH:  -- that's based on his knowledge --

 5          JUDGE WYNN:  We already know that.

 6          JUDGE OSTEEN:  Yeah, Dr. Jackman acknowledged that,

 7  and that's fodder for argument in terms of the standard.  We

 8  get that.  We don't need to be an expert to figure that out.

 9  I'm not saying whether it's a good or bad argument, just

10  something that you can argue in terms of his expertise.  Does

11  it make some relevant difference to the case if he uses seven

12  versus eight, or he takes their reports and uses that

13  information?  Do you follow me?

14          MR. STRACH:  I do, Your Honor.  Let me move to a

15  different topic and see if this helps the Court.

16          JUDGE WYNN:  Just lay the foundation for it, if he --

17  because I think being a general expertise -- if he's going to

18  go into a specific-level area, you need to give some foundation

19  for how his expertise goes into that area.  This is still under

20  advisement, and I want to give you every benefit of the doubt.

21  If you think he has it, then tell us how you he has it.

22          MR. STRACH:  All right.  Well, I think he does have

23  what --

24          JUDGE WYNN:  Well, then give it to us.

25          MR. STRACH:  So far I feel like he does, but, you

1  know, perhaps the Court may disagree.  I apologize for that.

2         Let me see if I can get to a section where this may

3  make more sense for the Court.

4  BY MR. STRACH:

5  Q    Mr. Trende, let me focus more on really what the bulk of

6  your report was focused on, which was -- which actually starts

7  later in the report.  Let's see if I can find the page so I can

8  get the Court there.

9         All right.  It generally starts on page 29 and

10 following.  At page 29, you have a heading that says "The

11 Efficiency Gap is Not Clearly the Hallmark of a Gerrymander as

12 Commonly Understood."  What do you mean by that?

13 A    Yeah, so in Dr. Jackman's report, he refers to partisan

14 asymmetry -- that partisan asymmetry metrics is the hallmark of

15 a gerrymander, and from a theoretical perspective, maybe.  The

16 question is when you take the efficiency gap and you apply it

17 to actual maps, does it produce sensible results?  This is the

18 type of thing you want to do when you do statistical analysis.

19 For example -- well, yes, it's the type of thing you want to

20 do.

21 Q    And in the work you've done with congressional and other

22 elections, have you done work which allowed you to assess

23 whether districts were, you know, gerrymandered and, as you

24 say, in the sensible meaning of the term?

25 A    Yeah, it's difficult to come up with -- I mean, as this

1  case, I think, illustrates, it's difficult to come up with a

2  definition of a gerrymander, but there are certainly bizarre

3  results you can get.  For example, if you have a map with

4  contorted lines that the Democrats drew and all the

5  contemporaneous evidence indicated they were trying to draw it

6  to favor Democrats, and it ends up producing an actionable

7  Republican efficiency gap standard, which I've calculated the

8  efficiency gaps, that's not terribly difficult to do, the --

9  then something's up.

10      If the North Carolina Democrats -- or if the North

11 Carolina Republicans drew a map to aid Republicans and it ended

12 up showing a .19 efficiency gap, you know, something that

13 showed very heavy Democratic gerrymander, that's a problem.  If

14 it happens in one map, it's not that big a deal.  If it happens

15 in, say, a fifth of the maps that are produced over time, then

16 I think you've got a problem, and the maps that are going to --

17 the cases that are going to be coming before the Court in

18 future circumstances is going to have to deal with these

19 bizarre outcomes.

20 Q    Well, let's just try to walk through a couple of examples

21 just to try to add some context to this.

22      If you look at page 38 of the report, you've got

23 there a map of the Alabama 1972 redistricting.  Can you tell

24 the Court what's the -- what point are you trying to make with

25 this 1972 map?

1  A    So one of the problems that the efficiency gap has when

2  it's put into practice is that -- I understand what Eric McGhee

3  is getting at in his initial LSQ article on this where he kind

4  of conceptualizes the efficiency gap.  What redistricters are

5  trying to do when they gerrymander is either put Democrats into

6  a district right up to the point where they don't win it or to

7  put Democrats into districts where they overwhelmingly win it,

8  and that wastes votes.  I understand that conceptually.

9        The problem is that once you actually put a map into

10  practice, a lot of things affect congressional outcomes.  You

11  can have incumbents that you thought were going to lose get

12  caught up in scandals.  You can have issues where incumbents

13  die and a district that you thought would be a win for

14  Democrats suddenly becomes something Republicans can win; and

15  when you're in jurisdictions with small numbers of

16  congressional districts, and this is out of the Stephanopoulos

17  and McGhee article, the efficiency gap becomes lumpy.  These

18  small freak circumstances can produce wild changes in the

19  efficiency gap.

20        And so what this Alabama map in 1972 illustrates --

21  it's a nice illustration of how these sorts of factors come

22  into effect.  This is a map that has a Republican lean.  It's

23  not a massive Republican lean, but it was drawn -- I believe

24  there were two Republicans in the entire Alabama state

25  legislature at the time it was drawn and a Democratic governor.

1  What happened -- the Democrats drew -- Alabama lost a district

2  in the 1972 redistricting, and what Democrats did was they drew

3  a Republican incumbent, who had won in 1964 and managed to hang

4  on in the subsequent years, into the same district as a

5  long-time Democratic incumbent in the second district.  So that

6  was something that the Democrats thought they were going to

7  win, and it would waste Republican votes, but, unfortunately,

8  the Democratic incumbent died in between the time that the map

9  was drawn and the time of the election.  So instead of running

10 against a long-time -- at a relatively young age.  He was 64, I

11 believe.  So instead of running against a long-time incumbent,

12 this Republican incumbent ends up running against a 26-year-old

13 Democratic state legislator.  He ends up winning, and so this

14 map that was drawn to waste Republican votes ends up wasting

15 Democratic votes because of this kind of fluke circumstance

16 that has an outsized impact in a small number of districts.

