**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting, *et al.*, <br><br> Defendants. | CIVIL ACTION NO. 1:16-CV-1164 <br><br> THREE-JUDGE COURT |

**LEAGUE OF WOMEN VOTERS PLAINTIFFS' POST-TRIAL BRIEF**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

I.      STANDING. ............................................................................................. 3

II.     DISCRIMINATORY INTENT. .............................................................. 5

        A.      "Predominant" or "Sole" Partisan Intent Is Not Required......................... 5

        B.      Plaintiffs Presented Overwhelming Evidence of Discriminatory Intent .... 7

        C.      Defendants' Objections Are Meritless........................................................ 8

III.    DISCRIMINATORY EFFECT ........................................................... 10

        A.      Supreme Court Precedent Requires a Large and Durable Partisan Asymmetry ............................................................................................... 10

B.    Plaintiffs Presented Overwhelming Evidence of Discriminatory Effect .... 12

C.    Defendants' Objections Are Meritless........................................................ 17

IV.    JUSTIFICATION ................................................................................................ 21

A.    Supreme Court Precedent Requires a Justification Inquiry ....................... 21

B.    Plaintiffs Presented Overwhelming Evidence of Unjustifiability ............. 22

C.    Defendants' Objections Are Meritless........................................................ 25

CONCLUSION .......................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bethune-Hill v. Va. State Bd. of Elections,*
137 S. Ct. 788 (2017) ............................................................9

*Brown v. Thomson,*
462 U.S. 835 (1983) ..................................................... 21,22

*Davis v. Bandemer,*
478 U.S. 109 (1986)....................................................*passim*

*Easley v. Cromartie,*
532 U.S. 234 (2001)......................................................... 10

*Gaffney v. Cummings,*
412 U.S. 735 (1973)........................................................... 6

*Karcher v. Daggett,*
462 U.S. 725 (1983) ...............................................6, 22, 26

*Larios v. Perdue,*
306 F. Supp. 2d 1190 (N.D. Ga. 2003) ............................. 4

*LULAC v. Perry,*
548 U.S. 399 (2006) ............................................... 6, 10, 12

*Miller v Johnson,*
515 U.S. 900 ..................................................................... 11

*Pope v. Cty. of Albany,*
No. 11-cv-0736, 2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) ........................................4

*Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections,*
827 F.3d 333 (4th Cir. 2016) ...........................................23

*United States v. Hays,*
515 U.S. 737 (1995) ........................................................... 4

*Vieth v. Jubelirer,*
541 U.S. 267 (2004)..................................................*passim*

iii

**Cases**                                                                   **Page(s)**

*Village of Arlington Heights v. Metro Hous. Dev. Corp.*,
429 U.S. 252 (1977)............................................................................................5

*Voinovich v. Quilter*,
507 U.S. 146 (1993)..........................................................................................22

*Whitford v. Gill*,
218 F. Supp. 3d 837 (W.D. Wis. 2016) ...................................................*passim*

*Whitford v. Nichol*,
151 F. Supp. 3d 918 (W.D. Wis. 2015) ..........................................................18

## INTRODUCTION

At trial, all of Plaintiffs' claims about North Carolina's current Congressional plan (the "2016 Plan") were borne out. The evidence confirmed what Defendants had already conceded: that "in adopting the Plan, the General Assembly *intended* to favor Republican voters and disadvantage voters who voted for non-Republican candidates." Dkt. 50:7 (emphasis added). The evidence also thoroughly documented the Plan's discriminatory *effect*: an extraordinarily large and durable pro-Republican partisan asymmetry. The evidence showed as well that this asymmetry cannot be *justified* by North Carolina's political geography or legitimate redistricting objectives. As for Defendants' counterarguments, they were unable to survive scrutiny.

Starting with discriminatory intent, there is no dispute that under the Adopted Criteria for the 2016 Plan, the "Partisan Advantage" factor required a congressional delegation with "10 Republicans and 3 Democrats." PFOF 68. Nor is there any disagreement about the boast of Rep. David Lewis, the Co-Chair of the 2016 Joint Select Committee on Congressional Redistricting (the "Committee"), that "this would be a political gerrymander." PFOF 73. At trial, Defendants' only response to these damning facts was that Plaintiffs are "blowing them up" and "ignoring all the other criteria." Tr.IV 169:5-9.[1] But admissions that a law was enacted to disadvantage a particular party—not

---

[1] The Roman numeral in citations to the trial transcript indicates the day of trial.

1

to promote the public welfare—*should* be highlighted. They should also be condemned by the courts.

Next, with respect to discriminatory effect, Professor Simon Jackman testified that social scientists use several metrics to assess the partisan asymmetry of a district map. All of these metrics agree that the 2016 Plan exhibited a nearly unprecedented asymmetry in the 2016 election. Its efficiency gap was the largest in the country in 2016, and its partisan bias was the second-largest *since 1972*. Prof. Jackman also explained that social scientists use sensitivity testing to evaluate the durability of a map's asymmetry. This testing shows that the Plan's asymmetry would persist under all plausible electoral conditions. At trial, Defendants did not criticize any of these analyses. Their only riposte was that the efficiency gap allegedly has limitations in states other than North Carolina—a claim that is both irrelevant and wrong.

