IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

COMMON CAUSE, *et al.*,

PLAINTIFFS,

v.

ROBERT A. RUCHO, in his official capacity as
Chairman of the North Carolina Senate
Redistricting Committee for the 2016 Extra
Session and Co-Chairman of the Joint Select
Committee on Congressional Redistricting,
*et al.*,

DEFENDANTS.

CIVIL ACTION
NO. 1:16-CV-1026-WO-JEP

THREE-JUDGE COURT

LEAGUE OF WOMEN VOTERS OF NORTH
CAROLINA, *et al.*,

PLAINTIFFS,

v.

ROBERT A. RUCHO, in his official capacity as
Chairman of the North Carolina Senate
Redistricting Committee for the 2016 Extra
Session and Co-Chairman of the 2016 Joint
Select Committee on Congressional
Redistricting, *et al.*,

DEFENDANTS.

CIVIL ACTION
NO. 1:16-CV-1164-WO-JEP

THREE JUDGE PANEL

## *COMMON CAUSE* PLAINTIFFS' POST-TRIAL BRIEF

## Introduction

North Carolina's 2016 Congressional Plan (the "2016 Plan")—by the explicit written criteria used to draw its districts and the Defendants' admissions—prescribes the partisan effect Defendants intended the plan to yield. As Representative David Lewis explained in introducing the "Partisan Advantage" criterion, the map would "give a partisan advantage to ten Republicans and three Democrats because … it's [not] possible to draw a map with 11 Republicans and two Democrats." Dkt. 12, ¶ 13. The 2016 congressional election results confirmed what Defendants knew when the plan was adopted: by using the voting history of North Carolina citizens, the map could sort likely Republican and likely Democratic voters by political affiliation to achieve a predictable, and extreme partisan goal. This enabled Defendants to draw surgically-precise district splits that virtually guaranteed the result.

The record contains almost no factual disputes. Defendants present no evidence to challenge Plaintiffs' central allegations—that Defendants created the 2016 Plan with the explicit intention of favoring Republicans, and that the map that resulted achieved precisely that objective.[1] Instead, Defendants rely on speculation that the 2016 Plan was drawn for reasons other than partisan advantage and exaggerate the uncertainty around the impact of districting on political outcomes, despite overwhelming evidence that the practice has grown remarkably precise and effective in recent decades.

[1] A more complete recitation of the facts is set forth in the *Common Cause* Plaintiffs' Findings of Fact and Conclusions of Law.

1626218.1

1

As the Court recognized at the outset of trial, this case principally presents legal rather than factual questions. While the *Common Cause* Plaintiffs and the *League of Women Voters* Plaintiffs propose somewhat distinct legal standards by which to evaluate the 2016 Plan, the facts show the 2016 Plan to be such an extreme partisan gerrymander that the Court should find the facts sufficient to find it unconstitutional under either approach.

## I.   This Case Is Justiciable

As this Court noted in denying Defendants' earlier Motions to Dismiss and Motion to Stay, controlling precedent holds that constitutional challenges to partisan gerrymandering claims are justiciable. Dkt. 50 at 21; *Davis v. Bandemer*, 478 U.S. 109, 118-28 (1986); *Vieth v. Jubelirer,* 541 U.S. 267 (2004) (five Justices maintaining *Bandemer's* holding as to justiciability); *LULAC v. Perry*, 548 U.S. 399, 413-14 (2006) ("[w]e do not revisit the justiciability holding" in *Davis*); *Shapiro v. McManus*, __ U.S. __, 136 S. Ct. 450, 456 (2015) (reversing jurisdictional dismissal of claim that gerrymander of single Maryland congressional district violates the First Amendment).

Defendants argue that no judicially manageable standards exist to enable this Court to determine whether an admitted, explicit, and extreme partisan gerrymander of congressional districts is prohibited by the Constitution. In effect, Defendants argue that there are no limiting principles when it comes to partisanship in the drawing of district lines.

That position is at odds with the Supreme Court's recognition that "[p]artisan gerrymanders … are incompatible with democratic principles." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, __U.S. __, 135 S. Ct. 2653, 2658 (2015); *see also Benisek v. Lamone*, ___ F. Supp. 3d ____, 2017 WL 3642928, at *16 (D. Md. Aug. 24, 2017) (Niemeyer, J., dissenting) (describing partisan gerrymandering as "cancerous, undermining the fundamental tenets of our form of democracy").  It also undermines the specific and well-settled constitutional guarantee that the fundamental objective of redistricting is to "establish 'fair and effective representation for all citizens.'"  *Vieth*, 541 U.S. at 307 (quoting *Reynolds v. Sims*, 377 U.S. 533, 565-66 (1964)).  The 2016 Plan— by its very design—runs counter to that guarantee.  Its purpose is not to provide fair and effective representation to all citizens, but to give the party in power a partisan advantage over other parties and candidates by "drawing … district lines to subordinate adherents of one political party and entrench a rival party in power."  *Arizona Indep. Redistricting Comm'n,* 135 S. Ct. at 2658.

