**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| COMMON CAUSE, et al.,<br><br>    Plaintiffs,<br>  v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, et al.,<br><br>    Defendants. | No. 1:16-CV-1026 |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al.,<br><br>    Plaintiffs,<br>  v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, et al.,<br><br>    Defendants. | No. 1:16-CV-1164 |

## MEMORANDUM OPINION AND ORDER DENYING LEGISLATIVE DEFENDANTS' EMERGENCY MOTION TO STAY

PER CURIAM:

In a memorandum opinion and order entered January 9, 2018 (the "Order"), this Court held that North Carolina's 2016 Congressional Redistricting Plan (the "2016 Plan") constitutes an unconstitutional partisan gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment, the First Amendment, and Article I of the Constitution. *Common Cause v. Rucho* (*Common Cause II*), --- F. Supp. 3d ---, 2018 WL 341658 (M.D.N.C. Jan. 9, 2018). Before the Court is a motion (the "Motion") by only the Legislative Defendants[1] in this matter—four Republican members of the North Carolina General Assembly—to stay this Court's Order pending Supreme Court review. Leg. Defs.' Emerg. Mot. to Stay Pending S. Ct. Rev. & Request for Exp. Rul'g, Jan. 11, 2018, ECF No. 119. Neither the State of North Carolina nor any of the State Board

---

[1] Legislative Defendants in both actions are Robert A. Rucho, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting; David R. Lewis, in his official capacity as Chairman of the North Carolina House of Representatives Redistricting Committee for the 2016 Extra Session and Co-Chairman of the 2016 Joint Select Committee on Congressional Redistricting; Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives; and Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate. Plaintiffs also name as defendants A. Grant Whitney, Jr., in his official capacity as Chairman and acting on behalf of the North Carolina State Board of Elections ("Whitney"); the North Carolina State Board of Elections (collectively, with Whitney, the "State Board Defendants"); and the State of North Carolina (collectively, with the State Board Defendants, "State Defendants").

Defendants have sought an emergency stay. Nor has the State of North Carolina or the State Board Defendants appealed this Court's Order to the Supreme Court.

After careful consideration of Legislative Defendants' arguments, we conclude that Legislative Defendants have failed to meet their "heavy burden" in seeking the "extraordinary relief" of staying this Court's order. *Harris v. McCrory*, No. 1:13CV949, 2016 WL 6920368, at *1 (M.D.N.C. Feb. 9, 2016) (internal quotation marks omitted). Therefore, and as further explained below, we exercise our discretion to deny Legislative Defendants' motion to stay.

## I.

On February 5, 2016, a panel of three federal judges held that two districts established by North Carolina's 2011 decennial congressional redistricting plan constituted racial gerrymanders in violation of the Equal Protection Clause. *Harris v. McCrory*, 159 F. Supp. 3d 600, 604 (M.D.N.C. 2016), *aff'd sub nom. Cooper v. Harris*, 137 S. Ct. 1455 (2017). Less than two weeks later, the General Assembly adopted the 2016 Plan. *Common Cause II*, 2018 WL 341658, at *7. Several months later, Plaintiffs filed the instant actions. *Id.* at *8–9.

On June 26, 2017, Legislative Defendants moved to stay these proceedings pending the Supreme Court's final decision in *Gill v. Whitford*, Nos. 1161, 16A1149. ECF Nos. 74, 75. Plaintiffs opposed Legislative Defendants' motion, and State Defendants took no position. ECF Nos. 78, 79. In an August 29, 2017 order, and subsequent opinion, this Court denied Legislative Defendants' stay motion. *Common*

3

*Cause v. Rucho* (*Common Cause I*), Nos. 1:16-CV-1026, 1:16-CV-1164, 2017 WL 3981300, at *2 (M.D.N.C. Sept. 8, 2017).

In October 2017, this Court held a four-day trial, during which the parties introduced evidence and presented testimony and arguments. *Common Cause II,* 2018 WL 341658, at *9. Thereafter, the parties filed extensive post-trial briefing. *Id.* at *9–10. On January 9, 2018, this Court ruled in favor of Plaintiffs on all of their claims and gave Defendants until January 24, 2018, to enact a remedial plan. *Id.* at *10, *74–76.

