# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

COMMON CAUSE, *et al.*,

       PLAINTIFFS,

       v.

ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, *et al.*,

       DEFENDANTS.

|  |
|---|

CIVIL ACTION
No. 1:16-CV-1026-WO-JEP

THREE-JUDGE COURT

## BRIEF OF THE *COMMON CAUSE* PLAINTIFFS IN RESPONSE TO ORDER OF JUNE 27, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

Answers of *Common Cause* Plaintiffs to the Court's Questions ........................................ 1

ARGUMENT ..................................................................................................................... 3

    I.    The Two Holdings in *Gill v. Whitford* ................................................................ 3

    II.    *Gill* Does Not Adversely Impact This Court's Holdings that the 2016
    Plan violates the First Amendment and Article I, §§ 2 and 4 of the
    Constitution (Issue 1) ....................................................................................... 7

    III.    The *Common Cause* Plaintiffs Have Standing to Assert
    Vote-Dilution Claims, Non-Dilutionary Claims for Injury to
    Their Rights of Political Association, and Structural Injury Claims
    (Issues 2 and 3) ................................................................................................. 9

        a.    Unlike *Gill*, this Court found that the votes of the Democratic and
        other non-Republican voters in each of the ten cracked districts
        were diluted by their placement in those districts under the 2016 Plan
        and, further, that these voters have standing to challenge the
        apportionment of their districts (Issue 2) ....................................................... 9

        b.    *Gill* also supports the standing of Democratic voters in packed
        Districts to assert district-specific claims under the Equal
        Protection Clause (Issue 3) ........................................................................... 10

        c.    Cracking and packing violate the fundamental duty of government
        under the Equal Protection Clause to govern impartially ........................... 10

        d.    The *Common Cause* Plaintiffs also have standing based on the
        legally cognizable "non-dilutionary injuries" to their rights of
        political association ...................................................................................... 14

i

e. The North Carolina Democratic Party also has standing to assert a statewide claim .......................................................................................... 17

f. Plaintiffs also have standing to challenge the 2016 Plan as a violation of Article I's structural guarantees .............................................. 18

IV. The Sufficiency of These Findings Dictates the Response of the *Common Cause* Plaintiffs With Respect To the Second, Third and Fourth Issues Raised by the Court .................................................................. 20

CONCLUSION ........................................................................................................ 23

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ............................................................................. 17

*Ariz. State Legislature v. Arizona Indep. Redistricting Comm'n*,
    135 S. Ct. 2652 (2015) ........................................................................ 18

*Arlington Heights v. Metropolitan Housing Corp.*,
    429 U.S. 252 (1977) ............................................................................. 13

*Bond v. United States*,
    564 U.S. 211 (2011) ......................................................................... 18-19

*Bush v. Gore*,
    531 U.S. 98 (2000) ............................................................................... 11

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ............................................................................. 13

*Common Cause v. Rucho*,
    279 F. Supp. 3d 587 (M.D.N.C. 2018) ............................................*passim*

*Davis v. Bandemer*,
    478 U.S. 109 (1986) ............................................................................. 11

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .....................................................................*passim*

*Karcher v. Daggett*,
    462 U.S. 725 (1983) ............................................................................. 11

*Lozman v. City of Rivera Beach, Fla.*
138 S. Ct. 1945 (2018) ........................................................................................ 13

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992) ............................................................................................ 22

*Mt. Healthy City Bd. of Ed. v. Doyle,*
429 U.S. 274 (1977) ............................................................................................ 13

*N.E. Fla. Chapter, Associated Gen. Contractors v. City of Jacksonville,*
508 U.S. 656 (1993) ........................................................................................ 12-13

*Reed v. Town of Gilbert,*
135 S.Ct. 2218 (2015) ...................................................................................... 13-14

*Reynolds v. Sims,*
377 U.S. 533 (2015) ............................................................................................ 11

*Romer v. Evans,*
517 U.S. 620 (1996) ............................................................................................ 11

*Warth v. Seldin,*
422 U. S. 490 (1975) ............................................................................................ 18

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I .................................................................................... *passim*

U.S. Const. art. 1, § 2 .................................................................................. *passim*

U.S. Const. art. 1 § 4 ................................................................................... *passim*

iv

The *Common Cause* Plaintiffs in Civil Action No. 1:16-CV-1026 respectfully submit this brief in response to this Court's Order of June 27, 2018, which invited the parties in these two captioned cases to submit briefs addressing the following four issues:

1.      What impact, if any, *Gill* has on this Court's holdings that the 2016 Plan violates the First Amendment and Article I of the Constitution;

2.      Whether the existing factual record is adequate to address whether Plaintiffs have standing to state a vote dilution claim under the Equal Protection Clause;

3.      If a party believes additional factual development is required, what that factual development should entail; and

4.      Assuming arguendo that no additional factual development is required, whether, under *Gill*, Plaintiffs have standing to assert a vote dilution claim under the Equal Protection Clause.

