## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

COMMON CAUSE, *et al.*,

      PLAINTIFFS,

      v.

ROBERT A. RUCHO, in his official capacity as
Chairman of the North Carolina Senate
Redistricting Committee for the 2016 Extra
Session and Co-Chairman of the Joint Select
Committee on Congressional Redistricting,
*et al.*,

      DEFENDANTS.

CIVIL ACTION
NO. 1:16-CV-1026-WO-JEP

THREE-JUDGE COURT

## BRIEF OF THE *COMMON CAUSE* PLAINTIFFS
## IN RESPONSE TO ORDER OF JULY 16, 2018

The *Common Cause* Plaintiffs in Civil Action No. 1:16-CV-1026 respectfully

submit this brief in response to this Court's Order of July 16, 2018 (and restated in this

Court's Order of July 18, 2018).  This brief addresses a single, narrow issue:  whether,

based on the existing record and the supplemental declarations and deposition testimony

of Dr. Jowei Chen, the *Common Cause* Plaintiffs have standing to assert a vote-dilution

claim under the Equal Protection Clause.[1]

As outlined in the *Common Cause* Plaintiffs' brief dated July 11, 2018 (the "July

11 Brief"), the existing factual record shows that most, if not all, of the individual

*Common Cause* Plaintiffs were placed into cracked or packed districts under the 2016

North Carolina Congressional Plan (the "2016 Plan").  *See* ECF No. 130 at 20–21.[2]  That

suffices under *Gill v. Whitford*, 138 S. Ct. 1916 (2018), to establish those individual

plaintiffs' standing to challenge their respective districts.[3]  Under *Gill*, a voter-plaintiff

has standing to bring a vote-dilution claim under the Equal Protection Clause if he or she

has been "place[d] in a 'cracked' or 'packed' district"; nothing more is required.  *Id.* at

---

[1] This brief does not address the *Common Cause* Plaintiffs' other constitutional
challenges to the 2016 Plan and its individual districts.  Those challenges and the
*Common Cause* Plaintiffs' standing to bring them are discussed in full in the Brief of the
*Common Cause* Plaintiffs in Response to Order of June 27, 2018.  *See* ECF No. 130.

[2] Moreover, because the organizational *Common Cause* Plaintiffs—the North Carolina
Democratic Party and Common Cause North Carolina—have members in each of the
2016 Plan's districts, they have standing to challenge all districts the evidence shows to
be cracked or packed under the 2016 Plan on behalf of their members in those districts.
*See Warth v. Seldin*, 422 U.S. 490, 511, 515 (1975).

[3] The presence of one plaintiff with standing is sufficient to satisfy Article III
requirements. *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47,
52 n.2 (2006) (Roberts, C.J.).

1931. Indeed, the Supreme Court remanded *Gill* to allow the plaintiffs in that case to show that their votes had been diluted by their placement in "packed" or "cracked" districts. *Id.* at 1934.

The Supreme Court's unexplained decision to remand these consolidated North Carolina cases to this Court for further consideration in light of *Gill* cannot, and should not, be construed as a finding by the Supreme Court that the existing record did not establish standing with respect to the *Common Cause* Plaintiffs. To the contrary, as this Court held following a full trial, that record amply demonstrated the cracking and packing of specific districts and the placement of individual *Common Cause* Plaintiffs within those cracked or packed districts. Therefore, no supplementation of the record is necessary to establish the *Common Cause* Plaintiffs' standing to assert these vote-dilution claims.

Only by inferring additional standing requirements beyond the plain language of *Gill* could Legislative Defendants argue that none of the *Common Cause* Plaintiffs has standing to bring a vote-dilution claim under the Equal Protection Clause. Nonetheless, out of an abundance of caution, and to anticipate arguments Legislative Defendants may raise in the Supreme Court, the *Common Cause* Plaintiffs instructed their trial expert Dr. Jowei Chen to perform additional calculations based on evidence in the existing record regarding the placement of the individual *Common Cause* Plaintiffs in the 2016 Plan and across the distribution of two sets of his simulated plans.

