**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| COMMON CAUSE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION |
| ROBERT A. RUCHO, in his official | ) | NO. 1:16-CV-1026-WO-JEP |
| capacity as Chairman of the North | ) | |
| Carolina Senate Redistricting | ) | THREE-JUDGE COURT |
| Committee for the 2016 Extra Session | ) | |
| and Co-Chairman of the Joint Select | ) | |
| Committee on Congressional | ) | |
| Redistricting, *et al.*, | ) | |
| | ) | |
| Defendants. | | |

| | | |
|---|---|---|
| League of Women Voters of North | ) | |
| Carolina, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION |
| Robert A. Rucho, in his official capacity | ) | NO. 1:16-CV-1164-WO-JEP |
| as Chairman of the North Carolina | ) | |
| Senate Redistricting Committee for the | ) | THREE-JUDGE COURT |
| 2016 Extra Session and Co-Chairman of | ) | |
| the 2016 Joint Select Committee on | ) | |
| Congressional Redistricting, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## LEGISLATIVE DEFENDANTS' BRIEF ON STANDING

# INTRODUCTION

Standing is "not dispensed in gross." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). The League of Women Voters ("LWV") plaintiffs and the Common Cause plaintiffs have ignored this admonition from the Supreme Court. Instead, they have relied heavily on a concurring opinion in Gill despite another admonition from the majority—that "the reasoning of this Court with respect to the disposition of this case is set forth in this opinion and *none other*." *Gill*, 138 S. Ct. at 1931 (emphasis added).

Rather than tether their claims to individual injuries suffered by individual voters in individual districts using district-specific evidence, plaintiffs have repackaged what amount to statewide challenges to the 2016 congressional plan as purportedly district-specific challenges. But if it walks and quacks like a duck, then it's still a duck. The new expert evidence submitted by plaintiffs affirms that they have always pursued a statewide challenge and continue to do so. Plaintiffs are not seeking a remedy for individual injuries in individual districts. Instead, they are seeking statewide relief on behalf of their favored political party—the Democrats. *Gill* absolutely forecloses them from basing their alleged standing on this ground. Their expert evidence also demonstrates that rather than seeking a remedy for individual harm, the plaintiffs are instead trying to harm Republican voters statewide through a court order that would impose proportional representation for congressional districts. Plaintiffs' statewide challenge is still not sufficient to establish standing and their claims should therefore be dismissed.

Moreover, plaintiffs' new evidence demonstrates that none of the LWV or Common Cause plaintiffs can establish an injury-in-fact which is fairly traceable to the

2

2016 congressional plan. While they couch their injury in the language of vote dilution, their new evidence makes it clear they are not complaining about vote dilution at all. Instead, like their pre-*Gill* claims using the efficiency gap measure, plaintiffs want Democratic votes, including their own, spread more efficiently in other districts statewide. Indeed, for all of the LWV plaintiffs and most of the Common Cause plaintiffs, the Republican or Democratic leaning tendency of the district they reside in would not change even in a map gerrymandered to elect only seven Republicans and six Democrats. And many, if not all, of the remaining plaintiffs who currently reside in districts that lean Republican could continue to reside in Republican-leaning districts in even the allegedly randomized district maps generated by their expert. Thus, the only "injury" to each individual plaintiff is an inability to elect more Democrats statewide regardless of the impact on his or her own district.

Finally, plaintiffs' inability to establish standing under *Gill* applies to all of their claims, not just their equal protection claims. *Gill* addressed First Amendment claims as well as equal protection claims. And this Court repeatedly characterized all of plaintiffs' claims—under the equal protection clause, First Amendment, and Article I—as being vote dilution in nature. *Common Cause v. Rucho*, 279 F.Supp 587, 673, 675-76, 688 (M.D.N.C.) *vacated*, No. 17-1295, __ S. Ct. __, 2018 WL 1335403, *1 (U.S. Jun. 25, 2018). Thus, plaintiffs' failure to establish standing mandates the dismissal of all their claims.

