# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| COMMON CAUSE, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, et al.,<br><br>        Defendants. | No. 1:16-CV-1026 |
| LEAGUE OF WOMEN VOTERS OF NORTH CAROLINA, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>ROBERT A. RUCHO, in his official capacity as Chairman of the North Carolina Senate Redistricting Committee for the 2016 Extra Session and Co-Chairman of the Joint Select Committee on Congressional Redistricting, et al.,<br><br>        Defendants. | No. 1:16-CV-1164 |

Before WYNN, Circuit Judge, and OSTEEN, District Judge, and BRITT, Senior District Judge.

## MEMORANDUM OPINION

WYNN, Circuit Judge, wrote the opinion, in which BRITT, Senior District Judge, concurred.  OSTEEN, JR., District Judge, concurs in part and dissents in part.

# TABLE OF CONTENTS

I.   BACKGROUND ........................................................................................8

   A.   THE MODERN HISTORY OF REDISTRICTING IN NORTH CAROLINA ........................... 8

   B.   THE DRAWING OF THE 2016 PLAN ......................................................... 11

   C.   PROCEDURAL HISTORY ....................................................................... 25

II.  JURISDICTIONAL ARGUMENTS ...........................................................34

   A.   STANDING ...................................................................................... 34

      1.   Equal Protection Clause ................................................................. 36

      2.   First Amendment ......................................................................... 62

      3.   Article I .................................................................................... 68

   B.   JUSTICIABILITY ................................................................................ 77

      1.   Governing Law ........................................................................... 79

      2.   Legislative Defendants' Arguments Against Justiciability .............................. 92

III. EQUAL PROTECTION..............................................................................126

   A.   BACKGROUND LAW ......................................................................... 127

2

1.      Discriminatory Intent ................................................................ 128

2.      Discriminatory Effects .............................................................. 134

3.      Lack of Justification .................................................................. 140

B.  Application ..................................................................................... 142

1.      Statewide Evidence .................................................................. 142

2.      District-Specific Evidence ........................................................ 205

IV.     FIRST AMENDMENT ........................................................................ 251

A.  Background Law ........................................................................... 252

B.  Legal Standard and Application ................................................ 259

1.      Intent To Burden Speech and Associational Rights ..................... 263

2.      Burden on Speech and Associational Rights ................................ 265

3.      Causation .................................................................................. 274

V.      ARTICLE I ........................................................................................ 276

A.  Background Law ........................................................................... 276

B.  Application ..................................................................................... 279

VI.    REMEDY ........................................................................................... 288

In these consolidated cases, two groups of Plaintiffs allege that North Carolina's 2016 Congressional Redistricting Plan (the "2016 Plan") constitutes a partisan gerrymander in violation of Article I of the Constitution, the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.  After conducting a four-day trial and carefully considering the parties' evidence and briefing, this Court awarded judgment in Plaintiffs' favor on all of their claims and enjoined the State from using the 2016 Plan in future elections.  *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 598 (M.D.N.C. 2018), *vacated sub nom. Rucho v. Common Cause*, 138 S. Ct. 2679 (2018) (mem.).  On July 25, 2018, the Supreme Court vacated that judgment, and remanded the case to this Court for reconsideration in light of the Supreme Court's decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), which addressed what evidence a plaintiff must put forward to establish Article III standing to lodge a partisan vote dilution claim under the Equal Protection Clause.

As further explained below, we conclude that, under the test set forth in *Gill*, at least one Plaintiff registered to vote in each of the thirteen districts in the 2016 Plan has standing to assert an Equal Protection challenge to each of those districts.  In particular, such Plaintiffs introduced evidence establishing that each of their districts is "packed or cracked" and, as a result, that their votes "carry less weight than [they] would carry in another, hypothetical district."  *Id.* at 1931.  We further conclude that *Gill* did not call into question—and, if anything, supported—this Court's previous determination that Plaintiffs have standing to assert partisan gerrymandering claims under Article I and the First Amendment.

4

As to the merits, a common thread runs through the restrictions on state election regulations imposed by Article I, the First Amendment, and the Equal Protection Clause: the Constitution does not allow elected officials to enact laws that distort the marketplace of political ideas so as to intentionally favor certain political beliefs, parties, or candidates and disfavor others.  In particular, Article I preserves inviolate the right of "the People" to elect their Representatives, and therefore bars the States from enacting election regulations that "dictate electoral outcomes" or "favor or disfavor a class of candidates." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833–34 (1995).  Similarly, the First Amendment prohibits election regulations that "restrict the speech of some elements of our society in order to enhance the relative voice of others." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976) (per curiam).  And the Equal Protection Clause embodies the foundational constitutional principle that the State must govern "impartially"—that "the State should treat its voters as standing in the same position, regardless of their political beliefs or party affiliation." *Davis v. Bandemer*, 478 U.S. 109, 166 (1986) (Powell, J., concurring in part and dissenting in part).  That the framers of the Constitution and the Reconstruction Amendments sought to protect this principle through three different constitutional provisions only reinforces its centrality to our democratic system.

Partisan gerrymandering—"the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power," *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015)—strikes at the heart of this foundational constitutional principle.  By definition, partisan gerrymandering amounts to an effort to dictate electoral outcomes by favoring candidates

5

of one party and disfavoring candidates of another. *Thornton*, 514 U.S. at 833–34. By intentionally ensuring that Representatives from one party have a disproportionate voice in Congress, it also "restrict[s] the speech of some elements of our society"—voters who do not support the policies embraced by the favored party—and "enhance[s] the relative voice of others"—voters who support the favored party. *Buckley*, 424 U.S. at 48–49. And by favoring the viewpoints of one group of voters over another, it runs afoul of the Government's constitutional duty to "treat its voters as standing in the same position, regardless of their political beliefs or party affiliation." *Davis*, 478 U.S. at 166.

Put differently, by intentionally seeking to entrench a favored party in power and make it difficult—if not impossible—for candidates of parties supporting disfavored viewpoints to prevail, partisan gerrymandering "seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994). But "'[t]he best test of truth is the power of the thought to get itself accepted in the competition of the market,' and *the people lose when the government is the one deciding which ideas should prevail*." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018) (emphasis added) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). Partisan gerrymanders, therefore, "raise the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Turner Broad.*, 512 U.S. at 64 (internal quotation marks omitted).

6

That is precisely what the Republican-controlled North Carolina General Assembly sought to do here. The General Assembly expressly directed the legislators and consultant responsible for drawing the 2016 Plan to rely on "political data"—that is, past election results specifying whether, and to what extent, particular voting precincts had favored Republican or Democratic candidates, and therefore were likely to do so in the future—to draw a districting plan that would ensure Republican candidates would prevail in the vast majority of the State's congressional districts, and would continue to do so in future elections. Ex. 1007. And the Republican-controlled General Assembly achieved that goal. As detailed below, the 2016 Plan led to Republican candidates prevailing by "safe" margins in the vast majority of the State's thirteen congressional districts. Put differently, the General Assembly's Republican majority "decid[ed] which ideas [w]ould prevail" in the State's congressional elections. *Becerra*, 138 S. Ct. at 2375. In doing so, they deprived Democratic voters "of their natural political strength" by making it difficult for such voters to raise money, attract strong candidates, and motivate fellow party members and independent voters to campaign and vote. *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring).

Legislative Defendants[1] drew a plan designed to subordinate the interests of non-Republican voters not because they believe doing so advances any democratic,

---

[1] Senator Robert Rucho, in his official capacity as co-chair of the Joint Select Committee on Congressional Redistricting (the "Committee"); Representative David Lewis, in his official capacity as co-chair of the Committee; Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives; and Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate.

constitutional, or public interest, but because, as the chief legislative mapdrawer openly acknowledged, *the General Assembly's Republican majority* "think[s] electing Republicans is better than electing Democrats." Ex. 1016, at 34:21–23. But that is not a choice the Constitution allows legislative mapdrawers to make. Rather, "those who govern should be the *last* people to help decide who *should* govern." *McCutcheon v. Fed Election Comm'n.*, 572 U.S. 185, 134 S. Ct. 1434, 1441–42 (2014) (plurality op. of Roberts, C.J.). Indeed, "the core principle of [our] republican government [is] that the voters should choose their representatives, not the other way around." *Ariz. State Leg.*, 135 S. Ct. at 2677 (internal quotation marks omitted). Accordingly, and as further explained below, we conclude, with one narrow exception,[2] that Plaintiffs prevail on all of their constitutional claims.[3]

## I.    BACKGROUND

### A.    THE MODERN HISTORY OF REDISTRICTING IN NORTH CAROLINA

Over the last 30 years, North Carolina voters repeatedly have asked state and federal courts to pass judgment on the constitutionality of the congressional districting plans drawn by their state legislators. The first such challenge involved a redistricting plan adopted by the North Carolina General Assembly after the 1990 census, which

---

[2] As further explained below, we hold that Plaintiffs failed to adduce sufficient evidence to support their partisan vote dilution challenge under the Equal Protection Clause to District 5. *See infra* Part III.B.2.e.

[3] This opinion constitutes our findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1).

increased the size of North Carolina's congressional delegation from 11 to 12 members. *See Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 633–34 (1993).  When the General Assembly set out to redraw the state's congressional districts to incorporate the new seat, the Department of Justice, pursuant to its "max-black" policy, pushed for the creation of a second majority-black district to augment, it maintained, the representation of the state's African-American voters in Congress. *Id.* at 635.  In response, the General Assembly prepared a revised district map that included the majority-black First and Twelfth Districts (the "1992 Plan"). *Id.*

Several dozen North Carolina voters, most of whom were Republican, challenged the 1992 Plan as a partisan gerrymander, in violation of the Equal Protection Clause, the First Amendment, and Article I, Section 2 of the United States Constitution.  *Pope v. Blue*, 809 F. Supp. 392, 394–95, 397–98 (W.D.N.C. 1992), *aff'd* 506 U.S. 801 (1992).  A divided three-judge panel dismissed the action, holding that the plaintiffs failed to adequately allege that the redistricting plan had a legally cognizable "discriminatory effect" on any "identifiable political group," under the standard set forth in the Supreme Court's decision in *Davis v. Bandemer*, 478 U.S. 109, 127 (1986) (plurality op.).  *Pope*, 809 F. Supp. at 397.

Separately, a group of North Carolina voters challenged the 1992 Plan as a racial gerrymander, in violation of the Equal Protection Clause.  *Shaw I*, 509 U.S. at 636-37.  After several years of litigation, the Supreme Court held that the General Assembly's use of race as the predominant factor in drawing the second majority-black district in the 1992 Plan violated the Equal Protection Clause, and enjoined the use of that district in

9

future elections.  *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 905–18 (1996).  In 1997, a politically divided General Assembly enacted a remedial plan expected to elect six Republican and six Democratic Representatives, rendering each party's share of the state's congressional delegation proportional to its share of the statewide vote in the most recent congressional election.  *Cromartie v. Hunt*, 133 F. Supp. 2d 407, 412-13 (E.D.N.C. 2000), *rev'd sub nom. Easley v. Cromartie*, 532 U.S. 234 (2001); *id.* at 423-24 (Thornburg, J., dissenting).  In 2001, after several more years of litigation, the Supreme Court approved that remedial plan.  *See Easley*, 532 U.S. 234 (holding that three-judge panel's finding that race constituted the predominant motivation in redrawing remedial districts was not supported by substantial evidence).

Just as litigation regarding the 1992 Plan came to an end, the results of the 2000 census entitled North Carolina to another seat in Congress, and the General Assembly again set out to redraw the state's congressional districts to include the additional seat. The resulting plan, which was adopted in 2001 (the "2001 Plan"), was used in each of the State's congressional elections between 2001 and 2010.  In all but one of these elections, the party receiving more statewide votes for their candidates for the House of Representatives also won a majority of the seats in North Carolina's congressional delegation (the only exception being the 2010 election, in which Republicans won 54 percent of votes statewide but only 6 of the 13 seats).  Exs. 1021–25.  Although the 2001 Plan did not include any majority-black districts, black voters in the First and Twelfth Districts were consistently successful in electing their preferred candidates.  *Harris v. McCrory*, 159 F. Supp. 3d 600, 606–07 (M.D.N.C. 2016), *aff'd sub nom. Cooper v.*

10

*Harris*, 137 S. Ct. 1455 (2017).  Unlike the 1992 Plan, the 2001 Plan did not generate significant federal litigation.  *Id.* at 607.

## B.  THE DRAWING OF THE 2016 PLAN

In 2010, for the first time in more than a century, North Carolina voters elected Republican majorities in both the North Carolina Senate and the North Carolina House of Representatives, giving Republicans exclusive control over the decennial congressional redistricting process.[4]  *See id.* at 607.  The House of Representatives and Senate each established redistricting committees, which were jointly responsible for preparing a proposed congressional redistricting plan.  *Id.*  Representative David Lewis, in his capacity as the senior chair of the House Redistricting Committee, and Senator Robert Rucho, in his capacity as senior chair of the Senate Redistricting Committee, were responsible for developing the proposed redistricting plan.  *Id.*

Through private counsel, the committees engaged Dr. Thomas Hofeller, who had previously worked as the redistricting coordinator for the Republican National Committee, to draw the new congressional districting plan.  *Id.*  Concurrent with his work on the 2011 North Carolina congressional redistricting plan, Dr. Hofeller also served on a "redistricting team" established as part of the national Republican State Leadership Committee's ("RSLC") Redistricting Majority Project, commonly referred to as "REDMAP."  Ex. 2015, at ¶ 13.  According to RSLC, REDMAP sought to elect

---

[4] Under the North Carolina Constitution, the Governor lacks the authority to veto redistricting legislation.  *See* N.C. Const. art. II, § 22.

Republican candidates to state legislatures so that Republicans would control such legislatures' redistricting efforts and thereby "solidify conservative policymaking at the state level and maintain a Republican stronghold in the U.S. House of Representatives for the next decade." *Id.* at ¶ 10. With regard to North Carolina, in particular, REDMAP sought to "[s]trengthen Republican redistricting power by flipping [state legislative] chambers from Democrat to Republican control." Ex. 2020.

Representative Lewis and Senator Rucho, both of whom are Republican, orally instructed Dr. Hofeller regarding the criteria he should follow in drawing the new districting plan. Dep. of Thomas B. Hofeller ("Hofeller Dep.") 20:7–19, Jan. 24, 2017, ECF Nos. 101-34, 110-1. According to Dr. Hofeller, Representative Lewis and Senator Rucho's "primar[y] goal" in drawing the new districts was "to create as many districts as possible in which GOP candidates would be able to successfully compete for office." *Id.* at 123:1–7.

In accordance with Representative Lewis and Senator Rucho's instructions, Dr. Hofeller testified that he sought "to minimize the number of districts in which Democrats would have an opportunity to elect a Democratic candidate." *Id.* at 127:19–22. In order to minimize the electoral opportunities of Democratic candidates, Dr. Hofeller used the results of past statewide elections to predict whether a particular precinct or portion of a precinct was likely to vote for a Republican or Democratic congressional candidate in future elections. *See id.* at 132:22–134:13, 159:20–160:12. According to Dr. Hofeller, "past voting behavior," as reflected in "past election results," is "the best predictor of future election success." Ex. 2037. Past election data have become "the industry

12

standard" for predicting the partisan performance of a districting plan, he explained, because "as more and more voters . . . register non-partisan or independent," party registration data have decreased in predictive value. *Id.*

Using past election data to "draw maps that were more favorable to Republican candidates," Dr. Hofeller moved district lines "to weaken Democratic strength in Districts 7, 8, and 11 . . . by concentrating Democratic voting strength in Districts 1, 4, and 12." Ex. 2043, at 33–34. Additionally, according to Dr. Hofeller, "[t]he General Assembly's goal [in 2011] was to increase Republican voting strength in New Districts 2, 3, 6, 7, and 13. This could only be accomplished by placing all the strong Democratic [census voting districts ("VTDs")][5] in either New Districts 1 or 4." Hofeller Dep. 116:19–117:25; Ex. 2036, at 4 (Dr. Hofeller averring that "[t]he Republican strategy was to weaken Democratic strength in Districts 7, 8, and 11; and to completely revamp District 13, converting it into a competitive GOP district."). Dr. Hofeller testified that to "improve[] GOP voting strength" in Districts 2 and 9, he "concentrat[ed] Democratic voting strength in Districts 1, 4 and 12." Ex. 2036, at 4. Dr. Hofeller conceded that, by making these changes, the 2011 Plan "diminished . . . [t]he[] opportunity to elect a Democratic candidate in the districts in which [he] increased Republican voting strength." Hofeller Dep. 128:17–21. All told, Dr. Hofeller testified that he redrew

---

[5] Counties in North Carolina draw precinct lines based on the latest census. The General Assembly created VTDs on January 1, 2008, defined by the precinct lines as they existed on that date. N.C. Gen. Stat. § 163-132.1B. For the most part, precincts and VTDs in North Carolina remain the same, although since January 1, 2008, some counties have divided certain VTDs into multiple precincts.

Districts 2, 3, 6, 7, 8, 9, 11, and 13 to increase Republican voting strength in those districts, and, to do so, he concentrated Democratic voters in Districts 1, 4, and 12.

Claiming (incorrectly) that Section 2 of the Voting Rights Act required the creation of majority-black districts "where possible," Representative Lewis and Senator Rucho also directed Dr. Hofeller to draw two majority-black districts in the state. *Harris*, 159 F. Supp. 3d at 608. This goal worked hand-in-hand with the General Assembly's partisan objective because, as Legislative Defendants acknowledge, "race and politics are highly correlated." Ex. 2043, at ¶ 120. Thus, Dr. Hofeller drew the map to further concentrate black voters, who are more likely to vote for Democratic candidates, into District 1 and District 12, where Dr. Hofeller already was planning to concentrate Democratic voting strength. *Harris*, 159 F. Supp. 3d at 607–09. As a result, the proportion of black voters in those districts increased from 47.76 percent to 52.65 percent and from 43.77 percent to 50.66 percent, respectively. *Id.* The General Assembly enacted the 2011 Plan on July 28, 2011. *Id.* at 608.

North Carolina conducted two congressional elections using the 2011 Plan. In 2012, Republican candidates received a minority of the statewide vote (49%), Ex. 3023, but won a supermajority of the seats in the State's congressional delegation (9 of 13), Ex. 1020. In 2014, Republican candidates received 54 percent of the statewide vote, and won 10 of the 13 congressional seats. Ex. 1019.

Meanwhile, voters living in the two majority-black districts challenged the 2011 Plan in both state and federal court, alleging that lines for the two districts constituted unconstitutional racial gerrymanders. *Harris*, 159 F. Supp. 3d at 609–10. The Supreme

14

Court of North Carolina twice ruled that the 2011 Plan did not violate the state or federal constitution. *Dickson v. Rucho*, 781 S.E.2d 404, 410–11 (N.C. 2015), *vacated*, 137 S. Ct. 2186 (2017) (mem.); *Dickson v. Rucho*, 766 S.E.2d 238 (N.C. 2014), *vacated*, 135 S. Ct. 1843 (2015) (mem.). However, on February 5, 2016, a three-judge panel presiding in the U.S. District Court for the Middle District of North Carolina struck down Districts 1 and 12 as unconstitutional racial gerrymanders and enjoined their use in future elections. *Harris*, 159 F. Supp. 3d at 627. Following argument, the Supreme Court affirmed the *Harris* panel's decision in its entirety. *Cooper v. Harris*, 137 S. Ct. 1455 (2017).

With both chambers of the North Carolina General Assembly still controlled by Republicans—and elected under one of the most widespread racial gerrymanders ever confronted by a federal court, *Covington v. North Carolina*, 316 F.R.D. 117, 124 (M.D.N.C. 2016), *aff'd* 137 S. Ct. 2211 (2017)—Representative Lewis and Senator Rucho again took charge of drawing the remedial districting plan. On February 6, 2016, Representative Lewis once more engaged Dr. Hofeller to draw the remedial plan. Dep. of Rep. David Lewis ("Lewis Dep.") 44:2–4, Jan. 26, 2017, ECF Nos. 101-33, 108-3, 110-3, 110-4; *see also* Ex. 4061. Soon thereafter, Representative Lewis spoke with Dr. Hofeller over the phone regarding the drawing of the new plan. Lewis Dep. 44:12–24; Ex. 4061. Even before he spoke with Representative Lewis, Dr. Hofeller had begun working on a remedial plan using redistricting software and data on his personal computer. Hofeller Dep. 130:2–9.

On February 9, 2016, Representative Lewis and Senator Rucho met with Dr. Hofeller at his home and provided him with more detailed oral instructions regarding the

15

criteria he should follow in drawing the remedial plan.  Ex. 4061; Lewis Dep. 48:19-49:7;

Dep. of Sen. Robert Rucho ("Rucho Dep.") 170:13-170:17, Jan. 25, 2017, ECF Nos. 101-

32, 110-5.  Once again, Representative Lewis and Senator Rucho did not reduce their

instructions to Dr. Hofeller to writing.  Lewis. Dep. 60:1–13.  In addition to directing Dr.

Hofeller to remedy the racial gerrymander, Representative Lewis and Senator Rucho

again directed Dr. Hofeller to use political data—precinct-level election results from all

statewide elections, excluding presidential elections, dating back to January 1, 2008—in

drawing the remedial plan.  Ex. 2043, at ¶ 38; Lewis Dep. 162:24–163:7; Hofeller Dep.

100:3–102:5, 180:10–16.  Representative Lewis and Senator Rucho further instructed Dr.

Hofeller that he should use that political data to draw a map that would maintain the

existing partisan makeup of the state's congressional delegation, which, as elected under

the racially gerrymandered plan, included 10 Republicans and 3 Democrats.  Ex. 2043, at

¶ 38; Lewis Dep. 162:24–163:7; Hofeller Dep. 175:19–23, 178:14–20, 188:19–190:2.

And Representative Lewis and Senator Rucho instructed Dr. Hofeller "to change as few"

of the district lines in the 2011 Plan as possible in remedying the racial gerrymander.

Lewis Dep. 75:25–76:2.

   With these instructions, Dr. Hofeller continued to prepare draft redistricting plans

on his personal computer.  To achieve Representative Lewis and Senator Rucho's

partisan objectives—and in accordance with his belief that "past voting data" best predict

future election results—Dr. Hofeller drew the draft plans using an aggregate variable he

created to predict partisan performance.  For each census block, the variable compared

the sum of the votes cast for Republican candidates in seven statewide races occurring

between 2008 and 2014 with the sum of the average total number of votes cast for Democratic and Republican candidates in those same races. Exs. 1017, 2002, 2039, 2043 at ¶¶ 18, 47, 49, 50; Dep. of Thomas Hofeller, Vol. II ("Hofeller Dep. II") 262:21–24, Feb. 10, 2017, ECF No. 110-2.

Dr. Hofeller testified that he used the averaged results from the seven elections so as "to get a pretty good cross section of what the past vote had been," Hofeller Dep. 212:16–213:9, and "[t]o give [him] an indication of the two-party partisan characteristics of VTDs," Hofeller Dep. II 267:5–6. Dr. Hofeller explained that "he had drawn numerous plans in the state of North Carolina over decades," and in his "experience[,] . . . the underlying political nature of the precincts in the state does not change no matter what race you use to analyze it." Ex. 2045, at 525:6–10; Hofeller Dep. at 149:5–18. "So once a precinct is found to be a strong Democratic precinct, it's probably going to act as a strong Democratic precinct in every subsequent election. The same would be true for Republican precincts." Ex. 2045, at 525:14–17; *see also* Hofeller Dep. II at 274:9–12 ("[I]ndividual VTDs tend to carry . . . the same characteristics through a string of elections.").

When he drew district lines, Dr. Hofeller was constantly aware of the partisan characteristics of each county, precinct, and VTD. Displaying the partisanship variable on his computer screen by color-coding counties, VTDs, or precincts to reflect their likely partisan performance, Ex. 5116, at ¶ 8, fig. 1; Hofeller Dep. 103:5–105:24; Hofeller Dep. II 267:18–278:4, Dr. Hofeller would use the partisanship variable to assign a VTD "to one congressional district or another," Hofeller Dep. 106:23–107:1, 132:14–

17

20, and "as a partial guide" in deciding whether and where to split VTDs or counties, *id.* at 203:4-5; *see also id.* at 202:2-5; Hofeller Dep. II at 267:10-17.  Dr. Hofeller further averred that partisanship considerations were the principal factor governing his placement of district lines within split counties.  Ex. 5001, at 7–8 ("For the most part, the internal boundaries of split counties were drawn using a composite percentage of seven statewide political races.").

In assigning a county, VTD, or precinct to a particular district, Dr. Hofeller also sought to preserve the "core" constituency of the districts in the 2011 Plan.  Ex. 5001, at ¶ 31. Using his partisanship variable—and in accordance with his effort to preserve the "cores" of the districts in the 2011 Plan—Dr. Hofeller drew, for example, Districts 1, 4, and 12 to be "predominantly Democratic," as those districts had been under the 2011 Plan.  Hofeller Dep. 192:7–16.  After drawing a draft plan, Dr. Hofeller also would use his seven-election variable to assess the partisan performance of the plan on a district-by-district basis and as a whole.  *Id.* at 247:18–23; Hofeller Dep. II 283:15–19, 284:20–285:4.  Dr. Hofeller then would convey his assessment of the partisan performance of each district to Representative Lewis.  Hofeller Dep. II 290:17–25.

The following day, February 10, 2016, Dr. Hofeller met with Representative Lewis and Senator Rucho and showed them several draft redistricting plans.  Rucho Dep. 31:16-31:18, 37:7-37:8.  "Nearly every time" he reviewed Dr. Hofeller's draft maps, Representative Lewis assessed the partisan performance of the 2016 Plan as a whole and each "individual voter district[]" using the results from North Carolina's 2014 Senate race between Senator Thom Tillis and former Senator Kay Hagan, which was, in

18

Representative Lewis's opinion, "the closest political race with equally matched candidates who spent about the same amount of money." Lewis Dep. 63:9–64:17. Representative Lewis visited Dr. Hofeller's house several more times over the next few days to review additional draft remedial plans. On either February 12 or February 13, Dr. Hofeller presented the near-final 2016 Plan to Representative Lewis, which Representative Lewis found acceptable. *Id.* at 77:7-20. Using the results of the Tillis-Hagan race, Representative Lewis concluded that the 2016 Plan would yield the "10-3 Republican advantage" the Chairs had intended. *Id.* at 128:29.

On February 12, 2016, the leadership of the North Carolina General Assembly appointed Representative Lewis and Senator Rucho as co-chairs of a newly formed a Joint Select Committee on Congressional Redistricting (the "Committee"), comprised of 25 Republican and 12 Democratic legislators, to draw the remedial district plan. Ex. 2009. On February 15, 2016—two days after Dr. Hofeller completed drawing the 2016 Plan—the co-Chairs held a public hearing on the redistricting effort. Ex. 1004. Dr. Hofeller did not attend the public hearing. Rucho Dep. 55:4–6. The Committee also solicited written comments regarding the redistricting efforts on its website. *Id.* at 55:10–23. Dr. Hofeller was not apprised of any of the comments made at the public hearing or in the written submissions. *Id.* at 55:4–56:13. Because Dr. Hofeller finished drawing the 2016 Plan before the public hearing and the opening of the window for members of the public to submit written comments, Hofeller Dep. 177:9–21, the 2016 Plan did not reflect any public input.

On February 16, 2016—three days after Dr. Hofeller, at Representative Lewis and Senator Rucho's direction, had completed drawing the remedial maps, *id.*; Ex. 5001, at ¶ 33—the Committee met for the first time. At that meeting, Representative Lewis and Senator Rucho proposed the following criteria to govern the drawing of the remedial districts:

<u>Equal Population</u>: The Committee will use the 2010 federal decennial census data as the sole basis of population for the establishment of districts in the 2016 Contingent Congressional Plan. The number of persons in each congressional district shall be as nearly as equal as practicable, as determined under the most recent federal decennial census.

<u>Contiguity</u>: Congressional districts shall be comprised of contiguous territory. Contiguity by water is sufficient.

<u>Political Data</u>: The only data other than population data to be used to construct congressional districts shall be election results in statewide contests since January 1, 2008, not including the last two presidential contests. Data identifying the race of individuals or voters shall not be used in the construction or consideration of districts in the 2016 Contingent Congressional Plan. Voting districts ("VTDs") should be split only when necessary to comply with the zero deviation population requirements set forth above in order to ensure the integrity of political data.

<u>Partisan Advantage</u>: The partisan makeup of the congressional delegation under the enacted plan is 10 Republicans and 3 Democrats. The Committee shall make reasonable efforts to construct districts in the 2016 Contingent Congressional Plan to maintain the current partisan makeup of North Carolina's congressional delegation.

<u>Twelfth District</u>: The current General Assembly inherited the configuration of the Twelfth District from past General Assemblies. This configuration was retained because the district had already been heavily litigated over the past two decades and ultimately approved by the courts. The Harris court has criticized the shape of the Twelfth District citing its "serpentine" nature. In light of this, the Committee shall construct districts in the 2016 Contingent Congressional Plan that eliminate the current configuration of the Twelfth District.

20

> Compactness: In light of the Harris court's criticism of the compactness of the First and Twelfth Districts, the Committee shall make reasonable efforts to construct districts in the 2016 Contingent Congressional Plan that improve the compactness of the current districts and keep more counties and VTDs whole as compared to the current enacted plan. Division of counties shall only be made for reasons of equalizing population, consideration of incumbency and political impact. Reasonable efforts shall be made not to divide a county into more than two districts.

> Incumbency: Candidates for Congress are not required by law to reside in a district they seek to represent. However, reasonable efforts shall be made to ensure that incumbent members of Congress are not paired with another incumbent in one of the new districts constructed in the 2016 Contingent Congressional Plan.

Ex. 1007. No other criteria were discussed by the Committee or in legislative debate on the 2016 Plan.

Representative Lewis explained the relationship between the "Political Data" and "Partisan Advantage" criteria as follows: the Partisan Advantage criterion "contemplate[s] looking at the political data . . . and as you draw the lines, if you're trying to give a partisan advantage, you would want to draw lines so that more of the whole VTDs voted for the Republican on the ballot than they did the Democrat." Ex. 1005, at 57:10–16. And he further explained that "to the extent [we] are going to use political data in drawing this map, it is to gain partisan advantage." *Id.* at 54. Representative Lewis "acknowledge[d] freely that this would be a political gerrymander," which he maintained was "not against the law." *Id.* at 48:4–6.

Democratic state Senator Floyd McKissick, Jr., objected to the "Partisan Advantage" criterion, stating that "ingrain[ing]" the 10-3 advantage in favor of Republicans was not "fair, reasonable, [or] balanced" because, as recently as 2012,

21

Democratic congressional candidates had received more votes on a statewide basis than Republican candidates. *Id.* at 49:16–50:5, 50:14–22. In response, Representative Lewis said that he "propose[d] that [the Committee] draw the maps to give a partisan advantage to 10 Republicans and 3 Democrats because [he] d[id] not believe it[ would be] possible to draw a map with 11 Republicans and 2 Democrats." *Id.* at 50:7–10. Democratic Committee members also expressed concern that the Partisan Advantage criterion would "bake in partisan advantage that was achieved through the use of unconstitutional maps." *Id.* at 62:1–3. In response, Representative Lewis again reiterated that "the goal" of the criterion "is to elect 10 Republicans and 3 Democrats." *Id.* at 62:18–19.

That same day, Committee members adopted, on a bipartisan basis, the Equal Population, Contiguity, Twelfth District, and Incumbency criteria. *Id.* at 14:16–18:3, 21:9–24:18, 91:17–94:17, 95:15–98:20. The remaining two criteria—Political Data and Partisan Advantage—were adopted on party-line votes. *Id.* at 43:21–47:5, 67:2–69:23. Additionally, the Committee authorized the chairmen to engage a consultant to assist the Committee's Republican leadership in drawing the remedial plan. Ex. 2003.

Also on February 16, 2016, after receiving authorization to hire a redistricting consultant, Representative Lewis and Senator Rucho sent Dr. Hofeller an engagement letter, which Dr. Hofeller signed that same day. Ex. 2003. Upon his formal engagement, Dr. Hofeller downloaded the 2016 Plan, which he had completed several days earlier, from his personal computer onto a legislative computer. Lewis Dep. 138:6–8; Ex. 1009, at 45:7–45:11; Ex. 1014, at 21:10–21:24; Ex. 4061. Democratic Committee members were not allowed to consult with Dr. Hofeller nor were they allowed access to the state

22

computer systems to which he downloaded the 2016 Plan. Ex. 1011, at 36:9-20; Ex. 1014, at 44:23-45:15; Ex. 2008. According to Representative Lewis, Senator Rucho, and Dr. Hofeller, the 2016 Plan adhered to the Committee's Partisan Advantage and Political Data criteria. Ex. 1014, at 36:25–37:6; Ex. 1016, at 37:3–7; Hofeller Dep. 129:14–15.

The following day, Representative Lewis and Senator Rucho presented the 2016 Plan to the Committee. Ex. 1008. As part of the presentation, Representative Lewis provided Committee members with spreadsheets showing the partisan performance of the proposed districts in twenty previous statewide elections. Ex. 1017. Representative Lewis stated that he and Senator Rucho believed that the 2016 Plan "will produce an opportunity to elect ten Republican members of Congress," but it was "a weaker map than the [2011 Plan]" from the perspective of Partisan Advantage. Ex. 1008, at 12:3–7. The Committee approved the 2016 Plan by party-line vote. *Id.* at 67:10–72:8.

On February 19, 2016, the North Carolina House of Representatives debated the 2016 Plan. During that debate, Representative Lewis further explained the rationale behind the Partisan Advantage criterion, stating: "I think electing Republicans is better than electing Democrats. So I drew this map to help foster what I think is better for the country." Ex. 1016, at 34:21–23. Following that debate, the North Carolina Senate and North Carolina House of Representatives approved the 2016 Plan, with one slight

modification,[6] on February 18 and February 19, respectively, in both cases by party-line votes. Ex. 1011, at 110:13–22; Ex. 1016, at 81:6–16.

The 2016 Plan splits 13 counties and 12 precincts. Ex. 5023. Under several mathematical measures of compactness, the districts created by the 2016 Plan are, on average, more compact than the districts created by the 2011 Plan. Ex. 5048. In accordance with the Chairs goals of protecting incumbents and preserving the "cores" of the districts in the 2011 Plan, 10 of the 13 districts (Districts 1, 2, 3, 4, 5, 6, 7, 10, 11, and 12) in the 2016 Plan retain at least 50 percent of the population in their corresponding 2011 version. Ex. 5001, Table 1. Representative Lewis acknowledged as much, testifying that "[m]any of the[ districts in the 2016 Plan] look basically the same as they did in the 2011 map." Lewis Dep. 61:15–16. For example, Representative Lewis noted that, like the 2011 Plan, the 2016 Plan split Buncombe County and the City of Asheville, where Democratic voters are concentrated, between Districts 10 and 11. *Id.* at 62:11–19. Notwithstanding the General Assembly's stated goal of protecting incumbents, the 2016 Plan paired 2 of the 13 incumbents elected under the unconstitutional 2011 Plan (David Price previously elected in District 4 and George Holding previously elected in District 13). Ex. 2010, at 15–19.

---

[6] During a Senate Redistricting Committee meeting on February 18, 2017, the 2016 Plan was slightly modified by moving two whole precincts and one partial precinct between Districts 6 and 13 to avoid placing two incumbents in the same district. Ex. 1009, at 53:2–54:14; Ex. 1014, at 22:21–23:10; Lewis Dep. 138:6–139:2.

The *Harris* plaintiffs filed objections to the Plan with the three-judge court presiding over the racial gerrymandering case. *Harris v. McCrory*, No. 1:13-cv-949, 2016 WL 3129213, at *1 (M.D.N.C. June 2, 2016). Among those objections, the *Harris* plaintiffs asked the court to reject the 2016 Plan as an unconstitutional partisan gerrymander. *Id.* at *2. Noting that the Supreme Court had not agreed to a standard for adjudicating partisan gerrymandering claims and that the "plaintiffs ha[d] not provided the Court with a 'suitable standard'" for evaluating such claims, the court rejected the partisan gerrymandering objection "as presented." *Id.* at *3 (quoting *Ariz. State Leg.*, 135 S. Ct. at 2658). The court twice made clear, however, that its "denial of plaintiffs' objections *does not* constitute or imply an endorsement of, or foreclose any additional challenges to, the [2016 Plan]." *Id.* at *1, *3 (emphasis added).

In November 2016, North Carolina conducted congressional elections using the 2016 Plan. In accordance with the objective of the Partisan Advantage criterion, Republican candidates prevailed in 10 of the 13 (76.92%) congressional districts established by the 2016 Plan. Ex. 1018. Republican candidates received 53.22 percent of the statewide vote. Ex. 3022. Republican candidates prevailed in each of the ten districts Dr. Hofeller and the Chairs intended and expected Republican candidates to prevail (Districts 2, 3, 5, 6, 7, 8, 9, 10, 11, and 13), and Democratic candidates prevailed in each of the three districts Dr. Hofeller and the Chairs intended and expected to be "predominantly Democratic" (Districts 1, 4, and 12). Exs. 3022, 5116.

## C.   PROCEDURAL HISTORY

On August 5, 2016, Common Cause, the North Carolina Democratic Party, and fourteen North Carolina voters[7] (collectively, "Common Cause Plaintiffs"), filed a complaint alleging that the 2016 Plan constituted a partisan gerrymander. Compl., *Common Cause v. Rucho*, No. 1:16-CV-1026, Aug. 5, 2016, ECF No. 1. The League of Women Voters of North Carolina (the "League") and twelve North Carolina voters[8] (collectively, "League Plaintiffs," and together with Common Cause Plaintiffs, "Plaintiffs") filed their partisan gerrymandering action on September 22, 2016. Compl., *League of Women Voters of N.C. v. Rucho*, No. 1:16-CV-1164, Sept. 22, 2016, ECF No. 1. Both parties named as defendants Legislative Defendants; A. Grant Whitney, Jr., in his official capacity as Chairman of the North Carolina State Board of Elections (the "Board of Elections"); the Board of Elections; and the State of North Carolina (collectively, with Chairman Whitney and the Board of Elections, "State Defendants," and with Legislative Defendants, "Defendants").

In their operative complaints, both Common Cause Plaintiffs and League Plaintiffs allege that the 2016 Plan violates the Equal Protection Clause, by intentionally diluting the electoral strength of individuals who previously opposed, or were likely to oppose,

---

[7] The individual plaintiffs in the Common Cause action are Larry D. Hall; Douglas Berger; Cheryl Lee Taft; Richard Taft; Alice L. Bordsen; William H. Freeman; Melzer A. Morgan, Jr.; Cynthia S. Boylan; Coy E. Brewer, Jr.; John Morrison McNeill; Robert Warren Wolf; Jones P. Byrd; John W. Gresham; and Russell G. Walker, Jr.

[8] The individual plaintiffs in the League action are William Collins, Elliott Feldman; Carol Faulkner Fox; Annette Love; Maria Palmer; Gunther Peck; Ersla Phelps; John Quinn, III; Aaron Sarver; Janie Smith Sumpter; Elizabeth Torres Evans; and Willis Williams.

Republican candidates, and the First Amendment, by intentionally burdening and retaliating against supporters of non-Republican candidates on the basis of their political beliefs and association.  First Am. Compl. for Decl. J. and Inj. Relief ("Common Cause Compl.") ¶¶ 25–45, *Common Cause v. Rucho*, No. 1:16-CV-1026, Sept. 7, 2016, ECF No. 12; Am. Compl. ("League Compl.") ¶¶ 69–83, *League of Women Voters of N.C. v. Rucho*, No. 1:16-CV-1164, Feb. 10, 2017, ECF No. 41.  Plaintiffs allege that the General Assembly diluted the votes of supporters of non-Republican candidates through "cracking"—dispersing members or supporters of a disfavored party or group across a number districts so that they are relegated to minority status in each of those districts— and "packing"—concentrating members or supporters of the disfavored party or group in a particular district or limited number of districts so as to dilute the voting strength of supporters of the disfavored party or group in the remaining districts.  Common Cause Compl. ¶ 35; League Compl. ¶ 6.

Common Clause Plaintiffs further allege that the 2016 Plan violates Article I, section 2 of the Constitution, which provides that members of the House of Representatives will be chosen "by the People of the several States," by usurping the right of "the People" to select their preferred candidates for Congress, and Article I, section 4, by exceeding the States' delegated authority to determine "the Times, Places and Manner of holding Elections" for members of Congress.  Common Cause Compl. ¶¶ 46–54.

On February 7, 2017, this Court consolidated the two actions for purposes of discovery and trial.  Order, Feb. 7, 2017, ECF No. 41.  Three days later, League Plaintiffs

amended their complaint to reflect the results of the 2016 congressional election conducted under the 2016 Plan and empirical analyses of those results.

On February 21, 2017, Defendants moved to dismiss both complaints under Federal Rule of Civil Procedure 12(b)(6), principally asserting that (1) *Pope v. Blue*, 809 F. Supp. 392 (W.D.N.C. 1992), which the Supreme Court summarily affirmed, 113 S. Ct. 30 (1992), required dismissal of Plaintiffs' actions, and (2) the Supreme Court's splintered opinions regarding the justiciability of—and, to the extent such claims are justiciable, the legal framework for—partisan gerrymandering claims foreclosed Plaintiffs' claims. Mot. to Dismiss for Failure to State a Claim, Feb. 21, 2017, ECF No. 45. In a memorandum opinion and order entered March 3, 2017, this Court denied Defendants' motions to dismiss. *Common Cause v. Rucho*, 240 F. Supp. 3d 376 (M.D.N.C. 2017); Order, Mar. 3, 2017, ECF No. 51.

Beginning on October 16, 2017, this Court held a four-day trial, during which the Common Cause Plaintiffs, League Plaintiffs, and Legislative Defendants introduced evidence and presented testimony from their expert witnesses. The parties also stipulated to the admission of numerous additional exhibits as well as extensive deposition testimony. Although counsel for the State Defendants attended trial, they did not participate and took no position as to how this Court should resolve the case.

In post-trial briefing, League Plaintiffs set forth a single, three-part test for determining whether a state congressional redistricting plan violates the First and Fourteenth Amendments. Under their proposed test, a plaintiff alleging that a state redistricting body engaged in unconstitutional partisan gerrymandering bears the burden

of proving: (1) that the redistricting body enacted the challenged plan with the intent of discriminating against voters who support candidates of a disfavored party and (2) that the challenged plan had a "large and durable" discriminatory effect on such voters. League of Women Voters Pls.' Post-Trial Br. ("League Br.") 3, Nov. 6, 2017, ECF No. 113. If the plaintiff makes such a showing, then the burden shifts to the governmental defendant to provide (3) a legitimate, non-partisan justification for the plan's discriminatory effect. *Id.*

League Plaintiffs pointed to the Political Advantage and Partisan Advantage criteria as well as the chairmen's official explanations of those criteria as evidence of the General Assembly's intent to discriminate against voters who support Democratic candidates. *Id.* at 7–8. As to the plan's discriminatory effects, League Plaintiffs introduced expert analyses of the 2016 Plan's alleged "partisan asymmetry" to establish that the plan makes it substantially more difficult for voters who favor Democratic candidates to translate their votes into representation, and that this substantial difficulty is likely to persist throughout the life of the 2016 Plan. *Id.* at 12–16. Finally, League Plaintiffs asserted that Legislative Defendants failed to provide any evidence of a legitimate justification for the 2016 Plan's alleged partisan asymmetry, such as the state's political geography or other legitimate redistricting goals. *Id.* at 21–24.

By contrast, Common Cause Plaintiffs advanced distinct legal frameworks for their First Amendment, Equal Protection, and Article I claims. Regarding the First Amendment, Common Cause Plaintiffs asserted that the 2016 Plan's disfavoring of voters who previously opposed Republican candidates or associated with non-Republican

29

candidates or parties amounts to viewpoint discrimination and passes constitutional muster only if narrowly tailored to serve a compelling state interest. Common Cause Pls.' Post-Trial Br. ("Common Cause Br.") 5–8, Nov. 6, 2017, ECF No. 116. According to Common Cause Plaintiffs, the General Assembly's use of individuals' past voting history to assign such individuals to congressional districts with the purpose of advantaging Republican candidates on a statewide basis constitutes evidence of viewpoint discrimination. *Id.* at 7–15. Common Clause Plaintiffs further contended that Legislative Defendants provided no compelling interest justifying such viewpoint discrimination. *Id.* at 9.

Turning to the Equal Protection Clause, Common Cause Plaintiffs suggested that the level of scrutiny to which a court must subject a redistricting plan turns on the degree to which the redistricting body intended to pursue partisan advantage. *Id.* at 15–17. According to Common Cause Plaintiffs, the General Assembly predominantly pursued partisan advantage in drawing the 2016 Plan, warranting application of strict scrutiny. *Id.* Under that standard, Legislative Defendants must show that the plan was narrowly tailored to advance a compelling state interest, Common Cause Plaintiffs maintained. *Id.* As proof of the General Assembly's predominant intent to burden voters who support non-Republican candidates, Common Cause Plaintiffs pointed to the Political Data and Partisan Advantage criteria, the chairmen's explanations of the purpose behind those criteria, and expert analyses showing that the 2016 Plan is an "*extreme statistical outlier*" with regard to its pro-Republican tilt relative to thousands of other simulated districting plans conforming to non-partisan districting principles. *Id.* at 17. Common Cause

Plaintiffs further argued that, even if this Court found that the General Assembly did not draw the 2016 Plan with a predominantly partisan motive, the 2016 Plan nonetheless failed constitutional muster under intermediate or rational basis scrutiny. *Id.* at 18–19.

Finally, Common Cause Plaintiffs alleged that the 2016 Plan exceeds the General Assembly's delegated authority under Article I, section 4—commonly referred to as the "Elections Clause"—because it amounts to an unconstitutional effort "'to dictate electoral outcomes'" and "'to favor . . . a class of candidates.'" *Id.* at 20–21 (quoting *Cook v. Gralike*, 531 U.S. 510, 523–24 (2001)). And Common Clause Plaintiffs further asserted that the 2016 Plan violates Article I, section 2 because it gives voters who favor Republican candidates "'a greater voice in choosing a Congressman'" than voters who favor candidates put forward by other parties. *Id.* at 22–23 (quoting *Wesberry v. Sanders*, 376 U.S. 1, 13–14 (1964)).

In response, Legislative Defendants first argued that both sets of Plaintiffs lack Article III standing to assert any of their claims. Legislative Defs.' Post-Trial Br. ("Leg. Defs.' Br.") 12, Nov. 6, 2017, ECF No. 115. With regard to Plaintiffs' Equal Protection claim, in particular, Legislative Defendants asserted that the Equal Protection Clause does not permit statewide standing for partisan gerrymandering claims and that Plaintiffs lacked standing to lodge district-by-district partisan gerrymandering challenges, notwithstanding that at least one individual Plaintiff who is a registered Democrat resided in each of the State's thirteen congressional districts. *Id.* at 12–14.

Legislative Defendants next contended that, even if Plaintiffs have standing, neither set of Plaintiffs had offered a judicially manageable standard under *any*

31

constitutional provision for evaluating a partisan gerrymandering claim; therefore, they claimed, Plaintiffs' actions must be dismissed as raising nonjusticiable political questions. *Id.* at 9. To that end, Legislative Defendants criticized Plaintiffs' expert statistical analyses, in particular, on grounds that such analyses are "a smorgasbord of alleged 'social science' theories" that fail to answer what Legislative Defendants see as the fundamental question in partisan gerrymandering cases: "how much politics is too much politics in redistricting?" *Id.* at 2, 9–11. As to the merits, Legislative Defendants asserted that the 2016 Plan was not a "partisan gerrymander"—as they define that term— because, among other reasons, (1) the General Assembly did not try to "maximize" the number of Republican seats, and (2) the districts created by the 2016 Plan conform to a number of traditional redistricting principles such as compactness, contiguity, and adherence to county lines. *Id.* at 3, 7–8.

In a memorandum opinion and order entered January 9, 2018, this Court first rejected Legislative Defendants' justiciability and standing arguments, holding that Plaintiffs had put forward judicially manageable standards for adjudicating their claims and that the individual and organizational Plaintiffs had standing to assert district-by-district and statewide challenges to the 2016 Plan under each of the constitutional provisions under which Plaintiffs seek relief. *Common Cause*, 279 F. Supp. 3d at 608–36. The Court then unanimously held that the 2016 Plan violated the Equal Protection Clause and Article I of the Constitution. *Id.* at 636–72, 683–90; *id.* at 693–96, 698 (Osteen, J., concurring in part). And a majority of the panel further concluded that the 2016 Plan violated the First Amendment. *Id.* at 672–83 (majority op.). Having found

that the 2016 Plan violated the Constitution, the Court enjoined the State from conducting further elections using the 2016 Plan and gave the General Assembly an opportunity to draw a (second) remedial plan for use in the 2018 election. *Id.* at 690.

Soon thereafter, Legislative Defendants unsuccessfully moved this Court to stay our order pending review by the Supreme Court. *Common Cause v. Rucho*, 284 F. Supp. 3d 780, 782 (M.D.N.C. 2018). Legislative Defendants then successfully sought a stay from the Supreme Court. *Rucho v. Common Cause*, 138 S. Ct. 923 (2018) (mem.). Several months later, on June 25, 2018, the Supreme Court vacated this Court's judgment, remanding the case for reconsideration in light of *Gill*, which addressed what evidence a plaintiff must put forward to establish Article III standing to assert a partisan gerrymandering claim under the Equal Protection Clause based on a vote dilution theory.

This Court invited the parties to submit briefing regarding the impact of *Gill* on our January 9, 2018, opinion and order striking down the 2016 Plan as an unconstitutional partisan gerrymander. Having carefully considered the Supreme Court's opinion in *Gill* and the parties' briefing, we conclude that at least one of the named Plaintiffs residing in each of the State's thirteen congressional districts has standing to lodge a partisan vote dilution challenge under the Equal Protection Clause to each district in the 2016 Plan. And we further hold that *Gill* does not call into question our earlier conclusions that Plaintiffs have standing to assert First Amendment and Article I challenges to the 2016 Plan, and that all of Plaintiffs' constitutional claims are justiciable.

Turning to the merits, we conclude that Plaintiffs' evidence establishes that 12 of the 13 districts in the 2016 Plan violate the Equal Protection Clause because, in drawing

33

each of those 12 districts, the General Assembly's predominant intent was to dilute the votes of voters who favored non-Republican candidates; the General Assembly's manipulation of each of those district's lines has had the effect of diluting such voters' votes; and no legitimate state interest justifies that dilution. We further reaffirm our previous conclusion that the 2016 Plan violates the First Amendment by unjustifiably imposing burdens on Plaintiffs based on their previous and ongoing political expression and affiliation. Finally, we again hold that the 2016 Plan violates Article I by exceeding the scope of the General Assembly's delegated authority to enact congressional election regulations and interfering with the right of "the People" to choose their Representatives.

## II.    JURISDICTIONAL ARGUMENTS

Before addressing the merits of Plaintiffs' claims, we first address Legislative Defendants' threshold standing and justiciability arguments. As detailed below, we conclude that some, but not all, Plaintiffs have standing to assert partisan vote dilution claims under the Equal Protection Clause; that Plaintiffs have standing to assert partisan gerrymandering claims under the First Amendment; and that Common Cause Plaintiffs have standing to assert their claims under Article I of the Constitution. We further conclude that Plaintiffs' partisan gerrymandering claims are not barred by the political question doctrine, either in theory or as proven.

### A.    STANDING

Article III's "case" or "controversy" requirement demands that a plaintiff demonstrate standing—that the plaintiff has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of

issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962). To establish standing, a plaintiff first must demonstrate "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations and some internal quotation marks omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id.* (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon*, 426 U.S. at 38, 43). Plaintiffs bear the burden of establishing their standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

Importantly, the Supreme Court repeatedly has admonished that courts must assess a plaintiff's standing on a claim-by-claim basis. *Gill*, 138 S. Ct. at 1934 ("[S]tanding is not dispensed in gross." (internal quotation marks omitted)). Put differently, "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)).

With regard to each of Plaintiffs' three claims, Legislative Defendants do not dispute that to the extent Plaintiffs suffered an injury-in-fact, the injury was caused by the 2016 Plan. Nor do they dispute that, for each of Plaintiffs' claims, the asserted injuries are redressable by a favorable decision of this Court. Accordingly, we must determine whether Plaintiffs have suffered an injury-in-fact for each of the three claims at issue: (1) that the 2016 Plan violates the Equal Protection Clause of the Fourteenth Amendment by diluting Plaintiffs' votes on the basis of invidious partisanship; (2) that the 2016 Plan violates the First Amendment by burdening Plaintiffs' rights to engage in political speech and association; and (3) that the 2016 Plan violates Article I of the Constitution by "dictat[ing] electoral outcomes," by "favor[ing] . . . a class of candidates," *Cook*, 531 U.S. at 523, and by giving voters who favor Republican candidates "a greater voice in choosing a Congressman" than voters who favor candidates put forward by other parties, *Wesberry*, 376 U.S. at 14.

1. Equal Protection Clause

a. *Background*

In *Gill*, the Supreme Court addressed what constitutes an injury-in-fact sufficient to give rise to Article III standing to assert a partisan gerrymandering claim under the Equal Protection Clause based on a vote dilution theory. 138 S. Ct. at 1930–31. There, twelve Wisconsin voters lodged a statewide challenge to all ninety-nine districts in the State Assembly districting plan, principally alleging that the plan as a whole violated the Equal Protection Clause by intentionally diluting the votes of individuals who supported Democratic candidates. *Id.* at 1923–24. Four of the plaintiff-voters further alleged in the

36

complaint that "they lived in State Assembly districts where Democrats have been cracked or packed." *Id.* at 1924. At trial, however, the plaintiffs' evidence focused on the mapmakers' intent to draw a plan that would favor Republican candidates statewide and on the statewide partisan effects of the map. *Id.* at 1931–32. And none of the individual plaintiffs "sought to prove that he or she lived in a cracked or packed district." *Id.* at 1932. Following trial, the district court held that each of the plaintiffs suffered an injury-in-fact giving rise to Article III standing to assert a *statewide* Equal Protection challenge to the districting plan because their evidence established that, "[a]s a result of the statewide partisan gerrymandering, Democrats do not have the same opportunity provided to Republicans to elect representatives of their choice to the Assembly" and therefore that "the electoral influence of plaintiffs and other Democratic voters statewide has been unfairly [and] disproportionately . . . reduced for the life of [the districting plan]." *Whitford v. Gill*, 218 F. Supp. 3d 837, 927–28 (W.D. Wisc. 2016) (first three alterations in original) (internal quotation marks omitted), *vacated* 138 S. Ct. at 1929, 1934.

The Supreme Court rejected the district court's holding that a plaintiff challenging a districting plan on grounds that it violates the Equal Protection Clause by diluting the plaintiff's vote on the basis of partisanship has standing to challenge a plan statewide. *Gill*, 138 S. Ct. at 1931. Emphasizing "that a person's right to vote is 'individual and personal in nature,'" the Court held that "[t]o the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Id.* at 1930 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). When a plaintiff alleges that a districting plan dilutes

37

his vote on the basis of partisanship, the Court explained, "[t]hat harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Id.* at 1931. Put differently, the injury giving rise to such a claim "arises through a voter's placement in a 'cracked' or 'packed' district." *Id.*

In reaching this conclusion, the Court explicitly analogized partisan gerrymandering claims premised on vote dilution to *Shaw*-type racial gerrymandering claims, for which the Court has "held that a plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered." *Id.* at 1930 (citing *United States v. Hays*, 515 U.S. 737, 744–45 (1995)). In a *Shaw*-type racial gerrymandering case, a plaintiff can establish that the lines of her district were drawn on the basis of race "through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). And like *Gill*'s reference to "hypothetical district[s]," 138 S. Ct. at 1931, a plaintiff in such a racial gerrymandering case can establish a burden on her Fourteenth Amendment rights by introducing an alternative districting plan, which conforms to a legislature's legitimate districting objectives and traditional redistricting criteria, under which the plaintiff's vote would not have been diluted based on her race. *See, e.g., Cooper*, 137 S. Ct. at 1478–81; *Easley v. Cromartie*, 532 U.S. 234, 258 (2001).

38

Applying this precedent, the *Gill* Court concluded that several forms of evidence relied on by the plaintiffs failed to establish an injury-in-fact. First, the Court held that testimony by one named plaintiff, William Whitford, that the districting plan undermined his ability "to engage in campaign activity to achieve a [Democratic] majority in the Assembly and the Senate" did not establish an injury in fact for two reasons: (a) Whitford conceded on cross examination that *his district* was not cracked or packed and that the plan "did not affect the weight of his vote" and (b) the Supreme Court never has recognized a "shared interest in the composition of 'the legislature as a whole'" as an individual legal interest. *Gill*, 138 S. Ct. at 1924–25, 1932. Second, the Court said that the plaintiffs' direct evidence that the mapmakers intended the districting plan to strengthen the electoral prospects of Republican candidates did not support standing because the injury-in-fact requirement "turns on effect, not intent, and requires a showing of a burden on the plaintiffs votes that is actual or imminent, not conjectural or hypothetical." *Id.* at 1932 (internal quotation marks omitted). Finally, the Court said that the plaintiffs' statistical analyses of the districting plan's "partisan asymmetry"—that the plan does not allow supporters of the two principal parties to translate their votes into representation with equal effectiveness—did not establish the requisite district-specific injury because the analyses "are an average measure" and therefore "do not address the effect that a gerrymander has on the votes of particular citizens." *Id.* at 1933.

The instant case meaningfully differs from *Gill*. To begin, unlike the plaintiffs in *Gill* who "failed to meaningfully pursue their allegations of individual harm," *id.* at 1932, Common Cause Plaintiffs, in particular, have alleged, argued, and proven district-specific

39

injuries *throughout* the course of this litigation.  For example, each individual Common Cause Plaintiff alleged in their complaint that his or her vote is "diluted or nullified as a result of his placement in [his or her particular district]."  Common Cause Compl. ¶¶ 2(d)–(q).  The Common Cause Complaint further alleged that the 2016 Plan "pack[s] as many Democratic voters as possible in the First, Fourth, and Twelfth Congressional Districts" and "dilut[es] or nullif[ies] the votes of the remaining Democratic voters who reside outside of these three districts by dispersing (or 'cracking') all remaining Democratic voters among the other ten districts," and therefore that "[t]he 2016 Plan as a whole, *and each of the thirteen individual districts*" are unconstitutional.  *Id.* ¶¶ 35, 37, 45 (emphasis added).

Common Cause Plaintiffs also sought, obtained, and introduced at trial—before the Supreme Court decided *Gill*—district-specific evidence of cracking and packing.  For example, Common Cause Plaintiffs requested that Defendants admit, for each district, that Dr. Hofeller included or excluded counties and parts of counties in particular districts or divided counties between particular districts to achieve the General Assembly's partisan objective for each district.  Ex. 2043, at 23–33.  Additionally, Common Cause Plaintiffs deposed Dr. Hofeller and Representative Lewis regarding why boundaries for specific districts were drawn in a specific location and the political consequence of those boundaries.  *E.g.*, Hofeller Dep. 1927–12; Lewis Dep. 50:20–51:1, 62:2–19, 64:10–17.  And Common Cause Plaintiffs' statistical evidence provides not only an "average measure" of the 2016 Plan's cracking and packing, but also district-specific evidence of cracking and packing.  Ex. 3040, at 18, 30, 39.

40

Common Cause Plaintiffs' *pre-trial* Proposed Findings of Fact also forecasted that they would introduce numerous pieces of evidence establishing that the 2016 Plan manipulated lines of specific districts and thereby cracked and packed likely Democratic voters solely for the benefit of the Republican Party. Findings of Fact & Conclusions of Law Filed by the Common Cause Pls. 21, 28, 36–37, No. 1:16-CV-1026, June 5, 2017, ECF No. 65. And Common Cause Plaintiffs' *post-trial* Proposed Findings of Fact likewise asked this Court to make numerous district-specific findings as to the discriminatory burden imposed by each of the districts in the 2016 Plan. Common Cause Pls.' Post-Trial Findings of Fact & Conclusions of Law ("Common Cause FOF") 12–16, 28–36, No. 1:16-CV-1026, Nov. 6, 2017, ECF No. 117. There can be no question that Common Cause Plaintiffs have "meaningfully pursued" a district-by-district vote dilution claim under the Equal Protection Clause. *Gill*, 138 S. Ct. at 1932.

Additionally, unlike the *Gill* plaintiffs, who resided in a small minority of the State Assembly districts that they challenged, *see id.* at 1923, 1931, named Common Cause Plaintiffs reside and are registered to vote in each of the 13 congressional districts included in the 2016 Plan, Exs. 3024–38. Accordingly, unlike the *Gill* plaintiffs, the Common Cause Plaintiffs are not complaining of gerrymandering in districts in which they do not reside.

In contrast, prior to *Gill*, League Plaintiffs framed their Equal Protection claim as a statewide challenge, rather than a district-specific challenge. *See, e.g.*, League of Women Voters of N.C. Pls.' Final Proposed Findings of Fact & Conclusions of Law ("League FOF") 81, No. 1:16-CV-1026, Nov. 6, 2017, ECF No. 112 ("Plaintiffs' injury is

concrete and particularized because as a result of the statewide partisan gerrymandering, Democrats do not have the same opportunity provided to Republicans to elect representatives of their choice to Congress."). And several League Plaintiffs testified that their vote was diluted because Democratic candidates' share of the State's congressional delegation was not proportionate to the share of congressional votes cast for Democratic candidates statewide. *E.g.*, Dep. of Elliott J. Feldman ("Feldman Dep.") 20:8–16, Mar. 24, 2017, ECF No. 101-20; Dep. of Annette Love ("Love Dep.") 12:3–18, Apr. 7, 2017, ECF No. 101-1.

But unlike in *Gill*—which did not include an organizational plaintiff and in which the individual plaintiffs resided in a small minority of the districts challenged— Defendants stipulated prior to trial that the League has members in each of the State's thirteen congressional districts, and that at least one League member in each of those districts is registered as a Democrat and supports and votes for Democratic candidates. *See* Trial Tr. II, at 140–41; Ex. 4080. Also unlike the plaintiffs in *Gill*—who failed to develop any district-specific evidence of cracking or packing—League Plaintiffs alleged that specific districts were cracked or packed and introduced district-specific evidence to support such allegations. In their complaint, for example, League Plaintiffs stated that "[a]mong 'cracked' districts in which the prevailing candidate received less than 60 percent of the vote Republican candidates won *all six* of them (Districts 2, 5, 6, 8, 9, and 13). Conversely, the one 'packed' district in which the prevailing candidate received more than 70 percent of the vote (District 1) was won by a Democratic candidate." League Compl. ¶ 64.

Additionally, League Plaintiffs introduced into evidence—again, before the Supreme Court decided *Gill*—numerous county or county group maps color-coded on a precinct-by-precinct basis using Dr. Hofeller's partisanship variable to demonstrate that a particular district group in the 2016 Plan divided (or cracked) concentrations of non-Republican voters in the county or that a particular district in the 2016 Plan packed concentrations of non-Republican voters in the county. Exs. 4008, 4066 (Buncombe County); Exs. 4009, 4067 (Cumberland County); Exs. 4010, 4068 (Guilford County); Exs. 4011, 4069 (Johnston County); Exs. 4012, 4070 (Mecklenburg County); Exs. 4013, 4071 (Pitt County), Exs. 4014, 4072 (Wake and Durham Counties); Exs. 4015, 4073 (Wilson County); Ex. 4074 (Bladen County). And Mary Trotter Klenz, who is a Democratic voter and member of the League, testified that she believes the congressional district in which she is registered to vote, District 9, is the product of invidious partisan gerrymandering because it is a result of a legislative effort to divide Mecklenburg County along partisan lines and thereby render Democratic candidates "less competitive" than they were in the previous version of her district. 30(b)(6) Dep. of the League of Women Voters of N.C. by Mary Trotter Klenz ("Klenz Dep.") 65:23–66:12, Apr. 4, 2017, ECF No. 101–28 ("[T]he way the district is drawn . . . this little, bitty piece is in Mecklenburg County in my neighborhood and then goes all the way . . . along the state line over to Bladen County . . . so it's even less competitive. When it was more in Mecklenburg, at least you had the . . . continuity of Mecklenburg . . . [b]ut now its so spread out that it's just ridiculous."). Several other League Plaintiffs also testified to district-specific injuries. *E.g.* Dep. of Carol Faulkner Fox ("Fox Dep.") 19:25, 20:9–12, Mar. 22, 2017,

43

ECF No. 101-4; Dep. of Aaron J. Sarver ("Sarver Dep.") 25:2–26:18, Apr. 10, 2017, ECF No. 101-23.

Likewise, League Plaintiffs introduced into evidence several alternative districting plans generated through computer simulation by Dr. Jowei Chen, a political science professor at the University of Michigan—all of which conform to the General Assembly's non-partisan districting criteria, *see infra* Part III.B.1.a—or created by Dr. Hofeller that did not display the same degree of cracking and packing of Democratic voters in particular districts as the 2016 Plan, exs. 4016–33. Based on that evidence, League Plaintiffs' Proposed Findings of Fact asked this Court to make numerous findings that, in specific counties, the lines of particular districts were drawn to pack or crack likely Democratic voters. League FOF ¶¶ 125–35.

And after the Supreme Court vacated this Court's opinion and judgment for reconsideration in light of *Gill*, League Plaintiffs proffered additional evidence to support their standing to lodge a district-by-district vote dilution claim under the Equal Protection Clause to each district in the 2016 Plan. In particular, a declaration by the director of the League identified specific precincts in each of the thirteen congressional districts in which at least one League member is registered to vote and regularly votes as a Democrat. Decl. of Walter L. Salinger 2–4, July 10, 2018, ECF No. 129-1. Furthermore, a supplemental declaration by Dr. Chen demonstrated that, in all but one of those League members' districts, the votes of those members would have carried more weight, as measured by Dr. Hofeller's precinct-level partisanship variable, in the districting plan generated by Dr. Chen that maximally advances, subject to certain constraints, the

44

General Assembly's non-partisan redistricting objectives ("Plan 2-297"). Supp. Decl. of

Jowei Chen ("Second Chen Decl.") 2–3, 6–7, July 11, 2018, ECF No. 129-2.[9][10]

---

[9] League Plaintiffs and Common Cause Plaintiffs each submitted a supplemental declaration by Dr. Chen regarding Plaintiffs' standing. Second Chen Decl.; Decl. of Dr. Jowei Chen ("Third Chen Decl."), July 11, 2018, ECF No. 130-2. As further explained below, at trial Dr. Chen offered testimony and opinions based on 3,000 computer-generated districting plans drawn to conform to the General Assembly's nonpartisan districting criteria. *See infra* Part III.B.a.ii. Prior to trial, Plaintiffs disclosed to Defendants each of those 3,000 plans as well as numerous forms of descriptive information about the plans, including the two-party vote share for each district in each of the plans, as measured by Dr. Hofeller's partisanship variable. Plaintiffs also disclosed in discovery the address of the residences of each individual Plaintiff. All of that information was admitted into evidence at trial.

Dr. Chen's supplemental declarations—which Plaintiffs submitted after the Supreme Court decided *Gill* and remanded this case for reconsideration under the standing framework set forth therein—report the two-party vote share, as measured by Dr. Hofeller's partisanship variable, in each individual Plaintiff's district in either Plan 2-297 or 2,000 of Dr. Chen's computer-generated plans and compare that vote share to the district-by-district results observed in the 2016 election using the 2016 Plan. Each declaration, therefore, amounts to a new presentation of data and analyses already disclosed to Legislative Defendants and admitted into evidence. Additionally, Legislative Defendants deposed Dr. Chen regarding his supplemental declarations and, following that deposition, were afforded the opportunity to submit additional briefing to this Court regarding the supplemental declarations and their impact on Plaintiffs' standing. In such circumstances, we exercise our discretion to admit Dr. Chen's supplemental declarations into evidence. *See, e.g.*, *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 816 (D.S.C. 2011) (admitting supplemental expert report when supplement "clarif[ied]" earlier expert testimony and opposing party had opportunity to question expert regarding supplemental report).

[10] Plan 2-297 was one of 1,000 plans randomly generated by Dr. Chen that protect more incumbents and split fewer counties than the 2016 Plan. Second Chen Decl. 2; Ex. 2010, at 15; *see also infra* Part III.B.1.a.ii. The most significant constraint imposed by Dr. Chen in determining which of those 1,000 plans maximally advanced the General Assembly's non-partisan districting objectives is that Dr. Chen considered only those simulated districting plans that would have elected seven Republican candidates and six Democratic candidates based on Dr. Hofeller's partisanship variable. Second Chen. Decl. 2. Nearly fifty-three percent of the 1,000 randomly generated plans would have
(Continued)

The most significant difference between this case and *Gill*, however, is that, as demonstrated below, Plaintiffs who reside and vote in *each* of the thirteen challenged congressional districts testified to, introduced evidence to support, and, in all but one case, ultimately proved the type of dilutionary injury the Supreme Court recognized in *Gill*. *See infra* Part II.A.1.b. And all of those Plaintiffs identified at least one alternative districting plan—and in many cases hundreds of alternative districting plans—that more effectively conforms to the General Assembly's non-partisan redistricting criteria, but

_____

elected seven Republicans and six Democrats based on Dr. Hofeller's partisanship variable, a significantly higher percentage than the next two most common delegations observed in Dr. Chen's sample. Ex. 2010, at 16 (reporting that 19.4% of plans would have elected six Republican candidates and that 25.8% of plans would have elected eight Republican candidates, according to Dr. Hofelelr's partisanship variable).

Legislative Defendants object to this constraint on grounds that it effectively imposes, they maintain, a "proportional" representation. Leg. Defs.' Br. on Standing ("Leg. Defs.' Standing Br.") 11, Aug. 7, 2018, ECF No. 140. To be sure, the Supreme Court has stated that the Constitution does not *require* that the two-party make-up of a state's congressional delegation be proportionate to the two-party statewide congressional vote. *Bandemer*, 478 U.S. at 132 (plurality op.). But selecting the modal outcome in a randomly generated sample, which outcome happens to not favor either party, does not amount to imposing a proportionality requirement. Rather, it simply amounts to selecting a plan with a congressional delegation that most commonly occurs as a result of a state's political geography and non-partisan districting objectives. And even if Dr. Chen had sought to impose a proportionality requirement, the Supreme Court has held that it is constitutionally permissible for a state legislature to seek to draw a "districting plan that would achieve a rough approximation of the statewide political strengths of the Democratic and Republican Parties." *Gaffney v. Cummings*, 412 U.S. 735, 752 (1973). Accordingly, contrary to Legislative Defendants' argument, in identifying a "hypothetical" plan in which their votes would "carry more weight," *Gill*, 138 S. Ct. at 1931, Plaintiffs were not barred from relying on a plan that "rough[ly] approximat[ed]" the statewide political strength of the two parties, *Gaffney*, 412 U.S. at 752.

46

nonetheless places the Plaintiff in a district in which the Plaintiff's vote would "carry [more] weight."[11]  *Gill*,  138 S. Ct. at 1931.

> b.     *Plaintiffs' District-Specific Standing Evidence*

District 1 runs along the eastern side of North Carolina's border with Virginia. Ex. 1001.  As discussed more fully below, District 1 amounts to a successful effort by the General Assembly to concentrate, or pack, voters who were unlikely to support a Republican candidate, and thereby dilute such voters' votes.  *See infra* Part III.B.2.a. Common Cause Plaintiff Larry Hall resides in District 1, is a registered Democrat, and typically votes for Democratic candidates.  Ex. 3031; Dep. of Larry Hall ("Hall Dep.")

---

[11] Legislative Defendants further object to the use of Plan 2-297 and Dr. Chen's other 1,999 computer-generated plans as comparators on grounds that a number of the districts in those plans are more favorable to Democratic candidates than their counterparts in the 2016 Plan.  Leg. Defs.' Standing Br. 13–18.  According to Legislative Defendants, Dr. Chen's plans thereby "harm Republican voters in the very same way as alleged by [Plaintiffs] here."  *Id.* at 18.

But given that (1) the General Assembly's Republican leadership intentionally drew the 2016 Plan to advantage Republican candidates, *see* Ex. 1007, and that (2) the 2016 Plan is an "extreme statistical outlier" with regard to its favorability to Republican candidates, *see infra* Part III.B.1.a.ii, it is unsurprising that Dr. Chen's alternative plans— which were drawn without regard to partisan favoritism and to conform to the General Assembly's non-partisan districting objectives—would be more favorable to Democratic candidates.  *Cf. Covington*, 238 F. Supp. 3d at 450 (explaining, in racial gerrymandering case, that "the fact that the [remedial] districts happen to reduce [the black voting age population] in the redrawn districts, while increasing it in adjoining districts, is to be expected whenever a plan replaces racial predominance with other redistricting principles" (internal quotation marks and alterations omitted)).  Accordingly, contrary to Legislative Defendants' claim, that Dr. Chen's plans are more favorable to Democratic voters and candidates in no way establishes that those plans subject Republican voters to the same form of invidious partisan discrmination that the 2016 Plan inflicts on non-Republican candidates and voters.

47

12:8–9, 8:11–14, 30:17–19, 32:10–22, 17:22–24, Apr. 5, 2017, ECF No. 101-2.  Hall testified that the 2016 Plan's packing of Democratic voters in District 1 had the effect of diluting his vote.  Hall Dep. at 15:8–14 ("[T]he 2016 Plan . . . changed the district, and the impact of my vote . . . was reduced.").  Hall's vote would have carried greater weight in numerous other "hypothetical district[s]," *Gill*, 138 S. Ct. at 1931—of 2,000 simulated districting plans generated by Dr. Chen to conform to the General Assembly's non-partisan redistricting criteria all but 3 of the plans, including Plan 2-297, would have placed Hall into a less Democratic-leaning district, as measured by Dr. Hofeller's precinct-level partisanship variable, Third Chen Decl. 4, 6–8, 11.

District 2 includes all or part of six counties running along the border between North Carolina's piedmont and coastal plains regions.  Ex. 1001.  As explained more fully below, District 2 reflects a successful effort by the General Assembly to crack concentrations of Democratic voters, and thereby dilute such voters' votes.  *See infra* Part III.B.2.b.  Common Cause Plaintiff Douglas Berger, who is registered as a Democrat and usually votes for Democratic candidates, resides in District 2.  Ex. 3024; Dep. of Douglas Berger ("Berger Dep.") 29:6–9, 34:7–13; 65:13–18; 67:20–25, 69:3–9, Apr. 21, 2017, ECF No. 101-8.  Berger testified that prior to the 2011 redistricting, he was assigned to a highly competitive district, with the prevailing candidate in the 2010 election winning by "just a few hundred votes."  Berger Dep. 32:5–22.   But his district is no longer "competitive" as a result of the redistricting, he testified, with Democratic candidates lacking any meaningful chance at prevailing.  *Id.* at 6:14–20 (noting that District 2 was "the secondmost competitive district . . . which involved a 13 percentage point loss by the

48

Democratic candidate"); *see also id.* at 73:2–8 (stating that the General Assembly's "primary focus has been to look at how each of the people in this district have voted and . . . all the people that have certain a political view or view similar to my view, we've been . . . aggregated and relegated to a position where we can't have our views reflected"). By contrast, over 99 percent of the simulated districting plans generated by Dr. Chen, including Plan 2-297, would have assigned Berger to a more Democratic-leaning district. Third Chen Decl. 4, 6–8, 11.

District 3 encompasses a number of counties in northeast North Carolina, many of which border the Atlantic Ocean or Intracoastal Waterway. Ex. 1001. As explained more fully below, Plaintiffs alleged, and ultimately proved, that in drawing District 3 the General Assembly cracked likely Democratic voters and submerged such voters in a district in which a Republican candidate would prevail. *See infra* Part III.B.2.c. Common Cause Plaintiff Richard Taft—who resides in District 3 and is a registered Democrat who typically votes for Democratic candidates—testified that "District 3 is still designed . . . to disperse [his Democratic] vote around," and that his "vote really is meaningless . . . because the Republican majority is set and there is no way a candidate who is a Democrat can win in that district." Ex. 3036; Dep. of Richard Taft, MD ("R. Taft Dep.") 14:12–14, 24:25–25:11, Mar. 30, 2017, ECF No. 101-10. Mr. Taft's wife, Cheryl Lee Taft, likewise testified that the manipulation of District 3's lines adversely affected the weight of her vote. Dep. of Cheryl Taft ("C. Taft Dep.") 26:1–5, Mar. 30, 2017, ECF No. 101-11. By contrast, over 95 percent of the 2,000 simulated districting

plans generated by Dr. Chen, including Plan 2-297, would have placed the Tafts in a more Democratic-leaning district. Third Chen Decl. 4, 6–8, 11.

District 4 runs through the center of Wake County, southern Durham County, and Orange County, connecting concentrations of Democratic voters in the Cities of Raleigh, Durham, and Chapel Hill. Exs. 1001, 3019. As detailed more fully below, Dr. Hofeller, acting at Representative Lewis and Senator Rucho's direction, intended to and did in fact pack likely Democratic voters in District 4 and, in doing so, diluted such voters' votes. *See infra* Part III.B.2.d. League Plaintiff Carol Fox—who lives in Durham County in District 4 and votes for Democratic candidates—testified that District 4 "was packed"— i.e., "drawn so that all of the Democrats are smooshed together so that they're going win with a huge surplus of votes needed." Fox Dep. 19:25, 20:9–12. Common Cause Plaintiff Alice Bordsen also is registered to vote in District 4 and has historically voted for Democratic congressional candidates. Ex. 3026; Dep. of Alice Louise Bordsen ("Bordsen Dep.") 37:1–2, Apr. 18, 2017, ECF No. 101-15. Bordsen testified that she believes District 4 is the product of "intentional packing" and is "super pack[ed]." Bordsen Dep. at 33:8–16, 34:16–17. Approximately, 80 percent of the districting plans in Dr. Chen's 2,000-plan sample would have placed Bordsen in a district with fewer likely Democratic voters.[12] Third Chen Decl. 4, 6–8.

---

[12] Common Cause Plaintiff Morton Lurie, who resides in District 4, also alleged that he suffered a dilutionary injury in fact attributable to 2016 Plan's redrawing of District 4's boundaries. Unlike the other individual Common Cause Plaintiffs, Lurie is a registered *Republican* who typically votes for *Republican* candidates, including the Republican congressional candidate in District 4 in the 2016 election. Ex. 3032; Dep. of
(Continued)

District 5 spans ten whole counties in the northwest corner of the State. Ex. 1001. Plaintiffs introduced evidence, but ultimately fail to prove, that District 5 reflects an effort by the General Assembly to submerge Democratic voters in a safe Republican district. *See infra* Part III.B.2.e. Common Cause Plaintiff William H. Freeman lives in District 5, is registered as a Democrat, and voted against the Republican congressional candidate in the 2016 election. Ex. 3029; Dep. of William Halsey Freeman ("Freeman Dep.") 6:24–7:7, Apr. 7, 2017, ECF No. 101-14. Freeman testified that as a result of the redistricting plans drawn by Dr. Hofeller, Representative Lewis, and Senator Rucho, the lines of District 5 are "much worse" for Democratic candidates. Freeman Dep. 18:25–19:3, 19:14–23. Freeman further testified that "because of the way [District 5 is drawn], there is no remote chance of any Democrat winning, so my vote is just a total waste." *Id.*

---

Morton Lurie ("Lurie Dep.") 8:5–7, 9:8, 20:1–5, Apr. 5, 2017, ECF No. 101-12. Lurie, who the 2016 Plan moved from a district in which a Republican candidate prevailed, testified that the 2016 plan "dilute[s] the value of [his] vote" because "there's no chance of a Republican winning in the 4th District." *Id.* at 25:15–20. Lurie makes a compelling argument that the 2016 Plan has had the effect of diluting his vote: more than 91 percent of the districting plans generated by Dr. Chen placed Lurie into a district more favorable to the Republican candidates Lurie has historically supported. Third Chen Decl. 4, 6–8. Unlike the Democratic Plaintiffs who reside in District 4, however, Lurie has difficulty establishing that the General Assembly assigned *him* to that district in an effort to dilute *his* vote. In particular, the General Assembly would seemed to have preferred that Lurie lived elsewhere so that his Republican vote would not be "wasted" in a district the General Assembly drew to be "predominantly Democratic." Hofeller Dep. 192:7–16. But because Lurie elected to live in a precinct predominantly populated by likely Democratic voters, the General Assembly had little option but to assign Lurie to a district drawn so that a Democratic candidate would prevail. Because other Plaintiffs have standing to lodge an Equal Protection partisan vote dilution challenge to District 4, we need not—and thus do not—definitively address Lurie's standing.

51

at 17:17–25. More than half of the 2,000 simulated districting plans generated by Dr. Chen placed Freeman in a district more favorable to Democratic candidates. Third Chen Decl. 4, 6–9. And in Dr. Chen's Plan 2-297, the Republican vote share in Freeman's district, as measured by Dr. Hofeller's partisanship variable, would decline from 56.15 percent to 49.30 percent. *Id.* at 11.

District 6 spans all or part of six counties in central North Carolina. Ex. 1001. As explained more fully below, District 6 reflects a successful effort by the General Assembly to crack likely Democratic voters and thereby dilute their votes by submerging them in a safe Republican district. *See infra* Part III.B.2.f. Common Cause Plaintiff Meltzer A. Morgan, Jr., is affiliated with the Democratic Party and typically votes for Democratic candidates. Ex. 3034; Dep. of Melzer Aaron Morgan, Jr. ("Morgan Dep.") 5:11–14, 15:7–17, 16:2–7, April 7, 2017, ECF No. 101-16. Between 2002 and 2010, Morgan was assigned to District 13, which consistently elected Democratic candidates. *See* Morgan Dep. 10:18–23. But as a result of the redistricting, Morgan now is assigned to District 6, which he characterized as "tilted" for Republicans and "not competitive." *Id.* at 23:7–8. By contrast, approximately 78 percent of the 2,000 simulated districting plans generated by Dr. Chen would have placed Morgan in a district less favorable to Republican candidates. Third Chen Decl. 4, 6–9. For example, the predicted Republican vote share in Morgan's district in Plan 2-297 (51.49%) is approximately three percentage points lower than the predicted Republican vote share in District 6 (54.46%). *Id.* at 11.

District 7 includes all or part of nine counties located in the southeast corner of the State. Ex. 1001. As detailed below, District 7 cracks concentrations of Democratic

voters and has the effect of submerging such voters in a safe Republican district.  *See infra* Part III.B.2.g.  Common Cause Plaintiff Cynthia Boylan—who resides in District 7, is a registered Democrat, and typically votes for Democratic candidates, Ex. 3027—testified that although Democratic candidates historically prevailed in the district by narrow margins, "the way [District 7] was redrawn was to give the Republican nominee the advantage of being elected in the . . . [d]istrict," Dep. of Cynthia Boylan ("Boylan Dep.") 18:1–9, Apr. 5, 2017, ECF No. 101-17.  Nearly 64 percent of the 2,000 districting plans generated by Dr. Chen, including Plan 2-297, placed Boylan in a district more favorable to Democratic candidates, as measured by Dr. Hofeller's partisan performance variable.  Third Chen Decl. 4, 6–9, 11.

District 8 takes on a snake-like shape, running through all or part of seven counties in south central North Carolina.  Ex. 1001.  As explained more fully below, District 8 was intended to, and does in fact, dilute the voting strength of Democratic voters by cracking concentrations of likely Democratic voters.  *See infra* Part III.B.2.h.  Common Cause Plaintiff Coy E. Brewer, Jr., lives in Cumberland County—which is in District 8—is a registered Democrat, and typically votes for Democratic candidates.  Ex. 3025; Dep. of Coy E. Brewer, Jr. ("Brewer Dep.") 44:15–16, Apr. 18, 2017, ECF No. 101-18.  Brewer testified that historically "all" of the congressional districts that included parts of Cumberland County were "reasonably competitive."  Brewer Dep. 50:1–7.  But as a result of the redistricting, which split a concentration of likely Democratic voters in Cumberland County, District 8 is no longer "competitive" for Democratic candidates, according to Brewer.  *Id.* at 51:9–17.  By contrast, over 99 percent of the districting plans

generated by Dr. Chen to conform to the General Assembly's non-partisan districting criteria, including Plan 2-297, placed Brewer in a district that was less heavily tilted in favor of Republicans. Third Chen Decl. 4, 6–9, 11.

District 9 runs through all or part of eight counties that lie directly south of District 8, connecting the southern portion of the City of Charlotte with rural Bladen County. Ex. 1001. As detailed more fully below, Plaintiffs alleged, and ultimately proved, that in drawing District 9, the General Assembly cracked likely Democratic voters and submerged them in a district in which a Republican candidate was much more likely to prevail. *See infra* Part III.B.2.i. The 2016 Plan places Common Cause Plaintiff John Morrison McNeill—who lives in Robeson County, is affiliated with the Democratic party, and typically votes for Democratic candidates, ex. 3033; Dep. of John Morrison McNeill ("McNeill Dep.") 33:3–7, April 5, 2017, ECF No. 101-19—in District 9, ex. 3033. McNeill testified that unlike earlier districting plans, the version of District 9 in the 2016 Plan connects south Charlotte, which is predominantly Republican, and Robeson County, which he said includes low-income, rural voters who favor Democratic policies like Obamacare—areas that have "little in common." McNeill Dep. 26:9–27:14. More than 97 percent of the 2,000 districting plans generated by Dr. Chen, including Plan 2-297, placed in McNeill in a more Democratic-leaning district. Third Chen Decl. 4, 6–9, 11. Similarly, League member Klenz, who lives in the Mecklenburg County section of District 9, testified that the General Assembly redrew District 9 to make Democratic candidates "less competitive" by connecting "a little, bitty piece" of Mecklenburg County, which is composed of heavily Republican precincts, with rural counties many

54

miles away, including Bladen County. Klenz Dep. 65:23–66:12. And Plan 2-297 demonstrates that it was possible for the General Assembly to draw a districting plan that does not join Mecklenburg County's predominantly Republican precincts, including the precinct in which Klenz lives, with predominantly rural counties in Eastern North Carolina like Bladen and Robeson, where McNeill lives. *See* Second Chen Decl. 2–3.

District 10 spans all or part of eight counties, running from Charlotte's eastern suburbs to the foothills of the Appalachian Mountains. Ex. 1001. As explained below, in drawing District 10, the General Assembly intended to, and did in fact, dilute the voting strength of Democratic voters by cracking concentrations of such voters and submerging those voters in a safe Republican district. *See infra* Part III.B.2.j. League Plaintiff John Quinn, III, resides in Buncombe County in District 10, is member of the Democratic Party, and voted for the Democratic congressional candidate in the 2016 election. Dep. of John J. Quinn, III ("Quinn Dep.") 10:18–11:2, 11:10-18, 17:1–3, 21:24–25, 37:20–25, Apr. 10, 2017, ECF No. 101-22. Quinn testified that the 2016 Plan splits Buncombe County and the City of Asheville between District 10 and District 11, and thereby cracks a concentration of voters that are politically cohesive (and tend to vote Democratic), unlike his previous district which did not divide Buncombe County and was "the single most competitive district in the State." Quinn Dep. 26:17–23, 38:20–25. Quinn further testified that District 10 is "certainly not compact at all." *Id.* at 26:25. Plan 2-297 does not divide Buncombe County and assigns Quinn to a district that is more favorable to Democratic candidates. Second Chen Decl. 2, 4–7 (reporting that district that includes Asheville in Plan 2-297, District 1, has predicted Republican vote share of 52.62 percent,

55

as opposed to predicted Republican vote share of 58.17 percent in District 10 of the 2016 Plan)

District 11 encompasses almost all of the southwest corner of the State, with the sole exception being a bulbous protrusion of District 10 that takes in a portion of Buncombe County and the City of Asheville. Ex. 1001. As explained more fully below, District 11 reflects a successful effort by the General Assembly to crack a naturally occurring concentration of Democratic voters, and thereby create a safe Republican district. *See infra* Part III.B.2.k. The 2016 Plan assigned Common Cause Plaintiff Jones P. Byrd, who is a registered Democrat and typically votes for Democratic congressional candidates, to District 11. Ex. 3028; Dep. of Jones P. Byrd ("Byrd Dep.") 27:2–4, Apr. 20, 2017, ECF No. 101-24. Prior to 2011, District 11 included all of Buncombe County, Byrd testified, but the 2016 Plan, like the 2011 Plan, "sliced and diced" Buncombe County by "mov[ing] a core of the Democratic concentration out of the district, and put[ting] it in a district where it would be diluted." Byrd Dep. 20:4–5, 20:23–21:16, 21:22–22:1, 31:14–32:3. Under the 2016 Plan, Democratic "votes don't really matter in either [district]," he further explained, because both districts were drawn to ensure Republican candidates would prevail. *Id.* at 32:15–18. Notably, *all* 2,000 districting plans generated by Dr. Chen, including Plan 2-297, would have placed Byrd into a district more favorable to Democratic candidates, as measured by Dr. Hofeller's partisanship variable. Third Chen Decl. 4, 6–11. Similarly, League Plaintiff Aaron Sarver—who resides in Asheville in District 11 and is a registered Democrat who votes for Democratic candidates, Sarver Dep. 25:2–9, 45:15–17, 47:14–48:6—testified that

56

because "Asheville is divided into two Congressional Districts the political voice is diluted" and "the 10th or 11th are not winnable" for Democratic candidates, *id.* at 25:2–26:18. Plan 2-297 does not divide the City of Asheville or Buncombe County and assigns Sarver to a district that is more favorable to Democratic candidates. Second Chen Decl. 3, 4–7 (reporting that district that includes Asheville in Plan 2-297, District 1, has predicted Republican vote share of 52.62 percent, as opposed to predicted Republican vote share of 57.11 percent in District 11 in the 2016 Plan).

District 12 contains all of Mecklenburg County, with the exception of a pizza-slice-shaped section of predominantly Republican precincts in the southeastern portion of the county, which are assigned to District 9. Exs. 1001, 3017. As explained below, District 12 amounts to a successful effort by the General Assembly to pack Mecklenburg County voters who were unlikely to support a Republican congressional candidate and thereby dilute such voters' votes. *See infra* Part III.B.2.l. Common Cause Plaintiff John W. Gresham lives in District 12 and is a registered Democrat who typically votes for Democratic candidates. Ex. 3030; Dep. of John West Gresham ("Gresham Dep.") 8:7–9, 9:16–18, 37:12–14, Mar. 24, 2017, ECF No. 101-24. Gresham testified that the 2016 Plan "pack[s]" likely Democratic voters in Mecklenburg County, and thereby "diluted" his vote. Gresham Dep. 25:5, 37:18–21. By comparison, over 99 percent of the districting plans in Dr. Chen's 2,000-plan sample, including Plan 2-297, placed Gresham into a district with fewer likely Democratic voters. Third Chen Decl. 4, 6–11.

Finally, District 13 includes all or parts of five counties in central North Carolina. Ex. 1001. As demonstrated more fully below, Plaintiffs' evidence proves District 13 was

57

intended to, and does in fact, dilute the voting strength of Democratic voters by cracking concentrations of likely Democratic voters. *See infra* Part III.B.2.m. Common Cause Plaintiff Russell Walker, Jr., resides in District 13, is a registered Democrat, and typically votes for Democratic candidates, including in the 2016 congressional election. Ex. 3037; Dep. of Russell Grady Walker, Jr. ("Walker Dep.") 29:24, Apr. 7, 2017, ECF No. 101-27. Walker testified that the 2016 Plan "diluted" his vote because "there was no chance for a qualified person who was not a Republican to have much of a shot at" winning in District 13. Walker Dep. 29:17–23. Nearly 90 percent of the 2,000 districting plans generated by Dr. Chen, including Plan 2-297 placed Walker in a district more favorable to Democratic candidates. Third Chen Decl. 4, 6–11; Clarification Regarding Paragraph Describing Plaintiff Russell Walker in July 11, 2018 Supp. Decl. of Jowei Chen 2, July 24, 2018, ECF No. 136-1.

Because Plaintiffs in each of the State's thirteen congressional districts both testified that and introduced direct and circumstantial evidence that "the particular composition of the voter's own district . . . caus[ed] his [or her] vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district," *Gill*, 138 S. Ct. at 1931, we conclude that such Plaintiffs have standing to assert partisan vote dilution claims under the Equal Protection Clause to each of those districts.[13] Additionally, because at least one of these Plaintiffs—who, again, reside in

---

[13] Legislative Defendants nevertheless claim that Plaintiffs who support Democratic candidates and live in Districts 1, 4, and 12—which elected Democratic candidates in the 2016 election—lack standing to assert a partisan vote dilution claim (Continued)

each of the State's thirteen congressional districts—is affiliated with the Democratic

Party, we further conclude that Plaintiff North Carolina Democratic Party has standing to

under the Equal Protection Clause because such Plaintiffs' "candidate of choice" was elected in those districts, Leg. Defs.' Standing Br. 8—a position Judge Osteen embraces in his partial dissent, *post* at 303–05. But *Gill* states that a plaintiff can suffer a dilutionary injury as a result of "*packing*," as well as "cracking." 138 S. Ct. at 1931 (emphasis added). When a district is packed, the injured individuals necessarily elect their candidate of choice, albeit by an overwhelming margin. Accordingly, contrary to Legislative Defendants' contention, *Gill* contemplated that individuals placed in packed districts—like Districts 1, 4, and 12—would have standing, notwithstanding the election of their candidate of choice. That result is consistent with the Court's racial gerrymandering jurisprudence—to which *Gill* expressly appealed—which holds that those members of a particular race that are packed into a district have standing to assert a racial gerrymandering claim, notwithstanding that the district elected their candidate of choice. *Id.* at 1930; *see also, e.g., Covington*, 137 S. Ct. at 2211 (affirming district court finding that state legislative districting plan packed African-Americans into 28 majority-African-American districts; plaintiffs included African-American voters who resided in packed districts and were able to elect their candidate of choice); *Cooper*, 137 S. Ct. at 1469, 1473, 1482 (affirming district court finding that 2011 Plan unconstitutionally "pack[ed]" African-American voters into Districts 1 and 12, notwithstanding that Plantiff African-American voters were able to elect their candidate of choice in those districts).

For the same reason, we reject Legislative Defendants' argument that Plaintiffs who "live in districts that either elected Republicans in 2016 or which have elected Republicans under prior maps adopted by a Democratic-controlled General Assembly" lack standing. Leg. Defs.' Br. at 8. Contrary to Legislative Defendants' argument, *Gill*'s discussion of standing does not focus on—or even mention—whether a plaintiff's "candidate of chioce" prevailed. Rather, it requires courts to determined whether a particular district was "packed" or "cracked" and whether the vote of a plaintiff who resides in that district would "carry more weight" under an alternative plan. 138 S. Ct. at 1930–31. As is the case with Plaintiffs who live in packed districts, it is the intentional dilution of the voting strength of voters who support non-Republican candidates—not the outcome of a particular election—that injures those Plaintiffs who were cracked into a safe Republican district. If the votes of such Plaintiffs had not been diluted on the basis of invidious partisanship—and therefore their districts had not been drawn so as to allow the Republican candidate to prevail by a "safe" margin—then the elected officials, facing a close re-election race, may have been more responsive to issues supported by Democratic voters and such voters would have had a better chance electing their preferred candidate in future elections.

59

raise a partisan vote dilution challenge to each district in the 2016 Plan. *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."). Likewise, at a minimum, the League has standing to assert a partisan vote dilution challenge to District 9 because, as explained above, League member Klenz lives in that district and testified to and provided evidence that her vote was diluted on the basis of invidious partisanship.[14] *Id.*

    *c.*    *Several Individual and Organizational Plaintiffs Lack Standing under Gill*

    We further conclude that, under *Gill*, several named Plaintiffs lack standing to lodge a partisan vote dilution claim under the Equal Protection Clause. In particular, several named Plaintiffs testified that they believe their vote was diluted by the 2016 Plan *as a whole*, rather than by the lines of their particular district. For example, League Plaintiff Elliot Feldman—who resides in District 9 and is a registered Democrat, Ex. 4055—testified that he was "aggrieved [by] the present situation whereby Democrats can

---

    [14] Because at least one Plaintiff with standing to assert an Equal Protection partisan vote dilution claim lives in each of the State's thirteen congressional districts, we need not—and thus do not—decide whether the League has standing to challenge all thirteen districts under such a theory. In particular, we do not decide whether, by itself, evidence that an organization (1) has a member in each district in a plan (2) who supports an allegedly disfavored party and (3) lives in a precinct that would be assigned to a district more favorable to the allegedly disfavored party under an alternative plan confers standing on the organization to lodge a partisan vote dilution challenge to each district in the plan.

have . . . 51, 52 percent of the vote for . . . congressional [candidates], and then wind up [with] about 30 percent [of the seats] here on the congressional level," Feldman Dep. 20:8–13. Feldman further agreed this his "problem with the districts is that the number of Republicans elected is not proportional to the vote that Republicans receive in statewide elections." *Id.* at 30:12–16. Similarly, League Plaintiff Annette Love, who resides in District 1, testified that her "problem is with the plan as a whole, *not [her] specific district*." Love Dep. 12:16–18 (emphasis added). According to Love, the 2016 Plan is "unfair" to supporters of Democratic candidates, like herself, because "we have 3 representatives [in Washington] versus I believe it's 10" Republican representatives. *Id.* at 12:10–15.

Other individual Plaintiffs similarly testified that they felt injured by the plan *as a whole*—not the boundaries of their specific district—because the partisan composition of the State's congressional delegation was not proportionate to the two-party share of the statewide vote. Dep. of William Collins ("Collins Dep.") 16:5–19, Mar. 30, 2017, ECF No. 101-5 (League Plaintiff who lives in District 1 stating he believes "statewide the plan is not fair because "10 to 3" ratio of Republicans to Democrats in congressional delegation "doesn't really project the right numbers."); Dep. of Elizabeth Evans ("Evans Dep.") 21:14–22:18, Apr. 7, 2017, ECF No. 101-7 ("I have a problem with the plan statewide. . . . I'm part of a majority party [Democratic] in North Carolina, but I have only three representatives."); Dep. of Willis Williams ("Williams Dep.") 26:13–27:22, March 30, 2017, ECF No. 101-6 ("[T]he problem with the plan is that statewide it disadvantages Democrats."). And organizational plaintiff Common Cause likewise

testified that its Equal Protection Clause challenge was solely premised on a statewide theory of injury. 30(b)(6) Dep. of Common Cause by Bob Phillips ("Phillips Dep.") 16:24–17:4, Apr. 14, 2017, ECF No. 101-29.

As explained above, *see supra* Part II.A.1.a, *Gill* held that partisan vote dilution claims under the Equal Protection Clause must proceed district-by-district, and therefore that a plaintiff cannot rely on an alleged "statewide" injury to support such a claim, 183 S. Ct. at 1931, as these specific Plaintiffs seek to do. Likewise, *Gill* stated that the Supreme Court never has recognized a "shared interest in the composition of the legislature as a whole" as an individual interest giving rise to a vote dilution claim, 138 S. Ct. at 1924–25, 1932 (internal quotation marks omitted), meaning that these Plaintiffs cannot rely on the composition of the State's congressional *delegation* to establish their individual injury. Accordingly, these Plaintiffs lack standing to assert a partisan vote dilution claim under the Equal Protection Clause.[15]

## 2.    First Amendment

Having concluded that at least one Plaintiff has standing to lodge a partisan vote dilution challenge under the Equal Protection Clause to each of the thirteen districts in the 2016 Plan, we next address whether Plaintiffs have standing to assert their First Amendment claims. Partisan gerrymandering implicates the "the First Amendment

---

[15] Because at least one Plaintiff with standing to assert an Equal Protection partisan vote dilution claim lives in each of the State's thirteen congressional districts, we need not—and thus do not—decide whether the remaining individual Plaintiffs—Maria Palmer, Gunther Peck, Ersla Phelps, Janie Sumpter, and Robert Wolf—have standing to assert a partisan vote dilution claim under the Equal Protection Clause.

interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring in the judgment). Put differently, "significant 'First Amendment concerns arise' when a State purposely 'subject[s] a group of voters or their party to disfavored treatment.'" *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring) (alteration in original) (quoting *Vieth*, 541 U.S. at 314).

Among other types of "burden[s]" on First Amendment rights, partisan gerrymandering "*purposely* dilut[es] the weight of certain citizens' votes to make it more difficult for them to achieve electoral success *because of* the political views they have expressed through their voting histories and party affiliations." *Shapiro v. McManus*, 203 F. Supp. 3d 579, 595 (D. Md. 2016) (three-judge panel). This dilutionary aspect of the First Amendment injury associated with partisan gerrymandering echoes the district-specific injury giving rise to a partisan vote dilution claim under the Equal Protection Clause. *See id.* (explaining that "while a State can dilute the value of a citizen's vote by placing him in an overpopulated district, a State can also dilute the value of his vote by placing him in a particular district because he will be outnumbered there by those who have affiliated with a rival political party. In each case, the weight of the viewpoint communicated by his vote is 'debased'" (quoting *Bd. of Estimate of City of N.Y. v. Morris*, 489 U.S. 688, 693–94 (1989)). As detailed above, at least one Plaintiff in each of the State's thirteen congressional districts has adequately alleged such a dilutionary injury. *See supra* Part II.A.1.b.

63

Partisan gerrymandering also implicates "distinct," non-dilutionary First Amendment injuries, such as infringing on "the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects." *Gill*, 138 S. Ct. at 1939 (Kagan, J., concurring); *id*. at 1938 ("[T]he associational harm of a partisan gerrymander is distinct from vote dilution."); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (explaining that the Supreme Court "ha[s] repeatedly held that freedom of association is protected by the First Amendment," including "the right of individuals to associate for the advancement of political beliefs"). These associational harms "ha[ve] nothing to do with the packing or cracking of any single district's lines." *Gill*, 138 S. Ct. at 1939. Rather, "the valued association and the injury to it are statewide, [and] so too is the relevant standing requirement." *Id.*

Individual Plaintiffs testified to legally cognizable non-dilutionary injuries to their First Amendment right to engage in political association. In particular, individual Plaintiffs testified to decreased ability to mobilize their party's base, persuade independent voters to participate, attract volunteers, raise money, and recruit candidates. For example, League Plaintiff Elizabeth Evans, who served as the Secretary of the Granville County Democratic Party and worked on the Democratic Party's canvassing and get-out-the-vote efforts, testified that she had difficulty convincing fellow Democrats to "come out to vote" because, as a result of the gerrymander, "they felt their vote didn't count." Evans Dep. 12:24–16:12. Common Cause Plaintiff Melzer Morgan, who is a member of the Democratic Party, testified that "[t]he drawing of the districts mean[s] that . . . you don't have a very vibrant Democratic Party because there is not much hope of

64

prevailing at various levels" as a result of the gerrymander. Morgan Dep. 23:2–5, 27:21–24. Morgan further testified that individuals inclined to support Democratic candidates have refused to give money to the Democratic congressional candidate in his Greensboro district, in particular, because they say there is "no sense in us giving money to that candidate because [she] is unlikely to prevail, notwithstanding the merit of [her] position." *Id.* at 23:20–25. And League Plaintiff John Quinn, who is "very active" in his local Democratic Party in District 11, testified that he has had difficulty "rais[ing] money," "recruit[ing] candidates," and "mobiliz[ing] a campaign" for a Democratic candidate in his district because the district was drawn to strongly favor Republican candidates. Quinn Dep. 24:13–14, 38:20–39:34.

Other individual Plaintiffs who support and work on behalf of the Democratic Party and Democratic candidates also testified at length regarding the adverse effects of the 2016 Plan on the ability of their party to perform its core functions. Berger Dep. 73:11–74:1, 79:10–13; Brewer Dep. 52:2–13; Fox Dep. 51:18–52:9; Palmer Dep. 27:4–29:21, 32:13–34:17 50:10–23; Dep. of Gunther Peck ("Peck Dep.") 27:8–24, 34:6–20, March 22, 2017, ECF No. 101-3; Quinn Dep. 31:19–32:3, 37; C. Taft Dep. 17:6–11; Sarver Dep. 26:9–27:23, 34:8–15, 37:18–39:4; Walker Dep. 29:17–30:8. The Supreme Court has recognized that these types of non-dilutionary harms constitute cognizable First Amendment injuries. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 792 (1983) (finding that plaintiff was injured by election law that made "[v]olunteers . . . more difficult to recruit and retain, media publicity and campaign contributions . . . more difficult to secure, and voters . . . less interested in the campaign").

65

As Justice Kagan recognized in *Gill*, "what is true for party members may be doubly true for party officials and triply true for the party itself (or for related organizations)." 138 S. Ct. at 1938; *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) ("The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization."). "By placing a state party at an enduring electoral disadvantage, the gerrymander weakens its capacity to perform all its functions." *Gill*, 138 S. Ct. at 1938 (Kagan, J., concurring). That is the case here. The North Carolina Democratic Party testified that "with the way the congressional districts were drawn, it indicates that only three [districts] would elect Democrats and the others will not be able to elect Democrats [which] makes it extremely difficult to raise funds and have resources and get the attention of the national congressional campaign committees and other lawful potential funders for congressional races in those districts." *See* 30(b)(6) Dep. of N.C. Democratic Party by George Wayne Goodwin ("Goodwin Dep.") 97:18–98:5, April 17, 2017, ECF Nos. 110-7, 101-30. Additionally, "[t]he way the districts are drawn these days, it's harder to recruit candidates given that the deck seems to be stacked, at least in congressional districts," the party testified. *Id.* at 27:17–20; *see also id.* at 42:12–25 (identifying particular districts in which Democratic Party had difficulty recruiting candidates).

Plaintiff organizations the League and Common Cause also testified to associational injuries attributable to the 2016 Plan. The League engages in statewide voter education, registration, and "get out the vote" efforts. Klenz Dep. 44:15–25, 59:16–17. Due to a lack of voter interest attributable to the gerrymander, the League had

66

difficulty fulfilling its mission of "inform[ing] . . . [and] engag[ing] voters in the process of voting and civic participation in their government." *Id.* 59:16–17. Additionally, as a result of the 2016 Plan, the League has had difficulty providing opportunities for its members and other voters to interact with "candidate[s] that [were] expected to win and projected to win," because those candidates were often not "motivated" to participate "in voter forums, debates, [or] voter guides, because the outcome is so skewed in favor or in disfavor of one or the other." *Id.* at 60:6–10. Accordingly, the League has established that the 2016 Plan's invidious partisan discrimination burdens its mission. *See Ohio A Philip Randolph Inst. v. Smith*, No. 1:18-CV-357, 2018 WL 3872330, at *4 (S.D. Ohio Aug. 15, 2018) (three-judge panel) (finding, post-*Gill*, that the Ohio League of Women Voters had standing to assert First Amendment partisan gerrymandering claim because "the map makes it more difficult to engage voters through their education, registration, and outreach efforts, and by deterring and discouraging their members and other Ohio voters from engaging in the political process" (internal quotation marks and alterations omitted)); *League of Women Voters of Mich. v. Johnson*, slip op. at 13, No. 2:17-CV-14148 (E.D. Mich. May 16, 2018), ECF No. 54 (three-judge panel) (same, in case in which Michigan League of Women Voters asserted partisan gerrymandering challenge to Michigan districting plan).

Common Cause and its members work, on a statewide basis, to educate the public about voting-related issues and "advocate for more open, honest and accountable government." Phillips Dep. 35:9–10, 37:25–39:9, 71:6–8, 150:2–7. As part of that effort, Common Cause has long advocated for redistricting reform, and legislation

67

providing for non-partisan redistricting. *Id.* at 20:20–21:13. In North Carolina, in particular, Common Cause worked with Republican legislators in the 2000s and Democratic legislators in the 2010s to enact legislation providing for non-partisan redistricting, and Common Cause developed and advocated for a non-partisan congressional districting plan as an alternative to the 2016 Plan. *Id.* at 21:9–13, 29:6–11, 150:8–15. As a redistricting plan expressly designed to achieve "Partisan Advantage," Ex. 1007, the 2016 Plan runs directly contrary to the non-partisan approach to redistricting—and the open and accountable government—for which Common Cause and its members have long advocated. Accordingly, the 2016 Plan has burdened the rights of members of the League and Common Cause "to associate for the advancement of political beliefs." *Williams*, 393 U.S. at 30.

In sum, we conclude both individual and organizational Plaintiffs have standing to assert their First Amendment challenge to the 2016 Plan. And we further conclude that because these injuries are statewide, such Plaintiffs have standing to lodge a First Amendment challenge to the 2016 Plan as a whole. *Gill*, 138 S. Ct. at 1939.

### 3.    Article I

The injuries underlying Common Cause Plaintiffs' Article I claims—which allege that the 2016 Plan exceeds the General Assembly's authority under the Elections Clause and usurps the power of "the People" to elect their representatives—also do not stop at a single district's lines. In invoking Article I, Plaintiffs allege that North Carolina's districting map upsets a fundamental balance established by the Constitution. As explained in more detail below, the grant of power to state legislatures to regulate federal

elections in Article I, section 4 is akin to an enumerated power of Congress. *See infra*

Part V; Richard H. Pildes, *The Constitution and Political Competition*, 30 NOVA L. REV.

253, 263–64 (2006). This is "[b]ecause any state authority to regulate election to

[congressional] offices could not precede their very creation by the Constitution";

accordingly, "such power 'had to be delegated to, rather than reserved by, the States.'"

*Cook v. Gralike*, 531 U.S. 510, 522 (2001) (quoting *Thornton*, 514 U.S. at 804). Thus,

"the States may regulate the incidents of elections . . . only within the exclusive

delegation of power under the Elections Clause." *Id.* at 523. Here, Common Cause

Plaintiffs allege that the General Assembly's partisan gerrymandering exceeds the scope

of that power and therefore upsets the constitutional balance established by Article I.

These Plaintiffs' Article I claim, therefore, is premised on federalism. "The

Framers understood the Elections Clause as a grant of authority to issue procedural

regulations, and not as a source of power to dictate electoral outcomes, to favor or

disfavor a class of candidates, or to evade important constitutional restraints." *Thornton*,

514 U.S. at 833–34; *see also Cook*, 531 U.S. at 527 (Kennedy, J., concurring) ("[A state]

simply lacks the power to impose any conditions on the election of Senators and

Representatives, save neutral provisions as to the time, place, and manner of elections

pursuant to Article I, § 4."). Accordingly, if Plaintiffs are correct in their assertions about

the General Assembly's actions, then, in enacting the 2016 Plan, the General Assembly

acted beyond its constitutional authority in direct contravention of a delicate balance of

governmental powers established in Article I. *See Thornton*, 514 U.S. at 841 (Kennedy,

J., concurring) ("That the States may not invade the sphere of federal sovereignty is as

69

incontestable . . . as the corollary proposition that the Federal Government must be held within the boundaries of its own power when it intrudes upon matters reserved to the States."). Establishing such a structural harm can confer standing. *See Bond v. United States*, 564 U.S. 211, 221–22 (2011) ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable."); *see also Ariz. State Leg.*, 135 S. Ct. at 2695 (Scalia, J., dissenting) ("[W]e have *never* passed on a separation-of-powers question raised directly by a governmental subunit's complaint. We have *always* resolved those questions in the context of a private lawsuit in which the claim or defense depends on the constitutional validity of action by one of the governmental subunits that has caused a private party concrete harm.").

To be sure, bringing a claim that implicates a structural harm does not absolve litigants from the requirement to allege particularized injuries. *See Lance v. Coffman*, 549 U.S. 437, 440 (2007) (per curiam). In *Lance*, the Colorado state legislature was initially unable to agree on a new congressional redistricting map after the 2000 census, so the state court drew and implemented a new map. *See id.* at 437–38. Several years later, in 2003, the state legislature finally passed a new redistricting plan. *See id.* at 438. The state attorney general, however, sought to enjoin implementation of the map on grounds that the Colorado Constitution prohibits more than one redistricting after each census. *See id.* The state supreme court held that the new map indeed violated the state constitution and could not take effect. *See id.* Subsequently, four voters brought suit in federal court alleging that the ruling of the Colorado Supreme Court violated the

70

Elections Clause of the U.S. Constitution by preventing the Colorado legislature from exercising its constitutionally-granted power of regulating elections. *See id.* at 441. But the Supreme Court held that the voters lacked standing to bring such a suit because "[t]he only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed." *Id.* at 442. The Court described the voters' claims as "precisely the kind of undifferentiated, generalized grievance about the conduct of the government" that is insufficient to confer standing. *Id.* Rather, the voters needed to cite more than "the right, possessed by every citizen, to require that the Government be administered according to law." *Id.* at 440.

In *Lance*, the Supreme Court specifically differentiated the generalized injuries of the plaintiffs in that case from the individualized injuries alleged by the plaintiffs in *Baker v. Carr*, 369 U.S. 186 (1962). In *Baker*, the plaintiffs lived in five Tennessee counties and challenged the state districting plan "apportioning the members of the General Assembly among the State's 95 counties." 369 U.S. at 187–88, 204. The alleged injury was based on a vote dilution theory: "appellants assert . . . that [the current apportioning] disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-à-vis voters in irrationally favored counties." *Id.* at 207–08. And although the entire state map was ultimately redrawn in that case, *Gill* clarified that the *Baker* plaintiffs' claims were only brought on a district-by-district basis, because they were based on an alleged injury of vote dilution. *See Gill*, 138 S. Ct. at 1930–31.

71

Unlike the plaintiffs in *Lance*—and like the plaintiffs in *Baker*—at least one Plaintiff residing in each district in the 2016 Plan alleges and offers proof of the type individualized dilutionary injuries the Court recognized in *Gill*. *See supra* Part II.A.1.b. Those injuries-in-fact establish such Plaintiffs' standing to lodge their structural claim under Article I. *Bond*, 564 U.S. at 221–22.

Plaintiffs also allege and prove additional non-dilutionary injuries, including injuries to their associational rights. *See supra* Part II.A.2. As discussed above, these injuries include, among others, difficulty recruiting candidates due to the perceived lack of competitiveness of elections, difficulty raising money, and difficulty encouraging people to vote on account of widespread belief that electoral outcomes are foregone conclusions. *Id*. And, as Justice Kagan made clear, such injuries, if statewide in scope, admit statewide standing. *See id*.

Several circuits also have relied on these types of associational injuries when finding that organizations had standing to assert claims under Article I. For example, in *Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006), the Republican Party of Texas declared that one of its candidates, who had already won the primary election for the U.S. House of Representatives in one of Texas' districts, was no longer eligible to run due to a change in his residency. *See id*. at 584–85. The Texas Republican Party thus sought to replace the candidate on the general election ballot with a new candidate. *See id*. Before the Republican Party could do so, however, the Democratic Party sought injunctive relief. *See id*. at 585. The district court found that the Republican Party had impermissibly added a residency requirement to running for the U.S. House of

72

Representatives, which the Qualifications Clause of the Constitution prohibited. *See id.* Accordingly, the district court permanently enjoined the chairwoman of the Republican Party from finding the first candidate to be ineligible and from replacing him on the ballot with another Republican candidate. *See id.*

The Republican Party appealed. Among its arguments was that the residency requirement for candidates for the House of Representatives was a permissible use of the authority conferred to the State under the Elections Clause. *See id.* at 590–91. The Fifth Circuit rejected this argument. The court found that the Republican Party's actions were not performed in a "'nondiscriminatory, politically neutral fashion,'" *id.* at 590 (quoting *Miller v. Moore*, 169 F.3d 1119, 1125 (8th Cir. 1999)), nor did they fall within the limited grant of power provided by the Elections Clause, *id.* at 591.

Relevant here, the Fifth Circuit found that the Texas Democratic Party had standing to bring these claims. For direct standing, the court found that the Democratic Party would suffer an economic injury because "it would need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame." *Id.* at 586 (internal quotation marks omitted). Furthermore, the Party would also have standing as a result of "harm to its election prospects." *Id.* More specifically, "if the [Republican Party] were permitted to replace [the original candidate] with a more viable candidate, then [the Democratic Party's] congressional candidate's chances of victory would be reduced." *Id.* Additionally, other "Democratic candidates, like county commissioners and judges, would suffer due to the change's effect on voter turnout and volunteer efforts." *Id.*

73

Like the Legislative Defendants here, the Republican Party in *Benkiser* argued that such ill effects were not injuries-in-fact sufficient to confer standing. The Fifth Circuit disagreed, admonishing that "[v]oluminous persuasive authority shows otherwise." *Id.* at 587 & n.4 (collecting cases). The court held that "a political party's interest in a candidate's success is not merely an ideological interests. Political victory accedes power to the winning party, enabling it to better direct the machinery of government toward the party's interest. While power may be less tangible than money, threatened loss of that power is still a concrete and particularized injury sufficient for standing purposes." *Id.* (internal citation omitted). The same is true in this case. The North Carolina Democratic Party has an interest in electing its candidates to office, and the inability to recruit candidates, raise funds, and get voters to the polls create injuries-in-fact sufficient to confer standing.[16] *See supra* Part II.A.2.

Two challenges to a Kansas law requiring proof of citizenship to register to vote—decided by two separate circuits—similarly establish that an individual who suffers an injury-in-fact as a result of an election regulation has standing to assert a structural challenge to the regulation under Article I. *See League of Women Voters of the*

---

[16] The Fifth Circuit also found that the Democratic Party had associational standing on behalf of its candidates. *See Benkiser*, 459 F.3d at 587. The Fifth Circuit held that the Republican Party's actions "threaten [the Democratic candidate's] election prospects and campaign coffers," and that "[p]ersuasive authorities establish that such injuries are sufficient to give a candidate standing to protest the action causing the harm." *Id.* at 587 & n.4 (collecting cases). Again, the same is true in this case.

*U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (holding that because the "new obstacles" created by the Kansas law "unquestionably make it more difficult for the Leagues to accomplish their primary mission of registering voters, they provide injury for purposes both of standing and irreparable harm"); *see also Fish v. Kobach*, 840 F.3d 710, 716 n.5 (10th Cir. 2016) (holding that Plaintiffs, including the League of Women Voters of Kansas, have standing to challenge the law). Further still, although the Supreme Court did not specifically address standing in *Thornton*, the Court nonetheless ruled on the merits of the case when several citizens and the League of Women Voters of Arkansas brought suit challenging a law that violated both the Qualifications Clause and the Elections Clause. *See* 514 U.S. 779. Several other cases provide similar tacit support. *See, e.g., Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) (addressing the merits in a case brought by a collection of non-profit organizations to a state law that fell outside the scope of the Elections Clause); *Tashjian*, 479 U.S. at 2017 (addressing the merits in a case brought by the Republican Party challenging a law outside the scope of the Elections Clause and stating that although "[t]he Constitution grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1," that power "does not justify . . . the abridgment of fundamental rights, such as the right to vote [or] the freedom of political association." (citing *Wesberry*, 376 U.S. at 6–7)); *Anderson*, 460 U.S. at 792 (finding that plaintiff was injured by an election law that made "[v]olunteers . . . more difficult to recruit and retain, media publicity and campaign contributions . . . more difficult to secure, and voters . . . less interested in the campaign").

75

In sum, as the Supreme Court held in *Bond*, citizens have standing in cases "assert[ing] injury from governmental action taken in excess of the authority that federalism defines," 564 U.S. at 220—that is, when a "government acts in excess of its lawful powers," *id.* at 222—so long as the plaintiffs still have the requisite injury-in-fact. Here, Common Cause Plaintiffs' Article I claim is grounded in that same principle of federalism. They claim that the North Carolina General Assembly has overstepped the limited grant of power provided by the Elections Clause, thereby giving it too much influence over the National Legislature. Like in *Wesberry*, these actions, if true, "defeat [a] principle solemnly embodied" in the Constitution. 376 U.S. at 14; *see also Cook*, 531 U.S. at 528 (Kennedy, J., concurring) ("The dispositive principle in this case is fundamental to the Constitution, to the idea of federalism, and to the theory of representative government. The principle is that Senators and Representatives in the National Government are responsible to the people who elect them, not to the States in which they reside. . . . The idea of federalism is that a National Legislature enacts law which bind the people as individuals, not as citizens of a State; and, it follows, freedom is most secure if the people themselves, not the States as intermediaries, hold their federal legislators to account for the conduct of their office"); *Thornton*, 514 U.S. at 842 (Kennedy, J., concurring) ("Nothing in the Constitution or The Federalist Papers, however, supports the idea of state interference with the most basic relation between the National Government and its citizens, the selection of legislative representatives"). The harm suffered by Plaintiffs as a result of this potential violation of the Constitution's structure, however, manifests itself through individual dilutionary and associational

76

injuries. Accordingly, we find that such injuries are sufficient injuries-in-fact on behalf of the individual plaintiffs, as well as on behalf of the Democratic Party of North Carolina and Common Cause. Furthermore, because these structural and associational harms have statewide implications, we find that such injuries are sufficient to confer standing on a statewide basis. *See Gill*, 138 S. Ct. at 1938–40 (Kagan, J., concurring).

* * * * *

In conclusion, we find and conclude that individual and organizational Plaintiffs in each congressional district have alleged and suffered dilutionary injuries-in-fact attributable to the 2016 Plan, and, based on those injuries, have standing to assert a partisan vote dilution challenge to each of those districts. We further find and conclude that individual and organizational Plaintiffs have standing to assert a statewide First Amendment claim. And those Common Cause Plaintiffs who have alleged and proven injuries-in-fact also have standing to seek relief under Article I.

### B.    JUSTICIABILITY

Next, Legislative Defendants argue that although partisan gerrymandering claims are justiciable "in theory," Plaintiffs' specific partisan gerrymandering claims should be dismissed because, as alleged and proven, they raise nonjusticiable political questions. Leg. Defs.' FOF 93. The political question doctrine dates to Justice Marshall's opinion in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), and rests on the principle that certain disputes are not appropriate for or amenable to resolution by the courts because they raise questions constitutionally reserved to the political branches, *id.* at 170

("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.").

The political question doctrine has played a central role in apportionment cases. The Supreme Court set forth its current test for determining whether a claim raises a political question in a case dealing with the justiciability of one-person, one-vote claims. *See Baker v. Carr*, 369 U.S. 186 (1962). Prior to *Baker*, in *Colegrove v. Green*, 328 U.S. 549 (1946), several Justices took the position that certain apportionment challenges raised political questions because the Constitution expressly delegated authority over apportionment to the States, subject to the supervision of Congress, thereby leaving no place for judicial review.[17] *Id.* at 553–55.

*Baker* confronted a one-person, one-vote challenge under the Equal Protection Clause to a state legislative districting plan. The Court concluded such claims were justiciable, and distinguished *Colegrove* on grounds that *Colegrove* involved a challenge under the Guaranty Clause, Article IV, Section 4, which the Court had previously held was not "the source of a constitutional standard for invalidating state action." 369 U.S. at 209–10, 223 (citing *Taylor v. Beckham*, 178 U.S. 548 (1900)). In concluding that one-person, one-vote apportionment claims are justiciable, *Baker* held that an issue poses a political question if there is:

A textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and

---

[17] In *Baker*, the Court concluded that a majority of the *Colegrove* Court did not dismiss the action on justiciability grounds. *Baker*, 369 U.S. at 234–35.

manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217. Applying this test, the Court concluded one-person, one-vote claims were justiciable under the Fourteenth Amendment because they involved a determination of "the consistency of state action with the Federal Constitution"—a question constitutionally assigned to the Judiciary. *Id.* at 226. The Court further emphasized that the resolution of the question was "judicially manageable" because "[j]udicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action." *Id.* The Court subsequently extended *Baker*'s justiciability holding to one-person, one-vote challenges to congressional districts under Article I, Section 2. *See Wesberry*, 376 U.S. at 5–6.

### 1. Governing Law

In *Davis v. Bandemer*, 478 U.S. 109 (1986), the Supreme Court applied the *Baker* framework to partisan gerrymandering claims, holding that such claims do not raise nonjusticiable political questions, *see id.* at 123 (plurality op.); *id.* at 161–65 (Powell, J., concurring in part and dissenting in part). Writing for the Court, Justice White emphasized that the Court had previously concluded that one-person, one-vote and racial gerrymandering claims were justiciable, thereby establishing that apportionment claims

implicating "issue[s] of representation" are justiciable. *Id.* at 124 (plurality op.). Justice White further stated that there was no reason to believe that the "standards . . . for adjudicating this political gerrymandering claim are less manageable than the standards that have been developed for racial gerrymandering claims." *Id.* at 125. Although the Court recognized the justiciability of partisan gerrymandering claims under the Equal Protection Clause, a majority could not agree as to the substantive standard for proving such claims. *Compare id.* at 127–37, *with id.* at 161–62 (Powell, J., concurring in part and dissenting in part).

The Court revisited the justiciability of partisan gerrymandering claims in *Vieth v. Jubelirer*, 541 U.S. 267 (2004). Conceding "the incompatibility of severe partisan gerrymanders with democratic principles," *id.* at 292 (plurality op.), a four-justice plurality nonetheless took the position that no judicially manageable standard exists to adjudicate partisan gerrymandering claims and therefore would have reversed *Bandemer*'s holding of justiciability, *id.* at 281. Justice Kennedy agreed with the plurality that the *Vieth* plaintiffs had failed to put forward a legally cognizable standard for evaluating partisan gerrymandering claims, therefore warranting dismissal of the action for failure to allege "a valid claim on which relief may be granted." *Id.* at 306, 313 (Kennedy, J., concurring in the judgment). But Justice Kennedy rejected the plurality's conclusion that partisan gerrymandering claims are categorically nonjusticiable. *See id.* at 309–10. And the remaining four Justices agreed with Justice Kennedy's refusal to reverse *Bandemer*'s justiciability holding. *Id.* at 317 (Stevens, J., dissenting) ("[F]ive Members of the Court . . . share the view that, even if these appellants are not entitled to

80

prevail, it would be contrary to precedent and profoundly unwise to foreclose all judicial review of similar claims that might be advanced in the future.").  Two years later, the Supreme Court again refused to revisit *Bandemer*'s holding that partisan gerrymandering claims are justiciable.  *League of United Latin Am. Citizens v. Perry* (*LULAC*), 548 U.S. 399, 414 (2006).   And the Supreme Court's most recent partisan gerrymandering decision, *Gill*, expressly declined to address the justiciability of such claims, 138 S. Ct. at 1929 (majority op.), with Justice Kagan, joined by three other Justices, reaffirming that "[c]ourts have a critical role to play in curbing partisan gerrymandering," *id.* at 1941 (Kagan, J., concurring).

Accordingly, under controlling Supreme Court precedent, a challenge to an alleged partisan gerrymander presents a justiciable case or controversy.  *See Common Cause*, 240 F. Supp. 3d at 387.  For good reason.

As the Supreme Court recently held, "'partisan gerrymanders . . . are incompatible with democratic principles.'"  *Ariz. State Leg.*, 135 S. Ct. at 2658 (quoting *Vieth*, 541 U.S. at 292 (plurality op.)) (alterations omitted).   That statement accords with the unanimous conclusion of the Justices in *Vieth*.  *See* 541 U.S. at 292 (plurality op.) (recognizing "the incompatibility of severe partisan gerrymanders with democratic principles"); *id.* at 312, 316–17 (Kennedy, J., concurring) ("If a State passed an enactment that declared 'All future apportionment shall be drawn so as most to burden Party X's rights to fair and effective representation, though still in accord with one-person, one-vote principles,' we would surely conclude the Constitution had been violated."); *id.* at 326 (Stevens, J., dissenting) ("State action that discriminates against a

81

political minority for the sole and unadorned purpose of maximizing the power of the majority plainly violates the decisionmaker's duty to remain impartial"); *id.* at 345 (Souter, J., dissenting) ("[T]he increasing efficiency of partisan redistricting has damaged the democratic process to a degree that our predecessors only began to imagine."); *id.* at 360 (Breyer, J., dissenting) (holding that redistricting plan violates Constitution if it amounts to an "*unjustified* use of political factors to entrench a minority in power").

On its most fundamental level, partisan gerrymandering violates "the core principle of republican government . . . that the voters should choose their representatives, not the other way around." *Ariz. State Leg.*, 135 S. Ct. at 2677 (internal quotation marks omitted); *see also Powell v. McCormack*, 395 U.S. 486, 540–41 (1969) ("[T]he true principle of a republic is, that the people should choose whom they please to govern them." (quoting Alexander Hamilton in 2 Debates of the Federal Constitution 257 (J. Elliott ed. 1876))). Put differently, partisan gerrymandering represents "'an abuse of power that, at its core, evinces a fundamental distrust of voters, serving the self-interest of the political parties at the expense of the public good.'" *LULAC*, 548 U.S. at 456 (Stevens, J., concurring in part and dissenting in part) (quoting *Balderas v. Texas*, Civ. Action No. 6:01CV158, App. to Juris. Statement 209a–10a (E.D. Tex. 2006)). To that end, partisan gerrymandering leads to a "cascade of negative results . . . : indifference to swing voters and their views; extreme political positioning designed to placate the party's base and fend off primary challenges; the devaluing of negotiation and compromise; and the impossibility of reaching pragmatic, bipartisan solutions to the nation's problems." *Gill*, 138 S. Ct. at 1940 (Kagan, J., concurring) (internal quotation marks omitted).

82

Partisan gerrymandering runs contrary to both the structure of the republican form of government embodied in the Constitution and fundamental individual rights preserved by the Bill of Rights. As detailed more fully below, partisan gerrymandering of congressional districts constitutes a structural violation because it insulates Representatives from having to respond to the popular will, and instead renders them responsive to state legislatures or, as in this case, political factions thereof. *See infra* Part V. Unlike the Senate, which, at the time of the founding, represented the interests of the States, the Framers intended for the House of Representatives to be the governmental body directly responsive to "the People." U.S. Const. Art. I, § 2; *see also Wesberry*, 376 U.S. at 13 (explaining that "William Samuel Johnson of Connecticut had summed [the Great Compromise] up well: 'in one branch the people, ought to be represented; in the other, the States'"). As James Madison explained, "it is essential to liberty that the government in general should have a common interest with the people, so it is particularly essential that the [House of Representatives] *should have an immediate dependence on, and an intimate sympathy with, the people*." *See* The Federalist No. 52 (James Madison), at 295 (Clinton Rossiter ed., 1999) (emphasis added). On this point, both the Federalists and Anti-Federalists agreed. *See e.g.*, James Madison, *Notes of Debates in the Federal Convention of 1787* 39 (W. W. Norton & Co. 1987) (1787) (hereinafter "*Debates*") (reporting that George Mason "argued strongly for an election of the larger branch by the people. It was to be the grand depository of the democratic principle of the government."); *id.* at 167 (reporting that James Wilson stated that he "considered the election of the first branch by the people not only as the corner Stone, but

as the foundation of the fabric: and that the difference between a mediate and immediate election was immense"). "When that moment does not come—when legislators can entrench themselves in office despite the people's will—the foundation of effective democratic governance dissolves." *Gill*, 138 S. Ct. at 1940–41 (Kagan, J., concurring).

Emphasizing that the House of Representatives was the repository of the People's power, the Framers repeatedly expressed concern about state legislatures, or political factions thereof, interposing themselves between Representatives and the People. For example, James Madison explained that "[i]t is *essential*" that a Republican government "derive[ its powers] from the great body of society, *not from an inconsiderable proportion or a favored class of it*; otherwise a handful of tyrannical nobles, exercising their oppressions by a delegation of their powers, might aspire to the rank of republicans and claim for their government the honorable title of republic." The Federalist No. 39 (James Madison), at 209 (second emphasis added); *Debates* at 40 (reporting that James Wilson stated that "[a]ll interference between the general and local government should be obviated as much as possible"). The Framers expressed particular concern that State legislatures would seek to influence Congress by enacting electoral regulations that favored candidates aligned with, and responsive to, the interests of the legislatures, rather than the public at large. *See Debates* at 167 (reporting that Rufus King expressed concern that "the Legislatures would constantly choose men subservient to their own views as contrasted to the general interest; and that they might even devise modes of election that would be subversive of the end in view"). Surveying these and other founding era authorities, the Supreme Court recognized that "[i]t would defeat the

84

principle solemnly embodied in the Great Compromise . . . to hold that, within the states, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." *Wesberry*, 376 U.S. at 14. Partisan gerrymandering—drawing district lines to enhance the electoral power of voters who support a favored party and diminish the electoral power of voters who support disfavored parties—amounts to a legislative effort "to give some voters a greater voice in choosing a Congressman than others," *id.*, contrary to the republican system put in place by the Framers.

Partisan gerrymandering also runs afoul of rights that "are individual and personal in nature," *Reynolds*, 377 U.S. at 561, because it subverts the foundational constitutional principle that the State govern "impartially"— that "the State should treat its voters as standing in the same position, regardless of their political beliefs or party affiliation." *Davis*, 478 U.S. at 166 (Powell, J., concurring in part and dissenting in part); *see also infra* Part III. And partisan gerrymandering infringes on core political speech and associational rights by "burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment); *see also infra* Part IV.

That partisan gerrymandering encroaches on these individual rights by undermining the right to vote—the principle vehicle through which the public secures other rights and prevents government overreach—magnifies the constitutional harm. As the Supreme Court explained in *Wesberry*, "[o]ur Constitution leaves no room for

classification of people in a way that unnecessarily abridges [the right to vote]" because "[o]ther rights, even the most basic, are illusory if the right to vote is undermined." 376 U.S. at 17–18. To that end, the Supreme Court long has held that "legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

A partisan gerrymander that is intended to and likely has the effect of entrenching a political party in power undermines the ability of voters to effect change when they see legislative action as infringing on their rights. And as James Madison warned, a legislature that is itself insulated by virtue of an invidious gerrymander can enact additional legislation to restrict voting rights and thereby further cement its unjustified control of the organs of both state and federal government.[18] *See Debates* at 424 ("[T]he

---

[18] A separate three-judge panel of this Court concluded that the General Assembly unjustifiably, and therefore unconstitutionally, relied on race in drawing lines surrounding twenty-eight districts in North Carolina's 2011 state legislative redistricting plan—among the largest racial gerrymanders ever confronted by a federal court. *See Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016). The Supreme Court summarily affirmed that decision without dissent. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017) (mem.). The *Covington* panel subsequently held that several districts redrawn by the General Assembly in an effort to remedy the constitutional violation constituted racial gerrymanders themselves, *Covington v. North Carolina*, 283 F. Supp. 3d 410, 429–42 (M.D.N.C. 2018)—a decision the Supreme Court again affirmed, 138 S. Ct. 2548, 2552–54 (2018). The legislature elected under the racially gerrymandered 2011 plan has enacted, and continues to enact, voting- and election-related legislation that has been struck down by state and federal courts as unconstitutional or violative of federal law. *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 214–15 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1399 (2017) (mem.); *Raleigh Wake Citizens Ass'n v. Wake*

(Continued)

inequality of the Representation in the Legislatures of particular States, would produce like inequality in their representation in the Natl. Legislature, as it was presumable that the Counties having the power in the former case would secure it to themselves in the latter."). That is precisely what occurred in the late Eighteenth Century when Democratic legislatures used aggressive partisan gerrymanders to secure Democratic control of the House of Representatives and then, by virtue of that control, restrict earlier federal efforts to enforce the Fifteenth Amendment in the South, thereby facilitating the return of de jure and de facto segregation. *See* Erik J. Engstrom, Partisan Gerrymandering and the Construction of American Democracy 94–121 (2013).

---

*Cty. Bd. of Elections*, 827 F.3d 333, 352 (4th Cir. 2016); Order, *Poindexter v. Strach*, No. 5:18-CV-366 (Aug. 22, 2018), ECF No. 22 (holding that statute retroactively removing candidates from the ballot who were qualified and previously had been approved to appear on the ballot likely violated the candidates' rights under the First and Fourteenth Amendments); *N.C. State Conf. of the NAACP v. Bipartisan Bd. of Elections & Ethics Enforcement*, No. 1:16-CV-1274, 2018 WL 374 8172, at *12–13 (M.D.N.C. Aug. 7, 2018) (holding that state statute authorizing individual voters to challenge registrations of other voters on change-of-residency grounds violated National Voter Registration Act); *City of Greensboro v. Guilford Cty. Bd. of Elections*, 251 F. Supp. 3d 935, 951 (M.D.N.C. 2017); Order on Injunctive Relief, *Cooper v. Berger*, No. 18-CVS-9805 (Wake Cty. Super. Ct. Aug. 21, 2018) (three-judge panel) (holding that ballot language adopted by the General Assembly to describe two amendments to the North Carolina Constitution proposed by the General Assembly "misleads and does not sufficiently inform the voters" regarding the substance of the amendments and thereby likely violates the State Constitution); *Cooper v. Berger*, No. 16-CVS-15636 (Wake Cty. Super. Ct. Mar. 17, 2017) (three-judge panel) (striking down portions of two statutes, which stripped the then recently elected Democratic Governor of a broad variety of powers, including powers related to supervision of State Board of Elections, on separation-of-powers grounds).

The Constitution sharply curtails restrictions on electoral speech and the right to vote because, in our republican form of democracy, elected representatives in power have a strong incentive to enact legislation or policies that preserve their position and those of their fellow partisans, at the expense of public interest. As Justice Scalia explained, "[t]he first instinct of power is the retention of power, and, under a Constitution that requires periodic elections, that is best achieved by the suppression of election-time speech." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 263 (2003) (Scalia, J., concurring in part and dissenting in part). Casting a vote and associating with a political party are among the most fundamental forms of "election-time speech." *See Williams*, 393 U.S. at 30 (recognizing "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively"); *Reynolds*, 377 U.S. at 555 ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."); Alexander Meiklejohn, *The First Amendment is an Absolute*, 1961 Sup. Ct. Rev. 245, 254 (1961) ("The revolutionary intent of the First Amendment is . . . to deny to [the government] authority to abridge the freedom of the electoral power of the people."). Partisan gerrymandering is no different than legislative efforts to curtail other forms of election-time speech because in both cases "[p]oliticians have deep-seated incentives to bias translation of votes into seats." Engstrom, *supra* at 192. Accordingly, because partisan gerrymandering encroaches on individuals' right to engage in "election-time speech"—

88

including the right to vote—allegations of partisan gerrymandering "must be carefully and meticulously scrutinized" by the judiciary. *Reynolds*, 377 U.S. at 562.

Because partisan gerrymandering targets voting rights, the deference to the policy judgments of the political branches animating the political question doctrine is inapplicable. In *Wesberry*, the defendant state asserted that claims premised on malapportionment of congressional districts raise political questions because the Elections Clause—which empowers state "Legislatures," subject to congressional regulation, to "prescribe[] . . . The Times, Places and Manner of holding Elections for . . . Representatives"—textually commits districting and apportionment questions to Congress and the States. 376 U.S. at 6–7. In rejecting that argument, the Supreme Court refused to "support . . . a construction [of the Elections Clause] that would immunize state congressional apportionment laws which debase a citizen's right to vote from the power of courts to protect the constitutional rights of individuals from legislative destruction, a power recognized at least since our decision in *Marbury v. Madison*." *Id.* In sum, "[t]he right to vote is too important in our free society to be stripped of judicial protection by such an interpretation of Article I." *Id.*

Further, "a textually demonstrable constitutional commitment" of authority to a coordinate branch provides the strongest basis for treating a claim as a political question. *Vieth*, 541 U.S. at 278 (plurality op.) (characterizing the "textually demonstrable constitutional commitment" test as the most "importan[t] and certain[]" test for the existence of a political question). Given that the Supreme Court has recognized that the importance of the right to vote warrants not treating malapportionment claims as political

89

questions, notwithstanding the alleged textual commitment of such claims in the Elections Clause, a purported lack of judicially manageable standards provides an even weaker basis for "stripp[ing] of judicial protection" the right to vote when a legislature seeks to destroy that right through partisan gerrymandering.[19] *Wesberry*, 376 U.S. at 6–7.

Importantly, and contrary to Legislative Defendants' claims, the judiciary's refusal to treat alleged infringements on the right to vote—like claims of partisan gerrymandering—as political questions reflects an effort to *advance* the interests served by the political question doctrine, rather than usurp the role of the political branches. As

---

[19] We further note that a majority of the Supreme Court *never* has found that a claim raised a nonjusticiable political question solely due to the alleged absence of a judicially manageable standard for adjudicating the claim. Rather, in each case in which the Supreme Court has found a claim nonjusticiable under the political doctrine, the Court has principally pointed to a textual commitment of the challenged action to a political branch in finding the claim nonjusticiable. *See, e.g.*, *Nixon v. United States*, 506 U.S. 224, 228–36 (1993) (holding that challenge to the procedure Senate adopted for "try[ing]" impeachment, U.S. Const. Art. I, § 3, cl. 6, raised nonjusticiable political question); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) (holding that claim premised on the "organizing, arming, and disciplining" of members of the National Guard involved issue "committed expressly to the political branches of government"). In *Vieth*, Justice Kennedy's controlling opinion explained why the Court has declined to rely on an alleged lack of judicial manageable standards as an exclusive basis for finding a claim nonjusticiable:

> Relying on the distinction between a claim having or not having a workable standard . . . involves a difficult proof: proof of a categorical negative [—] proof that no standard could exist. This is a difficult proposition to establish, for proving a negative is a challenge in any context.

*Vieth*, 541 U.S. at 311 (Kennedy, J., concurring). Legislative Defendants have failed to provide any "proof that no standard could exist" for evaluating a partisan gerrymandering claim. Accordingly, we decline Legislative Defendants' request that we take the unprecedented step of dismissing a claim under the political question doctrine solely due to an alleged lack of judicially manageable standards for resolving the claim.

90

the Supreme Court has explained, "[t]he voting rights cases, indeed, have represented the Court's efforts to strengthen the political system by assuring a higher level of fairness and responsiveness to the political processes, not the assumption of a continuing judicial review of substantive political judgments entrusted expressly to the coordinate branches of government." *Gilligan v. Morgan*, 413 U.S. 1, 11 (1973). Put differently, because the judiciary jealously protects the right to vote—and thereby ensures that the People retain the means to counteract any encroachment by the political branches on substantive individual rights—the judiciary can give the political branches greater latitude to make substantive policy decisions. *See* John Hart Ely, Democracy and Distrust: A Theory of Judicial Review 102 (1980) (explaining that by "devoting itself instead to policing the mechanisms by which [our constitutional] system seeks to ensure that our elected representatives will actually represent," the judiciary "recognizes the unacceptability of the claim that appointed and life-tenured judges are better reflectors of conventional values than elected representatives").

In sum, partisan gerrymandering infringes on a variety of individual rights and does so by targeting the right to vote—the constitutional mechanism through which the People repel legislative encroachment on their rights. The Supreme Court long has recognized that when the Constitution preserves individual rights, courts have an obligation to enforce those rights. *Marbury*, 5 U.S. at 166 ("[W]here a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy."). We find no basis to disregard that obligation here.

91

Notably, the State defendant in *Reynolds* made arguments against judicial oversight of state redistricting identical to those advanced by Legislative Defendants here—namely, that it is improper for courts to embroil themselves in inherently political issues and that courts lack the capability of identifying a judicially manageable standard to determine whether, and to what degree, malapportionment violates the Constitution. Rejecting each of these arguments, the Supreme Court reaffirmed the principle first recognized by Chief Justice Marshall in *Marbury*: "We are cautioned about the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a denial of constitutionally protected rights demands judicial protection; our oath and our office require no less of us." *Reynolds*, 377 U.S. at 566. Our oath and our office impose that same obligation here.

2.      Legislative Defendants' Arguments Against Justiciability

Legislative Defendants nonetheless argue that, regardless of whether partisan gerrymandering claims are justiciable "in theory," this Court should dismiss Plaintiffs' claims as nonjusticiable because Plaintiffs have failed to put forth a "judicially manageable standard" for resolving their claims. Leg. Defs.' Br. 2, 11, 17; Leg. Defs.' FOF 93. Legislative Defendants argue that the analytical frameworks and empirical analyses advanced by Plaintiffs fail to provide a judicially manageable standard for three reasons. First, Legislative Defendants assert that Plaintiffs' legal frameworks and expert analyses fail to address, much less resolve, what Legislative Defendants see as the fundamental question bearing on the constitutionality of partisan gerrymandering: "how much politics is too much politics in redistricting"? Leg. Defs.' Br. 2, 9-11. Second,

92

Legislative Defendants argue that the empirical analyses on which Plaintiffs rely—which Legislative Defendants characterize as "a smorgasbord of alleged 'social science' theories"—lack any constitutional basis, and instead amount to "academically inspired proposed judicial amendments to the Constitution." *Id.* at 2, 17. Finally, Legislative Defendants maintain that allowing the judiciary to strike down a redistricting plan as a partisan gerrymander would interfere with the political branches' decision, rendered pursuant to Congress's authority under the Election Clause, to require election of representatives from single-member districts. *Id.* at 13. We reject all three arguments.

### a. Failure To Draw Line Between Acceptable and "Too Much" Partisanship

Legislative Defendants' assertion that any judicially manageable partisan gerrymandering framework must distinguish "reasonable" partisan gerrymandering from "too much" partisan gerrymandering rests on the premise that some degree of invidious partisan gerrymandering—again, defined by the Supreme Court as "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power," *Ariz. State Leg.*, 135 S. Ct. at 2658—is constitutionally permissible. To justify that premise, Legislative Defendants assert that (i) the Elections Clause assigns election regulation—and districting, in particular—to political bodies, and thereby contemplates that politics will play a role in the drawing of district lines, rendering questions of partisan gerrymandering "best left to the political branches," Leg. Defs.' FOF 93; (ii) historical practice indicates that the founding generation viewed some amount of partisan gerrymandering as constitutionally permissible; and (iii) the Supreme

93

Court repeatedly has sanctioned at least some degree of partisan gerrymandering.  None of these three claims is correct.

i.

Legislative Defendants are correct that the Elections Clause delegates primary responsibility to state legislatures—or other redistricting bodies established pursuant to state law—to draw congressional districts.  *See Ariz. State Leg.*, 135 S. Ct. at 2668, 2677. But neither founding era authorities nor Supreme Court precedent supports Legislative Defendants' contentions that the Elections Clause's assignment of election regulation to *political* bodies contemplates such bodies engaging in some degree of invidious *partisan* discrimination in the regulation of elections—the conduct at issue here—or that such efforts would be immune from judicial review.

On the contrary, scholars agree that "[t]he idea of political parties, representing institutionalized divisions of interest, was famously *anathema* to the Framers, as it had long been in Western political thought."   Daryl J. Levinson & Richard H. Pildes, *Separation of Parties, Not Powers*, 119 Harv. L. Rev. 2311, 2320 (2006) (emphasis added); *see also, e.g.*, James A. Gardner, *Can Party Politics Be Virtuous*, 100 Colum. L. Rev. 667, 667 (2000) ("The generation of Americans that founded the United States and wrote its Constitution feared and despised political parties."); Steven G. Calabresi, *Political Parties as Mediating Institutions*, 61 U. Chi. L. Rev. 1479, 1484–85 (1994) ("The Framers of our Constitution were quite outspoken in voicing their dislike for 'factions' and 'parties.'").

94

For example, James Madison, the principal author of the Constitution, characterized "factions" as a "disease" and a dangerous vice that "tainted our public administration."   The Federalist No. 10, at 46 (James Madison).   In defending the Elections Clause, Alexander Hamilton similarly decried the "diseases of faction."   The Federalist No. 61, at 343 (Alexander Hamilton).   And in his 1796 Farewell Address, George Washington spoke at length about the "baneful effect of the spirit of party" and the "interest and duty of a wise people to discourage and restrain it."   George Washington,         Farewell         Address         (1796),         *available*         *at* http://avalon.law.yale.edu/18th_century/washing.asp.[20]

---

[20] In full, Washington warned that:

This spirit [of party], unfortunately, is inseparable from our nature, having its root in the strongest passions of the human mind.   It exists under different shapes in all governments, more or less stifled, controlled, or repressed; but in those of the popular form, it is seen in its greatest rankness, and is truly their worst enemy.

The alternate domination of one faction over another, sharpened by the spirit of revenge, natural to party dissension, which in different ages and countries has perpetrated the most horrid enormities, is itself a frightful despotism.   But this leads at length to a more formal and permanent despotism.   The disorders and miseries which result gradually incline the minds of men to seek security and repose in the absolute power of the individual; and sooner or later the chief of some prevailing faction, more able or more fortunate than his competitors, turns this disposition to the purposes of his own elevation, on the ruins of public liberty.

Without looking forward to an extremity of this kind (which nevertheless ought not to be entirely out of sight), the common and continual mischiefs of the spirit of party are sufficient to make it the interest and duty of a wise people to discourage and restrain it.

(Continued)

As illustrated by Washington's address, "[t]he founders' antipathy toward political parties rested on their belief that parties were the vehicles by which self-interested groups and individuals—'factions,' in their terminology—coordinated and pressed their efforts to seize political power." Gardner, *supra* at 668. "Once in possession of power, factions could be expected to use it to pursue their own private self-interest at the expense of the common good, a course of behavior that political theorists since Aristotle have judged to be a defining characteristic of bad government." *Id.*

This "antipathy" for political parties played a central role in the drafting of the Elections Clause, in particular: the most hotly contested issue at the constitutional convention regarding the Election Clause dealt with whether, and to what extent, the

---

It serves always to distract the public councils and enfeeble the public administration. It agitates the community with ill-founded jealousies and false alarms, kindles the animosity of one part against another, foments occasionally riot and insurrection. It opens the door to foreign influence and corruption, which finds a facilitated access to the government through the channels of party passions. Thus the policy and the will of one country are subject to the policy and will of another.

There is an opinion that parties in free countries are useful checks upon the administration of the government and serve to keep alive the spirit of liberty. This within certain limits is probably true; and in governments of a monarchical cast, patriotism may look with indulgence, if not with favor, upon the spirit of party. But in those of a popular character, in governments purely elective, it is a spirit not to be encouraged. From their natural tendency, it is certain there will always be enough of that spirit for every salutary purpose. And there being constant danger of excess, the effort ought to be by force of public opinion, to mitigate and assuage it. A fire not to be quenched, it demands a uniform vigilance to prevent its bursting into a flame, lest, instead of warming, it should consume.

George Washington, Farewell Address (1796).

federal government should be empowered to displace the States' authority to administer and regulate elections. On the one hand, James Madison argued that "the Legislatures of the States ought not to have the uncontrouled right of regulating the times places and manner of holding elections [as i]t was impossible to foresee all the abuses that might be made of the discretionary power." *Debates* at 423. "Whenever the State Legislatures had a favorite measure to carry, they would take care so *to mould their regulations as to favor the candidates they wished to succeed*," Madison explained. *Id.* at 424 (emphasis added). Likewise, Alexander Hamilton argued that the federal government should have some supervisory authority over the States' regulation of elections because there was no reason to believe that "it is less probable that *a predominant faction in a single State should, in order to maintain its superiority, incline to a preference of a particular class of electors*, than that a similar spirit should take possession of the representatives of thirteen States, spread over a vast region, and in several respects distinguishable from each other by a diversity of local circumstances, prejudices, and interests." The Federalist No. 61, at 342 (emphasis added).

On the other hand, delegates who opposed federal intrusion on state regulation of elections saw such intrusion "as an avenue through which Congress might perpetuate itself in power or . . . *institute unfair at-large voting methods in the states so as to favor particular interests*." Jamal Greene, Note, *Judging Partisan Gerrymanders Under the Elections Clause*, 114 Yale L.J. 1021, 1036 (2005) (emphasis added); Br. of *Amici Curiae* Historians in Supp. of Appellees ("Historians' Br.") at 14, *Gill v. Whitford*, No. 16-1161 (S. Ct. Sept. 5, 2017) ("Importantly, delegates arguing against Madison['s

Case 1:16-cv-01026-WO-JEP   Document 142   Filed 08/27/18   Page 97 of 321

position on the Elections Clause] did not claim that such entrenchment was a state's right or somehow acceptable—rather, they countered that the greater fear was that Congress might abuse its power to entrench itself."). Thus, although the delegates disagreed as to whether, and to what extent, to place authority over the regulation of congressional elections in the federal government, they were *united* in their view that the Constitution should be drafted to minimize the possibility that political bodies controlled by partisan "factions" would adopt electoral regulations designed to favor the controlling party. *See* Note, *A New Map: Partisan Gerrymandering as a Federalism Injury*, 117 Harv. L. Rev. 1196, 1201 (2004). Put differently, the founders disagreed as to whether empowering the federal government to establish election regulations or devolving such power to the States was more likely to forestall the universally feared abuse of such regulations by political bodies—and political parties controlling such bodies, in particular—but they *agreed* that the Elections Clause should be written so as to prevent the enactment of election regulations motivated by invidious partisanship. More significantly, due to the framers' antipathy for political parties, the Constitution as whole—not just the Elections Clause— "was designed to discourage [political parties'] emergence." Richard H. Pildes, Foreword, *The Constitutionalization of Democratic Politics*, 118 Harv. L. Rev. 28, 81 (2004).

Accordingly, the vehement and universal condemnation of political parties by the individuals responsible for drafting and initially implementing the Constitution— including in their debates regarding the Elections Clause—contradicts Legislative Defendants' claim that the Elections Clause's assignment of election regulation to

98

political bodies amounts to constitutional acquiescence in invidiously partisan election regulations, like the 2016 Plan. There is a wide gulf between legislative mapdrawers taking into account *political* considerations in drawing districting lines—as the Election Clause contemplates—and *partisan* legislative mapdrawers seeking to subordinate the interests of supporters of a rival party and entrench their fellow partisans in power, *see infra* Part II.B.2.a.iii—as the General Assembly did here and as Washington, Madison, and Hamilton warned against. Put differently, that the Elections Clause contemplates election regulations based, at least in part, on *political* considerations in no way proves that it contemplates election regulations enacted for *partisan advantag*e, particularly when the Framers expressly sought to discourage the formation of political parties.

As to Legislative Defendants' related contention that questions of election regulation are "best left to the political braches" because "nothing in the Constitution gives unelected judges the authority to make . . . policy decisions overruling the decisions by elected representatives," Leg. Defs.' FOF 93, 95, that contention runs squarely into an unbroken wall of Supreme Court precedent dating back decades striking down as unconstitutional numerous state and federal election regulations—and congressional districting plans and election regulations, in particular—even though the Constitution assigns primary authority over election regulation to the political branches. *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455 (2017); *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014); *Shelby Cty., Ala. v. Holder*, 570 U.S. 529 (2013); *Ariz. Free Enterprise Club's Freedom PAC v. Bennett*, 564 U.S. 721 (2011); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *Cook v. Gralike*, 531 U.S. 510 (2001); *Bush v. Vera*, 517

99

U.S. 952 (1996); *Miller v. Johnson*, 515 U.S. 900 (1995); *U.S. Terms Limits, Inc. v. Thornton*, 514 U.S. 779 (1995); *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986); *Karcher v. Daggett*, 462 U.S. 725 (1983); *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Buckley v. Valeo*, 424 U.S. 1 (1976); *Williams v. Rhodes*, 393 U.S. 23 (1968); *Reynolds v. Sims*, 377 U.S. 533 (1964); *Wesberry v. Sanders*, 376 U.S. 1 (1964); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960).

As the *Wesberry* Court explained in rejecting an identical argument, "since our decision in *Marbury v. Madison*," it has been recognized that federal courts have the "power . . . to protect the constitutional rights of individuals from legislative destruction," including the destruction of constitutional rights through discriminatory election regulations. 376 U.S. at 6–7. Indeed, "the need for judicial review is *at its most urgent* in [such] cases. For here, politicians' incentives conflict with voters' interests, leaving citizens without any political remedy for their constitutional harms." *Gill*, 138 S. Ct. at 1941 (Kagan, J., concurring) (emphasis added).

Legislative Defendants offer no argument, nor have we identified any, as to why the conduct at issue here—a controlling party in a state legislative body enacting an election regulation designed to subordinate the interests of supporters of the party's rival and cement itself in power—should be treated as an exception to this long-recognized and -exercised role for federal courts to ensure that state and federal election laws do not violate the Constitution. Notably, the Supreme Court refused to except several of the election regulations struck down above from constitutional scrutiny, notwithstanding that the political branches enacted those regulations based on a good faith, if ultimately

100

constitutionally mistaken, belief that the regulations would advance democratic and public interests. *See, e.g.*, *Shelby Cty.*, 570 U.S. at 535 (striking down provision in Voting Rights Act of 1965, which Congress enacted "to address entrenched racial discrimination in voting, an insidious and pervasive evil which had been perpetuated in certain parts of the country through unremitting and ingenious defiance of the Constitution" (internal quotation marks omitted)); *Thornton*, 514 U.S. at 783–84 (striking down provision in Arkansas Constitution establishing term limits for members of the State's congressional delegation because "[t]he people of Arkansas find and declare that . . . entrenched incumbency has reduced voter participation and has led to an electoral system that is less free, less competitive, and less representative than the system established by the Founding Fathers"); *Buckley*, 424 U.S. at 26–27 (striking down several provisions in the Federal Election Campaign Act of 1971, which Congress enacted to "limit the actuality and appearance of corruption" resulting from large political donations and to "equalize the relative ability of all citizens to affect the outcome of elections").

By contrast, Legislative Defendants do not argue—and never have argued—that the 2016 Plan's express partisan discrimination advances *any* democratic, constitutional, or public interest. Nor could they. Neither the Supreme Court nor any lower court has recognized any such interest furthered by partisan gerrymandering—"the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power." *Ariz. State Leg.*, 135 S. Ct. at 2658. And as explained above, partisan gerrymandering runs contrary to numerous fundamental democratic principles and individual rights enshrined in the Constitution. *See supra* Part II.B.1. Given (1) that

101

the Supreme Court routinely strikes down state and federal election regulations that violate the Constitution and (2) that the Court does so even in the case of regulations adopted by the political branches to further democratic and public interests, we see no reason why the Court would create a special exception from constitutional scrutiny for election regulations, like partisan gerrymanders, enacted for an invidious purpose and which do not purport to advance any democratic or public interest. Accordingly, we decline Legislative Defendants' invitation to create such a special exception.

ii.

Having rejected Legislative Defendants' Elections Clause argument, we turn to their related contention that founding era practice indicates that the founding generation viewed some amount of partisan gerrymandering as constitutionally permissible. Setting aside the legal question of whether any approach to constitutional interpretation— including approaches grounded in ascertaining the original understanding or meaning of the Constitution—would privilege historical practice over the uniform and express statements of the Framers condemning parties and partisan election regulations, the historical evidence does not bear the weight Legislative Defendants claim.

As to the historical pedigree of gerrymanders, like the plurality in *Vieth*, we note that gerrymanders date to the colonial era. *See* Leg. Defs.' Br. 17; 541 U.S. at 274 (plurality op.). And without question, several notorious gerrymanders were drawn soon after the Founding, including the "salamander"-shaped state legislative district attributed to Massachusetts Governor Elbridge Gerry in 1812 that gave rise to the term "gerrymander." *Vieth*, 541 U.S. at 274; *see* Engstrom, *supra* at 21 ("Partisan collisions

102

over districting pervaded the early republic, and even had antecedents in the colonial legislatures"). State legislatures gerrymandered state legislative and congressional districts to favor one candidate at the expense of another in a variety of ways: through the manipulation of district lines; by using regional or state-wide, multi-member districts, as opposed to single-member districts; and, *most commonly*, by creating districts with unequal population. Engstrom, *supra* at 22–23.

But while some amount of gerrymandering occurred in the founding era, the historical evidence does not reveal that *partisan* gerrymandering—the drawing of districts to subordinate supporters of disfavored party and entrench a favored party in power—was so widespread as to indicate that the founding generation, contrary to the express objections of the framers, viewed some amount of partisan gerrymandering as permissible. In particular, "an organized political party system did not become a recognized and accepted feature of the American political system until the Jacksonian period." Levinson & Pildes, *supra* at 2320–21; *see* James Thomas Tucker, *Redefining American Democracy: Do Alternative Voting Systems Capture the True Meaning of "Representation*,*"* 7 Mich. J. of Race & L. 357, 427 (2002) ("Political affiliations initially were much more informal and localized, and did not evolve into the more organized form we commonly associate with parties until the Jacksonian Era in the 1830s."). And as late as 1824, a two-party system had emerged in only *ten percent* of the states, Engstrom, *supra* at 44, meaning that gerrymandering by one party to minimize or diminish the electoral prospects of the candidates of an opposition party—the conduct at

issue here—could not have occurred in the vast majority of the country for several decades after the Constitution was ratified.

In the small minority of states in which the two-party system was sufficiently well-established to give rise to the enactment of partisan gerrymanders, such gerrymanders were widely criticized as antidemocratic and unconstitutional. For example, the newspaper cartoon that coined the term "Gerry-Mander" described partisan redistricting as "a grievous wound on the Constitution,—it in fact subverts and *changes our form of Government*, which ceases to be *Republican* as long as an *Aristocratic* House of Lords under the form of a Senate tyrannizes over the People, and silences and stifles the voice of the *Majority*." *The Gerry-Mander, or Essex South District Formed into a Monster!*, Salem Gazette, Apr. 2, 1813. Numerous other Nineteenth-Century partisan gerrymanders, most commonly accomplished through malapportionment, faced similar condemnation from politicians, the press, the judiciary, and the public. *See* Historians' Br. at 23–34.

Even if founding-era practice did support Legislative Defendants' assertion that some degree of partisan gerrymandering was viewed as permissible—which it does not—long-standing, and even widespread, historical practice does not immunize governmental action from constitutional scrutiny. *See, e.g.*, *Citizens United*, 558 U.S. at 365 (striking down federal statute prohibiting electioneering communications by corporations, in part, on grounds that statute unconstitutionally discriminated against corporate entities, notwithstanding that laws had been in place for approximately 100 years constraining the

political speech of corporations[21]); *Reynolds*, 377 U.S. at 582 (holding that malapportionment of state legislative districts violates Equal Protection Clause, notwithstanding that malapportionment was widespread in the Nineteenth and early Twentieth Centuries). That is particularly true when, as here, the legal bases for challenging the conduct were unavailable at the time of the Founding. *See id.* The Equal Protection Clause, which fundamentally altered the relationship between the States and the federal government, post-dates the founding era by decades. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976) ("There can be no doubt that this line of cases has sanctioned intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the States."); *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715 (4th Cir. 2016) (Wilkinson, J.) ("Of course, the Reconstruction Amendments . . . materially altered the division of labor [between the federal government and the States] established by the Framers for the regulation of elections."). Likewise, the Supreme Court did not recognize the incorporation of the First Amendment against the States through the Fourteenth Amendment until 1943. *See Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943). And until the Reconstruction Congress adopted Section 1983, there was no mechanism for a plaintiff to challenge a congressional redistricting plan as a partisan gerrymander under

---

[21] *See id.* at 394 (Stevens, J., dissenting) (noting that "Congress ha[d] placed special limitations on campaign spending by corporations ever since the passage of the Tillman Act in 1907")

Article I or any other federal constitutional provision. *See* The Enforcement Act of 1871, 17 Stat. 13 (1871), *codified as amended at* 42 U.S.C. § 1983.

Accordingly, even if some degree of partisan gerrymandering had been acceptable during the founding era, that does not mean that the ratification of the Fourteenth Amendment and the incorporation of the First Amendment against the States did not subsequently render unconstitutional the drawing of district lines to frustrate the electoral power of supporters of a disfavored party. That is precisely what the Supreme Court concluded in holding that racial gerrymandering and malapportionment violated the Constitution, notwithstanding that both practices were widespread during the Nineteenth and early Twentieth Centuries. *See Reynolds*, 377 U.S. at 556 n.30, 567 n.43; *Gomillion v. Lightfoot*, 364 U.S. 339, 345–46 (1960).

iii.

Legislative Defendants' contention that the Supreme Court has sanctioned some degree of partisan gerrymandering—the drawing of district lines to undermine the electoral prospects of supporters of candidates of a disfavored party—fares no better. To be sure, the Supreme Court has recognized certain *purposes* for which a state redistricting body may take into account political data or partisan considerations in drawing district lines. For example, in appropriate circumstances, a legislature may draw district lines to avoid the pairing of incumbents. S*ee Karcher v. Daggett*, 462 U.S. 725, 740 (1983). Likewise, the Supreme Court has held that a state redistricting body does not violate the Constitution by seeking "to create a districting plan that would achieve a rough approximation of the statewide political strengths of the Democratic and Republican

106

Parties." *Gaffney*, 412 U.S. at 752. And the Supreme Court has recognized that a redistricting body may draw district lines to respect political subdivisions or maintain "communities of interest." *Abrams v. Johnson*, 521 U.S. 74, 100 (1997).

But the Supreme Court's acceptance of state legislatures' reliance on partisan considerations and political data for certain purposes does not establish that a state legislature may pursue *any* political or partisan objective, as Legislative Defendants contend. In particular, the Supreme Court never has recognized that a legislature may draw district lines for the purpose of diminishing or minimizing the voting strength of supporters of a particular party or citizens who previously voted for representatives of a particular party—the legislative action challenged here. On the contrary, the Supreme Court recently held that such efforts are "incompatible with democratic principles." *Ariz. State Leg.*, 135 S. Ct. at 2658 (alteration omitted); *see also Reynolds*, 377 U.S. at 578–79 (condemning "[i]ndiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, [as] little more than an *open invitation to partisan gerrymandering*" (emphasis added)). And in approving the "proportionality" gerrymander in *Gaffney*, the Court expressly distinguished gerrymanders that seek "to minimize or eliminate the political strength of any group or party."[22] 412 U.S. at 754; *see*

---

[22] For this reason, Legislative Defendants misplace reliance on the Supreme Court's decision in *Easley*. Leg. Defs.' Br. 6. Unlike the 2016 Plan, which was drawn by a Republican-controlled General Assembly to disfavor supporters of Democratic candidates, *see supra* Part I.B.; *infra* Part III.A.1.i, the districting plan at issue in *Easley* was drawn by a politically divided General Assembly to "fairly allocate political power to the parties in accordance with their voting strength," *Gaffney*, 412 U.S. at 754; *see also Cromartie*, 133 F. Supp. 2d at 412–13; *id.* at 423–24 (Thornburg, J. dissenting). (Continued)

*also id.* at 751 ("A districting plan may create multimember districts perfectly acceptable under equal population standards, but invidiously discriminatory because they are employed to minimize or cancel out the voting strength of racial *or political* elements of the voting population." (emphasis added) (internal quotation marks omitted)).  Likewise, the Supreme Court did not include burdening or punishing citizens for voting for candidates from an opposing party among its list of "legitimate" redistricting factors that justify deviating from population equality in congressional districts.  *See Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1306–07 (2016).

In sum, neither the constitutional delegation of redistricting to political bodies, nor historical practice, nor Supreme Court precedent supports Legislative Defendants' assertion that it is sometimes permissible for a state redistricting body to draw district lines for the sole purpose of diminishing the electoral power of voters who supported or are likely to support a disfavored party or candidate.  Because the Constitution does not authorize state redistricting bodies to engage in such partisan gerrymandering, we believe a judicially manageable framework for evaluating partisan gerrymandering claims need not distinguish an "acceptable" level of partisan gerrymandering from "excessive" partisan gerrymandering.  *Vieth*, 541 U.S. at 316 (Kennedy, J., concurring in the judgment) (recommending against "a standard that turns on whether partisan interests in the redistricting process were excessive" because a government body is "culpable"

_____

Accordingly, the districting plan at issue in *Easley* advanced a recognized legitimate districting objective.

108

regardless of whether it seeks to maximize its partisan advantage or "proceeds by a more subtle effort, capturing less than all the seats in each State"). Rather, the framework should distinguish partisan gerrymandering from the results of legitimate districting objectives, including those objectives that take into account political data or permissible partisan considerations. Put differently, "[a] determination that a gerrymander violates the law must rest . . . on a conclusion that [political] classifications, though generally permissible, were applied in an invidious manner or in a way unrelated to any legitimate legislative objective." *Id.* at 307. As explained below, we conclude that Plaintiffs' proposed legal frameworks and supporting evidence do just that.

That being said, our conclusion that twelve of the thirteen districts in the 2016 Plan violate the Equal Protection Clause *does not rest* on our determination that States lack authority to engage in partisan gerrymandering—the intentional drawing of district lines to undermine the electoral prospects of candidates of a disfavored party and entrench a favored party in power—in drawing congressional districts. In particular, we assume that a congressional district amounts to an unconstitutional partisan gerrymander *only if* the legislative body's *predominant* purpose in drawing the district was to subordinate the interests of supporters of a disfavored party and entrench a representative from a favored party in power. *See infra* Part III.A.1. Accordingly, under the standard on which we rely on to strike down those twelve districts, a state legislative body may engage in some degree of partisan gerrymandering, so long as it was not predominantly motivated by invidious partisan considerations.

Notably, the Supreme Court has treated predominance as a judicially manageable standard in the gerrymandering context. In particular, the Court has endorsed predominance as the standard for determining how much consideration of race is "too much" in the drawing of legislative district lines. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995) (recognizing that "[t]he distinction between being aware of racial considerations and being motivated by them may be difficult to make," but nonetheless holding that a racial gerrymandering plaintiff may prevail by showing "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district"). Given that *Gill* expressly analogized partisan gerrymandering claims to racial gerrymandering claims, 138 S. Ct. at 1930, and that predominance is a judicially manageable standard for distinguishing acceptable consideration of race from "too much" consideration of race, the predominance standard we apply constitutes a judicially manageable standard from distinguishing "too much" partisan gerrymandering from an acceptable level of partisan gerrymandering, to the extent that partisan gerrymandering ever is constitutionally acceptable.

b.     *The Judicial Manageability of Plaintiffs' Empirical Analyses*

Legislative Defendants next argue that the empirical analyses introduced by Plaintiffs do not offer a judicially manageable standard for adjudicating partisan gerrymandering claims, but instead are "a smorgasbord of alleged 'social science' theories" that lack any constitutional basis. Leg. Defs.' Br. 2. As detailed more fully below, Plaintiffs offer two groups of empirical analyses to support their Equal Protection and First Amendment claims. The first group of analyses relies on thousands of

110

computer-generated districting plans that conform to most traditional redistricting criteria, including those relied on by the General Assembly in drawing the 2016 Plan. According to Plaintiffs, when these plans are evaluated using the precinct-by-precinct results of recent North Carolina elections, the 2016 Plan is an "extreme statistical outlier" with regard to the degree to which it disfavors voters who oppose Republican candidates. *See infra* Parts III.B.1.a–b. Plaintiffs assert that these analyses prove that the General Assembly intended to burden voters who supported non-Republican candidates, that the 2016 Plan had the effect of burdening such voters, and that that effect was not attributable to another legitimate redistricting objective. The second group of analyses assess the 2016 Plan's "partisan symmetry"—whether the plan allows supporters of the two principal parties to translate their votes into representation with equal effectiveness. *See infra* Part III.B.1.b.ii. According to Plaintiffs, a variety of measures of the 2016 Plan's partisan symmetry reveal that, throughout the life of the plan, supporters of non-Republican candidates will likely have a significantly more difficult time translating their votes into representation.

Legislative Defendants are correct that none of these empirical analyses appear in the Constitution. But Plaintiffs need not show that a particular empirical analysis or statistical measure appears in the Constitution to establish that a judicially manageable standard exists to resolve their constitutional claims. *See, e.g.*, *Brown v. Thomson*, 462 U.S. 835, 842–43 (1983) (holding that "an apportionment plan with a maximum population deviation under 10% falls within th[e] category" of "minor deviations . . . from mathematical equality among state legislative districts [that] are insufficient to

111

make out a prima facie case of invidious discrimination under the Fourteenth Amendment," notwithstanding that the plain language of the Constitution references no such statistical threshold). Rather, Plaintiffs must identify cognizable constitutional standards to govern their claims, and provide credible *evidence* that Defendants have violated those standards. And contrary to Legislative Defendants' assertions, Plaintiffs do not seek to constitutionalize any of the empirical analyses they have put forward to support their claims, nor does this Court do so. Instead, Plaintiffs argue that these analyses provide *evidence* that the 2016 Plan violates a number of well-established constitutional standards—that the government act impartially, not infringe the right to vote, not burden individuals based on the exercise of their rights to political speech and association, and not allow state legislatures to dictate electoral outcomes or interpose themselves between the voters and their representatives in Congress.

The Supreme Court long has relied on statistical and social science analyses as *evidence* that a defendant violated a standard set forth in the Constitution or federal law. In the context of the Equal Protection Clause, in particular, the Supreme Court has relied on statistical and social science evidence as proof that a government action was motivated by discriminatory intent or had a discriminatory effect—the same purposes for which Plaintiffs seek to use such evidence here. For example, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court held that an ordinance providing a municipal board of supervisors with the discretion to grant or withhold its consent to use wooden buildings as laundries, although neutral on its face, was administered in a manner that discriminated on the basis of national origin, *id.* at 366, 374. As proof, the Court noted

112

that the board withheld consent from 200 individuals, "all of whom happen to be Chinese subjects," whereas "eighty others, not Chinese subjects, [we]re permitted to carry on the same business under similar conditions." *Id.* at 374.

Likewise, in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954), the Supreme Court cited numerous academic studies of the psychological impact of segregation on children and youth as evidence that "[s]eparate educational facilities are inherently unequal," and therefore violate the Equal Protection Clause, *id.* at 494–95 & n.11. And the Supreme Court has recognized that "[s]tatistical analyses have served and will continue to serve an important role as one indirect indicator of racial discrimination in access to service on governmental bodies." *Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 620 (1974). The Court also embraced the use of statistical evidence to determine whether a governmental body was justified, under the Fourteenth Amendment, in using "race-based measures to ameliorate the effects of past discrimination." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 476–77 (1989) (plurality op.); *see also id.* at 509 ("[E]vidence of a pattern of individual discriminatory acts can, if supported by appropriate statistical proof, lend support to a local government's determination that broader remedial relief is justified.").

The Supreme Court also has relied on statistical and social science evidence in cases involving voting rights and redistricting, in particular. For example, to support their racial gerrymandering claim, the plaintiffs in *Gomillion* alleged that the City of Tuskegee, Alabama, redrew its municipal boundaries "to remove from the city all save only four or five of its 400 Negro voters while not removing a single white voter or

113

resident." 364 U.S. at 341. The Court concluded that the plaintiffs alleged adequate facts to support a claim under the Equal Protection Clause, explaining that "[i]f these allegations upon a trial remain uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a *mathematical demonstration*, that the legislation is solely concerned with segregating white and colored voters." *Id.* (emphasis added). More recently, the Court relied on statistical analyses to strike down as unconstitutional the coverage formula in Section 4(b) of the Voting Rights Act, citing evidence that the gap between white and black voter registration percentages had fallen substantially since Congress first adopted the coverage formula in 1965, as had the percentage of proposed voting changes facing objections from the Attorney General. *Shelby Cty. v. Holder*, 133 S. Ct. 2612, 2626 (2013). And of particular note, in its decision holding that the 2011 Plan constituted a racial gerrymander, the Supreme Court in part relied on an expert statistical analysis—which found that the General Assembly disproportionately moved blacks into the racially gerrymandered districts, even when controlling for party registration—as proof that the General Assembly predominantly relied on race, rather than partisan considerations, in drawing district lines. *Cooper*, 137 S. Ct. at 1477–78.

Contrary to Legislative Defendants' assertion that Plaintiffs must identify a specific empirical test derived from the language of the Constitution to prove the existence of a judicially manageable standard to adjudicate their constitutional claims, in none of these cases did the Supreme Court hold that the particular statistical or social science analyses upon which it relied had—or had to have—constitutional pedigree, or

114

that the plaintiff had to identify a specific empirical threshold, across which the relevant constitutional provision would be violated. For example, the *Gomillion* Court did not state that a statistical analysis revealing that the municipal boundary plan had fenced out, say, only 80 percent of blacks, as opposed to 99 percent, would be inadequate to establish a constitutional violation. Nor did the Court require that the plaintiffs identify the particular percentage of fenced-out blacks at which a boundary plan would violate the Equal Protection Clause. Likewise, the *Brown* Court did not point to any specific constitutional basis for its reliance on psychological research demonstrating the impact of segregation on children and youth, nor did it require the plaintiffs to identify a specific degree of adverse psychological impact necessary to support an Equal Protection claim. And the *Shelby County* Court did not require the states seeking invalidation of the coverage formula to identify a specific gap between white and black voter registration percentages or a specific percentage of proposed voting changes facing objections from the Attorney General at which Congress would be constitutionally barred from displacing the states' rights to administer elections. Rather, in all of the cases, the Supreme Court treated the empirical analyses as *evidence* of a violation of an established constitutional standard—that governmental entities must act impartially, that governmental entities must not invidiously discriminate based on race or national origin, that the federal government may not interfere in traditional areas of state authority absent a compelling justification, and that the federal government must have a legitimate reason for subjecting the laws of certain states to more intrusive scrutiny than those of other states.

Contrary to Legislative Defendants' assertion, therefore, courts are not foreclosed from considering statistical analyses and "'social science' theories" as evidence of a violation of a constitutional or statutory standard. Leg. Defs.' Br. 2. But that does not mean courts must blindly accept such analyses either. On the contrary, in all cases courts play an essential gatekeeping role in ensuring that an expert analysis—including each analysis introduced by Plaintiffs and Legislative Defendants—is sufficiently reliable, in that it "is based on sufficient facts or data," "is the product of reliable principles and methods," and the principles and methods have "been reliably applied . . . to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). And when, as here, the court also serves as the finder-of-fact, the court must carefully weigh empirical evidence, and discount such evidence's probative value if it fails to address the relevant question, lacks rigor, is contradicted by more reliable and compelling evidence, or is otherwise unworthy of substantial weight.

Here, in arguing that Plaintiffs' empirical evidence fails to provide a judicially manageable standard for adjudicating their claims, Legislative Defendants identify what they see as a number of specific flaws, limitations, and weaknesses of that evidence—that the partisan asymmetry measures cannot be applied in all states, that the simulated maps fail to take into account certain criteria on which the General Assembly relied, that several of the analyses rely on hypothetical election results, to name a few. We find these objections either unfounded or insufficiently compelling to overcome the significant probative value of the analyses, *see infra* Part III. Tellingly, as evidenced by their consistent placement of "social science" in quotation marks and their characterization of

116

Plaintiffs' evidence as "academically inspired," Legislative Defendants' judicial manageability argument more aptly rests on the belief that we should dismiss Plaintiffs' actions as nonjusticiable simply because much of the evidence upon which Plaintiffs' rely has its genesis in academic research and is the product of an effort by scholars to apply novel, and sometimes complex, methodological approaches to address a previously intractable problem. Such an argument must fail as a matter of fact and law.

As a matter of fact, we recognize that the application of Plaintiffs' empirical methods to redistricting, to date, has largely occurred in academic research. *But see Raleigh Wake Citizens Ass'n v. Wake Cty. Bd. of Elections*, 827 F.3d 333, 344 (4th Cir. 2016) (relying on analysis of hundreds of computer-simulated districting plans as evidence that population deviations in municipal districting plan were attributable to illegitimate partisan purpose rather than legitimate redistricting objectives); *Whitford*, 218 F. Supp. 3d at 890–906 (relying on predictions of vote percentages based on historical election data, a "uniform swing analysis," and a measure of partisan asymmetry to conclude Wisconsin legislative redistricting plan adversely affected representational rights of non-Republican voters). But the empirical methods themselves have been developed and broadly applied inside and outside of academia to address a wide variety of problems. For example, Dr. Chen testified that the computational algorithms and statistical theories he used in generating simulated redistricting plans to assess the partisan performance of the 2016 Plan are used by logistics companies to optimize their distribution chains. Trial Tr. II, at 25:2-24. And other empirical methods on which Plaintiffs' expert witnesses relied are broadly used by governments, the business

117

community, and academia in a variety of other fields ranging from national defense, to public safety, to finance, and to health care. Trial Tr. I, at 41:4–8; Br. *Amicus Curiae* Eric S. Lander in Supp. of Appellees 23–25, *Gill v. Whitford*, No. 16-1161 (S. Ct. Aug. 31, 2017).

To hold that such widely used, and relied upon, methods cannot provide a judicially manageable standard for adjudicating Plaintiffs' partisan gerrymandering claims would be to admit that the judiciary lacks the competence—or willingness—to keep pace with the technical advances that simultaneously facilitate such invidious partisanship and provide an opportunity to remedy it. *See Vieth*, 541 U.S. at 312 (Kennedy, J., concurring in the judgment) (explaining that advances in technology in redistricting pose both a "threat"—because technology increases "the temptation to use partisan favoritism in districting"—and a "promise"—because "these new technologies may produce new methods of analysis that make more evident the precise nature of the burdens gerrymanders impose on the representational rights of voters and parties"); *see also Gill*, 138 S. Ct. at 1941 (Kagan, J., concurring) ("[T]echnology makes today's gerrymandering altogether different from the crude linedrawing of the past."). But "the Constitution forbids 'sophisticated as well as simpleminded modes of discrimination.'" *Reynolds*, 377 U.S. at 563 (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)). Accordingly, the judiciary likewise has an obligation to keep pace with technological and methodological advances so it can effectively fulfill its constitutional role to police ever-more sophisticated modes of discrimination.

118

As a legal matter, the empirical analyses' sophistication and genesis in academic research also do not preclude this Court from concluding that Plaintiffs' claims are judicially manageable. To be sure, the statistical analyses and social science theories used by Plaintiffs' experts are more advanced than the bare descriptive statistics upon which the Supreme Court relied in *Yick Wo*, *Gomillion*, and *Shelby County*. But the Court has not hesitated to accept sophisticated or novel empirical methods as evidence. For example, in *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court endorsed the use of "extreme case analysis and bivariate ecological regression analysis," *id.* 52–53, in determining whether an electoral district exhibits "racially polarized" voting, within the meaning of Section 2 of the Voting Rights Act, *id.* at 61 (plurality op.). Notably, both forms of analysis derived from social science literature, as did the definition of "racially polarized" voting adopted by the Court. *Id.* at 53 nn.20–21. Outside of the voting context, the Supreme Court has embraced new social science theories and empirical analyses to resolve a variety of constitutional and statutory disputes. *See, e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2280–81, 2285–87 (2018) (relying extensively on theoretical economic literature in holding that court reviewing antitrust challenge to a two-sided transaction platform must consider "both sides" of the market in "rule of reason" analysis); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 881–82, 889–92 (2007) (appealing to "the theoretical literature" and a variety of economic analyses to support its decision to reverse century-old precedent treating vertical price restraints as a per se violation of the Sherman Act); *Utah v. Evans*, 536 U.S. 452, 465 (2002) (holding that Census Bureau's use of "hot-deck imputation" to conduct

119

decennial census did not violate census statute or the Constitution, relying on the "technical literature" to determine whether hot-deck imputation constitutes "sampling"); *Maryland v. Craig*, 497 U.S. 836, 855, 857 (1990) (appealing to "the growing body of academic literature documenting the psychological trauma suffered by child abuse victims who must testify in court" in holding that the Confrontation Clause did not categorically prohibit state laws permitting victims of child abuse to testify outside the presence of their alleged abuser).

As the judiciary's understanding and application of statistical and empirical methods have increased, it has come to appreciate that the attractive simplicity of less sophisticated methods—like the descriptive statistics relied on in *Yick Wo*, *Gomillion*, and *Shelby County*—comes with costs. In particular, descriptive statistics rarely provide, as a statistical matter, a basis for making causal inferences. *See* Jeffrey M. Wooldridge, Econometric Analysis of Cross Section and Panel Data § 1.1 (2002) ("The notion of ceteris paribus—that is, holding all other (relevant) factors fixed—is the crux of establishing a causal relationship. Simply finding that two variables are correlated is rarely enough to conclude that a change in one variable causes a change in another."); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 800 (2011) ("[C]orrelation [is] not evidence of causation."). For example, although descriptive statistics may reveal that an allegedly disfavored group of employees has a lower average salary than another group, that does not mean that the average salary difference is attributable to invidious discrimination, as the allegedly disfavored group's lower average salary may reflect a variety of nondiscriminatory reasons that can be accounted for adequately only by using

120

more advanced statistical methods. *See Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988) (Posner, J.) ("Correlation is not causation."); *Ste. Marie v. E. R.R. Ass'n*, 650 F.2d 395, 400 (2d Cir. 1981) (Friendly, J.).

Advances in statistical and empirical theory and application, therefore, have the potential to allow parties, experts, and amici to provide courts with more rigorous and probative evidence, thereby decreasing the risk that courts will render a decision that later proves to have rested on an errant empirical analysis. Consequently, it makes no practical or legal sense for courts to close their eyes to new scientific or statistical methods—as Legislative Defendants implicitly suggest—to prove or disprove claims premised on established legal standards. As Justice Kennedy recognized in *Vieth*, "new technologies may produce new methods of analysis that make more evident the precise nature of the burdens gerrymanders impose on the representational rights of voters and parties." 541 U.S. at 312–13. That is precisely what we find Plaintiffs' empirical methods have done. *See infra* Part III.B.

More fundamentally, there is no constitutional basis for dismissing Plaintiffs' claims as judicially unmanageable—not because they are irrelevant, unreliable, or incorrectly applied, but simply because they rely on new, sophisticated empirical methods that derive from academic research. The Constitution does not require the federal courts to act like Galileo's Inquisition and enjoin consideration of new academic research, and the knowledge gained therefrom, simply because such research provides a new understanding of how to give effect to our long-established governing principles. *See* Timothy Ferris, Coming of Age in the Milky Way 97–101 (1989). That is not what

the founding generation did when it adopted a Constitution grounded in the then-untested political theories of Locke, Montesquieu, and Rousseau. That is not what the Supreme Court did when it recognized that advances in our understanding of psychology had proven that separate could not be equal. And that is not what we do here.

Legislative Defendants' characterization of the empirical evidence introduced by Plaintiffs' as a "smorgasbord" also suggests that Legislative Defendants view the sheer number of analyses upon which Plaintiffs' rely as rendering their claims judicially unmanageable. Leg. Defs.' Br. 2. But when a variety of different pieces of evidence, empirical or otherwise, all point to the same conclusion—as is the case here—courts have *greater* confidence in the correctness of the conclusion because even if one piece of evidence is subsequently found infirm other probative evidence remains. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 293, 296 (1999) (holding that exculpatory evidence withheld by government was not "material" for purposes of *Brady v. Maryland*, 373 U.S. 83 (1963), when "there was considerable forensic and other physical evidence linking [the defendant] to the crime"). Even if none of the analyses introduced by Plaintiffs could, by itself, provide definitive evidence that the 2016 Plan constitutes an unconstitutional partisan gerrymander—which we do not necessarily believe is the case—"[a] case of discrimination can . . . be made by assembling a number of pieces of evidence, none meaningful in itself, consistent with the proposition of statistical theory that a number of observations, each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction: a number

of weak proofs can add up to a strong proof." *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (Posner, J.) (internal quotation marks omitted).

In sum, Plaintiffs' reliance on academically derived, social science evidence to support their partisan gerrymandering claims does not render their claims judicially unmanageable.

### c. Congress's Decision To Require Single-Member Districts

Finally, Legislative Defendants contend that rejecting their nonjusticiability argument would be tantamount to nullifying the political branches' decision to require representatives to be elected from single-member districts. *See* Leg. Defs.' Br. 13 ("[W]hat plaintiffs are asking the Court to do is *sub silentio* eliminate district-based congressional redistricting in North Carolina."). Again, we disagree.

By statute, each State must "establish[] by law a number of districts equal to the number of Representatives to which such State is so entitled, and Representatives shall be elected only from districts so established, no district to elect more than one Representative." 2 U.S.C. § 2c. Consistent with that statutory obligation, our invalidation of the 2016 Plan as an unconstitutional partisan gerrymander in no way impacts North Carolina's authority—indeed, statutory obligation—to draw a congressional redistricting plan using single-member districts. Rather, it simply requires that the General Assembly, in drawing congressional district lines, not seek to diminish or minimize the electoral power of voters who supported or are likely to support candidates of a particular party.

123

Of equal significance, judicial restriction of partisan gerrymandering advances the purpose behind single-member districts, rather than undermines it. The Supreme Court long has recognized that the "basic aim" of requiring districting is to "achiev[e] . . . fair and effective representations for all citizens." *Reynolds*, 377 U.S. at 565–66. To that end, "[t]he very essence of districting is to produce a different—a more 'politically fair'—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats." *Gaffney*, 412 U.S. at 753. The use of districting, as opposed to elections at large, serves a number of specific beneficial purposes. For example, unlike at-large electoral systems, which in politically divided states can lead to a wholesale change in the state's congressional delegation with only a small shift in votes between parties, *see* Engstrom, *supra* at 22–28, single-member districting systems "maintain[] relatively stable legislatures in which a minority party retains significant representation," *Vieth*, 541 U.S. at 360 (Breyer, J., dissenting). Additionally, single-member districts "diminish the need for coalition governments" and thereby "make[] it easier for voters to identify which party is responsible for government decision-making (and which rascals to throw out)." *Id.* at 357. And single-member districts make it easier for a representative to understand the interests of her constituency and act on behalf of those interests because she serves a limited group of constituents, rather than the entire state. S. Rep. 90-291, at 28 (1967) (Individual Views of Sen. Bayh). The use of single-member districts comes with democratic costs, as well. Most notably, the stability achieved by single-member districts necessarily entails that a legislative body will be less responsive to shifts in popular will.

124

Our Supreme Court defines "partisan gerrymandering" as "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power," *Ariz. State Leg.*, 135 S. Ct. at 2658. Thus, by definition, partisan gerrymandering—not judicial oversight of such gerrymandering—contravenes the purpose of district-based congressional districting because it is intended *not* to "achiev[e] . . . fair and effective representations for *all* citizens," *Reynolds*, 377 U.S. at 565–66 (emphasis added), and *not* to produce a "more 'politically fair'" result, *Gaffney*, 412 U.S. at 753. And partisan gerrymandering undermines several of the specific benefits of single-member districts. It poses a risk that "a representative may feel more beholden to the cartographers who drew her district than to the constituents who live there." *LULAC*, 548 U.S. at 470 (Stevens, J., concurring in part and dissenting in part). And by "entrenching" a party in power, *Ariz. State Leg.*, 135 S. Ct. at 2658, even in the face of shifting voter preferences, *LULAC*, 548 U.S. at 470–71 (Stevens, J., concurring in part and dissenting in part), partisan gerrymandering makes it harder for voters "to throw the rascals out," *Vieth*, 541 U.S. at 357 (Breyer, J., dissenting) (internal quotation marks omitted), magnifying the downsides to the use of single-member districts.

Not only does partisan gerrymandering contradict the purpose behind single-member districting—and enhance its drawbacks—the legislative history of Section 2c reveals that Congress did not intend for the statute to empower state legislatures to engage in partisan gerrymandering. Congress adopted the current version of the single-member district statute in 1967, in the wake of the Supreme Court's invalidation of widespread malapportionment of congressional districts in *Wesberry*. S. Rep. 90-291, at

125

2.  The draft of the statute reported out of the House required that congressional districts be "in as reasonably a compact form as the State finds practicable." *Id.* at 4.  The House intended for the compactness requirement to reflect a "congressional policy against gerrymandering" and to "prevent gerrymandering," including gerrymandering to "attempt 'to minimize or cancel out the voting strength of racial or *political elements* of the voting population.'" *Id.* (emphasis added) (quoting *Burns v. Richardson*, 384 U.S. 73, 89 (1965)).  Congress removed the compactness provision from the final version of the statute after a group of senators expressed concern that the ambiguity of the reasonableness standard would be "an invitation to gerrymander, especially to gerrymander at the expense of urban minority groups." *Id.* at 19 (Minority Views of Sens. Kennedy, Dodd, Hart, and Tydings).  Accordingly, although legislators were divided as to whether the compactness provision would be an effective tool to combat gerrymandering, they agreed that the statute should not serve as an "invitation" to state legislatures to engage in gerrymandering, as we find Legislative Defendants did here.

* * * * *

In sum, we conclude that Plaintiffs have standing to lodge a partisan vote dilution challenge under the Equal Protection Clause to each of the districts in the 2016 Plan and to assert claims under the First Amendment and Article I challenging the 2016 Plan as a whole.  We further hold that each of Plaintiffs' claims is justiciable, and, in reaching that conclusion, we reject Legislative Defendants' argument that Plaintiffs have failed to provide this Court with a judicially manageable standard for resolving their claims.

III.    EQUAL PROTECTION

Having disposed of Legislative Defendants' standing and justiciability arguments, we now turn to Plaintiffs' claims under the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. Partisan gerrymandering runs afoul of the Equal Protection Clause because, by seeking to diminish the electoral power of supporters of a disfavored party, a partisan gerrymander treats individuals who support candidates of one political party less favorably than individuals who support candidates of another party. *Cf. Lehr v. Robertson*, 463 U.S. 248, 265 (1983) ("The concept of equal justice under law requires the State to govern impartially."). Put differently, a redistricting plan violates the Equal Protection Clause if it "serve[s] *no purpose* other than to favor one segment—whether racial, ethnic, religious, economic or *political*—that may occupy a position of strength . . . or to disadvantage a politically weak segment." *Karcher*, 462 U.S. at 748 (Stevens, J. concurring).

## A.    BACKGROUND LAW

As this Court explained in denying Defendants' motions to dismiss, the Supreme Court's splintered partisan gerrymandering decisions establish that in order to prove a prima facie partisan gerrymandering claim under the Equal Protection Clause, "a plaintiff must show both [1] discriminatory intent and [2] discriminatory effects." *Common Cause*, 240 F. Supp. 3d at 387 (citing *Bandemer*, 478 U.S. at 127 (plurality op.); *id.* at 161 (Powell, J., concurring and dissenting)). Plaintiffs further propose—and we agree— that if Plaintiffs establish that the 2016 Plan was enacted with discriminatory intent and resulted in discriminatory effects, the plan will nonetheless survive constitutional scrutiny

127

if its discriminatory effects are attributable to the state's political geography or another legitimate redistricting objective. League Br. 21; Common Cause Br. 17–19; *see also Bandemer*, 478 U.S. at 141–42 (plurality op.) (recognizing justification step); *cf. Whitford*, 218 F. Supp. 3d at 884 ("[T]he Equal Protection clause prohibit[s] a redistricting scheme which (1) is intended to place a severe impediment on the effectiveness of the votes of individual citizens on the basis of their political affiliation, (2) has that effect, and (3) cannot be justified on other, legitimate legislative grounds.").

Importantly, because the injury giving rise to a partisan vote dilution claim is personal in nature, *Gill*, 138 S. Ct. at 1930 (majority op.), partisan vote dilution claims under the Equal Protection Clause, like racial gerrymandering claims, must proceed on a district-by-district basis. Accordingly, each of the three elements of a partisan vote dilution claim must be satisfied for each district. Although the three-step framework governing partisan gerrymandering claims under the Equal Protection Clause is not in dispute, neither the Supreme Court nor the parties agree as to the standard of proof for each of those elements—or whether Plaintiffs satisfied those standards—the questions to which we now turn.

1.    Discriminatory Intent

The Supreme Court long has required that a plaintiff seeking relief under the Equal Protection Clause to establish that a challenged official action can "be traced to a . . . discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 240 (1976). The discriminatory purpose or intent requirement extends to Equal Protection challenges to redistricting plans, in particular, including partisan gerrymandering challenges. *See, e.g.*,

128

*Bandemer*, 478 U.S. at 127 (plurality op.); *id.* at 161 (Powell, J., concurring in part and dissenting in part); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982); *see also Cooper*, 137 S. Ct. at 1463 (holding that to establish a racial gerrymandering claim under the Equal Protection Clause, a plaintiff must show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district" (internal quotation marks omitted)).

To establish a discriminatory purpose or intent, a plaintiff need not show that the discriminatory purpose is "express or appear[s] on the face of the statute." *Washington*, 426 U.S. at 241. Rather, "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Id.* at 242; *see also Covington*, 138 S. Ct. at 2553 (affirming district court's finding, based on "circumstantial . . . evidence concerning the shape and demographics of [the challenged] districts," that race predominated in the drawing of district lines, notwithstanding that legislature expressly directed mapdrawers not to consider race in drawing the districts).

In determining whether an "invidious discriminatory purpose was a motivating factor" behind the challenged action, evidence that the impact of the challenged action falls "more heavily" on one group than another "may provide an important starting point." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "Sometimes a clear pattern, unexplainable on grounds other than [invidious discrimination], emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* Likewise, "[t]he historical background of the decision" may be probative of discriminatory intent, "particularly if it reveals a series of

129

official actions taken for invidious purposes." *Id.* at 267. "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes," including whether the legislative process involved "[d]epartures from the normal procedural sequence." *Id.* Additionally, "[t]he legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports." *Id.* at 268.

Although the discriminatory intent requirement and the forms of evidence probative of such intent are well-established, it remains unclear what *type* of intent a partisan gerrymandering plaintiff must prove. As explained above, there are a number of purposes for which a state redistricting body permissibly may rely on political data or take into account partisan considerations. *See supra* Part II.B.2.a.iii. Accordingly, a plaintiff in a partisan gerrymandering case cannot satisfy the discriminatory intent requirement simply by proving that the redistricting body intended to rely on political data or to take into account political or partisan considerations. Rather, the plaintiff must show that the redistricting body intended to apply partisan classifications "in an invidious manner or in a way unrelated to any legitimate legislative objective." *Vieth*, 541 U.S. at 307 (Kennedy, J., concurring in the judgment); *id.* at 339 (Stevens, J., dissenting) (holding redistricting plan would violate Equal Protection Clause if it reflected "a naked desire to increase partisan strength"); *see also Romer v. Evans*, 517 U.S. 620, 632 (1996) (defining an "invidious" classification as "a classification of persons undertaken for its own sake . . . inexplicable by anything but animus towards the class it affects"). To that

130

end, a plaintiff satisfies the discriminatory purpose or intent requirement by introducing evidence establishing that the state redistricting body acted with an intent to "subordinate adherents of one political party and entrench a rival party in power." *Ariz. State Leg.*, 135 S. Ct. at 2658.

Another question bearing on the discriminatory intent requirement is what *level* of intent a plaintiff must prove to establish a partisan gerrymandering claim. Common Cause Plaintiffs assert that the degree of partisan intent motivating the drawing of the districting plan's lines determines the level of scrutiny under which a court must review the plan. Common Cause Br. 16–18. For example, if a partisan purpose "predominated" over other legitimate redistricting criteria, then the 2016 Plan warrants strict scrutiny, Common Cause Plaintiffs maintain. *Id.* at 17. If partisan advantage was only "a purpose" motivating the 2016 Plan, then, according to Common Cause Plaintiffs, the plan should be reviewed under the "sliding scale" standard of review set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Common Cause Br. 18. By contrast, League Plaintiffs assert that a plaintiff need not prove that invidious partisanship "predominated" over other legitimate redistricting criteria, instead arguing that a partisan gerrymandering plaintiff will meet its burden under the intent prong if it proves that the redistricting body acted with the intent to "disadvantage[e] one party's (and favor[] the other party's) voters and candidates." League Br. at 5.

League Plaintiffs' position that a plaintiff asserting a partisan vote dilution claim under the Equal Protection Clause need not show that partisan considerations

131

"predominated" over other legitimate, non-partisan redistricting criteria finds support in Supreme Court precedent. In *Bandemer*, the plurality opinion did not require that a plaintiff establish that the mapmakers were solely or primarily motivated by invidious partisanship, but instead required proof of "intentional discrimination against an identifiable political group." 478 U.S. at 127. And in describing the general intent requirement for Equal Protection claims in *Arlington Heights*, the Supreme Court held that a plaintiff generally need not prove that a legislature took a challenged action with the "sole," "dominant," or "primary" purpose of discriminating against an identifiable group. 429 U.S. at 265–66.

The Supreme Court, however, has recognized one exception to the general rule set forth in *Arlington Heights*: to establish a *Shaw*-type racial gerrymandering claim under the Fourteenth Amendment, a plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. There are compelling theoretical arguments against extending the "predominance" requirement applicable in such racial gerrymandering actions to partisan gerrymandering claims. To begin, the Supreme Court expressly has characterized *Shaw*-type racial gerrymandering claims as "'analytically district' from a vote dilution claim." *Id.* at 911 (quoting *Shaw I*, 509 U.S. at 652). Because Plaintiffs' Equal Protection claim is grounded in a partisan vote dilution theory, there is good reason to question the applicability of precedent bearing on an "analytically distinct" form of claim.

132

More significantly, the constitutional violation in a *Shaw*-type racial gerrymandering case consists of "separat[ing] voters into different districts on the basis of race." *Shaw I*, 509 U.S. at 649. Accordingly, to state a prima facie case of racial gerrymandering a plaintiff *need not show* that a legislative mapdrawer segregated voters on the basis of race *to disadvantage members of one racial group relative to another*. *See Miller*, 515 U.S. at 904 ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination . . . regardless of the race of those burdened or benefitted by a particular classification." (internal quotation marks omitted)); *Shaw I*, 509 U.S. at 650–51; *Covington*, 316 F.R.D. at 129 ("[A] finding that race was the predominant motive drawing a district does not . . . signify that the legislature acted . . . with discriminatory intent in its redistricting."). Notably, the Supreme Court expressly has distinguished *Shaw*-type racial gerrymandering claims from claims that a "State has enacted a particular voting scheme as a *purposeful device* 'to minimize or cancel out the voting potential of racial or ethnic minorities'"—*i.e.* districting schemes that *invidiously* discriminate on the basis of race. *See Miller*, 515 U.S. at 911 (emphasis added) (quoting *Mobile v. Bolden*, 446 U.S. 55, 66 (1980), *superseded by statute on other grounds as recognized by Thornburg v. Gingles*, 478 U.S. 30, 35 (1986)). In the latter type of cases, a plaintiff need not prove that the redistricting body's *invidious* purpose predominated. *See Bolden*, 446 U.S. at 66 (plurality op.).

Under the Supreme Court's definition of "partisan gerrymandering" a plaintiff must show that the legislative mapdrawer segregated voters on the basis of partisanship for an *invidious* purpose—to "subordinate adherents of one political party and entrench a

rival party in power." *Ariz. State Leg.*, 135 S. Ct. at 2658. That a partisan gerrymandering plaintiff must meet the heightened burden of showing invidiousness weighs heavily against extending the predominance requirement for *Shaw*-type racial gerrymandering claims to partisan gerrymandering claims.

Nevertheless, in *Gill*, the Supreme Court expressly analogized partisan gerrymandering claims to *Shaw*-type racial gerrymandering claims and appealed to precedent regarding such claims in justifying its holding, 138 S. Ct. at 1930, suggesting that the Supreme Court may import into its partisan gerrymandering jurisprudence the predominance requirement it applies in *Shaw*-type racial gerrymandering cases. Accordingly, we assume that a plaintiff asserting a partisan vote dilution claim under the Equal Protection Clause faces the heightened burden of proving that a legislative mapdrawer's predominant purpose in drawing the lines of a particular district was to "subordinate adherents of one political party and entrench a rival party in power."[23] *Ariz. State Leg.*, 135 S. Ct. at 2658.

## 2. Discriminatory Effects

The discriminatory effects prong is the principal reason the Supreme Court has failed to agree on a standard for proving a partisan gerrymandering claim.[24] For nearly

---

[23] Because we find that invidious partisanship *predominated* in the drawing of twelve the thirteen districts in the 2016 Plan, *see infra* Part III.B.2, Plaintiffs necessarily satisfy their burden under the intent prong regardless of whether the Supreme Court adopts the heightened predominance standard we assume applies.

[24] As a theoretical matter, there is good reason to question whether a partisan vote dilution plaintiff who has proven that a state districting body was predominantly
(Continued)

134

two decades, the plurality opinion in *Bandemer* provided what was widely treated as the controlling test for determining whether a redistricting plan had the effect of discriminating against voters based on their partisan affiliation. *See, e.g.*, *Pope*, 809 F. Supp. at 395 ("[The *Bandemer*] plurality opinion must be considered controlling as the position which concurs in the judgment on the narrowest grounds."). In *Bandemer*, a group of Indiana Democrats sued Indiana state officials alleging that the State's decennial state legislative redistricting—which was enacted by a Republican-controlled legislature and approved by a Republican governor—violated the Equal Protection Clause by

---

motivated by invidious partisan considerations in drawing district lines should be required to demonstrate discriminatory effects. In particular, in *Shaw*-type racial gerrymandering claims—which do not require a showing of invidious intent and to which the *Gill* Court expressly appealed, *see supra* Part III.A.1—a plaintiff need not demonstrate that a districting plan's segregation of voters on basis of race yields discriminatory effects. *See Cooper*, 137 S. Ct. at 1464. Likewise, a plaintiff who has proven invidious racial gerrymandering need not show that such gerrymandering has resulted in discriminatory effects. *See Hunter v. Underwood*, 471 U.S. 222, 228 (1985) ("Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor.").

Additionally, once a plaintiff proves that a state districting body acted with invidious discriminatory intent, a discriminatory effects requirement effectively obligates a court to determine whether the body failed to achieve its intended goal. To do so, a plaintiff would seem to have to demonstrate either that the districting body was *not inept*—*i.e.* poorly implemented its predominant purpose in drawing the districting plan— or, alternatively, that the potential mutability of voter preferences *did not render futile* the districting body's effort to engage in invidious discrimination. We are not aware of any legal standard requiring a plaintiff to disprove that a legislative body was inept or intentionally engaged in a futile task. Notwithstanding these theoretical problems with the discriminatory effects requirement, we nevertheless assume *Bandemer* continues to control and that a partisan vote dilution plaintiff must prove that a districting plan drawn with invidious partisan intent yielded discriminatory effects.

135

intentionally discriminating against Democrats, notwithstanding that the plan satisfied the one-person, one-vote requirement. 478 U.S. at 113–14 (plurality op.). As evidence of the districting plan's discriminatory effects, the plaintiffs alleged that the legislature drew district lines that packed Democratic voters into certain districts and fragmented Democratic votes in other districts in order to debase Democratic voting strength. *Id.* at 115. Additionally, the legislature allegedly used multi-member districts to further diminish Democrats' voting strength. *Id.* In the first election following the redistricting, Democratic candidates received 51.9 percent of the vote but won 43 percent (43 of 100) of the seats in the state House. *Id.* In the Senate, Democratic candidates received 53.1 percent of the vote, and won 52 percent (13 of 25) of the seats up for election. *Id.*

Writing for a four-Justice plurality, Justice White stated that a partisan gerrymandering plaintiff must prove that it "has been unconstitutionally denied its chance to effectively influence the political process" or that the "electoral system [has been] arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Id.* at 132–33, 142-43. Because legislators are presumed to represent all of their constituents, "even in a safe district where the losing group loses election after election," a "mere lack of proportional representation will not be sufficient to prove unconstitutional representation." *Id.* at 132. Rather, a plaintiff must provide evidence "of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process." *Id.* at 133.

136

Applying this test, the plurality concluded the plaintiffs failed to meet their burden. *Id.* at 134. In particular, the plurality stated that the results of a single election were insufficient to demonstrate that Indiana Democrats would be relegated to minority status throughout the decade, particularly because Indiana was a "swing [s]tate" and voters would "sometimes prefer Democratic candidates, and sometimes Republican." *Id.* at 135. The plurality further emphasized that the district court did not find that the redistricting plan would preclude Democrats from taking control of the assembly in a subsequent election, nor did the district court ask "by what percentage the statewide Democratic vote would have had to increase to control either the House or the Senate." *Id.* And the plaintiffs provided no proof that the redistricting plan would "consign the Democrats to a minority status in the Assembly throughout the [decade]." *Id.*

The *Bandemer* plurality's discriminatory effects test proved virtually impossible for future plaintiffs to satisfy. *See, e.g.*, *Pope*, 809 F. Supp. at 397 (dismissing partisan gerrymandering action because the plaintiffs did "not allege, nor c[ould] they, that the state's redistricting plan . . . caused them to be 'shut out of the political process'" or that they had "been or w[ould] be consistently degraded in their participation in the entire political process"); *Badham v. Eu*, 694 F. Supp. 664, 670 (N.D. Cal. 1988) (dismissing partisan gerrymandering claim because the plaintiffs failed to allege any "interfer[ence] with [the allegedly disfavored party's] registration, organizing, voting, fund-raising, or campaigning" or that the interests of supporters of the disfavored party were "being 'entirely ignore[d]' by their congressional representatives" (third alteration in original) (quoting *Bandemer*, 478 U.S. at 132)). As one commentator explained, "by its

137

impossibly high proof requirements the Court in *Bandemer* essentially eliminated political gerrymandering as a meaningful cause of action, but only after it had essentially declared the practice unconstitutional." John Hart Ely, *Gerrymanders: The Good, the Bad, and the Ugly*, 50 Stan. L. Rev. 607, 621 (1998); *see also* Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, The Law of Democracy 563 (1998) ("*Bandemer* has served almost exclusively as an invitation to litigation without much prospect of redress.").

In *Vieth*, all of the Justices rejected *Bandemer*'s discriminatory effects test. 541 U.S. at 283 (plurality op.) ("Because this standard was misguided when proposed [and] has not been improved in subsequent application, . . . we decline to affirm it as a constitutional requirement."); *id.* at 308 (Kennedy, J., concurring in the judgment); *id.* at 318, 339 (Stevens, J., dissenting); *id.* at 344–45 (Souter, J., dissenting); *see id.* at 360 (Breyer, J., dissenting). And the Justices appeared to agree that one of the principal problems with the *Bandemer* plurality's discriminatory effects test is that it created an evidentiary standard so high that no plaintiff could satisfy it, even in the face of strong evidence of partisan discrimination. *See id.* at 280–81 (plurality op.) (noting that under *Bandemer*'s test, "several districting plans . . . were upheld despite allegations of extreme partisan discrimination, bizarrely shaped districts, and disproportionate results"); *id.* at 312 (Kennedy, J., concurring in the judgment) (rejecting *Bandemer*'s effects test as establishing "a single, apparently insuperable standard"); *id.* at 344–45 (Souter, J., dissenting) (rejecting *Bandemer* effects test on grounds that it "required a demonstration

138

of such pervasive devaluation over such a period of time as to raise real doubt that a case could ever be made out").

In light of *Vieth*'s rejection of *Bandemer*'s discriminatory effects test, there is an absence of controlling authority regarding the evidentiary burden a plaintiff must meet to prove that the boundaries of a particular district have the effect of discriminating against voters who are likely to support a disfavored candidate or party. However, the Supreme Court's two most recent cases discussing partisan gerrymandering—*Gill* and *Arizona Independent Redistricting Commission*—provide some guidance regarding what a plaintiff must show to prove discriminatory effects resulting from district lines drawn on the basis of invidious partisanship. In *Gill*, the Court held that the injury in a partisan vote dilution case "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would in another, hypothetical district." 138 S. Ct. at 1931. Put differently, the "burden" giving rise to a partisan vote dilution claim "arises through a voter's placement in a 'cracked' or 'packed' district." *Id.* Likewise, in *Arizona Independent Redistricting Commission* defined partisan gerrymandering as, in part, "subordinates adherents of one political party." *Ariz. State Leg.*, 135 S. Ct. at 2658. Accordingly, the lines of a particular district have the effect of discriminating against—or subordinating—voters who support candidates of a disfavored party, if the district dilutes such voters' votes by virtue of cracking or packing.

*Arizona Independent Redistricting Commission* further defined partisan gerrymandering as "entrenching a rival party in power." *Ariz. State Leg.*, 135 S. Ct. at

139

2658.    The Supreme Court's reference to entrenchment addresses another principal constitutional concern with partisan gerrymandering—that it insulates legislators from popular will and renders them unresponsive to portions of their constituencies.  *See Reynolds*, 377 U.S. at 565 ("Since legislatures are responsible for enacting laws by which all citizens are to be governed, they should be bodies which are collectively responsible to the popular will.").    As the Supreme Court explained with regard to racial gerrymanders, "[w]hen a district obviously is created solely to effectuate the perceived common interests of one . . . group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole."  *Shaw I*, 509 U.S. at 648.  To prove entrenchment, a plaintiff need not meet *Bandemer*'s "apparently insuperable standard," *id.* at 312 (Kennedy, J., concurring in the judgment), which required a showing that supporters of a disfavored party had been entirely ignored by their representatives and for years had been frozen out of key aspects of the political process.  Instead, a plaintiff must show that the dilution of the votes of supporters of a disfavored party in a particular district—by virtue of cracking or packing—is likely to persist in subsequent elections such that an elected representative from the favored party in the district will not feel a need to be responsive to constituents who support the disfavored party.

### 3.    Lack of Justification

The justification prong examines whether districts' discriminatory partisan effects are justified by a legitimate state districting interest or neutral explanation.  *See Vieth*, 541 U.S. at 307 (Kennedy, J., concurring in the judgment) (noting that "[a] determination

140

that a gerrymander violates the law" must "rest . . . on a conclusion that [political] classifications . . . were applied in . . . a way unrelated to any legitimate legislative objective"); *Bandemer*, 478 U.S. at 141 ("If there were a discriminatory effect and a discriminatory intent, then the legislation would be examined for valid underpinnings."). As a general matter, once a plaintiff establishes a prima facie case that the boundaries of a challenged district violate the Equal Protection Clause, the burden shifts to the governmental defendant to prove that a legitimate state interest or other neutral factor justified such discrimination. *See, e.g.*, *Cooper*, 137 S. Ct. at 1464 (racial gerrymandering); *Brown*, 462 U.S. at 842–43 (one-person, one-vote). Plaintiffs contend—and Legislative Defendants do not dispute—that the same burden-shifting approach applies in partisan gerrymandering cases.[25] Accordingly, once a plaintiff establishes a prima facie case of partisan vote dilution, the burden shifts to the defendant to prove that a district's or districts' discriminatory effects are attributable to a legitimate state interest or other neutral explanation.

---

[25] The district court in *Gill* expressly declined to determine whether, at the justification inquiry, the burden shifts to the government defendant to prove that a districting plan's discriminatory partisan effects were attributable to a legitimate state interest. 218 F. Supp. 3d at 911. As explained above, the burden-shifting approach taken by the Supreme Court in analogous Equal Protection cases counsels in favor of placing the burden on Legislative Defendants. And unlike the defendants in *Whitford*, who expressly argued that the burden on the justification prong rested with the plaintiffs, *Whitford v. Nichol*, 180 F. Supp. 3d 583, 599 (W.D. Wis. 2016) (summary judgment order), Legislative Defendants have not argued that Plaintiffs have the burden to prove that 2016 Plan's discriminatory partisan effects were not justified by a legitimate state interests. Nevertheless, we find that even if the burden lies with Plaintiffs, Plaintiffs have propounded sufficient evidence of the 2016 Plan's lack of justification to meet such a burden.

## B.    APPLICATION

Having laid out the legal framework for a evaluating Plaintiffs' partisan vote dilution claim under the Equal Protection Clause, we now must determine whether Plaintiffs' evidence establishes that any, some, or all of the thirteen districts in the 2016 Plan constitute partisan gerrymanders.  Although partisan vote dilution claims, like racial gerrymandering claims, must proceed on a district-by-district basis, *Gill*, 138 S. Ct. at 1930 (majority op.), Plaintiffs can—and do—rely on statewide evidence to prove their partisan vote dilution claims, *see Ala. Leg. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015) ("Voters, of course, can present statewide *evidence* in order to prove racial gerrymandering in a particular district."); *Gill*, 138 S. Ct. at 1937 (Kagan, J., concurring) (stating that when district court, on remand, considers merits of partisan vote dilution claim under the Equal Protection Clause, "it can consider statewide (as well as local) evidence").  Accordingly, applying the legal framework set forth above, we first consider Plaintiffs' statewide evidence bearing on discriminatory intent, discriminatory effects, and lack of justification.  Then, we evaluate Plaintiffs' district-specific evidence bearing on each of the three prongs of a partisan vote dilution claim.

### 1.    Statewide Evidence

#### a.    *Intent*

The record in this case reflects that a wealth of statewide evidence proves the General Assembly's predominant intent to "subordinate" the interests of non-Republican voters and "entrench" Republican domination of the state's congressional delegation.  In particular, we find that the following evidence proves the General Assembly's

142

predominant discriminatory intent: (i) the facts and circumstances surrounding the drawing and enactment of the 2016 Plan, (ii) empirical analyses of the 2016 Plan, and (iii) the discriminatory partisan intent motivating the 2011 Plan, which the General Assembly expressly sought to carry forward when it drew the 2016 Plan.

i.

Several aspects of the 2016 redistricting process establish that the General Assembly sought to advance the interests of the Republican Party at the expense of the interests of non-Republican voters. *First*, Republicans had exclusive control over the drawing and enactment of the 2016 Plan. The Committee's Republican leadership and majority denied Democratic legislators access to the principal mapdrawer, Dr. Hofeller. Ex. 1011, at 36:9–20; Ex. 1014, at 44:23–45:15; Ex. 2008. And with the exception of one small change to prevent the pairing of Democratic incumbents, Dr. Hofeller finished drawing the 2016 Plan *before* Democrats had an opportunity to participate in the legislative process. Additionally, all of the key votes—including the Committee votes adopting the Political Data and Partisan Advantage criteria and approving the 2016 Plan, and the House and Senate votes adopting the 2016 Plan—were decided on a party-line basis. Ex. 1008, at 12:3–7, 67:10–72:8; Ex. 1011, at 110:13–22; Ex. 1016, at 81:6–16. As the *Bandemer* plurality recognized, when a single party exclusively controls the redistricting process, "it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." *Bandemer*, 478 U.S. at 129 (plurality op.); *Pope*, 809 F. Supp. at 396.

143

*Second*, the legislative process "[d]epart[ed] from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 267.  Representative Lewis and Senator Rucho instructed Dr. Hofeller regarding the criteria he should follow in drawing the 2016 Plan *before* they had been appointed co-chairs of the Committee and *before* the Committee debated and adopted those criteria.  Lewis Dep. 77:7–20.  Indeed, Dr. Hofeller completed drawing the 2016 Plan *before* the Committee met and adopted the governing criteria.  *Id.*  And notwithstanding that the Committee held public hearings and received public input, Dr. Hofeller never received, much less considered, *any* of that input in drawing the 2016 Plan.  Rucho Dep. 55:4–56:13; Hofeller Dep. 177:9–21.

*Third*, the plain language of the "Partisan *Advantage*" criterion reflects an express legislative intent to discriminate—to favor voters who support Republican candidates and subordinate the interests of voters who support non-Republican candidates.  Ex. 1007 (emphasis added).  Moreover, the Partisan Advantage criterion reflects an express intent to entrench the Republican supermajority in North Carolina's congressional delegation by seeking to "maintain" the partisan make-up of the delegation achieved under the unconstitutional 2011 Plan.  *Id.*

The official explanation of the purpose behind that criterion by Representative Lewis—who co-chaired the Committee and, in that capacity, developed the Adopted Criteria and oversaw the drawing of the 2016 Plan—demonstrates as much. Representative Lewis explained that "to the extent [we] are going to use political data in drawing this map, it is to gain partisan advantage."  Ex. 1005 at 54; *see also* Ex. 1016, at 29:12–13 ("We did seek a partisan advantage in drawing the map." (Statement of Rep.

144

Lewis)). To that end, the Partisan Advantage criterion required "draw[ing] lines so that more of the whole VTDs voted for the Republican on the ballot than they did the Democrat," he explained. Ex. 1005, 57:10-16. And Representative Lewis "acknowledge[d] freely that this would be a political gerrymander," *Id.* at 48:4–5—a sentiment with which Senator Rucho "s[aw] nothing wrong," Rucho Dep. 118:20–119:10.

*Fourth*, the process Dr. Hofeller followed in drawing the 2016 Plan, in accordance with Representative Lewis and Senator Rucho's instructions, reflected the General Assembly's intent to discriminate against voters who were likely to support non-Republican candidates. In particular, in accordance with the Political Data criterion, Dr. Hofeller used past election results—which Dr. Hofeller, Representative Lewis, and Senator Rucho agree serve as the best predictor of whether a geographic area is likely to vote for a Republican or Democratic candidate, Ex. 1016, at 30:23–31:3; Hofeller Dep. 25:1–17; Rucho Dep. 95:15–16—to create a composite partisanship variable indicating whether, and to what extent, a particular precinct was likely to support a Republican or Democratic candidate, Hofeller Dep. II 262:21–24, 267:5–6. Of particular relevance to the mapdrawers' intent to draw a plan that would favor Republicans for the remainder of the decade, Dr. Hofeller testified that he believed that because "the underlying political nature of the precincts in the state does not change," his composite partisanship variable indicated whether a particular precinct would be a "strong Democratic precinct [or Republican precinct] *in every subsequent election*." Ex. 2045, at 525:14–17 (emphasis added); *see also* Hofeller Dep. II 274:9–12 (explaining partisan characteristics of

145

particular VTD, as reflected in Dr. Hofeller's composite partisanship variable, are likely to "carry . . . through a string of elections").

Dr. Hofeller then used the partisanship variable to assign a county, VTD, or precinct "to one congressional district or another," Hofeller Dep. 106:23–107:1, 132:14–20, and "as a partial guide" in deciding whether and where to split VTDs, municipalities, or counties, *id.* 203:4–5; Hofeller Dep. II 267:10–17. For example, Dr. Hofeller split—or, in redistricting parlance, "cracked"—the Democratic city of Asheville between Republican Districts 10 and 11 and the Democratic city of Greensboro between Republican Districts 6 and 13. Ex. 4066, 4068. And Dr. Hofeller drew the Districts 4 and 12 to be "predominantly Democratic," Hofeller Dep. 192:7–12, by concentrating—or "packing"—Democratic voters in Durham, Mecklenburg, and Wake Counties in those two districts, Ex. 4070, Ex. 4072.

After drawing a draft plan, Dr. Hofeller then would use his partisanship variable to assess the partisan performance of the plan on a district-by-district basis and as a whole. *Id.* at 247:19–23; Hofeller Dep. II 283:15–22, 284:20–285:4. Based on that review, Dr. Hofeller would convey his assessment of the partisan performance of the plan to Representative Lewis. Hofeller Dep. II 290:17–25. The evidence establishes that Representative Lewis's appraisal of the various draft plans provided by Dr. Hofeller focused on such plans' likely partisan performance. Representative Lewis admitted as much during debate on the proposed map, stating that he believed "electing Republicans is better than electing Democrats," and therefore that he "drew this map in a way to help foster" the election of Republican candidates. Ex. 1016, at 34:21–23. And

146

Representative Lewis testified that when he assessed the draft plans, "[n]early every time" he used the results from North Carolina's 2014 Senate race between Senator Thom Tillis and former Senator Kay Hagan to evaluate the plans' partisan performance in "future elections."  Lewis Dep. 63:9–64:17.

ii.

We also find that empirical evidence reveals that the 2016 Plan "bears more heavily on [supporters of candidates of one party] than another."  *Washington*, 426 U.S. at 242.  In particular, two empirical analyses introduced by Plaintiffs demonstrate that the pro-Republican partisan advantage achieved by the 2016 Plan cannot be explained by the General Assembly's legitimate redistricting objectives, including legitimate redistricting objectives that take into account partisan considerations.

Dr. Jonathan Mattingly, a mathematics and statistics professor at Duke University and an expert in applied computational mathematics, drew an ensemble of 24,518 simulated districting plans from a probability distribution of *all* possible North Carolina congressional redistricting plans.  Ex. 3002, at 9–10.  To create the ensemble, Dr. Mattingly programmed a computer first to draw a random sample of more than 150,000 simulated plans using a Markov chain Monte Carlo algorithm—a widely employed statistical method used in a variety of settings[26]—that randomly perturbed the lines of an

---

[26] Dr. Mattingly testified that the Markov chain Monte Carlo algorithm was developed as part of the Manhattan Project and is widely used for a variety of purposes, including drug development, weather forecasting, and machine learning.  Trial Tr. I, at 41:4–8.

initial districting plan[27] to generate successive new plans. *Id.* at 13–15. The computer algorithm then eliminated from the 150,000 plan sample all "unreasonable" districting plans—plans with noncontiguous districts, plans with population deviations exceeding 0.1 percent, plans that were not reasonably compact under common statistical measures of compactness, plans that did not minimize the number of county and VTD splits, and plans that did not comply with the Voting Rights Act[28]—yielding the 24,518-plan ensemble.[29] *Id.* at 15–17. The criteria Dr. Mattingly used to eliminate "unreasonable" plans from his sample reflect traditional redistricting criteria, *see Harris*, 136 S. Ct. at 1306 (recognizing compactness, contiguity, maintaining integrity of political subdivisions, and, potentially, compliance with the Voting Rights Act, as "legitimate" considerations for deviations from population equality in state redistricting plans), and nearly all non-partisan criteria adopted by the Committee, *see* Ex. 1007.

---

[27] To ensure the choice of initial districting plan did not impact his results, Dr. Mattingly conducted his analysis using three different initial plans: (1) the 2011 Plan, (2) the 2016 Plan, and (3) a plan drawn by a bipartisan group of retired North Carolina judges who served as a simulated nonpartisan districting commission. Ex. 3004, at 27; Trial Tr. I, at 87:5-88:11. Dr. Mattingly found that the choice of initial plan did not impact his principal findings. Ex. 3004, at 27; Trial Tr. I, at 87:5-88:11.

[28] Dr. Mattingly's algorithm ensured compliance with the Voting Rights Act by requiring that any simulated plan included in the final ensemble include one district with a black voting-age population ("BVAP") of at least 40 percent and a second district with a BVAP of at least 33.5 percent. Trial Tr. I, at 41:23–25. Dr. Mattingly chose those thresholds because they were comparable to the BVAP percentages in the two highest BVAP districts in the 2016 Plan. *Id.* at 42:2–11.

[29] To test the robustness of his results to changes in his exclusion criteria, Dr. Mattingly re-ran his analyses using an ensemble of more than 119,000 simulated maps. Ex. 3040, at 31–32. The partisanship results he obtained using the larger ensemble mirrored those obtained using the smaller ensemble. *Id.*; Trial Tr. I, at 77:20–79:15.

148

After constructing the 24,518-plan ensemble, Dr. Mattingly analyzed the partisan performance of the 2016 Plan relative to the plans in his ensemble using precinct-level actual votes from North Carolina's 2012 and 2016 congressional elections.[30] Dr. Mattingly's analysis, therefore, "assumed that the candidate does not matter, that a vote for the Democrat or Republican will not change, even after the districts are rearranged." Ex. 3002, at 23. Dr. Mattingly found that 0.36 percent (89/24,518) of the plans yielded a congressional delegation of 9 Republicans and 4 Democrats—the outcome that would have occurred under the 2016 Plan—when he evaluated the ensemble using actual 2012 votes. *Id.* at 3; Ex. 3040, at 7. The ensemble most frequently yielded plans that would have elected 7 (39.52%) or 6 (38.56%) Republicans. Ex. 3002, at 4; Ex. 3040, at 7. Using actual 2016 congressional votes, a congressional delegation of 10 Republicans and 3 Democrats—the outcome that occurred under the 2016 Plan—occurred in less than 0.7 percent of the simulated plans (162/24,518), with a delegation of 8 Republicans and 5 Democrats occurring in approximately 55 percent of the plans. Ex. 3040 at 19. Put differently, using both actual 2012 or 2016 votes, more than 99 percent of the 24,518 simulated maps produced fewer Republican seats than the 2016 Plan. Trial Tr. I, at 35:9–10.

---

[30] Dr. Mattingly reasonably excluded the results from the 2014 election because one of the candidates in that election ran unopposed, meaning that there were no votes in that district from a contested election to use in performing his analysis. Ex. 3002, at 23. Legislative Defendants took no issue with this methodological choice.

Dr. Mattingly's analysis of the simulated plans also demonstrated that the General Assembly "cracked" and "packed" Democratic voters. Dr. Mattingly ordered the 13 congressional districts in each of the 24,518 simulated plans from lowest to highest based on the percentage of Democratic votes that would have been cast in the districts in the 2012 and 2016 elections. Ex. 3002, at 5–7. When analyzed using the results of both the 2012 and 2016 election, the medians of the Democratic vote share in each of the 13 districts "form a relatively straight, gradually increasing line from the most Republican district . . . to the most Democratic." *Id.* at 7; Ex. 3040, at 18, 30, 39. An identical plot of the Democratic vote percentages under a plan drawn by a bipartisan commission of former judges took on the same, gradually increasing linear form. Ex. 3040, at 18, 30, 39.

By contrast, when Dr. Mattingly conducted the same analysis using the 2016 Plan, he found that the line connecting the medians of the Democratic vote share in each of the 13 districts took on an "S-shaped" form, which Dr. Mattingly characterized as "the signature of gerrymandering," because the 2016 Plan places "significantly more Democrats in the three most Democratic districts and fairly safe Republican majorities in the first eight most Republican districts." Ex. 3002, at 8; Ex. 3040, at 18, 30, 39; Trial Tr. I, 35:19–22 ("[T]here were clearly many, many more Democrats packed into those Democratic districts [in the 2016 Plan]; and on the other hand, that allowed there to be many more Republicans in the next group of districts."). Using 2012 votes, for example, the percentage of votes cast for Democratic candidates in the three most Democratic districts (Districts 12, 4, and 1) in the 2016 Plan was significantly higher than the

percentage of votes cast for Democratic candidates in the three most Democratic districts in the 24,518 plan sample, and the percentage of votes cast for Democratic candidates in the eighth through tenth most Democratic districts (Districts 9, 2, and 13) was significantly lower than in the equivalent districts in the ensemble. Ex. 3002, at 6-7; Ex. 3040, at 29–30. And the percentage of votes cast for Democratic candidates in the sixth and seventh most Democratic district was below that of 75 percent of the plans in the ensemble. Ex. 3040, at 29–30; *see also* Trial Tr. I, at 60:6–23 (describing the sixth through thirteenth most Republican districts in 2016 Plan as "extreme outliers" relative to the simulated plans). Dr. Mattingly found the same pattern of packing Democratic voters in the three most Democratic districts when he used the votes from the 2016 election. Ex. 3002, at 6-7.



Figure 1: *The "signature" of gerrymandering*

To determine whether the 2016 Plan's pro-Republican bias could have resulted from chance, Dr. Mattingly analyzed how "slight[]" changes in the boundaries of the districts in the 2016 Plan impacted the plan's partisan performance. Trial Tr. I, at 36:3–12. That analysis found that "when [he] shifted just as little as 10 percent of the boundary," the new map produced a "very, very different" partisan result that was "[m]uch, much less advantageous to Republicans." *Id.* Dr. Mattingly performed a number of additional analyses to validate his results by assessing their sensitivity to changes in his model—including seeking to reduce the number of county splits in his sample, reducing the population deviation threshold, and altering the compactness

152

threshold—all of which confirmed the robustness of his results.[31]  Ex. 3040, at 35–38; Trial Tr. I, at 83:23–84:1, 85:9–20, 85:21–86:24.

Based on his principal analyses and sensitivity and robustness tests, Dr. Mattingly concluded that the 2016 Plan is "heavily gerrymandered" and "dilute[s] the votes" of supporters of Democratic candidates.  Ex. 3002, at 9.  He further concluded that the General Assembly could not "have created a redistricting plan that yielded [the pro-Republican] results [of the 2016 Plan] unintentionally."  Trial Tr. I, at 62:9–12; *see also id.* at 73:8–9 (stating the pro-Republican partisan results of the 2016 Plan, when analyzed using 2016 votes, "would be essentially impossible to generate randomly"); *id.* at 92:24–93:8 (opining that 2016 Plan was "specifically tuned" to achieve a pro-Republican "partisan advantage").  And Dr. Mattingly further opined "that it's extremely unlikely that one would have produced maps that had that level of packing here and that level of depletion [of Democratic votes] here unintentionally or using nonpartisan criteria."  *Id.* at 71:24–72:2.

We find that Dr. Mattingly's analyses, which he confirmed through extensive sensitivity testing, provide strong evidence that the General Assembly's predominant intent in drawing the 2016 Plan was to dilute the votes of voters likely to support

---

[31] At trial, Common Cause Plaintiffs asked Dr. Mattingly to testify to the results of several additional sensitivity and robustness analyses he performed, all of which confirmed his principal findings.  Trial Tr. I, at 139:19-141:12.  Legislative Defendants objected to those analyses on grounds that they had not been disclosed prior to trial.  Trial Tr. I, at 139:7-9.  We sustain Legislative Defendants' objection, *see* Fed. R. Civ. P. 26(a)(2)(B), 26(e)(1)(A), and therefore do not consider that evidence.

Case 1:16-cv-01026-WO-JEP   Document 142   Filed 08/27/18   Page 153 of 321

Democratic candidates and entrench the Republican Party in power. In particular, given that 99 percent of Dr. Mattingly's 24,518 simulated plans—which conformed to traditional redistricting criteria and the non-partisan criteria adopted by the Committee— would have led to the election of at least one additional Democratic candidate, we agree with Dr. Mattingly's conclusion that the 2016 Plan's pro-Republican bias is not attributable to a legitimate redistricting objective, but instead reflects an intentional effort to subordinate the interests of non-Republican voters. Dr. Mattingly's analysis that the packing and cracking of non-Republican voters had to have been the product of an intentional legislative effort reinforces that conclusion. And Dr. Mattingly's finding that the 2016 Plan produced "safe Republican majorities in the first eight most Republican districts," Ex. 3002, at 8, shows that the General Assembly intended for the partisan advantage to persist. That the 2016 Plan's intentional pro-Republican bias exists when Dr. Mattingly used the actual votes from *both* 2012 (a relatively good year for Democrats) and 2016 (a relatively good year for Republicans) also speaks to the imperviousness of the 2016 Plan's partisan advantage to changes in candidates and the political environment.

Dr. Chen, a political science professor at the University of Michigan and expert in political geography and redistricting, also evaluated the 2016 Plan's partisan performance relative to simulated districting plans. Trial Tr. I, at 157:2–4. But rather than creating a representative ensemble of districting plans by randomly perturbing an initial plan, as Dr. Mattingly did, Dr. Chen created a computer algorithm to draw three random sets of 1,000

154

simulated districting plans that comply with specific criteria.[32]   Ex. 2010, at 2.   To determine "whether the distribution of partisan outcomes created by the [2016 Plan] could have plausibly emerged from a non-partisan districting process," *id.* at 4, Dr. Chen, like Dr. Mattingly, then analyzed the partisan performance of the 2016 Plan relative to the plans in his three 1,000-plan samples using precinct-level election results, *id.* at 9. Unlike Dr. Mattingly, who used results from North Carolina's 2012 and 2016 congressional elections, Dr. Chen used two equally-weighted averages of precinct-level votes cast in previous statewide elections: (1) the seven statewide elections Dr. Hofeller included in his composite partisanship variable and (2) the twenty elections included in the Committee's Political Data criterion. *Id.* at 9–10.  As the Fourth Circuit explained, "Dr. Chen's computer simulations are based on the logic that if a computer randomly draws [1,000] redistricting plans following traditional redistricting criteria, and the actual enacted plan[] fall[s] completely outside the range of what the computer has drawn [in terms of partisanship], one can conclude that the traditional criteria do not explain that enacted plan." *Raleigh Wake Citizens Ass'n*, 827 F.3d at 344.

Dr. Chen programmed the computer to draw the first set of districting plans to follow what he deemed to be the non-partisan criteria included in the Committee's Adopted Criteria: population equality, contiguity, minimizing county and VTD splits, and

---

[32] To draw a random sample of simulated plans, Dr. Chen's algorithm builds each simulated plan by randomly selecting a VTD and then "building outward" from that VTD, in accordance with the governing criteria, "by adding adjacent VTDs until you construct an entire first district."  Trial Tr. I, at 163:19-25.

maximizing compactness.  *Id.* at 6.  The 1,000 simulated plans generated by the computer split the same or fewer counties and VTDs as the 2016 Plan and significantly improved the compactness of the 2016 Plan under the Reock and Popper-Polsby measures of compactness.  *Id.* at 6–7.  Dr. Chen found that *none* of the 1,000 plans yielded a congressional delegation of 10 Republicans and 3 Democrats—the outcome that would have occurred under the 2016 Plan—when he evaluated the sample using Dr. Hofeller's seven-election average.  *Id.* at 13–14.  The sample most frequently yielded plans that would have elected 6 (32.4%) or 7 (45.6%) Republicans.  *Id.* at 13.  Using the results of the twenty elections referenced in the Adopted Criteria, a congressional delegation of 10 Republicans and 3 Democrats—the outcome that would have occurred under the 2016 Plan—again occurred in *none* of the simulated plans, with a delegation of 6 (52.5%) Republicans occurring most frequently.  *Id.*  Based on these results, Dr. Chen concluded that "the [2016 Plan] is an extreme partisan outlier when compared to valid, computer-simulated districting plans" and that the Committee's "partisan goal—the creation of 10 Republican districts—predominated over adherence to traditional districting criteria."  *Id.* at 10–11.

To test whether the Committee's goal of protecting incumbents called into question the validity of his results, Dr. Chen next programmed his computer to draw maps that adhered to the requirements it used to draw the first set of simulated maps, and also to not pair in a single district any of the 13 incumbents elected under the 2011 Plan. *Id.* at 15.  By comparison, the 2016 Plan paired 2 of the 13 incumbents elected under the 2011 Plan.  *Id.*  Like the first set of simulations, the second set of simulated plans split the

156

same or fewer counties and VTDs as the 2016 Plan and improved the compactness of the 2016 Plan under the Reock and Popper-Polsby measures. *Id.* at 18. Dr. Chen again found that *none* of the 1,000 plans yielded a congressional delegation of 10 Republicans and 3 Democrats—the outcome that would have occurred under the 2016 Plan—when he evaluated the sample using Dr. Hofeller's seven-election average. *Id.* at 16–17. A majority of the plans included in the sample (52.9%) would have elected 7 Republicans. *Id.* at 16. Using the twenty elections in the Adopted Criteria, a congressional delegation of 10 Republicans and 3 Democrats again occurred in *none* of the simulated plans, with a delegation of 6 (50.3%) or 7 (30.6%) Republicans occurring most frequently. *Id.* Based on these results, Dr. Chen concluded that the General Assembly's desire to avoid pairing incumbents did not explain the 2016 Plan's pro-Republican partisan advantage. *Id.* at 18–19.

To further test the validity of his results, Dr. Chen's third set of simulations sought to match the number of split counties (13) and paired incumbents (2) in the 2016 Plan, rather than minimize such criteria. *Id.* at 19–20. Adhering to these characteristics of the 2016 Plan did not meaningfully alter Dr. Chen's results. In particular, he again found that *none* of the 1,000 plans yielded a congressional delegation of 10 Republicans and 3 Democrats—the outcome that would have occurred under the 2016 Plan—when he evaluated the sample using Dr. Hofeller's seven-election average. *Id.* at 21–22. A majority of the plans included in the sample (53%) would have elected 7 Republicans. *Id.* at 21. Using the twenty elections in the Adopted Criteria, a congressional delegation of 10 Republicans and 3 Democrats again occurred in *none* of the simulated plans, with a

delegation of 6 Republicans and 7 Democrats occurring most frequently (52.3%). *Id.* Based on these results, Dr. Chen concluded that the General Assembly's decision not to minimize the number of county splits or paired incumbents could not "have justified the plan's creation of a 10-3 Republican advantage." *Id.* at 20.

Analyzing the results of his three simulation sets as a whole, Dr. Chen concluded that the 2016 Plan "is an extreme statistical outlier in terms of its partisanship." Trial Tr. I, at 213:22–23. He further concluded "that the pursuit of that partisan goal . . . of creating a ten Republican map, not only *predominated* [in] the drawing of the map, but it *subordinated* the nonpartisan portions of the Adopted Criteria," including the goals of increasing compactness and avoiding county splits. Trial Tr. I, at 158:20–159:2 (emphasis added).

Like Dr. Mattingly's analyses, we find that Dr. Chen's analyses provide compelling evidence that the General Assembly's predominant intent in drawing and enacting the 2016 Plan was to subordinate the interests of non-Republican voters and entrench Republican congressmen in office. In particular, we find it significant that *none* of the 3,000 simulated districts plans generated by Dr. Chen's computer algorithm, which conformed to all of the traditional nonpartisan districting criteria adopted by the Committee, produced a congressional delegation containing 10 Republican and 3 Democrats—the result the General Assembly intended the 2016 Plan to create, and the result the 2016 Plan in fact created. That the 2016 Plan continued to be an "extreme statistical outlier" in terms of its pro-Republican tilt under three separate specifications of

criteria for drawing the simulated plans reinforces our confidence that Dr. Chen's

conclusions reflect stable and valid results.[33]

---

[33] In his partial dissent, our colleague Judge Osteen states that he does not find Dr. Chen's maps "as persuasive as the majority" because "Dr. Chen drafted [the] maps without consideration to partisan interests," notwithstanding that, according to Judge Osteen, a state legislative body may permissibly pursue some degree of partisan favoritism. *Post* at 313. We do not believe the non-partisan nature of Dr. Chen's maps undermines their probative force. To begin, we first rely on Dr. Chen's (and Dr. Mattingly's maps) to establish the General Assembly's invidious partisan *intent*—that the 2016 Plan "bears more heavily on [supporters of candidates of one party] than another." *Washington*, 426 U.S. at 242. By demonstrating that the 2016 Plan amounts to an "extreme statistical outlier" relative to plans that conform to the General Assembly's non-partisan objectives, Dr. Chen's maps are "tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with" favoring the Republican party at the expense of non-Republican voters and candidates. *Gomillion*, 364 U.S. at 341. To be sure, given the direct evidence of the General Assembly's invidious partisan intent, Dr. Chen's maps are less necessary to establish invidious intent *in this particular case*. Nonetheless, even in the absence of the overwhelming direct evidence of invidious discriminatory intent, Dr. Chen's maps offer a basis for establishing that the General Assembly was predominantly motivated by partisan considerations in drawing district lines.

Additionally, as Justice Kennedy explained in *Vieth*, one of the two principle obstacles to identifying a judicially manageable standard for evaluating a partisan gerrymandering claim is the absence of "any agreed upon model of fair and effective representation." 541 U.S. at 307. Put differently, assuming as we do that some degree of partisanhip is permissible, there needs to be a baseline from which to measure to what degree a districting plan drawn on the basis of partisan favoritism deviates from the universe of "fair and effective" plans. *Id.* By identifying the distribution of partisan outcomes that occur in a randomly drawn set of plans, Dr. Chen's (and Dr. Mattingly's) simulations provide a baseline measure of what constitutes "fair and effective" plans against which courts can assess how much invidious partisanship is "too much" (in the event the Supreme Court concludes that some degree of unadorned partisan discrimination in permissible). When, as here, a districting plan is standard deviations from the mean in terms of the partisan composition of the delegation it produces, that amounts to probative and reliable statewide evidence that the plan rests on "too much" partisanship. To be sure, such evidence, standing alone, does not establish invidious partisanship predominated in the drawing of the lines of a particular district. Nonetheless, when, as here, such evidence is supported by district-specific evidence of
(Continued)

159

Legislative Defendants raise two objections to Dr. Mattingly's and Dr. Chen's analyses, neither of which we find undermines the persuasive force of their conclusions. To begin, Legislative Defendants assert that Dr. Mattingly's and Dr. Chen's analyses rest on the "baseless assumption" that "voters vote for the party, and not for individual candidates." Leg. Defs.' Br. 10–11. Although we agree that the quality of individual candidates may impact, to a certain extent, the partisan vote share in a particular election, we do not find that this assumption undermines the probative force of the two simulation analyses, and for several reasons.

To begin, we find it significant that Dr. Mattingly and Dr. Chen used four different sets of actual votes—2012 and 2016 congressional votes in Dr. Mattingly's case and the seven- and twenty-statewide race averages in Dr. Chen's case—and reached essentially the same conclusion. As Legislative Defendants' expert in congressional elections, electoral history, and redistricting Sean Trende acknowledged,[34] Trial Tr. III, at 30:14-15,

---

cracking and packing, then it provides reliable and compelling evidence of discriminatory intent, discriminatory effects, and lack of justification.

[34] Prior to trial, League Plaintiffs moved to exclude Mr. Trende's report and testimony under Federal Rule of Evidence 702 and *Daubert*. League of Women Voters Pls.' Mot. in Limine To Exclude the Testimony of Sean P. Trende at trial, June 16, 2017, ECF No. 702. This Court's Final Pretrial Order denied the motion, without prejudice to League Plaintiffs asserting a similar objection at trial. Final Pretrial Order, Oct. 4, 2017, ECF No. 90. League Plaintiffs renewed their motion to exclude Mr. Trende's testimony at trial. Trial Tr. III, at 19:20–22. This Court took League Plaintiffs' objection under advisement and allowed Mr. Trende to testify. *Id.* at 30:2–21. We conclude that Mr. Trende's training and experience render him qualified to provide expert testimony regarding congressional elections, electoral history, and redistricting, and therefore overrule League Plaintiffs' objection.

the sets of votes used by Dr. Mattingly and Dr. Chen included elections in which Republican candidates performed well and elections in which Democratic candidates performed well, Ex. 5101, at 25, 36 (describing 2008 election as a "Democratic wave" and 2010 election as a "Republican wave"). The twenty-race average used by Dr. Chen, in particular, encompassed forty race/candidate combinations occurring over four election cycles, meaning that it reflected a broad variety of candidates and electoral conditions. Given that Dr. Mattingly and Dr. Chen reached consistent results using data reflecting numerous candidates and races—and confirmed those results in numerous sensitivity analyses—we believe that the strength or weakness of individual candidates does not call into question their key findings. That Dr. Chen found that the 2016 Plan produced a 10-Republican, 3-Democrat delegation using Dr. Hofeller's seven-race average and the twenty-race average derived from the Adopted Criteria—the *same* partisan make-up as the congressional delegation elected by North Carolina voters in the 2016 race—further reinforces our confidence that Dr. Mattingly's and Dr. Chen's assumption regarding the partisan behavior of voters did not materially impact their results.

Second, Dr. Chen investigated the reasonableness of the assumption Legislative Defendants challenge by analyzing his set of simulated districting plans using VTD-specific predicted Republican and Democratic vote shares generated by a regression model. Ex. 2010, at 26–31. The regression model controlled for incumbency and turnout, factors correlated with candidate quality and electoral conditions. *Id.* at 27. Dr. Chen found that even when controlling for incumbency and turnout on a VTD-by-VTD basis, over 67 percent of his simulated maps yielded a congressional delegation of 7

161

Republicans and 6 Democrats, and none of his maps produced a delegation of 10 Republicans and 3 Democrats—the outcome the 2016 Plan would have produced. *Id.* at 36. Based on that finding, Dr. Chen reaffirmed his conclusion that the 2016 Plan "could have been created only through a process in which the explicit pursuit of partisan advantage was the predominant factor." *Id.* at 30.

Third, and most significantly, Dr. Mattingly's and Dr. Chen's assumption that Legislative Defendants characterize as "baseless"—that the partisan characteristics of a particular precinct do not materially vary with different candidates or in different races— is the *same assumption* on which the Committee, Representative Lewis, Senator Rucho, and Dr. Hofeller relied in drawing the 2016 Plan. As Dr. Hofeller—who has been involved in North Carolina redistricting for more than 30 years, Ex. 2045, at 525:6–10— testified: "[T]he underlying political nature of the precincts in the state *does not change no matter what race you use to analyze it*." Ex. 2045, at 525:9–10 (emphasis added); Hofeller Dep. 149:5–18. "So once a precinct is found to be a strong Democratic precinct, it's probably going to act as a strong Democratic precinct in every subsequent election. The same would be true for Republican precincts." Ex. 2045, at 525:14–17; *see also* Hofeller Dep. II 274:9–12 ("[I]ndividual VTDs tend to carry . . . the *same characteristics through a string of elections*." (emphasis added)). Representative Lewis, Senator Rucho, and the Committee agreed with Dr. Hofeller that, at least in North Carolina, past election results serve as the best predictor of whether, and to what extent, a particular precinct will favor a Democratic or Republican candidate, Ex. 1016, at 30:23–31:2; Rucho Dep. 95:15–16, and therefore directed Dr. Hofeller to use past election results to draw a plan

162

that would elect 10 Republicans and 3 Democrats, *see* Ex. 1007. And Dr. Hofeller, Representative Lewis, and the rest of the Committee relied on past election results—the same election results upon which Dr. Chen relied—in evaluating whether the 2016 Plan achieved its partisan objective. Ex. 1017 (spreadsheet Representative Lewis presented to the Committee, immediately before it voted to approve the 2016 Plan, showing the partisan performance of the plan using votes cast in twenty previous statewide elections).

Importantly, the past election results upon which Dr. Hofeller, Representative Lewis, and the Committee relied to assess the 2016 Plan involved different candidates—a composite of seven statewide races in Dr. Hofeller's case and the results of the 2014 Tillis-Hagan Senate race in Representative Lewis' case—than those who ran in the 2016 congressional elections. Legislative Defendants and the expert mapdrawer they employed, therefore, believed that Dr. Mattingly's and Dr. Chen's allegedly "baseless" assumption was sufficiently reasonable, at least in the case of North Carolina, to rely on it to draw the 2016 Plan. Likewise, Legislative Defendants' expert in American politics and policy, southern politics, quantitative political analysis, and election administration, Dr. M.V. Hood, III, conceded that he relied on the *same assumption* in assessing the likely partisan performance of the districts created by the 2016 Plan. Trial Tr. IV, at 11:8-12, 71:1–15 (acknowledging that by averaging partisan results of past elections with different candidates, as Dr. Hofeller and Dr. Chen did, "candidate effects are going to average out so we'll get a pretty good fix on what the partisan composition of an area is"). In such circumstances, we cannot say that that assumption calls into question the

163

significant probative force of Dr. Mattingly's and Dr. Chen's analyses, particularly given how extreme a partisan outlier the 2016 Plan was in each of the two analyses.

Legislative Defendants next contend that both sets of simulated maps fail to account for a number of criteria *implicitly* relied upon by the General Assembly, including: that more populous, rather than less populous counties should be divided; that the "core" of the 2011 Plan districts should be retained; that a district line should not traverse a county line more than once; and that, to ensure compliance with the Voting Rights Act, one district should have a black voting age population ("BVAP") of at least 42 percent and another should have a BVAP of at least 35 percent. Leg. Defs.' FOF 78–86.

*None* of these alleged criteria were among the seven criteria adopted by the Committee, Ex. 1007, nor are *any* of these criteria mentioned in the legislative record. Additionally, both the Adopted Criteria and the legislative record expressly contradict the purported BVAP threshold criterion, as the Adopted Criteria state that "[d]ata identifying the race of individuals or voters *shall not be used* in the construction or consideration of districts," Ex. 1007 (emphasis added), and Representative Lewis and Dr. Hofeller repeatedly disclaimed any reliance on race or effort to preserve BVAP percentages in the 2016 Plan, *see, e.g.*, Ex. 1016 at 62:9–20; Hofeller Dep. 145:9–12, 146:4–146:8, 183:22–184:8. And even if the General Assembly had implicitly adopted a BVAP threshold criterion—which the record proves it did not—Dr. Mattingly's analysis accounted for that criterion by requiring that any simulated plan included in his final ensemble include

one district with a BVAP of at least 40 percent and a second district with a BVAP of at least 33.5 percent.  Trial Tr. I, at 41:23–25

The *only* two of the alleged implicit criteria that find *any* support in the record of this case—the alleged criteria requiring preservation of the "cores" of the districts in the 2011 Plan and the division of populous counties—are criteria that would serve to advance the General Assembly's invidious partisan objective.  By preserving the "cores" of the districts in the 2011 Plan, the General Assembly perpetuated the partisan effects of a districting plan expressly drawn "to minimize the number of districts in which Democrats would have an opportunity to elect a Democratic candidate."  Hofeller Dep. 127:19–22. And the alleged criterion requiring division of populous counties—which is referenced in a single line of an affidavit provided by Dr. Hofeller after the trial, *see* Ex. 5116, at 5— effectively required "cracking" areas of Democratic strength because more populous counties tend to be Democratic whereas less populous counties tend to be Republican. This is precisely what the 2016 Plan did by dividing populous Democratic counties like Buncombe and Guilford.  Exs. 4066, 4068.  Given that most of these alleged implicit criteria have no support in the record and the remaining purported criteria work hand-in-hand with the General Assembly's partisan objective, the omission of these purported criteria from Dr. Mattingly's and Dr. Chen's analyses does not in any way call into question the persuasive force of their results.

### iii.

Finally, although we find the facts and analyses specifically relating to the 2016 Plan sufficient, by themselves, to establish the General Assembly's discriminatory intent,

we further note that evidence regarding the drawing and adoption of the *2011 Plan* also speaks to the General Assembly's discriminatory intent in drawing and enacting the *2016 Plan*. Typically, it would be improper for a court to rely on evidence regarding a different districting plan in finding that a redistricting body enacted a challenged plan with discriminatory intent. The "Partisan Advantage" criterion proposed by the Chairs and adopted by the Committee, however, expressly sought to carry forward the partisan advantage obtained by Republicans under the unconstitutional 2011 Plan. Ex. 1007 ("The Committee shall make reasonable efforts to construct districts in the 2016 . . . Plan to maintain the current partisan makeup of North Carolina's congressional delegation."). Accordingly, to the extent invidious partisanship was a motivating purpose behind the 2011 Plan, the Committee expressly sought to carry forward—and thereby entrench—the effects of that partisanship.

As with the 2016 Plan, Republicans exclusively controlled the drawing and adoption of the 2011 Plan. The 2011 redistricting effort coincided with the RSLC's REDMAP, in which Dr. Hofeller participated and which sought to "solidify conservative policymaking at the state level and maintain a Republican stronghold in the U.S. House of Representatives *for the next decade*." Ex. 2015, at ¶ 10; Ex. 2026, at 1 (emphasis added). As chairs of the committees responsible for drawing the 2011 Plan, Representative Lewis and Senator Rucho's "primary goal" was "to create as many districts as possible in which GOP candidates would be able to successfully compete for office." Hofeller Dep. 123:1–7. Defendants conceded as much in the *Harris* litigation, in

166

which Dr. Hofeller stated in an expert report that "[p]olitics was the primary policy determinant in the drafting of the . . . [2011] Plan." Ex. 2035, at ¶ 23.

To effectuate the General Assembly's partisan intent, Dr. Hofeller drew the 2011 Plan "to *minimize* the number of districts in which Democrats would have an opportunity to elect a Democratic candidate." Hofeller Dep. 127:19–22 (emphasis added). In particular, Dr. Hofeller "concentrat[ed]" Democratic voters in three districts, Ex. 2043, at 33–34, and thereby "increase[d] Republican voting strength" in five new districts, Hofeller Dep. 116:19–117:25. Notably, the three districts in the 2011 Plan that elected Democratic candidates were the same three districts in the 2016 Plan that elected Democratic candidates, and the ten districts in the 2011 Plan that elected Republican candidates were the same ten districts in the 2016 Plan that elected Republican candidates. Exs. 1018–19. Additionally, when compared to his 24,518-plan ensemble, Dr. Mattingly found that the 2011 Plan also was "heavily engineered" to favor Republican candidates, Ex. 3002, at 2, exhibiting "S-shaped curve" that is "the signature of [partisan] gerrymandering" as the 2016 Plan, Trial Tr. I, at 76:18–77:5; Ex. 3040, at 17–18. Accordingly, the 2016 Plan carried forward the invidious partisan intent motivating the 2011 Plan.

iv.

Legislative Defendants nonetheless argue that the General Assembly failed to act with the requisite discriminatory intent for two reasons: (1) the General Assembly did not seek to "maximize partisan advantage" and (2) the General Assembly adhered to a number of "traditional redistricting criteria," such as compactness, contiguity, and equal

167

population. Neither argument, however, calls into question our finding that Plaintiffs satisfied their burden as to the discriminatory intent requirement.

Legislative Defendants' reliance on the General Assembly's purported lack of intent to "maximize partisan advantage" fails as a matter of both law and fact. As a matter of law, Legislative Defendants cite no authority, controlling or otherwise, stating that a governmental body must seek to "maximize" partisan advantage in order to violate the Equal Protection Clause. To be sure, the Supreme Court has indicated that evidence that a legislative body sought to maximize partisan advantage would prove that the legislature acted with discriminatory intent. *See Gaffney*, 412 U.S. at 751 ("A districting plan may create multimember districts perfectly acceptable under equal population standards, but invidiously discriminatory because they are employed to 'minimize or cancel out the voting strength of racial or political elements of the voting population.'" (quoting *Fortson v. Dorsey*, 379 U.S. 433, 439 (1965)); *Vieth*, 541 U.S. at 316 (Kennedy, J., concurring in the judgment) ("If a State passed an enactment that declared 'All future apportionment shall be drawn so as most to burden Party X's rights to fair and effective representation, though still in accord with one-person, one-vote principles,' we would surely conclude the Constitution had been violated.").

That does not mean, however, that to establish a constitutional violation a plaintiff *must* prove that a districting body sought to maximize partisan advantage. The Supreme Court does not require that a redistricting plan maximally malapportion districts for it to violate the one-person, one-vote requirement. Nor does the Supreme Court require that a redistricting plan maximally disadvantage voters of a particular race to constitute an

unconstitutional racial gerrymander. And in the context of partisan gerrymandering, in particular, Justice Kennedy has rejected a "maximization" requirement, explaining that a legislature is "culpable" regardless of whether it engages in an "egregious" and "blatant" effort to "capture[] every congressional seat" or "proceeds by a more subtle effort, capturing less than all seats." *Vieth*, 541 U.S. at 316.

Another basis for not imposing a maximization requirement is that, in the context of a partisan gerrymander, what constitutes "maximum partisan advantage" is elusive, and turns on political strategy decisions. A party may not seek to maximize the number of seats a redistricting plan could allow it to win in a particular election because, by spreading out its supporters across a number of districts to achieve such a goal, its candidates would face a greater risk of losing either initially or in subsequent elections. *See* Bernard Grofman & Thomas Brunnell, *The Art of the Dummymander*, *in* Redistricting in the New Millennium 192–93 (Peter F. Galderisi ed., 2005) (finding, for example, that North Carolina's 1991 decennial redistricting plan, which was drawn by a Democrat-controlled General Assembly, created districts with sufficiently narrow margins in favor of expected Democratic voters that Republicans were able capture seats later in the decade). Accordingly, different partisan redistricting bodies may have different perspectives on what constitutes maximum partisan advantage.

As a matter of fact, Plaintiffs presented compelling evidence that the General Assembly *did* seek to maximally burden voters who were likely to support non-Republican candidates. Most significantly, in explaining the proposed Partisan Advantage criterion to the Committee, Representative Lewis said that he "propose[d] that

169

[the Committee] draw the maps to give a partisan advantage to 10 Republicans and 3 Democrats because *[he] d[id] not believe it[ would be] possible to draw a map with 11 Republicans and 2 Democrats*." Ex. 1005, at 50:7–10 (emphasis added). Legislative Defendants assert that this statement establishes that Representative Lewis *did not* draw the map to maximize partisan advantage because he did not believe that it would be possible to draw a plan that could elect 11 Republicans without violating other criteria, "such as keeping . . . counties whole and splitting fewer precincts." Leg. Defs.' Br. 5. Put differently, Legislative Defendants maintain that the 2016 Plan's adherence to other traditional redistricting criteria establishes that the General Assembly did not pursue maximum partisan advantage. *Id.*

But Representative Lewis acknowledged during his deposition that had the 2016 Plan split a large number of precincts and counties, as the 2011 Plan did, there was a significant risk that the *Harris* court would "throw it out" on grounds that it failed to remedy the racial gerrymander. Lewis Dep. 166:13–168:8. Accordingly, Representative Lewis's testimony indicates that he believed the 2016 Plan offered the maximum lawful partisan advantage—the maximum partisan advantage that could be obtained without risking that the *Harris* court would "throw" the plan out as perpetuating the constitutional violation.

Dr. Mattingly's and Dr. Chen's analyses further evidence that the 2016 Plan reflected an effort to maximize partisan advantage. In particular, when Dr. Mattingly evaluated his 24,518-plan ensemble using the votes cast in North Carolina's 2012 congressional election, *none* of the plans produced an 11-2 pro-Republican partisan

170

advantage. Ex. 3040, at 7. And Dr. Mattingly found the same result when he used votes from the 2016 election—*none* of the simulated plans produced an 11-2 partisan advantage. *Id.* at 19. Likewise, regardless of whether Dr. Chen applied the seven-race formula used by Dr. Hofeller or the twenty-race formula adopted by the Committee, none of his 3,000 simulated plans produced a 10-3 pro-Republican partisan advantage, let alone an 11-2 partisan advantage. Ex. 2010, at 12, 16, 21, 36–37.

Finally, the facts and circumstances surrounding the drawing and enactment of the 2011 Plan—the partisan effects of which the Committee expressly sought to carry forward in the 2016 Plan, Ex. 1007—further establish that the General Assembly drew the 2016 Plan to maximize partisan advantage. In particular, Representative Lewis and Senator Rucho's "primar[y] goal" in drawing the 2011 Plan was "to create *as many districts as possible* in which GOP candidates would be able to successfully compete for office." Hofeller Dep. 123:1–7 (emphasis added). And, in accordance with that goal, Dr. Hofeller testified that he drew the plan "to *minimize* the number of districts in which Democrats would have an opportunity to elect a Democratic candidate." *Id.* at 127:19–22 (emphasis added).

Nor does the General Assembly's reliance on a number of traditional redistricting criteria undermine our finding that invidious partisan intent motivated the 2016 Plan. As a matter of law, the Supreme Court long has held that a state redistricting body can engage in unconstitutional partisan gerrymandering even if it complies with the traditional redistricting criterion of population equality. *Gaffney*, 412 U.S. at 751. More recently, the Supreme Court rejected an identical argument in a racial gerrymandering

171

case, holding that "inconsistency between the [challenged] plan and traditional redistricting criteria *is not a threshold requirement*" to establish such a claim. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) (emphasis added). The rationale supporting the *Bethune-Hill* Court's refusal to allow compliance with traditional redistricting criteria to immunize a plan from scrutiny under the Equal Protection Clause is equally compelling in the partisan gerrymandering context. As the *Whitford* Court explained in holding that compliance with traditional redistricting criteria is not a "safe harbor" from a partisan gerrymandering claim, "[h]ighly sophisticated mapping software now allows lawmakers to pursue partisan advantage without sacrificing compliance with traditional districting criteria." 218 F. Supp. 3d at 889. "A map that appears congruent and compact to the naked eye may in fact be an intentional and highly effective partisan gerrymander." *Id.*

As a matter of fact, the 2016 Plan does not conform to all traditional redistricting principles. Although the plan is equipopulous, contiguous, improves on the compactness of the 2011 Plan, and reduces the number of county and precinct splits relative to the 2011 Plan, a number of districts in the 2016 Plan take on "bizarre" and "irregular" shapes explicable only by the partisan make-up of the precincts the mapdrawers elected to place within and without the districts. *See infra* Part III.B.2. The 2016 Plan also fails to adhere to the traditional redistricting principle of "maintaining the integrity of political subdivisions." *Harris*, 136 S. Ct. at 1306. In particular, Legislative Defendants' expert Dr. Hood conceded that the 2016 Plan divided numerous political subdivisions, *see, e.g.*, Trial Tr. IV, at 41:2–18, 42:6–43:4, including the City of Asheville, Buncombe County,

172

Cumberland County, the City of Fayetteville, the City of Greensboro, Guilford County, Johnston County, the City of Charlotte, Mecklenburg County, the City of Raleigh, and Wake County, Exs. 4066–72. Notably, the Committee voted, on a party-line basis, against adopting a proposed criterion that would have directed the mapdrawers to make reasonable efforts to respect the lines of political subdivisions and preserve communities of interest. *See* Ex. 1006, at 27–28. The division of political subdivisions allowed the General Assembly to achieve its partisan objectives, by packing non-Republican voters in certain districts and submerging non-Republican voters in majority-Republican districts. Trial Tr. IV, at 41:2–18, 42:6–43:4.

* * * * *

In sum, we find that Plaintiffs' statewide evidence establishes that the General Assembly's pursuit of partisan advantage predominated over its non-partisan redistricting objectives. And given that Dr. Chen found that the General Assembly's desire to protect incumbents and express refusal to try to avoid dividing political subdivisions failed to explain the 2016 Plan's partisan bias, we find that Plaintiffs' evidence distinguishes between permissible redistricting objectives that rely on political data or consider partisanship, and what instead here occurred: invidious partisan discrimination.

b.     *Effects*

Having concluded that statewide evidence establishes that the General Assembly's predominant intent was to discriminate against voters who supported or were likely to support non-Republican candidates and entrench Republican candidates in office, we now turn to Plaintiffs' statewide evidence of the 2016 Plan's discriminatory effects. We

find that Plaintiffs' statewide evidence proves that the 2016 Plan dilutes the votes of non-Republican voters—by virtue of widespread cracking and packing—and entrenches the State's Republican congressmen in office. In reaching this conclusion we rely on the following categories of evidence: (i) the results of North Carolina's 2016 congressional election conducted using the 2016 Plan; (ii) expert analyses of those results revealing that the 2016 Plan exhibits "extreme" partisan asymmetry; (iii) Dr. Mattingly's and Dr. Chen's simulation analyses; and (iv) the results of North Carolina's 2012 and 2014 elections using the 2011 Plan—the partisan effects of which the General Assembly expressly sought to carry forward when it drew the 2016 Plan—and empirical analyses of those results.

i.

We begin with the results of North Carolina's 2016 congressional election conducted under the 2016 Plan. The General Assembly achieved its unambiguously stated goal: North Carolina voters elected a congressional delegation of 10 Republicans and 3 Democrats. Exs. 1018, 3022. That the 2016 Plan resulted in the outcome Representative Lewis, Senator Rucho, Dr. Hofeller, and the General Assembly intended proves both that the precinct-level election data used by the mapdrawers served as a reliable predictor of the 2016 Plan's partisan performance and that the mapdrawers effectively used that data to draw a districting plan that perfectly achieved the General Assembly's partisan objectives.

Following the 2016 election, Republicans hold 76.9 percent of the seats in the state's thirteen-seat congressional delegation, whereas North Carolina voters cast 53.22

174

percent of their votes for Republican congressional candidates. Ex. 3022. Notably, the district court in *Gill* found that less significant disparities between the favored party's seat-share and vote-share (60.7% v. 48.6% and 63.6% v. 52%) provided evidence of a challenged districting plan's discriminatory effects. 218 F. Supp. 3d at 901. As the court explained, "[i]f it is true that a redistricting 'plan that more closely reflects the distribution of state party power seems a less likely vehicle for partisan discrimination,' . . . then a plan that deviates this strongly from the distribution of statewide power suggests the opposite." *Id.* at 902 (quoting *LULAC*, 548 U.S. at 419 (opinion of Kennedy, J.)).

The results of the 2016 election also reveal that the 2016 Plan "packed" and "cracked" voters who supported Republican candidates. In particular, in the three districts in which Democratic candidates prevailed, the Democratic candidates received an average of 67.95 percent of the vote, whereas Republican candidates received an average of 31.24 percent of the vote. *See* Ex. 3022. By contrast, in the ten districts in which Republican candidates prevailed, the Republican candidates received an average of 60.27 percent of the vote, and Democratic candidates received an average of 39.73 percent of the vote. *See id.* Democratic candidates, therefore, consistently won by larger margins than Republican candidates. Additionally, the Democratic candidate's margin in the *least* Democratic district in which a Democratic candidate prevailed (34.04%) was nearly *triple* that of the Republican candidate's margin in the *least* Republican district in which a Republican candidate prevailed (12.20%), *see id.*, reflecting the "S-shaped curve" that Dr. Mattingly described as "the signature of [partisan] gerrymandering," Trial Tr. I, at 76:18–77:5.

175

And the results of the 2016 congressional election establish that the 2016 Plan's discriminatory effects—attributable to cracking and packing—likely will persist through multiple election cycles. To begin, the Republican candidate's vote share (56.10%) and margin of victory (12.20%) in the *least* Republican district electing a Republican candidate, District 13, exceed the thresholds at which political science experts, including Legislative Defendants' expert Dr. Hood, consider a seat to be "safe"—*i.e.*, highly unlikely to change parties in subsequent elections. *See* Ex. 5058, at 25, Trial Tr. IV, at 29:16–22, 86:21–88:5; *LULAC*, 548 U.S. at 470–71 (Stevens, J., dissenting in part) (characterizing 10 percent advantage as a threshold for a "safe" seat and explaining that "[m]embers of Congress elected from such safe districts need not worry much about the possibility of shifting majorities, so they have little reason to be responsive to political minorities in their district"). Indeed, all of the districts—including all ten Republican-held districts—in the 2016 Plan are "safe" under that standard. Ex. 3022.

Additionally, Dr. Simon Jackman—a professor of political science at the University of Sydney and expert in statistical methods in political science, elections and election forecasting, and American political institutions, Trial Tr. II, at 32:5-9— performed a "uniform swing analysis," which is used by both researchers and courts to assesses the sensitivity of a districting plan to changing electoral conditions, Ex. 4002, at 15–16, 54–59; *Whitford*, 218 F. Supp. 3d at 899–903. To conduct his uniform swing analysis, Dr. Jackman took the two-parties' statewide vote share in the 2016 election, and then shifted those shares by one-percent increments ranging from 10 percent more Republican to 10 percent more Democratic. Ex. 4002, at 54. The analysis assumed that

176

votes shift in all districts by the same amount. *Id.* Dr. Jackman found that "[i]f Democrats obtained a statewide, uniform swing of even six points—taking Democratic share of the two-party vote to 52.7%—*no seats would change hands relative to the actual 2016 results.*" *Id.* at 59 (emphasis added). Accordingly, even if Democratic candidates obtained a 52.7 percent of the statewide vote, they would comprise only 23.1 percent of the state's congressional delegation. And if Democratic candidates captured the *same percentage* of the vote (53.22%) that elected Republican candidates in ten districts in 2016, Democratic candidates would prevail in only four districts. Ex. 3022.

ii.

We also find that other analyses performed by Dr. Jackman assessing the 2016 Plan's "partisan asymmetry"—whether supporters of each of the two parties are able to translate their votes into representation with equal ease—provide additional evidence of the 2016 Plan's statewide discriminatory effects. Trial Tr. II, at 34:20–22 (explaining that a redistricting plan exhibits partisan asymmetry if there is "a gap between the parties with respect to the way their votes are translated into seats"). The concept of partisan symmetry, at least in its modern form, dates to the 1970s, but scholars did not begin to widely view it as a measure of partisan gerrymandering until the last 20 years. *Id.* at 33:24–34:11. Dr. Jackman analyzed three standard measures of partisan symmetry: the "efficiency gap," "partisan bias," and "the mean-median difference." *Id.* at 34:13–17.

The *efficiency gap*, which was the focus of Dr. Jackman's report and is the newest measure of partisan asymmetry, evaluates whether a districting plan leads supporters of one party to "waste" more votes than supporters of the other. Ex. 4002, at 5. The

177

concept of "wasted" votes derives directly from two of the principal mechanisms mapdrawers use to diminish the electoral power of a disfavored party or group: packing and cracking.  Trial Tr. II, at 45:19–46:11.  "Wasted" votes are votes cast for a candidate in excess of what the candidate needed to win a given district, which increase as more voters supporting the candidate are "packed" into the district, *or* votes cast for a losing candidate in a given district, which increase, on an aggregate basis, when a party's supporters are "cracked."[35]  *Id.* at 35:9–23, 45:19–46:11.

Dr. Jackman calculated the efficiency gap by subtracting the sum of one party's wasted votes in each district in a particular election from the sum of the other party's wasted votes in each district in that election and then dividing that figure by the total number of votes cast for all parties in all districts in the election.  Ex. 4002, at 18; Ex. 4078.  Efficiency gaps close to zero, which occur when the two parties waste approximately the same number of votes, reflect a districting plan that does not favor, invidiously or otherwise, one party or the other.

Using the results of the 2016 congressional elections conducted under the 2016 Plan, Dr. Jackman calculated an efficiency gap favoring Republican candidates of 19.4 percent.[36]  Ex. 4002, at 7–8.  That constituted the third largest efficiency gap (pro-

---

[35] "Wasted" votes is a term of art used by political scientists, and is not intended to convey that any vote is in fact "wasted" as that term is used colloquially.

[36] The efficiency gap measure takes on a different sign depending on whether it favors one party or the other.  Rather than denoting the sign of each calculated efficiency gap, this opinion reports the absolute value, or magnitude, of the efficiency gap.

178

Republican or pro-Democratic) in North Carolina since 1972, surpassed only by the efficiency gaps exhibited in the 2012 and 2014 elections using the 2011 Plan. Trial Tr. II, at 54:21–24.

To put the 19.4 percent figure further in perspective, Dr. Jackman estimated the efficiency gaps for 512 congressional elections occurring in 25 states[37] between 1972 and 2016.[38] He determined that the distribution of those efficiency gaps was normal with its mean and median centered on zero, meaning that, on average, the districting plans in his

---

[37] Dr. Jackman's database included results from only 25 states because he excluded elections both in states with six or fewer representatives at the time of the election and in Louisiana due to its unique run-off election system. Ex. 4002, at 18–19 According to Dr. Jackman, when a state has six or fewer representatives the efficiency gap varies substantially with the shift of a single seat, thus making it a less useful metric in those states. *Id.* Legislative Defendants do not take issue with this methodological choice.

[38] Approximately 14 percent of the districts included in Dr. Jackman's 512-election database had elections that did not include candidates from both parties. Ex. 4002, at 20–26. Rather than excluding districts with uncontested elections from his database, Dr. Jackman "imputed" (or predicted) Democratic and Republican vote shares in those elections in two ways: (1) using presidential vote shares in the districts and incumbency status and (2) using results from previous and subsequent contested elections in the district and incumbency status. *Id.* at 24–26. Because calculating an efficiency gap requires predicting both vote shares *and* turnout, Dr. Jackman also predicted turnout using turnout data from contested congressional elections, usually contested elections under the same districting plan. *Id.* Importantly, Dr. Jackman reported measures of statistical significance reflecting error rates associated with the imputed vote shares and turnout, and his conclusions regarding the partisan performance of the 2016 Plan accounted for those measures of statistical significance. *See, e.g.*, *id.* at 41–48. Although Legislative Defendants assert that the imputation requirement complicates the efficiency gap analysis, they do not challenge Dr. Jackman's methodology for imputing the vote shares and turnout in the uncontested elections, nor do they take issue with his results. Leg. Defs.' FOF 64. Accordingly, we find that Dr. Jackman's imputation of vote shares and turnout in uncontested elections does not impact the validity and probative force of his results.

179

sample did not tend to favor either party. Ex. 4002, at 26–28. Dr. Jackman found that North Carolina's 2016 congressional election under the 2016 Plan yielded the 13th most pro-Republican efficiency gap of the 512 elections in the database, and that 95 percent of the plans in the database had efficiency gaps that were smaller in magnitude (in favor of either Republicans or Democrats). *Id.* at 7, 65. Dr. Jackman also calculated the average efficiency gap for the 136 unique districting plans included in his 512-election database, and found that the 2016 Plan produced the fourth-largest average efficiency gap of the 136 plans. *Id.* at 10; Trial Tr. II, at 60:15–17. And Dr. Jackman compared North Carolina's efficiency gap in 2016 with that of 24 other states for which his database contained 2016 data, finding that the 2016 Plan produced the largest efficiency gap of any of those plans. Ex. 4002, at 9.

To further put the 19.4 percent figure in context, Dr. Jackman used his database of elections to analyze what magnitude of efficiency gap would likely lead to at least one congressional seat changing hands—a "politically meaningful" burden on a disfavored party's supporters. Ex. 4002, at 37; Trial Tr. II, at 64:6–12. Dr. Jackman found that in states with congressional delegations with 7 to 15 representatives, like North Carolina, an 8 percent efficiency gap is associated with at least one seat likely changing hands.[39] Ex. 4002, at 39–41. Under that threshold, North Carolina's 2016 efficiency gap of 19.4 percent indicates that the 2016 Plan allowed Republicans to prevail in at least one more

---

[39] Dr. Jackman observed a lower threshold of 5 percent for states with congressional delegations with 15 members or more. Ex. 4002, at 39-41.

district than they would have in an unbiased plan. Based on these results, Dr. Jackman concluded that the 2016 Plan creates "a systematic advantage for Republican candidates," *id.* at 62, and that that advantage "is generating tangible consequences in terms of seats being won," Trial Tr. II, at 82:13–16.

Dr. Jackman also sought to test whether, given the magnitude of North Carolina's 2016 efficiency gap, the pro-Republican bias of the 2016 Plan is likely to persist in future elections. To do so, he performed regressions using his multi-state dataset to analyze the relationship between the first efficiency gap observed in the first election conducted under a particular districting plan and the average efficiency gap over the remaining elections in which that plan was used. Ex. 4002, at 47–54. Using data from the 108 plans in his dataset that were used in at least three elections, Dr. Jackman estimated that a plan with an initial efficiency gap of 19.4 percent in favor of a particular party, like the 2016 Plan, likely would have an 8 percent average efficiency gap in favor of the same party in the remaining elections conducted under the plan, with the plan resulting in an average efficiency gap in that same party's favor over 90 percent of the time. *Id.* at 47. When Dr. Jackman restricted his data set to the 44 plans that have been used at least three times since 2000, he found that an efficiency gap of 19.4 percent in favor of one party would likely have a 12 percent efficiency gap in that party's favor over the remainder of the plan's use. *Id.* Based on these analyses, Dr. Jackman concluded that the evidence "strongly suggests" that the 2016 Plan "will continue to produce large, [pro-Republican] efficiency gaps (if left undisturbed), generating seat tallies for Democrats well below those that would be generated from a neutral districting plan." *Id.* at 66.

181

Additionally, Dr. Jackman evaluated the likely persistence of the 2016 Plan's pro-Republican bias by conducting a uniform swing analysis and determining the size of pro-Democratic swing necessary to eliminate the 2016 Plan's pro-Republican efficiency gap. *Id.* at 54–60. Dr. Jackman found that it would require a uniform swing of approximately 9 percentage points in Democrats' favor—on the order of the 1974 post-Watergate swing in favor of Democrats, the largest pro-Democratic swing that has occurred in North Carolina since 1972—for the efficiency gap to return to zero, and therefore for the 2016 Plan to lose its pro-Republican bias. *Id.* at 55–59. Based on these analyses, Dr. Jackman concluded that the 2016 Plan's pro-Republican efficiency gap "is durable," and that it would require a swing of votes in Democratic candidates' favor of "historic magnitude" to strip the 2016 Plan of its pro-Republican bias. Trial Tr. II, at 54:24–55:9; *see also* Ex. 4002, at 66 (concluding that the 2016 Plan's large, pro-Republican efficiency gap is "likely to endure over the course of the plan").

Legislative Defendants raise several objections to Dr. Jackman's efficiency gap analysis: (1) the efficiency gap cannot be applied in all states; (2) the efficiency gap is a measure of "proportional representation," and therefore is foreclosed by controlling Supreme Court precedent; (3) there are several problems with Dr. Jackman's efficiency gap thresholds for identifying when a particular plan is biased towards one party and when that bias is likely to persist; (4) the efficiency gap does not account for a variety of idiosyncratic factors that play a significant role in determining election outcomes; (5) the efficiency gap fails to flag as unconstitutional certain districting plans that bear certain hallmarks of a partisan gerrymander; (6) the efficiency gap cannot be administered

182

prospectively, making it impossible for a legislature to predict whether a districting plan will violate the Constitution; and (7) the efficiency gap does not encourage mapmakers to draw more competitive districts. Leg. Defs.' FOF 62–66. Although we do not entirely discount all of these objections, we find that they do not individually, or as a group, materially undermine the persuasive force of Dr. Jackman's efficiency gap analysis regarding the 2016 Plan.

Dr. Jackman concedes that the sensitivity of the efficiency gap in jurisdictions with only a few districts—in the case of congressional districts, states with six or fewer districts—renders it difficult, if not impossible, to apply. *See* Ex. 4002, at 19. According to Legislative Defendants, this limitation requires this Court to categorically reject the efficiency gap as a measure of partisan gerrymandering because "[i]t would be untenable for a court to impose a constitutional standard on one state that literally cannot be imposed or applied in all other states." Leg. Defs.' Br. 10. But League Plaintiffs do not propose that this Court constitutionalize the efficiency gap—nor does this Court do so. Rather, League Plaintiffs argue—and this Court finds—that Dr. Jackman's efficiency gap analysis provides *evidence* that Defendants violated the governing constitutional standard: that a redistricting body must not adopt a districting plan that intentionally subordinates the interests of supporters of a disfavored party and entrenches a favored party in power. *See supra* Parts III.A. That constitutional standard does not vary with the size of a state's congressional delegation. In states entitled to a small number of representatives, a partisan gerrymandering plaintiff simply will have to rely on different types of *evidence* to prove that the redistricting body violated that constitutional standard.

Importantly, in addition to the efficiency gap, this Court relies on a variety of other types of evidence probative of the 2016 Plan's discriminatory effects, much of which could be relied on in states with a smaller number of congressional districts. *See infra* Part III.B.

Legislative Defendants also are correct that the Constitution does not entitle supporters of a particular party to representation in a state's congressional delegation in proportion to their statewide vote share. *See LULAC*, 548 U.S. at 419 (opinion of Kennedy, J.) ("To be sure, there is no constitutional requirement of proportional representation . . . ."). But the efficiency gap, like other measures of partisan asymmetry, does not dictate strict proportional representation. Trial Tr. II, at 48:21–50:7; Trial Tr. III, at 70:5–7. In particular, the efficiency gap permits a redistricting body to choose to draw a districting plan that awards the party that obtains a bare majority of the statewide vote a larger proportion of the seats in the state's congressional delegation (referred to as a "winner's bonus"). The efficiency gap, therefore, is not premised on strict proportional representation, but rather on the notion that the magnitude of the winner's bonus should be approximately the same for both parties. Trial Tr. II, at 49:8–17 (Dr. Jackman explaining that partisan symmetry is a "weaker property" than proportional representation because "[a]ll it insists on is that the mapping from votes into seats is the same for both sides of politics"). Even if the efficiency gap did amount to a measure of proportional representation, "[t]o say that the Constitution does not require proportional representation is not to say that highly *dis*proportionate representation may not be evidence of a discriminatory effect." *Whitford*, 218 F. Supp. 3d at 906-07. On the contrary, a number of Justices have concluded that disproportionate representation constitutes evidence,

184

although not conclusive evidence, of a redistricting plan's discriminatory effects—the same way in which we treat Dr. Jackman's efficiency gap evidence. *LULAC*, 548 U.S. at 419 (opinion of Kennedy, J.) ("[A] congressional plan that more closely reflects the distribution of state party power seems a less likely vehicle for partisan discrimination than one that entrenches an electoral minority."); *Bandemer*, 478 U.S. at 132 (plurality op.) ("[A] failure of proportional representation *alone* does not constitute impermissible discrimination under the Equal Protection Clause." (emphasis added)).

As to Dr. Jackman's proposed thresholds, Legislative Defendants are correct that in *Gill* Dr. Jackman used a different method for calculating an efficiency gap[40] and found "that an efficiency gap above 7% in any districting plan's first election year will continue to favor that party for the life of the plan." 218 F. Supp. 3d at 905. By contrast, here Dr. Jackman concluded that, in states like North Carolina with 7 to 14 representatives, a 12 percent first-year efficiency gap indicates that the districting plan's partisan bias will persist in subsequent elections. Ex. 4002, at 51–54. Even under the more conservative threshold Dr. Jackman proposes in this case, approximately one-third of the post-2000

_____

[40] In *Gill*, Dr. Jackman used the "simplified method" for calculating the efficiency gap, which assumes equal voter turnout at the district level and that for each "1% of the vote a party obtains above 50%, the party would be expected to earn 2% more of the seats." 218 F. Supp. 3d at 855 n.88, 904. Although it accepted Dr. Jackman's analysis, the district court expressed a preference for the "full method" of calculating the efficiency gap because that method does not rely on assumptions about voter turnout and the votes-to-seats ratio. *Id.* at 907–08. Dr. Jackman calculated the 2016 Plan's efficiency gap, as well as the efficiency gaps observed in his 512-election database, using the "full method," and therefore his analysis does not rest on the assumptions about which the district court expressed concern. We decline to criticize Dr. Jackman for changing his analysis to the methodology the district court found most reliable and informative.

districting plans in such states that would trip Dr. Jackman's threshold did not have an average remainder-of-the-plan efficiency gap of sufficient magnitude to establish that the districting plan deprived the disfavored party of at least one seat. *Id.* at 53. We agree with Legislative Defendants that this error rate, which pertains only to the durability of a gerrymander, weighs against relying on Dr. Jackman's proposed thresholds as the sole basis for holding unconstitutional a districting plan. But Dr. Jackman's efficiency gap analysis—and his threshold analysis, in particular—is not the sole, or even primary, form of evidence we rely on in finding that nearly all of the districts in the 2016 Plan violate the Equal Protection Clause. And given (1) that the magnitude of the 2016 Plan's efficiency gap in the 2016 congressional election (19.4 percent) significantly exceeded either threshold, (2) that most plans in Dr. Jackman's database that exceeded his proposed threshold continued to exhibit a meaningful bias throughout their life, and (3) that numerous other pieces of evidence provide proof of the 2016 Plan's discriminatory effects, we do not believe this concern strips Dr. Jackman's analyses of their persuasive force in this case. *See Whitford*, 218 F. Supp. 3d at 907–08 (acknowledging different methods of calculating the efficiency could prove problematic in other cases but nonetheless relying on efficiency gap evidence because challenged legislative districting plan was not "at the statistical margins" and "both methods yield[ed] an historically large, pro-Republican [efficiency gap]").

Legislative Defendants next assert that the efficiency gap, as a "mathematical formula," does not take into account a number of idiosyncratic considerations that effect the outcome of particular elections, such as "the quality of . . . candidates, the amount of

186

money raised, the impact of traditional districting principles on election results, whether Democratic voters are more concentrated than Republican voters, and the impact of wave elections." Leg. Defs.' FOF 65. We agree that each of these considerations may impact the outcome of a particular election. But we reject Legislative Defendants' assertion that Dr. Jackman's conclusion that the 2016 Plan is an extreme partisan outlier does not account for these contest-specific factors. On the contrary, Dr. Jackman reached his conclusion by comparing the 2016 Plan's efficiency gap with efficiency gaps observed in the other 512 elections in his database. That database comprises results from 512 elections occurring in 25 states over a 44-year period. As Dr. Jackman explained, "all of those [election-specific] factors appeared in those 512 elections," including the Watergate and 1994 wave elections, candidates facing political scandals, candidates who were well-funded or poorly funded, states with political geography favoring one party or the other, and unique candidates at the top of the ballot like President Obama and President Trump. Trial Tr. II, at 69:5–18. Accordingly, comparing the 2016 Plan's efficiency gap to those observed in hundreds of other elections allowed Dr. Jackman to conclude that the election-specific factors that Legislative Defendants highlight do not explain the large magnitude of the 2016 Plan's pro-Republican efficiency gap.

Relatedly, Legislative Defendants contend that Dr. Jackman's proposed efficiency thresholds flag several bipartisan districting plans or districting plans drawn by courts or nonpartisan commissions and fail to flag as partisan gerrymanders a number of districting plans that bear other hallmarks of gerrymandering such as irregular shapes and widespread division of political subdivisions and voting precincts. *See* Ex. 5101, at 29–

62.  But if a districting plan is drawn on a bipartisan basis or by a nonpartisan body, a plaintiff will be unable to establish that it was drawn with discriminatory intent, and therefore the plan will pass constitutional muster.  *See Whitford*, 21 F. Supp. 3d at 908. Likewise, just as compliance with traditional redistricting criteria does not immunize a districting plan from constitutional scrutiny, *see supra* Part III.B.1.a.iv, failure to comply with redistricting criteria does not necessarily prove the inverse—that a districting plan amounts to an actionable partisan gerrymander.   And to the extent Dr. Jackman's threshold fails to flag certain unconstitutional plans, a plaintiff can rely on other types of evidence to prove a plan's discriminatory effects.   Additionally, each of these concerns are not present in this case—the Republican-controlled General Assembly intended to dilute the votes of non-Republican voters and the 2016 Plan exhibited an extremely large efficiency gap in the 2016 election—meaning that those concerns, although potentially legitimate in other cases, do not significantly undermine the probative force of Dr. Jackman's efficiency gap conclusions as to the 2016 Plan.  *Accord Whitford*, 218 F. Supp. 3d at 908.

We also reject Legislative Defendants' assertion that a state redistricting body cannot apply the efficiency gap prospectively.  In particular, Dr. Chen used the results from the seven races on which Dr. Hofeller relied and the twenty races included in the Committee's Political Data criterion to predict the efficiency gap for both the 2016 Plan and the 3,000 simulated plans he generated.  Ex. 2010, at 32–34.  Like Dr. Jackman's *post hoc* analysis, Dr. Chen's analysis revealed that the 2016 Plan's predicted efficiency gap was an extreme outlier relative to the simulated plans in his sample and significantly

188

higher than the thresholds suggested by Dr. Jackman. *Id.* at 25. Accordingly, just as the General Assembly used the data relied on by Dr. Hofeller and prescribed by the Committee to predict (correctly) that the 2016 Plan would elect ten Republicans and three Democrats, so too could it have used that same data to predict the 2016 Plan's efficiency gap—and that the magnitude of that gap would provide strong evidence of the 2016 Plan's pro-Republican bias.[41]

Finally, we agree with Legislative Defendants that the efficiency gap does not provide redistricting bodies with an incentive to draw districting plans with more competitive districts. But the 2016 Plan, which Legislative Defendants seek to keep in place, also creates uniformly "safe" districts. *See* Ex. 3022. And the Supreme Court has never held that the Constitution entitles voters to competitive districts. Accordingly, regardless of whether the efficiency gap's failure to encourage redistricting bodies to draw districting plans with competitive districts is desirable from a policy perspective, that failure does not render the efficiency gap legally infirm.

*Partisan bias*—the second measure of partisan asymmetry calculated by Dr. Jackman—measures a districting plan's asymmetry by taking the two parties' statewide vote share in a particular election, and then imposing a uniform swing of the magnitude

---

[41] At trial, League Plaintiffs sought to adduce additional evidence of legislators' ability to use the efficiency gap prospectively by asking Dr. Jackman about a report purportedly prepared by a North Carolina state legislator calculating the efficiency gap for a proposed state legislative districting plan. Trial Tr. II, at 136:24–137:7. Legislative Defendants objected to the question on hearsay grounds. *Id.* at 137:10–13. Having taken the objection under advisement at trial, we now sustain that objection.

necessary to make the parties split the statewide vote equally. Trial Tr. II, at 47:7–21; *LULAC*, 548 U.S. at 420 (explaining that partisan bias is measured by "comparing how both parties would fare hypothetically if they each (in turn) had received a given percentage of the vote" (internal quotation marks and alteration omitted)). After performing the uniform swing, the analyst then calculates the number of seats each party would win. Trial Tr. II, at 47:7–21. A districting plan "is biased in favor of the party that would win more than 50 percent of the seats, if it won 50 percent of the vote and is biased against the . . . party that would win less than 50 percent of the seats if it were able to win 50 percent of the vote," Dr. Jackman explained. *Id.* at 46:15–47:4. When partisan bias is close to zero, a districting plan does not favor, invidiously or otherwise, one party or the other. Ex. 4002, at 13–17; Trial Tr. II, at 48:21–50:7. In *LULAC*, a majority of the Court agreed that partisan bias, at a minimum, has "utility in redistricting planning and litigation," even if, by itself, it is "not a reliable measure of unconstitutional partisanship." 548 U.S. at 420 (opinion of Kennedy, J.); *id.* at 483–84 (Souter, J. dissenting in part) (joined by Ginsburg, J., noting that "[i]nterest in exploring [partisan bias and other measures of partisan symmetry] is evident" and citing separate opinions of Kennedy, J., Stevens, J., and Breyer, J.).

Dr. Jackman found that the 2016 Plan exhibited a pro-Republican partisan bias of 27 percent. Ex. 4003, at 3–4. He again sought to put that figure in perspective by comparing it to previous North Carolina congressional elections and congressional elections across the country. Dr. Jackman found that the 2016 Plan's partisan bias in the 2016 election was the largest observed in North Carolina since 1972, the first year for

190

which he had data.  *Id.*   And the 2016 Plan's partisan bias was the *second largest* observed among the 283 state congressional elections[42] in his database, and "roughly three standard deviations from the historical mean."  *Id.* at 4.  Based on these findings, Dr. Jackman characterized the partisan bias exhibited by the 2016 Plan as "extreme"— "of quite literally historic magnitude, not just relative to North Carolina's history, but in the United States of America."  Trial Tr. II, at 80:15, 80:24–81:1.

Finally, Dr. Jackman estimated the 2016 Plan's *mean-median difference* in North Carolina's 2016 congressional election.   As its name suggests, the mean-median difference is the difference between a party's mean vote share in a particular election and median vote share in that election across all of the districts included in the subject districting plan.  Ex. 4003, at 7.  In his report, Dr. Jackman explained that the intuition behind the mean-median difference measure "is that when the mean and the median diverge significantly, the distribution of district-level vote shares is skewed in favor of one party and against its opponent—consistent with the classic gerrymandering techniques of 'packing' partisans into a relatively small number of districts and/or

---

[42] In comparing the 2016 Plan's partisan bias with that exhibited in elections in other states, Dr. Jackman excluded what he characterized as "uncompetitive elections"— elections in which the two parties' statewide vote shares were not closer than the range of 55 percent to 45 percent.  Ex. 4003, at 4–5.  Accordingly, Dr. Jackman had fewer comparators for his partisan bias estimate than for his efficiency gap estimate.  Dr. Jackman explained that he excluded uncompetitive elections because partisan bias is a less reliable measure of partisan asymmetry in such elections.  *Id.* at 5.  Legislative Defendants take no issue with that methodological decision.  North Carolina's 2016 statewide congressional vote was within the 55%-to-45% range, and therefore, under Dr. Jackman's unrebutted opinion, partisan bias provides reliable evidence of the 2016 Plan's partisan asymmetry in 2016.

'cracking' partisans among a larger number of districts." *Id.* As with the efficiency gap and partisan bias, the closer the mean-median difference is to zero, the less a plan is biased (invidiously or otherwise) towards one party or another.

Dr. Jackman found that the 2016 Plan exhibited a pro-Republican mean-median difference of 5.1 percent in North Carolina's 2016 congressional election. He explained that the mean-median difference arose from the packing of Democratic voters in the three districts in which Democratic candidates prevailed, and the dispersal of Democratic voters across the remaining districts. Trial Tr. II, at 81:17–21 ("[T]he skew here arises from the fact that there are three districts where Democratic vote share is in the 60s, and then there are ten where it's below 50 percent, where the Democrat lost."). Again seeking to put the 2016 Plan's 5.1 percent figure in historical perspective, Dr. Jackman found that "North Carolina's average mean-median difference from 1972 to 2016 was just 1.0%," Ex. 4003, at 8, and for the other state elections included in his database the average mean-median difference was "roughly . . . zero." Trial Tr. II, at 81:22.

We find Dr. Jackman's partisan asymmetry analyses—each of which measures the 2016 Plan's packing and cracking of non-Republican voters—establish, on a statewide basis, that the 2016 Plan dilutes the votes of supporters of Democratic candidates and serves to entrench the Republican Party's control of the state's congressional delegation. In particular, we find it significant that three different measures of partisan asymmetry all point to the same result—that the 2016 Plan poses a significant impediment to supporters of non-Republican candidates translating their votes into seats, and that the magnitude of that impediment is an extreme outlier relative to other congressional districting plans.

192

We also find it significant that Dr. Jackman's analyses demonstrate the durability of the 2016 Plan's pro-Republican bias, both by comparing the 2016 Plan to other plans that were used in multiple elections and by demonstrating that 2016 Plan is likely to retain its pro-Republican bias "under any *likely* electoral scenario." *Whitford*, 218 F. Supp. 3d at 899, 903. Given that durability, we find that the 2016 Plan has the effect of entrenching Republican candidates in power, even in the face of significant shifts in voter support in favor of non-Republican candidates, and thereby likely making Republican elected representatives less responsive to the interests of non-Republican members of their constituency.

iii.

Next, we find that Dr. Mattingly's and Dr. Chen's simulation analyses not only evidence the General Assembly's discriminatory intent, but also provide strong evidence of the 2016 Plan's statewide discriminatory effects. As explained above, Dr. Mattingly created an ensemble of 24,518 simulated districting plans that conform to traditional redistricting criteria, and then assessed the electoral outcomes of those plans relative to the 2016 Plan using actual votes cast in North Carolina's 2012 and 2016 congressional elections. *See supra* Part III.B.1.a.ii. When he evaluated the ensemble using actual 2012 votes, Dr. Mattingly found that nearly 80 percent of the simulated plans would have yielded two-to-three fewer seats for Republicans than the 2016 Plan, and more than 99 percent of the plans resulted in at least one less seat for Republicans. Ex. 3040, at 7–10. And using actual 2016 congressional votes, Dr. Mattingly found that more than 70 percent of the simulated plans produced two-to-three fewer seats for Republicans than the

193

2016 Plan, and more than 99 percent of the plans resulted in at least one less seat for Republicans. *Id.* at 19–22. Dr. Mattingly's ensemble also revealed evidence that the 2016 Plan diluted the votes of supporters of Democratic candidates: Democratic candidates in the three most Democratic districts in the 2016 Plan—Districts 1, 4, and 12—received a significantly *higher* share of the two-party vote than the three most Democratic districts in Dr. Mattingly's 24,518-plan ensemble. Ex. 3040, at 28–29. And in the eighth-through-tenth most Democratic districts in the 2016 Plan—in which Democratic candidates lost—the Democratic candidate received a significantly *lower* share of the votes than in the equivalent districts in the 24,518-plan ensemble. *Id.* Accordingly, Dr. Mattingly's analyses indicate that the 2016 Plan had a measurable, tangible adverse impact on supporters of non-Republican candidates.

Dr. Chen's simulation analyses likewise indicate that the 2016 Plan had a measurable tangible statewide adverse effect on supporters of non-Republican candidates. Analyzing his first set of 1,000 simulated plans—which sought to conform to the Committee's non-partisan criteria—using elections results reflected in Dr. Hofeller's seven-race formula, Dr. Chen found that 78 percent of the simulated plans would have elected three-to-four fewer Republican candidates, with *all* of the plans electing at least one less Republican candidate. *See* Ex. 2010, at 12–13. And using the Committee's twenty-race criterion, Dr. Chen found that 94.5 percent of the simulated plans would have elected two-to-four fewer Republican candidates, with *all* of the plans electing at least one fewer Republican candidate. *Id.* at 13. Dr. Chen found similar results when he used the 2,000 simulated plans in his simulated sets that sought to avoid pairing incumbents

194

and match the county splits and incumbent protection of the 2016 Plan. *Id.* at 16, 21. Based on these results, Dr. Chen concluded that the 2016 Plan "creates 3 to 4 more Republican seats than what is generally achievable under a map-drawing process respecting non-partisan, traditional districting criteria." *Id.* at 2–3.

To assess the 2016 Plan's partisan effects, Dr. Chen also compared the 2016 Plan's efficiency gap with those of his simulated plans. For each of his three sets of 1,000 simulated districting plans, Dr. Chen found that the 2016 Plan yielded a significantly higher pro-Republican efficiency gap than *all* of the simulated plans, regardless of whether he used the results from the seven elections relied on by Dr. Hofeller or the twenty elections prescribed by the Committee. *Id.* at 32–34. Because the 2016 Plan yielded "improbabl[y]" high pro-Republican efficiency gaps, Dr. Chen concluded "with overwhelmingly high statistical certainty that neutral, non-partisan districting criteria, combined with North Carolina's natural political geography, could not have produced a districting plan as electorally skewed as the [2016 Plan]." *Id.* at 25.

Taken together, Dr. Mattingly's and Dr. Chen's analyses—which use multiple methods for generating districting plans and multiple sets of votes—provide further strong evidence that the 2016 Plan had the effect of diluting the votes of non-Republican voters, and entrenching Republican congressmen in office. As detailed above, none of Legislative Defendants' objections to Dr. Mattingly's and Dr. Chen's analyses call into question their persuasive force. *See supra* Part III.B.1.a.ii.

iv.

195

Finally, although not essential to our finding that the 2016 Plan had the effect of discriminating against supporters of non-Republican candidates, the results of the two congressional elections conducted under the *2011 Plan*—and empirical analyses of those results—provide further evidence of the *2016 Plan*'s discriminatory effects. As explained previously, *see supra* Part II.B.1.a.iii, because the Adopted Criteria expressly sought to carry forward the 2011 Plan's partisan effects, Ex. 1007, any discriminatory partisan effects attributable to the 2011 Plan are probative of the 2016 Plan's discriminatory effects. That is particularly true given that, according to an analysis by Legislative Defendants' expert Dr. Hood, most of the districts created by 2016 Plan retained the "core" of their constituency under the 2011 Plan, Ex. 5058, at 23, including, for example, Districts 1, 4, and 12 in which Dr. Hofeller expressly sought to "concentrat[e]" likely Democratic voters, Ex. 2043, at 33–34.

In North Carolina's 2012 election conducted under the 2011 Plan, North Carolina voters statewide cast 50.9 percent of the votes for Democratic congressional candidates, yet Democratic candidates won only 30.8 percent of the state's congressional seats (4 of 13). Ex. 4002, at 62. The 2011 Plan exhibited a 21.4 percent pro-Republican efficiency gap in the 2012 election. *Id.* In 2014, Democratic candidates won 46.2 percent of the statewide vote, and won 23.1 percent of the seats in the state's congressional delegation, producing a pro-Republican efficiency gap of 21.1 percent. *Id.* North Carolina's 2012 and 2014 efficiency gaps produced under the 2011 Plan were twelfth- and fourteenth-largest by magnitude in Dr. Jackman's 512-election sample. *Id.* at 65. Therefore, as the durability analyses conducted by Dr. Jackman described above would indicate, the

196

magnitude of the 2012 efficiency gap pointed to the large efficiency gap realized in 2014. *See supra* Part III.B.2.b.ii.

Noting that the magnitude of North Carolina's efficiency gaps under the 2011 Plan were significantly higher than those exhibited by the 2001 Plan, Dr. Jackman concluded that the 2011 Plan "is the driver of the change, systematically degrading the efficiency with which Democratic votes translate into Democratic seats in North Carolina." Ex. 4002, at 66. Accordingly, because (1) the General Assembly drew the 2016 Plan to perpetuate the partisan effects of the 2011 Plan and (2) evidence reveals that the 2011 Plan was systematically biased to durably dilute the votes of supporters of non-Republican candidates, we find that the pro-Republican bias of the 2011 Plan provides further evidence of the 2016 Plan's statewide discriminatory effects.

* * * * *

When viewed in totality, we find Plaintiffs' statewide evidence establishes that the 2016 Plan has diluted the votes of voters who support non-Republican candidates, and will continue to do so in the future. In making this determination, we find it significant that Plaintiffs' evidence proves the 2016 Plan's discriminatory effects in a variety of different ways. Plaintiffs' direct evidence based on the actual results of an election conducted under the 2016 Plan confirmed that the discriminatory effects intended by the 2016 Plan's architects and predicted by Dr. Mattingly's analyses—the election of 10 Republicans by margins that suggest they will retain their seats throughout the life of the plan—in fact occurred. That five different types of statistical analyses performed by three different experts all reached the same conclusion gives us further confidence that

197

2016 Plan produces discernible discriminatory effects. And although some of those analyses considered "unfair results that would occur in a hypothetical state of affairs," *LULAC*, 548 U.S. at 420 (opinion of Kennedy, J.), others like the efficiency gap and the mean-median difference did not. Given that all of this evidence "point[s] in the same direction"—and Legislative Defendants failed to provide any evidence to the contrary—Plaintiffs have provided "strong proof" of the 2016 Plan's discriminatory effects. *Sylvester*, 453 F.3d at 903.

### c. *Lack of Justification*

We now consider whether the 2016 Plan's dilutionary effects are justified by a legitimate state districting interest or neutral explanation. Legislative Defendants offer two statewide explanations[43] for the 2016 Plan's discriminatory effects: (i) North Carolina's political geography, which reflects the "natural packing" of Democratic voters, and (ii) the General Assembly's interest in protecting incumbents, and the electoral benefits of incumbency. We reject both proposed justifications.

### i.

Legislative Defendants first argue that Democratic voters tend to congregate in North Carolina's urban centers, and therefore that the 2016 Plan's pro-Republican

---

[43] Notwithstanding (1) that Common Cause Plaintiffs, in particular, have pressed a district-by-district Equal Protection challenge to the 2016 Plan throughout the course of this litigation, *see supra* Part II.A.1.a, and (2) Legislative Defendants have consistently argued that partisan vote dilution claims under the Equal Protection Clause must proceed district-by-district, Legislative Defendants never have advanced any district-specific justifications for the 2016 Plan's discriminatory effects.

partisan bias is attributable to such natural packing, rather than invidious partisan discrimination. *See* Ex. 5058, at 10–13; *Vieth*, 541 U.S. at 289–90 (plurality op.) (describing "'natural' packing"). To support their natural packing argument, Legislative Defendants rely on a shaded map prepared by Dr. Hood reflecting the partisan makeup of North Carolina's VTDs. Ex. 5058, at 9–10. According to Dr. Hood, that map "visual[ly]" demonstrates that "Democrats appear to be located in urban areas (e.g. Charlotte, Asheville, Winston-Salem, Greensboro, Durham, and Raleigh) and within the *blackbelt*[44] area of the state that runs through the coastal plain subregion," whereas "Republican partisans are much more geographically dispersed, producing a larger footprint within the state." *Id.* at 9–10 (footnote text altered). We agree with Legislative Defendants that supporters of Democratic candidates often cluster in North Carolina's urban areas, but we find that this clustering does not explain the 2016 Plan's pro-Republican discriminatory effects, for several reasons.

First, Dr. Hood conceded on cross-examination that, in drawing the 2016 Plan, the General Assembly repeatedly divided Democratic clusters. For example, Dr. Hood conceded that the 2016 Plan "cracked" the naturally occurring Democratic cluster in the

---

[44] According to Dr. Hood, the term "blackbelt" refers to North Carolina's "Coastal Plain" region, which encompasses a large population of African-American voters. *See* Ex. 5058, at 10, n.16. Dr. Hood's characterization of the "blackbelt" as a distinct political subregion derives from a 1949 academic analysis of North Carolina's political subregions. V.O. Key, Jr., Southern Politics in State and Nation (Alfred A. Knopf 1949). Dr. Hood did not directly testify as to whether that analysis, which is nearly seventy years old and predates the civil rights movement, continues to accurately reflect North Carolina's political geography.

City of Asheville and Buncombe County into two districts that he classified as "safe" Republican districts. Trial Tr. IV, at 40:1–43:4. Dr. Hood further conceded that had the General Assembly kept that naturally occurring Democratic cluster whole, it would have been more likely that voters in the cluster would have elected a Democratic candidate. *Id.* at 42:23–43:4. Dr. Hood similarly conceded that the 2016 Plan "cracked" several other naturally occurring Democratic clusters and, by "submerg[ing]" likely Democratic voters in pro-Republican districts, made it easier for Republican candidates to prevail in more districts. *Id.* at 43:5–50:25; *see infra* Part III.B.2. Accordingly, testimony by *Legislative Defendants' expert* belies any argument that natural packing explains the 2016 Plan's discriminatory partisan effect.

Second, Dr. Mattingly's and Dr. Chen's simulation analyses, both of which account for the state's political geography, found that "natural packing" of Democratic voters did not explain the 2016 Plan's partisan effects. In particular, based on his ensemble of 24,518 simulated congressional districting plans—all of which conformed to traditional redistricting criteria such as population equality, contiguity, keeping political subdivisions and precincts whole, compactness, and complying with the Voting Rights Act—Dr. Mattingly concluded that "the background structure in the geopolitical makeup of North Carolina, . . . its geography, where its people live, where its voters in each party are distributed, and whether the African-American population is, and what that necessitates relative to the Voting Rights Act" did not explain the 2016 Plan's partisan bias. Trial Tr. I, at 91:20–92:19. Dr. Chen's analysis of his simulated districting plans— which conformed to the nonpartisan criteria adopted by the Committee—reached the

200

same conclusion: the "political geography of North Carolina voters" does not explain the 2016 Plan's pro-Republican bias. *Id.* at 212:14–214:2.

Legislative Defendants have not provided *any* persuasive basis for calling into question Dr. Mattingly's and Dr. Chen's methods, findings, and conclusions. *See supra* Part III.B.1.a.ii. And other than Dr. Hood's "visual" analysis, Legislative Defendants have not provided any contrary empirical analysis showing that the state's political geography does, in fact, explain the 2016 Plan's discriminatory effects. *See Whitford*, 218 F. Supp. 3d at 914–15 (concluding that Wisconsin's political geography did not explain legislative districting plan's partisan bias when the defendant's natural packing argument was "based largely on . . . shaded maps rather than quantitative analysis"). Accordingly, we find that North Carolina's political geography does not explain the 2016 Plan's discriminatory effects on supporters of non-Republican candidates.

ii.

Next, Legislative Defendants suggest that the 2016 Plan's discriminatory effects are attributable to the General Assembly's legitimate interest in protecting incumbents elected under the 2011 Plan and the electoral benefits attributable to incumbency. Legislative Defendants are correct that state redistricting bodies have a legitimate interest, at least outside the remedial context,[45] in drawing districts so as to avoid pairing

---

[45] Although the Supreme Court has recognized that a redistricting body generally has a legitimate interest in avoiding the pairing of incumbents, the Supreme Court has not addressed whether, and by what means, a state redistricting body directed to draw remedial districts may protect incumbents elected in unconstitutional districts. *Easley v. Cromartie*, 532 U.S. 234, 262 n.3 (U.S. 2001) (Thomas, J., dissenting) (noting that that
(Continued)

incumbents in a single district.  *See Karcher*, 462 U.S. at 740.  But we find that the General Assembly's efforts to protect incumbents do not explain the 2016 Plan's discriminatory partisan effects.

In particular, Dr. Chen's simulation analyses demonstrate that the General Assembly could achieve its interest in avoiding the pairing of incumbents without

---

question was not presented to the Supreme Court or district court and, therefore, that the Court had not addressed it).  Four Justices, however, have stated that whether "the goal of protecting incumbents is legitimate, even where, as here, individuals are incumbents by virtue of their election in an unconstitutional racially gerrymandered district . . . is a questionable proposition."  *Id.*  The Justices' skepticism regarding the use of incumbency in the remedial context accords with the Supreme Court's admonition that remedial plans should not "validate the very maneuvers that were a major cause of the unconstitutional districting."  *Abrams v. Johnson*, 521 U.S. 74, 86 (1997).  Lower courts likewise have expressed concern about the use of incumbency in the remedial context.  *See Ketchum v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984) (expressing skepticism about efforts to protect incumbents in maps drawn to remedy impermissible race-based districting because "many devices employed to preserve incumbencies are necessarily racially discriminatory"); *Jeffers v. Clinton*, 756 F. Supp. 1195, 1199–1200 (E.D. Ark. 1990) (rejecting remedial districts that violated Voting Rights Act, notwithstanding that the districts were designed to protect incumbents, because "[t]he desire to protect incumbents, either from running against each other or from a difficult race against a black challenger, cannot prevail if the result is to perpetuate violations of the equal-opportunity principle contained in the Voting Rights Act").  The district court in *Covington* held that any interest a legislative body tasked with drawing a remedial districting plan has in protecting incumbents must give way to its obligation to remedy the constitutional violation, and therefore that the General Assembly's interest in protecting incumbents elected in racially gerrymandered districts and districts adjacent to such districts did not justify an enacted remedial plan's failure to fully remedy the segregation of voters on the basis of race.  283 F. Supp. 3d at 429–42.  The Supreme Court affirmed that judgment.  138 S. Ct. at 2552–54

The General Assembly drew the 2016 Plan after the 2011 Plan was found to be an unconstitutional racial gerrymander.  *See supra* Part I.B.  Accordingly, whether the General Assembly had a legitimate interest in protecting incumbents elected under the 2011 Plan remains uncertain, particularly with regard to those incumbents elected in the unconstitutional districts and districts adjoining the unconstitutional districts.

202

drawing a plan exhibiting the discriminatory effects of the 2016 Plan. Ex. 2010, at 15–19. Indeed, Dr. Chen's simulated plans advanced the Committee's goal of avoiding pairing incumbents *more effectively* than the 2016 Plan: unlike the 2016 Plan, which paired two of the state's thirteen incumbents, Dr. Chen drew 1,000 plans that did not pair *any* incumbents. *Id.* at 3, 15–19 ("These simulation results clearly reject any notion that an effort to protect incumbents might have warranted the extreme partisan bias observed in the [2016 Plan].").

Additionally, to ensure that the election data upon which he relied—the *same* data relied upon by Dr. Hofeller and prescribed by the Committee's Political Data criterion—adequately accounted for the benefits of incumbency, Dr. Chen performed a sensitivity analysis that accounted for the electoral advantages associated with incumbency. *Id.* at 26–31. Although that sensitivity analysis revealed, as expected, that incumbents enjoy electoral advantages, *id.* at 27 (finding that North Carolina congressional incumbents receive, on average, approximately 3 percent greater electoral support than nonincumbents), Dr. Chen found that the revealed electoral advantage associated with incumbency did not explain the 2016 Plan's pro-Republican bias, *id.* at 28–30, 32–37.

Dr. Chen's finding that incumbency does not explain the 2016 Plan's partisan bias is unsurprising given that the 2016 Plan sought to protect the incumbents elected under the 2011 Plan. As explained above, the General Assembly expressly drew the 2011 Plan "to minimize the number of districts in which Democrats would have an opportunity to elect a Democratic candidate." Hofeller Dep. 127:19–22; *see also supra* Part III.A.2–3. And the 2011 Plan had the effect of diluting the votes of supporters of Democratic

203

candidates and entrenching Republican control of the state's congressional delegation. Accordingly, the General Assembly's effort to protect incumbents elected under the 2011 Plan when it drew the 2016 Plan served to perpetuate the discriminatory partisan effects of the 2011 Plan.

Legislative Defendants nevertheless argue that Republican candidates' success in the 2016 election under the 2016 Plan was attributable to advantages associated with incumbency, including that the Republican incumbents attracted less experienced opponents and raised significantly more money than their opponents. Ex. 5058, at 6–7; Trial Tr. IV, at 51:1–53:12. But Legislative Defendants' political science expert, Dr. Hood, conceded on cross-examination that the likelihood an incumbent will prevail in a redrawn district impacts the incumbent's ability to raise money and whether he draws a strong opponent. Trial Tr. IV, at 54:23–55:12. To that end, Dr. Hood further conceded that the Republican incumbents may have attracted weak opponents and raised substantially more money because the General Assembly drew the Republican incumbents districts in which they were likely to prevail—a possibility that Dr. Hood did not consider, much less evaluate. *Id.* at 54:9–59:18.

Given that Legislative Defendants' own expert acknowledged that the 2016 Plan's discriminatory lines may have caused Republican incumbents' observed advantages, and that Legislative defendants failed to offer any analyses rebutting Dr. Chen's rigorous quantitative analysis showing that the General Assembly's goal of protecting incumbents did not explain the 2016 Plan's pro-Republican bias, we find the General Assembly's

interest in protecting incumbents and the electoral advantages associated with incumbency do not explain the 2016 Plan's discriminatory partisan effect.

* * * * *

In sum, we find that Plaintiffs' statewide evidence establishes that the General Assembly drew and enacted the 2016 Plan with a predominant intent to subordinate the interests of non-Republican voters and entrench Republican control of North Carolina's congressional delegation. We further find that numerous forms of statewide evidence prove that the 2016 Plan achieved the General Assembly's discriminatory partisan objective. And we find that neither North Carolina's political geography nor the General Assembly's interest in protecting incumbents explains the 2016 Plan's discriminatory effects.

## 2. District-Specific Evidence

Having concluded that Plaintiffs have introduced compelling statewide evidence bearing on discriminatory intent, discriminatory effects, and lack of justification, we turn to Plaintiffs' district-specific evidence. Because *Gill* expressly analogized to partisan vote dilution claims to racial gerrymandering claims, 138 S. Ct. at 1930, and because racial gerrymandering claims also proceed on a district-by-district basis, in evaluating each of the districts in the 2016 Plan we will draw on racial gerrymandering precedent. Recall that in a *Shaw*-type racial gerrymandering challenge a plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. In such cases, the Supreme Court has considered several forms of evidence, none

205

of which is necessary or decisive alone, as probative that an impermissible consideration predominated.

First, the Supreme Court has said that a lack of "respect for political subdivisions" may indicate an improper motive predominated. *Shaw I*, 509 U.S. at 647. For example, the division of counties, municipalities, or precincts can be probative that an improper motive predominated. *Miller*, 515 U.S. at 908, 918. Additionally, if the legislature has split "communities of interest" or grouped areas with "fractured political, social, and economic interests" that too may indicate an improper motive predominated. *Id.* at 919.

Second, the shape or appearance of a district also may speak to whether an improper motive predominated. Although a district need not be oddly shaped in order to violate the Equal Protection Clause, "bizarreness . . . may be persuasive circumstantial evidence that [partisanship] for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Id.* at 912–13; *see also Shaw II*, 517 U.S. at 905–06 (considering a district's bizarre shape and non-compactness to affirm a finding of racial predominance). That is particularly true when demographic evidence reveals that a district's bizarre lines coincide with the historical voting patterns of the precincts included in, or excluded from, the district. *See Miller*, 515 U.S. at 912–13. One way to assess whether a particular district takes on a bizarre shape is through use of mathematical measures of compactness, *Karcher*, 462 U.S. at 755 (Stevens, J., concurring); *Covington*, 316 F.R.D. at 140, such as the Reock and Polsby-Popper measures previously relied on by the General Assembly in defending the 2016 Plan, Exs. 1007; 5001 app'x. Additionally, although visually assessing districts

206

necessarily involves some subjective judgment, the Supreme Court has repeatedly relied upon such assessments (the "eyeball approach" or "interocular test") to determine if a district is "bizarre" or "irregular." *See, e.g., Vera*, 517 U.S. at 965–66; *Shaw II*, 517 U.S. at 905–06; *Shaw I*, 509 U.S. at 646–47.

Third, demographic data may help explain the location and idiosyncrasies of a district boundary, and thereby support a finding of predominance. *Miller*, 515 U.S. at 917 (noting that even if a district is not "bizarre on its face," the predominance of race may become clearer "when its shape is considered in conjunction with its racial and population densities"); *see also Vera*, 517 U.S. at 961–62. Thus, maps shaded to indicate the percentage of the population in each VTD or precinct that historically voted for candidates of a particular party may provide evidence that partisan considerations predominated in the drawing of a particular district's lines. *See, e.g.*, *Covington*, 316 F.R.D. at 141–65 (relying, in part, on "racial density maps" to determine whether race predominated in drawing district lines). Because Dr. Hofeller, Representative Lewis, and Senator Rucho testified that they relied on such data in drawing and evaluating the challenged districts, such maps provide particularly useful insights into whether district boundaries reflect partisan differences in the population. *See supra* Part I.B.

Finally, although not a precondition to establishing a claim that an improper districting consideration predominated, a plaintiff can introduce an alternative districting plan or plans that conform to traditional districting principles—as or more effectively than the challenged plan—and in which the plaintiff's vote is not diluted on the basis of an impermissible consideration. *See, e.g.*, *Cooper*, 137 S. Ct. at 1478–82; *Easley v.*

*Cromartie*, 532 U.S. 234, 258 (2001). Notably, *Gill* expressly embraced the use of alternative plans to demonstrate that the boundaries of a particular district diluted a particular plaintiff's vote on the basis of invidious partisanship. *See* 138 S. Ct. at 1931 (explaining that the injury in a partisan vote dilution case "arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry *in another, hypothetical district*" (emphasis added)); *id.* at 1936 (Kagan, J., concurring) ("Among other ways of proving packing or cracking, a plaintiff could produce an alternative map (or set of alternative maps)—comparably consistent with traditional districting principles—under which her vote would carry more weight.").

Here, Plaintiffs rely on numerous alternative districting plans to prove their partisan vote dilution claims. First, Plaintiffs rely on two alternative plans drawn by Dr. Hofeller as part of the 2016 remedial districting process. Exs. 4016–24. Both plans are comparable to the 2016 Plan with regard to compliance with traditional districting criteria such as county splits and compactness and include a number of districts more favorable to non-Republican voters than their counterparts in the 2016 Plan, as measured by Dr. Hofeller's partisanship variable. *Id.* Second, Plaintiffs rely on a group of maps drawn by a bipartisan group of retired North Carolina judges convened to act as a simulated non-partisan districting commission and directed to comply with a set of traditional, non-partisan districting criteria. Ex. 3002, at 10. Finally, Plaintiffs rely on the thousands of computer-generated districting plans created by Dr. Chen and Dr. Mattingly to conform to—and often more effectively advance—the General Assembly's non-partisan

208

districting objectives. *See, e.g.*, Exs. 4025–4033, 5025–34. Those computer-generated plans include Plan 2-297, which Dr. Chen generated to maximize, subject to certain constraints, the General Assembly's non-partisan districting criteria; in doing so, Plan 2-297 protects more incumbents, splits fewer counties, has more compact districts than the 2016 Plan, and exhibits significantly less dilution of Democratic voters' votes, based on Dr. Hofeller's partisanship variable. Second Chen. Decl. 1–5.

As further explained below, relying on these and other forms of district-specific evidence—as well as the overwhelming statewide evidence set forth above—we conclude that partisan considerations predominated in the drawing of all but one of the thirteen districts in the 2016 Plan, and therefore that those twelve districts violate the Equal Protection Clause.

### a. District 1

District 1 spans all or part of fourteen counties in northeastern North Carolina, most of which run along the eastern portion of North Carolina's border with Virginia. Ex. 1001. Dr. Hofeller testified that he "concentrate[d]" Democratic voters in the 2011 version of the district—which the Supreme Court held constituted a racial gerrymander, *Cooper*, 137 S. Ct. at 1468–72—in order to "weaken Democratic strength in Districts 7, 8, and 11," Ex. 2043, at 33–34, and "to increase Republican voting strength in New Districts 2, 3, 6, 7, and 13," Hofeller Dep. 116:19–117:25. Although the version of the district in the 2016 Plan eliminates a number of appendages in the 2011 version drawn to make the district majority-black, Ex. 2001, the 2016 Plan version retains approximately 70 percent of the population included in its 2011 version, Ex. 5001, tbl.1, carrying

209

forward the invidious partisanship motivating the 2011 version of the district's lines. Dr. Hofeller testified that District 1 was one of three districts in the 2016 Plan he and the Chairs drew, using past election results, to be "predominantly Democratic." Hofeller Dep. 192:7–16, ECF No. 110-1.

As Dr. Hofeller and the Chairs intended and expected, District 1 packs supporters of Democratic candidates: the district's Democratic candidate received approximately 70 percent of the votes cast in the 2016 election. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Democratic candidate was likely to receive 68.8% of the two-party vote share), *with* Ex. 1018, at 2 (Democratic candidate, Rep. G.K. Butterfield, received 68.62% of the vote in 2016 election). Additionally, in the 2016 election, the Democratic candidate in District 1 received a higher share of the vote in his district than each of the Republican candidates received in the 10 districts Dr. Hofeller drew to be predominantly Republican. Ex. 1018. Consistent with these results, Legislative Defendants' expert Dr. Hood characterized District 1 as "Safe Democratic." Ex. 5058, at 25.

To achieve the goal of concentrating Democratic voters in District 1, the 2016 Plan divides municipalities and communities of interest along partisan lines. For example, the southwestern edge of District 1 splits Wilson County by packing the county's large cluster of historically Democratic precincts into District 1, while placing the county's historically Republican precincts into District 2. Ex. 4015. Similarly, the southern edge of District 1 splits Pitt County by placing that county's disproportionately

210

Democratic precincts into District 1 while placing the disproportionately Republican precincts into District 3.  Ex. 4013.



Figure 2: *The partisan division of Wilson County between Districts 1 and 2*[46]

 Dr. Hofeller created several alternative maps that *did not* split either Wilson or Pitt County.  Ex. 2004, at 17–18.  Not a *single* map drawn by the bipartisan group of retired judges split either Wilson or Pitt County.  Ex. 5095.  And Plan 2-297 does not divide Wilson County at all and does not divide Pitt County along partisan lines. *Compare* Third Chen Decl. 1–3, *with* Ex. 4013.  Unsurprisingly, therefore, District 1's counterpart in Plan 2-297, District 12, packs fewer Democratic voters, with the Democratic candidate expected to obtain approximately 59 percent of the two-party vote, Second Chen Decl. at

---

[46] In Figures 2 through 8, which derive from Exhibits 3013 to 3020, precincts are shaded in accordance with Dr. Hofeller's partisanship variable. Precincts in blue historically favor Democratic candidates; precincts shaded with darker hues of blue historically favored Democratic candidates more than precincts with lighter hues of blue. Precincts in red historically favor Republican candidates; precincts shaded with darker hues of red historically favored Republican candidates more than precincts with lighter hues of red.  Green lines denote county lines and dotted lines denote district lines.

5, as opposed to 68 percent of vote garnered by the Democratic candidate in District 1 in the 2016 election, Ex. 1018, at 2.

Plaintiffs' statistical evidence further proves that District 1's unique partisan configuration was not mere happenstance. Instead, the data demonstrate that Democratic voters in District 1 were, in fact, packed together in order to dilute such voters' voting strength. In particular, Dr. Mattingly's analysis of more than 24,000 simulated maps— which conform to all of the General Assembly's non-partisan districting objectives— reveals that the 2016 version of District 1 is an extreme statistical outlier with regard to its concentration of Democratic voters. Ex. 3040, at 30. In particular, only 0.61 percent of the 24,000 simulated maps had *any district* with a higher concentration of likely Democratic voters. Trial Tr. I, at 72:10–13; Ex. 3040, at 29. This demonstrates that the effect of the 2016 version of Congressional District 1 is to pack Democratic voters into the district in an amount greater than would otherwise naturally occur more than 99 percent of the time under neutral districting criteria. *See* Trial Tr. I, at 55:2–6, 70:1–4, 76:22–77:1.

When viewed in conjunction with the overwhelming statewide evidence, this district-specific evidence confirms that (1) the mapdrawers predominantly intended to, and did in fact, pack Democratic voters in District 1; (2) the packing of Democratic voters in District 1 had the effect of diluting such voters' votes; and (3) the packing of Democratic voters in District 1 was not a product of the State's political geography or other legitimate, non-partisan districting considerations. Accordingly, we conclude that District 1 violates the Equal Protection Clause.

212

#### b.  District 2

District 2 spans all or part of six counties in central North Carolina, and splits three counties with Districts 1, 4, and 7.  Ex. 1001.  Dr. Hofeller testified that, in drawing the 2011 Plan, he removed Democratic voters in the prior version of the district and placed them "in either Districts 1 [or] 4" because it was the "only [way to] accomplish" the Republican leadership's goal "to increase Republican voting strength in New District[] . . . 13," which was renumbered to be District 2 in the 2016 Plan.  Hofeller Dep. 116:19–117:25.  District 2 retains approximately 57 percent of the population of its predecessor in the 2011 Plan, Ex. 5001, tbl.1, thereby carrying forward the mapdrawers' express partisan intent in drawing the 2011 version of District 2.

The results of the 2016 election confirm the mapdrawers successfully cracked Democratic voters: as Dr. Hofeller intended and expected, the district's Republican candidate received approximately 56 percent of the votes cast in the 2016 election, meaning that mapdrawers effectively ensured Democratic voters would be highly unlikely to elect their candidate of choice.  *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, candidate was likely to receive 55.6% of the two-party vote share), *with* Ex. 1018, at 2 (Republican candidate, Rep. George Holding, received 56.7% of the vote in 2016 election).  Notably, the Republican candidate received a significantly *lower* share of the vote in District 2 than each of the Democratic candidates received in the three districts Dr. Hofeller drew to be predominantly and overwhelmingly Democratic.  Ex. 1018.

To achieve the goal of diluting Democratic voting strength in District 2, the district takes on a highly irregular shape and divides municipalities and communities of interest along partisan lines.  For example, District 2 includes a horseshoe-shaped section of Wake County—a horseshoe-shaped section that the General Assembly retained from the 2011 version of the district, which also was expressly drawn to favor Republican candidates, Ex. 5001, map 4—that encompasses the predominantly Republican suburbs of Raleigh, but excludes the predominantly Democratic core of Raleigh, which the General Assembly placed in "predominantly Democratic" District 4.  Ex. 3019.  In the 2008 North Carolina gubernatorial election, for example, 41.5 percent of the Wake County voters assigned to District 2 voted Democratic, whereas 57.1 percent of the Wake County voters assigned to District 4 voted Democratic.  *Compare* VTD 2008 Election Results - 2 - District 2: 2016 Contingent Congressional Plan Corrected ("NCGA District 2 Data") 3 (Data Printed Feb. 25, 2016), *with* VTD 2008 Election Results - 2 - District 4: 2016 Contingent Congressional Plan Corrected ("NCGA District 4 Data") 3 (Data Printed Feb. 25, 2016).[47]  Precinct-level results from other races follow the same pattern:

---

[47] The General Assembly compiles and makes publicly available on its website for the 2016 Plan precinct-level election results on a county-by-county and district-by-district basis for each district in the 2016 Plan.  *See* N.C. General Assembly, 2016 Congressional Plan - Corrected, https://www.ncleg.net/Representation/Content/Plans/PlanPage_DB_2016.asp?Plan=2016 _Contingent_Congressional_Plan_-_Corrected&Body=Congress (last visited Aug. 8, 2018).  We take judicial notice of this legislatively-maintained data under Federal Rule of Evidence 201(b)(2), which provides for judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined by sources whose accuracy cannot reasonably be questioned."

the Wake County precincts assigned to District 2 tended to strongly favor Republican candidates, while the precincts assigned to District 4 favored Democratic candidates. *Compare* NCGA District 2 Data 3, *with* NCGA District 4 Data 3; *Compare* VTD 2010 Election Results - District 2: 2016 Congressional Plan Corrected 4 (Data Printed Feb. 25, 2016), *with* VTD 2010 Election Results - District 4: 2016 Congressional Plan Corrected 5 (Data Printed Feb. 25, 2016).  Additionally, the eastern edge of District 2 splits Wilson County by cracking off the county's large cluster of historically Democratic precincts into District 1, while placing the county's historically Republican precincts into District 2.  Ex. 4015.



Figure 3: *The partisan division of Wake County between Districts 2 and 4*

Notably, Dr. Hofeller created alternative maps that *did not* split Wilson County. Ex. 2004, at 17–18.  And although any map must split Wake County to satisfy the one-person, one-vote requirement, none of the maps drawn by the panel of former judges split Wake County along partisan lines, like the 2016 Plan.  *Compare* Ex. 5095, *with* Ex. 3019.

215

Likewise, numerous alternative maps generated by Plaintiffs' experts, including Plan 2-297, demonstrate that the General Assembly could have drawn District 2 without cracking the Democratic cluster in Wilson County, and without dividing Wake County along partisan lines. *Compare, e.g.*, Second Chen Decl. 3; Exs. 5025, 5027, 5029, *with* Ex. 3019. The district in Plan 2-297 that includes eastern Wake County, District 10, has a substantially lower Republican vote share as measured by Dr. Hofeller's variable than District 2. *Compare* Second Chen Decl. at 5 (expected Republican vote share of 47.40%), *with* Ex. 1018, at 2 (Republican candidate received 56.71% of the vote in 2016 election).

Plaintiffs' statistical evidence further proves that District 2's unique partisan make-up did not result from the State's political geography or other legitimate districting consideration. Instead, the data demonstrate that Democratic voters in District 2 were, in fact, cracked off into Districts 1 and 4 in order to dilute the voting strength of the remaining Democratic voters in District 2. In particular, Dr. Mattingly's analysis of more than 24,000 simulated maps shows that the 2016 version of District 2 is an extreme statistical outlier with regard to its concentration of Democratic voters. In the 2016 election the Democratic candidate in District 2 received *43 percent* of the vote, the second highest Democratic vote share in any of the ten districts in which a Republican candidate prevailed and the fifth highest Democratic vote share overall. Ex. 3040, at 29–30. Yet, in Dr. Mattingly's ensemble of more than 24,000 plans, the median Democratic vote share of the fifth most Democratic district was *51 percent*, with only .53 percent of such districts having a Democratic vote share at or below the level recorded in District 2

216

the 2016 election.  *Id.*  Put differently, in more than 99 percent of the 24,000 simulated maps, the district with the fifth highest share of Democratic votes—like District 2 recorded in the 2016 election—had a higher concentration of voters who supported Democratic congressional candidates that District 2.  Ex. 3040, at 29–30; *see* Trial Tr. I, at 55:2–6, 70:1–9, 72:10–13, 76:22–77:5.  Accordingly, the strategic drawing of District 2—including the cracking of Wilson and Wake Counties along partisan lines—diluted the votes of Democratic voters in District 2, and was not the result of the State's political geography or other legitimate redistricting considerations.

When viewed alongside the overwhelming statewide evidence set forth above, this district-specific evidence proves (1) that the mapdrawers predominantly intended to, and did in fact, crack Democratic voters in drawing District 2; (2) that the cracking of Democratic voters in and adjacent to District 2 had the effect of diluting such voters' votes; and (3) that the cracking of Democratic voters in and adjacent to District 2 was not a product of the State's political geography or other legitimate, non-partisan districting considerations.  Therefore, we conclude that District 2 violates the Equal Protection Clause.

### c.  District 3

District 3 spans all or part of seventeen counties in eastern North Carolina, most of which run along North Carolina's coast.  Ex. 1001.  Dr. Hofeller testified that, in drawing the 2011 Plan, he removed Democratic voters from the prior version of District 3 and placed them "in . . . District[] 1" because it was the "only [way to] accomplish" the General Assembly's goal "to increase Republican voting strength in New District . . . 3."

Hofeller Dep. 116:19–117:25.  Although the version of District 3 in the 2016 Plan eliminates a number of appendages from the 2011 version, Ex. 2001, the 2016 Plan version retains approximately 81 percent of the population included in the 2011 version, Ex. 5001, tbl.1, which the General Assembly expressly drew to increase Republican voting strength.

The results of the 2016 election demonstrate that the mapdrawers' successfully cracked Democratic voters in and around District 3: as Dr. Hofeller intended and expected, the district's Republican candidate received a safe majority of the votes cast in the 2016 election, and is therefore likely to retain his seat in future elections. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, candidate was likely to receive 55% of the two-party vote share), *with* Ex. 1018, at 2 (Republican candidate, Rep. Walter B. Jones, received 67.2% of the vote in 2016 election).  The Republican candidate also received a *lower* share of the vote in District 3 than two of the Democratic candidates received in the three districts Dr. Hofeller drew to be predominantly and overwhelmingly Democratic.  Ex. 1018.

To achieve the goal of diluting Democratic voting strength in District 3, the district divides municipalities and communities of interest along partisan lines.  In particular, the upper western edge of District 3 splits Pitt County by cracking off that county's disproportionately Democratic precincts into District 1, while placing its disproportionately Republican precincts into District 3.  Ex. 4013.  Notably, Dr. Hofeller created several alternative maps that *did not* split Pitt County.  Ex. 2004, at 17–18.  And all but one map drawn by the retired judges placed Pitt County entirely in one district.

218

Ex. 5095.  Additionally, Plaintiffs' experts generated a number of other alternative maps that likewise did not split Pitt County.  *E.g.*, Exs. 5025, 5027.  And although Plan 2-297 splits Pitt County, it does not do so along partisan lines.  *Compare* Second Chen Decl. 3, *with* Ex. 4013.  District 3's counterpart in Plan 2-297, District 13, has a substantially lower Republican vote share as measured by Dr. Hofeller's variable than District 3. *Compare* Second Chen Decl. at 5 (expected Republican vote share of 54.43%), *with* Ex. 1018, at 2 (Republican candidate received 67.2% of the vote in 2016 election).

When considered in conjunction with Plaintiffs' strong statewide evidence, this constitutes district-specific proof (1) that the mapdrawers predominantly intended to, and did in fact, crack Democratic voters in drawing District 3; (2) that the cracking of Democratic voters in and adjacent to District 3 had the effect of diluting the strength of the Democratic voters' votes in District 3; and (3) that the cracking of Democratic voters in and adjacent to District 3 was not a product of the State's political geography or other legitimate, non-partisan districting considerations.  Accordingly, District 3 violates the Equal Protection Clause

### d.    District 4

District 4 sits in the upper middle of North Carolina and spans all of Orange County, then snakes eastward and captures segments of Durham County and Wake County.  Ex. 1001.  Dr. Hofeller testified that he purposely drew the lines of the 2011 version of District 4 to encompass "all the strong Democratic VTDs" in the area because the goal of the General Assembly's Republican leadership "to increase Republican voting strength in New Districts 2, 3, 6, 7, and 13 . . . could only be accomplished" in that way.

Hofeller Dep. 116:19–117:25. Although the version of the district in the 2016 Plan is significantly more compact than the 2011 version, Ex. 2001, the 2016 Plan version retains approximately 62 percent of the population included in the 2011 version drawn to pack Democratic voters. Ex. 5001, tbl.1. To that end, Dr. Hofeller testified that District 4 was one of three districts in the 2016 Plan he and the Chairs drew, using past election results, to be "predominantly Democratic." Hofeller Dep. 192:7–16.

The results of the 2016 election demonstrate that the mapdrawers achieved their goal of packing Democratic voters in District 4: as Dr. Hofeller intended and expected, the district's Democratic candidate received an overwhelming majority of the votes cast in the 2016 election. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Democratic candidate was likely to receive 63% of the two-party vote share), *with* Ex. 1018, at 2 (Democratic candidate, Rep. David Price, received 68% of the vote in 2016 election). Consistent with these results, Dr. Hood characterized District 4 as "Safe Democratic." Ex. 5058, at 25. Additionally, in the 2016 election the Democratic candidate in District 4 received a higher share of the vote in his district than each of the Republican candidates received in the 10 districts Dr. Hofeller drew so as to ensure Republican candidates would prevail. Ex. 1018, at 2–4.

To achieve the goal of concentrating Democratic voters in District 4, the district divides municipalities and communities of interest along partisan lines. In particular, the eastern edge of District 4 reaches through Durham County and into the heart of Wake County, packing Wake County's large cluster of historically Democratic precincts into District 4, while placing the county's historically Republican precincts into a horseshoe-

220

shaped section of District 2. Ex. 4014. As noted above, precinct-level elections results reveal that the Wake County precincts assigned to District 2 tended to strongly favor Republican candidates, while the precincts assigned to District 4 favored Democratic candidates. *See supra* Part III.B.2.b.

Notably, although any map must divide Wake County to comply with the one-person, one-vote rule, each of the maps drawn by the panel of former judges did so by creating *single district* solely within Wake County and not dividing the county on partisan lines. *Compare* Ex. 5095, *with* Ex. 3019. And none of the judges' maps divided Wake County on partisan lines, as the 2016 Plan does. *Compare* Ex. 5095, *with* Ex. 3019. Likewise, numerous alternative maps generated by Plaintiffs' experts, including Plan 2-297, demonstrate that the General Assembly could have drawn District 4 without dividing Wake County on partisan lines so as to pack Democratic voters in District 4. *Compare, e.g.*, Second Chen Decl. 3; Exs. 5026–27, *with* Ex. 4014. The district most closely overlapping with District 4 in Plan 2-297, District 11, has a substantially lower Democratic vote share as measured by Dr. Hofeller's partisanship variable than District 4. *Compare* Second Chen Decl. at 5 (expected Democratic vote share of 63.22%), *with* Ex. 1018, at 2 (Democratic candidate received 68% of the vote in 2016 election).

Plaintiffs' statistical evidence further proves that District 4's unique partisan configuration was not attributable to the state's political geography or other legitimate districting considerations. Instead, the data demonstrate that Democratic voters in District 4 were, in fact, packed together in order to dilute the voting strength of those Democratic voters. In the 2016 election the Democratic candidate in District 4 received

221

*68 percent* of the vote, the second highest Democratic vote share overall. Ex. 3040, at 29–30. By contrast, in Dr. Mattingly's ensemble of more than 24,000 plans, the median Democratic vote share of the second most Democratic district, based on votes cast in the 2016 election, was *62 percent*, with none of such districts having as high a percentage as the level recorded in District 4 the 2016 election. *Id.*; Trial Tr. I, at 72:10–15. This demonstrates that the effect of the 2016 version of Congressional District 4 is to pack Democratic voters into the district in an amount greater than would otherwise *ever* naturally occur under neutral districting criteria. *See* Trial Tr. I, at 55:2–6, 70:1–4, 76:22–77:1; Ex. 3040.

When considered alongside Plaintiffs' compelling statewide evidence, this district-specific evidence proves (1) that the mapdrawers predominantly intended to, and did in fact, pack Democratic voters in District 4; (2) that the packing of Democratic voters in District 4 had the effect of diluting such voters' votes; and (3) that the packing of Democratic voters in District 4 was not a product of the State's political geography or other legitimate, non-partisan districting considerations. Accordingly, District 4 violates the Equal Protection Clause.

### e.    District 5

District 5 spans all or part of eleven counties in northwestern North Carolina, most of which run along the western portion of North Carolina's border with Virginia. Ex. 1001. In addition to the overwhelming statewide evidence of partisan gerrymandering, Plaintiffs introduced some district-specific evidence supporting their claim that District 5 dilutes the votes of Democratic voters assigned to the district. In particular, as Dr.

222

Hofeller intended and expected, the district's Republican candidate received a safe majority of the votes cast in the 2016 election, and is therefore likely to retain his seat in future elections. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Republican candidate was likely to receive 55.7% of the two-party vote share), *with* Ex. 1018, at 2 (Republican candidate, Rep. Virginia Fox, received 58.2% of the vote in 2016 election). The Republican candidate also received a significantly *lower* share of the vote in District 5 than each of the Democratic candidates received in the three districts Dr. Hofeller drew to be overwhelmingly Democratic. Ex. 1018, at 2–4. And Dr. Hood characterized District 5 as "Safe Republican." Ex. 5058, at 25.

Unlike with other districts, however, Plaintiffs produced no direct evidence that the mapdrawers expressly sought to increase Republican voting strength in drawing either the 2011 version of District 5 or the 2016 version of the district. Likewise, Plaintiffs produced no evidence indicating that District 5 splits municipalities or communities of interest along partisan lines. Ex. 4007. To the contrary, District 5 is principally composed of predominantly Republican precincts and does not divide either of the two clusters of Democratic precincts within it. *Id.* Indeed, based on historical voting patterns, it is difficult to imagine how one would draw a compact district in the northwest corner of North Carolina that was not predominantly Republican. *Id.* District 5 also is, on average, more compact than most of the other districts in the 2016 Plan and more compact, on average, than its counterpart in the 2011 Plan. Ex. 5001, app. And notably, District 5's counterpart in Plan 2-297, District 5, includes many of the same counties as the version of the district in the 2016 Plan and has a *higher* predicted

223

Republican vote share than the version of the district in the 2016 Plan. *Compare* Second Chen Decl. 3, 5 (expected Republican vote share of 63.86%), *with* Ex. 1018, at 2 (Republican candidate received 58.4% of the vote in 2016 election).

In sum, notwithstanding the compelling statewide evidence of cracking and packing, Plaintiffs have failed to demonstrate that District 5, in particular, cracks or packs Democratic voters, or that such voters' votes would carry more weight under an alternative plan. Accordingly, District 5 does not violate the Equal Protection Clause.

### f. *District 6*

District 6, which resembles a sideways "H," spans all or part of eight counties in northern and central North Carolina. Ex. 1001. Dr. Hofeller testified that in drawing the 2011 version of the district he "plac[ed]" into Districts 1 and 4 "all the strong Democratic VTDs" in order "to increase Republican voting strength in New District[] . . . 6." Hofeller Dep. 116:19–117:25. The version of District 6 in the 2016 Plan retains slightly more than half its population from the 2011 version, and, of particular relevance here, the version of District 6 in the 2016 Plan follows the 2011 version in cracking Guilford County and the City of Greensboro—the most populous part of the district—both of which traditionally support Democratic candidates. Exs. 1001; 2001. Accordingly, the 2016 Plan version of District 6 carries forward the invidious partisan intent and effects motivating the lines of the 2011 version of the district. To that end, Representative Lewis testified that when creating the 2016 Plan, he and Dr. Hofeller "move[d] individual VTDs from District 6 to District 13 in Guilford County, or vice versa, for political impact." Lewis Dep. 156:19–157:1.

The results of the 2016 election demonstrate that Dr. Hofeller achieved the goal of cracking Democratic voters in Guilford County, and submerging such voters in a "safe" Republican district: as Dr. Hofeller intended and expected, the district's Republican candidate prevailed in the district by a "safe" margin in the 2016 election. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Republican candidate was likely to receive 54.41% of the two-party vote share), *with* Ex. 1018, at 2 (Republican candidate, Rep. B. Mark Walker, received 59.2% of the vote in 2016 election). Dr. Hood characterized District 6 as "Safe Republican." Ex. 5058, at 25. And notably, the Republican candidate received a significantly *lower* share of the vote in District 6 than each of the Democratic candidates received in the three districts Dr. Hofeller drew to be predominantly and overwhelmingly Democratic. Ex. 1018.

To achieve the goal of diluting Democratic voting strength in District 6, the district divides municipalities and communities of interest along partisan lines. As noted above, the western edge of District 6 splits Guilford County and the City of Greensboro, placing approximately half of the city's large cluster of historically Democratic precincts into District 6 and placing the other half into District 13. Ex. 4010. Significantly, *Legislative Defendants' expert*, Dr. Hood, testified that line drawn through Guilford County separating Districts 6 and 13 constituted "legislative cracking of a Democratic partisan cluster in the redistricting process." Trial Tr. IV, at 45:2–8. Dr. Hood further testified that had the mapdrawers not cracked Guilford County, one of the two districts "would have been more Democratic." *Id.* at 45:24–46:5.



Figure 4: *The cracking of Guilford County between Districts 6 and 13*

Dr. Hofeller created at least one alternative map that *did not* split the Guilford County Democratic cluster. Ex. 2004, at 18. Not a *single* map submitted by the retired judges splits Guilford County *at all*, let alone through the middle of the Greensboro Democratic cluster. Ex. 5095. Several other alternative maps generated by Plaintiffs' experts did not split Guilford County, or split it less significantly. *E.g.*, Exs. 5025–26, 5028, 5031. And although Dr. Chen's Plan 2-297 divides Guilford County, it does so because Dr. Chen was constrained to follow the General Assembly's objective of avoiding the pairing of two incumbents who reside in Guilford County and were elected under the 2011 Plan, Second Chen Decl. 3, which split Guilford County and was expressly drawn to increase Republican voting strength, Hofeller Dep. 116:19–117:25. Notably, the two districts in Plan 2-297 that contain parts of Guilford County are significantly more compact, on average, than their counterparts in the 2016 Plan under

Case 1:16-cv-01026-WO-JEP   Document 142   Filed 08/27/18   Page 226 of 321

the compactness measures preferred by the General Assembly. *Compare* Second Chen Decl. 5 (reporting Reock and Polsby-Popper scores of .522 and .320, respectively, for District 6, and scores of .481 and .248 for District 7 in Plan 2-297), *with* Ex. 5001 app'x (reporting Reock and Polsby-Popper scores of .50 and .32, respectively, for District 6, and scores of .36 and .23 for District 13 in the 2016 Plan). And District 6's counterpart in Plan 2-297, District 7, has a substantially lower Republican vote share as measured by Dr. Hofeller's variable than that observed in District 6 in the 2016 election. *Compare* Second Chen Decl. at 5 (expected Republican vote share of 51.49%), *with* Ex. 1018, at 2 (Republican candidate received 59.2% of the vote in 2016 election).

Plaintiffs' statistical evidence further proves that District 6's partisan make-up is attributable to the intentional cracking of Democratic voters, rather than political geography or other legitimate non-partisan redistricting considerations. In particular, Dr. Mattingly found that District 13, with which District 6 split the historically Democratic precincts in Greensboro and Guilford County, represents an extreme statistical outlier. Ex. 3040, at 30. In the 2016 election the Democratic candidate in District 13 received *44 percent* of the vote, the highest Democratic vote share in any of the ten districts in which a Republican candidate prevailed and the fourth highest Democratic vote share overall. *Id.* at 29–30. Yet, in Dr. Mattingly's ensemble of more than 24,000 plans, the median Democratic vote share of the fourth most Democratic district was *54 percent*, with only .19 percent of such districts having a Democratic vote share at or below the level recorded in District 13 the 2016 election. *Id.* Accordingly, the splitting of Guilford

County, not North Carolina's political geography, diluted the votes of Democratic voters in District 6.

Viewed in conjunction with Plaintiffs' statewide evidence, Plaintiffs district-specific evidence demonstrates (1) that the mapdrawers predominantly intended to, and did in fact, dilute the votes of Democratic voters in District 6; (2) that the cracking of Democratic voters in District 6 and adjacent districts had the effect of diluting such voters' votes; and (3) that the cracking of Democratic voters in District 6 and adjacent districts was not a product of the State's political geography or other legitimate, non-partisan districting considerations. Accordingly, we conclude that District 6 violates the Equal Protection Clause.

## g.    *District 7*

District 7 spans all or part of nine counties in southeastern North Carolina. Ex. 1001. Dr. Hofeller testified that he redrew a number of districts in the 2011 Plan "to weaken Democratic strength in District[] 7," Ex. 2043, at 33–34, and "to increase Republican voting strength in New District[] 7," Hofeller Dep. 116:19–117:25. Although the version of District 7 in the 2016 Plan eliminates a number of appendages in the 2011 version, *see* Ex. 2001, the 2016 Plan version includes nearly all of the counties in the 2011 version of the district and retains approximately 72 percent of the population included in its 2011 version. Ex. 5001, tbl.1. Therefore, 2016 Plan version of District 7 carries forward the express partisan intent motivating the lines of the 2011 version of the district, and the attendant discriminatory effects.

The results of the 2016 election demonstrate that the mapdrawers successfully diluted Democratic voters' votes in drawing District 7: the Republican candidate received approximately 61 percent of the votes cast in the 2016 election, a much higher percentage than Dr. Hofeller estimated.  *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Republican candidate was likely to receive 53.7% of the two-party vote share), *with* Ex. 1018, at 2 (Republican candidate, Rep. David Rouzer, received 60.9% of the vote in 2016 election).  Yet, notwithstanding this higher-than-anticipated Republican vote share, the Republican candidate in District 7 still received a *lower* share of the vote in his district than each of the Democratic candidates received in the three districts Dr. Hofeller drew to be predominantly and overwhelmingly Democratic.  Ex. 1018.

To achieve the goal of diluting Democratic voter strength in District 7, the district divides municipalities and communities of interest along partisan lines.  For example, the northwestern edge of District 7 splits Johnston County in two—cracking the county's large cluster of historically Democratic precincts into near-equal halves between Districts 7 and 2.  Ex. 4011.  Similarly, the southwestern edge of District 7 splits Bladen County by meandering around more than half of the county's disproportionately Democratic precincts to draw those districts into District 7, while retaining the remaining precincts in District 9.  Ex. 4007.



Figure 5: *The cracking of Johnston County between Districts 2 and 7*

Notably, Dr. Hofeller created several alternative maps that *did not* split Johnston and Bladen Counties. Ex. 2004, at 17–23. Not a *single* map drawn by the panel of retired judges split those counties. Ex. 5095. And a number of other alternative maps generated by Plaintiffs' experts kept Johnston and Bladen Counties whole. *E.g.*, Exs. 5025–27. Additionally, Plan 2-297 does not divide Bladen County, nor does it divide Johnston County as clearly along partisan lines. Second Chen Decl. 3. Furthermore, District 7's counterpart in Plan 2-297, District 9, has a substantially lower Republican vote share as measured by Dr. Hofeller's variable than that observed in District 6 in the 2016 election. *Compare* Second Chen Decl. at 5 (expected Republican vote share of 52.18%), *with* Ex. 1018, at 2 (Republican candidate received 60.9% of the vote in 2016 election).

Against the backdrop of Plaintiffs' overwhelming statewide evidence, this district-specific evidence proves (1) that the mapdrawers predominantly intended to, and did in fact, crack Democratic voters in drawing District 7; (2) that the cracking of Democratic voters in District 7 and adjacent districts had the effect of diluting such voters' votes; and

230

(3) that the cracking of Democratic voters in District 7 and adjacent districts was not a product of the State's political geography or other legitimate, non-partisan districting considerations. Therefore, we conclude that District 7 violates the Equal Protection Clause.

*h.  District 8*

District 8 takes on a serpentine shape, running more than 100 miles from the outskirts of Charlotte in Cabarrus County to part of the City of Fayetteville in Cumberland County. Ex. 1001. According to Legislative Defendants' expert Dr. Hood, Cabarrus County lies in a different political "subregion" of the State than Fayetteville and Cumberland County, as those subregions have traditionally been defined by political scientists. Ex. 5058, at 8–9.

Dr. Hofeller testified that, in drawing the 2011 Plan, he intended to—and did, in fact—"weaken Democratic strength" in District 8. Ex. 2043, at 33–34. Dr. Hofeller substantially changed the shape of District 8 in the 2016 Plan, retaining only 42 percent of the population in the 2011 version of the district. Ex. 5001, tbl.1. However, the voting strength of Democratic voters in the district remains intentionally "weak[]." Ex. 2043, at 33–34. As Dr. Hofeller intended and expected, the district's Republican candidate received a safe majority of the votes cast in the 2016 election. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Republican candidate was likely to receive 54.9% of the two-party vote share), *with* Ex. 1018, at 3 (Republican candidate, Rep. Richard Hudson, received 58.8% of the vote in 2016 election). And in the 2016 election, the Republican candidate in District 8 received a significantly lower

231

share of the vote in his district than each of the Democratic candidates received in the three districts Dr. Hofeller drew to be predominantly and overwhelmingly Democratic. Ex. 1018.

Although the 2016 Plan substantially altered the boundaries of the version in the 2011 Plan, the 2016 version of District 8 continues to strongly favor Republican candidates because, like the earlier version of the district, it divides counties and communities of interest along partisan lines, and joins sections of the state that have little in common. In particular, the southeastern edge of District 8 cracks the City of Fayetteville and a large cluster of historically Democratic precincts in Cumberland, Hoke, and Robeson Counties between Districts 8 and 9. Ex. 4009. Legislative Defendants' expert Dr. Hood conceded as much, testifying that the three-county area constituted a "cluster of Democratic VTDs" that the 2016 Plan "split between those two districts." Trial Tr. IV, at 47:10, 48:24–49:18. Dr. Hood further testified that if the 2016 Plan had not cracked the Cumberland-Hoke-Robeson County Democratic cluster, either District 8 or District 9 would not have been a safe Republican district, as is the case under the 2016 Plan. *Id.* at 49:12–25.



Figure 6: *The cracking of Cumberland County between Districts 8 and 9*

Dr. Hofeller created at least one alternative map that left Cumberland County whole. *See, e.g.*, Ex. 2004, at 14. Several other maps generated by Plaintiffs' experts—including Plan 2-297—did not divide Cumberland County, *e.g.*, Second Chen Decl. 3; Ex. 5029, or crack the Cumberland-Hoke-Robeson County cluster, *e.g.*, Exs. 5026, 5033. Also unlike the 2016 Plan, numerous maps generated by Plaintiffs' experts—including Plan 2-297—do not place Cabarrus County and the Cumberland-Hoke-Robeson County grouping, which lie in different political subregions of the State, in the same district. *E.g.*, Second Chen Decl. 3; Exs. 5025–27. Additionally, although none of the districts in Plan 2-297 take on District 8's serpentine-shape, the district in Plan 2-297 that includes most of the Cumberland-Hoke-Robeson County cluster, District 8, has a substantially lower Republican vote share as measured by Dr. Hofeller's variable than District 8 in the 2016 Plan. *Compare* Second Chen Decl. 5 (expected Republican vote share of 46.43%), *with* Ex. 1018, at 3 (Republican candidate received 58.8% of the vote in 2016 election).

Plaintiffs' statistical evidence further proves that District 8's partisan make-up did not result from the State's political geography, but rather from the mapdrawers' successful effort to dilute Democratic voters' votes. In particular, in the 2016 election the Democratic candidate in District 9—the district with which District 8 split the Democratic voters in the Cumberland-Hoke-Robeson County cluster—received *42 percent* of the vote, the third highest Democratic vote share in any of the 10 districts in which a Republican candidate prevailed and the sixth highest Democratic vote share among all 13 districts. Ex. 3040, at 29–30. Yet, in Dr. Mattingly's ensemble of more than 24,000 plans—all of which conformed to traditional redistricting criteria—the median Democratic vote share of the sixth most Democratic district was *48 percent*, with only *.02 percent* of such districts having a Democratic vote share at or below the level recorded in District 9 in the 2016 election. *Id.* Accordingly, the splitting of Democratic voters in the Cumberland-Hoke-Robeson County cluster between District 8 and District 9 had the effect of diluting the votes of Democratic voters in District 8.

When considered in conjunction with Plaintiffs' statewide evidence, we find that Plaintiffs have proven (1) that the mapdrawers predominantly intended to, and did in fact, crack Democratic voters in and adjacent to District 8; (2) that the cracking of Democratic voters in an adjacent to District 8 had the effect of diluting such voters' votes; and (3) that the cracking of Democratic voters in an adjacent to District 8 was not a product of the State's political geography or other legitimate, non-partisan districting considerations. Accordingly, District 8 violates the Equal Protection Clause

i.    *District 9*

234

District 9 spans all or part of eight counties running along the southeastern portion of North Carolina's border with South Carolina, tracking the serpentine southern border of District 8. Ex. 1001. The District encompasses a number of predominantly Republican precincts in southern Charlotte and its Mecklenburg and Union County suburbs—the areas from which District 9 draws the most population—and then extends nearly 150 miles east, through a number of predominantly Democratic precincts, to rural Bladen County. *Id.*; Ex. 3040, at 2. Legislative Defendants' expert Dr. Hood opined that Charlotte and its Mecklenburg and Union County suburbs and Bladen County lie in different political "subregions" of North Carolina, as the State's political regions have been defined by political scientists. Ex. 5058, at 8–9.

The mapdrawers successfully diluted the votes of Democratic voters by submerging such voters in a predominantly Republican district: as Dr. Hofeller intended and expected, the district's Republican candidate received over 55 percent of the votes cast in the 2016 election. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Republican candidate was likely to receive 55.7% of the two-party vote share), *with* Ex. 1018, at 2 (Republican candidate, Robert Pittenger, received 58.2% of the vote in 2016 election). And despite this safe margin of victory, the victorious Republican candidate in District 9 received a lower share of the vote in his district than each of the Democratic candidates received in the three districts Dr. Hofeller drew to be predominantly and overwhelmingly Democratic. Ex. 1018, at 2–4.

To achieve the goal of diluting Democratic voter strength in District 9, the district divides several municipalities and communities of interest along partisan lines, and joins

235

sections of the state that have little in common. For example, the northwestern edge of District 9 splits Mecklenburg County by drawing district lines so that almost all of the traditionally Republican precincts found in a small slice of southern Mecklenburg County fall within District 9, while the rest of the county's historically Democratic precincts are packed into District 12. Ex. 4012. In particular, in the 2008 gubernatorial election, approximately 25 percent of the Mecklenburg County voters assigned by the mapdrawers to District 9 in the 2016 Plan voted for the Democratic candidate, whereas more than 56 percent of the Mecklenburg County voters assigned to District 12 voted for the Democratic candidate. VTD 2008 Election Results - 2 - District 9: 2016 Contingent Congressional Plan Corrected ("NCGA District 9 Data") 2 (Data Printed Feb. 25, 2016), *with* VTD 2008 Election Results - 2 - District 4: 2016 Contingent Congressional Plan Corrected ("NCGA District 12 Data") 12 (Data Printed Feb. 25, 2016). Precinct-level results from other elections follow the same pattern: the Mecklenburg County precincts assigned to District 9 tended to strongly favor Republican candidates, while the precincts assigned to District 12 favored Democratic candidates. *Compare* NCGA District 9 Data 2, *with* NCGA District 12 Data 3; *Compare* VTD 2010 Election Results - District 9: 2016 Congressional Plan Corrected 3 (Data Printed Feb. 25, 2016), *with* VTD 2010 Election Results - District 12: 2016 Congressional Plan Corrected 3 (Data Printed Feb. 25, 2016).

Additionally, as Legislative Defendants' expert Dr. Hood acknowledged, the northeastern edge of District 9 cracks Cumberland County's historically Democratic precincts between districts 8 and 9. Ex. 4012; Trial Tr. IV, at 47:10, 48:24–49:18. Further, the southeastern edge of District 9 cracks Bladen County's historically

236

Democratic precincts between Districts 7 and 9. Ex. 4012. And several Plaintiffs testified that the predominantly Republican Mecklenburg County section of District 9 has little in common with the predominantly rural eastern portion of the district that historically has favored Democratic candidates. McNeill Dep. 26:9–27:18; Klenz Dep. 65:23–66:12.

Notably, Dr. Hofeller created several alternative maps that *did not* split Mecklenburg, Cumberland, and Bladen Counties in the same districting plan. Ex. 2004, at 13, 14, 15, 17–23. And not a *single* map drawn by the retired judges split all three counties. Ex. 5095. Nor did any of the judges' maps place any portion of Mecklenburg County in the same district as parts of Cumberland County or Bladen County. *Id.* Nor did any of their maps divide Mecklenburg County along partisan lines, as the 2016 Plan does. *Id.* Likewise, numerous alternative maps generated by Plaintiffs' experts, including Dr. Chen's Plan 2-297, demonstrate that the General Assembly could have drawn District 9 without dividing Mecklenburg County along partisan lines or placing portions of Mecklenburg County in the same district as portions of Bladen and Cumberland Counties, which lie in a different political subregion of the state. *E.g.* Second Chen Decl. 3; Exs. 5025–27. Additionally, although none of the districts in Plan 2-297 place Mecklenburg County in the same district as Robeson and Bladen County, the district in Plan 2-297 that, like District 9, includes southeastern Mecklenburg and Union Counties, District 4, has a slightly lower Republican vote share as measured by Dr. Hofeller's variable than District 9 in the 2016 Plan. *Compare* Second Chen Decl. 5

(expected Republican vote share of 57.77%), *with* Ex. 1018, at 2 (Republican candidate received 58.2% of the vote in 2016 election).

Plaintiffs' statistical evidence further proves that District 9's unique partisan configuration did not result from the State's political geography, but rather from the mapdrawers' successful effort to dilute Democratic voters' votes by combining Mecklenburg County's populous Republican precincts with Democratic precincts in rural southeast North Carolina.  In particular, in the 2016 election the Democratic candidate in District 9 received *42 percent* of the vote, the third highest Democratic vote share in any of the 10 districts in which a Republican candidate prevailed and the sixth highest Democratic vote share among all 13 districts.  Ex. 3040, at 29–30.  By contrast, in Dr. Mattingly's ensemble of more than 24,000 plans the median Democratic vote share of the sixth most Democratic district was *48 percent*, with only *.02 percent* of such districts having a Democratic vote share at or below the level recorded in District 9 in the 2016 election.  *Id.*

This strong district-specific evidence—when coupled with the overwhelming statewide evidence—establishes (1) that the mapdrawers predominantly intended to, and did in fact, crack Democratic voters in and adjacent to District 9; (2) that the cracking of Democratic voters in and adjacent to District 9 had the effect of diluting such voters' votes; and (3) that the cracking of Democratic voters in and adjacent to District 9 was not a product of the State's political geography or other legitimate, non-partisan districting considerations.  Accordingly, we conclude District 9 violates the Equal Protection Clause.

238

District 10 spans all or part of eight counties in southwestern North Carolina, running from the western suburbs of Charlotte to a bizarre, bulbous protrusion into Buncombe County and the City of Asheville in the Appalachian Mountains.  Ex. 1001. Like the 2011 Plan, the 2016 Plan divides Buncombe County and Asheville, which are composed of precincts that historically favor Democrats, between Districts 10 and 11. Exs. 2001, 4008.  The 2016 version of District 10 closely tracks the version of the district in 2011 Plan, retaining over 95 percent of the 2011 version's population. Ex. 5001, tbl. 1. The congressional districting plan in place prior to the 2011 election did not divide Buncombe County or Asheville, and the district in that plan that included all of Buncombe County and Asheville elected the Democratic candidate in the 2010 election, Ex. 1021; Quinn Dep. 26:17–23, 38:20–25, notwithstanding that Republican candidates performed strongly in the 2010 election, both in North Carolina and nationwide, Exs. 1021; 5101, at 25, 36. Although the General Assembly received "push back" regarding the splitting of Buncombe County and Asheville in the 2011 Plan, Dr. Hofeller and Representative Lewis determined that it simply "wasn't worth the effort" to remove the split for the 2016 version, especially since the split was present "in every scenario" that achieved their partisan objectives.  Lewis Dep. 62:4–19.

The 2016 Plan successfully cracked Democratic voters in and adjacent to District 10: as Dr. Hofeller intended and expected, the district's Republican candidate received an overwhelming majority of the votes cast in the 2016 election.  *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Republican candidate was

239

likely to receive 58% of the two-party vote share), *with* Ex. 1018, at 2 (Republican candidate, Rep. Patrick McHenry, received 63.1% of the vote in 2016 election). Consistent with these results, Legislative Defendants' expert Dr. Hood characterized District 10 as "Safe Republican." Ex. 5058, at 25. And despite this safe margin of victory, in the 2016 election the victorious Republican candidate in District 10 received a significantly lower share of the vote in his district than each of the Democratic candidates received in the three districts Dr. Hofeller drew to be predominantly and overwhelmingly Democratic. Ex. 1018, at 2–4.

To achieve the goal of diluting Democratic voting strength in District 10, the district divides municipalities and communities of interest along partisan lines. In particular, the northeastern edge of District 10 splits Buncombe County and Asheville with District 11. Ex. 4008. Notably, Legislative Defendants' expert Dr. Hood testified that the district line drawn through Buncombe County and Asheville constituted "legislative cracking of a Democratic partisan cluster in the redistricting process." Trial Tr. IV, at 41:12–18. Dr. Hood further conceded that had Buncombe County and Asheville not been divided between two districts—*i.e.* had the "naturally packed" Buncombe County and Asheville Democratic "cluster" been kept whole—the district containing Buncombe County and Asheville would have been more favorable to Democratic candidates. *Id.* at 40:1–43:4.

240



Figure 7: *The cracking of Buncombe County between Districts 10 and 11*

Significantly, Dr. Hofeller created several alternative maps that *did not* split the Buncombe County Democratic cluster. Ex. 2004, at 11, 13, 18. And not a *single* map drawn by the retired judges splits Buncombe County *at all*, let alone through the middle of the Democratic cluster. Ex. 5095; *cf.* Lewis Dep. 64:25–65:1 (testifying he "couldn't ever figure out a way" to "keep Buncombe county whole"). Likewise, numerous alternative maps generated by Plaintiffs' experts, including Plan 2-297, demonstrate that the General Assembly could have drawn District 10 without cracking the Democratic cluster in Buncombe County. *E.g.*, Second Chen Decl. 3, Exs. 5025–27. Notably, Districts 1 and 2 in Plan 2-297, which contain most of the area encompassed by Districts 10 and 11 in the 2016 Plan, are, on average, significantly more compact than District 10 and 11 of the 2016 Plan, as measured by the General Assembly's preferred Reock and Polsby-Popper metrics. *Compare* Second Chen Decl. 3–5 (reporting Reock and Polsby-Popper scores of .320 and .324, respectively, for District 1, and scores of .553 and .325

241

for District 2 in Plan 2-297), *with* Ex. 5001 (reporting Reock and Polsby-Popper scores of .35 and .26, respectively, for District 10, and scores of .26 and .21 for District 11 in the 2016 Plan).

When viewed in conjunction with Plaintiffs' overwhelming statewide evidence, this district-specific evidence proves (1) that the mapdrawers predominantly intended to, and did in fact, crack Democratic voters in and adjacent to District 10; (2) that the cracking of Democratic voters in and adjacent to District 10 had the effect of diluting such voters' votes; and (3) that the cracking off of Democratic voters in and adjacent to District 10 was not a product of the State's political geography or other legitimate, non-partisan districting considerations. District 10, therefore, violates the Equal Protection Clause.

### k.    *District 11*

District 11 spans all or part of sixteen counties in western North Carolina, including sections of Buncombe County and Asheville. Ex. 1001. District 11 closely tracks the shape and population of the version of the district in the 2011 Plan, retaining over 96 percent of the 2011 version's population. Exs. 2001; 5001, tbl. 1. Dr. Hofeller averred that a part of the "strategy" of the General Assembly's Republican leadership in drawing the 2011 Plan "was to weaken Democratic strength in District[] 11." Ex. 2034, at 2. As explained above, *see supra* Part III.B.2.j, notwithstanding that the General Assembly received "push back" as a result of the division of Buncombe County and Asheville between Districts 10 and 11, Dr. Hofeller and Representative Lewis determined that it simply "wasn't worth the effort" to remove the split for the 2016 version,

especially since the split was present "in every scenario" that achieved their partisan objectives. Lewis Dep. 62:4–19. Accordingly, the version of District 11 in the 2016 Plan expressly carried forward the express partisan intent and effects attributable to the version of the district included in the 2011 Plan.

District 11 cracks Democratic voters and thereby dilutes their votes: as the mapdrawers intended and expected, the district's Republican candidate received a safe majority of the votes cast in the 2016 election. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Republican candidate was likely to receive 57.1% of the two-party vote share), *with* Ex. 1018, at 2 (Republican candidate, Rep. Mark Meadows, received 64.1% of the vote in 2016 election). Consistent with these results, Dr. Hood characterized District 11 as "Safe Republican." Ex. 5058, at 25. Although District 11 is safely Republican, the victorious Republican candidate in District 11 received a significantly lower share of the vote in his district in the 2016 election than each of the Democratic candidates received in the three districts Dr. Hofeller drew to be predominantly and overwhelmingly Democratic. Ex. 1018, at 2–4.

To achieve the goal of diluting Democratic voting strength in District 11, the district divides municipalities and communities of interest along partisan lines. As explained above, the eastern edge of District 11 splits Buncombe County and the City of Asheville with District 10. *See supra* Part III.B.2.j; *see also* Exs. 3013; 4008. Notably, Legislative Defendants' expert Dr. Hood testified that the Buncombe County boundary between Districts 10 and 11 constituted "legislative cracking of a Democratic partisan cluster in the redistricting process." Trial Tr. IV, at 41:12–18. And Dr. Hood further

243

conceded that had Buncombe County and Asheville been kept whole, the district containing Buncombe County and Asheville would have been more favorable to Democratic candidates. *Id.* at 40:1–43:4.

Dr. Hofeller created several alternative maps that *did not* split the Buncombe County Democratic cluster. Ex. 2004, at 11, 13, 18. And not a *single* map submitted by the retired judges splits Buncombe County *at all*, let alone along the Democratic cluster. Ex. 5095. Likewise, numerous alternative maps generated by Plaintiffs' experts, including Plan 2-297, demonstrate that the General Assembly could have drawn District 11 without cracking the Democratic cluster in Buncombe County. *E.g.*, Second Chen Decl. 3, Exs. 5025–27. And significantly, Districts 1 and 2 in Plan 2-297, which contain most of the area encompassed by Districts 10 and 11 in the 2016 Plan, are, on average, significantly more compact than District 10 and 11 of the 2016 Plan, as measured by the Reock and Polsby-Popper metrics. *Compare* Second Chen Decl. 3–5 (reporting Reock and Polsby-Popper scores of .320 and .324 , respectively, for District 1, and scores of .553 and .325 for District 2 in Plan 2-297), *with* Ex. 5001 (reporting Reock and Polsby-Popper scores of .35 and .26, respectively, for District 10, and scores of .26 and .21 for District 11 in the 2016 Plan). Additionally, District 11's counterpart in Plan 2-297, District 1, has a substantially lower Republican vote share as measured by Dr. Hofeller's partisanship variable than that observed in District 11 in the 2016 election. *Compare* Second Chen Decl. 5 (expected Republican vote share of 52.62%), *with* Ex. 1018, at 2 (Republican candidate received 64.1% of the vote in 2016 election).

244

When viewed in conjunction with Plaintiffs' overwhelming statewide evidence, this district-specific evidence demonstrates (1) that the mapdrawers predominantly intended to, and did in fact, crack Democratic voters in and adjacent to District 11; (2) that the cracking of Democratic voters in and adjacent to District 11 had the effect of diluting such voters' votes; and (3) that the cracking of Democratic voters in and adjacent to District 11 was not a product of the State's political geography or other legitimate, non-partisan districting considerations. Accordingly, District 11 violates the Equal Protection Clause.

### l. District 12

District 12 is wholly contained within Mecklenburg County. Ex. 1001. Dr. Hofeller testified that District 12 was one of three districts in the 2016 Plan he and the Chairs drew, using past election results, to be "predominantly Democratic." Hofeller Dep. 192:7–16. As Dr. Hofeller intended and expected, the district's Democratic candidate received well over 60 percent of the votes cast in the 2016 election. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Democratic candidate was likely to receive 63.8% of the two-party vote share), *with* Ex. 1018, at 4 (Democratic candidate, Rep. Alma Adams, received 67% of the vote in 2016 election). Consistent with these results, Dr. Hood characterized District 12 as "Safe Democratic." Ex. 5058, at 25. In the 2016 election, the Democratic candidate in District 12 received a higher share of the vote in her district than all but one of the Republican candidates received in the 10 districts Dr. Hofeller drew to be predominantly Republican. Ex. 1018, 2–4.

245

To achieve the goal of concentrating Democratic voters in District 12, the district divides Mecklenburg County and Charlotte along partisan lines. In particular, the southern edge of District 12 splits Mecklenburg County by packing the county's large cluster of historically Democratic precincts into District 12, while placing the county's historically Republican precincts into District 9. Ex. 4012. To that end, precinct-level election results reveal the Mecklenburg County precincts assigned to District 9 tended to strongly favor Republican candidates, while the precincts assigned to District 12 favored Democratic candidates. *See supra* Part III.B.2.i.



Figure 8: *The partisan division of Mecklenburg County between Districts 9 and 12*

Although any map drawn to comply with the one-person, one-vote requirement must divide Mecklenburg County, numerous alternative maps drawn by the panel of retired judges and generated Plaintiffs' experts, including Plan 2-297, demonstrate that the General Assembly could have drawn District 12 without hewing exactly to the line formed between the Democratic and Republican precincts in Mecklenburg County, as the

246

2016 Plan does. *Compare, e.g.*, Second Chen Decl. 3; Exs. 5025–27, 5095, *with* Ex. 4012. Notably, the district, like District 12, wholly contained in Mecklenburg County in Plan 2-297, District 3, has a significantly lower predicted Democratic vote share, as measured by Dr. Hofeller's partisanship variable, than that observed in District 12. *Compare* Second Chen Decl. 5 (expected Democratic vote share of 54.18%), *with* Ex. 1018, at 2 (Democratic candidate received 67% of the vote in 2016 election).

Plaintiffs' statistical evidence further demonstrates that District 12's partisan make-up resulted from the mapdrawers' successful efforts to pack Democratic voters, rather than the State's political geography or other legitimate redistricting consideration. In particular, among Dr. Mattingly's more than 24,000 simulated maps—all of which conform to traditional districting criteria—District 12 in the 2016 Plan is an extreme statistical outlier with regard to its concentration of Democratic voters. Ex. 3040, at 30. In the 2016 election the Democratic candidate in District 12 received *67 percent* of the vote, the third highest Democratic vote share recorded in all 13 districts. *Id.* at 29–30. Yet, in Dr. Mattingly's ensemble of more than 24,000 plans, the median Democratic vote share of the third most Democratic district was *57 percent*—approximately 10 percentage points fewer—with only *.07 percent* of such districts having a Democratic vote share at or above the level recorded in District 12 in the 2016 election. *Id.* This demonstrates that the effect of the 2016 version of District 12 is to pack Democratic voters into the district in an amount greater than would otherwise naturally occur more than 99.9 percent of the time under neutral districting criteria. *See* Trial Tr. I, at 55:2–6, 70:1–4, 76:22–77:5.

247

Considered alongside Plaintiffs' strong statewide evidence, this district-specific evidence proves (1) that the mapdrawers predominantly intended to, and did in fact, pack Democratic voters in District 12; (2) that the packing of Democratic voters in District 12 had the effect of diluting such voters' votes; and (3) that the packing of Democratic voters in District 12 was not a product of the State's political geography or other legitimate, non-partisan districting considerations. Accordingly, we conclude that District 12 violates the Equal Protection Clause.

*m.    District 13*

District 13 spans all or part of five counties in mid-western North Carolina, running from Charlotte's northern suburbs to the center of Guilford County and the City of Greensboro. Ex. 1001. Representative Lewis and Dr. Hofeller drew the version of District 13 in the 2016 Plan by "mov[ing] individual VTDs from District 6 to District 13 . . . , or vice versa, for political impact." Lewis Dep. 156:19–157:1.

The results of the 2016 election reveal that the mapdrawers effectively diluted the votes of Democratic voters in and adjacent to District 13 in drawing the district: as Dr. Hofeller intended and expected, the district's Republican candidate received over 53 percent of the votes cast in the 2016 election. *Compare* Ex. 5116, at 9 (Dr. Hofeller averring that, using his seven-race formula, Republican candidate was likely to receive 53.5% of the two-party vote share), *with* Ex. 1018, at 4 (Republican candidate, Rep. Ted Bud, received 56.1% of the vote in 2016 election). And in the 2016 election the victorious Republican candidate in District 13 received a significantly lower share of the vote in his district than each of the Democratic candidates received in the three districts

248

Dr. Hofeller drew to be predominantly and overwhelmingly Democratic. Ex. 1018, at 2–4.

To achieve the goal of diluting Democratic voting strength in District 13, the district divides municipalities and communities of interest along partisan lines. As explained above, the northeastern edge of District 13 splits Guilford County and Greensboro in half, cracking off approximately half of the county's large cluster of historically Democratic precincts into District 6. *See supra* Part III.B.2.f; *see also* Ex. 4010. Significantly, Legislative Defendants' expert, Dr. Hood testified that the boundary between Districts 6 and 13 constitutes "legislative cracking of a Democratic partisan cluster in the redistricting process." Trial Tr. IV, at 45:2–8. And Dr. Hood further testified that had the mapdrawers not cracked Guilford County, either District 6 or District 13 "would have been more Democratic." *Id.* at 45:24–46:5.

Dr. Hofeller created at least one alternative map that *did not* split Guilford County Democratic cluster. Ex. 2004, at 18. And not a *single* map drawn by the retired judges splits Guilford County *at all*, let alone along the Democratic cluster. Ex. 5095. A number of other maps generated by Plaintiffs' experts did not split Guilford County, or split it far less significantly. *E.g.*, Exs. 5025–26, 5028, 5031. And although Dr. Chen's Plan 2-297 divides Guilford County, it does so because Dr. Chen was constrained to follow the General Assembly's objective of avoiding the pairing of incumbents elected under the 2011 Plan, Second Chen Decl. 3, which split Guilford County and was expressly drawn to increase Republican voting strength, Hofeller Dep. 116:19–117:25. As noted above, the two districts in Plan 2-297 that contain parts of Guilford County are

249

significantly more compact, on average, than their counterparts in the 2016 Plan under the compactness measures preferred by the General Assembly. *Compare* Second Chen Decl. 5 (reporting Reock and Polsby-Popper scores of .522 and .320, respectively, for District 6, and scores of .481 and .248 for District 7 in Plan 2-297), *with* Ex. 5001 (reporting Reock and Polsby-Popper scores of .50 and .32, respectively, for District 6, and scores of .36 and .23 for District 13 in the 2016 Plan). Additionally, although no district in Plan 2-297 closely resembles District 13, the district in Plan 2-297 that includes eastern Greensboro and Guilford County, District 6, has a substantially lower Republican vote share as measured by Dr. Hofeller's partisanship variable than that observed in District 13 in the 2016 election. *Compare* Second Chen Decl. 5 (expected Republican vote share of 49.30%), *with* Ex. 1018, at 2 (Republican candidate, Rep. Ted Budd, received 56.1% of the vote in 2016 election).

Plaintiffs' statistical evidence further proves that District 13's partisan make-up is attributable to the intentional cracking of Democratic voters, rather than political geography or other legitimate non-partisan redistricting considerations. In particular, Dr. Mattingly found that District 13 represents an extreme statistical outlier in terms of its partisan composition. Ex. 3040, at 30. In the 2016 election the Democratic candidate in District 13 received *44 percent* of the vote, the highest Democratic vote share in any of the ten districts in which a Republican candidate prevailed and the fourth highest Democratic vote share overall. Ex. 3040, at 29–30. By contrast, in Dr. Mattingly's ensemble of more than 24,000 plans, the median Democratic vote share of the fourth most Democratic district was *54 percent*, with *significantly less than one percent*—just

.19 percent—of such districts having a Democratic vote share at or below the level recorded in District 13 the 2016 election. *Id.* Accordingly, the splitting of Guilford County, not North Carolina's political geography, had the effect of diluting the votes of Democratic voters in and adjacent to District 13.

This district-specific evidence—when coupled with Plaintiffs' overwhelming statewide evidence—proves (1) that the mapdrawers predominantly intended to, and did in fact, crack Democratic voters in and around District 13; (2) that the cracking of Democratic voters in and around District 13 had the effect of diluting such voters' votes; and (3) that the cracking of Democratic voters in and around District 13 was not a product of the State's political geography or other legitimate, non-partisan districting considerations. Therefore, District 13 violates the Equal Protection Clause.

* * * * *

All told, Plaintiffs' statewide and district-specific evidence proves that (1) in drawing Districts 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, and 13, the General Assembly's predominant intent was to subordinate the interests of non-Republican voters and entrench Republicans in power; (2) the General Assembly cracked or packed Democratic voters in each of those districts and thereby diluted such voters' votes; and (3) the dilution of such voters' votes is not attributable to the State's political geography or other legitimate redistricting considerations. Accordingly, we conclude that each of those twelve districts constitutes an invidious partisan gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment.

IV.   FIRST AMENDMENT

Next, we consider Plaintiffs' claims under the First Amendment. The First Amendment, through the Due Process Clause of the Fourteenth Amendment, prohibits states from making any law "abridging the freedom of speech." U.S. Const. amend. I. Partisan gerrymandering—again, "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power," *Ariz. State Leg.*, 135 S. Ct. at 2658—implicates First Amendment rights because "political belief and association constitute the core of those activities protected by the First Amendment," *Elrod v. Burns*, 427 U.S. 347, 356 (1976), and because "[t]he First Amendment operates as a vital guarantee of democratic self-government," *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 855 F.3d 381, 427 (D.C. Cir. 2017) (Kavanaugh, J., dissenting). Accordingly, the First Amendment "has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339–40 (internal quotation marks omitted). To that end, the First Amendment protects "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, *regardless of their political persuasion*, to cast their votes effectively." *Williams*, 393 U.S. at 30-31 (emphasis added).

## A.  BACKGROUND LAW

Several lines of precedent bear on the application of the First Amendment to partisan gerrymanders. To begin, by favoring one set of political beliefs over another, partisan gerrymanders implicate the First Amendment prohibition on "viewpoint discrimination." *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995); *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring in the judgment) ("First

Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment *by reason of their views*." (emphasis added)). The First Amendment prohibits the government from favoring or disfavoring particular viewpoints, and, therefore, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment). Viewpoint discrimination is "presumptively unconstitutional," *Rosenberger*, 515 U.S. at 830 (internal quotation marks omitted), and therefore subject to "strict scrutiny," *McCullen v. Coakley*, 134 S. Ct. 2518, 2530 (2014) (explaining that a governmental action amounting to viewpoint discrimination survives strict scrutiny only if the action is "the least restrictive means of achieving a compelling state interest").

Relatedly, by seeking to dilute the electoral speech of supporters of disfavored parties or candidates, partisan gerrymandering runs afoul of the First Amendment's prohibition on laws that disfavor a particular group or class of speakers. *Citizens United*, 558 U.S. at 340 (explaining that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content"). The First Amendment prohibits such laws because "[b]y taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to

253

strive to establish worth, standing, and respect for the speaker's voice." *Id.* at 340–41; *see also Becerra*, 138 S. Ct. at 2378 ("Speaker-based laws run the risk that the State has left unburdened those speakers whose messages are in accord with its own views." (internal quotation marks omitted)). In the context of political speech, in particular, the Supreme Court repeatedly has applied the First Amendment's prohibition on "restrictions on certain disfavored speakers" to strike down electoral laws that disfavor a particular group of speakers. *Id.* at 341; *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784 (1978). And when, as is the case with a partisan gerrymander, a restriction on one group of speakers "suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *Belotti*, 435 U.S. at 785–86 (footnote omitted). Like viewpoint discrimination, governmental actions that discriminate against a particular group or class of speakers are subject to "strict scrutiny." *See Citizens United*, 558 U.S. at 340.

Third, by disfavoring a group of voters based on their prior votes and political association, partisan gerrymandering implicates the First Amendment's prohibition on burdening or penalizing individuals for engaging in protected speech. *Vieth*, 541 U.S. at 314 (2004) (Kennedy, J., concurring in the judgment) (explaining partisan gerrymandering violates "the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views"). The Supreme Court has explained that the government cannot "penalize[]" a person for engaging in "constitutionally protected speech or associations" because such indirect regulation of

speech would "allow the government to produce a result which it could not command directly." *Perry v. Sinderman*, 408 U.S. 593, 597 (1972) (internal quotation marks and alterations omitted). The Supreme Court's First Amendment retaliation jurisprudence represents a specific application of the general principle that even when the law affords the government the authority to make discretionary decisions—like firing or promoting an employee or allowing public use of a governmental facility—the government may not exercise such discretion "in a narrowly partisan or political manner." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–71 (1982) (plurality op.). For example, although the government retains discretion to curate public school libraries, "[i]f a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books." *Id.*; *see also id.* at 907 (Rehnquist, J., dissenting) ("I can cheerfully concede all of this.").

Courts have distilled a three-prong test from the Supreme Court's First Amendment retaliation jurisprudence, examining whether (1) the plaintiff's "speech was protected;" (2) "the defendant's . . . retaliatory action adversely affected the plaintiff's constitutionally protected speech;" and (3) "a causal relationship exists between [the plaintiff's] speech and the defendant's retaliatory action." *See, e.g.*, *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000). Examining these considerations, the Supreme Court repeatedly has struck down as violative of the First Amendment government actions that burden or penalize an individual or group for engaging in political speech or association. *See, e.g.*, *Rutan v. Republican Party of Ill.*, 497 U.S. 62,

255

65 (1990) (concluding that First Amendment prohibits government employers from making "promotion, transfer, recall, and hiring decisions involving low-level public employees . . . based on party affiliation and support"); *Elrod*, 427 U.S. at 373 (holding that First Amendment prohibits government officials from discharging or threatening to discharge lower-level public employees based on their political affiliation).

Finally, partisan gerrymandering implicates First Amendment precedent dealing with electoral regulations that have the potential to burden political speech or association. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). The First Amendment demands judicial scrutiny of state election regulations because regulations that "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affect[]—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson*, 460 U.S. at 788. Because states' "important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions," *id.*, the Supreme Court applies "sliding-scale" scrutiny to state election regulations, *see Burdick*, 504 U.S. at 433–34. In particular, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Id.* at 434 (quoting *Anderson*, 460 U.S. at 789; *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 213–14 (1986)). Under this

256

test, "[e]lection regulations that impose a severe burden on associational rights are subject to strict scrutiny." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008). By contrast, "[i]f a statute imposes only modest burdens . . . then 'the State's important regulatory interests are generally sufficient to justify reasonable, *nondiscriminatory* restrictions.'" *Id.* at 452 (emphasis added) (quoting *Anderson*, 460 U.S. at 788).

Applying that test, the Court has "repeatedly upheld reasonable, *politically neutral* regulations that have the effect of channeling expressive activity at the polls." *Id.* at 438 (emphasis added). By contrast, the Supreme Court has repeatedly struck down as violative of the First Amendment even facially neutral electoral regulations that had the effect of burdening particular parties, candidates, or groups of voters. *See, e.g.*, *Tashjian*, 479 U.S. at 225 (concluding that state's enforcement of statute requiring closed primaries, against the will of the Republican party, violated First Amendment); *Anderson*, 460 U.S. at 806 (striking down state candidate filing deadline because it posed unjustified burden on third-party candidates and voters who supported such candidates, with the "interests of the voters who chose to associate together" for political ends constituting the Court's "primary concern"). These cases reflect the governing principle that "in exercising their powers over elections and in setting qualifications for voters, the States may not infringe upon basic constitutional protections," including enacting "election laws [that] so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973).

257

Against these many, multifaceted lines of precedent, the First Amendment's applicability to partisan gerrymandering is manifest. How can the First Amendment prohibit the government from disfavoring certain viewpoints, yet allow a legislature to enact a districting plan that disfavors supporters of a particular set of political beliefs? How can the First Amendment bar the government from disfavoring a class of speakers, but allow a districting plan to disfavor a class of voters and candidates? How can the First Amendment protect government employees' political speech rights, but stand idle when the government infringes on voters' political speech rights? And how can the First Amendment ensure that candidates ascribing to all manner of political beliefs have a reasonable opportunity to appear on the ballot, and yet allow a state electoral system to favor one set of political beliefs over others? As at least five Justices already have determined, we conclude that the First Amendment does not draw such fine lines. *See Gill*, 138 S. Ct. at 1937–40 (Kagan, J., concurring); *Vieth*, 541 U.S. at 314–15 (Kennedy, J., concurring).

The 2016 Plan, in particular, implicates all four of these lines of precedent. The 2016 Plan discriminates against a particular viewpoint: voters who oppose the Republican platform and Republican candidates. The 2016 Plan also discriminates against a particular group of speakers: non-Republican candidates and voters who support non-Republican candidates. The General Assembly's use of Political Data—individuals' votes in previous elections—to draw district lines to dilute the votes of individuals likely to support non-Republican candidates imposes burdens on such individuals based on their past political speech and association. And the 2016 Plan's express partisan favoritism

258

excludes it from the class of "reasonable, politically neutral" electoral regulations that pass First Amendment muster. *Burdick*, 504 U.S. at 438. Indeed, if legislative mapdrawers can "rig" an election through the manipulation of district lines so as to ensure a favored group of candidates widely prevails—as we find the North Carolina General Assembly did here—then there would be no reason for legislators to resort to second-best approaches to attempt to dictate electoral outcomes and distort the marketplace of political ideas, such as those struck down in *Anderson*, *Citizens United*, and *McCutcheon*.

## B.    LEGAL STANDARD AND APPLICATION

Notwithstanding the evident applicability of the First Amendment to partisan gerrymandering, and the 2016 Plan in particular, neither the Supreme Court nor lower courts have settled on a framework for determining whether a partisan gerrymander violates the First Amendment. League Plaintiffs, in accordance with the approach taken by the district court in *Gill*, assert that the three-prong framework governing partisan gerrymandering claims under the Equal Protection Clause also applies to partisan gerrymandering claims under the First Amendment. This requires a plaintiff to demonstrate (1) discriminatory intent, (2) discriminatory effects, and (3) a lack of justification for the discriminatory effects. League Br. 3; *Whitford*, 218 F. Supp. 3d at 884. That inquiry mirrors the considerations the Supreme Court evaluates in First Amendment retaliation cases and First Amendment challenges to election regulations, *see supra* Part IV.A; *infra* Part IV.C, albeit using somewhat different nomenclature. Legislative Defendants agree that to the extent partisan gerrymandering is actionable

259

under the First Amendment—and we conclude that it is, *see supra* Parts II.B, IV.A[48]—the governing legal framework is no "different from any test which might apply under the Fourteenth Amendment." Leg. Defs.' FOF 105–06 ("'[T]he [F]irst amendment, like the [T]hirteenth, offers no protection of voting rights beyond that afforded by the [F]ourteenth and [F]ifteenth Amendments.'" (quoting *Washington v. Finley*, 664 F.2d 913, 927–28 (4th Cir. 1981))).

Common Cause Plaintiffs, by contrast, assert that once a plaintiff proves that a redistricting body intended for a districting plan to discriminate against voters likely to support a disfavored candidate or party—and thereby intended to engage in discrimination against a particular viewpoint and group of speakers—a court must subject the plan to strict scrutiny, upholding the plan "'only if [Defendants] prove[] that [it is] narrowly tailored to serve compelling state interests.'" Common Cause Br. 7–8 (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)). Accordingly, unlike League Plaintiffs, Common Cause Plaintiffs take the position that once a plaintiff demonstrates that a districting plan is motivated by invidious partisan intent, the First Amendment does not require a plaintiff to demonstrate that a plan has concrete discriminatory effects.

We agree with Common Cause Plaintiffs that the Supreme Court's demonstrated dim view of viewpoint discrimination, laws that discriminate against a class of speakers,

---

[48] *See also Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015) (noting that a First Amendment claim of impermissible partisan gerrymandering articulates "a legal theory put forward by a Justice of this Court and uncontradicted by the majority in any of our cases").

and laws that impose severe burdens on associational rights provides strong theoretical support for their position that invidious partisan discrimination, even absent a showing of concrete discriminatory effects, "is itself an injury to the First Amendment rights of the intended targets or victims." Common Cause Br. 9. To that end, the Supreme Court repeatedly has struck down election laws and regulations that discriminate against a particular viewpoint or group of speakers, even in the absence of evidence that the law or regulation had, or would have, a concrete effect on the outcome of an election. *See, e.g.*, *Citizens United*, 558 U.S. at 365–66 (striking down statute placing certain restrictions on political advocacy by corporations); *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 481 (2007) (opinion of Roberts, C.J.) (same); *id.* at 504 (Scalia, J., concurring in the judgment) (same). It defies reason that the First Amendment—which "has its fullest and most urgent application" to political speech—would subject election regulations that discriminate against associations of individuals organized principally for economic gain to the most exacting level of constitutional scrutiny, *see Citizens United*, 558 U.S. at 339–43, 365, but subject election regulations that expressly discriminate against associations of individuals principally organized to advance political beliefs, like Plaintiffs North Carolina Democratic Party, League of Women Voters, and Common Cause, to less searching scrutiny. And we see no reason why the First Amendment would provide greater protection to associations of individuals principally organized to advance a single political belief, *see Becerra*, 138 S. Ct. at 2372–76 (applying strict scrutiny to content-based regulation of speech as-applied to state-licensed medical clinics "devoted to opposing" abortion), than it does to associations of individuals, like political

261

parties and religious institutions, organized to support or advance a collection of moral or political beliefs.

Likewise, courts reviewing election regulations under the *Anderson/Burdick* framework apply strict scrutiny to election regulations that are not "even-handed" or "politically neutral." *Dudum v. Arntz*, 640 F.3d 1098, 1106 (9th Cir. 2011); *see also Clingman v. Beaver*, 544 U.S. 581, 603-04 (2005) (O'Connor, J. concurring in part) (concluding that burden imposed by electoral regulation was not "severe," and thus not subject to strict scrutiny, because it imposed "only a modest and politically neutral burden on associational rights"). We can conceive of no reason why a redistricting plan that is expressly not "even handed" or "politically neutral"—like the 2016 Plan—would not be subject to the same searching First Amendment scrutiny as other election regulations enacted pursuant to a state legislature's Article I authority to regulate elections.

Nevertheless, Supreme Court precedent appears to bar a plaintiff from successfully challenging a partisan gerrymander solely based on evidence that a redistricting body enacted a districting plan with discriminatory partisan intent. *See LULAC*, 548 U.S. at 418 (opinion of Kennedy, J.) ("[A] successful claim attempting to identify unconstitutional acts of partisan gerrymandering must do what appellants' sole-motivation theory explicitly disavows: show a burden, as measured by a reliable standard, on the complainants' representational rights. For this reason, a majority of the Court rejected a test proposed in *Vieth* that is markedly similar to the one appellants present today."); *id.* at 511–12 (Scalia, J., concurring in part and dissenting in part). To that end,

262

the one lower court to put forward a unique framework for adjudicating partisan gerrymandering claims under the First Amendment since the Supreme Court decided *LULAC* required that a partisan gerrymandering plaintiff prove that he experienced a "demonstrable and concrete adverse effect" on his First Amendment rights. *Shapiro*, 203 F. Supp. 3d at 598.

In light of this precedent, we assume that the Supreme Court would review First Amendment partisan gerrymandering claims in accordance with the intermediate scrutiny standard applied in retaliation cases and challenges to election regulations that do not impose a "severe" burden on voting rights.[49] Drawing on that precedent, we derive a three-prong test requiring Plaintiffs to prove: (1) that the challenged districting plan was intended to burden individuals or entities that support a disfavored candidate or political party, (2) that the districting plan in fact burdened the political speech or associational rights of such individuals or entities, and (3) that a causal relationship existed between the governmental actor's discriminatory motivation and the First Amendment burdens imposed by the districting plan.

       1.      Intent To Burden Speech and Associational Rights

---

[49] We need not definitively resolve this question because we find (1) that the General Assembly intended for the 2016 Plan to subordinate the interests of non-Republican voters and entrench Republican congressmen in office, (2) that the 2016 Plan had that effect, and (3) that no legitimate state interest or neutral explanation justified the 2016 Plan's discriminatory effect. *See supra* Part III; *infra* Part IV.B. Accordingly, under either League Plaintiffs and Legislative Defendants' three-prong framework or Common Cause Plaintiffs' strict-scrutiny approach, Plaintiffs prevail on their First Amendment claims.

The intent prong principally derives from the causation component in First Amendment retaliation cases. In such cases, a "plaintiff must show a causal connection between a defendant's *retaliatory animus* and subsequent injury in any sort of retaliation action." *Hartman v. Moore*, 547 U.S. 250, 259 (2006) (emphasis added). Put differently, a plaintiff must show that her protected First Amendment activities were a "motivating factor" behind the challenged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The motivating-factor requirement in First Amendment retaliation claims parallels the intent requirement in Equal Protection Claims. *Id.* at 287 n.2 (citing *Arlington Heights*, 429 U.S. at 270–71). Relying on this precedent, lower courts have concluded that the motivating-factor requirement renders proof of a governmental actor's intent to burden speech or associational rights an essential element of First Amendment retaliation claims. *See, e.g.*, *Greenwich Citizens Comm., Inc. v. Ctys. Of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 32 (2d Cir. 1996) ("[R]etaliatory intent is required for a retaliatory First Amendment claim."); *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 14 F.3d 457, 464 (9th Cir. 1994) ("The defendant's intent is an element of the [retaliation] claim." (emphasis removed)); *Shapiro*, 203 F. Supp. 3d at 597.

Applying the guidelines for assessing discriminatory intent in *Arlington Heights*, we previously found that Plaintiffs adduced more-than-sufficient evidence to prove that, in enacting the 2016 Plan, the General Assembly predominantly intended to "subordinate" the interests of entities and voters who supported, or were likely to support, non-Republican candidates. *See supra* Part III.B. Given that the *Arlington Heights* intent

264

inquiry parallels the intent inquiry in First Amendment retaliation claims, *see Mt. Healthy*, 429 U.S. at 287 n.2, we likewise find that Plaintiffs satisfied their burden to demonstrate that the General Assembly intended to burden the speech and associational rights of such entities and voters.

## 2. Burden on Speech and Associational Rights

Next, we must determine whether the 2016 Plan in fact burdened First Amendment rights. The requirement that a plaintiff demonstrate that a partisan gerrymander burdens political speech or associational rights derives from both retaliation and election regulation cases. In the context of retaliation claims, even when, as here, a challenged governmental action does not flatly prohibit protected speech or association, the action nonetheless burdens First Amendment rights if it "has a chilling effect or an adverse impact" on speech or associational rights. *The Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2005). To constitute an actionable First Amendment burden, the chilling effect or adverse impact must be more than *de minimis*. *See, e.g.*, *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006); *ACLU of Md., Inc. v. Wicomico Cty.*, 999 F.2d 780, 786 n.6 (4th Cir. 1993). Likewise, the *Anderson/Burdick* framework applied in election regulation cases requires a plaintiff to establish that a challenged regulation imposed a "burden" on political speech or associational rights. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189–90 (2008) (opinion of Stevens, J.). The Court has refused to impose "any litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters," instead requiring that "[h]owever slight [a] burden may appear . . . it must be justified by relevant and

265

legitimate state interests sufficiently weighty to justify the limitation." *Id.* at 191 (internal quotation marks omitted).

Legislative Defendants argue that partisan gerrymandering does not "burden" First Amendment rights because it does not "prohibit" supporters of a disfavored party or candidate from speaking nor does it "chill" speech or "deter" such supporters "from engaging in political speech or association." Leg. Defs.' FOF 139. Put differently, the 2016 Plan does not "chill" First Amendment activities because "Plaintiffs are every bit as free under [the 2016 Plan] to run for office, express their political views, endorse and campaign for their favorite candidates, vote, or otherwise influence the political process through their expression." *Kidd v. Cox*, No. 1:06-CV-0997, 2006 WL 1341302, at *12 (N.D. Ga. 2006).

A governmental action "chills" speech if it is "likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011) (alteration in original) (internal quotation marks omitted). "Any chilling effect must be objectively reasonable. Nevertheless, a claimant need not show [he] ceased those activities altogether to demonstrate an injury in fact." *Id.* (alterations and internal citation omitted).

Under that standard, the record reveals that the 2016 Plan has had a constitutionally cognizable chilling effect on reasonable North Carolinians' First Amendment activities. Multiple Plaintiffs testified that in "the most recent election, a lot of people did not come out to vote"—despite Plaintiffs' concerted get-out-the-vote efforts—"[b]ecause they felt their vote didn't count." Evans Dep. 16:4–9; *accord, e.g.*,

266

Peck Dep. 27:20–24 ("I can't tell you how many people told me this election, Republicans as well as Democrats, 'This system is rigged. My vote doesn't count.' It was really hard to try to galvanize people to participate."). Likewise, in the 2016 election under the 2016 Plan, many organizations' "biggest struggle was to get people to vote." Peck Dep. 40:5–6. Voters and advocacy organizations elected not to participate in congressional races because they believed they could not "have a democratic—small 'D'—democratic impact. It doesn't really matter for those races because of the gerrymandering because they're not competitive." Peck Dep. 30:20–24.

Additionally, the League had difficulty fulfilling its mission of "inform[ing] . . . [and] engag[ing] voters in the process of voting and civic participation in their government." Klenz Dep. 59:16–17; *see id.* 44:15–25 (explaining that the League of Women Voters engages in "voter registration" and "Get Out The Vote" efforts). For example, the League testified that it had difficulty finding ways for their members to interact with "candidate[s] that [were] expected to win and projected to win," because those candidates were often not "motivated" to participate "in voter forums, debates, [or] voter guides, because the outcome is so skewed in favor or in disfavor of one or the other." *Id.* at 59:16–17, 60:6–10. Individual Plaintiffs also testified to the adverse impact of the districting plan on their ability to interact with and influence their representatives. *See, e.g.*, Brewer Dep. 24:8–25:6 (explaining that in "non-competitive districts" representatives from "both parties are not required to reach out to voters in the other party or even truly independent voters," and therefore such voters tend "to be poorly represented because their views and their potential votes are not fairly considered").

The 2016 Plan also chilled the speech and associational rights of voters affiliated with the North Carolina Democratic Party. Because Democratic candidates were unlikely to prevail in districts drawn by the General Assembly to elect Republicans, it "ma[d]e[] it extremely difficult" for the North Carolina Democratic Party "to raise funds and have resources and get the attention of the national congressional campaign committees and other lawful potential funders for congressional races in those districts." Goodwin Dep. 98:1–5. For the same reasons, the party had difficultly recruiting strong candidates. *Id.* at 41:20–42:20; 60:23–61:16. Individual Plaintiffs who supported Democratic candidates testified to similar difficulty raising money, attracting candidates, and mobilizing voters to support the political causes and issues such Plaintiffs sought to advance. *E.g.*, Quinn Dep. 39:1–3 ("[Extreme gerrymandering] makes it harder for me [as a local organizer] to raise money; it makes it harder for me to recruit candidates; makes it harder to just mobilize a campaign."); Palmer Dep. 27:19–23 (recounting that citizens in one district asked for "help [to] recruit a candidate for [the citizens'] county [because] . . . no Democrats [we]re going to run [t]here" given the significant obstacle to success posed by the partisan gerrymander); Morgan Dep. 23:21–25 ("[P]eople . . . say no sense in us giving money to that candidate because [he or she] is unlikely to prevail, notwithstanding the merit of their positions.").

Expert testimony confirmed the reasonableness of North Carolinians' feelings that their votes "did not count" and the corresponding chilling effects on speech and associational activities. For example, the Republican candidate's vote share (56.10%) and margin of victory (12.20%) in the *least* Republican district which elected a

Republican candidate under the 2016 Plan exceeded the thresholds at which political science experts, including Legislative Defendants' expert Dr. Hood, consider a district to be "safe"—*i.e.*, highly unlikely to change parties in subsequent elections. Ex. 5058, at 25, Trial Tr. IV, at 29:16–22, 86:21–88:5. Likewise, Dr. Jackman testified that it would require a swing of votes in Democratic candidates' favor of "historic magnitude" to strip the 2016 Plan of its pro-Republican bias. Trial Tr. II, at 54:24–55:9. And Dr. Hood testified that when a district's lines are drawn so that a particular party's candidate is likely to prevail, the opposing party will have difficulty attracting a strong candidate and raising money to support that candidate. Trial Tr. IV, at 54:9–59:18.

All of these chilling effects on speech and association—difficulty convincing voters to participate in the political process and vote, attracting strong candidates, raising money to support such candidates, and influencing elected officials—represent cognizable, and recognized, burdens on First Amendment rights. *See, e.g.*, *Anderson*, 460 U.S. at 792 (finding that plaintiff was injured by election law that made "[v]olunteers . . . more difficult to recruit and retain, media publicity and campaign contributions . . . more difficult to secure, and voters . . . less interested in the campaign"); *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 587 (6th Cir. 2006) (recognizing that electoral restrictions that "affect a political party's ability to perform its primary functions— organizing and developing, recruiting supporters, choosing a candidate, and voting for that candidate in a general election"—can constitute "severe" First Amendment burdens); *Benkiser*, 459 F.3d at 586–87; *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989); *Benisek v. Lamone*, 266 F. Supp. 3d 799, 834 (D. Md. 2017)

269

(Niemeyer, J., dissenting) ("[T]he purposeful reduction of one party's effectiveness may well chill the protected expression of that party's voters, even if no individual plaintiff establishes, as a factual matter, that *he* was so chilled."), *aff'd on other grounds* 138 S. Ct. 1942 (2018).  Importantly, that partisan gerrymanders do not bar citizens from voting or expressing their political views does not render these First Amendment burdens any less significant.  *Cal. Democratic Party v. Jones*, 530 U.S. 567, 581 (2000) ("We have consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired.").

Additionally, Legislative Defendants' myopic focus on whether a partisan gerrymander, and the 2016 Plan in particular, "chilled" or "deterred" protected speech or association ignores that a retaliatory governmental action also poses a constitutionally cognizable "burden" when it "adversely affects[s]" the speaker and the candidate or political groups with whom he seeks to associate.  *Rutan*, 497 U.S. at 73; *Suarez*, 202 F.3d at 686.  As detailed above, myriad evidence establishes that the 2016 Plan makes it easier for supporters of Republican candidates to translate their votes into seats in the state's congressional delegation and diminishes the need for Republican representatives to respond to the interests of voters who support non-Republican candidates.  *See supra* Part III.B.  Accordingly, even if the speech of voters who support non-Republican candidates was not *in fact* chilled—if, for example, they had all continued to vote for, speak on behalf of, donate money to, and campaign for such candidates—the 2016 Plan nonetheless "adversely affected" such voters' First Amendment rights by diluting the

270

electoral power of their votes. *Shapiro*, 203 F. Supp. 3d at 597–98 (recognizing that "dilution" of disfavored party's electoral power constitutes adverse effect cognizable under the First Amendment).

The principle that partisan vote dilution—the intentional diminishment of the electoral power of supporters of a disfavored party and enhancement of the electoral power of supporters of a favored party—constitutes an actionable adverse effect on political speech and associational rights derives from bedrock First Amendment principles. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others *is wholly foreign to the First Amendment*." *Buckley*, 424 U.S. at 48–49 (emphasis added), *superseded by statute on other grounds as stated in McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003); *see also Emily's List v. Fed. Election Comm'n*, 581 F.3d 1, 5–6 (D.C. Cir. 2013) (Kavanaugh, J.) (characterizing this sentence from *Buckley* as "perhaps the most important sentence in the Court's entire campaign finance jurisprudence"). Simply put, the First Amendment does not permit the government "to restrict the political participation of some in order to enhance the relative influence of others." *McCutcheon*, 572 U.S. at 1441 (plurality op.).

To that end, the government may not, for example, cap the amount of independent expenditures individuals, entities, and political parties may make on behalf of a "clearly identified candidate." *Buckley*, 424 U.S. at 45. Likewise, it is beyond cavil that the First Amendment would forbid the government from making large public spaces available for speakers advocating for a favored political party, while allowing supporters of disfavored

271

speakers only to speak in smaller public venues, simply because government officials preferred the message of the favored party's speakers. Nor is there any question that the government would violate the First Amendment if it allowed supporters or candidates of one party to speak with a bullhorn but barred candidates from other parties from doing the same. Although the supporters of the disfavored candidate or party remain free to speak as much as they wish—*i.e.* their speech is not chilled—the government nonetheless violates the First Amendment by "enhanc[ing] the relative voice" of the favored party. *Buckley*, 424 U.S. at 48–49.

Just as the government may not altruistically "equaliz[e] the relative ability of individuals and groups to influence the outcome of elections," *Citizens United*, 558 U.S. at 350 (internal quotation mark omitted), neither may the government drown out the political speech of disfavored individuals and groups "in order to enhance the relative influence of others," *McCutcheon*, 134 S. Ct. at 1441; *see also Shapiro*, 203 F. Supp. 3d at 598 ("While citizens have no right to be assigned to a district that is likely to elect a representative that shares their views, the State also *may not intentionally drown out the voices of certain voters* by reason of their views." (emphasis added)). That is particularly true in the republican form of government adopted by the Framers, in which elected officials represent the interests of "the People" in making governing decisions. U.S. Const. art. I, § 2; *see infra* Part V. When a legislature draws a congressional districting plan designed to enhance the electoral power of voters likely to support candidates of a favored party and the districting plan achieves that intended goal by electing more Representatives from the favored party than would have prevailed under a non-

272

discriminatory plan—as was the case with the 2016 Plan in the 2016 election—then the legislature unconstitutionally has "enhanced the relative voice" of the favored party in Congress, at the expense of the viewpoint of the supporters of disfavored parties.

Contrary to Legislative Defendants' assertions, the 2016 Plan's chilling effects and adverse impacts are more than *de minimis*. Even a "slight" burden on "a political party, an individual voter, or a discrete class of voters" can violate the First Amendment if not supported by a justification of commensurate magnitude—as is the case here. *See Crawford*, 553 U.S. 181, 189–90 (2008) (opinion of Stevens, J.). And the myriad burdens on political speech and associational rights attributable to the 2016 Plan— including decreased voter engagement, difficulty raising money and attracting candidates, and vote dilution—are of a different magnitude than numerous retaliatory actions that courts have found to constitute more than *de minimis* burdens on First Amendment rights. *See, e.g.*, *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir. 1997) (filing of single "false [disciplinary] charge infringed . . . First Amendment right[s]"); *Crawford-El v. Britton*, 93 F.3d 813, 826 (D.C. Cir. 1996) ("[P]ecuniary losses . . . sustained in the form of the costs of shipping . . . boxes and replacing clothing, though small, might well deter a person of ordinary firmness . . . from speaking again."), *vacated on other grounds*, 523 U.S. 574 (1998); *Sloman v. Tadlock*, 21 F.3d 1462, 1470 (9th Cir. 1994) (holding that factfinder could reasonably conclude that a police officer's "decisions to issue a citation and warnings to" a citizen expressing his political beliefs "chilled the political expression of [the citizen] and his group"); *see also Anderson*, 460 U.S. at 792 (1983) (finding that plaintiff candidate was burdened by election law that made "[v]olunteers . . . more

273

difficult to recruit and retain, media publicity and campaign contributions . . . more difficult to secure, and voters . . . less interested in the campaign," even in the absence of evidence the candidate would have prevailed in election).

Taken together, we find that Plaintiffs' evidence establishes that the 2016 Plan's pro-Republican bias had the effect of chilling the political speech and associational rights of individuals and entities that support non-Republican candidates. And we further find that the 2016 Plan adversely affected such individuals' and entities' First Amendment rights by diluting the electoral speech and power of voters who support non-Republican candidates. Therefore, we find that Plaintiffs' evidence is more-than-adequate to establish that the 2016 Plan burdened their political speech and associational rights.

### 3. Causation

Like the burden requirement, the causation requirement derives from both First Amendment retaliation and election regulation cases. In retaliation cases, the causation element not only requires a plaintiff to demonstrate retaliatory intent, it also allows a governmental actor to escape liability if the actor demonstrates it would have taken the challenged action "even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287; *Hartman*, 547 U.S. at 260 (explaining that a governmental "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway"). Similarly, the *Anderson/Burdick* framework applied in First Amendment election regulation cases requires that courts assess "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the

274

plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789; *Tashjian*, 479 U.S. at 213–14). Accordingly, under the causation prong, a challenged districting plan that burdens political speech and associational rights nonetheless passes First Amendment muster if legitimate state interests, unrelated to the redistricting body's intent to burden the rights of supporters of a disfavored party, justify the First Amendment burdens imposed by the plan.

As explained above, the 2016 Plan burdens First Amendment rights both by chilling voters, candidates, and parties' participation in the political process and by diluting the electoral power of supporters of non-Republican candidates. In evaluating Plaintiffs' claims under the Equal Protection Clause, we found that neither North Carolina's political geography nor any other legitimate redistricting objective justified the 2016 Plan's subordination of the interests of non-Republican voters. *See supra* Part III.B. And it is axiomatic that the government has no legitimate interest in "restrict[ing] the speech of some elements of our society in order to enhance the relative voice of others." *Buckley*, 424 U.S. at 48–49. Accordingly, we find that the General Assembly's discriminatory animus against non-Republican voters, candidates, and parties caused the 2016 Plan's burdens on such voters, candidates, and parties' political speech and associational rights.

* * * * *

In sum, we find (1) that the 2016 Plan was intended to disfavor supporters of non-Republican candidates based on those supporters' past expressions of political beliefs, (2) that the 2016 Plan burdened such supporters' political speech and associational rights,

275

and (3) that a causal relationship existed between the General Assembly's discriminatory motivation and the First Amendment burdens imposed by the 2016 Plan. Accordingly, we conclude that the 2016 Plan violates the First Amendment.

## V.    ARTICLE I

Finally, we turn to Common Clause Plaintiffs' claims under Article I of the Constitution. Common Cause Plaintiffs assert the 2016 Plan runs afoul of two provisions in Article I: section 2, which provides that the "House of Representatives shall be composed of Members chosen . . . by the People," and the Elections Clause, which provides that "the Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations," U.S. Const. art. I, § 4, cl. 1. Although Common Cause Plaintiffs assert distinct claims under Article 1, section 2 and the Elections Clause, framing era records and Supreme Court doctrine reveal that the two provisions are closely intertwined.

### A.    BACKGROUND LAW

Because the right to elect Representatives to Congress "ar[ose] from the Constitution itself," the States have no "reserved" or "sovereign" authority to adopt laws or regulations governing congressional elections. *Thornton*, 514 U.S. at 802-05; *id.* at 802 ("As Justice Story recognized, 'the states can exercise no powers whatsoever, which exclusively spring out of the existence of the national government, which the constitution does not delegate to them. . . . No state can say, that it has reserved, what it never possessed.'" (quoting Story, 1 Commentaries on the Constitution of the United States §

276

627 (3d ed. 1858)). Rather, the Constitution—and the Elections Clause in particular—delegates to the States the power to impose certain types of laws and regulations governing congressional elections, including laws or regulations establishing congressional districts. *Id.* at 802-05; *see also Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1283 (11th Cir. 2012) ("[S]tates have the delegated power under the Elections Clause to create districts for congressional elections."). But unless the Elections Clause or another constitutional provision delegates to the States the authority to impose a particular type of election law or regulation, "such a power does not exist." *Thornton*, 514 U.S. at 805.

The plain language of the Elections Clause confers on the States the authority to regulate the "Times, Places, and Manner" of holding congressional elections. U.S. Const. art. I, sec. 4. During the Constitutional Convention, James Madison provided a list of examples of the types of regulations that would fall within States' authority to regulate the "Times, Places, and Manner" of holding elections: "whether the electors should vote by ballot or *viva voce*, should assemble at this place or that place; should be divided into districts or all meet at one place, sh[oul]d all vote for all the representatives; or all in a district vote for a number allotted to the district." *Debates* at 423–24. The Framers, therefore, "understood the Elections Clause as a grant of authority to issue *procedural regulations*." *Thornton*, 514 U.S. at 833 (emphasis added).

In accordance with the intent of the Framers, the Supreme Court has held that "[t]he Elections Clause gives States authority 'to enact numerous requirements as to *procedure* and safeguards which experience shows are necessary in order to enforce the

277

fundamental right involved.'" *Id.* (emphasis added) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). Put differently, the Elections Clause empowers the States to promulgate "regulations designed to ensure that elections are fair and honest and that some sort of order rather than chaos accompanies the democratic processes." *Id.* at 834–35 (emphasis added) (internal quotation marks and alterations omitted).

The States' broad, delegated power under the Election Clause, however, is not without limit. *See, e.g.*, *Cook v. Gralike*, 531 U.S. 510, 527 (2001) (Kennedy, J. concurring) ("The Elections Clause thus delegates but limited power over federal elections to the States."); *Montano v. Lefkowitz*, 575 F.2d 378, 385 (2d Cir. 1978) (Friendly, J.) ("*Wesberry* makes clear that the apparent breadth of the power granted to state legislatures by [the Elections Clause], is not a carte blanche."). In particular, "in exercising their powers of supervision over elections and in setting qualifications for voters, the States may not infringe upon basic constitutional protections." *Kusper*, 414 U.S. at 56–57; *see also Tashjian*, 479 U.S. at 217 ("The power to regulate the time, place, and manner of elections does not justify, without more, the abridgement of fundamental rights."). For example, in *Wesberry*, the Court held that the Elections Clause does not "immunize state congressional apportionment laws which debase a citizen's right to vote." 376 U.S. at 7. Likewise, the Elections Clause does not serve "as a source of power [for States] to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints." *Thornton*, 514 U.S. at 833–34. In other words, the States' authority under the Elections clause extends *only* to "*neutral*

278

provisions as to the time, place, and manner of elections." *Gralike*, 531 U.S. at 527 (emphasis added).

## B.    APPLICATION

Under this precedent, we conclude that the 2016 Plan exceeds the General Assembly's delegated authority under the Elections Clause for three reasons: (1) the Elections Clause did not empower State legislatures to disfavor the interests of supporters of a particular candidate or party in drawing congressional districts; (2) the 2016 Plan's pro-Republican bias violates other constitutional provisions, including the First Amendment, the Equal Protection Clause, and Article I, section 2; and (3) the 2016 Plan represents an impermissible effort to "dictate electoral outcomes" and "disfavor a class of candidates." *Thornton*, 514 U.S. at 833–34.

As to the first reason, the Elections Clause was the product of a vigorous debate at the Constitutional Convention among the delegates regarding whether, and to what extent, to lodge authority over the regulation of congressional elections in Congress. On the one hand, those who feared the power of the new federal government did not want to give Congress the ability to override state election regulations. For example, the Anti-Federalist propagandist Federal Farmer argued that placing authority to promulgate election regulations in the national government would allow Congress to draft election laws that favored particular representatives or viewpoints. *See Greene*, *supra* at 1033. "'[T]he general legislature may . . . evidently so regulate elections as to secure the choice of any particular description of men.'" *Id.* (quoting Letter from the Federal Farmer (Oct. 10, 1787), *reprinted in* Origins of the House of Representatives: A Documentary Record

279

52, 53 (Bruce A. Ragsdale ed., 1990)).  Other Anti-Federalists, including Patrick Henry,

expressed similar concerns about Congress manipulating election regulations to favor a

particular group of candidates or their supporters.  *Id.* at 1036.

On the other hand, supporters of congressional control over state election

regulations—the position that ultimately prevailed—emphasized the risk that States

would refuse to hold elections, and thereby strip the federal government of power, or,

more relevant to the case at hand, enact election regulations—including districting

plans—that would favor particular factions.  For example, James Madison argued that

"[w]henever the State Legislatures had a favorite measure to carry, they would take care

so to mould their regulations as to favor the candidates they wished to succeed." *Debates*

at 424.  Likewise, a delegate at the Massachusetts ratifying convention "warned that

'when faction and party spirit run high,' a legislature might take actions like 'making an

unequal and partial division of the states into districts for the election of

representatives.'" *Ariz. State Leg.*, 135 S. Ct. at 2672 (quoting Theophilus Parsons in

Debate in Massachusetts Ratifying Convention (16–17, 21 Jan. 1788), in 2 The Founders'

Constitution 256 (P. Kurland & R. Lerner eds. 1987)).

Accordingly, although the Framers disagreed as to whether, and to what extent,

the Elections Clause should empower Congress to displace state election regulations, the

Framers agreed that, regardless of whether Congress retained such authority, the

Elections Clause should not empower legislative bodies—be they state or federal—to

impose election regulations that would favor or disfavor a particular group of candidates

or voters.  *See Thornton*, 514 U.S. at 833 n.47 ("'The constitution expressly provides that

the choice shall be by the people, which cuts off both from the general and state Legislatures the power of so regulating the mode of election, as to deprive the people of a fair choice.'" (quoting "The Republican," Connecticut Courant (Hartford, Jan. 7, 1788), 1 Bailyn 710, 713)).   To that end, the Supreme Court has expressly recognized that the Elections Clause was "intended to act as a safeguard against manipulation of electoral rules by politicians and factions in the States to entrench themselves or place their interests over those of the electorate." *Ariz. State Leg.*, 135 S. Ct. at 2672.

As explained above in drawing the 2016 Plan, the General Assembly "manipulat[ed]," *id.*, district lines in order to subordinate the interests of non-Republican candidates and their supporters and entrench Republican candidates in power.  The 2016 Plan, therefore, does not amount to a "neutral," *Gralike*, 531 U.S. at 527, or "fair" procedural regulation, *Thornton*, 514 U.S. at 853, but rather an effort to achieve an impermissible substantive goal—providing the Republican party with a "Partisan Advantage," Ex. 1007.   Accordingly, the 2016 Plan exceeds the General Assembly's delegated authority under the Elections Clause.

Turning to the second reason, the 2016 Plan's favoring of Republican candidates and their supporters and disfavoring of non-Republican candidates and their supporters violates the Elections Clause by "infring[ing] upon basic constitutional protections." *Kusper*, 414 U.S. at 56–57.  As explained above, twelve districts in the 2016 Plan violate the Equal Protection Clause because they reflect a successful, and unjustified, effort by the General Assembly to subordinate the interests of non-Republican voters and entrench Republican Representatives in power.  *See supra* Part III.  Additionally, as an intentional,

281

and successful, effort to burden the speech and associational rights of supporters of non-Republican candidates, the 2016 Plan violates the First Amendment. *See supra* Part IV.

The 2016 Plan also violates Article I, section 2's grant of authority to "the People" to elect their Representatives. The Framers decision to vest the power to elect Representatives in "the People" was—and is—significant. This feature differentiated the House of Representatives from every other federal government body at the time of the Framing. It is "the only textual reference to 'the People' in the body of the original Constitution and the only express, original textual right of the People to direct, unmediated political participation in choosing officials in the national government." Richard H. Pildes, *The Constitution and Political Competition*, 30 Nova L. REV. 253, 267 (2006). For example, at the time, Senators were elected by the state legislatures. U.S. Const. art. I, § 3 *repealed by* U.S. Const. amend. XVII. The President was and still is elected through an intermediate body—the Electoral College. U.S. Const. art. II, § 1. Only the House of Representatives was directly accountable to the People.

Article I, section 2 was a product of the so-called Great Compromise, which resolved a bitter dispute between delegates regarding whether representation in the national legislature would be determined by population, with representatives directly elected by the people, or would be awarded equally among the States, with representatives elected by state legislatures. *See Wesberry*, 376 U.S. at 12-13. Under the Great Compromise, the Senate represented the interests of the States, each State was awarded equal representation in that body, and Senators were elected by state legislatures. *Id.* at 13. By contrast, "[t]he House of Represen[t]atives, the Convention

282

agreed, was to represent the people as individuals, and on the basis of complete equality for each voter." *Id.* at 14. The House of Representatives, therefore, provided "a direct link between the National Government and the people of the United States." *Thornton,* 514 U.S. at 803.

The delegates at the Constitutional Convention decided to have the House of Representatives elected directly by the People for two major reasons. First, the Framers viewed popular election of at least one branch of government as an essential feature of a government founded on democratic principles. James Madison explained, for example, that "[a]s it is essential to liberty that the government in general should have a common interest with the people, so it is particularly essential that the [House of Representatives] should have an immediate dependence on, and an intimate sympathy with, the people." The Federalist No. 52, at 295 (James Madison). Other delegates at the constitutional convention also emphasized the critical importance of direct popular election of representatives in any republican form of government. *Debates* at 39 (reporting that George Mason "argued strongly for an election of the larger branch by the people, stating that "[i]t was to be the grand depository of the democratic principle of the government"); *id.* at 167 (reporting that James Wilson stated he "considered the election of the first branch by the people not only as the corner Stone, but as the foundation of the fabric: and that the difference between a mediate and immediate election was immense"). Put simply, Article I, Section 2 gives effect to the Framers' belief that "'[t]he true principle of a republic is, that the people should choose whom they please to govern them.'" *Powell,*

395 U.S. at 540–41 (quoting Alexander Hamilton in 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876)).

The Framers also saw popular election of Representatives as an important check on the States' power. *See, e.g.*, *Debates* at 40 (reporting that James Wilson stated that: "no government could long subsist without the confidence of the people. In a republican Government, this confidence was peculiarly essential. . . . All interference between the general and local government should be obviated as much as possible."); *id.* at 167 (reporting that Alexander Hamilton did not want state legislatures to elect both chambers of Congress, because "State influence . . . could not be too watchfully guarded against"); *id.* (reporting that Rufus King worried that "the Legislatures would constantly choose men subservient to their own views as contrasted to the general interest; and that they might even devise modes of election that would be subversive of the end in view"). In sum, "the Framers, in perhaps their most important contribution, conceived of a Federal Government directly responsible to the people, possessed of direct power over the people, and chosen directly, *not by States, but by the people*." *Thornton*, 514 U.S. at 821 (emphasis added).

The 2016 Plan's invidious partisanship runs contrary to the Constitution's vesting of the power to elect Representatives in "the People." U.S. Const. art. I, § 2. To begin, partisan gerrymanders, like the 2016 Plan, violate "the core principle of republican government" preserved in Article I, Section 2—"namely, that the voters should choose their representatives, not the other way around." *Ariz. State Leg.*, 135 S. Ct. at 2677 (internal quotation marks omitted). And by favoring supporters of Republican candidates

284

over supporters of non-Republican candidates, the 2016 Plan "defeat[s] the principle solemnly embodied in the Great Compromise" because it reflects a successful effort by the General Assembly to "draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." *Wesberry*, 376 U.S. at 14.

Additionally, rather than having "'an habitual recollection of their dependence on the people,'" as the Framers intended, *Ariz. State Leg.*, 135 S. Ct. at 2677 (quoting The Federalist No. 57, at 320 (James Madison)), partisan gerrymanders render Representatives responsive to the controlling faction of the State legislature that drew their districts, *Vieth*, 541 U.S. at 331-32 (Stevens, J. dissenting) ("The problem [with partisan gerrymandering], simply put, is that the will of the cartographers rather than the will of the people will govern."). By rendering Representatives responsive to the state legislatures who drew their districts rather than the People, the 2016 Plan also upsets the careful balance struck by the Framers in the Great Compromise by "interpos[ing]" the General Assembly between North Carolinians and their Representatives in Congress. *See Gralike*, 531 U.S. at 527 (Kennedy, J., concurring) ("A State is not permitted to interpose itself between the people and their National Government as it seeks to do here."). "Neither the design of the Constitution nor sound principles of representative government are consistent with the right or power of a State to interfere with the direct line of accountability between the National Legislature and the people who elect it." *Id.* at 528.

Finally, the 2016 Plan amounts to a successful effort by the General Assembly to "disfavor a class of candidates" and "dictate electoral outcomes." *Thornton*, 514 U.S. at

833–34.  In *Cook v. Gralike*, 531 U.S. 510 (2001), the Court considered an amendment to a state constitution that "instruct[ed]" each member of the state's congressional delegation "to use all of his or her delegated powers to pass the Congressional Term Limits Amendment," *id.* at 514 (majority op.).  To advance that goal, the amendment further provided that "the statement 'DISREGARDED VOTERS' INSTRUCTION ON TERM LIMITS' be printed on all primary and general [election] ballots adjacent to the name of a[n incumbent] Senator or Representative who fails to take any of one of eight [enumerated] legislative acts in support of the proposed amendment."  *Id.*  And the amendment further required that primary and general election ballots expressly indicate if a nonincumbent candidate "'DECLINED TO PLEDGE TO SUPPORT TERM LIMITS.'"  *Id.* at 514–15.

The Court concluded that the amendment exceeded the state's authority under the Elections Clause.  *Id.* at 524–27.  In reaching this conclusion, the Court reaffirmed that because the Elections Clause constitutes the States' sole source of "authority over congressional elections," "the States may regulate the incidents of such elections . . . *only* within the exclusive delegation of power under the Elections Clause."  *Id.* at 522–23 (emphasis added).  The Court concluded the amendment exceeded that delegated authority for two principal reasons.  First, the amendment was "plainly designed to favor candidates who are willing to support the particular form of term limits amendment set forth in its text and to disfavor those who either oppose term limits entirely or would prefer a different proposal."  *Id.* at 523–25.  Second, the placement of the "pejorative" or "negative" labels next to candidates who opposed the term limits amendment on the

ballot "handicap[ped] [such] candidates 'at the most crucial stage in the election process—the instant before the vote is cast.'" *Id.* at 524–25 (quoting *Anderson v. Martin*, 375 U.S. 399, 402 (1964)). By "handicap[ping]" candidates who opposed the term limits amendment, the state constitutional amendment represented an "attempt[t] to 'dictate election outcomes,'" which "simply is not authorized by the Elections Clause." *Id.* at 524, 526 (quoting *Thornton*, 514 U.S. at 833–34); *see also Chamness v. Bowen*, 722 F.3d 1110, 1121 (9th Cir. 2013) (explaining that, under *Gralike*, the Elections Clause prohibits state election regulations that "dictate political outcomes or invidiously discriminate against a class of candidates"); *Brown*, 668 F.3d at 1284 (explaining that the Elections Clause, as interpreted in *Thornton* and *Gralike*, does not authorize a state legislature to enact an election regulation "meant to prevent or severely cripple the election of particular candidates").

Like the state constitutional amendment at issue in *Gralike*, the Partisan Advantage criterion—and the record evidence regarding Representative Lewis, Senator Rucho, and Dr. Hofeller's implementation of that criterion in drawing the 2016 Plan, *see supra* Parts I.B, III.B.1.a—establishes that the 2016 Plan was intended to disfavor non-Republican candidates and supporters of such candidates and favor Republican candidates and their supporters. And like the constitutional amendment in *Gralike*, the General Assembly's express intent to draw a redistricting plan that would elect a congressional delegation composed of 10 Republicans and 3 Democrats—coupled with the fact that the 2016 election under the 2016 Plan yielded a congressional delegation with the intended composition—demonstrates that the 2016 Plan amounted to a

287

*successful* "attempt[] to 'dictate election outcomes.'" *Gralike*, 531 U.S. at 526 (quoting *Thornton*, 514 U.S. at 833–34). Accordingly, the 2016 Plan's demonstrated partisan favoritism "simply is not authorized by the Elections Clause." *Id.*

## VI. REMEDY

Having concluded that the 2016 Plan violates the Equal Protection Clause, the First Amendment, and Article I of the Constitution, we now must determine the appropriate remedy. Absent unusual circumstances, "such as where an impending election is imminent and a State's election machinery is already in progress," courts should take "appropriate action to insure that no further elections are conducted under the invalid plan." *Reynolds*, 377 U.S. at 585. Here, the State held primary elections several months ago and the general election is only a few months away. That usually would leave us with little choice but to allow the State to use the 2016 Plan in the 2018 election.

However, this case presents unusual circumstances. To begin, the General Assembly has abolished primary elections for several partisan state offices. *N.C. Democratic Party v. Berger*, 717 Fed. App'x 304, 305 (4th Cir. 2018) (per curiam). Accordingly, the General Assembly has concluded that, for at least some partisan offices, primary elections are unnecessary. Therefore, were this Court to order the State to conduct a general congressional election without holding primary elections, that would be consistent with the General Assembly's policy preference as to at least some offices.

Additionally, on June 26, 2018, Legislative Defendants represented to the Supreme Court that altering state legislative districts at that time would cause "only minimal disruption to the ongoing election process," notwithstanding that the State had

288

already conducted primary elections using the districts Legislative Defendants sought to set aside. Appellants' Supp. Br. at 5, *North Carolina v. Covington*, No. 17-1364 (S. Ct. June 26, 2018). Therefore, at least from Legislative Defendants' standpoint, the completion of primary elections would not seem to preclude imposition of an alternative districting plan, at least from the perspective of the State's "ongoing election process."

Finally, we further note that North Carolina courts have indefinitely enjoined the State from preparing or finalizing ballots for the November 6, 2018, election on grounds that language adopted by the General Assembly to describe two proposed state constitutional amendments violates the North Carolina Constitution by misleading voters regarding the nature of the amendments. *See* Order on Injunctive Relief at 29–30, *Cooper v. Berger*, No. 18-CVS-9805 (Wake Cty. Super. Ct. Aug. 21, 2018). Accordingly, while that injunction remains in place, any order this Court enters impacting the November 6, 2018, election would not seem to impose additional burdens on the State's electoral machinery.

In such circumstances, we decline to rule out the possibility that the State should be enjoined from conducting *any* further congressional elections using the 2016 Plan. For example, it may be possible for the State to conduct a general election using a constitutionally compliant districting plan without holding a primary election. Or, it may be viable for the State to conduct a primary election on November 6, 2018, using a constitutionally compliant congressional districting plan, and then conduct a general election sometime before the new Congress is seated in January 2019. Accordingly, no later than 5 p.m. on August 31, 2018, the parties shall file briefs addressing whether this

289

Court should allow the State to conduct *any* future election using the 2016 Plan. Those briefs should discuss the viability of the alternatives discussed above, as well as any other potential schedules for conducting elections using a constitutionally compliant plan that would not unduly interfere with the State's election machinery or confuse voters. Regardless of whether we ultimately allow the State to use the 2016 Plan in the 2018 election, *we hereby enjoin* the State from conducting any elections using the 2016 Plan in any election after the November 6, 2018, election.

As to the drawing of a remedial plan, as a general rule, once a federal court concludes that a state districting plan violates the Constitution or federal law, it should "afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise . . . its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). This case presents an exceptional circumstance, however: the General Assembly enacted the 2016 Plan after another panel of this Court invalidated the 2011 Plan as a racial gerrymander. *Harris*, 159 F. Supp. 3d at 627. When a court finds a remedial districting plan also violates the Constitution, courts generally do not afford a legislature a second "bite-at-the-apple" to enact a constitutionally compliant plan. *See Covington*, 138 S. Ct. at 2553–54 (concluding that district court did not abuse its discretion in denying state legislature second opportunity to draw remedial districts when several redrawn districts failed to remedy constitutional violation); *Chapman v. Meier*, 420 U.S. 1, 27 (1975) (holding that if a state fails to enact "a constitutionally acceptable" remedial districting plan, "the responsibility falls on the District Court"); *Reynolds*, 377 U.S. at 586 (holding that a district court "acted in a most

290

proper and commendable manner" by imposing its own remedial districting plan, after the district court concluded that the remedial plan adopted by state legislature failed to remedy constitutional violation).

We nevertheless previously exercised our discretion to allow the General Assembly a second opportunity to draw a constitutional congressional districting plan because at the time the General Assembly drew the 2016 Plan, the Supreme Court had not established a legal standard for adjudicating partisan gerrymandering claims and because redistricting is primarily a legislative function. *Common Cause*, 279 F. Supp. 3d at 690. The intervening months have given us some reason to revisit that determination. To begin, the General Assembly made no discernible effort to take advantage of the previous opportunity we afforded it to draw a plan that cures the partisan gerrymander. *Gill* also clarified the nature of the injury giving rise to a partisan vote dilution claim under the Equal Protection Clause, *see supra* Part II.A.1, rendering somewhat less uncertain the legal standard for evaluating such claims and the validity of our conclusion that twelve districts in the 2016 Plan violate the Equal Protection Clause.

Additionally, in *Covington* the Supreme Court held that several proposed remedial state legislative districts drawn by the General Assembly—itself elected under one of the most widespread racial gerrymanders ever encountered by a federal court—carried forward the racial gerrymandering that rendered the original versions of the districts unconstitutional, raising legitimate questions regarding the General Assembly's capacity or willingness to draw constitutional remedial districts. 138 S. Ct. at 2553–54. And during the intervening months, the General Assembly has enacted a number of pieces of

291

election-related legislation that federal and state courts have struck down as unconstitutional, *see supra* note 18, further calling into question the General Assembly's commitment to enacting constitutionally compliant, non-discriminatory election laws.

Most significantly, additional time has passed. We continue to lament that North Carolina voters now have been deprived of a constitutional congressional districting plan—and, therefore, constitutional representation in Congress—for six years and three election cycles. To the extent allowing the General Assembly another opportunity to draw a remedial plan would further delay electing Representatives under a constitutional districting plan, that delay weighs heavily against giving the General Assembly another such opportunity. Accordingly, in the briefs to be filed not later than 5 p.m. on August 31, 2018, the parties also shall address whether this Court should allow the General Assembly another opportunity to draw a constitutionally compliant congressional districting plan.

Although we have not yet decided whether we will afford the General Assembly another chance to draw such a plan, we conclude that if we do allow such an opportunity, the General Assembly should do so as quickly as possible. Accordingly, in the event the General Assembly believes it is entitled to another opportunity to draw a constitutionally compliant plan, it should begin work immediately to draw such a plan. To that end, if we do allow the General Assembly the first opportunity to draw a remedial plan, we will not consider a remedial districting plan enacted by the General Assembly after 5 p.m. on September 17, 2018. That deadline will allow the General Assembly approximately three weeks to draw a remedial plan, more than the amount of time state law affords the

General Assembly to draw remedial districting plans. N.C. Gen. Stat. § 120-2.4(a)

(2017). We further advise Defendants that they should be prepared to file with this

Court, soon after that deadline, the enacted proposed remedial plan, along with:

1. transcripts of all committee hearings and floor debates related to the proposed remedial plan;

2. the "stat pack" for the proposed remedial plan;

3. a description of the process the General Assembly, and any constituent committees or members thereof, followed in drawing and enacting the proposed remedial plan, including, without limitation, the identity of all participants involved in the process;

4. any alternative plans considered by the General Assembly, any constituent committee responsible for drawing the remedial plan, or the leadership of the General Assembly or any such committee; and

5. all criteria, formal or informal, the General Assembly, any constituent committee responsible for drawing the remedial plan, and the leadership of the General Assembly or any such committee applied in drawing the proposed remedial plan, including, without limitation, any criteria related to race, partisanship, the use of political data, or the protection of incumbents, and a description of how the mapdrawers used any such criteria.

In the event we decide to first consider any remedial plan drawn by the General

Assembly before the September 14, 2018, deadline, we will provide Plaintiffs an

opportunity to file objections to some or all of the districts in the remedial plan.

Given our uncertainty as to whether the General Assembly should be afforded an

(additional) opportunity to draw a remedial plan—and the fast-approaching November 6,

2018, general election—we also find it appropriate to take steps to ensure the timely

availability of an alternative remedial plan for use in the event we conclude the General

Assembly is not entitled to such an opportunity or we conclude that the remedial plan

293

enacted by the General Assembly fails to remedy the constitutional violation. To that end, we intend to appoint in short order a Special Master pursuant to Federal Rule of Civil Procedure 53 to assist the Court in drawing an alternative remedial plan. *Rodriguez v. Pataki*, 207 F. Supp. 2d 123, 125 (S.D.N.Y. 2002) ("[T]he 'eleventh hour' is upon us, if indeed it has not already passed. It is therefore necessary for this Court to prepare for the possibility that this Court will be required to adopt an appropriate redistricting plan."). Accordingly, we direct the parties to confer and file no later than August 29, 2018, a list of three qualified and mutually acceptable candidates to serve as Special Master. In the event the parties fail to agree as to a list of candidates, the Court may identify a special master without input from the parties. The parties should also address in their August 31, 2018, briefing whether any one of the thousands of districting plans currently in the record, including Dr. Chen's Plan 2-297, could—or should—be adopted as a remedial plan.

SO ORDERED

OSTEEN, JR., District Judge, concurring in part and dissenting in part:

In *Gill*, prior to explaining the issue of standing as relevant to a claim of political gerrymandering, the Court summarized the gerrymandering line of cases. *Gill v. Whitford*, 585 U.S. ___, 138 S. Ct. 1916, 1926–29, ___ L. Ed 2d ___ (2018). The Court recognized, *inter alia*, that in *Davis v. Bandemer* "[a] majority of the Court agreed that the case before it was justiciable." *Gill*, 138 S. Ct. at 1927. The Court concluded its summary of these cases by stating:

> Our considerable efforts in *Gaffney*, *Bandemer*, *Vieth*, and *LULAC* leave unresolved whether such claims may be brought in cases involving allegations of partisan gerrymandering. In particular, two threshold questions remain: what is necessary to show standing in a case of this sort, and whether those claims are justiciable. Here we do not decide the latter question because the plaintiffs in this case have not shown standing under the theory upon which they based their claims for relief.

*Id.* at 1929.

Of particular note to me are *Bandemer* and *Vieth* in terms of the law a district court is required to apply. As Justice Scalia explained in *Vieth*, "[e]ighteen years ago, we held that the Equal Protection Clause grants judges the power—and duty—to control political gerrymandering, *see Davis v. Bandemer*, 478 U.S. 109 (1986)." *Vieth v. Jubelirer*, 541 U.S. 267, 276 (2004). *Bandemer* held "that a political gerrymandering claim could succeed where plaintiffs showed 'both intentional discrimination against an identifiable political group and an actual

295

discriminatory effect on that group." *Vieth*, 541 U.S. at 281 (quoting *Bandemer*, 478 U.S. at 127). Although Justice Scalia posited in *Vieth* that political gerrymandering claims are nonjusticiable and that *Bandemer* was wrongly decided, *Bandemer* was not overturned by *Vieth*. Similarly, *Gill* did not overturn *Bandemer*, as *Gill* did not reach the question of justiciability.[1] Therefore, absent a contrary ruling from the Supreme Court, partisan gerrymandering claims are justiciable under the Equal Protection Clause and lower courts are obliged to apply that law and articulate a standard for adjudication.

The Supreme Court remanded this present case for "further consideration in light of *Gill v. Whitford*." *Common Cause v. Rucho*, 279 F. Supp. 3d 587 (M.D.N.C. 2018), *vacated and remanded*, 138 S. Ct. 2679 (June 25, 2018) (mem.).

---

[1] In my opinion previously, *see Common Cause v. Rucho*, 279 F. Supp. 3d 587, 692 (M.D.N.C. 2018) (Osteen, J., concurring in part and dissenting in part), *vacated and remanded*, 138 S. Ct. 2679 (June 25, 2018) (mem.), I expressed my concern over Equal Protection and First Amendment claims in this context. Justice Scalia, in *Vieth*, explained his opinion that these claims are not justiciable because of an inability to establish "judicially discernible and manageable standards." *See Vieth*, 541 U.S. at 280. After a review of *Gill*, particularly in light of its pointed discussion of an "undifferentiated, generalized grievance about the conduct of government," *Gill*, 138 S. Ct. at 1931, quoting *Lance v. Coffman*, 549 U.S. 437, 442 (2007), I remain concerned over the justiciability of Equal Protection and First Amendment claims of political gerrymandering. *See Common Cause*, 179 F. Supp. 3d at 692–93. I am not sure there is a constitutional, and judicially manageable, standard for limiting partisan political consideration by a partisan legislative body in the discharge of its duties except by legislative action, *see* U.S. CONST. art. I, § 4, or by what I continue to see as an outside limit established by Article I, Sections 2 and 4 of the United States Constitution prohibiting a legislature from dictating election results. Nevertheless, we are bound to follow existing Supreme Court precedent.

296

This order requires us to reconsider standing and related issues in light of *Gill.*

With respect to standing, the Court in *Gill* explained:

> We have long recognized that a person's right to vote is "individual and personal in nature." *Reynolds v. Sims,* 377 U.S. 533, 561, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964). Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Baker,* 369 U.S., at 206, 82 S. Ct. 691. The plaintiffs in this case alleged that they suffered such injury from partisan gerrymandering, which works through "packing" and "cracking" voters of one party to disadvantage those voters. 1 App. 28–29, 32–33, Complaint ¶¶ 5, 15. That is, the plaintiffs claim a constitutional right not to be placed in legislative districts deliberately designed to "waste" their votes in elections where their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking). *Id.,* at 32–33, ¶ 15. To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific.

*Gill,* 138 S. Ct. at 1929–30. In determining standing, therefore, a plaintiff in a political gerrymandering case must demonstrate district-specific injury within the context of:

> the familiar three-part test for Article III standing: that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. ___, ___, 136 S. Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).

*Id.* at 1929–30.

In this case, as in *Gill*, Plaintiffs asserted both district-specific political gerrymandering claims and statewide challenges to the apportionment of Congressional districts. The Court in *Gill* held that statewide challenges are not

297

cognizable for purposes of standing. In rejecting a statewide challenge, the Court

stated:

> The plaintiffs argue that their claim of statewide injury is analogous to the claims presented in *Baker* and *Reynolds,* which they assert were "statewide in nature" because they rested on allegations that "districts *throughout a state* [had] been malapportioned." But, as we have already noted, the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were "individual and personal in nature," *Reynolds,* 377 U.S., at 561, 84 S. Ct. 1362 because the claims were brought by voters who alleged "facts showing disadvantage to themselves as individuals," *Baker,* 369 U.S., at 206, 82 S. Ct. 691.

> The plaintiffs' mistaken insistence that the claims in *Baker* and *Reynolds* were "statewide in nature" rests on a failure to distinguish injury from remedy. In those malapportionment cases, the only way to vindicate an individual plaintiff's right to an equally weighted vote was through a wholesale "restructuring of the geographical distribution of seats in a state legislature." *Reynolds*, 377 U.S., at 561, 84 S. Ct. 1362.

> Here, the plaintiffs' partisan gerrymandering claims turn on allegations that their votes have been diluted. *That harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district.* Remedying the individual voter's harm, therefore, does not necessarily require restructuring all of the State's legislative districts.

*Id.* at 1930–31 (emphasis added).

Applying *Bandemer*, *Vieth*, and *Gill*, I find under Supreme Court precedent

that partisan gerrymandering claims are justiciable under the Equal Protection

Clause. I find this to be true even in the absence of a recognized jurisprudential

remedy. I join the majority opinion to hold, as required by *Gill*, that Plaintiffs are

298

required to show standing on the basis of the composition of his or her own district.  I also join the majority to find that some of the individual Plaintiffs, as explained below, have alleged and proven both standing and a violation of the Equal Protection Clause.  Specifically, I concur with the opinion of the majority that those individual Plaintiffs alleging "cracking" for purposes of partisan advantage have alleged and proven "an individual and personal injury" as opposed to a generalized grievance against governmental conduct of which he or she does not approve.  I also concur that the organizations here – Common Cause, the Democratic Party, and the League of Women Voters – have standing to assert the claims of the individual members of their respective organizations with respect to the individual and personal injury sustained by those members residing in individual districts which were cracked.  As to the organizational Plaintiffs, I concur with the majority that they have met their burden on behalf of aggrieved individual members (with respect to ten challenged districts instead of thirteen) that "Plaintiffs who reside and vote in *each* of the thirteen challenged congressional districts testified to, introduced evidence to support, and, in all but one case, ultimately proved the type of dilutionary injury the Supreme Court recognized in *Gill*," that is, the cracking and packing of districts as described in *Gill*.  Maj. Op. at 45.  I concur with the majority that Plaintiffs have shown both a partisan intent to subordinate the interests of non-Republican voters and that those

partisan considerations were the predominant factor in the redistricting. I also concur with the majority that Defendants have not justified the effects of the 2016 Plan. I therefore agree with the majority's conclusion that the 2016 Plan violates the Equal Protection Clause. Finally, I concur with the majority's remedial action.

For the reasons stated hereafter and to the extent described herein, I also join the majority's conclusion that Plaintiffs have shown that the 2016 Plan violates Article I, Sections 2 and 4 of the United States Constitution by proving that the drawers of the Plan intended to dictate and preordain election outcomes and disfavor a class of candidates. Although *Gill* addressed standing within an Equal Protection claim, I agree with the majority that the individual Plaintiffs have established standing, as voters, to proceed with a claim under Article I, Sections 2 and 4 of the United States Constitution for reasons similar to the Equal Protection standing argument.

I disagree with the majority on several points. First, I disagree that a Plaintiff who demonstrates "packing" but concedes election of the candidate of his or her choice has standing or has demonstrated a constitutional injury under the facts as presently presented. Second, I disagree that there is a distinction between "political considerations" and "partisan interests" or that consideration of partisan, political interests in redistricting constitutes a power that was not delegated to the states or is otherwise prohibited in legislative action, including districting. I

300

therefore weigh the maps created by Dr. Chen differently from the majority, as I do not find a non-partisan map drawing process, as performed by Dr. Chen, to be a necessary or relevant comparison.  Third, I disagree that any of the Plaintiffs in this case have standing to assert a statewide claim as to the statewide collective effect of any political gerrymandering.   Finally, assuming that partisan gerrymandering claims are justiciable under the First Amendment, I am unconvinced that Plaintiffs have proven an injury to their First Amendment rights and I dissent, for the same reasons I set forth previously, *see Common Cause*, 279 F. Supp. 3d at 696 (Osteen, J., concurring in part and dissenting in part), from the majority's conclusion that the 2016 Plan violates the First Amendment.

## I.   <u>Standing</u>

Similar to this case, the plaintiffs in *Gill* alleged vote dilution resulting from packing and cracking districts for the purpose of gaining political advantage. *Gill*, 138 S. Ct. at 1929–30 ("The plaintiffs in this case alleged that they suffered such injury from partisan gerrymandering, which works through "packing" and "cracking" voters of one party to disadvantage those voters.")   However, in my reading of *Gill*, I am not convinced the Court has held that both packing and cracking would serve to establish standing as a matter of law.   Instead, as I read *Gill*, packing and cracking may constitute a basis upon which a plaintiff may establish standing if the criteria for standing are met as a factual matter under the

test for standing set forth in *Spokeo*. For example, in describing the plaintiffs, the

Court stated:

> Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Baker*, 369 U.S., at 206, 82 S. Ct. 691. The plaintiffs in this case alleged that they suffered such injury from partisan gerrymandering, which works through "packing" and "cracking" voters of one party to disadvantage those voters. 1 App. 28–29, 32–33, Complaint ¶¶ 5, 15. That is, the plaintiffs claim a constitutional right not to be placed in legislative districts deliberately designed to "waste" their votes in elections where their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking). *Id.*, at 32–33, ¶ 15.

*Gill*, 138 S. Ct. at 1929–30. The Court later stated:

> And the sum of the standing principles articulated here, as applied to this case, is that the harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes. In this gerrymandering context that burden arises through a voter's placement in a "cracked" or "packed" district.

*Id.* at 1931. The Court phrased the relevant facts in terms of what was claimed

("plaintiffs claim a constitutional right") and how the harm is "understood," such

that while I am convinced that cracking and packing could provide a basis upon

which to find standing is present, that issue is dependent upon the facts found by a

lower court. The Court concluded with the admonition that "[w]e express no view

on the merits of the plaintiffs' case. We caution, however, that 'standing is not

dispensed in gross.' A plaintiff's remedy must be tailored to redress the plaintiff's

particular injury." *Id.* at 1934 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S.

332, 354 (2006)).

Therefore, in a case involving allegations of cracking and packing, we are to determine whether the facts associated with cracking and packing are sufficient to confer standing by applying the tests set forth in *Spokeo*, 136 S. Ct. at 1547, and *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 560 n.1, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

I am of the opinion that packing and cracking are objectively different with respect to standing. Here, as in *Gill*, the individual Plaintiffs in packed districts "claim a constitutional right not to be placed in legislative districts deliberately designed to 'waste' their votes in elections where their chosen candidates will win in landslides (packing)." *Gill*, 138 S. Ct. at 1930. And the vote dilution alleged by packing and proven at trial may establish an individual Plaintiff in a packed district sustained the "invasion of a legally protected interest" assuming a constitutional interest exists in not having a vote wasted. *Lujan*, 504 U.S. at 560. However, standing also requires a concrete and particularized injury which "affects the plaintiff in a personal and individual way." *Id.* at 560 n.1. Because a Democrat plaintiff in a packed district is indisputably able to elect the candidate of his or her choice, that individual has not sustained an injury which affects the voter in a personal and individual way. A packed district does not demonstrably inflict "the representational injury articulated in racial gerrymandering claims—that 'elected officials are more likely to believe that their primary obligation is to represent only

303

the members of [the favored] group, rather than their constituency as a whole,'" *Agre v. Wolfe*, 284 F. Supp. 3d 591, 641 (E.D. Pa.) (Schwarz, J., concurring), *appeal dismissed*, 138 S. Ct. 2576 (May 29, 2018) (mem.), and *appeal dismissed sub nom.*, *Scarnati v. Agre*, 138 S. Ct. 2602 (June 4, 2018) (mem.) (quoting *United States v. Hays*, 515 U.S. 737, 744 (1995)).  Instead, I believe a Democrat plaintiff living in a "packed" district is complaining about the process, the intent, and the invasion of a legally protected interest but all in the absence of an injury.

For example, the majority describes the packing in District 1 and its effect on Plaintiff Larry Hall.  Maj. Op. at 47–48.  As described by the majority, "District 1 amounts to a successful effort by the General Assembly to concentrate, or pack, voters who were unlikely to support a Republican candidate, and thereby dilute such voters' votes." *Id.* at 47. The majority finds that "Plaintiff Larry Hall resides in District 1, is a registered Democrat, and typically votes for Democrat candidates", *id.*, and that "Hall's vote would have carried greater weight in numerous other 'hypothetical districts.'" *Id.* at 48 (quoting *Gill*, 138 S. Ct. at 1931). For purposes of standing, I find that Plaintiff Hall has not established standing because his interest as a registered Democrat in voting for Democrat candidates has not been injured.  He was able to elect the candidate of his choice from his district, a Democrat. I conclude that a Plaintiff residing in a packed district on the facts present before this court has not sustained an individual and

304

personal injury but, instead, has proven a "collective political interest," and a "generalized grievance against governmental conduct of which he or she does not approve." *Gill*, 138 S. Ct. at 1930, 1932.

Nevertheless, the majority of the districts at issue in this case are ones within which Democrats contend and ultimately proved that cracking occurred, diminishing the power of Democrat voters to elect a Democrat candidate. As to these "cracked" districts, I agree with the majority that Plaintiffs have demonstrated the dilution of voting strength which appears to be recognized by *Gill* for purposes of standing. Those Plaintiffs who contend districts were cracked have alleged and proven an (1) an individual injury in fact resulting from their vote dilution claims, that is, the reduced ability to elect the candidate of his or her choice; (2) that is fairly traceable to the challenged conduct of the defendant, that is, cracking communities of interest; and (3) that is likely to be redressed by favorable decision. And although both cracking and packing may involve splitting communities of interest, only cracking has the result of producing a concrete and particularized harm.

*Gill* reminds us that the Federal Judiciary is charged with respecting "the proper—and properly limited—role of the courts in a democratic society." *Gill*, 138 S. Ct. at 1929 (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). Consistent with that limited role, *Gill* markedly, and for the first time in the context of

political gerrymandering, directed the attention of courts and parties to the distinction between individualized injury and general political grievance. I therefore believe, based upon those considerations described by *Gill*, that Plaintiffs have not established standing as to statewide challenges to political gerrymandering. I would further find that the organizational Plaintiffs have standing only to the extent they challenge the districts on the basis of district-specific injury to individual members.

The Court in *Gill* reminds us, as lower courts, that:

> [P]laintiffs may not rely on 'the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past.' A citizen's interest in the overall composition of the legislature is embodied in his right to vote for his representative. And the citizen's abstract interest in policies adopted by the legislature on the facts here is a nonjusticiable "general interest common to all members of the public."

*Gill*, 138 S. Ct. at 1931 (internal citations omitted). I find that the overall composition of the congressional delegation, whether 10-3, 9-4, or 7-6, or any other statewide claim of injury, is a non-justiciable claim of "general interest common to all members of the public." *Id.* (quoting *Ex parte Levitt*, 302 U.S. 633, 636 (1937) (per curiam)). To be clear, I find that the admissions of certain legislators of an intent to create a 10-3 congressional delegation constitutes evidence which may be considered in determining the manner of drafting individual districts and the intent to dilute certain voters within those districts, but I

306

am not convinced that intent or the statewide plan provides standing for any Plaintiff to assert a claim based on statewide injury.

As noted above and found by the majority, the organizational Plaintiffs have standing, by and through their members, to challenge individual districts on behalf of the individual member-voters. Maj. Op. at 58–60. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). However, I do not agree that the organizations have standing to challenge the districting plan on a statewide basis, nor do I find the organizational Plaintiffs have standing to assert political gerrymandering claims because of other organizational purposes. The Court in *Gill*, applying a standard derived from racial gerrymandering, observed that "[a] plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve.'" *Gill*, 138 S. Ct. at 1930 (quoting *United States v. Hayes*, 515 U.S. 737, 744–45 (1995)).

For example, League of Women Voters allege in the Complaint:

> LWVNC has standing to challenge the 2016 Plan. The Plan
> discriminates against North Carolina voters who associate with the
> Democratic Party by diluting their votes for the purpose of
> maintaining a 10-to-3 Republican advantage in congressional seats.
> The Plan thus directly impairs LWVNC's mission of encouraging
> civic engagement and nonpartisan redistricting reform. Additionally,
> LWVNC is a membership organization, and its members are harmed
> by the Plan because it dilutes Democratic votes and impairs
> Democratic voters' ability to elect their preferred congressional
> candidates. LWVNC's members' right to participate freely and
> equally in the political process is burdened as well by the Plan, which
> in many cases denies the ability to cast a meaningful vote altogether.

(Complaint, 1:16CV1164 (Doc. 1) at 7.)   I do not find the League has standing to

challenge an overall statewide plan drawn "for the purpose of maintaining a 10-to-

3 Republican advantage in congressional seats," nor do I find the League has

standing on behalf of voters who associate with the Democratic Party generally.

To hold otherwise, in my opinion, is to recognize injury on the basis of general

political grievance, a matter specifically rejected by *Gill*.

Similarly, Common Cause has asserted claims "on behalf of its members

who are citizens of North Carolina and are registered Democratic voters, whose

votes have been diluted or nullified . . .", (Complaint, 1:16CV1026 (Doc. 1) at 2),

and as to those claims I agree with the majority that Common Cause has standing.

However, Common Cause further alleges that:

> Common Cause is at the forefront of efforts to combat
> gerrymandering, no matter what party is responsible, in the belief that
> when election districts are created in a fair and neutral way, the
> People will be able to elect representatives who truly represent them.
> To that end, Common Cause has organized and led the coalitions that

secured passage of ballot initiatives that created independent redistricting commissions in Arizona and California and campaigned for ratification of an amendment to the Florida Constitution prohibiting partisan gerrymandering.

*Id.* at 3. While those interests may or may not be appropriate from a policy objective, I do not find these interests, or similar interests in statewide reform, to provide standing on a statewide basis. For similar reasons, I find the Democratic Party has standing on behalf of individual members only.

## II.  Equal Protection and Partisan Political Considerations

The majority's opinion rejects Legislative Defendants' arguments that some degree of partisan gerrymandering is permissible, Maj. Op. at 108, and further finds that:

> neither the constitutional delegation of redistricting to political bodies, nor historical practice, nor Supreme Court precedent supports Legislative Defendants assertion that it is sometimes permissible for a state redistricting body to draw district lines for the purpose of diminishing the electoral power of voters who supported or are likely to support a disfavored party or candidate.

*Id.* The majority proceeds to clarify that:

> our conclusion that twelve of the thirteen districts violate the Equal Protection Clause *does not rest* on our determination that States lack authority to engage in partisan gerrymandering . . . in drawing congressional districts. In particular, we assume that a congressional district amounts to an unconstitutional partisan gerrymander *only if* the legislative body's *predominant* purpose in drawing the district was to subordinate the interests of a disfavored party . . . ."

*Id.* at 109.

I dissent from this portion of the majority's opinion and agree with the Legislative Defendants to find that the Constitution does permit consideration by a legislative body of both political and partisan interests in the redistricting process. This question has been addressed at length in a number of cases, and I agree with those cases recognizing the fact that political consideration and partisan advantage are not prohibited by the Constitution. *See, e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 274–76 (2004); *Whitford v. Gill*, 218 F. Supp. 3d 837, 936 (W.D. Wis. 2016) (Griesbach, J., dissenting), *vacated and remanded*, *Gill v. Whitford*, 138 S. Ct. 1916 (2018); *Agre v. Wolf*, 284 F. Supp. 3d 591,620–24 (E.D. Pa.), *appeal dismissed*, 138 S. Ct. 2576 (May 29, 2018) (mem.), and *appeal dismissed sub nom.*, *Scarnati v. Agre*, 138 S. Ct. 2602 (June 4, 2018) (mem.).

The Constitution delegates redistricting power for federal elections to the States and their legislatures.[2] Legislative action is a political process, and issues

---

[2] In North Carolina, redistricting is conducted by the General Assembly, a partisan body, consistent with the Constitution. As Chief Justice Roberts explains:

(Continued)

310

addressed by those legislative bodies affecting constitutional questions —

redistricting, the Second Amendment, the First Amendment, abortion, and the like

— are all inherently political in nature. All of those constitutional issues,

specifically the Second Amendment and abortion, are affected by legislation

passed by legislative bodies which are partisan and political. Even if the legislative

process should result in an unconstitutional law, that law can be overturned only on

constitutional grounds and not due to any perceived inappropriate level of partisan

political consideration. Courts have never considered or required that constitutional

issues be addressed only in a nonpartisan, fair, and neutral manner. I find the same

is true for political and partisan consideration as part of redistricting. As the

plurality in *Bandemer* observed, "[i]t would be idle . . . to contend that any political

consideration taken into account in fashioning a reapportionment plan is sufficient

to invalidate it . . . . Politics and political considerations are inseparable from

---

[S]tates have "broad powers to determine the conditions under which the right of suffrage may be exercised." *Carrington v. Rash*, 380 U.S. 89, 91, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (internal quotation marks omitted); see also *Arizona, ante*, at —— U.S., at —— – ——, 133 S.Ct., at 2257 – 2259. And "[e]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 161, 12 S.Ct. 375, 36 L.Ed. 103 (1892). Drawing lines for congressional districts is likewise "primarily the duty and responsibility of the State." *Perry v. Perez*, 565 U.S. ——, ——, 132 S.Ct. 934, 940, 181 L.Ed.2d 900 (2012) (per curiam) (internal quotation marks omitted).

*Shelby Cty. v. Holder*, 570 U.S. 529, 543, 133 S. Ct. 2612, 2623 (2013).

districting and apportionment." *Bandemer*, 478 U.S. at 128 (internal citations omitted) (quoting *Gaffney v. Cummings*, 412 U.S. 735, 752–53 (1973)). Although *Bandemer* has been abrogated to some degree, *see Common Cause v. Rucho*, 240 F. Supp. 3d 376, 387 (M.D.N.C. 2017) (per curiam), this observation remains true today.

The Court has recognized many times in redistricting and apportionment cases that some degree of partisanship and political consideration is constitutionally permissible in a redistricting process undertaken by partisan actors. *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("Our prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."); *Miller v. Johnson*, 515 U.S. 900, 914 (1995) ("[R]edistricting in most cases will implicate a political calculus in which various interests compete for recognition . . . ."); *Gaffney*, 412 U.S. at 753 ("Politics and political considerations are inseparable from districting and apportionment."); *see also Cooper v. Harris*, ____ U.S. ____, 137 S. Ct. 1455, 1488 (2017) (Alito, J., concurring in part and dissenting in part) (recognizing the constitutionality of at least some amount of political gerrymandering); *Whitford*, 218 F. Supp. 3d at 934–35 (Griesbach, J., dissenting) ("The Supreme Court has long acknowledged partisan considerations are inevitable

312

when partisan politicians draw maps."). And Congress, though it could presumably act to limit partisan gerrymandering under its Article I, Section 4 authority, has chosen only to require single-member districts. 2 U.S.C. § 2c.

I do not find, therefore, that the Constitution forbids a political body from taking into account partisan considerations, and indeed partisan advantage, when producing a redistricting plan. I agree with the majority, however, that when partisan considerations predominate a legislature may act contrary to the Equal Protection Clause under existing precedent.

Because I do not find the Constitution forbids a political body from taking into account partisan considerations, I do not find the North Carolina congressional maps submitted by Plaintiff's expert, Jowei Chen, as persuasive as the majority. Dr. Chen drafted maps without consideration to partisan interests. Declaration of Dr. Jowei Chen, 1:16CV1026 (Doc. 130-2) at 2. As Dr. Chen describes:

> In connection with my March 1, 2017 expert report in this litigation, I turned over all data concerning 1,000 North Carolina congressional maps created as Simulation Set 1, *produced using a computer simulation process following only the non-partisan portions of the Adopted Criteria* used for the 2016 Plan. I also turned over all data concerning 1,000 additional congressional maps created as Simulation Set 2, *produced using a simulation process following the non-partisan portions of the Adopted Criteria and avoiding the pairing of any incumbents.*

*Id.* (emphasis added). Dr. Chen then compared those maps as to each district and the enacted 2016 Plan. *Id.* at 2–3. I do not think there is any dispute that maps for

purposes of establishing congressional districts could be drawn using non-partisan criteria. It is also undisputed that partisan advantage was a factor in drawing the 2016 Plan. *See* Maj. Op. at 12–14 (describing the process used to draw maps under the 2016 Plan).

In my opinion, Dr. Chen's maps demonstrate two facts. First, they provide evidence that political partisan consideration affected the districts as drafted in the 2016 Plan, a fact which is hardly noteworthy as Defendants admit as much. Second, and significantly, Dr. Chen's maps have been admitted and argued as the alternative to the 2016 Plan. The League Plaintiffs argue:

> Turning from the fact of the 2016 Plan's cracking and packing to their lack of necessity, plaintiffs focus here on a single alternative map: Professor Chen's Plan 2-297. As noted earlier, several types of evidence may be used at this stage of the inquiry, including the data about thousands of simulated maps presented by the Common Cause plaintiffs. Dkt. 130-2. In the League plaintiffs' view, a single alternative map is a simple and intuitive way to show that a challenged plan's cracking and packing could have been avoided. A single alternative map also has the nice property of demonstrating that supporters of the opposing party could be simultaneously uncracked and unpacked—within one particular plan than an array of alternatives.

*See, e.g.*, League of Women Voters Plaintiffs' Brief, 1:16CV1026 (Doc. 138) at 11–12. But this evidence, and any remedy, is based upon maps which were drafted in a completely nonpartisan fashion, and I do not find that action or that remedy to be constitutionally required or even appropriate. As Justice Scalia described in *Vieth*:

314

The Constitution clearly contemplates districting by political entities, *see* Article I, § 4, and unsurprisingly that turns out to be root-and-branch a matter of politics. *See Miller*, *supra*, at 914, 115 S.Ct. 2475 ("[R]edistricting in most cases will implicate a political calculus in which various interests compete for recognition ..."); *Shaw*, *supra*, at 662, 113 S.Ct. 2816 (White, J., dissenting) ("[D]istricting inevitably is the expression of interest group politics ..."); *Gaffney v. Cummings*, 412 U.S. 735, 753, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) ("The reality is that districting inevitably has and is intended to have substantial political consequences").

*Vieth*, 541 U.S. at 285–86.

Instead, I believe that only the state legislatures, through their power to draft congressional districts in the first instance, and Congress with its power under Article I, Section 4 of the United States Constitution, have the authority to remove political partisan considerations entirely from the redistricting process. "It is significant that the Framers provided a remedy for such practices in the Constitution. Article I, § 4, while leaving in state legislatures the initial power to draw districts for federal elections, permitted Congress to 'make or alter' those districts if it wished." *Vieth*, 541 U.S. at 275. With respect to political or partisan considerations in the drawing of congressional districts, the Constitution provides the people of this State with the power to "seek relief from Congress, which can make or alter the regulations prescribed by the legislature. And the Constitution gives them another means of change. They can follow the lead of the reformers who won passage of the Seventeenth Amendment." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, ___ U.S. ___, 135 S. Ct. 2652, 2692 (2015)

315

(Roberts, C.J., dissenting). I therefore do not assign the same weight or consideration to Dr. Chen's maps as the majority has in its opinion, and further find the comparison of Dr. Chen's maps to the 2016 Plan of only limited relevance.

## III. <u>First Amendment</u>

Assuming that partisan gerrymandering claims are justiciable under the First Amendment,[3] I find that the majority's adopted test would in effect foreclose all partisan considerations in the redistricting process—a result I am unable to conclude that the First Amendment requires — and would allow redress for an injury that Plaintiffs have not proven rises to a constitutional level. Therefore, I respectfully dissent.

No one disputes that the First Amendment protects political expression and association. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339–40 (2010); *Buckley v. Valeo,* 424 U.S. 1, 15 (1976) (per curiam). But as another court aptly noted in rejecting plaintiffs' claim that the inability to elect a preferred candidate burdened their political expression, "[p]laintiffs are every bit as free

---

[3] As we recognized, "the splintered opinions in *Bandemer* and *Vieth* stand for, at a minimum, [that] Fourteenth Amendment partisan gerrymandering claims are justiciable[.]" *Common Cause*, 240 F. Supp. 3d at 387. But the justiciability (or nonjusticiability) of a claim under one legal theory does not necessitate the same result under another. *See Baker v. Carr*, 369 U.S. 186, 209–11 (1962). Although "nothing in the Court's splintered opinions in *Vieth* rendered nonjusticiable Plaintiffs' First Amendment claims[,]" *Common Cause*, 240 F. Supp. 3d at 389, the Court has not expressly ruled in this area, which remains unsettled at best.

under the new [redistricting] plan to run for office, express their political views, endorse and campaign for their favorite candidates, vote, or otherwise influence the political process through their expression." *Radogno v. Ill. State Bd. of Elections*, No. 1:11-CV-04884, 2011 WL 5025251, at *7 (N.D. Ill. Oct. 21, 2011) (second alteration in original) (quoting *Kidd v. Cox*, No. 1:06-CV-0997-BBM, 2006 WL 1341302, at *17 (N.D. Ga. May 16, 2006)). As the *Radogno* court explained, "[i]t may very well be that Plaintiffs' ability to *successfully elect* their preferred candidate is burdened by the redistricting plan, but that has nothing to do with their First Amendment rights." *Id.* (citing *Washington v. Finlay*, 664 F.2d 913, 927–28 (4th Cir. 1981)).

Plaintiffs are likewise free under the 2016 Plan to "field candidates for office, participate in campaigns, vote for their preferred candidate, or otherwise associate with others for the advancement of common political beliefs." *Id.* (quoting *Kidd*, 2006 WL 1341302, at *17). The fact that some Plaintiffs testified about difficulties involving voter outreach, fundraising, and candidate recruitment, (*see, e.g.*, Dep. of Elizabeth Evans 16:4–9, April 7, 2017, 1:16-CV-1026, Doc. No. 101-7; Dep. of John J. Quinn, III 39:1–3, April 10, 2017, 1:16-CV-1026, Doc. No. 101-22), fails to persuade me that the 2016 Plan objectively chilled the speech and

associational rights of the citizens of North Carolina so as to prove a First Amendment violation.[4]

Justice Kennedy, suggesting in *Vieth* that the First Amendment may be an applicable vehicle for addressing partisan gerrymandering claims, proposed that such an analysis should ask "whether political classifications were used to burden a group's representational rights." *Vieth*, 541 U.S. at 314-15 (Kennedy, J., concurring). The *Vieth* plurality rejected this proposal because "a First Amendment claim, if it were sustained, would render unlawful *all* consideration of political affiliation in districting, just as it renders unlawful *all* consideration of political affiliation in hiring for non-policy-level government jobs." *Id.* at 294 (plurality op.). Common Cause Plaintiffs essentially agree, arguing that strict scrutiny is triggered once a plaintiff shows that a redistricting body intended for a plan to discriminate against a certain set of voters. (Common Cause Br. at 5-8.) The majority adopts an intermediate scrutiny standard requiring the showing of a concrete burden to political speech or associational rights. Maj. Op. at 263. However, in practice, I find the result to be indistinguishable, for partisan

---

[4] It should also be noted that the "concept of a 'chilling effect' is associated with the doctrine of overbreadth, and describes the situation where persons whose expression is protected are deterred from exercising their rights by the existence of an overly broad statute regulating speech." *Kidd*, 2006 WL 1341302, at *18 n.12 (internal citation omitted); *see also New York v. Ferber*, 458 U.S. 747, 772 & n.27 (1982). While Plaintiffs and other citizens may feel a sense of disillusionment toward the political process due to the 2016 Plan, this differs from fear of enforcement due to an "overly broad statute regulating speech."

consideration in a political process is an attempt to create some sort of political advantage for the supporters of a candidate or party. This advantage necessarily comes at the expense of or burden to the other.

As explained above, Congress has declined to expressly limit partisan gerrymandering by statute, *see* 2 U.S.C. § 2c, and the Court's cases accepting or tolerating some amount of partisan consideration are many, *see, e.g.*, *Cromartie*, 526 U.S. at 551; *Miller*, 515 U.S. at 914; *Gaffney*, 412 U.S. at 753; *see also Harris*, ____ U.S. ____, 137 S. Ct. at 1488 (Alito, J., concurring in part and dissenting in part); *Whitford*, 218 F. Supp. 3d at 934–35 (Griesbach, J., dissenting). It might be desirable for a host of policy reasons to remove partisan considerations from the redistricting process. But I am unable to conclude that the First Amendment requires it, or that Plaintiffs here have proven violations of their speech or associational rights under the First Amendment.

## IV.   <u>Article I, Sections 2 and 4</u>

I agree with the majority's conclusion that Plaintiffs have alleged and proven standing to challenge the 2016 Plan. Under Article I, Sections 2 and 4, I would again find standing on behalf of those voters in cracked districts who were not able to elect the candidate of their choice. Under this same theory, if such standing is ultimately found constitutionally proper as a matter of law by the Court, those

319

voters unable to elect the candidate of their choice have sustained injury due to legislative control of their district's electoral result.

I join the majority and find that the 2016 Plan amounts to a successful attempt to dictate election outcomes. I join in the majority's opinion as to Article I, Sections 2 and 4 to the extent consistent with the discussion above. I differ slightly from the majority in that I do not find that the Elections Clause completely prohibits State legislatures from disfavoring a particular party. *See Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1284 & n.10 (11th Cir. 2012) (rejecting the prohibition of all regulations influencing election outcomes and instead reading the cases as prohibiting States from attempting "to prevent or severely cripple the election of particular candidates").

"[T]he people should choose whom they please to govern them." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 783 (1995) (quoting *Powell v. McCormack*, 395 U.S. 486, 547 (1969)). In this case, the legislature, not the people, dictated the outcome when the districts were drawn, and Defendants have presented no specific facts to support a finding that the election results were due to anything other than the maps being drawn to reach a specific result. General suggestions of other factors possibly contributing to the election results such as fundraising disparities, voter turnout, the quality of the candidates, and unforeseen candidate circumstances, *see, e.g.*, Legislative Defs.' Post-Trial Br. 10-11, Nov. 6, 2017,

ECF No. 115; Leg. Defs.' Proposed Findings of Fact and Conclusions of Law 67, Nov. 6, 2017, ECF No. 114, are insufficient to establish that something other than partisan consideration dictated the election results across the State.

## V. <u>Remedy</u>

I concur with the majority's remedial action. I agree that the General Assembly generally is entitled to a second opportunity to draw a constitutional congressional districting plan. As noted in both the majority opinion and this opinion, the adjudication of partisan gerrymandering claims against a redistricting plan is a developing area of law, and the General Assembly generally should have the opportunity to remedy its plan under the standards set forth in the majority opinion.