# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| COMMON CAUSE, *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ROBERT A. RUCHO, in his official ) <br> capacity as Chairman of the North ) <br> Carolina Senate Redistricting Committee ) <br> for the 2016 Extra Session and Co- ) <br> Chairman of the Joint Select Committee ) <br> on Congressional Redistricting, *et al.*, ) <br> ) <br> Defendants. ) | CIVIL ACTION <br> NO. 1:16-CV-1026-WO-JEP <br><br> THREE-JUDGE COURT |
| League of Women Voters of North ) <br> Carolina, *et al.,* ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> Robert A. Rucho, in his official capacity ) <br> as Chairman of the North Carolina ) <br> Senate Redistricting Committee for the ) <br> 2016 Extra Session and Co-Chairman of ) <br> the 2016 Joint Select Committee on ) <br> Congressional Redistricting, *et al.,* ) <br> ) <br> Defendants. ) | CIVIL ACTION <br> NO. 1:16-CV-1164-WO-JEP <br><br> THREE-JUDGE COURT |

**LEGISLATIVE DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO STAY AND IN RESPONE TO THE COURT'S ORDER OF AUGUST 27, 2018**

1

**INTRODUCTION**

This Court's August 27, 2018 order has unleashed an avalanche of confusion. Candidates and voters are in a state of upheaval with just two months to go before a critical federal election. Moreover, if the Court follows through with its threat to impose a proportional representation congressional map on North Carolina, the practical effect of this action will be to sway election results in an ongoing election for one set of candidates over another. (See https://www.cnn.com/2018/08/28/politics/north-carolina-gerrymandering-kagan-balance-of-power-house/index.html). The Court should immediately stay its order, decline to meddle in an upcoming election, and calm the storm it has created.

The Court's action is all the more inexplicable since no partisan gerrymandering claim has succeeded before the Supreme Court, nor has the Supreme Court come close to endorsing the legal standards embraced here. Because the Supreme Court has never identified a justiciable theory for adjudicating partisan gerrymandering claims, plenary Supreme Court review of this Court's decision identifying such a standard and invalidating North Carolina's map is a virtual certainty. Not only does this case come within the Supreme Court's appellate jurisdiction, but the Court recently noted probable jurisdiction when a federal court in Wisconsin identified a justiciable federal standard and entered a stay of a remedial order in that case despite having much more time before the next election. If the Court grants plenary review, there is a realistic prospect it will continue to find these claims nonjusticiable which would render all these remedial efforts in vain. But even if the Court finds some justiciable standard, it will likely not be the

2

Case 1:16-cv-01026-WO-JEP   Document 147   Filed 08/31/18   Page 2 of 17

precise theory this Court has adopted.  Either way, the massive short-term disruption will be unjustified and the legislature may well need to draw new maps once again.  Given the near certainty of Supreme Court review, the prudent course is to defer any remedy until after the Court considers the issue, which is to say until after the 2018 election cycle.

It is difficult to understand the Court's rush to impose proportional representation on North Carolina voters when an earlier case in this judicial district based on a well-established claim of racial gerrymandering did not do so.  On August 11, 2016—two-plus months before the 2016 General Election—a three-judge panel of this judicial district found certain legislative districts to be racially gerrymandered.  *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), *aff'd,* 137 U.S. 2211 (2017).  Even though two elections had been conducted under the unlawful districts, the Court found that it was too late in the election cycle to order new districts for the 2016 General Election.  *Id.* at 177.  Instead, the Court enjoined the State from using the unlawful districts in any election after the 2016 General Election.  *Id.*  It is difficult to understand why the Court now feels the need to rush.[1]  Given the unprecedented and novel nature of the legal claims alleged here by the plaintiffs and adopted by the Court—and the fact that the Supreme Court has rejected every single claim of partisan gerrymandering it has

---

[1] The Supreme Court has not looked kindly upon prior rash actions by courts in this judicial district. When the *Covington* district court took the extraordinary step of entering an order requiring that the State draw new districts for purposes of holding a special election for legislative seats before the next regularly scheduled General Election in 2018, the Supreme Court vacated the order and required the court to conduct a more measured analysis of the issue before severely disrupting the state's election machinery and governance.