17 Q    Let's look at page 31, which is another Alabama map.  This

18 one is instead 1992.  What was the practical situation here?

19 A    So this is another example of a map that produces a

20 Republican lean in its first year of implementation, and this

21 is a map that was drawn by a legislature that's overwhelmingly

22 Democratic and had a Democratic governor.  It's an example

23 of -- 1992 was an okay Democratic year, and it ended up -- but

24 you have -- basically, what this comes down to is the

25 7th District is the minority-majority district, and so

1   Democratic votes are naturally packed within it.  It's

2   difficult to say to what extent to translate that directly into

3   efficiency gaps, but that ends up in kind of naturally wasting

4   Democratic votes.  So you end up with this plan drawn by an

5   overwhelmingly Democratic legislature, signed by a Democratic

6   governor that nevertheless has a Republican lean.

7   Q    All right.  Let's look at page 45 of the report.  This is

8   a map of the Georgia redistricting in 2002.  What happened

9   here?

10  A    So this is a map that is kind of on the gerrymander's

11  greatest hits.  You can see the bizarre, contorted districts.

12  The Democrats still had unified control of the Georgia

13  government in 2002, and so they drew this map in an attempt to

14  make an 8-5 Democratic map, and it ended up falling apart in

15  the first year for a couple reasons.  First, 2002 was,

16  generally speaking, a good Republican year.  You had a

17  Republican president with a 72 percent approval rating on

18  Election Day.  So some of these maps that were designed to

19  narrowly elect Democratic incumbents ended up electing

20  Republicans, and you had fluky circumstances, like the

21  Democratic nominee in the 12th District was the Speaker of the

22  House's son, and it came out that he had a criminal record, had

23  been convicted three times; and so in a Democratic year, he

24  might still have won in that district, but in a Republican

25  year, the Republican barely wins, and a bunch of Democratic

1   votes get wasted.

2           And, again, something with a smallish number of

3   districts, losing one or two districts that you thought were

4   going to go your way has a substantial impact on the efficiency

5   gap.

6   Q    Are there any examples in North Carolina that you're aware

7   of through your prior work?

8   A    Yeah, so if you go to I guess page 57 of my report, you

9   see the famous North Carolina map from 1992, and, again, I

10  think you would be hard-pressed to have someone say this isn't

11  a gerrymander.  I mean, they're using touch-point contiguity

12  throughout it, and you can see the bizarre lines, and it's

13  bizarre in ways that go beyond compliance with the Voting

14  Rights Act.  I mean, yes, you have the 12th District and the

15  1st District, which are VRA districts, but that doesn't explain

16  things like the relationship, it's very hard to see, between

17  the 11th, 10th, 5th, and 9th Districts in Western North

18  Carolina.

19          So this is a map again drawn by a Democratic

20  legislature, signed by a Democratic governor, the type of thing

21  you would expect if the efficiency gap itself were a hallmark

22  of a gerrymander to produce a substantial Democratic map, but

23  lean and be actionable, but it wasn't.  In fact, in 1994, the

24  map actually produces a Republican lean because in 1994, you

25  have David Funderburk surprisingly winning in the 2d District,

1  Fred Heineman shocking everyone by winning in the 4th District.

2  So these maps that would generally waste a lot of Republican

3  votes end up wasting huge numbers of Democratic votes because

4  that's what happens under fluke circumstances with the

5  efficiency gap, and since you only have twelve -- you only have

6  twelve districts here.  Two districts flipping moves the

7  efficiency gap by about .14, which is enough to go from an even

8  map to an actionable map just by a fluke.

9  Q    What about the 2002 North Carolina map, page 58?

10  A    Yeah, again, so the 2002 map is a map that's drawn by

11  Democrats that was intended to kind of -- first, it was

12  intended to give the 13th District, the new district, to Brad

13  Miller, who I believe was the House or Senate Redistricting

14  Chairman at the time, but also to weaken Robin Hayes in the

15  8th District, the old Bill Hefner district, that was at the

16  time marginally -- could be drawn marginally Republican.  They

17  shored up the Democratic vote share there.  They tried to

18  protect Democratic incumbents in the 7th District and then also

19  make the 11th a little more competitive than it had been.

20          And in the first year, again, you have a good

21  Republican year.  So these Republicans managed to hold on, and

22  you end up -- you don't end up with an actionable map in the

23  first year.  Now, what you do end up with is in 2010, the last

24  year it's in effect, you actually do get an actionable map, and

25  the reason -- and, in fact, if Etheridge hadn't had his --

1    Congressman Etheridge hadn't had the unfortunate incident and

2    had been reelected, you would have had an efficiency gap of

3    somewhere around .19, what the Republicans have under the

4    current map, again an example of how a fluke circumstance can

5    have a big impact on the efficiency gap.

6           What happens in 2010 is you finally have a Republican

7    wave election hit, and this is when the map does its work

8    because Republicans can get close in districts like the 7th and

9    the 8th, and the 11th, of course, flips in 2006 and Shuler

10   holds on, but they -- and so they end up wasting a lot of votes

11   in those districts.  So that's when you see it, see the

12   efficiency gap -- or that's when you see the gerrymander come

13   out, but in these kind of normal years, or even these

14   Democratic years like 2006 and 2008, you don't see anything

15   actionable.

16          So, again, if this were the type of thing that just

17   happened in one or two maps, it's a problem; but in the report,

18   I identify a fifth of the maps in the data set as just having

19   obvious problems in terms of the efficiency gap, and these are

20   the type of cases that are going to be before courts.

21          MR. STRACH:  Thank you.  Thank you, Your Honors.

22   That's all I have for him.

23          JUDGE OSTEEN:  Cross-examination?

24

25

CROSS-EXAMINATION

BY MS. GREENWOOD:

Q    Thank you.  Hello again, Mr. Trende.

A    Hello again.

Q    Now, in your testimony, am I right that you considered
what you called the traditional understandings of a
gerrymander?