Lastly, with respect to justification, Professor Jowei Chen testified about his thousands of district map simulations. All of these simulations were based on the spatial patterns of North Carolina's voters. All of the simulations also used as criteria the very factors (other than partisan advantage) relied on by the 2016 Plan's authors. Yet *not one* of Prof. Chen's simulated maps had an efficiency gap as large as the Plan, and the typical simulated map had an efficiency gap of *zero*. At trial, Defendants did not challenge any of Prof. Chen's methods. Instead, they concocted a series of additional criteria that, in their view, Prof. Chen should have used. Missing from this post hoc list, though, was any

evidence that the newly devised factors could possibly have led to the Plan's enormous asymmetry.

The Court should therefore hold that Plaintiffs' proposed test—requiring (1) discriminatory intent, (2) a large and durable discriminatory effect, and (3) a lack of a legitimate justification for this effect—is justiciable under the First and Fourteenth Amendments. The Court should also hold that the 2016 Plan is unconstitutional under this test.

## I.     STANDING

Before discussing the three prongs of Plaintiffs' test, it is necessary to establish Plaintiffs' standing. In a partisan gerrymandering challenge to a statewide district plan, voters who support the candidates and policies of the disadvantaged party have standing. These voters' electoral influence is intentionally diluted because of their political beliefs. As a result, they are not "able to translate their votes into seats as effectively" as the favored party's supporters, and they "suffer[] a personal injury . . . that is both concrete and particularized." *Whitford v. Gill*, 218 F. Supp. 3d 837, 928 (W.D. Wis. 2016) (*Whitford II*). Moreover, "there can be no dispute that a causal connection exists between [the plan] and the plaintiffs' inability to translate their votes into seats as efficiently," and that if a symmetric plan were adopted, it "would redress the constitutional violation." *Id.*

Under this approach, standing works the same way in partisan gerrymandering cases as it does in other vote dilution proceedings. In a one-person, one-vote suit, for example, the constitutional injury is the vote dilution caused by district overpopulation.

3

Accordingly, "any underrepresented plaintiff may challenge *in its entirety* the redistricting plan that generated his harm." *Larios v. Perdue*, 306 F. Supp. 2d 1190, 1209 (N.D. Ga. 2003). In a suit under Section 2 of the Voting Rights Act, similarly, the usual injury is that minority voters in a certain region have been denied an equal opportunity to elect the representatives of their choice. Thus, minority voters who "reside in a[n] . . . area that could support additional [majority-minority districts]" have standing to sue. *Pope v. Cty. of Albany*, No. 11-cv-0736, 2014 WL 316703, at *5 (N.D.N.Y. Jan. 28, 2014).

It is true that standing in partisan gerrymandering cases does not work the same way as in racial gerrymandering cases. But partisan and racial gerrymandering have nothing in common except an evocative word. Partisan gerrymandering is "intentional vote dilution," *Vieth v. Jubelirer*, 541 U.S. 267, 298 (2004) (plurality opinion)—a "burden[] . . . on the representational rights of voters and parties," *id.* at 313 (Kennedy, J., concurring in the judgment). In contrast, racial gerrymandering is the "racial classification" of voters, regardless of whether their votes are diluted or even enhanced. *United States v. Hays*, 515 U.S. 737, 744 (1995). This is why "[t]he rationale and holding of *Hays* have no application here." *Whitford II*, 218 F. Supp. 3d at 929. Vote dilution is simply unrelated to racial classification.

In any event, Plaintiffs have standing here on any theory. Individual Plaintiffs like Carol Faulkner-Fox and Aaron Sarver are committed Democrats who support, and work toward, the election of Democratic candidates throughout North Carolina. PFOF 2, 5-6,

4

17. The League of Women Voters of North Carolina is a statewide organization whose pursuit of civic engagement and nonpartisan redistricting reform is handicapped by the 2016 Plan. PFOF 3-4, 18-19. And even if an individual plaintiff is needed in each congressional district, the parties have stipulated that the League "has individual members who are registered Democrats living in each of North Carolina's thirteen congressional districts." PFOF 4. "Each of those registered Democrats support and vote for Democratic candidates and have an interest in furthering policies at the national level that are consistent with the Democratic Party Platform." *Id.*

## II.    DISCRIMINATORY INTENT

### A.    "Predominant" or "Sole" Partisan Intent Is Not Required.

Turning to the merits of Plaintiffs' proposed test, its first prong is *discriminatory intent*: the enactment of a district plan with the aim of disadvantaging one party's (and favoring the other party's) voters and candidates. Several legal points about this prong are worth noting. *First*, the prong is derived from foundational First and Fourteenth Amendment principles. The First Amendment prohibits "burdening or penalizing citizens because of . . . their voting history [or] their association with a political party." *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment). Likewise, under the Fourteenth Amendment, "[p]roof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

5

*Second*, Supreme Court precedent bars formulations that call for "predominant" or "sole" partisan intent to be shown. In *Vieth*, both the appellants and Justice Stevens advocated a predominance requirement. The plurality (joined here by Justice Kennedy) explicitly rejected this idea, observing that a "'predominant motivation' test" is too "[v]ague" and "indeterminate." *Vieth*, 541 U.S. at 284-85 (plurality opinion). In *LULAC v. Perry*, the appellants argued that a district plan "solely motivated by partisan objectives" is unlawful. 548 U.S. 399, 416 (2006) (opinion of Kennedy, J.). This proposal fared no better, because "affixing a single label" to "acts arising out of mixed motives" is a "complex" and "daunting" task. *Id.* at 418.