It "is of the very essence of judicial duty" to say what the law is.  *Marbury v. Madison*, 5 U.S. 137, 178 (1803).  Courts have regularly undertaken that duty with regard to previously unreached claims by applying existing "judicial standards. . . [that] are well developed and familiar . . . to determine [the applicability of such standards] on the particular facts."  *Baker v. Carr*, 369 U.S. 186, 226 (1962); *INS v. Chadha*, 462 U.S. 919, 943 (1983) ("[C]ourts cannot reject … a bona fide controversy as to whether some action denominated as 'political' exceeds constitutional authority.").

The 2016 Plan violates (1) the First Amendment, which limits state action that burdens or penalizes protected expression or draws content- or viewpoint-based distinctions between messages or speakers; (2) the Equal Protection Clause of the Fourteenth Amendment, which imposes on each State a duty to govern impartially; (3) the limited authority delegated to North Carolina under the Elections Clause in Article I, § 4 of the Constitution; and (4) Article 1, § 2 of the Constitution, which requires that members of the House of Representatives be chosen "by the people" and not by the legislature.

The constitutional principles the *Common Cause* Plaintiffs ask this Court to apply are neither new nor novel. They are deeply embedded in the language of the Constitution and supported by a long line of Supreme Court cases that already offer judicially manageable standards. There is no need, as Defendants suggest, for the Court to derive some other standard before it can properly adjudicate these claims.

This raises a distinction between the *Common Cause* and *League* cases. The *League* Plaintiffs propose a single, three-part test that requires a showing of large and durable statewide partisan asymmetry to demonstrate the discriminatory effect as the legal standard for their First and Fourteenth Amendment claims. While some burden on protected rights must be shown before a court should intervene, the *Common Cause* Plaintiffs do not believe the Constitution or controlling precedent require either a large or a durable effect before the Court can intervene, particularly with respect to a First Amendment claim. Regardless, the record evidence illustrates that the 2016 Plan is an

1626218.1

4

extreme outlier that does create a large partisan asymmetry in North Carolina's congressional districts. Whether or not the Court requires such a showing, it is powerful evidence of the burden imposed by the legislature's explicit decision to exercise its delegated responsibility to maximize Republican partisan advantage rather than "ensure fair and effective representation." *Vieth*, 541 U.S. at 307 (quoting *Reynolds*, 377 U.S. at 565-66.

## II.       The 2016 Plan Violates the First Amendment

The First Amendment prohibits government from "prescrib[ing] what shall be orthodox in politics," *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), and subjects to strict scrutiny content-based laws that "restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). The rights to join a political party and to support candidates of one's choice are "core … activities protected by the First Amendment." *Elrod v. Burns*, 427 U.S. 347, 356 (1976); *see Heffernan v. City of Paterson,* 136 S. Ct. 1412, 1418 (2016). The right of voters "regardless of their political persuasion, *to cast their votes effectively* … rank[s] among our most precious freedoms" and is also protected by the First Amendment. *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (emphasis added). The 2016 Plan runs afoul of each of these protected rights.

The 2016 Plan employs a content-based distinction—the past votes of North Carolina citizens—to achieve its partisan goal. The Supreme Court has long held that "[c]ontent-based laws—[laws] that target speech based on its communicative content—

1626218.1

are presumptively unconstitutional [under the First Amendment] and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citing cases); *United States v. Alvarez*, 567 U.S. 709, 716-17 (2012) ("[T]he Constitution demands that content-based restrictions … be presumed invalid … and that the Government bear the burden of showing their constitutionality."). This is so even where the law itself is "viewpoint neutral." *Reed*, 135 S. Ct. at 2230. Even though this statute (though not the Adopted Criteria) is "facially content neutral," it plainly includes a content-based distinction. *Id.* at 2227. By Defendants' admission, the past voting data was used to achieve a partisan goal "because of disagreement with the [political] message … convey[ed]" by the Democratic Party and Democratic voters and their support of Democratic candidates in past elections. *Id.*

The 2016 Plan also engages in impermissible viewpoint discrimination. It discriminates against the Democratic Party, Democratic candidates and Democratic voters based on their political party affiliation and political viewpoints. "[D]iscrimination among viewpoints … based on 'the specific motivating ideology or the opinion or perspective' …[is] a 'more blatant' and 'egregious form of content discrimination.'" that violates the most basic principle of the First Amendment. *Reed*, 135 S. Ct. at 2230 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). While the North Carolina legislature has some discretion in drawing congressional district lines, the First Amendment prohibits it from exercising "that discretion … in a

1626218.1

6

narrowly partisan or political manner." *Bd. of Educ. v. Pico*, 457 U.S. 853, 870-71 (1982) ("If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated" the First Amendment.).