On January 11, 2018, Legislative Defendants filed the Motion and also noticed an appeal to the Supreme Court. Leg. Defs.' Notice of Appeal, Jan. 11, 2018, ECF No. 121. Plaintiffs oppose the Motion. ECF No. 122. State Defendants—including the State of North Carolina—have not asked this Court to stay its Order, nor have they filed an appeal from the Order to the Supreme Court.

## II.

"The Court considers four factors when determining whether to issue a stay pending appeal: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Harris*, 2016 WL 6920368, at *1 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)); *accord Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). "A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right,

4

even if irreparable injury might otherwise result to the appeal." *Nken v. Holder*, 556 U.S. 418, 417 (2009) (internal quotation marks omitted).

"[A] stay is considered 'extraordinary relief' for which the moving party bears a 'heavy burden,'" and "[t]here is no authority to suggest that this type of relief is any less extraordinary or the burden any less exacting in the redistricting context." *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336 (N.D. Ga. 2004) (quoting *Winston-Salem/Forsyth Cty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (Burger, Circuit Justice, 1971)); *see Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 558–59 (E.D. Va. 2016) (Diaz, J.) (same); *Does 1-5 v. Cooper*, No. 1:13CV711, 2016 WL 10587195, at *1 (M.D.N.C. Mar. 2, 2016) ("The granting of a stay pending appeal is 'an extraordinary remedy.'" (quoting *Adams v. Walker*, 488 F.2d 1064, 1065 (7th Cir. 1973))). To that end, "[a]s with other types of cases, district courts evaluating redistricting challenges have generally denied motions for a stay pending appeal." *Harris*, 2016 WL 6920368, at *1 n.1 (collecting cases).

## A.

Legislative Defendants' Motion does not specifically address the four factors set forth in *Hilton*. We nonetheless conclude that even assuming Legislative Defendants had addressed the governing four factors, they could not satisfy their "heavy burden" to obtain the "extraordinary relief" of a stay of this Court's Order.

## 1.

To begin, Legislative Defendants fail to make a "strong showing" that they are likely to succeed on the merits. In particular, their Motion does not dispute this Court's unanimous conclusions that, in enacting the 2016 Plan, the General Assembly (1)

5

predominantly intended to subordinate the interests of non-Republican voters and entrench Republican control of the State's congressional delegation, (2) that the 2016 Plan had its intended effect, and (3) that the 2016 Plan's invidious partisan effects were not attributable to the State's political geography or other legitimate redistricting criteria. *Common Cause II*, 2018 WL 341658, at *35–60. Likewise, Legislative Defendants do not dispute that (1) the 2016 Plan was intended to disfavor individuals and entities that previously supported non-Republican candidates, (2) the 2016 Plan burdened the political speech and associational rights of such individuals and entities, and (3) a causal relationship existed between the General Assembly's discriminatory motivation and the First Amendment burdens imposed by the 2016 Plan. *Id.* at *64–69. Nor do they dispute that the 2016 Plan amounted to a successful attempt by the General Assembly to favor a class of voters and candidates and dictate the outcomes of congressional elections. *Id.* at *74. Those conclusions rest on extensive factual findings concerning a variety of pieces and types of evidence, *id.* at *35–60, *64–69, *74—all of which will be reviewed by the Supreme Court under the highly deferential "clear error" standard, *see Harris*, 2016 WL 6920368, at *1 (holding Legislative Defendants failed to make "strong showing" that they were likely to succeed on merits of appeal of racial gerrymandering decision, when decision rested on extensive factual findings subject to clear error review); *Personhuballah*, 155 F. Supp. 3d at 559 (same).

Likewise, other than the unsupported statement that Legislative Defendants "believe this Court's Order will be reversed by the Supreme Court on appeal," Motion 6, Legislative Defendants do not identify any particular errors in this Court's legal

6

reasoning, let alone errors in *each* of this Court's bases for concluding that the 2016 Plan violated the Constitution—as would be necessary for the Supreme Court to reverse this Court's judgment. Additionally, we note that with regard to several uncertain legal issues, this Court's opinion rendered factual findings under multiple legal standards. For example, recognizing that the Supreme Court has not decided whether a plaintiff seeking relief under the Equal Protection Clause must show that invidious partisanship was one consideration motivating a challenged districting plan's lines or that the mapdrawers were predominantly motivated by invidious partisanship, this Court found that Plaintiffs' intent evidence satisfied either standard. *See id.* at *45; *id.* at *78–79 (Osteen, J., concurring). Likewise, the Court concluded that regardless of whether Plaintiffs or Defendants bore the burden under the Equal Protection Clause's justification prong, the evidence adduced at trial proved the 2016 Plan's invidious partisanship was not justified by the state's political geography or other legitimate state interests. *Id.* at *57 n.33 (majority op.). And the majority concluded that regardless of whether the First Amendment's "burden" requirement demands that a plaintiff prove that a partisan districting plan "chills" or "adversely effects" the plaintiffs' speech or associational rights, Plaintiffs' evidence proved that they suffered cognizable burdens on their First Amendment rights. *Id.* at *65–69. That this Court rendered factual findings under multiple potential legal standards makes it all the more likely that the Supreme Court will affirm this Court's judgment, regardless of what standard the Supreme Court adopts.