In addressing these questions, the parties were directed to include citations to the record supporting their responses.

### Answers of the *Common Cause* Plaintiffs to the Court's Questions

The *Common Cause* Plaintiffs respectfully submit the following answers to the Court's questions:

1.      *Gill* has no impact on this Court's prior holdings that the 2016 Plan violates both the First Amendment and Article I, §§ 2 and 4 of the Constitution.  Indeed, the opinion of the Court took pains to note that it was not expressing a view on anything except the

plaintiffs' Equal Protection claim premised on vote dilution.  In light of Justice Kagan's concurrence, however, this Court can and should make further findings, based on the already-existing record in this case, in further support of those holdings.

2.      The existing factual record is adequate to support this Court's previous finding of fact that the *Common Cause* Plaintiffs' votes were diluted under the 2016 Plan and its holding that they have standing to bring a vote-dilution claim under the Equal Protection Clause based upon district-specific injuries.  The current record is also sufficient to establish the *Common Cause* Plaintiffs' standing to assert challenges against the 2016 Plan (whether as a whole or district-by-district) to redress injuries to their non-dilutionary rights of political association.  Finally, the current record is also sufficient to establish the *Common Cause* Plaintiffs' standing to challenge the 2016 Plan (whether as a whole or district-by-district) based on structural harms cognizable under Article I.

3.      No supplementation of the record is required to establish the *Common Cause* Plaintiffs' standing to assert an Equal Protection Claim on a vote-dilution injury theory under *Gill.*  Nor is additional factual development necessary to support the *Common Cause* Plaintiffs' standing to prove claims under the First Amendment,  Article I, §§ 2 or 4 of the Constitution.  Nevertheless, in light of the remand by the Supreme Court, this Court can and should make supplemental findings based on the already-existing record in

2

further support of its previous holding that the *Common Cause* Plaintiffs have established district-specific standing.[1]

4.    Under *Gill*, the *Common Cause* Plaintiffs have standing to assert district-specific vote dilution claims under the Equal Protection Clause challenging the apportionment of their respective individual districts.  The *Common Cause* Plaintiffs also have standing to assert challenges to the 2016 Plan (whether as a whole or district-by-district) to redress injuries to their non-dilutionary rights of political association.  Lastly, the *Common Cause* Plaintiffs have standing to challenge the 2016 Plan (whether as a whole or district-by-district) based on structural harms cognizable under Article I.

## ARGUMENT

### I.    The Two Holdings in *Gill v. Whitford*.

In *Gill v. Whitford*, 138 S. Ct. 1916 (2018), the Supreme Court held:

First, a vote-dilution claim under the Fourteenth Amendment is district-specific and must be supported by a district-specific injury.  An individual voter does not have standing to challenge a state-wide state legislative apportionment plan as a whole under the Equal Protection Clause on a vote-dilution injury theory.  *See* 138 S. Ct. at 1930–31.

Second, an individual voter has standing to challenge his or her "placement in a 'cracked' or 'packed' district" under the Equal Protection Clause on a vote-dilution

---

[1] The *Common Cause* Plaintiffs believe that the current record is adequate and does not require supplementation; however, in the event that the Court decides to grant a request by other parties to supplement the record, the Common Cause Plaintiffs respectfully request that they be permitted to file the Declaration of Dr. Jowei Chen, attached as Exhibit B, and discussed *infra* at 21-22.

3

theory of injury. *Id.* at 1931. The Court in *Gill* remanded the Wisconsin plaintiffs'

district-specific claims that their votes had been diluted by their placement in "packed" or

"cracked" districts for trial under the Equal Protection Clause. *Id.* at 1934.

    *Gill* addressed a statewide challenge under the Equal Protection Clause to the

apportionment of Wisconsin's 99 state senate districts. The plaintiffs alleged standing to

assert their statewide challenge based exclusively on a vote-dilution theory of injury. The

plaintiffs alleged that the Republican-controlled legislature had wasted the votes of

Democratic voters statewide by packing and cracking Democratic voters into districts to

enable Republicans to capture a disproportionate share of the seats—e.g., 60 seats (60.6%

of the seats) in 2012 with only 48.6% of the statewide vote and 63 seats (63.6% of the

seats) in 2014 with only 52% of the statewide vote. Only four of the twelve plaintiffs

alleged that they lived "in a district that has been packed or cracked." 138 S. Ct. at 1924.

And these plaintiffs did not allege that their placement in packed or cracked districts

diluted their votes in their individual districts. They instead alleged that, "regardless of

'whether they themselves reside in a district that has been packed or cracked,' they have

been 'harmed by the manipulation of district boundaries' because Democrats statewide

'do not have the same opportunity provided to Republicans to elect representatives of

their choice to the Assembly.'" *Id.* Although the Wisconsin plaintiffs cited the First

Amendment in their complaint, they based their case at trial solely on the Equal

Protection Clause, and relied exclusively on the efficiency gap and other statewide

4

evidence to prove that the votes of Democratic voters statewide had been diluted in comparison to those of Republican voters statewide.