3

The results corroborate the already powerful existing record evidence of district-specific injury and further confirm the proof already in the record from the analyses of Dr. Jonathan Mattingly and the admissions of Legislative Defendants and their witnesses. For some individual plaintiffs, the actual districts into which they were placed by the 2016 Plan are either more Republican-leaning (cracked) or more Democratic-leaning (packed) than the district into which they would be placed in *any* of Dr. Chen's 2,000 simulated neutrally-drawn maps. Put differently, the extreme partisan split of the districts into which *these specific individuals* were placed by the 2016 Plan is statistically impossible unless the drawing of *these individuals'* own district boundaries was guided by the invidious "Partisan Advantage" criterion explicitly enshrined in the 2016 Plan. This confirms what the existing record amply demonstrates: the 2016 Plan achieved its express goal of preserving 10 Republican and 3 Democratic seats by manipulating the lines of individual, identifiable districts to ensure that result.

Since filing their Complaint over two years ago, the *Common Cause* Plaintiffs have continuously challenged the manner in which those individual district lines were drawn. The existing record, which Legislative Defendants had ample opportunity to dispute, is more than adequate to establish the *Common Cause* Plaintiffs' district-specific standing to assert a claim under the Equal Protection Clause on a vote-dilution theory of injury. Whether or not the Court accepts the supplemental declarations of Dr. Chen—about which Legislative Defendants had the opportunity to cross-examine Dr. Chen in his recent deposition—there is no need for further delay.

4

**I.    The Existing Factual Record Supports the Vote-Dilution Claims of the**
***Common Cause* Plaintiffs.**

The existing factual record is adequate to support this Court's previous finding of

fact that the individual *Common Cause* Plaintiffs' votes were diluted under the 2016 Plan

and its holding that those individual plaintiffs have standing to bring vote-dilution claims

under the Equal Protection Clause based upon those district-specific injuries. *See*

*Common Cause v. Rucho*, 279 F. Supp. 3d 587, 615 (M.D.N.C. 2018).

As the Court's unanimous opinion in *Gill* makes clear, "the harm asserted by the

plaintiffs is best understood as arising from a burden on those plaintiffs' own votes.  In

this gerrymandering context, that burden arises when a voter is placed in a 'cracked' or

'packed' district."  138 S. Ct. at 1931.  The "requisite harm" required to establish

standing, then, is proof that the individual plaintiff "lives in a cracked or packed district,"

and nothing more.  *Id.* at 1932.  This understanding flows logically from the gravamen of

the constitutional claim, which is that voters have been unconstitutionally "placed in

legislative districts deliberately designed to 'waste' their votes in elections where their

chosen candidates will win in landslides (packing) or are destined to lose by closer

margins (cracking)."  *Id.* at 1930.

Thus, the sole question this Court must address to determine whether the

individual *Common Cause* Plaintiffs have standing to pursue their vote-dilution claims is

whether the 2016 Plan placed them in congressional districts that have been packed or

cracked.  That analysis boils down to two parts:  (1) identifying districts that have been

packed or cracked; and (2) determining whether any plaintiffs, and if so, which, reside in those districts. The existing trial record offers ample evidence with respect to each inquiry.

As to the first, in addition to the admissions of Legislative Defendants and their witnesses, the *Common Cause* Plaintiffs point to the trial testimony and accompanying PowerPoint presentation of Dr. Jonathan Mattingly. Dr. Mattingly testified that his ensemble of more than 24,000 neutrally drawn maps provided a "baseline" for comparison. Tr. T. Vol. I, ECF No. 105, at 35. And as compared to that baseline, "there were clearly many, many more Democrats packed into" the three most Democratic districts—*i.e.*, districts that were packed—"and on the other hand, that allowed there to be many more Republicans in the next group of districts"—*i.e.*, districts that were cracked. *Id.*

Slide 29 of Dr. Mattingly's PowerPoint presentation graphically illustrated at trial how the 2016 Plan packed Democratic voters into the three most Democratic districts—Congressional Districts ("CDs") 1, 4, and 12—and starved the fourth, fifth, and sixth most Democratic districts—districts that correspond with CDs 2, 9, and 13—of Democratic voters in the 2016 election. July 11 Brief at Ex. A ¶ 26. Not a single one of Dr. Mattingly's more than 24,000 neutrally drawn maps had as many Democratic votes in its three most Democratic districts as CDs 1, 4, and 12 garnered in the 2016 election. *Id.* at Ex. A ¶ 28. And not a single one of Dr. Mattingly's maps had as few Democratic

votes in its fourth-, fifth-, and sixth-most Democratic districts as CDs 2,[4] 9, and 13

garnered in the 2016 election. *Id.* at Ex. A ¶ 29.