It is significant that the only decision by a lower federal court concerning partisan gerrymandering claims under the federal constitution that has been affirmed by the

3

United States Supreme Court is a decision by this Court that such claims are not justiciable. *Harris v. Cooper*, No. 16-166, 2018 WL 3148263, *1 (U.S. June 28, 2018). The most recent expert testimony offered by the plaintiffs in this case proves the wisdom of that holding and demonstrates that the plaintiffs have no standing. There is no legal authority for this court to accept plaintiffs' backdoor argument for a statewide, proportional representation baseline or "influence" theory for evaluating the standing of a plaintiff to challenge an alleged partisan gerrymander.

## ARGUMENT

### 1. The League of Women Voters as an organization does not have standing to maintain this case

The LWV has offered testimony by one of its former Board members, Walter Salinger, to argue that it has standing to pursue this case as an organization. (*See* Declaration of Walter L. Salinger ("Salinger Decl.") (D.E. 129-1). But the evidence presented by Salinger falls far short of meeting the test for standing articulated in *Gill*, which requires evidence of a specific and concrete injury suffered by the individual plaintiff the LWV purports to represent.

Mr. Salinger was given a project of finding LWW members who reside in 10 specific districts and who "regularly" vote in the Democratic primary. (Salinger Decl. ¶ 6.) Salinger accomplished this task by comparing the LWV data base with records available at the State Board of Elections. (Deposition of Walter L. Salinger ("Salinger Dep.") at 12:20-13:25) (copy attached as Ex. A). Salinger does not know why the LWV attorneys selected the precincts for which he was asked to identify one LWV member

who regularly votes in the Democratic primary. (*Id*. at 14:1-10.) Salinger identified one member for each precinct by comparing the LWV membership rolls against information on a person's voter participation history available on the State Board of Elections web site. (*Id*. at 14:14 – 16:7.) Salinger did not identify the names of these individuals in his declaration and his counsel instructed him not to give those names during his deposition. (*Id*. at 19:24-22:7.) The mere fact that the LWV can identify anonymous members in these ten precincts—or even every precinct in the state—does not show that any of these members have suffered a specific and concrete harm that might give the LWV standing to represent them.

The LWV has members who vote for Democrats and Republicans. (*Id.* at 24:18 – 25:8.) The LWV Board authorized the commencement of this lawsuit. (*Id*. at 33:19-23.) But the LWV has never polled its members or allowed them the opportunity to vote on whether this lawsuit should have been filed or if they would consent to being represented by the LWV. (*Id*. at 33:19-35:19.)

Any order changing the 2016 map to provide "fairness" from the LWV perspective would result in a congressional delegation that provided proportional representation or something very close to that. (Deposition of Jowei Chen, Ex. 14, Plan 297 of Simulation Set 2) (copy attached as Exhibit B). Under any such remedy, and given the LWV contentions that they have members in every congressional district (Salinger Decl., Ex. 2) (D.E. 129-1), some of their members who currently vote for Republican candidates would be removed from districts that currently elect Republicans and placed in Democratic leaning districts. Other LWV members who vote Republican

5

and currently live in a 2016 Republican leaning district would be placed in a district with more Republicans than "needed" for those voters to elect their candidate of choice. (Salinger Dep. at 17:15-18:25) (discussing the current harm to LWV Democratic members who live in "packed" 2016 districts). The LWV has no concerns about the political outcomes for its Republican members (much less standing to represent them) because LWV's interests in this case are only aligned with the interests of the Democratic Party and its voters and candidates.

There is also no evidence that the ten members identified by Mr. Salinger have themselves suffered any injury. Mr. Salinger admitted that he did not speak to any of the members he identified and has no information on whether these ten anonymous members actually voted in the Democratic Party primary. (Salinger Dep. pp. 21-24:17). Further, under the 2016 congressional plan, registered Democrats and independents (who might vote in the Democratic primary) collectively outnumber registered Republicans in all thirteen congressional districts. In 12 of 13 districts, registered Democrats are either a majority or a plurality. (D.E. 114, pp. 12-13). The ten Republicans elected in 2016 could not have been elected in 2016 and will not be elected in 2018 without the support of many registered Democrats and independents. (*Id*.)