3

considered—the remedy ultimately followed in *Covington* is the only possible remedy in this case that will treat all of the parties and the voters of North Carolina in a fair and equitable manner.

Finally, even if this case did not involve novel legal standards and shaky legal claims, it would be too late to order relief. This Court should therefore allow the 2016 Plan to be used in the 2018 election.

### 1. The Court should not create electoral chaos to remedy a constitutional "violation" never recognized by the Supreme Court.

The Court's action is ironic indeed: unelected federal judges usurping the role of the State's elected representatives by taking the unprecedented step of enjoining a congressional plan two months before a general election under a legal theory that has never before been accepted by the Supreme Court. Adding to the irony is that by imposing a proportional representation map on North Carolina voters, the Court would be engaging in a form of judicial gerrymandering that would perpetuate the very conduct it is supposedly remedying. (See https://www.wsj.com/articles/north-carolinas-gerrymander-coup-1535670476) (attached as Exhibit 1).

The Court's action might make sense if any Supreme Court precedent supported it. But no such precedent exists.

In fact, in its most recent pronouncement on so-called partisan gerrymandering claims, a majority of the Supreme Court acknowledged that it has *not* decided the "threshold question[]" of "whether those claims are justiciable." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). The Court surveyed its cases in this area and concluded that its

4

Case 1:16-cv-01026-WO-JEP   Document 147   Filed 08/31/18   Page 4 of 17

"considerable efforts in *Gaffney*, *Bandemer*, *Vieth*, and *LULAC* leave *unresolved* whether [partisan gerrymandering] claims may be brought." *Id*. (emphasis added). *See also id*. at 1932 (noting that certain evidence on remand may be relevant but only if "such claims present a justiciable controversy"); *id*. at 1934 (noting that *Gill* involves "an unsettled kind of claim this Court has not agreed upon"; *id*. (the "contours and *justiciability*" of partisan gerrymandering claims are "*unresolved*") (emphasis added).

Nor was the justiciability issue resolved by *Davis v. Bandemer*, 478 U.S. 109 (1986). Instead, in reviewing *Bandemer*, the *Gill* Court explained that a majority of the Court there agreed only "that the case before it" was justiciable, not that partisan gerrymandering is itself in general a justiciable claim. *Gill*, 138 S. Ct. at 1927. The *Gill* majority also cast doubt on the justiciability of these claims in recounting *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC*") and *Vieth v. Jubelirer*, 541 U.S. 267 (2004). The Court specifically found that, in *LULAC*, "[a]s in *Vieth*, a majority of the Court could find no justiciable standard" for partisan gerrymandering claims. *Gill*, 138 S. Ct. at 1928. Thus, it is clear that the most recent majority of the Supreme Court does not view the justiciability of partisan gerrymandering claims as established.

This Court also ignored the only Supreme Court opinion that has garnered more than one or two votes in this area—the plurality opinion in *Vieth*. This Court ignores the holding in *Vieth* that claims under Article I, Section 2 are nonjusticiable—a finding that was not disputed by a single justice in either the concurring opinion or the dissenting opinion. *Vieth*, 541 U.S. at 305. Instead, the Court mainly relies upon a concurring

5

opinion by Justice Kennedy in *Vieth* and the dissenting opinions in that same case. While this Court quotes selected portions of the concurring and dissenting opinions, it ignores statements by these justices that are not helpful to this Court's finding of liability.[2]

For example, the Court indicates its preference for the computer simulated maps drawn by Dr. Chen because he did not consider politics despite the opinion in *Gill* and opinions of all the justices in *Vieth* that politics always plays a legitimate role in districting. *See Gill*, 138 S. Ct. at 1926-29; *Cromartie v. Hunt*, 526 U.S. 541, 551 (1994) (stating that "[o]ur prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering."); *Vieth*, 541 U.S. at 286 (plurality opinion); *Vieth*, 541 U.S. at 307 (Kennedy, J. concurring); *Vieth* 541 U.S. at 207 (Stevens, J., dissenting) (plaintiffs must prove that "partisan considerations dominate and control the lines drawn, forsaking all neutral principles"); *Vieth*, 541 U.S. at 343 (Souter and Ginsburg, J. J., dissenting) ("some intent to gain political advantage is inescapable whenever political bodies devise a district plan"); *Vieth*, 541 U.S. at 358