A    I think I have some obvious examples of gerrymanders.  How
these things work at the margins, it's difficult to say.

Q    Right.  In your opinion, what is sort of the traditional
understanding of a gerrymander, you used the term "you'd be
hard-pressed to find that this isn't a gerrymander."  What did
you mean there?

A    Well, I think if you have a map that's drawn by a party,
that's -- all the contemporaneous evidence indicates that it
was meant to benefit that party, especially if you have
contorted lines, which I think most people consider to be
evidence of a gerrymander, maybe not necessary, but sufficient,
that that's enough.

Q    Right.  So in your opinion, we don't need to consider
election results to determine whether a plan is a gerrymander?

A    So that's an interesting philosophical question whether
dummy-manders should be included in the definition of a
gerrymander, or something that in the first year -- I mean, I
am talking about actual results here, how these plans turned

1  out.  That's throughout my testimony, so I don't agree with

2  your characterization there, but, yeah, I think -- it's an

3  interesting question if a plan doesn't turn out in its first

4  year of implementation, whether it should still be a

5  gerrymander or not.

6  Q    So what is your opinion on that?

7  A    I don't know the answer to that.  It's a philosophical

8  question that doesn't have a clear answer.  It's something I

9  could argue it either way.

10  Q    Do you remember at your deposition I asked you whether we

11  needed to consider election results that follow after a plan

12  has been enacted?

13  A    No.

14  Q    Would it refresh your recollection if I showed that to

15  you?

16  A    I imagine it would, yes.

17  Q    Okay.  Thank you.  So, Mr. Trende, if you can just turn to

18  page 159 and read to yourself lines 14 to 18.

19  A    Okay.

20  Q    And so I guess I'll ask you again.  Do we need to consider

21  election results that follow after a plan has been enacted to

22  determine whether a plan has been a gerrymander?

23  A    I say: "No.  Sometimes -- sometimes gerrymanders don't

24  work.  They're dummy-manders, like the Georgia map in 2002, but

25  that's part of the problem, or sometimes they don't work in the

1  first year that they're put into effect."  And the answer goes

2  on.

3  Q    Right.  But you just say no?

4  A    And then I explained it.

5  Q    Right.  So just to be clear, you wouldn't advocate for any

6  method of determining gerrymandering that's based on election

7  results, would you?

8  A    I didn't say that.  You asked me if you need to do it, and

9  I said no.  That doesn't mean there can't be metrics developed

10 that do do it.

11 Q    Right.  Do you remember in your deposition that I asked

12 you whether you would advocate for any methods based on

13 election results?

14 A    No.

15 Q    So if you turn to page 172, you just read lines 8 to 12.

16 Does that refresh your recollection?

17 A    Yes.

18 Q    Right.  So I'll ask again.  Do you -- are -- so you

19 wouldn't advocate for any method based on election results?

20 A    I wouldn't advocate it.  That doesn't mean that you can't

21 do it, or there's no way to do it.  Those are different

22 questions.

23 Q    Right.  Well, I'm just asking if you would advocate for

24 that?

25 A    I don't advocate -- the point, I think, in that section is

 1  I'm not advocating anything.  So I'm not sure there's a clear

 2  test that can be developed to do this.  I don't advocate any

 3  test for gerrymandering.

 4  Q    Okay.  I just want to go over this section of your report

 5  that was discussed in direct.  It starts on page 29.

 6  A    Right.

 7  Q    Now, I know you have a law degree, so I'm pretty sure that

 8  you're aware that the Plaintiffs have a three-part standard for

 9  partisan gerrymandering, is that right?

10  A    It's changed over time.  I went back and read the

11  Wisconsin motion to dismiss, and it was a two-part standard

12  then with one of them broken into two pieces so -- and I think

13  it was a four-part test at some point, maybe in the

14  Stephanopoulos and McGhee article.  I don't know what -- I

15  haven't read any of the briefings here.

16  Q    Right.  So in the deposition, I actually went over a

17  section of Professor Jackman's rebuttal report where he says

18  that the Plaintiffs' test is a three-part test.

19  A    That's what Dr. Jackman says.  I haven't read any of the

20  pleadings to see if he understands it.

21  Q    Okay.  And you've read the two Professor Jackman reports?

22  A    I have read the Jackman reports, yes.

23  Q    And nothing in Professor Jackman's quantitative analysis

24  addresses the question of whether plans were drawn with

25  partisan intent, is that right?

 1            JUDGE OSTEEN:  You're asking him to opine on

 2    Dr. Jackman's report?

 3            MS. GREENWOOD:  Yes.

 4    BY MS. GREENWOOD:

 5    Q    Well, I guess can you confirm that nothing in his report

 6    addresses the question of whether a plan was drawn with

 7    partisan intent?

 8    A    I will say this:  I don't remember anything in

 9    Dr. Jackman's report relating the efficiency gap to partisan

10    intent without rereading -- actually, I think he has three

11    reports because one of them is the recalculated version of the

12    second report, but I don't remember anything about intent in

13    them.

14    Q    Okay.  Now, in that Section 6 of your report that starts

15    on page 29 that we just discussed, it looks like you discussed

16    Alabama for every decade since the 1970s except the current

17    cycle, right?

18    A    Correct.

19    Q    And you didn't discuss the Alabama redistricting plans in

20    2010 because there's actually nothing wrong with the

21    application of the efficiency gap there, is there?

22    A    Well, aside from the question of whether eight seats or

23    seven seats is the cutoff, which I don't have a strong

24    preference on, but I don't know how to distinguish between the

25    two cut-offs that have been proposed, it lines up in 2010.

1  Q    Right.  And you didn't include Arizona for the 2010s

2  because there's nothing wrong with the application of the

3  efficiency gap there, is there?

4  A    I didn't include Arizona at all.  You would have to show

5  me what the efficiency gap calculation for Arizona in 2012 was.