*Third*, only one kind of political motivation—the pursuit of partisan advantage— fails Plaintiffs' discriminatory intent prong. The prong is *not* violated when a state government uses electoral data "fairly to allocate political power to the parties." *Gaffney v. Cummings*, 412 U.S. 735, 754 (1973). Nor is the prong necessarily offended when mapmakers' aim is "making districts compact, respecting municipal boundaries, preserving the cores of prior districts, [or] avoiding contests between incumbent Representatives." *Karcher v. Daggett*, 462 U.S. 725, 740 (1983). "As long as the criteria are nondiscriminatory," they are permissible. *Id.*

And *fourth*, control of the redistricting process is highly probative evidence of discriminatory intent. When a single party draws the lines, "it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." *Davis v. Bandemer*, 478 U.S. 109, 129 (1986) (plurality opinion). Conversely, "a plaintiff

would naturally have a hard time showing requisite intent" when a plan is designed by a court, a commission, or a divided state government. *Vieth*, 541 U.S. at 351 (Souter, J., dissenting). Since 1972, about *half* of all congressional maps have been crafted by an institution other than a unified state government. PFOF 241. Plaintiffs' discriminatory intent prong therefore does "meaningful" work because it insulates the bulk of these plans from liability. Tr.II 145:15-18 (Osteen, J.).

## B.     Plaintiffs Presented Overwhelming Evidence of Discriminatory Intent.

The evidence of discriminatory intent in the record is overwhelming and uncontested. Plaintiffs thus summarize it quickly before responding to Defendants' counterarguments. With respect to the North Carolina congressional plan adopted in July 2011 (the "2011 Plan"), its architect, Dr. Thomas Hofeller, wrote in an expert report that "[p]olitics was the primary policy determinant in the drafting of the . . . Plan." PFOF 32. He added that "[t]he General Assembly's overarching goal in 2011 was to create as many safe [or] competitive districts for Republican candidates or potential candidates as possible." PFOF 33-34.

With respect to the 2016 Plan, its "Partisan Advantage" criterion expressly required "[t]he partisan makeup of the congressional delegation" to be "10 Republicans and 3 Democrats." PFOF 68. Its "Political Data" criterion elaborated that, "other than population data," only "election results in statewide contests" would "be used to construct congressional districts." PFOF 67. These criteria were approved by the Committee on party-line votes. PFOF 69. The General Assembly subsequently did not

7

"add" to, or subtract from, these criteria or any others. Tr.II 155:9-12 (Wynn, J.). To the contrary, the *only* change made to the Plan after the Adopted Criteria's adoption was a tweak to a single district boundary to avoid an incumbent pairing. PFOF 58, 89.

At each meeting of the Committee, Lewis confirmed that the 2016 Plan sought a Republican advantage. He "acknowledge[d] freely that this would be a political gerrymander." PFOF 73. He "propose[d] that we draw the maps to give a partisan advantage to 10 Republicans and 3 Democrats because I do not believe it's possible to draw a map with 11 Republicans and 2 Democrats." PFOF 75. And he "ma[d]e clear that we to the extent are going to use political data in drawing the map, it is to gain partisan advantage." PFOF 77. Lewis's deposition testimony, like that of Hofeller and of the Committee's other co-chair, Sen. Bob Rucho, was consistent with Lewis's public statements. PFOF 242.

The Committee approved the 2016 Plan on a party-line vote on February 17, 2016. PFOF 85. Votes by the full House and Senate followed on February 19, in which every Democrat opposed the Plan and every Republican (but one) supported it. PFOF 99.

## C.    Defendants' Objections Are Meritless.

Defendants do not deny that the 2016 Plan was enacted with discriminatory intent. Instead, they contend that partisan advantage did not *predominate* over other redistricting goals. Tr.I 17:18-14. Even if this were true, it is legally irrelevant. As discussed above, five Justices rejected a predominance requirement in *Vieth*, deeming it judicially

8

unmanageable. It thus suffices for purposes of Plaintiffs' first prong if partisan gain was *a* motivation for the Plan. It need not be compared to, or weighed against, any other aim.

Defendants also assert that the 2016 Plan is immune from scrutiny because its authors intended to comply with traditional redistricting criteria. Tr.II 25:15-29:7. Again, even if this claim were accurate, it is legally immaterial. In *Vieth*, Justice Souter proposed a test requiring a plaintiff to show that districts "paid little or no heed to . . . traditional districting principles." 541 U.S. at 348 (Souter, J., dissenting). A majority of the Supreme Court rebuffed this suggestion. The plurality asked, "*How much* disregard of traditional districting principles," *id.* at 296 (plurality opinion), while Justice Kennedy observed that these criteria are not "sound as independent judicial standards" because "[t]hey cannot promise political neutrality," *id.* at 308 (Kennedy, J., concurring in the judgment).