> As Justice Kennedy has explained,
>
> > "The inquiry [under the First Amendment] is not whether political classifications were used. The inquiry instead is whether political classifications were used to burden a group's representational rights. If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest."

*Vieth*, 541 U.S. at 315; (requiring "motivating factor" showing) *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (requiring "motivating factor" showing); *Benisek v. Lamone*, 2017 WL 3642928, at *29 ("[O]nce the plaintiffs have established that the government's constitutionally impermissible intent 'was a motivating factor' in [its] decision, the burden shifts to the State to show that even absent the forbidden intent," the effect on the plaintiff would have been the same.) (Niemeyer, J., dissenting) (quotations omitted). Because viewpoint discrimination is generally impermissible, "[a]t its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017).

That standard is easily applied in this case. To the extent Defendants felt they had discretion in drawing the lines in the 2016 Plan, they exercised that discretion to favor

Republican candidates, voters, and views and singled out Democratic candidates and voters for disfavor based on their views. The sorting of voters using political data was the mechanism by which a certain political message was favored and another political message was disfavored. The *actual districts* drawn under the 2016 Plan reflect this sorting—which indeed maintains the 10-3 Republican "Partisan Advantage" established as a result of the now-invalidated, unconstitutional 2011 Plan. There is an abundance of direct evidence of the legislature's partisan intent in the Adopted Criteria, the admissions of Representative Lewis and Senator Rucho, and the cross-examination of the map drawer, Dr. Hofeller. *See, e.g.,* Plaintiff's Finding of Fact ¶¶ 28, 53-57. This direct evidence of the clear partisan intent behind the plan is further developed by the testimony of the *Common Cause* Plaintiffs' expert witnesses, Drs. Chen and Mattingly.

Once it is shown that—as here—political considerations were used to burden a political party or individual voters, the apportionment plan must be presumed to be unconstitutional under the First Amendment, and the burden of proof shifts to the State to prove that the viewpoint discrimination is justified by a compelling state interest, and is narrowly tailored. *Reed*, 135 S. Ct. at 2236; *Mt. Healthy*, 429 U.S. at 287; *see also* Michael S. Kang, *Gerrymandering and the Constitutional Norm Against Government Partisanship,* 116 Mich. L. Rev.__ (forthcoming Dec. 2017); Justin Levitt, *Intent is Enough: Invidious Partisanship in Redistricting*, 59 Wm. & Mary L. Rev. __(forthcoming 2017).

The First Amendment does not require government actions that target political speech based on the message it conveys—or treat parties or voters less favorably based on their political affiliation or beliefs—to have a "large" or "durable" discriminatory effect in order to warrant strict scrutiny, although that test is readily met here. But here, Defendants have not even attempted to present a compelling state interest to explain the use of political data to sort voters based on their voting history. The "Political Data" and "Partisan Advantage" criteria within the Adopted Criteria ensured that the party in control of the redistricting process would use that control to disfavor its political competition in the newly drawn districts—and have no other purpose.

Viewpoint discrimination is itself an injury to the First Amendment rights of the intended targets or victims. A partisan congressional redistricting plan punishes the disadvantaged party and its voters based on their political viewpoints, "starve[s] political opposition," and "tips the electoral process in favor of the incumbent party." *Elrod v. Burns*, 427 U.S. at 356; *Benisek v. Lamone*, 2017 WL 3642928, at *17 ("[W]hen district mapdrawers target voters based on their prior, constitutionally protected expression in voting and dilute their votes, the conduct violates the First Amendment, effectively punishing voters for the content of their voting practices.") (Niemeyer, J., dissenting).

Plaintiffs were injured when Defendants chose—without *any* compelling state interest—to disfavor the Democratic Party and Democratic voters based on their views and thereby diminish the equal *opportunity* to elect candidates of their choice. Elections results may be powerful evidence of this burden, but election wins and losses do not

1626218.1

9

complete the set of representational rights protected by the First Amendment. "The harm is not found in any particular election statistic, nor even in the outcome of an election, but instead on the intentional and targeted burdening of the effective exercise of a First Amendment representational right." *Benisek v. Lamone*, 2017 WL 3642928, at *17 (Niemeyer, J., dissenting).