2.

Turning to whether Legislative Defendants have shown an "irreparable injury that outweighs any injury to the Plaintiffs and the public," *Personhuballah*, 155 F. Supp. at 559, we emphasize at the outset that the State Defendants have *not* requested that this Court stay its Order, nor have State Defendants appealed this Court's Order. Rather, *only* Legislative Defendants—the Republican leadership of the North Carolina General Assembly and the legislative redistricting committee responsible for drawing the 2016 Plan—seek a stay of this Court's Order.

Chief Justice Roberts has recognized that whether, and to what extent, Legislative Defendants are authorized to represent the State's interests in federal election law litigation is an unsettled question of State law. *North Carolina v. N.C. State Conf. of NAACP*, 137 S. Ct. 1399, 1399–1400 (2017) (Statement of Roberts, C.J., respecting the denial of certiorari). During the pendency of this litigation, the General Assembly enacted legislation, over a veto by the Governor, purporting to authorize the General Assembly to control representation of the State's interests in litigation challenging the constitutionality of State statutes. N.C. Gen. Stat. § 114-2(10), *as amended by* 2017 N.C. Sess. Law 57, § 6.7(m). But the Governor, as head of the State's executive branch, has the authority and obligation under the North Carolina Constitution "to take care that the laws be faithfully executed." N.C. Const. art. III, § 5(4); *State ex rel. McCrory v. Berger*, 781 S.E.2d 248, 258 (N.C. 2016). And the State Attorney General, a constitutional officer elected statewide, also may have constitutional, common law, and statutory authority to represent the State's interests in litigation. *Martin v. Thornburg*, 359 S.E.2d 472, 479 (N.C. 1987); *see also* John E. Harris, Note, *Holes in the Defense: Evaluating the*

8

*North Carolina Attorney General's Duty to Defend and the Responses of Other Government Actors*, 92 N.C. L. Rev. 2027, 2048 (2014) ("[T]he [North Carolina] [C]onstitution seems to contemplate that the legal representation of the State's positions falls to the executive branch.").  Additionally, in separate redistricting litigation—in which the court has asked a Special Master to draw alternative configurations for 9 of 116 districts included in a remedial plan enacted by the General Assembly—Legislative Defendants have represented that, in that posture, Legislative Defendants lack authority to represent the interests of the General Assembly as a whole.  Leg. Defs.' Resp. to Special Master's Draft Rep. 5, *Covington v. North Carolina*, No. 15-cv-399, (M.D.N.C. Nov. 17, 2017), ECF No. 215 (stating that "the [L]egislative [D]efendants do not themselves speak for the entire General Assembly," and therefore that "[a] few members of the legislature, even if they are leaders, are not authorized to state how the entire legislature would vote on, or amend, draft districts proposed by a law professor").

To the extent Legislative Defendants, as individual legislators, lack authority to represent the State's interests, then Legislative Defendants can show no meaningful harm, let alone irreparable harm.  In particular, requiring Legislative Defendants—four members of one of the State's three branches of government, none of whom are running for or elected to Congress—to participate in drawing new maps while they await a ruling from the Supreme Court does not amount to an "irreparable injury."  *Johnson v. Mortham*, 926 F. Supp. 1540, 1542 (N.D. Fla. 1996) ("[T]he mere administrative inconvenience the Florida Legislature and Florida elections officials will face in redistricting simply cannot justify denial of Plaintiffs' fundamental rights."); *Covington v.*

*North Carolina*, --- F. Supp. 3d ---, 2017 WL 4162335, at *11 (M.D.N.C. Sept. 19, 2017) (stating that "inconvenience to legislators," including having to "adjust their personal, legislative, or campaign schedules," does not amount to substantial harm).