The Supreme Court held that the individual voters in *Gill* did not have standing to assert a statewide vote-dilution claim under the Equal Protection Clause because vote-dilution is a district-specific injury. *See id.* at 1930. The Court determined that the Wisconsin "plaintiffs' partisan gerrymandering claims turn[ed] on [their] allegations that their votes have been diluted." *Id.* at 1930-1931. "That harm," the Court reasoned, "arises from the particular composition of the voter's own district"—not from the composition of the 99-member Wisconsin Senate as a whole. *Id.* at 1931. The Court explained, "[a]n individual voter in Wisconsin is placed in a single district … [and] votes for a single representative. The boundaries of the district, and composition of its voters, determine whether … a particular voter is packed or cracked." *Id* at 1930. Accordingly, the Court concluded that it is the composition of "the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Id.* at 1931.

The Court, therefore, rejected the Wisconsin plaintiffs' argument "that their legal injury is not limited to the injury that they have suffered as individual voters" from the packing or cracking of their individual districts, "but extends also to the statewide harm to their interest 'in their collective representation in the legislature.'" *Id.* The Court held that, in the Equal Protection context, the Wisconsin plaintiffs' alleged injury was not an

5

"individual and personal injury … [as] required for Article III standing," but rather an "undifferentiated, generalized grievance." *Id.* The Court summarized its holding:

> [T]he sum of the standing principles articulated here, as applied to this case, is that the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes. In this gerrymandering context that burden arises through a voter's placement in a "cracked" or "packed" district.

*Id.*

The Court pointed out, however, that "four of the plaintiffs [had] … alleged that they lived in State Assembly districts where Democrats have been cracked or packed." *Id.* at 1924. The Court held that, unlike the other plaintiffs in *Gill,* these four "plaintiffs … [had] pleaded a particularized burden along [the] lines" that were required to establish their standing to state a vote-dilution claim under the Equal Protection Clause by "alleg[ing] that Act 43 had 'dilut[ed] the influence' of their votes as a result of packing or cracking of their legislative districts." *Id.* at 1931. The Court nevertheless reversed because "the[se] plaintiffs failed to meaningfully pursue their allegations of individual harm." *Id.* at 1932. Specifically, despite their allegations, "not a single plaintiff sought to *prove* that he or she lives in a cracked or packed district. They instead rested their case at trial – and their arguments before this Court – on their [efficiency gap] theory of statewide injury to Wisconsin Democrats . . . ." *Id.* (emphasis added). The Court refused, however, to dismiss these four plaintiffs' claims based on their failure to prove their allegations that they lived in packed or cracked districts (as Justice Thomas argued in his concurring opinion). The Court instead remanded the case for a new trial "in light

6

of the plaintiffs' allegations that [four plaintiffs] live in districts where Democrats like them have been packed or cracked … so that the plaintiffs may have an opportunity to prove concrete and particularized injuries . . . ." *Id.* at 1934.

## II.    *Gill* Does Not Adversely Impact This Court's Holdings that the 2016 Plan Violates the First Amendment and Article I, §§ 2 and 4 of the Constitution (Issue 1).

*Gill* does nothing to undermine or require reconsideration of this Court's prior holdings that the 2016 Plan violated the First Amendment and Article I, §§ 2 and 4 of the Constitution for at least four reasons:

*First*, unlike in the *Common Cause* case at bar, Article I, §§ 2 and 4 were not at issue in *Gill*.  Those provisions of the Constitution apply only to federal elections for the House of Representatives, and *Gill* concerned a challenge to a gerrymander of state legislative districts only.

*Second*, unlike the case at bar, *Gill* was not tried or decided under First Amendment principles.  In *Gill*, although the Wisconsin plaintiffs' complaint mentioned the First Amendment, the district court tried and decided—and, critically, the Supreme Court reviewed—only an Equal Protection claim.

*Third*, unlike the *Common Cause* plaintiffs, the Wisconsin plaintiffs based their standing to sue *solely* on a vote-dilution theory of injury.  The Wisconsin plaintiffs neither alleged nor proved that the partisan gerrymander of the legislative districts in Wisconsin had caused non-dilutionary injuries to their rights of political association as Democratic voters by making it more difficult for the plaintiffs to recruit candidates, raise

7

money, and persuade others to volunteer and turn out and vote in support of Democratic candidates—either in their own districts or in other districts. The opinion of the Court went out of its way to make clear that it was "leav[ing] for another day consideration of other possible theories of harm" beyond vote dilution, such as the associational theory discussed in Justice Kagan's concurrence. 138 S. Ct. at 1931; *see id.* at 1938-40 (Kagan, J., concurring).