That CDs 1, 4, and 12 were packed, and CDs 2, 9, and 13 were cracked, is also

made clear by the disparity between the Democratic vote fraction in each of these

districts as compared to Dr. Mattingly's ensemble of neutrally drawn maps:  the median

Democratic vote fraction in the three most Democratic districts in his ensemble ranged

from 57% to 65%; in stark contrast, the 2016 Democratic vote fraction in the enacted

CDs 1, 4, and 12 ranged from 67% to 70%.  Ex. 3040 at 29.  Those 2016 Democratic vote

fractions were higher than those in the three most Democratic districts in over 99% of Dr.

Mattingly's ensemble.  July 11 Brief at Ex. A ¶¶ 31-34.

Moreover, the median Democratic vote fraction in the fourth-, fifth-, and sixth-

most Democratic districts in his ensemble ranged from 48% to 54%, Ex. 3040 at 29—

which Legislative Defendants' expert witness Dr. M.V. Hood described as "competitive."

Tr. T. Vol. IV ECF No. IV at 29:16-25.  In stark contrast, the actual 2016 Democratic

vote fraction in CDs 2, 9, and 13—which garnered the fourth- through sixth-highest

Democratic vote fraction of the state's 13 districts—ranged from 42%-44%, Ex. 3040 at

29—which, in Dr. Hood's parlance, is "safe Republican."  Tr. T. Vol. IV at 29:21-22.

Those 2016 Democratic vote fractions for CDs 2, 9, and 13 were lower than the vote

---

[4] Further evidence of the cracking of CD 2 is set forth in the *Common Cause* Plaintiffs'
Proposed Supplemental Findings of Fact, demonstrating how a large swath of Wake
County that is highly Democratic was excised from CD 2 and placed instead into CD 4.
*See id.* at Ex. A ¶ 39.  Placing that swath of Wake County into CD 4 diluted Democratic
voting strength in CD 2.

fractions for the fourth- through sixth-most Democratic districts in over 99% of Dr. Mattingly's ensemble. July 11 Brief at Ex. A ¶¶ 35, 38, 40.

Indeed, CDs 1, 4, and 12 are so packed with Democratic voters that a Democratic candidate is assured of winning in a landslide no matter how low the level of Democratic voter turnout, resulting in large numbers of Democratic votes being wasted in those specific districts— just as Legislative Defendants intended. *Id.* at Ex. A ¶ 28. As the direct—and intended—result of the packing of Democratic voters into CDs 1, 4, and 12, the number of Democratic voters assigned to the next-most Democratic districts—CDs 2, 9, and 13—has been reduced far below what could have resulted from North Carolina's political geography or application of neutral, non-partisan redistricting criteria. *Id.* at Ex. A ¶ 29. As such, the voting power of Democratic voters in these three districts has been so diluted that a Democratic candidate has virtually no chance of winning, no matter how high the level of Democratic voter turnout. *Id.*

For these six districts, proof of cracking and packing exists to a statistical certainty in Dr. Mattingly's analysis. Other proof in the record confirms that analysis and identifies other districts that were intentionally cracked. Thus, the Legislative Defendants' expert witness, Dr. Hood, admitted that the natural Democratic partisan clusters in (1) Greensboro, (2) Cumberland, Hoke, and Robeson Counties, and (3) Asheville were cracked in two, in that: (a) two separate pieces of the Democratic cluster in Greensboro were submerged into two safe Republican districts—CDs 6 and 13, *id.* at Ex. A ¶¶ 36-37; (b) two separate pieces of the Democratic cluster in Cumberland,

8

Hoke, and Robeson Counties were submerged into two safe Republican districts—CDs 8[5] and 9,[6] *id.* at Ex. A ¶ 42; and (c) two separate pieces of the Democratic cluster in Asheville were submerged into two safe Republican districts—CDs 10 and 11, *id.* at Ex. A ¶ 45. As Dr. Hood described in his testimony, the natural clustering of partisans often leads to placement of such a cluster into a single district, rather than cracking the cluster into multiple districts, Tr. T. Vol. IV at 50:12-24, as Legislative Defendants accomplished through the 2016 Plan. And, of course, beyond this district-specific evidence, there was overwhelming evidence—not disputed by Legislative Defendants— that the entire purpose and design of the 2016 Plan was a partisan gerrymander.