The LWV plaintiffs also offer no evidence proving that the ten anonymous members identified by Mr. Salinger even voted for Democratic congressional candidates in either the 2016 primary or general election, their history of voting patterns as it relates to congressional candidates, or that any of these anonymous members intend to vote for Democratic congressional candidates in the future. (Salinger Dep. pp. 22:12-24:17).

6

This is not insignificant. For example, Common Cause plaintiffs Richard and Cheryl Taft, both of whom are registered Democrats, have testified that in 2016 they voted for the Republican candidate in the Third Congressional District in 2016. (D.E. 114, pp. 24-28). The LWV cannot assert standing to represent anonymous members whose voting history is unknown and who may, in fact, decline to vote in Democratic congressional primaries or elections or even vote for Republican candidates in general elections. There is no evidence that any of these anonymous members experienced an alleged dilution of their congressional vote because of the 2016 congressional plan.

### 2. None of the individual LWV plaintiffs or individual Common Cause plaintiffs were injured by the 2016 congressional plan

Standing "is a threshold question in every federal case" and "[t]he burden of establishing standing is on the party seeking federal court action." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012) (internal quotations omitted). Plaintiffs have not and cannot establish standing here.

The "irreducible constitutional minimum of standing" has three requirements which the plaintiff must plead and prove: (1) that he has suffered a "concrete and particularized injury" that (2) is "fairly traceable to the challenged conduct" and (3) is likely to be redressed by a favorable decision by the courts. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). A "'generalized grievance' shared in substantially equal measure by all or a large class of citizens" is not sufficient to confer standing. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Moreover, harm cannot be proved by plaintiffs' "speculation" about what might happen. *Simon v. E. Kent. Welfare Rights*

*Organization*, 426 U.S. 26, 44 (1976). Injury-in-fact must instead be "both real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). Plaintiffs here have not pled facts sufficient to satisfy the requirements for standing.

Eight of the named individual LWV plaintiffs reside in districts where they were able to elect their candidate of choice in the 2016 general election. Moreover, at least four of the fourteen Common Cause plaintiffs live in 2016 districts that elected their candidate of choice. (D.E. 114 pp. 14-21 (CD 1); pp. 28-31 (CD 4); 44-46 (CD 12). The plaintiffs in these districts are all similarly situated to the lead *Gill* plaintiff, Professor Whitford. Professor Whitford could not credibly allege a claim that his vote had been diluted because of cracking or packing because he resides in a district that regularly elected his candidate of choice. *Gill*, 138 S. Ct. at 1933. Like Professor Whitford, the plaintiffs in the 2016 versions of North Carolina's CDs 1, 4, and 12 also have been able to elect their candidates of choice. Thus, none of these individual plaintiffs have themselves been "disadvantaged" and therefore have not suffered a "concrete and particularized" injury. *Id*.

The remaining plaintiffs live in districts that either elected Republicans in 2016 or which have elected Republicans under prior maps adopted by a Democratic-controlled General Assembly. (D.E. 114 pp. 21-23 (CD 2); pp. 24-28 (CD 3); pp. 31-33 (CD 5); pp. 33-34 (CD 6); pp. 34-37 (CD 7); pp. 35-38 (CD 8); pp. 38-39 (CD 9); pp. 40-42 (CD. 10); pp. 42-45 (CD. 11); pp. 46-47 (CD 13)).