---

[2] The Court also engages in one-sided argument in other ways. For instance, the Court repeatedly attacks the motives and, indeed, the very democratic legitimacy of the General Assembly. This begins with the recounting of the enactment of the 2011 legislative and congressional plans. In doing so, this Court ignores the express statement in the *Covington* Court's original opinion on the merits that the 2011 General Assembly did not act in bad faith. *Covington*, 316 F.R.D. at 124 n.1 ("[W]e make no finding that the General Assembly acted in bad faith or with discriminatory intent in drawing the challenged districts, which were precleared by the Justice Department pursuant to Section 5 of the VRA."). In addition to ignoring this finding and the fact that the Obama Justice Department precleared the districts found unconstitutional in *Covington*, this Court further ignores the fact that, on two different occasions, the North Carolina Supreme Court ruled that the 2011 legislative and congressional plans were constitutional. *See Dickson v. Rucho*, 367 N.C. 542, 766 S.E.2d 238 (2014), *vacated* 135 S. Ct. 1843 (2015); *Dickson v. Rucho*, 781 S.E.2d 404, 701 S.E.2d 404 (2015), *vacated* 137 S. Ct. 2186 (2017).

6

(Breyer, J., dissenting) ("political considerations will likely play an important, and proper, role in the drawing of district boundaries"); *Gaffney v. Cummings*, 412 U.S. 735, 752 (1973).[3]

Next, this Court finds relevant the fact that Republicans elected what the Court describes as a super majority of members of Congress in 2011 districts with less than a majority of the votes. But while the Court relies on Justice Kennedy's concurring opinion in *Vieth*, it then ignores Justice Kennedy's statement that nothing in the Constitution requires that the party that wins a majority of the votes win a majority of the seats. This is a thin reed indeed on which to unleash electoral chaos on an entire State, likely to be pivotal to a hotly contested, national election of the House. (See https://www.wsj.com/articles/north-carolinas-gerrymander-coup-1535670476)

---

[3] The Court has not only ignored decades of Supreme Court precedent allowing political considerations in redistricting, it repeatedly mischaracterizes statements made by Representative Lewis during the debates over the 2016 Plan. Representative Lewis never said that he had entrenched Republican candidates through the 2016 Plan or that Republican candidates would be entrenched. Taking his comments in context, instead of cherry picking them misleadingly, Representative Lewis actually said that political considerations had to be considered in harmony with all other criteria, including the use of whole counties and whole precincts. Moreover, Representative Lewis has been criticized regarding his layman's opinion that political gerrymandering was legal when, in fact, a member of this panel joined in an opinion issued in *Harris* stating that political gerrymanders were nonjusticiable. Memorandum Opinion, *Harris v. McCrory*, Case No. 1:13-cv-949 (June 2, 2016) (per curiam) ("In light of the plurality holding in *Vieth*, the Court's hands appear to be tied. . . .While we find our hands tied, we note that it may be possible to challenge redistricting plans when partisan considerations go 'too far.' . . .But it is presently obscure what 'too far' means."), aff'd. 138 S.Ct. 2711 (2018). The lay opinion offered by Representative Lewis, and the legal holding by one of the members of this panel who found partisan gerrymandering nonjusticiable in *Harris,* were and are well founded in the law.

The paper-thin reasoning of the Court is highlighted by its query regarding whether it should adopt Dr. Chen's proposed proportional representation map. The Court does not seem to be concerned that Dr. Chen's map would impose proportional representation on the State even though almost every member of the Supreme Court has flatly rejected proportional representation as a benchmark. *See Bandemer*, 478 U.S. at 132; *Veith*, 541 U.S. at 288 (Kennedy, J., concurring); *Veith*, 541 U.S. at 308 (Stevens, J., dissenting). Moreover, the Court does not seem troubled by the fact that adopting Dr. Chen's map would amount to nothing less than election subversion since that map is an acknowledged effort to elect more Democrats.