6  Q    Okay.  Do you have a reason why you didn't include

7  Arizona?

8  A    I don't remember.

9  Q    And if we turn to California, you discuss the plans in the

10 '80s and the 2000s, but you don't discuss the plans in the

11 '70s, '90s, or the current cycle.  Is that also because they

12 line up, as you say, in the ones you didn't discuss?

13 A    Well, California was an independent redistricting

14 commission, but I think the only Democratic map that trips your

15 threshold is Massachusetts, so I don't think -- I think

16 California probably lines up.

17 Q    Right.  So I guess I'm trying to understand if there's a

18 methodology behind why you chose to include some examples but

19 you chose not to include other examples?

20 A    Well, sure, because I'm looking over time at specific --

21 for maps that are generally considered to be gross

22 gerrymanders, that you would get -- that you would get very

23 little discussion over.  So, for example, the California map in

24 1982, the Burton-mander, everyone agrees that the Burton-mander

25 is a gerrymander, and I say the efficiency gap, to its credit,

1    gets that map.

2          There's a Texas map that everyone agrees is a

3    gerrymander.  To its credit, the efficiency gap flags that map.

4    Q    And so is your method --

5    A    And so if there were just one map or two maps that really

6    make no sense, I wouldn't have -- I wouldn't have done this

7    section, but it's a fifth of the maps.

8    Q    Right.  So there's 136 plans in Dr. Jackman's database.

9    So you're saying that a fifth of them are what you would say,

10   quote, wrong in terms of the outcome?

11   A    The efficiency gap produced -- the efficiency gap

12   statistic itself, which is being held forth as telling us a lot

13   about gerrymanders, it's the hallmark of it, produces results

14   that don't make sense.

15          Now, you can try to cabin it in with an intent

16   standard, and, again, I believe in Wisconsin you also suggested

17   you don't really have to do an intent standard in the motion to

18   dismiss response, but you can try to cabin it in with an intent

19   standard, but, again, the question is does the efficiency gap

20   metric itself make sense?  And if it's really measuring

21   gerrymandering well, you shouldn't get a situation where

22   Democrats are drawing a map and they have almost everyone in

23   the legislature, and it ends up with a Republican lean.

24   Q    Right.  But when you said I chose to include Texas or

25   California because everybody knows they're a gerrymander, is

1  that the methodology that you used; you only included things

2  where everybody knows they're a gerrymander?

3  A    Where there was broad agreement on gerrymanders.  The

4  California map shows up throughout the literature.  People are

5  writing about it.  Again, it's the Burton-mander.  It's

6  famously Bill Burton's contribution to modern art.  The *Almanac*

7  *of American Politics* contemporaneously describes it that way.

8  Q    And so you did a literature review to determine what

9  plans -- where everybody would consider them a gerrymander, is

10 that the methodology?

11 A    Again, it's having studied redistricting and gerrymander

12 for the better part of a decade now.  I have a sense for what

13 states are considered kind of the big gerrymanders and what

14 states aren't.  If I had one or two maps, I wouldn't have done

15 this, but it's a fifth of your data set.

16 Q    Well, it's not my data set.

17          I would like to go through some of the examples that

18 you discussed, some from your report and some that you

19 discussed just now, and I'm just going to try to work out how

20 the Plaintiffs' standard would apply.  You know, you said that

21 you wanted to talk about how this works in reality.

22          THE COURT:  Let me see counsel up here real quick.

23          (Bench conference as follows:)

24          JUDGE OSTEEN:  I'm not sure whether this is going to

25 the full report or as to his testimony, but, ultimately, as I

1  understand it, his testimony is limited in terms of I looked at

2  the efficiency gap, I looked at these maps, and concluded that

3  they're wrong 20 percent of the time.  That's a quick summary.

4            MS. GREENWOOD:  Right.

5            JUDGE OSTEEN:  There's a little bit of argument going

6  back and forth in terms of what the Plaintiffs' case is and why

7  you're here testifying to this, that, and the other, and that's

8  kind of opening the door to some irrelevant material.

9            You may -- in terms of what he actually knows, he may

10 be very well aware of the Plaintiffs' case and everything about

11 it, but, ultimately, that's not his field of expertise.  Even

12 though he's got his J.D. degree, that doesn't really qualify

13 him to talk about this intent and effect and these other prongs

14 if it doesn't fall within his field of expertise, and the more

15 open-ended the questions are, particularly in terms of the

16 introduction, like the one you just gave as to what you're

17 going to ask about, the more you invite him to opine on things

18 that fall outside his expertise.

19            These guys may disagree with me a little bit, but I

20 would like to see you narrow your questions to what he was

21 actually admitted for.

22            JUDGE WYNN:  Well, I do want to add, I think I would

23 like to allow the Defendants to have as much information and

24 testimony you want.  It really ultimately goes to the weight of

25 it.  My questions to you are not to limit your examination, but

1  to say to you, at the rate you're going, if you don't lay a

2  better foundation, I think it affects the weight tremendously.

3        So I was -- I was not trying to say don't ask him the

4  question.  I want to make sure you understand that, but I think

5  ultimately this is weight testimony, and probably -- I kind of

6  do a few appeals, and I see how these things come out down the

7  road, which I don't want to limit it in that perspective.  I do

8  tend to agree this looks like it's opinion matters when you go

9  to Jackman.  If you don't lay a foundation, I think it's going

10 beyond his expertise to give an opinion.  I think he can give

11 an opinion, just like the rest of us, as a layman, but experts

12 can specifically get into different grounds, but maybe after it

13 all comes out -- do you see where I'm going with it?  I think

14 ultimately -- I guess I feel like I'm okay not restricting the

15 testimony at this point, but understand that it really is

16 moving toward weight.

17        MS. GREENWOOD:  I'm only going to ask about that

18 section of the report, just parts of it, because that's what

19 was asked about it.