*Vieth* is consistent with the Court's earlier decision in *Bandemer*, where Justice Powell emphasized "the shapes of voting districts and adherence to established political subdivision boundaries." 478 U.S. at 173 (Powell, J., concurring in part and dissenting in part). The plurality "disagree[d] with [Justice Powell's] conception of a constitutional violation" because noncompliance with traditional criteria does "not show any actual disadvantage beyond that shown by the election results." *Id.* at 138-40 (plurality opinion). *Vieth* is also consistent with the Court's racial gerrymandering cases, which have made clear that "inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). Under all of these precedents, "compliance with traditional districting

9

principles" is simply not a "'safe harbor' for state legislatures." *Whitford II*, 218 F. Supp. 3d at 888.

Lastly, defendants invoke *Easley v. Cromartie*, 532 U.S. 234 (2001), where the Court concluded that politics, not race, was the predominant motivation for an earlier iteration of North Carolina's Twelfth District. Tr.II 114:19-115:1. Defendants' reliance on *Cromartie* is odd because it did not involve a partisan gerrymandering challenge. That the Twelfth District was not an unconstitutional *racial* gerrymander says nothing about whether it (or the map to which it belonged) may have been an unlawful *partisan* gerrymander.

### III. DISCRIMINATORY EFFECT

### A. Supreme Court Precedent Requires a Large and Durable Partisan Asymmetry.

The second prong of Plaintiffs' proposed test is *discriminatory effect*: whether a district plan exhibits a large and durable partisan asymmetry. Five Justices expressed interest in partisan symmetry—the symmetric treatment of the parties' voters, allowing their ballots to translate into representation with equal ease—in *LULAC*. Justice Stevens, for instance, noted that symmetry is "widely accepted by scholars as providing a measure of fairness in electoral systems." 548 U.S. at 466 (Stevens, J., concurring in part and dissenting in part). Justice Kennedy, similarly, did not "discount[] its utility in redistricting planning and litigation." *Id.* at 420 (opinion of Kennedy, J.).

A discriminatory effect prong is required under both the First and Fourteenth Amendments. Under the First Amendment, "a successful claim . . . must do what [an

10

intent-only] theory explicitly disavows: show a burden, as measured by a reliable standard, on the complainants' representational rights." *Id.* at 418; *see also Vieth*, 541 U.S. at 315 (Kennedy, J., concurring in the judgment) ("The [First Amendment] inquiry is not whether political classifications were used. The inquiry instead is whether political classifications were used to burden a group's representational rights."). Likewise, "in order to establish a partisan gerrymandering claim under the Equal Protection Clause, a plaintiff must show both (a) discriminatory intent and (b) discriminatory effects." Dkt. 50:21.

The doctrinal consensus that a discriminatory effect prong is necessary has a good practical explanation. A ruling that "all election district lines drawn for partisan reasons" are unconstitutional "would commit federal and state courts to unprecedented intervention in the American political process." *Vieth*, 541 U.S. at 306 (Kennedy, J., concurring in the judgment). After all, parties in full control of redistricting typically use electoral data and seek partisan advantage. If all of these efforts are unlawful, this would "throw into doubt the vast majority of the Nation's 435 congressional districts." *Miller v Johnson*, 515 U.S. 900 at 928 (O'Connor, J., concurring).

The doctrinal consensus extends not just to the size of a plan's discriminatory effect but also to its persistence. The *Bandemer* plurality made a durable disadvantage an explicit element of its test: whether a plan "will *consistently* degrade . . . a group of voters' influence," resulting in the "*continued* frustration of the will . . . of the voters." 478 U.S. at 132-33 (plurality opinion) (emphasis added). Analogously, both Justice

11

Breyer's opinion in *Vieth* and Justice Kennedy's in *LULAC* stressed the harm of entrenchment. *See LULAC*, 548 U.S. at 419 (opinion of Kennedy, J.) (criticizing a plan that "entrenched a party on the verge of minority status"); *Vieth*, 541 U.S. at 360 (Breyer, J., dissenting) (condemning the "use of political factors to entrench a minority").

**B.     Plaintiffs Presented Overwhelming Evidence of Discriminatory Effect.**

At trial, Prof. Jackman testified that social scientists use several metrics to assess the partisan asymmetry of a district plan. The *efficiency gap* is the difference between the parties' respective "wasted votes" (ballots that do not contribute to a candidate's election), divided by the total number of votes cast. PFOF 139. *Partisan bias* is the difference between a party's seat share and 50% in a hypothetical tied election. PFOF 141. And the *mean-median difference* subtracts a party's median vote share, across a plan's districts, from its mean vote share. PFOF 143. All of these metrics generally point in the same direction in competitive states like North Carolina. PFOF 157, 182. But in uncompetitive states, where one party is much more popular, partisan bias and the mean-median difference are unreliable and should not be used. PFOF 158.