The barrier enacted by the 2016 Plan sufficiently burdened Plaintiffs' representation rights to constitute a First Amendment violation:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the [disadvantaged] group ... need not allege that he would have obtained the benefit but for the barrier in order to establish standing. *The "injury in fact" in an equal protection case [or a First Amendment case]...is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.*

*Ne. Fla. Chapter of AGC of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (emphasis added); *see also Anderson v. Celebrezze*, 460 U.S. 780 (1983) (Anderson had standing to challenge a state ballot-access statute that deprived him of the opportunity to run as an independent candidate in a Presidential primary, without having to prove that he would have won); *Turner v. Fouche*, 396 U.S. 346 (1970); *Quinn v. Millsap*, 491 U.S. 95, 103 (1989); *Clements v. Fashing*, 457 U.S. 957 (1982) (individuals had standing to challenge statutes or regulations that deprived them of the opportunity to run for or to be appointed to a public office, without having to prove that they would have been chosen).

The record demonstrates the extent of the burden imposed on Plaintiffs and other Democrats targeted by the discrimination embodied in the 2016 Plan. Dr. Chen's

findings bear on both the discriminatory *intent* and the discriminatory *effect* of the explicit inclusion of partisan advantage in the 2016 Plan.  By applying the election results considered by Defendants in drawing the 2016 Plan (both the elections prescribed by the Adopted Criteria and those in Dr. Hofeller's formula) to determine the partisan distribution of seats for the simulated plans and enacted plan, Dr. Chen determined that "not only is the enacted plan an extreme partisan outlier" compared to the simulated plans, but that, controlling for North Carolina's political geography, "the net *effect* of the enacted plan's partisan efforts was the creation of at least 2 or 3 additional Republican seats."  Ex. 2010 at 10-11 (emphasis added).

Similarly, Dr. Mattingly's ensemble of over 24,000 redistricting maps provides compelling evidence that the 2012 and 2016 plans enacted by the legislature are extreme outliers created not by chance, but with the deliberate intention of ensuring that Republicans prevailed in the greatest number of districts possible.  By arraying all 13 districts in his ensemble of 24,000 maps from least to most Democratic, he illustrated the expected stair-stepping increase in Democratic votes from one district to the next if only neutral, non-partisan criteria had been employed to draw the district boundaries.  Ex. 3040, pp. 11 and 23.  Not surprisingly, the Democratic vote totals in the map drawn by the bipartisan group of retired judges in the Beyond Gerrymandering project—who used the same non-partisan criteria Dr. Mattingly used—fell neatly within the expected range in all 13 districts.  Ex. 3040, pp.13 and 25.  The 2012 and 2016 districts drawn by the legislature, however, produced Democratic vote totals that were very far outside the

1626218.1

11

expected range for the 6-7 most Democratic districts.  In the three most Democratic districts—CD 1, CD 4, and CD 12—the Democratic vote totals far exceeded the expected range in 2012 and 2016, convincingly establishing how the legislature packed Democratic voters into those districts.  Ex. 3040, pp. 14-17 and 26-29; Tr. Vol. I, 58:22-61:7 and 68:14-72:2.  In stark contrast, the number of Democratic voters in the next 3-4 most Democratic districts in both 2012 and 2016 fell far below the expected range established by Dr. Mattingly's ensemble, starving those districts of sufficient Democratic voters for Democratic candidates to remain competitive.  *Id.*  In Dr. Mattingly's words, the resulting "S" curve connecting the plot points for the 6-7 most Democratic districts in both 2012 and 2016 is the signature of an extreme partisan gerrymander.  Tr., Vol. 1, 63:2-3; 76:22-77:5*;* Ex. 3040, pp. 18 and 30.  As a result of the extreme partisan gerrymander, Democrats prevailed in only 4 districts in 2012, whereas in over 87% of Dr. Mattingly's ensemble Democrats would have prevailed in 6-8 districts.  Ex. 3040, pp. 7, 10, and Democrats prevailed in only 3 districts in 2016, whereas in over 70% of Dr. Mattingly's ensemble, Democrats would have prevailed in 5-7 districts.  Ex. 3040, pp. 19, 22.

Advancing Republican partisan interests by sorting voters into and out of districts, then, was the driving force behind 2012 Plan and the 2016 Plan—as well as individual districts within those plans. It had a dramatic effect on the political performance of those districts and the statewide distribution of seats, all evidence of a finely-tuned burden on Plaintiffs' representational rights.