And even if Legislative Defendants are entitled under State law to represent the State's interests—again, an unsettled question of state law—the timeline for drawing a new districting plan established by this Court's Order—which requires the General Assembly to adopt a new districting plan before the candidate filing period *begins* and *months before* both the primary and general elections—minimizes any harm to state interests.  As another three-judge panel concluded in rejecting a similar motion in a redistricting case, "[b]y adopting a remedy now, the [State] faces the lesser evil of implementing new districts at a time when it remains a relatively manageable task; then, if the [Supreme] Court reverses, the [State] need only revert to districts that it has operated under for years—a much less daunting challenge."  *See Personhuballah*, 155 F. Supp. 3d at 560.

### 3.

Whereas staying this Court's order would not materially injure Legislative Defendants, it would substantially injure—indeed, irreparably harm—Plaintiffs.  As numerous courts have recognized in cases holding that a state redistricting plan violates the Constitution or federal law, "[d]eprivation of a fundamental right, such as limiting the right to vote in a manner that violates the Equal Protection Clause, constitutes irreparable harm."  *Id.* (quoting *Johnson*, 926 F. Supp. at 1543); *see Harris*, 2016 WL 6920368, at *1 (same).  "[T]o prolong the creation of a [remedial] plan by the Legislature would only

10

serve to prolong the harm that plaintiffs have suffered for many years." *Cousin v. McWherter*, 845 F. Supp. 525, 528 (E.D. Tenn. 1994).

Additionally, Plaintiffs reasonably seek relief from the unconstitutional 2016 Plan prior to the 2018 election cycle, which begins in February 2018. Delaying Plaintiffs relief until after the Supreme Court resolves Legislative Defendants' appeal creates a substantial risk that, in the event the Supreme Court affirms this Court's judgment, this Court will not have adequate time to afford Plaintiffs the relief to which they are rightfully entitled—constitutionally compliant districting maps for use in the 2018 election. As this Court previously explained, "given the Court's 'responsibility to ensure that future elections will not be conducted under unconstitutional plans,' this substantial risk weighs strongly against granting the requested stay." *Common Cause I*, 2017 WL 3981300, at *7 (quoting *Larios*, 305 F. Supp. 2d at 1344).

That Plaintiffs and other North Carolina voters cast their ballots under an unconstitutional congressional redistricting plan in 2012, 2014, and 2016 only enhances the potential prejudice to Plaintiffs associated with staying these proceedings. If Plaintiffs—and North Carolina voters in general—are denied relief before the 2018 election, Legislative Defendants would reap the benefits of their invidious partisan districting efforts "for another election cycle." *Personhuballah*, 155 F. Supp. 3d at 560. As a result, North Carolinians would cast votes in congressional elections conducted under unconstitutional maps in 2012, 2014, 2016, *and* 2018—virtually the entire decade. Additionally, staying this Court's order pending Legislative Defendants' appeal would perversely "giv[e] [Legislative Defendants] the fruits of victory whether or not the appeal

11

has merit," *Jimenez v. Barber*, 252 F.2d 550, 553 (9th Cir. 1958), sending a troubling message to state legislatures that there is little downside to engaging in unlawful districting practices because "the federal courts are powerless to effectively redress [voters'] grievances," *Coal. for Educ. in Dist. One v. Bd. of Elections*, 370 F. Supp. 42, 58 (S.D.N.Y. 1974). We decline to send such a message.

4.

Finally, the public interest strongly weighs against staying this Court's Order. This Court found that the 2016 Plan violates "both the structure of the republican form of government embodied in the Constitution and fundamental individual rights preserved by the Bill of Rights" and the Fourteenth Amendment, *Common Cause II*, 2018 WL 341658, at *19. The 2016 Plan, therefore, inflicts "public harms," *Harris*, 2016 WL 6920368, at *2, including "harms to every voter in the [unconstitutional districts]," *Personhuballah*, 155 F. Supp. 3d at 560. These injuries "are magnified each time they are repeated." *Larios*, 305 F. Supp. 2d at 1344 (denying request to stay remedial proceedings pending Supreme Court review of a decision invalidating state districting plan). "The public has an interest in having congressional representatives elected in accordance with the Constitution." *Harris*, 2016 WL 6920368, at *2. Accordingly, as the Supreme Court has noted, once a districting scheme has been found unconstitutional, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

B.