*Fourth*, unlike the *Common Cause* case, the state Democratic Party was not a plaintiff in *Gill*. The Wisconsin Democratic Party has standing and could have asserted district-specific vote-dilution claims on behalf of its Democratic members in every packed district and every packed and cracked district in the State of Wisconsin. More importantly, as a statewide political organization, the Wisconsin Democratic Party has standing and could have asserted a statewide Equal Protection based on the "legally cognizable non-dilutionary injuries" to the Party's rights of political association and those of its members. *See*, *e.g.*, *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 615-16 (M.D.N.C. 2018), *vacated and remanded,* No. 17-1295, 2018 WL 1335403 (U.S. June 25, 2018). The non-dilutionary rights of political association of the Wisconsin Democratic Party are not confined to the boundaries of the particular district in which its members are registered to vote. The state Democratic Party and its members have an associational right to raise money, to recruit volunteers, and to encourage people to vote for Democratic candidates for Congress in every district in the state, and not merely for candidates running in a voter's home district. The injuries to the non-dilutionary rights of

8

political association of the Wisconsin Democratic Party as a statewide political organization, are, as Chief Justice Roberts described in *Gill*, injuries to the "group political interests" of the Wisconsin Democratic Party. *Id*. at 1933; *see also id.* at 1938 (Kagan, J., concurring).

### III. The *Common Cause* Plaintiffs Have Standing to Assert Vote-Dilution Claims, Non-Dilutionary Claims for Injury to Their Rights of Political Association, and Structural Injury Claims (Issues 2 and 3).

a. *Unlike* **Gill***, this Court found that the votes of the Democratic and other non-Republican voters in each of the ten <u>cracked</u> districts were diluted by their placement in those districts under the 2016 Plan and, further, that these voters have standing to challenge the apportionment of their districts* (*Issue 2*)*.*

Unlike *Gill*, this Court has made an express finding that the votes of the Democratic plaintiffs who live in each of the ten "cracked" districts were diluted by the way in which their districts were drawn under the 2016 Plan, and that these plaintiffs have standing to sue on a vote-dilution injury theory based on this district-specific harm. This Court found that:

> [T]he 2016 Plan diluted the votes of those Plaintiffs who supported non-Republican candidates and reside in the ten ["cracked"] districts that the General Assembly drew to elect Republican candidates ["cracked"]. That dilution constitutes a legally cognizable injury-in-fact.

*Rucho*, 279 F. Supp. 3d at 615.

This finding supports the standing of the ten individual Democratic plaintiffs who live in each of the ten "cracked" districts to assert district-specific challenges under the Equal Protection Clause. The Court's finding also supports the standing of Common Cause, the North Carolina Democratic Party, and the League of Women Voters to assert

9

district-specific claims of vote-dilution under the Equal Protection Clause on behalf of their members who live in each of the ten districts that the 2016 Plan cracked.

### b. **Gill** *also supports the standing of Democratic voters in <u>packed</u> districts to assert district-specific claims under the Equal Protection Clause (Issue 3).*

The Supreme Court went a step further in *Gill v. Whitford* and held that Democratic voters who were placed in "packed" districts would also have standing to sue on a vote-dilution injury theory. *See Gill*, 138 S. Ct. at 1931 (concluding that the vote dilution harm in challenges to partisan gerrymanders "arises through a voter's *placement* in a "cracked' *or 'packed'* district") (emphasis added). This is because placement in a "packed" district reduces the practical importance of one's vote just as much as placement in a "cracked" district does; either way, one's own personal vote matters less (or not at all). *Gill*, 138 S. Ct. at 1930; *see also id.* at 1936 (Kagan, J., concurring).

In the light of this ruling, counsel respectfully suggest that this Court amend its findings to conform to the holding of *Gill* and hold that the Democratic voters who were placed by the 2016 Plan in one of the three "packed" congressional districts—the 1st, the 4th, and the 12th districts—also have standing to challenge their district's lines under the Equal Protection Clause, as do the organizational plaintiffs with members placed in those districts.

### c. *Cracking and packing violate the fundamental duty of government under the Equal Protection Clause to govern impartially.*

The Supreme Court has held that "the idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative

10

government." *Bush v. Gore*, 531 U.S. 98, 107 (2000). If the "constitutional conception of 'equal protection of the laws' means anything," it means that a State has a fundamental duty to govern impartially. *Romer v. Evans*, 517 U.S. 620, 634 (1996). "The principle that government … remain open on impartial terms [is] …[c]entral both to the idea of the rule of law and to our own Constitution's guarantee of equal protection." *Id.* at 633. "In the context of redistricting, that guarantee is of critical importance because the franchise provides most citizens their only voice in the legislative process … [and] the contours of a voting district powerfully may affect citizens' ability to exercise influence through their vote." *Davis v. Bandemer*, 478 U.S. 109, 166 (1986) (Powell, J., concurring) (citing *Reynolds v. Sims*); *Karcher v. Daggett*, 462 U.S. 725, 748 (1983) (Stevens, J.).