Taken as a whole, the evidence already in the record offers ample proof that at least 10 of the thirteen districts in the 2016 Plan are the result of illegal cracking and packing. The evidence shows that CDs 1, 4, and 12 have been packed with Democratic voters and CDs 2, 6, 8, 9, 10, 11, and 13 have been cracked—or starved—of Democratic voters. Either way, the voting power of the Democratic voters who reside in these districts is diluted as a direct consequence of this packing and/or cracking. Consequently,

---

[5] Further evidence of the cracking of CD 8 is set forth in the *Common Cause* Plaintiffs' Proposed Supplemental Findings of Fact, demonstrating how the strong Democratic vote in Cumberland and Hoke Counties was submerged into the strong Republican vote in Cabarrus, Rowan, Moore, and Stanly Counties, thereby ensuring Republican dominance in CD 8. *See id.* at Ex. A ¶ 44.

[6] Further evidence of the cracking of CD 9 is set forth in the *Common Cause* Plaintiffs' Proposed Supplemental Findings of Fact, demonstrating how the most Republican parts of Mecklenburg County were assigned to CD 9 to ensure Republican dominance in that district and the most Democratic parts of the county were assigned to CD 12 to ensure Democratic dominance in that district. *See id.* at Ex. A ¶ 43.

under the standards articulated in *Gill*, *Common Cause* Plaintiffs Larry Hall (CD 1),

Douglas Berger (CD 2), Alice Bordsen (CD 4),[7] Morton Lurie (CD 4), Melzer Morgan

(CD 6), Coy E. Brewer, Jr. (CD 8), John Morrison McNeill (CD 9), Robert Warren Wolf

(CD 10), Jones P. Byrd (CD 11), John Gresham (CD 12), and Russell G. Walker, Jr.

(CD 13) have established their standing to pursue claims of vote dilution under the Equal

Protection Clause.

## II. Dr. Chen's Supplemental Declaration and Deposition Testimony Confirm the Standing of the *Common Cause* Plaintiffs to Assert Vote-Dilution Claims Under the Equal Protection Clause.

For the reasons discussed above, it is not necessary to re-open the evidentiary

record to determine whether the *Common Cause* Plaintiffs have standing to bring these

vote-dilution claims; the existing record clearly establishes that they do.  If, however, this

Court determines that limited supplementation of the record best allows the parties to test

Plaintiffs' standing in light of *Gill*, the *Common Cause* Plaintiffs would offer the

supplemental declaration of Dr. Jowei Chen as further evidence of their standing to assert

vote-dilution claims under the Equal Protection Clause.  *See* July 11 Brief at Ex. B

(hereafter "Chen Declaration for CC").[8]

---

[7] Plaintiff Bordsen recently moved her residence from CD 4 to CD 6.  Likewise, Plaintiff Morgan recently moved his residence from CD 6 to CD 4.  *See Common Cause* Plaintiffs' Post-Trial Findings of Fact and Conclusions of Law, ECF No. 117, ¶ 158.

[8] Dr. Chen also prepared a declaration at the request of the *League of Women Voters* Plaintiffs—based on data in the existing record—which is not discussed in this brief. Legislative Defendants had an opportunity to question Dr. Chen about both declarations during his July 30, 2018 deposition.