Thus, the only way in which any of the individual plaintiffs can allege a purported injury is by aggregating statewide voting totals and comparing the proportion of the total

8

vote for Republican and Democratic candidates against the number of congressional seats won by each party, and then arguing that even voters in districts that elect Democrats are injured because the Democratic Party did not elect its fair share of candidates. In continuing to make this argument (which is essentially identical to plaintiffs' arguments made before this court's opinion adopting this argument was vacated), plaintiffs are doing nothing more than attempting to camouflage their efficiency gap and proportional representation theories. These concepts have been flatly rejected by the Supreme Court and cannot be used to establish specific and concrete injury for any individual plaintiff.

Further, plaintiffs are not actually complaining about the "weight" of their vote. No such complaint can be made based on longstanding Supreme Court precedent. This is not a malapportionment case, in which the weight of a vote of a voter living in an overpopulated district is undeniably and mathematically lower than the weight of a vote of a voter living in an underpopulated district. *Reynolds v. Sims*, 377 U.S. 533, 561 (1964) (an individual's right to vote is "individual and personal in nature"). "The injury in a malapportionment case is 'a gross disproportion of representation to voting population.'" *Common Cause*, 279 F.Supp.3d at 611 (quoting *Baker v. Carr*, 369 U.S. 186, 207 (1962)). Such numerical disproportion is a true dilutionary harm. *Reynolds*, 377 U.S. at 568. The plaintiffs in this case have not alleged, and in fact could not show, that their votes are similarly diluted.

Instead, plaintiffs' "injury" here is their failure to vindicate their *partisan preference* in recent congressional elections either in their specific district or statewide. But the weight of one's actual *vote* is not the equivalent of the weight of one's partisan

9

*preference*.  For instance, plaintiffs allege that the votes of Democrats are not enough to ensure their partisan candidate can be elected.  They incorrectly suggest that their votes do not count towards electing Democratic candidates.  (Salinger Dep. pp. 17:23-18:25).  But these are not concerns about the weight of their votes.  Plaintiffs make no allegations showing that their votes are in fact not counted.

The Supreme Court has explained that "the mere fact that a particular [redistricting] makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm." *Davis v. Bandemer*, 478 U.S. 109, 131 (1986).[1]  Indeed, the "power to influence the political process is not limited to winning elections" and this is "true even in a safe district where the losing group loses election after election." *Id*. at 132.

Plaintiffs are really complaining about the perceived loss of voting power by their political party of choice—here, the Democrats—and not their individual vote.  This alleged harm is foreclosed by *Gill*.  The Supreme Court rejected a theory of harm grounded in the "effect that a gerrymander has on the fortunes of political parties." *Gill*, 138 S. Ct. at 1933.  And it stated clearly that it is "*not responsible for vindicating generalized partisan preferences*." *Id*. (emphasis added).  Plaintiffs' claims seek to vindicate a "collective political interest, not an individual legal interest." *Id*. at 1932.  The Court's decision in *Gill* makes clear that this is a "generalized grievance" which is not sufficient to confer standing.

---

[1] The *Bandemer* plurality opinion also noted that it would be impossible to find a constitutional violation after only one election under a challenged plan, the exact circumstance discussed here. *Id*. at 135.

10

3. **There is no authority for this court to use the LWV proportional representation benchmark for establishing standing**

LWV attempts to establish standing for their individual plaintiffs through the expert testimony of Jowei Chen. Plaintiffs use Dr. Chen to claim they have been injured because they are not able to elect a number of congressional candidates that is proportional to the statewide vote totals for Democrats. Dr. Chen supports this theory by comparing the 2016 plan to only one of his 2000 simulated maps that just so happens to include 7 so-called "Republican leaning" districts and 6 "Democratic leaning" districts. The Supreme Court has rejected inability of a party to elect a proportional number of candidates as a basis for establishing standing of an individual voter to challenge the legality of their district. *Bandemer*, 478 U.S. at 132; *Vieth v. Jubelirer*, 541 U.S. 267, 288, 308 (no authority for argument that a majority of voters should elect a majority of seats) (Kennedy, J. concurring); (Constitution does not require proportional representation (Stevens, J., dissenting). And consistent with these rulings regarding proportional representation, the Court in *Gill* rejected the argument that standing for individual plaintiffs can be established by statewide statistics allegedly showing that the plaintiff's political party was not electing a "fair" number of candidates.