In short, there is simply no settled law that would or should have advised that the consideration of politics among several other criteria would violate the Constitution. Given the fact that the Supreme Court has never affirmed a claim for partisan gerrymandering — and the latest attempt failed even before achieving merits review — there remains a substantial chance that the Supreme Court will not accept this Court's extravagant and untested theories, which would mean that the 2016 Plan may remain in place. This Court should not change the 2016 districts this close to an election when there is a substantial chance that the partisan gerrymandering claims in this case will be once again rejected by the Supreme Court. The remedy in this case should be no different than the remedy in *Covington*: elections must be allowed to proceed under the 2016 Plan and the General Assembly should be ordered to draw a new plan in time for the 2020 General Election. As in *Covington*, this type of remedy will allow sufficient time for judicial review of this Court's August 27, 2018 decision on the merits by the

Supreme Court and sufficient time for this Court to review any new plan adopted by the General Assembly for the elections in 2020.

 **2. It is too late to order new districts for the 2018 General Election.**

Changing districts at this late date will severely prejudice candidates and their supporters. Candidates for Congress have been campaigning in their districts since at least 2017. (*See* Declaration of Carter Wrenn ["Wrenn Decl."]) (attached as Exhibit 2). Campaign finance reports on file with the FEC show that, as of June 30, 2018, candidates in North Carolina's 13 congressional districts have raised nearly $20 million and spent nearly $14 million based upon the 2016 district lines. (*See* Campaign Finance Summary for N.C. Congressional Candidates Through Second Quarter Reports) (attached as Exhibit 3). Changing districts two months before the election will severely prejudice the ability of candidates to discern the issues that are important to the electorate in their respective districts. (Wrenn Decl. ¶¶ 6-7).[4] Candidates will have insufficient time to raise money and election results are likely to be distorted by the spending of Super PACs, which are not subject to the same contribution limits as candidates. (Wrenn Decl. ¶¶ 11-13).

Moreover, any order by this Court imposing new districts at this late date will severely prejudice the constitutional rights of absentee voters. The State has already missed its deadline for the process of approving ballot styles. (*See* North Carolina State Board of Elections and Ethics Enforcement Memo Dated August 29, 2018) (attached as

---

[4] Under federal law, North Carolina is obligated to have a general election – and not a primary – on November 8, 2018. *See* 2 U.S.C. § 7.

Exhibit 4). Under state law, absentee ballots must be available 60 days before the general election scheduled for November 6, 2018. N.C. Gen. Stat. § 163A-1305(a). Under federal law, absentee ballots must be available for overseas and military voters at least 45 days before the General Election. *See* Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20302(a)(8). Compliance with these deadlines requires that county boards of election know the location of the congressional districts in which they reside. This cannot be determined until all voters are coded to the correct districts. It takes approximately three weeks to prepare, print, test, and deliver ballots to counties across the State. (*See* attached Exhibit 4). According to a declaration submitted in the *Covington* matter by the Executive Director of the North Carolina State Board of Elections, it takes approximately three weeks after the State Board receives files containing jurisdiction information to properly geocode all voters. (*See* Second Declaration of Kim Westbrook Strach, *Covington v. State of North Carolina*, Case No. 1:15-cv-399 (May 6, 2016) (D.E. 117-1)) (attached as Exhibit 5). Thus, the Court's order of August 27, 2018 has already jeopardized the obligation of county boards to make absentee ballots available according to the deadlines set by federal or state law. The judicial imposition of new districts two months before the General Election will make compliance with these deadlines impossible.