20        JUDGE OSTEEN:  I think our two comments kind of marry

21 with the fact that we just make to sure that you didn't feel

22 like you were unfairly cut off by anything that we said

23 earlier, and you make sure to try to confine your questions to

24 elicit an answer that's relevant to your case and not an

25 argument about intent, effect, and these other things.

 1              MS. GREENWOOD:  Maybe we could take a 5-minute break,

 2     and I could come back and finish the cross-examination.

 3              (Bench conference concluded.)

 4              THE COURT:  We'll take a 5-minute recess.

 5              (At 11:18 a.m., break taken.)

 6              (At 11:33 a.m., break concluded.)

 7              JUDGE OSTEEN:  Hold on a second.  I'm sorry.  I

 8     missed everyone standing up for Ms. Petty, but you can feel

 9     free to do that again for her if you like.

10              All right.  So I think there's -- I think everybody

11     understands where we are, but I want to clear up, as best I

12     can, some -- what may be some lingering confusion.  Hope not,

13     but perhaps.

14               So let's see.  I'm trying to figure out how to put

15     this in some perspective.  Experts have been qualified in

16     different fields as we've proceeded throughout this trial, so

17     at this point I don't see any overlap.  We don't have two

18     experts qualified in the same area.  So as a result, I'm not

19     certain or I'm not convinced that the experts can be opining on

20     each other's -- directly on each other's opinions.

21              I can't remember now if it was Chen or Jackman, but

22     one of them said, The identity of the candidate doesn't make

23     any difference to my analysis.  So I wouldn't expect that

24     expert to then be able to come in like this expert has said,

25     Here's an individual candidate.  Here's what happened in that

1  election, so on and so forth, if that makes any sense.

2          This expert who is presently testifying was qualified

3  to testify with respect to US elections, including

4  congressional -- or congressional elections historically and

5  analysis -- congressional elections and analysis of electoral

6  history and redistricting, so that's this expert's field of

7  expertise.  It's not whether or not the efficiency -- how to --

8  no, excuse me -- whether or not the efficiency gap is a good

9  calculation or a bad calculation as to gerrymandering, except

10 as may be relevant through his experience.  But how the metrics

11 were put together and this, that or the other, he's not a

12 statistician.  This expert is not.  He also wasn't called to

13 testify about the pleadings overall in the case or what the

14 standard is that the Plaintiff is urging upon this Court and

15 those types of things.

16         So in terms of a foundation for an expert's

17 testimony, first of all, it has to be clear -- first, a

18 foundation has to be clear to make -- to establish that the

19 opinion the expert is about to render is an opinion that falls

20 within the particular expert's expertise.

21         So when we started out, I cut things off a little bit

22 because it seemed to me that this expert was testifying as to

23 whether seven or eight, in terms of efficiency gap and

24 statistical analysis, is appropriate or inappropriate or what;

25 and I didn't see any evidence that this particular expert had

 1  the expertise to testify as to that particular fact, all right,

 2  so a fact a layperson can testify to.  And, in fact, Jackman

 3  acknowledged that it had been eight or more in the first trial

 4  and now they revised the standard to seven or more for whatever

 5  conclusions or inferences can be drawn.

 6          So you qualify the expert and then with respect to

 7  the individual opinions that are sought with respect to the

 8  expert's testimony, there has to be at least enough foundation

 9  laid so that we, as a core, can make a determination, whether

10  it's now or later, as to what weight should -- first of all,

11  whether the opinion falls within the field and then, second, if

12  so, what weight should be assigned that opinion.

13          So any questions about that, Mr. Strach?

14          JUDGE WYNN:  Let me add to that and join in with

15  Judge Osteen to be clear.  Mr. Trende does have a heightened

16  knowledge and therefore he likely does -- and we likely will

17  find that he is an expert in certain areas.  The other experts

18  are experts.  When it comes down to evaluating their testimony,

19  it will fall upon us to grant a weight to each of their

20  testimony.

21          My purpose of directing the question to Mr. Strach

22  initially was not to restrict the testimony, but to give him a

23  heads up that if he wants this witness testimony to gain the

24  level of weight that I think he wants it to have, at least from

25  my perspective, it would be advisable to lay some more

 1   foundation to do it, not necessarily to get an expert opinion,

 2   but simply for a matter of weight.

 3           So I want to be clear that he may proceed to testify

 4   with an opinion, but it is the weight that is of great

 5   consideration here.  I was simply -- we didn't have to do it.

 6   We just let you testify, but I didn't want you later on to come

 7   back and say, well, we didn't know that the weight wasn't going

 8   to be considered on that level.  I wanted you to have the

 9   opportunity to lay a little bit more foundation or to show why

10   it is his testimony should be given that weight.  But

11   nonetheless, he may still -- if we qualify, which I think we

12   will, as an expert, he may still render an opinion, but then it

13   goes to the weight of it when you compare it with the other

14   testimony.

15           Overall, I think you should be allowed to testify.

16   In other words, don't feel restricted in allowing -- in getting

17   your witness to give the testimony.  Be aware, because I was

18   only giving that as a cautionary perspective, when it comes to

19   our consider -- this is a bench trial, so we're not in the same

20   situation as a jury.  We, as the judges, will take this later

21   on and you're not going to see us.  I don't want to be in a

22   room somewhere and say, well, this didn't have the weight,

23   didn't do that, and you didn't know that's what's going to

24   happen.