Prof. Jackman also testified that both the 2011 Plan and the 2016 Plan exhibited enormous, nearly unprecedented, pro-Republican partisan asymmetries. North Carolina recorded efficiency gaps of -21%, -21%, and -19% in 2012, 2014, and 2016. PFOF 185-186. The 2011 Plan had the largest average efficiency gap of *any* of the 136 maps, spanning the 1972-2016 period, in Prof. Jackman's database. PFOF 188. The 2016 Plan had the largest efficiency gap in the country in the 2016 election. PFOF 189. As the

12

below chart indicates, both maps are stark outliers, with efficiency gaps far above Prof. Jackman's suggested 12% threshold. PFOF 187.



Figure 6: Histogram of efficiency gap estimates in 512 elections, 1972-2016. The three vertical lines indicate where North Carolina's three most recent elections lie in the distribution of efficiency gap scores.

North Carolina also registered partisan biases of -27%, -27%, and -27%, and mean-median differences of -8%, -7%, and -5%, in 2012, 2014, and 2016. PFOF 185-186. These scores too are extraordinarily severe. The partisan biases, for example, are the second-largest since 1972, roughly three standard deviations from the historical mean. PFOF 190. Thus no matter how they are evaluated, the 2011 Plan and the 2016 Plan are extremely, almost uniquely, asymmetric.

Record evidence reveals how this huge Republican advantage was achieved. Throughout North Carolina, clusters of Democratic voters were either sliced in two or enclosed within a single district. Democrats, that is, were systematically cracked and packed while Republicans were allocated more efficiently across the State's districts. The

13

first map below shows the fate of Greensboro under the 2016 Plan. A Democratic cluster large enough to anchor a district is split down the middle, and each half of the city is submerged in a safely Republican district. PFOF 128. The second map below depicts the Charlotte metropolitan area. A Democratic cluster that could yield two Democratic districts is instead circumscribed in one highly uncompetitive district. PFOF 129; *see also* PFOF 127 (cracking of Asheville); PFOF 131 (cracking of Fayetteville); PFOF 130 (packing of Raleigh).



Case 1:16-cv-01026-WO-JEP   Document 113   Filed 11/06/17   Page 18 of 34



**Mecklenburg County**

PLAINTIFFS' EXHIBIT 4070 1:16-CV-1164

Prof. Jackman further testified about the durability of large efficiency gaps, both specifically as to the 2016 Plan and generally based on his database of congressional maps. For the Plan, he conducted rigorous sensitivity testing, swinging the 2016 election results by up to ten points in each party's direction and then recalculating the Plan's efficiency gap for each incremental shift. PFOF 193-194. As illustrated below, this testing indicated that it would take a six-point pro-Democratic swing for Democrats to capture just one more seat. For the Plan's efficiency gap to disappear, Democrats would have to improve on their 2016 showing by *nine* points—a wave whose only precedent is the Watergate election of 1974. PFOF 195-196. The Plan's pro-Republican asymmetry is

15

thus nearly impervious to any effort by voters "to vote the rascals out at the next election." Tr.II 108:16-17 (Osteen, J.).

For his entire database, Prof. Jackman examined how maps' *initial* efficiency gaps are related to their *average* efficiency gaps over the rest of their lifetimes. This link is quite strong, meaning that a plan that is highly asymmetric in its first election can be expected to remain asymmetric in the future. PFOF 167. Prof. Jackman also carried out a series of prognostic tests for the efficiency gap. Notably, the rate of "false positives"— maps with large initial efficiency gaps but small remainder-of-plan average efficiency gaps—approaches zero near his suggested 12% threshold. PFOF 168-169. And Prof. Jackman performed sensitivity testing for all plans used in this redistricting cycle. This testing confirms that maps with large efficiency gaps would remain skewed even if the electoral environment changed substantially. PFOF 170-172.



Figure 21: North Carolina efficiency gap scores generated by perturbing the actual 2016 result by varying degrees of uniform swing. The red square indicates the observed efficiency gap for North Carolina in 2016. Tick marks on the horizontal axis indicate swings in North Carolina Congressional elections 1972-2016.

16

### C. Defendants' Objections Are Meritless.

Defendants' experts do not dispute the accuracy of Prof. Jackman's calculations or analyses. They concede, in other words, that the 2016 Plan exhibited an exceptionally large partisan asymmetry in the 2016 election, and that based on sensitivity testing, this asymmetry will likely endure for the rest of the decade. Ex. 5101 at 80. These admissions confirm that the Plan fails the discriminatory effect prong of Plaintiffs' test.

Instead of contesting whether the prong is satisfied, Defendants offer a scattershot series of counterarguments. Plaintiffs group these claims into three categories, involving: (1) the foreseeability of elections; (2) assertions that apply to all measures of partisan asymmetry; and (3) points relevant to the efficiency gap alone. Defendants' main contention in the first category is that the partisan implications of the 2016 Plan are unknowable. The Plan may have produced a 10-3 Republican advantage in 2016, but past performance does not guarantee future results. Tr.IV 181:13-18.

This assertion ignores Prof. Jackman's sensitivity testing, which establishes that the 2016 Plan's skew would persist under all plausible electoral conditions. PFOF 195-196. Defendants' agnosticism is also at odds with every analysis of the Plan in the record. Whether the Plan is assessed using congressional election results, Hofeller's sets of seven and twenty prior elections, Prof. M.V. Hood III's set of ten prior elections, or Prof. Chen's predictive regression model, the outcome is always the same: a 10-3 Republican edge. PFOF 180. Nor is Defendants' doubt shared by Hofeller, the Plan's own author. He

17

testified that "past election results are the best . . . indicator of what future results may be." PFOF 112.