1626218.1

The settled standards for evaluating viewpoint discrimination demonstrate the foresight of Justice Kennedy's suggestion in *Vieth v. Jubelirer* that "[t]he First Amendment may be the more relevant constitutional provision in future cases that allege unconstitutional partisan gerrymandering." 541 U.S. at 314-15 (concurring opinion). "[T]hese allegations involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party or their expression of political views." *Id*. (citing *Elrod*, 427 U.S. at 362).

Further, Justice Kennedy pre-empted several of the objections to a First Amendment approach contained in Justice Scalia's plurality opinion. Justice Scalia maintained that "a First Amendment claim … would render unlawful *all* consideration of political affiliation in districting, just as it renders unlawful *all* consideration of political affiliation" in the patronage cases, which require "that political affiliation *be disregarded*." *Id*. at 294 (italics in original). Justice Kennedy responded that this was a "misrepresent[ation of] the First Amendment analysis." He explained that,

> The inquiry [under the First Amendment] is not whether political classifications were used. *The inquiry instead is whether political classifications were used to burden a group's representational rights.* If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest.

*Id*. at 315 (emphasis added); *see also id*. at 324-25 (Stevens, J. dissenting).

Further, Justice Kennedy rejected Justice Scalia's assertion that only "severe" or "extreme" partisan gerrymanders are unconstitutional. Justice Kennedy warned that

Case 1:16-cv-01026-WO-JEP   Document 116   Filed 11/06/17   Page 14 of 28

"courts must be cautious about adopting a standard that turns on whether the partisan interests in the redistricting process were excessive. Excessiveness is not easily determined." *Id*. at 316. Justice Kennedy cited two examples to illustrate his point. His first example was an "egregious" gerrymander that captured every congressional seat, and his second example was a more subtle gerrymander that allowed Party X to capture more seats than Party Y. In Justice Kennedy's view, "each is culpable." *Id*.

Defendants contend that the First Amendment claim must, by now, be foreclosed, but the Supreme Court disagrees. In one of his final opinions, Justice Scalia quoted Justice Kennedy's *Vieth* concurrence in reversing the dismissal for want of jurisdiction of a claim of a Democratic gerrymander of a single congressional district in Maryland. In that case, Plaintiffs' First Amendment challenge was revived based on "on a legal theory put forward by a Justice of this Court" that is "uncontradicted by the majority in any of our cases." *Shapiro v. McManus*, 136 S. Ct. at 456.

The *Common Cause* Plaintiffs do *not* argue that the First Amendment prohibits a State, or members of its legislature, from using political data for the *legitimate* legislative purpose of "achieving … fair and effective representation for all citizens [which] … is the basic aim of legislative apportionment." *Vieth*, 541 U.S. at 311 (Kennedy, J, (quoting *Reynolds v. Sims*, 377 U.S. at 565-68 (1964))); *see also Gaffney v. Cummings*, 412 U.S. 735, 754 (1973) (upholding Connecticut's use of political data to "provide a rough sort of proportional representation" rather than "to minimize or eliminate the political strength of any group or party").

Rather, the First Amendment restricts a State from using political data—the voting history of its citizens—to target those voters whose past political speech it *disfavors.* "Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

## III. The 2016 Plan Violates the Equal Protection Clause of the Fourteenth Amendment

"[T]he principle that government … remain open on *impartial terms* [is] … [c]entral both to the idea of the rule of law and to our own Constitution's guarantee of equal protection." *Romer v. Evans,* 517 U.S. 620, 633 (1996) (emphasis added). The most fundamental duty of a government under the Equal Protection Clause is to govern impartially. *Id.*; *Lehr v. Robertson*, 463 U.S. 248, 265 (1983) ("The concept of equal justice under law requires the State to govern impartially."); *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 587 (1979); *Karcher v. Daggett*, 462 U.S. 725, 748 (1983) (Stevens, J. concurring).

The Supreme Court has held that state laws that are intended to make it "more difficult for one group of citizens than … others to seek aid from the government [are] … a denial of equal protection … in the most literal sense." *Romer v. Evans,* 517 U.S. at 633. As Justice Powell explained in *Davis*, the classification of voters inherent in the application of "Partisan Advantage" criteria violates this fundamental right:

In the context of redistricting, [the duty to govern impartially] is of critical importance because the franchise provides most citizens their only voice in the legislative process. [citing *Reynolds*, 377 U.S. at 561-62, 565-66.] Since the contours of a voting district powerfully may affect citizens' ability to exercise influence through their vote, district lines should be determined in accordance with neutral and legitimate criteria…. [T]he State should treat its voters as standing in the same position, regardless of their political beliefs or party affiliation.