Rather than specifically addressing the four stay factors in *Hilton*, Legislative Defendants argue that this Court should stay its Order for three reasons: (1) the Supreme Court's pending review of two three-judge panel decisions in partisan gerrymandering cases—*Gill v. Whitford*, Nos. 1161, 16A1149, and *Benisek v. Lamone*, No. 17-333—makes it likely that the Supreme Court will vacate this Court's Order; (2) the Supreme Court stayed remedial proceedings in *Whitford*; and (3) implementation of the Court's Order prior to the 2016 election will be unduly disruptive to the State's election processes. To the extent these arguments are relevant to the stay inquiry, we find them unpersuasive.

1.

As to the potential impact of Supreme Court review of *Whitford* and *Benisek* on this Court's decision, in denying a previous motion by Legislative Defendants to stay these proceedings, we explained that *Whitford* differs from the instant case "in a number of significant ways." *Common Cause I*, 2017 WL 3981300, at *4. In particular, we noted that there is a distinct possibility that the Supreme Court could reverse *Whitford* on standing grounds, without addressing the merits, because the *Whitford* plaintiffs do not reside in all of the challenged districts. *Id.* (citing *Whitford v. Gill*, 218 F. Supp. 3d 837, 929 (W.D. Wisc. 2016)). By contrast, Plaintiffs in these matters reside in all thirteen North Carolina congressional districts, and therefore have standing to assert statewide and district-by-district challenges to the 2016 Plan as a whole. *Common Cause II*, 2018 WL 341658, at *14 n.9.

13

Additionally, *Whitford* involved state legislative districts, whereas the instant cases involve congressional districts. *Common Cause I*, 2017 WL 3981300, at *5. This Court unanimously concluded that the 2016 Plans violate provisions in Article I of the Constitution that pertain only to congressional redistricting, *see Common Cause II*, 2018 WL 341658, at *71–74; *id.* at *80–81 (Osteen, J., concurring in part), and therefore are not—and cannot be—at issue in *Whitford*. Likewise, because States have only "delegate[d]" authority to draw congressional districts, as opposed to their "sovereign" authority to draw state legislative districts, the instant cases do not present the same federalism concerns as those in *Whitford*. *Id.* at *70 (majority op.) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802–05 (1995)). And whereas the *Whitford* plaintiffs advanced a single framework for evaluating partisan gerrymandering claims under the First Amendment and Equal Protection Clause, Common Cause Plaintiffs proposed—and this Court adopted—a distinct framework for assessing partisan gerrymandering claims under the First Amendment. *Id.* at *64.

Finally, the trial revealed numerous meaningful factual differences between *Whitford* and the instant cases. For example, the *Whitford* districting plan was enacted as part of a decennial redistricting, whereas the General Assembly drew the Plan to preserve the partisan make-up of the General Assembly after federal courts held that North Carolina's 2011 congressional districting plan constituted a racial gerrymander. *Id.* at *4. Additionally, Plaintiffs adduced direct evidence of the General Assembly's invidious partisan intent—including statements by the legislators and consultant responsible for drawing the 2016 Plan, *id.* at *35–45—whereas the *Whitford* Court appears to have

14

largely relied on circumstantial evidence of intent. And Plaintiffs introduced numerous persuasive empirical analyses demonstrating the discriminatory partisan intent motivating adoption of the 2016 Plan, the 2016 Plan's discriminatory effects, and the lack of legitimate justification for those effects, most of which were not presented to the *Whitford* court. *Id.* at *35–60.

Although there are similarities between the instant cases and *Benisek*—both cases involve congressional districts and rely on similar First Amendment theories—*Benisek* also is meaningfully distinguishable in numerous ways. Most significantly, *Benisek* is before the Supreme Court on appeal from a denial of the plaintiffs' motion for the "extraordinary remedy" of a preliminary injunction. *Benisek v. Lamone*, 266 F. Supp. 3d 799, 808–09 (D. Md. 2017). To that end, unlike the instant cases, which were decided after full discovery and a four-day trial, *Benisek* involved only limited factual development. *Id.* at 809. In particular, whereas this Court made *dozens* of pages of factual findings based on thousands of pages of evidence and testimony, *e.g.*, *Common Cause II*, 2018 WL 341658, at *3–8, 35–60, the preliminary injunction record before the *Benisek* majority allowed it to render only *two* pages of factual findings, 266 F. Supp. 3d at 808–09. And the *Benisek* Court emphasized that the limited evidence available at the preliminary injunction stage suggested that the effects of the alleged gerrymander might not persist in subsequent elections. *Id.* at 808 ("[T]he razor's-edge Sixth District race in 2014 is evidence that suggests significant party-crossover voting and calls into doubt whether the State engineered an *effective* gerrymander."). By contrast, a variety of expert analyses presented by Plaintiffs to this Court proved the 2016 Plan's discriminatory