The cracking and packing of Democratic voters by the 2016 Plan are merely two sides of the same unconstitutional coin. The 2016 Plan is a classic example of a law with the primary purpose and effect of making it "more difficult for one group of citizens than … others to seek aid from the government [and] is itself a denial of equal protection… in the most literal sense" to both packed voters and cracked voters. *Romer,* 517 U.S. at 633.

A district is cracked when it has been politically cleansed by the removal of a sufficient number of Democratic voters to leave the district in the control of a safe majority of Republican voters. The Democratic voters who are removed from a cracked district must go somewhere. They must either be dumped into another cracked district which has Republican majority that is large enough to absorb the transferees, or they must be packed into a district with a supermajority of Democratic voters. In either case,

11

the votes of these Democrats will be diluted or wasted, and will no longer be as effective or influential as their votes would have been if the cracking and packing had not occurred. *See Gill*, 138 S. Ct. at 1936 (Kagan, J., concurring)

This Court correctly found that the *Common Cause* Plaintiffs had more than satisfied their burden of proof to demonstrate that cracking and packing and, further, that Plaintiffs established not only that invidious partisanship was *a* motive for the packing and cracking of Democratic voters by the 2016 Plan, but that *the predominant motive* of the 2016 Plan was to preserve the existing Republican "Partisan Advantage," which itself was the product of an earlier, admitted partisan gerrymander in 2011. *Rucho*, 279 F. Supp. 3d. at 654. This Court specifically found that:

> Legislative Defendants [did] not dispute that the General Assembly intended for the 2016 Plan to favor supporters of Republican candidates and disfavor supporters of non-Republican candidates. . . . The General Assembly expressly directed the legislators and consultant responsible for drawing the 2016 Plan to rely on 'political data' … to draw a districting plan that would ensure Republican candidates would prevail in the vast majority [10 of 13] of the state's congressional districts.

*Rucho*, 279 F. Supp. 3d at 597.

The Supreme Court has held that "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group … need not allege [or prove] that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury-in-fact' in an equal protection case … is the denial of equal treatment … from the imposition of the barrier, not the ultimate inability to obtain the benefit." *N.E.*

12

*Fla. Chapter, Associated Gen. Contractors v. City of Jacksonville,* 508 U.S. 656, 666

(1993) (Thomas, J.) (collecting cases); *Clinton v. City of New York*, 524 U.S. 417, 432-33

(1998).

The Common Cause Plaintiffs satisfied their burden of establishing standing and

proving substantive violations of both the Equal Protection Clause and the First

Amendment when they proved that the packing and cracking of Democratic voters by the

2018 Plan was motivated by a discriminatory partisan intent on the part of the General

Assembly to pack and crack Democratic voters to preserve the Republican majority's 10-

3 partisan advantage. The burden of proof then shifted to the Legislative Defendants to

prove that the injuries to the *Common Cause* Plaintiffs were not caused by the packing

and cracking of their votes under the 2016 Plan.  They could do so by showing that the

political makeup of the districts in the 2016 Plan were the result of political geography or

other legitimate factors and that Democratic voters would have been subject to the same

electoral disadvantages if the General Assembly had drawn district lines based purely on

legitimate redistricting principles.  *See Arlington Heights v. Metropolitan Housing Corp*.,

429 U.S. 252, 270-271, n.21 (1977) (equal protection); *Rucho,* 279 F. Supp. 3d at 639

(citing *Arlington Heights*); *see also Mt. Healthy City Bd. of Ed. V. Doyle*, 429 U.S. 274,

287 (1977) (First Amendment); *Lozman v. City of Rivera Beach, Fla*. 138 S. Ct. 1945,

1954-55 (2018) (also First Amendment).  Defendants could have argued that the

intentional discrimination against Democratic voters was necessary to achieve a

compelling state interest and was narrowly tailored. *See*, *e.g.*, *Reed v. Town of Gilbert*,

13

135 S.Ct. 2218, 2226 (2015).  However,  the "Legislative Defendants …[did] not argue—and have never argued—that the 2016 Plan's intentional disfavoring of supporters of non-Republican candidates advances *any* democratic, constitutional, or public interest." *Rucho,* 279 F. Supp. 3d at 597 (emphasis in the original).

Exhibit A contains additional citations to the record and proposed supplemental findings in support of the Court's earlier findings that the 2016 Plan diluted and/or nullified the votes of the *Common Cause* Plaintiffs relative to the votes of Republican voters.

### d. *The* Common Cause *Plaintiffs also have standing based on the legally cognizable "non-dilutionary injuries" to their rights of political association.*

Unlike the Wisconsin plaintiffs in *Gill*, the *Common Cause* Plaintiffs did not base their standing to sue under the Equal Protection Clause solely on vote dilution. The *Common Cause* Plaintiffs also alleged and proved that the 2016 Plan caused "*legally cognizable non-dilutionary injuries*" to the rights of political representation and association of Democratic voters in both the packed districts and the cracked districts, as well as statewide.  *Rucho*, 279 F. Supp. 3d at 615 (emphasis added).