Dr. Chen's supplemental declaration requires minimal explanation. As he explained during his deposition, taken on July 30, 2018 by counsel for Legislative Defendants, the calculations Dr. Chen performed for this supplemental declaration relied entirely on data already included in his initial expert report, except that he also used the residential addresses of the *Common Cause* individual-voter plaintiffs provided in the *Common Cause* Plaintiffs' Amended Complaint. *See* Chen Declaration for CC at 2; Deposition of Dr. Jowei Chen on July 30, 2018 (hereafter "Chen Dep. II") at 66 (attached as Exhibit A). Dr. Chen used these individual plaintiffs' addresses to determine the district in which each individual plaintiff would be placed under the 2016 Plan or any of his simulated plans. Chen Declaration for CC at 2.

Dr. Chen then calculated the partisanship of the districts in which each individual plaintiff would be placed (1) in the 2016 Plan, (2) in each of the 1,000 simulated plans in Simulation Set One from Dr. Chen's earlier expert report, and (3) in each of the 1,000 simulated plans in Simulation Set Two from Dr. Chen's earlier expert report. To calculate partisanship, Dr. Chen used exactly the same measures he had used in his earlier expert report: (1) the 20 statewide elections specified by the Adopted Criteria used for the 2016 Plan; and (2) the seven-election formula used by Dr. Hofeller in drawing the districts for the 2016 Plan. Chen Declaration for CC at 2.

Having calculated the partisan performance of the districts into which the individual *Common Cause* Plaintiffs would be placed in each of his simulated plans, Dr. Chen graphically displayed these results in a series of figures. *See id.* at 4-7, Figures 1-4.

11

As clearly shown by the figures themselves (and supported by the underlying, fully disclosed data), each figure plots the "Republican Vote Share of [the] District in which [a particular individual] Plaintiff Resides" for the 2016 Plan and each of the 1,000 Plans in Simulation Sets One or Two (depending on the figure). Beyond this graphical illustration, Dr. Chen reported the frequency with which the simulated plans would place a given individual plaintiff into a district that is more or less Democratic-leaning than the enacted 2016 Plan. *Id.* at 8-10.[9] Finally, Dr. Chen reported the Republican vote share— as measured by the Hofeller formula—of the districts in which the individual *Common Cause* Plaintiffs would be placed if a Court chose to evaluate Plan 297 of Dr. Chen's Simulation Set Two as a possible alternative to the 2016 Plan. *Id.* at 11, Table 1.

In *Gill*, the controlling opinion outlines the potential importance of distinguishing "the effect that a gerrymander has on the votes of particular citizens." 138 S. Ct. at 1933. In her concurrence, Justice Kagan makes the same observation in far greater detail: "Among other ways of proving packing or cracking, a plaintiff could produce an alternative map (or set of alternative maps)—comparably consistent with traditional districting principles—under which her vote would carry more weight." *Id.* at 1936 (Kagan, J., concurring). That is precisely what Dr. Chen's supplemental calculations illustrate here. Indeed, the example Justice Kagan highlights is a less-extreme version of

---

[9] Dr. Chen issued a clarification correcting the reported text for Plaintiff Russell Walker, who resides in CD 13. The figures and underlying data for Plaintiff Walker were correct as of the original filing. *See* ECF No. 136 at Ex. A; Chen Dep. II at 84-86 (clarifying that Plaintiff Walker resides in CD 13 rather than CD 3).

the results Dr. Chen reports for most of the individual *Common Cause* Plaintiffs. As

Justice Kagan wrote:

> For example, a Democratic plaintiff living in a 75%-Democratic district
> could prove she was packed by presenting a different map, drawn without a
> focus on partisan advantage, that would place her in a 60%-Democratic
> district. Or conversely, a Democratic plaintiff residing in a 35%-
> Democratic district could prove she was cracked by offering an alternative,
> neutrally drawn map putting her in a 50–50 district. The precise numbers
> are of no import. ***The point is that the plaintiff can show, through
> drawing alternative district lines, that partisan-based packing or cracking
> diluted her vote.***

*Id.* (emphasis added).