In its original decision in this case, this Court found that plaintiffs had standing because of the statewide unfairness of the 2016 congressional plan. *Covington*, 279 F.Supp.3d at 612. Using statewide evidence, this Court found that plaintiffs who supported non-Republican candidates who resided in one of ten districts that elected Republican candidates suffered "vote dilution" simply because a Republican was elected

11

in their district.[2]  Plaintiffs' arguments here are no different.  Once again using a statewide analysis—based upon benchmarks of either proportional representation or where a plaintiff would most likely reside under 2000 simulated statewide maps— plaintiffs continue to argue that standing is established simply because Democratic candidates allegedly cannot win a "fair" number of districts.  This is no different than the theory originally advocated by the plaintiffs, adopted by this Court in its first opinion, and rejected by the Supreme Court in *Gill*.  The fact that this Court's original decision was vacated for consideration in light of *Gill* mandates that this Court reject plaintiffs' second attempt to use statewide statistics or a proportional congressional plan as a benchmark for proving standing.[3]

Professor Chen completed two reports in this case – one for the LWV and the other for Common Cause.  The decision in *Gill* to reject a statewide analysis to prove standing for individual plaintiffs renders Dr. Chen's newest LWV report more than suspect.  For his LWV study, Dr. Chen was asked by his counsel to pick one map from his 2000 simulated maps that contained 7 Republican leaning districts and 6 Democratic leaning districts, and to then compare that map to the 2016 congressional plan.  He was also told that the map he selected had to contain at least one district with a black voting age population of over 40%.  (Chen Dep. p. 18).  Moreover, other than the fact that

---

[2] The ruling did not explain how any of the original defendants who reside in districts that elected Democrats – like most of the LWV plaintiffs –had standing to maintain this action.

[3] The same is true for the analysis conducted for Common Cause by Dr. Mattingly.  All of his analysis was grounded in simulated maps which could only be produced on a statewide basis.  Neither Dr. Mattingly nor Dr. Chen simulated districts on a district-by-district basis.

counsel told Dr. Chen to select a map that had 7 "leaning" Republican districts and 6 "leaning" Democratic districts, Dr. Chen's only explanation about a proportional representation map should be used as a benchmark for comparing the 2016 plan (as opposed to plans that had nine or eight leaning Republican districts) was because a 7-6 plan had an efficiency gap of zero. (Chen Dep. pp. 21-22). However, neither a nine or eight leaning Republican seat plan would have violated the efficiency gap standard. (*See* attached Supplemental Expert Report of Sean P. Trende, ¶ 5) (attached as Exhibit C). Thus, it is not coincidental that the LWV would advocate a 7-6 plan as the judicial standard for fairness because it approximates the proportionality plaintiffs have been seeking since the commencement of this lawsuit.

For his LWV analysis, Dr. Chen then created two color coded maps, one of the 2016 plan and the other of the plan Dr. Chen selected from his simulated maps (Plan 297). Districts on each map are coded so that Republican leaning maps are shades of red while Democratic maps are shades of blue. Using the formula developed by Dr. Hofeller, Republican leaning districts with a voting advantage between 50-55% were colored light red, districts with a Republican advantage of 55-60% were colored a darker shade of red, and districts with a Republican advantage above 60% were shaded the darkest red. Dr. Chen did the same blue shading progression for districts that favor Democrats.[4] (Chen Dep. p. 38:4-23).

---

[4] Dr. Chen did an identical study using a political index he prepared averaging twenty-four statewide elections. The results of this study are practically identical with the study based upon the Hofeller formula.