There is literally no precedent for a court to enjoin congressional elections two months before a general election and in fact all of the precedent is to the contrary. *Purcell v. Gonzalez,* 549 U.S. 1 (2006). Even closer to home is the decision by the district court in the *Shaw* litigation. On June 13, 1996, in the case of *Shaw v. Hunt*, 517

U.S. 899 (1996), the Supreme Court found that the 1992 version of North Carolina's Twelfth Congressional District was an unconstitutional gerrymander. The ruling by the Supreme Court was issued nearly two months earlier in the election cycle than this Court's order of August 27, 2018. Following the remand of *Shaw,* the three-judge court issued an order enforcing the *Shaw* judgment. With a full understanding that the 1996 election was well underway, the three-judge court declined to order new districts for the 1996 General Election even though two prior elections had been held under districts found unconstitutional by the Supreme Court. (*See* Order, *Shaw v. Hunt*, Case No. 92-202-CIV-5-BR) (July 30, 1996) ("It is further ORDERED that, in exercise of this court's equitable power to withhold the grant of immediately effective relief for found constitutional violations in legislative districting plans in order to avoid undue disruption of ongoing state electoral processes, the 1996 primary elections already held for congressional offices are hereby validated and the 1996 general election for those offices may proceed as scheduled under state law to elect members of congress under the existing redistricting plan.") (citing *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)) (attached as Exhibit 6).

The equitable circumstances that compelled the district court in *Shaw* to allow elections under enjoined districts in 1996 apply with even more force here because the Supreme Court has not yet reviewed or validated this Court's novel partisan gerrymandering theory or any claim for alleged unconstitutional partisan gerrymandering at all. There is no basis for this Court to depart from the precedent established in *Purcell*,

*Covington*, and *Shaw* and order new districts for the 2018 General Election or a special election under a court imposed plan prior to the 2020 General Election.[5]

    **3.    The proper remedy in this case is to allow elections to proceed in 2018 under the 2016 Plan and to give the General Assembly a deadline for enacting a new map for the 2020 General Election.**

It is simply not feasible for the General Assembly to enact and implement a new congressional plan for the 2018 General Election. Instead, this Court should recognize that the Supreme Court has rejected every single claim of alleged partisan gerrymandering that has ever come before it and allow the election to occur under the 2016 Plan. Given the disputed nature of the legal claims here, this case should be stayed so that a full Supreme Court can evaluate the merits of plaintiffs' claims and the soundness of the Court's order declaring the 2016 Plan illegal. There should be no rush to impose Dr. Chen's proportional representation plan or any other plan drawn by him or a special master because the Supreme Court could very well decide that this Court acted without legal authority through its imposition of such a plan. Further, even if the 2016 Plan had been ruled unconstitutional under a well-established principle of law, it is too late in the election process to change plans now. A different panel of this Court reached that conclusion in the *Covington* case, even though its holding finding 28 legislative districts unconstitutional was issued on August 11, 2016, or more than two weeks earlier than the decision issued by the Court in this case on August 27, 2018.

---

[5] We have found no cases where a federal district court has truncated the two-year term to which members of Congress are elected by ordering a special election after a districting plan is found to be unconstitutional. In fact, legislative defendants do not think that this Court has the constitutional authority to order a special election when the effect is to reduce the two-year term to which a member of Congress is elected.

12

The only proper remedy in this case is to allow elections to proceed under the 2016 Plan and for this Court to set a deadline for the General Assembly to enact a new plan for the 2020 General Election. This will allow for an orderly review of this Court's judgment by the Supreme Court. It is also consistent with every precedent known to the legislative defendants. While legislative defendants believe this Court's Order will be reversed by the Supreme Court on appeal, mandatory injunctions of statewide election laws, including redistricting plans, issued by lower courts at the later stages of an election cycle have consistently been stayed. *See, e.g., Hunt v. Cromartie*, 529 U. S. 1014 (2000); *Voinovich v. Quilter*, 503 U.S. 979 (1992); *Wetherell v. DeGrandy*, 505 U.S. 1232 (1992); *Louisiana v. Hays*, 512 U.S. 1273 (1994); *Miller v. Johnson*, 512 U.S. 1283 (1994). The Supreme Court has also affirmed decisions by lower courts to permit elections under plans declared unlawful because they were not invalidated until late in the election cycle. *Watkins v. Mabus*, 502 U.S. 952 (1991) (summarily affirming in relevant part *Watkins v. Mabus*, 771 F. Supp. 789, 801, 802-805 (S.D. Miss. 1991) (three-judge court)); *Republican Party of Shelby County v. Dixon*, 429 U.S. 934 (1976) (summarily affirming *Dixon v. Hassler*, 412 F. Supp. 1036, 1038 (W.D. Tenn. 1976) (three-judge court)); *Growe v. Emison*, 507 U.S. 25, 35 (1993) (noting that elections must often be held under a legislatively enacted plan prior to any appellate review of that plan).