25           So that was the reason I asked that question if you

 1 | decide you want to give more foundation.  It wasn't to say, oh,
 2 | no, he can't say it.  He can say it, but I want you to be clear
 3 | that it is a matter of weight and you need more weight to do
 4 | it.
 5 |         Does that make sense to you, where I'm going with
 6 | that?
 7 |         MR. STRACH:  Your Honor, I don't have any questions
 8 | about it.
 9 |         JUDGE WYNN:  Okay.  Well, I mean, I just want to be
10 | clear.  Isn't that -- the state of the law is such that if a
11 | witness is qualified as an expert and you have another expert
12 | testimony -- we have many trials of this sort -- it goes to a
13 | matter of weight.  What I tried to do was give you additional
14 | consideration that if we're going to be looking at -- because
15 | we are looking at weight, I was saying to you, at least from my
16 | concern, that maybe this foundational thing, if you want that
17 | to be looked at.  Not necessary.  That's the only point I'm
18 | making to you.  Do you understand?
19 |         MR. STRACH:  Thank you, Your Honor.
20 |         JUDGE WYNN:  Yes, sir.
21 |         JUDGE OSTEEN:  Do you have anything else to add?
22 |         JUDGE BRITT:  No.
23 |         MS. GREENWOOD:  Your Honor, I would be happy to close
24 | my cross-examination.
25 |         JUDGE OSTEEN:  Well, let me --

1          MS. GREENWOOD:  Let me explain.

2          JUDGE OSTEEN:  Go ahead.  Well, what I was going to

3  suggest is, first, I am loathe to open up rulings of the Court

4  to a question-and-answer period; but if anybody has a question,

5  I'm happy to entertain it now about what was said.  Any

6  questions?  Everybody feel like they understand what the Court

7  was saying?

8          MS. GREENWOOD:  Yes.  Thank you.

9          MR. STRACH:  No questions, Your Honor.

10         JUDGE OSTEEN:  All right.  I don't -- there's a

11  little -- I'm not suggesting you're cutting corners on me a

12  little bit.  Do you have any questions -- I mean, do you

13  understand what we've been talking about here?  Do you want to

14  --

15         MR. STRACH:  I mean, I suppose I understand.  I don't

16  not understand enough to have any questions.  That's about the

17  best way I can put it.

18         JUDGE OSTEEN:  All right.  We're going to move

19  forward.

20         What I propose here is that you go ahead and do your

21  cross-examination.

22         I'll give you a little latitude on redirect to the

23  extent you felt like you misunderstood or you've narrowed your

24  examination unfairly as a result of the first comment.  I'll

25  give you some latitude to reopen if there's some other material

1  you want to cover.

2          And if I give him that latitude, I'll give you that

3  latitude on recross.  All right.

4          MS. GREENWOOD:  Thank you.

5          MR. STRACH:  Thank you, Your Honor.

6          JUDGE OSTEEN:  You may then -- you don't -- if I need

7  to know something, you can tell us; but if I don't, you can

8  just jump back into your cross.

9          MS. GREENWOOD:  Thank you, Your Honor.  I just wanted

10  to raise a question related to the admission of the expert

11  report.

12          JUDGE BRITT:  I can't hear you, young lady.  Can you

13  go back over there and talk into the microphone?

14          MS. GREENWOOD:  I'm so sorry, Your Honor.

15          In this case, we had decided that if an expert

16  testified their expert report could be admitted as testimony,

17  but seeing as the initial examination only covered Part VI of

18  Mr. Trende's report, I would be -- I think that the Court

19  should only admit the qualification section of his report and

20  then Part VI.  If that's the case, then I'm happy to just sit

21  down.

22          JUDGE OSTEEN:  Well, at least in terms of my

23  response -- and I'll consult with these other judges, but --

24  I'm the junior man up here.  I don't mind starting the

25  conversation.

 1          If there's an agreement that a report comes in

 2   between the parties, I'm not going to rule in such a manner as

 3   to undercut that agreement.  So the question, it seems to me,

 4   at this point is what weight are we going to assign to

 5   different parts of the report as we review that report.  So

 6   from my perspective, to the extent the parties have stipulated

 7   that the report comes in, I would let the report come in and

 8   any lack of examination or any cross-examination would then go

 9   to the weight of the report.

10          Now, there may be another -- some additional on that

11   analysis from my perspective in terms of does this opinion

12   match the expert's qualifications, but that takes place in

13   every case regardless of whether it's a report or testimony or

14   anything else.

15          So let me see if these other judges --

16          JUDGE BRITT:  Well, I agree with what you said and

17   particularly the stipulation.  If they stipulated to the

18   admission of a report, it's in.

19          JUDGE OSTEEN:  Do you understand that?  All right.

20          MS. GREENWOOD:  Thank you, Your Honors.  I have no

21   further questions.

22          JUDGE OSTEEN:  All right.  Mr. Strach.

23          MR. STRACH:  Thank you, Your Honor.  Thank you for

24   the clarification.  I will cover some of the other areas of the

25   report, and I certainly understand that if the Court disagrees

 1  with the foundation for the parts that we're going to cover

 2  that that will impact how the Court looks at it, but I do think

 3  it's important at least to get the testimony on the record.

 4              JUDGE OSTEEN:  Understood.

 5              JUDGE WYNN:  What's important is you go ahead and

 6  give as much information as you want.  We've already indicated

 7  how we're going to look at it, but that shouldn't limit in any

 8  way -- you shouldn't feel limited in terms of what you are

 9  being able to present here today.

10              MR. STRACH:  Thank you, Your Honor.

11                       REDIRECT EXAMINATION

12  BY MR. STRACH:

13  Q    Mr. Trende, let's take a look at -- we talked about your

14  first opinion on page 7, so I will not repeat that.

15              JUDGE BRITT:  Page 7 of Exhibit 5101?

16              MR. STRACH:  Yes, Your Honor, that's where we were.

17  BY MR. STRACH:

18  Q    So, Mr. Trende, if you'll now look at page 9, Subheading

19  II says:  "The efficiency gap is not easy to calculate."  Will

20  you just simply tell the Court what your opinion there is and

21  I'll ask any follow-up if I think it's necessary?

22  A    Yes.  So the question is how easy is the efficiency gap

23  actually to calculate and I've seen the claim made that it's

24  very easy to calculate.  I understand Dr. Jackman did it on the

25  stand.  If you have the actual votes, doing the reduced method

 1  is pretty easy.  You just multiply two times the vote share

 2  minus the number of seats and you have your efficiency gap

 3  centered on 50 percent.