Turning to the second category, Defendants argue that measures of partisan asymmetry are tantamount to requirements of proportional representation. Tr.III 66:18-67:15; Tr.II 33:10-18. As Defendants' own experts conceded, they are not. PFOF 146. Indeed, the metrics were created in the first place to quantify partisan unfairness in single-member-district systems that do *not* typically produce "equal representation in government [for] equivalently sized groups." *Vieth*, 541 U.S. at 288 (plurality opinion). The efficiency gap, for instance, compares the parties' respective wasted votes in an election. It does not compare their statewide seat and vote shares, meaning that "an election's results may have a small efficiency gap without being proportional or they may be proportional and still have a large efficiency gap." *Whitford v. Nichol*, 151 F. Supp. 3d 918, 929-30 (W.D. Wis. 2015) (*Whitford I*). Similarly, a low partisan bias score arises when both parties would win about the same share of seats if they each received the same fraction of the statewide vote. A party's seats can thus be highly disproportionate to its votes—as long as the *other* party's seats would be as disproportionate to *its* votes if the parties' performances flipped. PFOF 147.

Defendants also claim that measures of partisan asymmetry can yield counterintuitive conclusions. Defendants' leading examples are North Carolina's congressional plans in the 1990s and 2000s, which allegedly aimed to benefit Democrats and featured highly noncompact districts, yet were not particularly asymmetric. Tr.II

18

108:11-120:11; Tr.II 177:3-10. But these cases are not actually troubling. If discriminatory effect is a distinct prong of the analysis (as Supreme Court precedent requires), then it is obviously possible for discriminatory *intent* to be shown but for liability not to follow due to the lack of a large and durable partisan asymmetry. This result is not odd at all; in fact, it is what transpired in *Bandemer* itself, where the Court "assumed that there was discriminatory intent," but nevertheless "found that there was insufficient discriminatory effect." 478 U.S. at 141-42 (plurality opinion); *see also Whitford II*, 218 F. Supp. 3d at 908 ("[A] challenge to a map enacted with egregious partisan intent but demonstrating a low [asymmetry] also will fail because the plaintiffs cannot demonstrate the required discriminatory effect.").

Defendants further contend that measures of partisan asymmetry cannot be calculated prospectively. Tr.II 84:20-85:9. As Prof. Jackman explained, of course they can be. *Expected* election results just have to be used for the computation instead of *actual* tallies. PFOF 178. That this analysis is feasible is evidenced by Sen. Robert Clark, who recently worked out efficiency gaps himself, without any expert assistance, for North Carolina's new state legislative plans. *Id.* What Sen. Clark did on his own can also be done by a map's drafters, so that "the outcome is known . . . before the election takes place." Tr.II 173:18-19 (Osteen, J.).

Defendants assert as well that measures of partisan asymmetry do not reflect candidate quality, fundraising, electoral waves, or many other factors. Tr.II 83:21-84:19. Prof. Jackman pointed out why this argument is wrong too. All of his asymmetry scores

19

are based on actual congressional election results—in fact, on 512 elections in 25 states over 44 years. PFOF 165. These actual results are the product of "the rich tapestry of American politics [from] 1972 to 2016," including "incumbents getting into trouble," "well-funded challenges," "[t]he Watergate wave election," "[t]he '94 wave," and so on. *Id.* This entire tapestry is captured by the asymmetry scores.

This leaves only the claims in the third category, involving the efficiency gap alone.[2] Defendants state that the metric has an "error rate" of 33%. Tr.II 168:1. But there are no mistakes in the efficiency gap's calculation. What this figure refers to is the share of district plans that exhibit efficiency gaps above Prof. Jackman's suggested thresholds in their first elections, but that go on to produce average efficiency gaps below his cutoffs over the rest of their lifetimes. Ex. 4002 at 54. Even for this analysis, the correct proportion, for all of the relevant maps rather than a subset, is 18%. *Id.* Put another way, of the seventeen plans that *initially* exhibited large efficiency gaps, fourteen *continued* to do so, on average, as long as they were in effect. *Id.* As for the three maps that did not, their volatility would have been flagged in advance by sensitivity testing. Tr.II 134:9-19.

Defendants also note that Prof. Jackman did not analyze (and so did not recommend efficiency gap thresholds for) congressional maps with six or fewer seats. Tr.II 176:16-19. With its thirteen seats, of course, North Carolina is not part of this group.

---

[2] Two of Defendants' arguments in this category can be addressed summarily: A plan can have a low efficiency gap but be uncompetitive, Tr.II 116:13-117:5, because partisan symmetry and competitiveness are simply different concepts, Tr.II 132:4-20. And if a plan's large initial efficiency gap disappeared in its second election, Tr.II 96:24-97:4, this possibility would have been noted ahead of time by sensitivity testing, Tr.II:134:9-19.