*Davis v. Bandemer*, 478 U.S. at 166 (Powell, J. concurring in part and dissenting in part).

Justice Stevens explained the same principle:

When a State adopts rules governing its election machinery or defining electoral boundaries, those rules must serve the interests of the entire community. If they serve no purpose other than to favor one segment—whether racial, ethnic, religious, economic or political—that may occupy a position of strength … or to disadvantage a politically weak segment … they violate the constitutional guarantee of equal protection.

*Karcher v. Daggett,* 462 U.S. at 748 (Stevens, J. concurring).

While there is no doubt that laws that discriminate based on political viewpoint are subject to strict scrutiny under the First Amendment, the level of scrutiny applicable under the Equal Protection Clause remains unsettled. Regardless, the 2016 Plan cannot survive any level of review.

This Court would be warranted in applying strict scrutiny to the partisan classification built into the 2016 Plan on a district-specific claim. The *Common Cause* Plaintiffs' experts demonstrated that the "Partisan Advantage" criterion predominated over—indeed, subordinated—the other criteria that govern the 2016 Plan. Dr. Chen's analysis shows that a redistricting plan that held constant the other criteria *actually* chosen by the legislature in 2016, but did not explicitly discriminate as to partisan

affiliation, would *never* yield a 10-3 plan. Ex. 2010 at 12. The 2016 enacted map is an *extreme statistical outlier* compared to the entire set of maps drawn to best simulate the degree to which partisan advantage predominated in the drawing of districts in the 2016 Plan. Dr. Mattingly's analyses confirm this result. *See supra* at 11. Only the decision to treat a class of candidates and voters differently from another class of candidates and voters can explain the results.

Strict scrutiny is appropriate under the Equal Protection Clause because the 2016 Plan "impinge[s] on personal rights protected by the Constitution" of the Democratic citizens to run for office and elect candidates of their choice. *City of Cleburne v. Cleburne Living Ctrs., Inc.,* 473 U.S. 432, 440 (1985); *see also Cooper v. Harris,* 137 S. Ct. 1455, 1473 n.7 (2017)) ("[I]f legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests . . . their action still triggers strict scrutiny.").

Proof of predominance of a discriminatory motive is required to invoke strict scrutiny under the Equal Protection Clause in the district-specific racial gerrymandering context. *See, e.g., Miller v. Johnson*, 515 U.S. 900, 916 (1995). The Court has also implied that proof of predominance of "illegitimate reapportionment factors"—including partisan advantage—is required to invalidate otherwise constitutional departures in one-person-one-vote cases for state legislative districts. *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. __, 136 S. Ct. 1301, 1307 (2016); *Cox v. Larios*, 542 U.S. 947, 947-49 (2004) (Stevens, J. concurring); *Raleigh Wake Citizens Ass'n v. Wake*

1626218.1

17

*Cty. Bd. of Elections*, 827 F.3d 333, 345 (2016) (holding that an "'intentional effort' to create a 'significant partisan advantage'" showed "the predominance of a[n] illegitimate reapportionment factor." (quoting *Cox v. Larios*, 542 U.S. at 947-49)). These cases give the lie to Defendants' assertion that politics can't be regulated from redistricting under any standard.

Alternatively, even if partisan advantage had been only a purpose, but not the predominant purpose of the 2016 Plan or individual districts within the Plan, the 2016 Plan would still be subject to the highest level scrutiny under the *Anderson v. Celebrezze* "sliding scale" standard of review. 460 U.S. at 788; *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). "Sliding-scale" scrutiny under *Anderson-Burdick* applies only to election regulations that are both "*reasonable* [and] *nondiscriminatory*." *Id.* (emphasis added). The 2016 Plan is neither "reasonable"—because it is not intended to serve a legitimate state interest—nor "non-discriminatory"— because it is motivated by a partisan purpose to discriminate against Democrats. The 2016 Plan should, therefore, be subjected to the highest level of scrutiny under *Anderson-Burdick* sliding-scale review.