15

partisan effects and demonstrated that those effects were likely to persist under all probable electoral scenarios. *Common Cause II*, 2018 WL 341658, at *47–57. Notably, the *Benisek* majority acknowledged that with the benefit of a full trial record the plaintiffs "might" prevail, but that it could not conclude the plaintiffs were "likely" to prevail on the limited preliminary injunction record before it. 266 F. Supp. 3d at 808–09; *see also id.* at 814 ("The Court remains open to the possibility that the evidence Plaintiffs have adduced, when subject to robust cross-examination and the development that only a trial can bring, may satisfy Plaintiffs' burden of proof.").

*Benisek* also meaningfully differs from the instant case from a legal perspective. Unlike the instant cases, in which this Court held that the 2016 Plan violated the Equal Protection Clause and Article I, Section 4, *Common Cause II*, 2018 WL 341658, at *1, *Benisek* does not include challenges under either constitutional provision. And although the *Benisek* plaintiffs asserted a claim under Article I, Section 2—which this Court found the 2016 Plan also violates, *id.* at *72–73—the *Benisek* preliminary injunction opinion did not separately address that claim. And whereas *Benisek* involves a challenge to a single congressional district, the instant cases challenge the 2016 Plan as a whole. *Id.* at *8, 13–14 & n.9. Accordingly, the Supreme Court's conclusion as to whether the *Benisek* plaintiffs satisfied their burden to obtain the extraordinary relief of a preliminary injunction on their First Amendment claim is highly unlikely to resolve, from either a factual or legal perspective, all issues decided by this Court's Order.

In light of the numerous legal and factual differences between *Whitford* and *Benisek* and the instant case, any decision the Supreme Court renders in those cases is

highly unlikely to undermine all of the factual and legal bases upon which this Court found the 2016 Plan violated the Constitution and enjoined further use of that plan. Indeed, the only way *Whitford* and *Benisek* would completely dispose of this Court's factual findings and legal conclusions would be if the Supreme Court holds that partisan gerrymandering claims are nonjusticiable under any legal theory, not just the Equal Protection framework adopted by the *Whitford* majority and the First Amendment framework considered by the *Benisek* majority. But, as this Court recognized in denying Legislative Defendants' previous stay motion, "the Supreme Court recently stated that '[p]artisan gerrymanders . . . are incompatible with democratic principles.'" *Common Cause I*, 2017 WL 3981300, at *6 (quoting *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015) (alteration in original)). "And the Court's last three decisions addressing partisan gerrymandering claims under the Equal Protection Clause have held that such claims are justiciable." *Id.* "It is axiomatic that "if a precedent of [the Supreme] Court has direct application in a case . . . [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.* (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (internal quotation marks omitted)). Accordingly, in ruling on Legislative Defendants' Motion, we must follow the Supreme Court's holding that partisan gerrymandering claims are justiciable and, therefore, refrain from exercising our discretion to stay our Order "on the bare possibility that the Supreme Court may reverse its precedent and flatly bar claims challenging a practice the Court has characterized as

17

'incompatible with democratic principles.'" *Id.* (quoting *Ariz. State Leg.*, 135 S. Ct. at 2658).

2.

Next, Legislative Defendants maintain that the Supreme Court's decision to stay remedial proceedings in *Whitford* renders it highly likely that the Supreme Court will stay remedial proceedings in these matters. Again, we disagree. The Supreme Court did not explain its decision to stay the remedial proceedings in *Whitford*. And there are a variety of reasons the Supreme Court may have decided to stay the remedial proceedings in *Whitford* that have no bearing on the instant cases. For example, the Supreme Court may have concluded that the state appellant in *Whitford* was likely to prevail on its statewide standing argument. Or the Court may have believed that the substantial federalism concerns with invalidating state legislative districts, as opposed to congressional districts, weighed heavily in favor of staying remedial proceedings until the Court rendered a final decision. Or the Court may have concluded that the less extensive empirical evidence introduced in *Whitford* was insufficient to demonstrate the challenged plan's discriminatory effects. Given that the Supreme Court provided no explanation for its decision to stay the remedial order in *Whitford* and that there are a variety of reasons for staying remedial proceedings in *Whitford* that have no bearing on this case, the Supreme Court's decision to stay remedial proceedings in *Whitford* does not justify the "extraordinary relief" of staying this Court's Order and risking that North Carolina will conduct a fourth congressional election under an unconstitutional districting plan.