Unlike vote-dilution injury, which is inherently district-specific because it stems from the drawing of an individual voter's own district lines, injuries to the *Common Cause* plaintiffs' First Amendment rights are *both* district-specific *and* statewide.  A number of the *Common Cause* voter-plaintiffs testified that the packing or cracking of *their* districts made *their* Congresspersons less responsive to *their* concerns, injuring their

14

First Amendment right to petition their representatives.  This is a district-specific injury.

Similarly, a number of the *Common Cause* voter-plaintiffs testified that the packing or

cracking of *their* districts made it more difficult to recruit candidates to run in *those*

districts.  This, too, is a district-specific injury, because it stems from the drawing of their

own districts' lines.

But First Amendment associational harm need not be district-specific, and the

*Common Cause* plaintiffs alleged and proved state-wide harms as well.  As Justice Kagan

noted in her concurrence, party members have associational interests that transcend the

lines of any single district and the outcome of any single district's race.  Democratic

Party members in *any* district—whether packed, cracked, or otherwise—have an identical

shared interest in the party's statewide ability to "fundrais[e], register[] voters, attract[]

volunteers, generat[e] support from independents, and recruit[] candidates to run for

office."  *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring).  The *Common Cause* plaintiffs

alleged and proved that "the gerrymander has burdened the ability of like-minded people

*across the State* to affiliate in a political party and carry out [these] activities and

objects."  *Id.* at 1939 (emphasis added).  Because these objectives are statewide, each of

the *Common Cause* voter-plaintiffs has standing to challenge the 2016 Plan in its entirety.

*Id.* ("Because on this alternative [non-dilutionary] theory, the valued association and the

injury to it are statewide, so too is the relevant standing requirement.").

The 2016 Plan burdens these legally cognizable non-dilutionary rights of political

association of the Democratic–voter plaintiffs irrespective of whether they live in a

15

packed district or a cracked district. The 2016 Plan makes it harder for a Democratic voter in a packed district to raise money, recruit volunteers, or turn out the vote for a Democratic candidate for Congress who is a shoo-in to be elected whether or not they volunteer, contribute to his campaign or even vote in the general election. The already-existing record establishes this beyond dispute. *See* Exhibit A, ¶¶ 28-31; s*ee also Common Cause* Plaintiffs' Post-Trial Findings of Fact and Conclusions of Law ("Post-Trial FOF"), Dkt. 117, 1:16-CV-1026, at ¶¶ 156, 164-67. The 2016 Plan also makes it more difficult for a Democratic voter who lives in a cracked district to recruit a Democratic candidate to run in that voter's home district, to raise money, or to recruit volunteers, from either within the "cracked" district or other parts of North Carolina. The Plan, by design, makes it more difficult to support a Democratic candidate who potential contributors and volunteers know has no chance of being elected because he or she is running in a safe Republican district from which Democratic voters have been deported and transferred to other districts. *See* Exhibit A, ¶¶ 32, 34-35, 38, 41.

This Court has previously found that the *Common Cause* Plaintiffs have standing to sue under the Equal Protection Clause (as well as under the First Amendment and Article I, §§ 2 and 4). That holding was based in part on this Court's prior finding of fact that the 2016 Plan caused "*legally cognizable non-dilutionary injuries* [to] … [the individual] Plaintiffs [who] testified to decreased ability to mobilize their party's base, to attract volunteers, and to recruit strong candidates" and made "[p]laintiffs … feel[] frozen out of the democratic process because 'their vote never counts,' which … affects voter

16

mobilization." *Rucho*, 279 F. Supp. 3d at 615–16.  These findings of fact are fully supported by the record and, further, by the decision of the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 792 (1983).  In that case, the Supreme Court held that an independent presidential candidate, John Anderson, and his supporters had standing to challenge an Illinois ballot access law that made "'volunteers … more difficult to recruit and retain[,] … media . . . more difficult to secure, and voters … less interested in the campaign.'"  *Rucho*, 279 F. Supp. 3d at 616.

### e. *The North Carolina Democratic Party also has standing to assert a statewide claim.*

This Court also held that the North Carolina Democratic Party ("NCDP") has standing to sue under the Equal Protection Clause (as well as under the First Amendment and Article I, §§ 2 and 4).  This decision was also based on the finding of fact that the 2016 Plan had injured the NCDP as a statewide political association or organization, by "ma[king] it more difficult for the [NCDP] to raise resources and to recruit candidates." *Rucho*, 279 F. Supp. 3d at 616; *see also* Post-Trial FOF, at ¶¶ 156, 164-67.

These "non-dilutionary injuries" to the associational rights of the NCDP are not confined to an individual district, but are statewide injuries that impact the NCDP in every city, county, and congressional district throughout North Carolina.  They are sufficient to give the NCDP standing to challenge the 2016 Plan statewide both in its own right and also on behalf of its members, some of whom live in every packed or cracked district in North Carolina.