While the precise numbers may be of "no import" for Justice Kagan's hypothetical

(or for the ultimate legal rule), certain of Dr. Chen's findings offer powerful quantitative

illustrations of the vote dilution in the individual districts of the 2016 Plan. To highlight

just a few examples, Dr. Chen's supplemental declaration and deposition testimony show

that, across 2,000 different neutrally-drawn maps, four of the individual *Common Cause*

Plaintiffs would *never* be placed (in at least one of the Simulation Sets of 1,000

simulations) in a district as cracked or packed as the district in which he is placed under

the enacted 2016 Plan. Chen Dep. II at 87-90 (covering Plaintiffs Gresham, Byrd,

Brewer, and Berger). These four plaintiffs reside in CDs 2, 8, 11 and 12. Chen

Declaration for CC at 4-7, Figures 1-4. For many other individual plaintiffs, the raw

numbers are not as stark, but the same principle holds true across North Carolina. As

examples, several other individual *Common Cause* Plaintiffs have been placed in districts

that have a skewed partisan composition relative to over 90% of the districts into which

they would have been placed in Dr. Chen's simulated plans: Larry Hall, CD 1 (over 99% of simulated plans less Democratic); Richard and Cheryl Taft, CD 3 (over 93% of simulated plans more Democratic); John McNeill, CD 9 (over 95% of simulated plans more Democratic); Robert Wolf, CD 10 (97% of simulated plans more Democratic). *Id.* at 8-10. The 2016 Plan places these specific *individuals* into specific *districts* that are cracked or packed relative to the districts in which they would have been placed if the 2016 Plan had not unconstitutionally enshrined "Partisan Advantage."

Dr. Chen's reported calculations thus identify CDs 1, 4, and 12 as packed districts (where the named plaintiffs would almost invariably be placed in a less Democratic district absent the gerrymander) and they also identify CDs 2, 6, 8, 9, 10, 11, and 13 as cracked districts (where the named plaintiffs would almost invariably be placed in more Democratic district absent the gerrymander). This evidence perfectly matches the record already before the Court with respect to these 10 districts and it confirms the ample evidence already in the trial record establishing that the individual *Common Cause* Plaintiffs have standing to assert vote-dilution claims under the Equal Protection Clause.

Although these district-specific allegations demonstrate vote dilution in only 10 of the 13 districts in the 2016 Plan, this pervasive problem requires a statewide solution. As Defendant Senator Robert Rucho explained at his deposition in this case: "if you make adjustments on one district, it has a rippling effect on others." Rucho Deposition on January 25, 2017, ECF No. 110-5 at 135-137 (explaining why the 2016 Plan had to redraw the entire North Carolina congressional map). Just as it did in response to the

14

*Harris* decision, which invalidated only *two* congressional districts, the North Carolina

General Assembly would necessarily have to draw a new statewide map in response to

the invalidation of *ten* of its thirteen congressional districts.

Respectfully submitted this 7th day of August, 2018.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.
North Carolina Bar No. 4112
Steven B. Epstein
North Carolina Bar No. 17396
Caroline P. Mackie
North Carolina Bar No. 41512
POYNER SPRUILL LLP
301 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
espeas@poynerspruill.com
sepstein@poynerspruill.com
cmackie@poynerspruill.com

/s/ Emmet J. Bondurant
Emmet J. Bondurant
Georgia Bar No. 066900
Jason J. Carter
Georgia Bar No. 141669
Benjamin W. Thorpe
Georgia Bar No. 874911
BONDURANT, MIXSON & ELMORE, LLP
1201 W. Peachtree Street, NW, Suite 3900
Atlanta, Georgia 30309
Telephone (404) 881-4100
Facsimile (404) 881-4111
bondurant@bmelaw.com
carter@bmelaw.com
bthorpe@bmelaw.com

/s/ Gregory L. Diskant
Gregory L. Diskant
New York Bar No. 1047240
Peter A. Nelson
New York Bar No. 4575684
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222
gldiskant@pbwt.com
pnelson@pbwt.com
***Counsel for the Common Cause Plaintiff***

16

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

The undersigned hereby certifies that the foregoing brief, exclusive of the case caption and certificate of service, contains less than six thousand two hundred fifty (6,250) words.

This the 7th day of August, 2018.

/s/ Edwin M. Speas, Jr.
Edwin M. Speas, Jr.

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to

all counsel and parties of record.

This the 7th day of August, 2018.

/s/ Edwin M. Speas, Jr.

Edwin M. Speas, Jr.