13

A comparison of these two maps shows that the three districts in Chen's map (Chen Districts 1, 4, and 12) that correspond to the three "Democratic" districts under the 2016 plan remain Democratic districts. Dr. Chen's map therefore confirms that none of the plaintiffs who reside in the 2016 versions of Congressional districts 1, 4 and 12 were injured by the 2016 congressional plan.

Next, to provide proportional representation Dr. Chen deletes three Republican districts found in the 2016 congressional plan and creates three new light blue Democratic districts (Chen 6, 8 and 10). To make these changes—and to provide proportional representation to Democrats statewide—Dr. Chen does to Republican voters exactly what the plaintiffs contend has been done to Democratic voters under the 2016 plan.

First, Dr. Chen decreases the percentage of Democratic voters in versions of Districts 1, 4, and 12 to more efficiently distribute Democratic voting strength. Next, Dr. Chen places Republican voters into two dark red districts (meaning a district with over 60% Republican voting margin) (Chen Districts 2 and 5). Examples of Republican voters placed into Chen Districts 2 and 5 include all Republican voters in both of these districts as all of them resided in 2016 congressional districts with lower Republican voting margins. Thus, Dr. Chen has placed Republican voters in his Districts 2 and 5 with voting margins far beyond what is "needed" for Republicans in those districts to elect Republicans. Under plaintiffs' theories, all of the Republican voters in Chen Districts 2 and 5 would have standing to challenge those districts and perhaps the entire Chen plan

14

as an illegal political gerrymander. Their situation under the Chen map is no different than the plaintiffs in this case who reside in the 2016 versions of CDs 1, 4, and 12.

But Dr. Chen is unable to create the desired proportional representation map simply by more efficiently distributing Democratic voters from Districts 1, 4, and 12 and placing Republicans in his Districts 2 and 5. So he also takes Republican voters out of districts where they currently elect a Republican and places them in a new Democratic leaning district. Examples of Republican voters being removed from a Republican district include Republican voters in Nash and Franklin County who currently elect a Republican in the 2016 version of CD 2. Dr. Chen places these voters in his version of CD 12. Republican voters in Wake and Johnston Counties who currently elect a Republican in the 2016 version of CD 2, are removed and placed into his District 10. Republican voters in Guilford County who currently elect a Republican are removed from the 2016 CD 13 and placed into Dr. Chen's Democratic-leaning District 6. Similarly, Republican voters in Forsyth and Stokes, who elect a Republican in the 2016 CD 5 are removed and placed into District 6. Finally, Dr. Chen's District 8 contains the following counties: Cumberland, Harnett, Hoke, Moore, Scotland, Montgomery and Richmond. Republican voters in all of these counties reside in one of three 2016 Congressional districts in which they elect a Republican (2016 CD 2, 8, and 9). Dr. Chen removes them and places them into his version of District 8. (Chen Dep. pp. 50:23-65:8)

If this Court was to recognize standing for the individual plaintiffs based upon the evidence presented by the LWV plaintiffs, the "injury" to the Republican voters impacted by such a ruling would be no different, and in fact much worse, than the injury alleged by

the individual plaintiffs. The only way for this Court to fashion a remedy to justify the dilution of the votes cast by Republican voters as proposed by plaintiffs and their expert is for it to adopt proportional representation as its judicially manageable standard of fairness. *See Bandemer*, 478 U.S. 109, 145 (1986) (O'Connor, J., concurring in judgment) (once districting is turned over to the courts it is predictable that they will move away from nebulous standards to some rough form of proportional representation). This is not a permissible option and the plaintiffs have offered no other judicially manageable standard for establishing standing.

### 4. The expert testimony offered by Common Cause also fails to establish standing for those plaintiffs

Common Cause has offered a different report from Dr. Chen in its attempt to establish standing for its individual plaintiffs. For each of the individual Common Cause plaintiffs, Chen compared the Republican voting advantage for their individual districts under the 2016 plan against the district in which each plaintiff would reside under all of the maps found in his two sets of simulated maps (with each set consisting of 1000 maps). (Chen Dep. Ex. 15, Figures 1-4). This report is even less persuasive than the report offered by Chen for the LWV plaintiffs.