## CONCLUSION

The Court should stay its Order in this case pending Supreme Court review.

Respectfully submitted this 31st day of August, 2018.

>OGLETREE, DEAKINS, NASH
>SMOAK & STEWART, P.C.
>
>/s/ Phillip J. Strach
>Phillip J. Strach
>N.C. State Bar No. 29456
>Michael D. McKnight
>N.C. State Bar No. 36932
>phil.strach@ogletreedeakins.com
>michael.mcknight@ogletreedeakins.com
>4208 Six Forks Road, Suite 1100
>Raleigh, North Carolina 27609
>Telephone: (919) 787-9700
>Facsimile: (919) 783-9412
>*Counsel for Legislative Defendants*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I hereby certify that this brief complies with L.R. 7.3(d) because the total word count for the body of the brief, including headings and footnotes, is 4,177.

This the 31st day of August, 2018.

> OGLETREE, DEAKINS, NASH
> SMOAK & STEWART, P.C.
>
> /s/ Phillip J. Strach
> Phillip J. Strach

# CERTIFICATE OF SERVICE

It is hereby certified that the foregoing has been electronically filed with the Clerk of Court using the CM/ECF system which will provide electronic notification of the same to the following:

Edwin M. Speas, Jr.
Carolina P. Mackie
Poyner Spruill LLP
P.O. Box 1801 (27602-1801)
301 Fayetteville St., Suite 1900
Raleigh, NC 27601
espeas@poynerspruill.com
cmackie@poymerspruill.com
*Attorneys for Common Cause Plaintiffs*

Emmet J. Bondurant
Jason J. Carter
Benjamin W. Thorpe
Bondurant, Mixson & Elmore, LLP
1201 W. Peachtree Street, NW, Suite 3900
Atlanta, Georgia 30309
bondurant@bmelaw.com
carter@bmelaw.com
bthorpe@bmelaw.com
*Attorneys for Common Cause Plaintiffs*

Gregory L. Diskant
Susan Millenky
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036
gldiskant@pbwt.com
smillenky@pbwt.com
*Attorneys for Common Cause Plaintiffs*

Alexander McC. Peters
Senior Deputy Attorney General
N.C. Department of Justice
P.O. Box 629
Raleigh, NC 27602

16

Allison Riggs
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 W. HWY. 54, STE. 101
DURHAM, NC 27707
Email: emily@southerncoalition.org
Email: anita@southerncoalition.org
*Attorneys for League of Women Voters of North Carolina Plaintiffs*

Danielle M. Lang
CAMPAIGN LEGAL CENTER
1411 K STREET NW
SUITE 1400
WASHINGTON, DC 20005
202-736-2200
Fax: 202-736-2222
Email: dlang@campaignlegalcenter.org
*Attorneys for League of Women Voters of North Carolina Plaintiffs*

Annabelle E. Harless
Ruth M. Greenwood
CAMPAIGN LEGAL CENTER
73 W. MONROE ST., STE. 322
CHICAGO, IL 60603
312-561-5508
Fax: 202-736-2222
Email: aharless@campaignlegalcenter.org
*Attorneys for League of Women Voters of North Carolina Plaintiffs*

Nicholas O. Stephanopoulos
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 E 60TH STREET
CHICAGO, IL 60637
773-702-4226
Email: nsteph@uchicago.edu\
*Attorneys for League of Women Voters of North Carolina Plaintiffs*

This the 31st day of August, 2018.

        OGLETREE, DEAKINS, NASH
        SMOAK & STEWART, P.C.

        /s/ Phillip J. Strach
        Phillip J. Strach