 4           When you have -- when you're doing the full version,

 5  which is what Dr. Jackman utilizes here -- and to emphasize, I

 6  stayed as far away from Dr. Chen's report and Dr. Jackman's

 7  report as I could.  There's not a lot -- you're absolutely

 8  right.  There's not a lot of clash between us.  I'm looking at

 9  it from just a different angle than Dr. Jackman is, the

10  practical impact of it.  So I don't have opinions -- or offer

11  opinions on whether it should be seven seats or eight seats or

12  whether we should use the full or the reduced or whether you

13  should use seats or percentages.  I just in my report look at

14  the practical implications of it.

15           Anyway, so if you have all the votes, the efficiency

16  gap -- in an Excel spreadsheet, you can calculate it pretty

17  easily with a little bit of practice.  In an R -- if you use a

18  programming language like R, you can calculate it immediately.

19  The problem is a lot of times you have these missing data.  You

20  have elections that aren't contested and you have to figure out

21  a way to do it.

22           Now, I read the Stephanopoulos and McGhee article,

23  and the suggestion there was you can use -- there's a range of

24  options you can use ranging from the type of very sophisticated

25  modeling that Dr. Jackman is doing to looking at old

 1  congressional results and picking a result that you think is

 2  reasonable, but those choices you make have impacts on how the

 3  efficiency gap turns out and things like --

 4          MS. GREENWOOD:  Your Honor, I would like to object to

 5  the extent the witness is offering an opinion about which

 6  method of imputation is better.  I think that's beyond what

 7  he's been qualified for.  I'm happy for that to --

 8          JUDGE WYNN:  Just bring it out on cross-examination.

 9          MS. GREENWOOD:  Thank you.  I will.

10          JUDGE BRITT:  You may resume.

11          THE WITNESS:  Thank you, Your Honor.

12          I don't know which one is better, but I do know that

13  there is substantial differences in ease of execution in these

14  different models.  So if you have a year where there aren't --

15  where there are a lot of uncontested elections, you're going to

16  have to figure out how you're going to account for these and

17  the ways for doing those are not something that you can do with

18  just a pen and paper.

19  BY MR. STRACH:

20  Q    And, Mr. Trende, do you have qualifications and experience

21  that you believe are sufficient to allow you to -- not give an

22  opinion on which one is a better way of doing it, but to

23  identify the fact that there are differences?

24  A    Yes, I mean, it's -- the Stephanopoulos and McGhee article

25  is a Law Review article; and having taken a lot of statistics

1  courses, I have at least a fundamental understanding of how

2  numbers in statistics work.

3          Now, I'll admit up front I can't offer critique of

4  Bayesian hierarchical modeling using Markov Chain Monte Carlo

5  runs with 25,000 burn-in iterations and 150,000 iterations,

6  saving every 30th iteration, like Dr. Jackman does.  I can't

7  say whether that is a good method or a bad method and don't

8  purport to.

9          I just want -- like I said, I saw a couple times the

10 efficiency gap is easy to calculate and that is true at a

11 superficial level if you have all the data.  If you don't have

12 the data, I just wanted it to be up front that this is kind of

13 what's involved with calculating the efficiency gap at that

14 point.  It's not something you can do with a pen and paper,

15 unless you just pick a number.

16 Q   All right.  Let's turn to page 14 of your report.

17 Mr. Trende, do you have any knowledge or experience in your

18 background regarding systems of government that are of a

19 proportional representation nature?

20 A   Certainly.  It's something you encounter in the basic

21 political science course, a course in comparative politics like

22 I took in undergrad.  It's something you encounter as an

23 elections analyst following elections across the world.  You at

24 least become aware of proportional representation and how it

25 works.

1            Now, I would not purport to be a specific example in

2  what the cutoff is in Germany, for example.  I don't know that.

3  What I do know -- or Israel.  What I do know is that different

4  countries that follow proportional representation have a cutoff

5  that you have to come across -- above that threshold; and that

6  generally once you cross that threshold, you rescale it and the

7  seats are awarded on a percentage-to-seats basis.

8  Q    And have you done any work or analyzed proportional

9  representation systems in other countries as part of your work

10  with RealClearPolitics?

11  A    Well, again, at a very basic level.  I mean, I agree

12  this -- it's so common knowledge it could almost be lay

13  testimony that this is how a proportional representation system

14  works.  You cross a threshold and you get your seats awarded

15  past that threshold on relationship of seats to votes.  That's

16  kind of the capital proportional, capital representation

17  method.

18  Q    What are you trying to -- what opinion are you giving with

19  the figure on page 14 of your report?

20  A    So I say the efficiency gap is proportional representation

21  for first-past-the-post system.  Now, what a

22  first-past-the-post system is is basically what we have here in

23  America.  The votes are cabined in by congressional districts;

24  and if you get a plurality or, in a state that has a runoff,

25  the majority of the vote, you win that district.

1          And so the practical effect of the efficiency gap is

2   to tie the number of seats you can get awarded to the number of

3   votes you can get awarded.  It's just -- instead of a

4   one-to-one -- roughly one-to-one relationship like you would

5   get in a pure proportional representation, the proportion is

6   two-to-one.  And this is taken from Dr. McGhee's initial

7   article in *Legislative Studies Quarterly* on the efficiency gap

8   and I believe -- I'm not -- it's from the McGhee article.  Oh,

9   and from the Stephanopoulos and McGhee article as well that

10  when a party -- it's set up to waste equal number of votes.

11         And so the effect of this is that you do not get

12  proportional representation, capital P, capital R, where it's a

13  roughly one-to-one relationship like you would get in some of

14  these parliamentary democracies, but you do have it as a

15  two-to-one relationship, which is still a proportion.