The group also makes up a small proportion (less than 20%) of the House of Representatives. And that Prof. Jackman did not study these delegations here does not mean they cannot be studied. As he explained, in a future case, he could easily focus on small states, tailoring his analysis to their circumstances. Tr.II 56:5-24.

Lastly, Defendants observe that Prof. Jackman's methods differ in some respects from those of earlier scholars who calculated efficiency gaps. Tr.II 92:9-94:23; Tr.II 175:15-21. But these differences are substantively trivial. There is a *98%* correlation between Prof. Jackman's scores and those of the other academics. Ex. 4003 at 17. Additionally, the whole point of social science is that it does not stand still. Unlike the earlier scholars, Prof. Jackman used the more rigorous "full method" to compute his efficiency gaps, included more states in his database, and incorporated durability into his suggested thresholds. Ex. 4003 at 16-17; Tr.II 62:13-67:25, 134:20-135:22. These are technical advances that should be welcomed by the courts.

## IV.    JUSTIFICATION

### A.    Supreme Court Precedent Requires a Justification Inquiry.

The final prong of Plaintiffs' proposed test is *justification*: whether the State can justify a district plan's asymmetry based on the State's political geography or valid redistricting goals. This prong has two doctrinal bases. One is reapportionment law, which relies on an identical inquiry to determine when "larger disparities in population" can be "justified by the State." *Brown v. Thomson*, 462 U.S. 835, 842-43 (1983). Justices' opinions in partisan gerrymandering cases are the other source. They have stressed that

21

"political classifications" are unlawful only if they are "unrelated to any legitimate legislative objective," *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring in the judgment), and that defendants should have a chance "to justify their decision by reference to objectives other than naked partisan advantage," *id.* at 351 (Souter, J., dissenting).

Importantly, the burden of justification is on the State under this approach. This is because, by the time the justification prong is reached, plaintiffs have already "established a prima facie case of discrimination" by proving discriminatory intent and effect. *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993). This burden allocation also reflects the State's greater familiarity with its "consistently applied legislative policies" and greater ability "to show with some specificity that a particular objective required the specific [asymmetry] in its plan." *Karcher*, 462 U.S. at 741.

Importantly as well, it is the map's *asymmetry* that must be justified by the State, not its overall layout. Almost every plan is underpinned by at least some legitimate considerations. But these factors do not save the map unless they actually explain its asymmetry. This is why the Supreme Court's reapportionment cases have referred over and over to the "deviations" or "variations" for which the State must account. *See, e.g.*, *Voinovich*, 507 U.S. at 161-62; *Brown*, 462 U.S. at 842-43; *Karcher*, 462 U.S. at 740-41.

## B. Plaintiffs Presented Overwhelming Evidence of Unjustifiability.

Even though it was their burden to justify the 2016 Plan's asymmetry, Defendants made no effort to do so. Plaintiffs, though, presented three kinds of evidence showing that no legitimate factor can explain the Plan's enormous skew. *First*, Prof. Chen used a

22

simulation technique on which the Fourth Circuit has previously relied, *see Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 344-45 (4th Cir. 2016), to produce three thousand different congressional plans for North Carolina. PFOF 200. All of these maps matched or surpassed the 2016 Plan's performance in terms of the nonpartisan Adopted Criteria. Their districts were "as equal as practicable" in population, "comprised of contiguous territory," and generated without "[d]ata identifying the race of individuals." PFOF 203. Their districts also did at least as good a job "improv[ing] the compactness" and "keep[ing] more counties and VTDs whole." *Id.*

Yet *not one* of the three thousand maps ever resulted in a 10-3 Republican advantage or an efficiency gap as large as the 2016 Plan's. Whether Prof. Chen analyzed the maps' partisan implications using Hofeller's full set of twenty prior elections, Hofeller's seven-election subset, or a predictive regression model, *all* of the maps were more symmetric than the Plan. PFOF 207. In fact, as the below chart illustrates, the maps tilted slightly in a Democratic direction. PFOF 208. Thus far from justifying the Plan's pro-Republican asymmetry, North Carolina's political geography and the nonpartisan Adopted Criteria seem mildly to favor Democrats.



*Second*, Hofeller himself, the architect of the 2016 Plan, created two draft maps that performed as well as the Plan in terms of traditional criteria but were far less skewed. Both of these drafts were more compact, on average, than the Plan. PFOF 235. The "ST-B" map divided three fewer counties than the Plan; the "17A" map divided two more. *Id.* But using Hofeller's own set of twenty prior elections, both drafts yielded seven Republican seats and six Democratic seats. *Id.*

And *third*, during the 2000s, North Carolina's congressional plan had an average efficiency gap of just 2%, or very close to perfect symmetry. PFOF 236. This plan also complied with all federal and state requirements. Indeed, it was so plainly compliant that it was not even challenged in court.

24

**C.  Defendants' Objections Are Meritless.**

Defendants' response to this evidence is to invent a series of additional criteria that, in their view, Prof. Chen should have used in his simulations. He should have matched the 2016 Plan's compactness. Tr.I 250:9-12. He should have taken race into account. Tr.I 259:1-10. He should have ensured that all incumbents would win their new districts. Tr.I 235:12-25. He should have kept Mecklenburg County whole. Tr.I 260:16-25. He should have split large rather than small counties. Tr.I 227:8-230:6. And so on.