Finally, under rational basis review under the Equal Protection Clause, the 2016 Plan fails constitutional muster. First, rational basis review under the Equal Protection Clause in cases involving fundamental rights, which include the rights to cast an equally effective ballot and elect a candidate of one's choice, is not the same as minimal rational basis review of an economic regulation that is far less strict. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 579 U.S. __, 136 S. Ct. 2292, 2309 (2016) (holding that it is

1626218.1

"wrong to equate the judicial review applicable to the regulation of a constitutionally protected personal liberty with the less strict review applicable where … economic legislation is at issue").  The Supreme Court has also held that "[t]he word 'rational' … includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially."  *City of Cleburne,* 473 U.S. at 452.  The 2016 Plan, therefore, fails even rational basis review under the Equal Protection Clause, because it violates the duty of government to govern impartially, *Romer v. Evans*, 517 U.S. 620; *New York City Transit Auth. v. Beazer*, 440 U.S. at 587, and is motivated by a desire on the part of the party in power "'to harm a politically [weak or] unpopular group' and cannot be justified by 'a *legitimate* governmental interest.'"  *Romer*, 517 U.S. at 634-35 (emphasis in original) (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)).

Critically, even after trial Defendants have not articulated a legitimate—and certainly not a compelling—state interest served by the partisan advantage they explicitly sought.  The record makes clear that the interest served was the Republican Party's—not North Carolina's.

## IV.  The 2016 Plan Exceeds the Power Delegated to North Carolina Under the Elections Clause

States have no sovereign, inherent, or reserved powers over the apportionment of congressional districts or the drawing of congressional district lines.  *Cook v. Gralike*, 531 U.S. 510 (2001); *U.S. Term Limits v. Thornton*, 514 U.S. 779 (1995); *Wesberry v. Sanders*, 376 U.S. 1 (1964).  States have only the power delegated to them by the

1626218.1

19

Elections Clause to "regulate the [t]imes, [p]laces and [m]anner of holding elections" of members of the House of Representatives.  Art. I, § 4.

The Supreme Court has held that the Elections Clause is only "a grant of authority to issue *procedural regulations*" for the conduct of congressional elections, and is "*not [] a source of power to dictate electoral outcomes, to favor or disfavor a class of candidates*, or to evade [other] important constitutional restraints."  *Cook*, 531 U.S. at 523-24 (quoting *Term Limits,* 514 U.S. at 833-34) (emphasis added).

In *Cook v. Gralike*, the voters of Missouri adopted an amendment to the Missouri constitution in a popular referendum.  The amendment, Article VIII, required the Missouri Secretary of State to print on the primary and general election ballots *truthful information* about each candidate's position on a "term limits" amendment to the U.S. Constitution next to the name of each candidate running for election to the U.S. Senate or House of Representatives.

The Supreme Court held the amendment to be unconstitutional under the Elections Clause.  The Court acknowledged that that "Article VIII furthers the State's interest in adding a term limits amendment to the Federal Constitution [and] … encourages the election of representatives who favor such an amendment."  531 U.S. at 518.  Even though Article VIII had been democratically adopted by the people of Missouri through the initiative process, the Supreme Court held that Article VIII exceeded the power delegated to the States by the Elections Clause because it was "plainly designed to favor candidates who are willing to support the … term limits amendment … and to disfavor

1626218.1

20

those who either oppose term limits entirely or would prefer a different proposal …."

The Court said that "the adverse labels handicap candidates 'at the most crucial stage in

the election process' … [and] surely place their targets at a political disadvantage …

[and] attempts to 'dictate electoral outcomes.'" *Id.* at 524-26.

"A State is not permitted to interpose itself between the people and their National

Government … [and] 'simply lack[] the power'" under the Elections Clause "to impose

any conditions on the election of Senators or Representatives, *save neutral provisions* as

to the time, place and manner of elections pursuant to Article I, § 4." *Id.* at 527

(Kennedy, J. concurring) (emphasis added).[2]

The 2016 Plan is a trifecta of violations of the Elections Clause that are far more

serious and offensive to the Constitution and democratic values than those in Article VIII

of the Missouri constitution.  The 2016 Plan is intended to (1) "dictate electoral

outcomes" by ensuring that a Republican will be elected in ten districts and a Democrat

will be elected in the three remaining districts; (2) favor one class of candidates

(Republicans) and disfavor another class of candidates (Democrats); and (3) "evade

[other] important constraints," including those imposed by the First Amendment, the

Equal Protection Clause of the Fourteenth Amendment, and the requirement in Article I,

§ 2 that Representatives be chosen "*by* the people," and not chosen *for* the people by the

legislature.

---

[2] Two other members of the Court (Chief Justice Rehnquist and Justice O'Connor) would
have declared Article VIII invalid under the First Amendment.

## V. Political Gerrymanders of Congressional Districts are Prohibited by Article I, § 2 of the Constitution

States' powers to apportion congressional districts are limited under the Elections Clause and under Article I, §2, which prohibits deviations from the one-person-one-vote rule to accommodate other State policies. *Wesberry v. Sanders*, 376 U.S. 1; *Kirkpatrick v. Preisler*, 394 U.S. 526 (1969).