Legislative Defendants nonetheless suggest that the Supreme Court will stay this Court's Order because the *Whitford* trial court gave the State a longer period of time to draw the remedial plan and the record in *Whitford* included several constitutionally compliant alternative plans. Motion 5. But the *Whitford* Court was able to give the state months to draw remedial maps because the next election was nearly two years away when the court rendered its liability decision. By contrast, the two-week window this Court provided to the State to draw remedial maps was dictated by the goal of minimally disrupting the State's election cycle, which begins in February, and conforms to the timeframe established by state law. *Common Cause II*, 2018 WL 341658, at *75. And contrary to Legislative Defendants' contentions, the record in this case includes a number of alternative districting plans. In particular, a bipartisan group of former judges convened to serve as a simulated nonpartisan redistricting commission drew an alternative congressional plan that conforms to virtually all traditional non-partisan districting criteria. *Id.* at *36 n.18. And two of Plaintiffs' experts drew thousands of simulated districting plans that conform to traditional districting criteria. *Id.* at *36–42.

3.

Finally, Legislative Defendants maintain "this Court should stay the Order under the Supreme Court's doctrine in *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)," because requiring the State to adopt and implement remedial districts at this time will disrupt the State's electoral processes. Motion 5–6. As this Court recognized in enjoining further use of the 2016 Plan, the Supreme Court long has held that once a court finds a redistricting plan violates the Constitution, "courts should take 'appropriate action to

19

insure that no further elections are conducted under the invalid plan.'" *Common Cause II*, 2018 WL 341658, at *74 (quoting *Reynolds*, 377 U.S. at 585). In *Purcell*, the Supreme Court highlighted an exception to this rule: when a state's election machinery is already in progress and an election is imminent, courts should be wary of making changes to state election laws. 549 U.S. at 4–5.

But *Purcell* involved an election that was "weeks" away. *Id.* at 4. By contrast, here the general election is more than *ten months* away. Indeed, the election cycle has not yet officially started. The candidate-filing period does not *begin* until February 12, 2018, more than two weeks *after* this Court's deadline for the General Assembly to enact a new plan, and the primary elections will not take place until May 2018. Legislative Defendants identify no cases holding that a Court violates the *Purcell* exception by enjoining the use of an unconstitutional districting plan before the start of an election cycle and months before any election is set to take place. And other courts have enjoined the use of unlawful election laws with less time until the next general election. *See, e.g.*, *Harris*, 2016 WL 6920368, at *1–2 (denying motion to stay order enjoining use of unconstitutional redistricting plan when general election was nine months away); *Larios*, 305 F. Supp. 2d at 1344 (rejecting disruption argument when general election was "more than eight months away"); *Flateau v. Anderson*, 537 F. Supp. 257, 266 (S.D.N.Y. 1962) (rejecting disruption argument when general election was seven months away and candidate filing period had not started).

We further "observe that the court has broad equitable power to delay certain aspects of the electoral process if necessary." *Larios*, 305 F. Supp. 2d at 1342 (citing

*Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 201 n.11 (1972); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971)). Accordingly, if this Court needs to extend the candidate-filing period to ensure any proposed remedial plan enacted by the General Assembly completely remedies the constitutional violation and is otherwise legally acceptable, it is within our power to do so. *Id.* at 1343. Additionally, we emphasize that the majority's decision to appoint a special master to draw a back-up plan concurrent with the General Assembly's opportunity to enact a remedial plan, and the Court's review of any such plan, further ensures that the state's election cycle will be minimally impacted. In particular, in the event the General Assembly fails to enact a remedial plan or enacts a remedial plan that is legally unacceptable, the special master's back-up plan will be more quickly available—and thereby subjecting the State's electoral process to less disruption—than if the Court waited until after it reviewed the General Assembly's remedial to appoint a special master.

## III.

For the foregoing reasons, we deny Legislative Defendants' motion to stay.

DENIED

Date: January 16, 2018

/s/ Hon. James A. Wynn, Jr.

/s/ Hon. William L. Osteen, Jr.

/s/ Hon. W. Earl Britt