17

***f. Plaintiffs also have standing to challenge the 2016 Plan as a violation of Article I's structural guarantees.***

Because Article I was not at issue in *Gill*, none of the opinions in *Gill* addressed whether a challenge to a partisan gerrymander under Article I is district-specific or statewide in nature.  However, the reasoning of Justice Kagan's concurrence suggests that such challenges are statewide in nature.  "Standing," the concurrence explained, "turns on the nature and source of the claim asserted." 138 S. Ct. at 1938 (Kagan, J., concurring) (quoting *Warth v. Seldin*, 422 U. S. 490, 500 (1975)).

Article I, § 2 guarantees that members of Congress will be chosen "by the People of the several States."  Article I, § 4 limits the power of state legislatures to meddle in Congressional elections, beyond outcome-neutral regulation of the "Times, Places, and Manner" of voting.  These clauses were "intended to act as a safeguard against manipulation of electoral rules by politicians and factions in the States to entrench themselves or place their interest over those of the electorate."  *Ariz. State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2672.  When a state legislature acts *ultra vires* by engaging in prohibited "manipulation," *that in itself* is the evil that Article I was intended to protect against—irrespective of how any particular district's lines are drawn or the resulting impact on the voting strength of any particular district's residents.  Thus, any North Carolinian who suffers injury-in-fact as a result of the 2016 Plan should have standing to challenge the Plan in its entirety as an *ultra vires* act in violation of Article I.  *Cf. Bond v. United States*, 564 U.S. 211, 222 (2011) (in Tenth

18

Amendment case, recognizing that any person injured-in-fact has "standing to object to a violation of a constitutional principle that allocates power within government" and may challenge a government body's "act[ion] in excess of its lawful powers").

Although we believe that the nature of the Article I injury is statewide in nature, in an excess of caution, we urge the Court to find that, even if it is district-specific, the plaintiffs who have district-specific injuries have standing to complain about the State's decision to cause those injuries and affect the outcome of elections in their districts.

* * *

Thus, although the Supreme Court held in *Gill* that vote-dilution is a district-specific injury that is not *alone* sufficient to support a statewide claim by a single voter, the "legally cognizable non-dilutionary injuries" to the rights of political association of individual Democratic voters, of the members of Common Cause, and of the NCDP and its members are both district-specific *and* statewide injuries that are separate from and additional to their injuries from vote dilution. *Rucho*, 279 F. Supp.3d at 617. The injuries to their rights of political association are therefore sufficient to give both the individual voters and the organizational plaintiffs standing to assert statewide challenges to the 2016 Plan as a whole. Accordingly, this Court was correct in finding that "[b]oth the individual and organizational Plaintiffs have suffered injuries-in-fact attributable to the 2016 Plan, and … have standing to challenge the 2016 Plan as a whole."

Moreover, this Court was also correct in finding, in the alternative, that "[e]ven absent statewide standing, because Plaintiffs reside in each of the state's thirteen districts

19

and have all suffered [district-specific] injuries-in-fact, Plaintiffs, as a group, have

standing to lodge district-by-district challenges to the entire 2016 Plan." *Id.* at 617. That

sentence alone fully distinguishes *Common Cause v. Rucho* from the Wisconsin case.

These findings of fact are fully supported by the record and are sufficient to

support the standing of the *Common Cause* Plaintiffs to challenge the constitutionality of

the 2016 Plan, both on a district-by-district and statewide basis under the First

Amendment, the Equal Protection Clause, and Article I, §§ 2 and 4 of the Constitution.

Further, and in response to the issues raised by the Court in its June 27, 2018 Order, these

findings establish the standing of the *Common Cause* Plaintiffs to assert *both* district-

specific and statewide claims under the Equal Protection Clause.

**IV.   The Sufficiency of These Findings Dictates the Response of the**
***Common Cause* Plaintiffs With Respect To the Second, Third and Fourth Issues**
**Raised by the Court.**

**Question 2:  Is the existing factual record adequate to address whether**
**Plaintiffs have standing to state a vote dilution claim under the Equal Protection**
**Clause?**

The Answer of the *Common Cause* Plaintiffs is "Yes."  The current factual record

is sufficient to establish the *Common Cause* Plaintiffs' standing to assert a vote-dilution

claim under the Equal Protection Clause for the reasons outlined above and following

from the record evidence outlined in Exhibit A.  Moreover, the current record is also

sufficient to establish the *Common Cause* Plaintiffs' standing to assert a claim under the

Equal Protection Clause and First Amendment based on the injuries to their non-

20

dilutionary rights of political association, and under Article I based on the structural harms wrought by the 2016 Plan.

**Question 3: If a party believes additional factual development is required, what should that factual development entail?**

The *Common Cause* Plaintiffs do not believe that any additional factual development is required to support their standing to assert claims under the Equal Protection Clause, nor is additional factual development necessary to support the *Common Cause* Plaintiffs' standing to prove claims under the First Amendment or Article I, §§ 2 and 4 of the Constitution.