First, all of the Common Cause plaintiffs could be placed in Republican-leaning districts in a large number of Dr. Chen's simulated maps, all of which are allegedly drawn without any partisan consideration. (Chen Dep. Ex. 15; Declaration of Sean Trende, ¶¶ 12-14). This shows that every plaintiff in this case could be placed in a

Republican-leaning district if districts were drawn by a computer without any consideration of politics.

Second, for eight of the individual Common Cause plaintiffs, the party that enjoyed the political advantage under the 2016 plan continues to enjoy the political advantage under a majority of Chen's two thousand simulated maps. (*See* Chen Dep. Ex. 15, Figures 1 and 2) (plaintiffs Gresham, Byrd, Wolf, Boylan, Freeman, Lurie, Bordsen, Hall).[5] Plaintiffs Byrd and Wolf represent the most interesting examples. Byrd currently resides in the 2016 version of CD 11, a district where the General Assembly allegedly cracked Democratic voters residing in Asheville. Wolf resides in the 2016 CD 10, another district that has allegedly cracked Democratic voters. Yet, almost *none* of dr. Chen's 2000 simulated maps placed Byrd or Wolf in a district that is Democratic leaning. Thus, even under Dr. Chen's analysis, it is impossible for Byrd or Wolf to claim that their votes were "diluted."

Six of the Common Cause clients would reside in a larger number of Democratic leaning districts found in Dr. Chen's two sets of simulated maps. (Chen Dep. Ex. 15, Figures 1 and 2). But none of these six plaintiffs were taken out of a Democratic district when the 2016 plan was enacted and all of them reside in areas where Republican candidate had been elected even under maps enacted by the Democratic-controlled General Assembly in 2001. (*See* D.E. 114 at 21-47).

---

[5] The absence of injury to these plaintiffs is also reinforced by Chen's 297 map. Under that map, nine of the fourteen Common Cause plaintiffs would be placed in a district with the same partisan balance as the district in which they reside under the 2016 Plan. (*See* attached Supplemental Declaration of M.V. Hood, III, p. 3) (attached as Exhibit D).

Dr. Chen's Common Cause report did not even attempt to show that any of the plaintiffs were "cracked" out of a Democratic leaning district in 2016. That is because what Common Cause is really seeking is a more efficient distribution of the Democratic voting strength statewide. Making districts that expand the influence of Democratic voters is no reason for this court to usurp the political authority of the current Republican-controlled General Assembly. Moreover, any order dictating North Carolina to adopt congressional plans merely to increase the "influence" of Democratic voters would raise "serious constitutional questions." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 445 (2006).

Dr. Chen's Common Cause analysis also completely ignores that more "efficient" judicial distribution of Democratic voters will harm Republican voters in the very same way as alleged by the plaintiffs here. More "efficient" distribution of Democrats will result in less "efficient" distribution of Republican votes. Therefore, Dr. Chen and the plaintiffs would place Republicans into districts with voting margins that are much higher than what is needed to elect their candidate of choice, take Republican voters out of 2016 districts where Republican voters now have a chance to elect a Republican (not only in 2016 but also under plans adopted in 2001 and 2011), and "submerge" those voters into judicially-mandated Democratic leaning districts.

Common Cause and plaintiffs' own expert testimony prove there is no such thing as a politically neutral district line. The way every district is drawn has political consequences both in the area of the district line and even state wide. *Vieth v. Jubelirer*, 541 U.S. 267, 343 (Souter, Ginsburg, J.J., dissenting) ("The choice to draw a district line

18

one way and not another always carries some consequence for politics . . .").  No matter who draws districts, one side or the other will be aggrieved.  Unelected federal judges are "'inherently ill-equipped to make decisions based upon highly political judgments'".  *Bartlett*, 556 U.S. at 17-18, *quoting Holder v. Hall*, 512 U.S. 874, 894 (1994) (Thomas, J., concurring in judgment).  It is clearly beyond the authority of this Court to mandate "competitive" or "fair districts."  In any case, every expert and political consultant will have a different definition of what is fair or competitive.  Nor does this court have the authority, as suggested by the LWV plaintiffs, to use a "proportional" map as the benchmark for fair districting.  This has been shot down every time it has been proposed to the Supreme Court who shot it once again it the *Gill* decision.