16         MR. STRACH:  Thank you, Mr. Trende.

17         Your Honor, that's all I have.

18         JUDGE OSTEEN:  All right.  Cross-examination?

19                    RECROSS-EXAMINATION

20  BY MS. GREENWOOD:

21  Q    Hello again, Mr. Trende.

22  A    Hello again.

23  Q    You said that you have expertise here -- sorry -- that

24  your expertise here is in the practical application of the

25  efficiency gap, is that right?

1  A    That's correct.  Well, I think the practical application

2  of the efficiency gap falls within my generalized expertise.

3  Q    Yes.  Thank you.  And so you're not an expert then in the

4  statistical properties of the efficiency gap, is that right?

5  A    I understand how the efficiency gap works statistically.

6  As far as giving an opinion like Dr. Jackman should have done

7  seven seats versus eight seats or whatever, no, I don't think I

8  can do that and wouldn't purport to.

9  Q    And then just a few other areas that Dr. Jackman looks at.

10 He looks at calculating a threshold, but would you agree that's

11 a technical area that doesn't fall within your general

12 expertise?

13 A    I mean, I understand how Dr. Jackman calculated his

14 threshold and I understand the regression analysis behind it.

15 Whether or not he should have done one seats or two seats, I'm

16 not sure there is an answer to that question, but I don't in my

17 report question the fact that he did it.  I just wanted to

18 point out the fact that he made that choice, that instead of

19 doing -- basing regression analysis on two seats, which is what

20 the Stephanopoulos and McGhee article puts forth, he bases his

21 regression analysis on a half seat or one seat.

22 Q    Right.  But you're not offering any opinions on the

23 technical aspect of the method that he used to calculate the

24 threshold?

25 A    No.  I'm just pointing out that there are these different

1  choices that could be made.

2  Q    Right.  And then another area that Dr. Jackman's analysis

3  included is imputations for uncontested elections, but that's

4  also a technical statistical expertise that doesn't fall within

5  your general area of expertise, is that right?

6  A    So initially I did kind of a sanity check on his results

7  to see if they produced sensible results, kind of like I did in

8  the main portion of my presentation, and found out that there

9  were some imputations that produced negative results.  I think

10 that's something I can do.  I think anyone can do that.  He

11 fixed it in a subsequent article.

12          But as far as criticizing the application of Bayesian

13 hierarchical modeling, no, I would not do that, aside from to

14 point out that in previous articles it's not like that's how

15 you have to do it, at least as suggested in the Stephanopoulos

16 and McGhee article.  There's a wide range of things that they

17 say you can do.

18 Q    Thank you.  And then with Dr. Jackman's pertubation and

19 sensitivity testing, that's also a technical area that falls

20 outside of your general expertise, is that right?

21 A    Again, I know what he's doing.  I can read a pertubation,

22 but I don't take issue with his perturbations in my report.

23 Q    Right.  And can I just confirm that at the end there you

24 were saying that proportional representation has a one-to-one

25 relationship and the efficiency gap doesn't have a one-to-one

1  relationship between seats and votes?

2  A    So I tried to distinguish between capital P, capital R

3  representation.  You're still putting the votes to seats in a

4  proportion.  It's a two-to-one portion rather than a one-to-one

5  proportion, so -- but it's not proportional representation as

6  people refer to it when they're talking about parliamentary

7  democracies.

8             MS. GREENWOOD:  Thank you.  No further questions.

9             JUDGE OSTEEN:  Anything in response to that?

10            MR. STRACH:  Nothing, Your Honor.  Thank you.

11            JUDGE OSTEEN:  Thank you, sir.  You may step down.

12            (At 11:57 a.m., witness excused.)

13            THE COURT:  Where does that leave us for today?  Are

14 we finished for today?

15            MR. STRACH:  Our witness won't be available until

16 tomorrow morning, as we identified, and we'll just be subject

17 to what Plaintiffs want to do about their rebuttal.

18            JUDGE OSTEEN:  That's right.

19            MS. EARLS:  Your Honor, we do not need to call a

20 rebuttal witness at this time.

21            JUDGE OSTEEN:  All right.  Yes, sir.  You've been

22 quiet over there, Mr. Speas.

23            MR. SPEAS:  I have.

24            JUDGE OSTEEN:  I'm glad to see you rise to speak.

25            MR. SPEAS:  Thank you, Your Honor.  I believe I speak

 1  for all the counsel when I say we want to be able to answer

 2  your questions tomorrow crisply and clearly; and if there's any

 3  guidance that the Court might have for the parties as they try

 4  to get ready for the oral arguments tomorrow, we would

 5  appreciate it.

 6          JUDGE OSTEEN:  All right.  Well, I prefer the

 7  sandbagging method myself.  It looks like I'm not alone in

 8  that, Mr. Speas.  We appreciate your invitation greatly, but we

 9  decline it respectfully.

10          All right.  We'll be in recess -- what time -- is

11  your witness getting here sometime today?  Is 8:30 too early?

12          MR. STRACH:  We can do 8:30, Your Honor.

13          JUDGE OSTEEN:  All right.  Is everybody good with

14  8:30?

15          MS. GREENWOOD:  That's fine with us.  Thank you.

16          JUDGE OSTEEN:  Then we'll start tomorrow morning at

17  8:30 and hear the last of the testimony, and then I think I

18  said yesterday a couple hours.  I'm not suggesting you should

19  take it all if you don't need it.

20          But anything on time you want to talk about?

21          JUDGE BRITT:  Only that we're going to get through

22  tomorrow.

23          JUDGE OSTEEN:  That's it.  We'll see you tomorrow

24  morning at 8:30.

25          (At 11:59 a.m., proceedings adjourned.)

1                          * * * * *

2                    C E R T I F I C A T E

3        I certify that the foregoing is a correct transcript
         from the proceedings in the above-entitled matter.

4

5                          _Joseph B. Armstrong_
                           _____
6        Date: 10/23/2017    Joseph B. Armstrong, RMR, FCRR
                             United States Court Reporter
7                            324 W. Market Street
                             Greensboro, NC  27401

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25