This ever-shifting list of requirements demonstrates why the burden of justification is (and should be) on the State. Otherwise plaintiffs are put in an impossible position as the State announces another condition every time they analyze the parameters the State previously specified. Defendants also do not even try to provide cites to the legislative record for their late-discovered criteria. And for good reason. The new criteria were never even *mentioned* by the Committee, let alone adopted by it or the full House and Senate.

Factually as well, there is no reason to think the additional requirements could possibly justify the 2016 Plan's massive skew. Take matching the Plan's "reasonable" level of compactness. Tr.II 158:7-9 (Osteen, J.). The compactness of Prof. Chen's simulated maps is *completely uncorrelated* with the maps' efficiency gaps. PFOF 205. There is thus no basis for hypothesizing that had the maps been merely as compact as the Plan (rather than more compact), they would have become drastically more asymmetric.

Or consider the racial makeup of North Carolina's districts. The Adopted Criteria explicitly barred racial data from being used. PFOF 105. Hofeller, Lewis, and Rucho also could not have been clearer that, in their view, "the *Harris* opinion found that there was not racially polarized voting in the state, and therefore, the race of the voters should not be considered." PFOF 108-109. Nevertheless, in an abundance of caution, Prof. Chen identified all of his maps that contained one district with a black voting-age population of at least 40%. (According to Defendants, "a congressional district with a BVAP between 40% and 50%" gives black voters "an equal ability to elect their candidates of choice." Dkt. 61:10). These 262 maps were *indistinguishable* from the full array of 3,000 in their partisan implications. Again, not a single one had ten Republican seats, and again, the modal map using Hofeller's twenty-election set had seven Democratic seats. PFOF 237.

Lastly, "avoiding contests between incumbent Representatives" is a valid goal only if it is pursued in a "nondiscriminatory" manner. *Karcher*, 462 U.S. at 740. Here, preventing incumbent pairings is inherently discriminatory because the incumbents won their offices under the 2011 Plan, the most extreme partisan gerrymander of the last half-century. PFOF 188. Even so, Prof. Chen matched the 2016 Plan's incumbent pairings in one simulation set, bettered its performance in another, and conducted robustness tests that incorporated the incumbency advantage into a predictive regression model. Once

26

more, none of the resulting maps were remotely as asymmetric as the 2016 Plan, and most were neutral or slightly tilted in a Democratic direction. PFOF 207-208.[3]

## CONCLUSION

For the foregoing reasons, the Court should hold that Plaintiffs' proposed test—requiring (1) discriminatory intent, (2) a large and durable discriminatory effect, and (3) a lack of a legitimate justification for this effect—is justiciable. The Court should also make clear that this test vindicates *both* voters' First Amendment right not to be discriminated against because of their political beliefs *and* their Fourteenth Amendment right not to be subjected to intentional vote dilution. The Court should further hold that the 2016 Plan is unconstitutional under the test.

However, to avoid "commit[ting] federal and state courts to unprecedented intervention," the Court should not recognize an intent-only standard under any constitutional provision. *Vieth*, 541 U.S. at 306 (Kennedy, J., concurring in the judgment). Nor should the Court announce that any particular measure of partisan asymmetry, or any particular asymmetry threshold, must be used. These are technical issues that should be "ironed out over time," Tr.II 180:4-7 (Osteen, J.)—not in the first partisan gerrymandering case involving a congressional plan ever to go to trial.

---

[3] As for core retention: It is mentioned neither by the Adopted Criteria nor by the legislative record. It is discriminatory since it would preserve the layout of the gerrymandered 2011 Plan. And it was violated anyway by the 2016 Plan, several of whose districts failed to retain their prior cores (yet were still won by Republicans). PFOF 240.

27

Respectfully submitted this 6th day of November, 2017.

<div style="margin-left: 2em;">

/s/ Anita S. Earls
Anita S. Earls (State Bar # 15597)
Allison J. Riggs (State Bar # 40028)
Emily Seawell (State Bar # 50207)
Southern Coalition for Social Justice
anitaearls@southerncoalition.org
allisonriggs@southerncoalition.org
emilyseawell@southerncoalition.org
1415 Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380 ext. 115
Facsimile: 919-323-3942
Counsel for All Plaintiffs

/s/ Ruth M. Greenwood
Ruth Greenwood
Annabelle Harless
Campaign Legal Center
73 W Monroe St, Suite 322
Chicago IL 60603
(312) 561-5508
rgreenwood@campaignlegalcenter.org
aharless@campaignlegalcenter.org

/s/ Nicholas O. Stephanopoulos
Nicholas O. Stephanopoulos
University of Chicago Law School
1111 E 60th St.
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

</div>

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I hereby certify that this brief complies with L.R. 40.1(c) because the total word count for the body of the brief including headings and footnotes is 6,248.

This the 6th day of November, 2017.

/s/ Ruth M. Greenwood
Ruth M. Greenwood

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing via electronic mail, addressed to counsel for all parties in this consolidated action.

      This the 6th day of November, 2017.

<div align="right">

/s/ Ruth M. Greenwood        
Ruth M. Greenwood

</div>