In its memorandum opinion denying the motion for a stay, this Court recognized that in *Wesberry v. Sanders*, the Supreme Court held that the unequal apportionment of congressional districts that was the result of a *failure* of a state legislature to reapportion the districts after each decennial census "'defeats the principle solemnly embodied in the Great Compromise' by making elected congressmen dependent on state legislatures, rather than the people," and "by allowing 'legislatures [to] draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others.'" Dkt. 87 at 12 (quoting *Wesberry v. Sanders*, 376 U.S. at 13-14).

The 2016 Plan is an even greater affront to the principles of the Great Compromise than the failure of the Georgia legislature to reapportion congressional districts after each decennial census to reflect the changes in the populations of the districts, which was the issue in *Wesberry*. The entire purpose and intent of a partisan gerrymander of congressional districts is to "draw [district] lines … in such a way as to give some voters a greater voice in choosing a Congressman than others" and to "mak[e] elected

congressmen dependent" for their offices and chances for re-election on the majority party in the state legislature. Dkt. 87 at 12 (quoting *Wesberry*, 376 U.S. at 13-14).

Partisan gerrymanders of congressional districts also violate Article I, § 2 by making the election of members of the House of Representatives dependent on and responsive to the interests of *primary election* voters, rather than dependent on and responsive to the interests of all of the people in the entire district who are eligible to vote in the general election. As the Supreme Court observed in *Shaw v. Reno*:

> The message that such districting sends to elected representatives is equally pernicious. When a district obviously is created … to effectuate the perceived interests of one … group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole. This is altogether antithetical to our system of representative democracy.

509 U.S. 630, 648 (1994).

Partisan gerrymanders of congressional districts violate "the core principle of republican government … that the voters should choose their representatives, not the other way around." *Arizona Indep. Redistricting Comm'n,* 135 S. Ct. at 2677 (internal quotations omitted). In a partisan gerrymander, the state legislature takes from the voters in each district the power to decide for themselves whether they will be represented in Congress by a Republican or a Democrat. The legislature makes that decision *for* the people in each district by drawing district lines and assigning sufficient numbers to ensure that a Republican or a Democratic will be elected to represent the people of the district in the House of Representatives and dictate the electoral outcome of the general election in each district to voters in each district.

1626218.1

23

## CONCLUSION

Each of these constitutional claims presents manageable standards for determining whether the 2016 Plan violates the United States Constitution. The largely-undisputed facts demonstrate the pressing need for a judicial remedy to the fundamentally anti-democratic approach to redistricting embodied by the 2016 Plan.

This the 6th day of November, 2017.

*/s/ Edwin M. Speas, Jr.*
Edwin M. Speas, Jr.
North Carolina Bar No. 4112
Steven B. Epstein
North Carolina Bar No. 17396
Caroline P. Mackie
North Carolina Bar No. 41512
POYNER SPRUILL LLP
301 Fayetteville Street, Suite 1900
Raleigh, NC 27601
Telephone: 919-783-6400
Facsimile: 919-783-1075
*espeas@poynerspruill.com*
*sepstein@poynerspruill.com*
*cmackie@poynerspruill.com*

*/s/ Emmet J. Bondurant*
Emmet J. Bondurant
Georgia Bar No. 066900
Jason J. Carter
Georgia Bar No. 141669
Benjamin W. Thorpe
Georgia Bar No. 874911
BONDURANT, MIXSON
  & ELMORE, LLP
1201 W. Peachtree Street, NW, Suite 3900
Atlanta, GA 30309
Telephone (404) 881-4100
Facsimile (404) 881-4111
*bondurant@bmelaw.com*
*carter@bmelaw.com*
*bthorpe@bmelaw.com*


*/s/ Gregory L. Diskant*
Gregory L. Diskant
New York Bar No. 1047240
Peter A. Nelson
New York Bar No. 4575684
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
*gldiskant@pbwt.com*
*pnelson@pbwt.com*

COUNSEL FOR PLAINTIFFS IN
COMMON CAUSE V. RUCHO, NO.
1:16-CV-1026

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel and parties of record.

This 6th day of November, 2017.

s/ *Edwin M. Speas, Jr.*
Edwin M. Speas, Jr.

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I hereby certify that this brief complies with L.R. 7.3(d) because the total word count for the body of the brief including headings and footnotes is 6232.

This 6th day of November, 2017.

s/ *Edwin M. Speas, Jr.*
Edwin M. Speas, Jr.

1626218.1