The *Common Cause* Plaintiffs believe that the current record is complete and does not therefore require supplementation with respect to their claims. But, in the event that the Court decides to grant any party's request to supplement the record, the *Common Cause* Plaintiffs are prepared at this time to offer a supplemental Declaration from Dr. Jowei Chen—attached here as Exhibit B—that demonstrates the districts in which the *Common Cause* individual voter-plaintiffs were placed under the 2016 Plan (as evidenced by the pleadings and their individual deposition) as well as under two sets of the simulated districting plans Dr. Chen created, reported, was deposed about, testified to, and was cross-examined about in this case. Dr. Chen has created no new districting simulations for this Declaration, nor has he conducted any new analysis of the enacted plan with respect to any finding appearing in his earlier report.

21

At the instruction of counsel for the *Common Cause* Plaintiffs, he has merely determined the simulated districts in which plaintiffs would be placed given their residential addresses (already in the record) and reported the political performance of the enacted plan and those simulated districts (already produced over a year ago, subject to deposition and cross-examination, and the basis of his conclusions as to the aggregate partisan distribution of seats under his simulated maps). At most, Dr. Chen's supplemental declaration is a summary of voluminous evidence under Federal Rule of Evidence 1006. More accurately, it is the application of already existing data in this case to a narrow question on which this Court may choose—though it need not do so—to evaluate additional evidence to confirm its earlier, well-supported findings of fact.

**Question 4: Assuming *arguendo* that no additional factual development is required, do Plaintiffs, under *Gill,* have standing to assert a vote dilution claim under the Equal Protection Clause?**

The answer is "Yes," with the additional note that the *Common Cause* Plaintiffs also have standing to assert both district-specific and statewide claims under the Equal Protection Clause based on the injuries to the *Common Cause* Plaintiffs' "cognizable non-dilutionary rights" of political association, and to assert statewide claims under Article I based on the structural injuries associated with the violation of that Article's guarantees. All of these harms are caused by or "fairly traceable to" the 2016 Plan's invidious cracking and packing of Democratic voters. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992).

22

**Conclusion**

The *Common Cause* Plaintiffs respectfully submit that nothing in *Gill v. Whitford* undermines this Court's prior holdings that the legally cognizable rights of the *Common Cause* Plaintiffs were injured-in-fact by the 2016 Plan or that these injuries in fact are sufficient to establish the *Common Cause* Plaintiffs' standing to assert district-specific challenges to the 2016 Plan on a vote-dilution theory; district-specific and statewide challenges to the 2016 Plan on a non-dilutionary theory of representational and associational harm; and a statewide challenge to the 2016 Plan under Article I, §§ 2 and 4 of the Constitution.

Finally, The *Common Cause* Plaintiffs point out that time is of the essence.  The North Carolina General Assembly has recently moved the filing period for the 2020 congressional elections from February 2020 to December 2019 and has moved the 2020 congressional primaries from May to March 2020.  *See* 2018 N.C. Sess. Law 21.  The people of North Carolina have been denied the opportunity to elect Members of the House Representative under a constitutionally valid and fair plan for the past four congressional elections—since 2010.  The legislative defendants should not be allowed to turn this limited remand from the Supreme Court into a vehicle to delay that would prevent their inevitable appeal from being heard and decided by the Supreme Court on the merits during the October 2018 Term.  This Court should not sanction their ongoing efforts to deny Plaintiffs the protection of the Constitution.

Respectfully submitted, this 11th day of July, 2018.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
North Carolina Bar No. 4112
Steven B. Epstein
North Carolina Bar No. 17396
Caroline P. Mackie
North Carolina Bar No. 41512
POYNER SPRUILL LLP
301 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
espeas@poynerspruill.com
sepstein@poynerspruill.com
cmackie@poynerspruill.com

/s/ Emmet J. Bondurant
Emmet J. Bondurant
Georgia Bar No. 066900
Jason J. Carter
Georgia Bar No. 141669
Benjamin W. Thorpe
Georgia Bar No. 874911
BONDURANT, MIXSON & ELMORE, LLP
1201 W. Peachtree Street, NW, Suite 3900
Atlanta, Georgia 30309
Telephone (404) 881-4100
Facsimile (404) 881-4111
bondurant@bmelaw.com
carter@bmelaw.com
bthorpe@bmelaw.com

/s/ Gregory L. Diskant
Gregory L. Diskant
New York Bar No. 1047240
Peter A. Nelson
New York Bar No. 4575684
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036

24

Telephone: (212) 336-2000
Facsimile: (212) 336-2222
gldiskant@pbwt.com
pnelson@pbwt.com

***Counsel for the* Common Cause *Plaintiffs***

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

The undersigned hereby certifies that the foregoing brief, exclusive of the case caption and certificate of service, contains less than six thousand two hundred fifty (6,250) words.

This the 11th day of July, 2018.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel and parties of record.

This the 11th day of July, 2018.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.