## CONCLUSION

What is fair in districting, and thus how a plaintiff may establish a fairly traceable, redressable injury-in-fact for standing, depends on the eye of the beholder.  Plaintiffs are asking this Court to base injury for standing purposes on nebulous standards about how to draw "fair" districting lines.  *Bandemer*, 478 U.S. at 145 (O'Connor, Jr., concurring in judgment).  Statewide measures or proportional representation are not sufficient and this case should therefore be dismissed.

Respectfully submitted this 7th day of August, 2018.

> OGLETREE, DEAKINS, NASH
> SMOAK & STEWART, P.C.
>
> /s/ Phillip J. Strach
> Phillip J. Strach
> N.C. State Bar No. 29456
> Michael D. McKnight
> N.C. State Bar No. 36932
> phil.strach@ogletreedeakins.com
> michael.mcknight@ogletreedeakins.com
> 4208 Six Forks Road, Suite 1100
> Raleigh, North Carolina 27609
> Telephone:  (919) 787-9700
> Facsimile:  (919) 783-9412
> *Counsel for Legislative Defendants*

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing **Legislative Defendants' Brief on Standing** has been electronically filed with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

Edwin M. Speas, Jr.
Carolina P. Mackie
Poyner Spruill LLP
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC  27601
espeas@poynerspruill.com
cmackie@poymerspruill.com
*Attorneys for Common Cause Plaintiffs*

Gregory L. Diskant
Susan Millenky
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036
gldiskant@pbwt.com
smillenky@pbwt.com
*Attorneys for Common Cause Plaintiffs*

Emmet J. Bondurant
Jason J. Carter
Benjamin W. Thorpe
Bondurant, Mixson & Elmore, LLP
1201 W. Peachtree Street, NW, Suite 3900
Atlanta, Georgia 30309
bondurant@bmelaw.com
carter@bmelaw.com
bthorpe@bmelaw.com
*Attorneys for Common Cause Plaintiffs*

Alexander McC. Peters
Senior Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC  27602

Allison Riggs
SOUTHERN COALITION FOR SOCIAL
JUSTICE
1415 W. HWY. 54, STE. 101
DURHAM, NC 27707
Email: emily@southerncoalition.org
Email: anita@southerncoalition.org
*Attorneys for League of Women Voters of*
*North Carolina Plaintiffs*

Danielle M. Lang
CAMPAIGN LEGAL CENTER
1411 K STREET NW
SUITE 1400
WASHINGTON, DC 20005
202-736-2200
Fax: 202-736-2222
Email: dlang@campaignlegalcenter.org
*Attorneys for League of Women Voters of*
*North Carolina Plaintiffs*

Annabelle E. Harless
Ruth M. Greenwood
CAMPAIGN LEGAL CENTER
73 W. MONROE ST., STE. 322
CHICAGO, IL 60603
312-561-5508
Fax: 202-736-2222
Email: aharless@campaignlegalcenter.org
*Attorneys for League of Women Voters of*
*North Carolina Plaintiffs*

Nicholas O. Stephanopoulos
UNIVERSITY OF CHICAGO LAW
SCHOOL
1111 E 60TH STREET
CHICAGO, IL 60637
773-702-4226
Email: nsteph@uchicago.edu\
*Attorneys for League of Women Voters of*
*North Carolina Plaintiffs*

This the 7th day of August, 2018.

OGLETREE, DEAKINS, NASH
SMOAK & STEWART, P.C.

/s/ Phillip J. Strach
Phillip J. Strach

35103635.1